POMERANTZ LLP
Gustavo F. Bruckner
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
gfbruckner@pomlaw.com

*Attorney for Plaintiff*

- additional counsel on signature page -

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| ALI KARIMI, Individually and On Behalf of All Others Similarly Situated,<br><br>                                    Plaintiff,<br><br>          v.<br><br>DEUTSCHE BANK AKTIENGESELLSCHAFT, JOHN CRYAN, CHRISTIAN SEWING, and JAMES VON MOLTKE,<br><br>                              Defendants. | Case No. 2:20-cv-08978-ES-MAH<br><br><u>AMENDED CLASS ACTION COMPLAINT</u><br><br><u>JURY TRIAL DEMANDED</u> |

Plaintiff Ali Karimi ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other

1

matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Deutsche Bank Aktiengesellschaft ("Deutsche Bank" or the "Bank"), analysts' reports and advisories about the Bank, and information readily obtainable on the Internet. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants who purchased or otherwise acquired Deutsche Bank securities between November 7, 2017, and July 6, 2020, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Bank and certain of its top officials.

2.      Deutsche Bank was founded in 1870 and is headquartered in Frankfurt am Main, Germany.  The Bank provides investment, financial, and related products

2

and services to private individuals, corporate entities, and institutional clients worldwide.

3.     Deutsche Bank has been the subject of scandal, investigation and regulatory enforcement for years because of anti-money laundering ("AML") compliance failures and deficiencies in its disclosure controls and procedures and internal control over financial reporting, causing it to have one of the lowest gradings offered by the U.S. Federal Reserve ("Federal Reserve").

4.     Throughout the Class Period, Defendants made materially false and misleading statements regarding the Bank's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Deutsche Bank had failed to remediate deficiencies related to AML, its disclosure controls and procedures and internal control over financial reporting, and its U.S. operations' troubled condition; (ii) as a result, the Bank failed to properly monitor customers that the Bank itself deemed to be high risk, including, among others, the convicted sex offender Jeffrey Epstein ("Epstein") and two correspondent banks, Danske Estonia and FBME Bank, which were both the subjects of prior scandals involving financial misconduct; (iii) the foregoing, once revealed, was foreseeably likely to have a material negative impact on the Bank's financial results and reputation; and (iv) as a result, the Bank's public statements were materially false and misleading at all relevant times.

5.    On May 13, 2020, media outlets reported that the Federal Reserve had sharply criticized Deutsche Bank's U.S. operations in an internal audit.  The audit reportedly found that Deutsche Bank had failed to address multiple concerns identified years earlier, including concerns related to the Bank's AML and other control procedures.

6.    On this news, the value of Deutsche Bank's ordinary shares fell $0.31 per share, or 4.49%, to close at $6.60 per share on May 13, 2020.

7.    Then, on July 7, 2020, the Federal Reserve's criticism of Deutsche Bank's failure to address its AML and other issues was reaffirmed when the New York State Department of Financial Services ("DFS") fined the Bank $150 million for neglecting to flag numerous questionable transactions from accounts associated with Epstein and with two correspondent banks, Danske Estonia and FBME Bank, both of which were the subjects of prior scandals involving financial misconduct.

8.    On this news, the value of Deutsche Bank's ordinary shares fell $0.13 per share, or 1.31%, to close at $9.82 per share on July 7, 2020.

9.    After the end of the Class Period, on September 20, 2020, *BuzzFeed News* published an article entitled "Deutsche Bank Execs Missed Money Laundering Red Flags" (the "*BuzzFeed* Article").  Citing an extensive review of "closely held US Treasury documents" as well as "confidential bank documents," the *BuzzFeed* Article reported, *inter alia*, "that Deutsche managers, including top executives, had

direct knowledge for years of serious failings that left the bank vulnerable to money launderers" and characterized the Bank's conduct as "let[ting] dirty clients run rampant."

10.     On this news, the value of Deutsche Bank's ordinary shares fell $0.75 per share, or 8.25%, to close at $8.34 per share on September 21, 2020.

11.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Bank's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

12.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

14.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b), as the alleged misstatements entered and the subsequent damages took place in this Judicial District.  Pursuant to Deutsche Bank's most recent annual report on Form 20-F, as of December 31, 2019, there were 2,066,101,774 of the Bank's ordinary shares outstanding.  Deutsche Bank's ordinary shares trade on the New York Stock

Exchange ("NYSE").  Accordingly, there are presumably hundreds, if not thousands, of investors in Deutsche Bank's ordinary shares located within the U.S., some of whom undoubtedly reside in the State of New Jersey ("New Jersey").  Additionally, upon information and belief, Deutsche Bank and/or an affiliate or subsidiary of the Bank maintained an office at Harborside Financial Center Platform, Jersey City, New Jersey 07311 during the Class Period.  In addition, upon information and belief, Deutsche Bank and/or an affiliate or subsidiary of the Bank had multiple offices throughout New Jersey during the Class Period.

15.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## **PARTIES**

16.    Plaintiff, as set forth in the attached Certification filed with Plaintiff's initial Complaint (*see* Dkt. No. 1 at *34-*36), acquired Deutsche Bank securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

17.    Defendant Deutsche Bank is organized under the laws of the Federal Republic of Germany, with principal executive offices located at Taunusanlage 12,

60325 Frankfurt am Main, Germany.  The Bank's ordinary shares trade in an efficient market on the NYSE under the ticker symbol "DB."

18.     Defendant John Cryan ("Cryan") served as Deutsche Bank's Chairman of the Management Board and Chief Executive Officer ("CEO") from before the start of the Class Period until April 8, 2018.

19.     Defendant Christian Sewing ("Sewing") has served as Deutsche Bank's CEO since April 8, 2018.

20.     Defendant James von Moltke ("Moltke") has served as Deutsche Bank's Chief Financial Officer at all relevant times.

21.     Defendants Cryan, Sewing, and Moltke are sometimes referred to herein as the "Individual Defendants."

22.     The Individual Defendants possessed the power and authority to control the contents of Deutsche Bank's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of Deutsche Bank's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Deutsche Bank, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive

representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

23.     Deutsche Bank and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

24.     Deutsche Bank was founded in 1870 and is headquartered in Frankfurt am Main, Germany.  The Bank provides investment, financial, and related products and services to private individuals, corporate entities, and institutional clients worldwide.

25.     Deutsche Bank has been the subject of scandal, investigation and regulatory enforcement for years due to widespread AML compliance failures and deficiencies in its disclosure controls and procedures and internal control over financial reporting, causing it to have one of the lowest gradings offered by the Federal Reserve.  Such deficiencies have negatively impacted the Bank and had far-reaching implications in the U.S., including in this Judicial District, which covers the State of New Jersey.  For example, on October 25, 2017, New Jersey Attorney General Christopher S. Porrino ("Porrino") announced that New Jersey is part of a $220 million, multi-state settlement with Deutsche Bank that resolves allegations of

fraudulent and anti-competitive conduct involving manipulation by Deutsche Bank of the London Interbank Offered Rate ("LIBOR").  According to Porrino, Deutsche Bank's manipulations of LIBOR harmed multiple government agencies and other entities in New Jersey, including the New Jersey Economic Development Authority.

### Materially False and Misleading Statements Issued During the Class Period

26.    The Class Period begins on November 7, 2017, when Deutsche Bank issued a press release announcing that Florian Drinhausen ("Drinhausen") would become Deutsche Bank's General Counsel in the following year and lead the Bank's Legal Department, replacing outgoing Co-General Counsels Christof von Dryander and Simon Dodds (the "November 2017 Press Release").  That press release touted Drinhausen's credentials, experience, and recognition within the legal field and quoted the Bank's Management Board Member for Legal and Labour Director (Arbeitsdirektor), Karl von Rohr, who assured investors that Drinhausen "is an excellent lawyer and a very experienced manager, who is very familiar with the bank and the challenges [it is] facing."

27.    Coming amidst the Bank's backdrop of scandals, criticism, and increased regulatory scrutiny, investigation, and enforcement, the November 2017 Press Release signaled to investors that Drinhausen's appointment as the Bank's General Counsel would further ensure the Bank's mitigation of its prior AML and other control function failures.  Covering Drinhausen's appointment, *Bloomberg*

reported that "Deutsche Bank AG is replacing its two general counsels with one head as it makes headway in reducing the number of major legal cases it's dealing with." The *Bloomberg* article contextualized Drinhausen's appointment within the myriad legal challenges that the Bank faced, noting, *inter alia*, that "Deutsche Bank spent 100 million euros on litigation in the first nine months of 2017, down from 800 million in the same period one year earlier."

28.     On March 16, 2018, Deutsche Bank filed an annual report on Form 20-F with the SEC, reporting the Bank's financial and operating results for the quarter and year ended December 31, 2017 (the "2017 20-F").  The 2017 20-F touted the Bank's remediation efforts with respect to its AML and other control functions, representing, in relevant part, that Defendants "have identified the need to strengthen [the Bank's] internal control environment and infrastructure and have embarked on initiatives to accomplish this"; that the Bank's "Management Board and [its] Group Audit function have increasingly and more intensively focused on [the Bank's] internal controls and infrastructure through numerous formal reviews and audits of [its] operations," which "have identified various areas for improvement relating to a number of elements of [the Bank's] control environment and infrastructure," including "the infrastructure relating to transaction capturing and recognition, classification of assets, asset valuation frameworks, data and process consistency, risk identification, measurement and management and other processes required by

laws, regulations, and supervisory expectations," as well as "regulatory reporting, [AML], 'know your customer' and other internal processes that are aimed at preventing use of [the Bank's] products and services for the purpose of committing or concealing financial crime."

29.     In this same vein, the 2017 20-F represented that Deutsche Bank's "principal regulators, including the [European Central Bank ('ECB')] and the Federal Reserve Board, have also conducted numerous reviews focused on various aspects of [the Bank's] internal controls and the related infrastructure, including among others, controls around AML and around valuation," and "have required [the Bank] formally to commit to remediate [its] AML and other weaknesses, including the fragmented and manual nature of [its] infrastructure"; that "[l]ocal regulators in other countries in which [the Bank] do[es] business also review the sufficiency of [its] control environment and infrastructure with respect to their jurisdictions"; and that "the overall goals of the various prudential regulators having authority over [the Bank] in the many places in which [it] do[es] business are broadly consistent, and the general themes of [its] deficiencies in internal controls and the supporting infrastructure are similar."

30.     The 2017 20-F further represented that, "to improve in the areas discussed above, [Deutsche Bank is] undertaking several major initiatives to enhance the efficacy of the transaction processing environment, strengthen [its]

controls and infrastructure, manage non-financial risks and enhance the skill set of

[its] personnel"; that the Bank "believe[s] that these initiatives will better enable [it]

to avoid the circumstances that have resulted in many of the litigations and

regulatory and enforcement investigations and proceedings to which [it] ha[s]

recently been subject, and will improve [its] ability to comply with laws and

regulations and meet supervisory expectations"; that, "[i]n particular, [the Bank is]

making efforts to reduce the complexity of [its] business and to integrate and

automate processes and business and second-line controls"; and that the Bank has

"also exited certain businesses . . . selectively off-boarded a number of clients,

worked to strengthen [its] compliance culture and control functions and increased

the size of and strengthened [its] Group Audit function."

     31.    In addition to the remediation efforts described above, the 2017 20-F

contained generic, boilerplate representations related to risks inherent in Deutsche

Bank's internal control environment, stating, relevant part:

> Both our internal control environment and the infrastructure that
> underlies it fall short in a number of areas of our standards for
> completeness and comprehensiveness and are not well integrated across
> the Bank. Our IT infrastructure, in particular, is fragmented, with
> numerous distinct platforms, many of which need significant upgrades,
> in operation across the Bank. Our business processes and the related
> control systems often require manual procedures and actions that
> increase the risks of human error and other operational problems that
> can lead to delays in reporting information to management and to the
> need for more adjustments and revisions than would be the case with
> more seamlessly integrated and automated systems and processes. As a
> result, it is often difficult and labor-intensive for us to obtain or provide

information of a consistently high quality and on a timely basis to comply with regulatory reporting and other compliance requirements or to meet regulatory expectations on a consistent basis and, in certain cases, to manage our risk comprehensively. Furthermore, it often takes intensive efforts to identify, when possible, inappropriate behavior by our staff and attempts by third parties to misuse our services as a conduit for prohibited activities, including those relating to anti-financial crime laws and regulation.

In addition, we may not always have the personnel with the appropriate experience, seniority and skill levels to compensate for shortcomings in our processes and infrastructure, or to identify, manage or control risks, and it often has been difficult to attract and retain the requisite talent. This has impacted our ability to remediate existing weaknesses and manage the risks inherent in our activity.

* * *

[W]e may be unable to complete . . . initiatives [related to strengthening the Bank's internal control environment] as quickly as we intend or as our regulators demand, and our efforts may be insufficient to remediate existing deficiencies and prevent future deficiencies or to result in fewer litigations or regulatory and enforcement investigations, proceedings and criticism in the future. We may also, when faced with the considerable expense of these initiatives, fail to provide sufficient resources for them quickly enough or at all, especially during periods when our operating performance and profitability are challenged. [. . .]

Plainly, the foregoing risk warnings were generic "catch-all" provisions that were not tailored to Deutsche Bank's actual known risks related to present deficiencies in its AML controls, as well as present deficiencies related to its disclosure controls and procedures and internal control over financial reporting, much less its relationships with, and lax monitoring of, customers that the Bank itself deemed to be high risk, such as Epstein, Danske Estonia, and FBME Bank.

32.     For example, the 2017 20-F represented that, following "[a]n evaluation . . . carried out under the supervision and with the participation of [Deutsche Bank's] management, including [its] Chairman and Chief Financial Officer, of the effectiveness of the design and operation of [the Bank's] disclosure controls and procedures . . . as of December 31, 2017," Deutsche Bank's "Chairman and Chief Financial Officer concluded that the design and operation of [the Bank's] disclosure controls and procedures were effective as of December 31, 2017"; that following "an assessment of the effectiveness of [the Bank's] internal control over financial reporting based on the framework established in Internal Control – Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO)," Deutsche Bank's "management has determined that [the Bank's] internal control over financial reporting as of December 31, 2017 was effective based on the COSO framework (2013)"; and that "[t]here was no change in [the Bank's] internal control over financial reporting identified in connection with the evaluation referred to above that occurred during the year ended December 31, 2017 that has materially affected, or is reasonably likely to materially affect, [the Bank's] internal control over financial reporting."

33.     In addition to confirming the current effectiveness of Deutsche Bank's disclosure controls and procedures and internal control over financial reporting, the

2017 20-F contained generic, boilerplate representations related to risks inherent in

"any control system," stating, in relevant part:

> There are, as described below, inherent limitations to the effectiveness
> of any control system, including disclosure controls and procedures.
> Accordingly, even effective disclosure controls and procedures can
> provide only reasonable assurance of achieving their control objectives.
>
> * * *
>
> A control system, no matter how well conceived and operated, can
> provide only reasonable, not absolute, assurance that the objectives of
> the control system are met. As such, disclosure controls and procedures
> or systems for internal control over financial reporting may not prevent
> all error and all fraud. Further, the design of a control system must
> reflect the fact that there are resource constraints, and the benefits of
> controls must be considered relative to their costs. Because of the
> inherent limitations in all control systems, no evaluation of controls can
> provide absolute assurance that all control issues and instances of fraud,
> if any, within the company have been detected. These inherent
> limitations include the realities that judgments in decision-making can
> be faulty, and that breakdowns can occur because of simple error or
> mistake. Additionally, controls can be circumvented by the individual
> acts of some persons, by collusion of two or more people, or by
> management override of the control. The design of any system of
> controls also is based in part upon certain assumptions about the
> likelihood of future events, and any design may not succeed in
> achieving its stated goals under all potential future conditions; over
> time, control may become inadequate because of changes in conditions,
> or the degree of compliance with the policies or procedures may
> deteriorate. Because of the inherent limitations in a cost-effective
> control system, misstatements due to error or fraud may occur and not
> be detected.

These risk warnings, too, were plainly generic "catch-all" provisions that were not

tailored to Deutsche Bank's actual known risks with respect to current deficiencies

in its disclosure controls and procedures, much less its relationships with, and lax

monitoring of, customers that the Bank itself deemed to be high risk, such as Epstein, Danske Estonia, and FBME Bank.

34.     Appended as exhibits to the 2017 20-F were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein Defendants Cryan and Moltke "certifie[d] . . . that, to [their] knowledge, the [2017 20-F] fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934, and that, to [their] knowledge, the information contained in such report fairly presents, in all material respects, the financial condition and results of operations of Deutsche Bank."

35.     On March 25, 2019, Deutsche Bank filed an annual report on Form 20-F with the SEC, reporting the Bank's financial and operating results for the quarter and year ended December 31, 2018 (the "2018 20-F").  The 2018 20-F contained substantively the same statements as those referenced in ¶¶ 28-33, *supra*, which touted the Bank's remediation efforts with respect to its AML and other control functions; confirmed the current effectiveness of Deutsche Bank's disclosure controls and procedures and internal control over financial reporting; and contained boilerplate representations related to risks inherent in the Bank's internal control environment and "any control system," which were plainly generic "catch-all" provisions that were not tailored to Deutsche Bank's actual known risks related to present deficiencies in its AML, the continued troubled condition of its U.S.

operations, and present deficiencies related to its disclosure controls and procedures and internal control over financial reporting, much less its relationships with, and lax monitoring of, customers that the Bank itself deemed to be high risk, such as Epstein, Danske Estonia, and FBME Bank.

36.     Appended as exhibits to the 2018 20-F were substantively the same SOX certifications as referenced in ¶ 34, *supra*, signed by Defendants Sewing and Moltke.

37.     On March 20, 2020, Deutsche Bank filed an annual report on Form 20-F with the SEC, reporting the Bank's financial and operating results for the quarter and year ended December 31, 2019 (the "2019 20-F"). The 2019 20-F contained substantively the same statements as those referenced in ¶¶ 28-33, *supra*, which touted the Bank's remediation efforts with respect to its AML and other control functions; confirmed the current effectiveness of Deutsche Bank's disclosure controls and procedures and internal control over financial reporting; and contained boilerplate representations related to risks inherent in the Bank's internal control environment and "any control system," which were plainly generic "catch-all" provisions that were not tailored to Deutsche Bank's actual known risks related to present deficiencies in its AML, the continued troubled condition of its U.S. operations, and present deficiencies related to its disclosure controls and procedures and internal control over financial reporting, much less its relationships with, and

lax monitoring of, customers that the Bank itself deemed to be high risk, such as Epstein, Danske Estonia, and FBME Bank.

38.    Appended as exhibits to the 2019 20-F were substantively the same SOX certifications as referenced in ¶ 34, *supra*, signed by Defendants Sewing and Moltke.

39.    The statements referenced in ¶¶ 26 and 28-38 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Bank's business, operational and compliance policies.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Deutsche Bank had failed to remediate deficiencies related to AML, its disclosure controls and procedures and internal control over financial reporting, and its U.S. operations' troubled condition; (ii) as a result, the Bank failed to properly monitor customers that the Bank itself deemed to be high risk, including, among others, Epstein and the correspondent banks Danske Estonia and FBME Bank, both of which were the subjects of prior scandals involving financial misconduct; (iii) the foregoing, once revealed, was foreseeably likely to have a material negative impact on the Bank's financial results and reputation; and (iv) as a result, the Bank's public statements were materially false and misleading at all relevant times.

## The Truth Emerges

40.     On April 29, 2020, Deutsche Bank issued a press release announcing that Drinhausen would "leave the company on 31 May 2020 by mutual agreement," without providing any further explanation for Drinhausen's departure.

41.     Then, two weeks later, on May 13, 2020, German newspaper *Sueddeutsche Zeitung* reported that the Federal Reserve had sharply criticized Deutsche Bank's U.S. operations in an internal audit.  The audit reportedly found that Deutsche Bank had failed to address multiple concerns identified years earlier, including concerns related to the Bank's AML and other control procedures.  For example, U.S. media outlets, citing *Sueddeutsche Zeitung*, reported that, in late March, the Federal Reserve had sent an audit report to Defendant Sewing and other top executives "expressing continued dissatisfaction" with Deutsche Bank's AML controls and liquidity management at its U.S. unit, which was reportedly "based on investigations in late 2019 and early 2020."

42.     On this news, the value of Deutsche Bank's ordinary shares fell $0.31 per share, or 4.49%, to close at $6.60 per share on May 13, 2020.

43.     Finally, on July 7, 2020, the Federal Reserve's criticism of Deutsche Bank's failure to address its AML and other issues was reaffirmed when the DFS fined the Bank $150 million for neglecting to flag numerous questionable transactions from accounts associated with Epstein and two correspondent banks,

Danske Estonia and FBME Bank, which were both the subject of prior scandals involving financial misconduct.

44.    For example, a *Law360* article published the same day, entitled "Deutsche Bank Fined $150M For Epstein, Partner Bank Lapses," stated, in relevant part, that "New York state's financial regulator . . . fined Deutsche Bank $150 million for failing to appropriately manage its dealings with alleged bad actors including millionaire sex offender Jeffrey Epstein," and that, "[a]ccording to the terms of a consent order with the [DFS], Deutsche Bank AG, its New York branch and Deutsche Bank Trust Company America agreed to pay the sum in connection with DFS claims that the bank neglected to flag numerous questionable transactions from accounts associated with Epstein and two correspondent banks, Danske Estonia and FBME Bank."

45.    With specific respect to Deutsche Bank's failure to appropriately monitor transactions related to Epstein, the *Law360* article reported, in relevant part:

> According to the DFS, Deutsche bank "processed hundreds of transactions totaling millions of dollars that, at the very least, should have prompted additional scrutiny in light of Mr. Epstein's history."
>
> Those transactions included payments to Epstein associates who were "publicly alleged" to have played roles in luring Epstein's victims, more than $7 million in settlement payments and $6 million in legal fees, more than $800,000 in cash withdrawals and "(consistent with public allegations of prior wrongdoing) payments directly to numerous women with Eastern European surnames."

The DFS claimed that Deutsche Bank's own reputational risk committee had imposed monitoring requirements on Epstein's bank accounts that the bank failed to adhere to.

"Throughout the relationship, very few problematic transactions were ever questioned, and even when they were, they were usually cleared without satisfactory explanation," the regulator said Tuesday.

* * *

The DFS' announcement comes on the heels of the arrest last week in New Hampshire of Epstein associate and alleged "fixer" Ghislaine Maxwell, who was charged by federal prosecutors in connection with her alleged actions on behalf of the financier and was removed to stand trial in New York. And the announcement occurs nearly a year after Epstein committed suicide in a federal jail in Manhattan as he awaited trial following his arrest in Florida on sex trafficking charges.

46.     With specific respect to Deutsche Bank's failure to appropriately monitor transactions related to Danske Estonia and FBME Bank, the *Law360* article reported, in relevant part, that, according to the DFS, the Bank's "oversight of the pair of correspondent banks was similarly lacking"; that Danske Estonia is "at the center of one of the world's largest money laundering scandals"; that "despite the fact that Deutsche Bank had given the Eastern European bank its highest risk rating, Danske Estonia was nonetheless able to transfer billions of dollars in suspicious transactions through Deutsche Bank accounts in the Empire State"; and that "Deutsche Bank was the last major Western bank with a correspondent banking relationship with FBME," even "after the U.S. Treasury Department's Financial

Crimes Enforcement Network told all banks with a U.S. footprint that they had to cut ties with the international bank."

47.     The *Law360* article also quoted the DFS's Superintendent of Financial Services, Linda A. Lacewell ("Lacewell"), who stated that "in each of the cases that are being resolved today, Deutsche Bank failed to adequately monitor the activity of customers that the bank itself deemed to be high risk."  Lacewell further stated that, "[i]n the case of Jeffrey Epstein in particular, despite knowing Mr. Epstein's terrible criminal history, the bank inexcusably failed to detect or prevent millions of dollars of suspicious transactions."

48.     On this news, the value of Deutsche Bank's ordinary shares fell $0.13 per share, or 1.31%, to close at $9.82 per share on July 7, 2020.

## Post-Class Period Disclosures

49.     After the end of the Class Period, on September 20, 2020, *BuzzFeed News* published an article entitled "Deutsche Bank Execs Missed Money Laundering Red Flags".  Citing an extensive review of "closely held US Treasury documents" as well as "confidential bank documents," the *BuzzFeed* Article reported, *inter alia*, "that Deutsche managers, including top executives, had direct knowledge for years of serious failings that left the bank vulnerable to money launderers" and characterized the Bank's conduct as "let[ting] dirty clients run rampant."

50.     On this news, the value of Deutsche Bank's ordinary shares fell $0.75 per share, or 8.25%, to close at $8.34 per share on September 21, 2020.

51.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Bank's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

52.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Deutsche Bank securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.   Excluded from the Class are Defendants herein, the officers and directors of the Bank, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

53.     The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, Deutsche Bank securities were actively traded on the NYSE.   While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.   Record owners and other members of the Class may be identified from

records maintained by Deutsche Bank or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

54.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

55.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

56.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Deutsche Bank;

- whether the Individual Defendants caused Deutsche Bank to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Deutsche Bank securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

57.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

58.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Deutsche Bank securities are traded in an efficient market;

- the Bank's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Bank traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Bank's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Deutsche Bank securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts

were disclosed, without knowledge of the omitted or misrepresented facts.

59.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

60.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

61.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

62.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

63.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various

untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Deutsche Bank securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Deutsche Bank securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

64.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Deutsche Bank securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Deutsche Bank's finances and business prospects.

65.     By virtue of their positions at Deutsche Bank, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

66.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Deutsche Bank, the Individual Defendants had knowledge of the details of Deutsche Bank's internal affairs.

67.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Deutsche Bank.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Deutsche Bank's businesses,

operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Deutsche Bank securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Deutsche Bank's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Deutsche Bank securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

68.     During the Class Period, Deutsche Bank securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Deutsche Bank securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Deutsche Bank securities was substantially lower than the prices paid by Plaintiff and the other

members of the Class.  The market price of Deutsche Bank securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

69.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

70.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Bank's securities during the Class Period, upon the disclosure that the Bank had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

71.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

72.    During the Class Period, the Individual Defendants participated in the operation and management of Deutsche Bank, and conducted and participated, directly and indirectly, in the conduct of Deutsche Bank's business affairs.  Because of their senior positions, they knew the adverse non-public information about

Deutsche Bank's misstatement of income and expenses and false financial statements.

73.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Deutsche Bank's financial condition and results of operations, and to correct promptly any public statements issued by Deutsche Bank which had become materially false or misleading.

74.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Deutsche Bank disseminated in the marketplace during the Class Period concerning Deutsche Bank's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Deutsche Bank to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Deutsche Bank within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Deutsche Bank securities.

75.     Each of the Individual Defendants, therefore, acted as a controlling person of Deutsche Bank.  By reason of their senior management positions and/or being directors of Deutsche Bank, each of the Individual Defendants had the power

to direct the actions of, and exercised the same to cause, Deutsche Bank to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Deutsche Bank and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

76.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Deutsche Bank.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  September 30, 2020

Respectfully submitted,

POMERANTZ LLP

*/s/ Gustavo F. Bruckner*
Gustavo F. Bruckner
Jeremy A. Lieberman
(admitted *pro hac vice*)
J. Alexander Hood II
(admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
gfbruckner@pomlaw.com
jalieberman@pomlaw.com
ahood@pomlaw.com

POMERANTZ LLP
Patrick V. Dahlstrom
(*pro hac vice* application
forthcoming)
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
pdahlstrom@pomlaw.com

BRONSTEIN, GEWIRTZ &
GROSSMAN, LLC
Peretz Bronstein
(*pro hac vice* application
forthcoming)
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
peretz@bgandg.com

*Attorneys for Plaintiff*