# EXHIBIT 2

As filed with the Securities and Exchange Commission on March 11, 2016

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**

# Form 20-F

☐ REGISTRATION STATEMENT PURSUANT TO SECTION 12(b) OR (g) OF THE SECURITIES EXCHANGE ACT OF 1934

or

☒ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 FOR THE FISCAL YEAR ENDED DECEMBER 31, 2015

or

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

or

☐ SHELL COMPANY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

Date of event requiring this shell company report…………………………….

**Commission file number 1-15242**

# Deutsche Bank Aktiengesellschaft

(Exact name of Registrant as specified in its charter)

**Deutsche Bank Corporation**
(Translation of Registrant's name into English)

**Federal Republic of Germany**
(Jurisdiction of incorporation or organization)

**Taunusanlage 12, 60325 Frankfurt am Main, Germany**
(Address of principal executive offices)

**Peter Burrill, +49-69-910-31781, peter.burrill@db.com, Taunusanlage 12, 60325 Frankfurt am Main, Germany**
(Name, Telephone, E-mail and/or Facsimile number and Address of Company Contact Person)

Securities registered or to be registered pursuant to Section 12(b) of the Act

See following page

Securities registered or to be registered pursuant to Section 12(g) of the Act.

NONE

(Title of Class)

Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act.

NONE

(Title of Class)

Indicate the number of outstanding shares of each of the issuer's classes of capital or common stock as of the close of the period covered by the annual report:

Ordinary Shares, no par value                                              1,378,898,267

(as of December 31, 2015)

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.

Yes ☐   No ☒

If this report is an annual or transition report, indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934.

Yes ☐   No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate website, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).

Yes ☐   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act (Check one):

Large accelerated filer ☒        Accelerated filer ☐        Non-accelerated filer ☐

Indicate by check mark which basis of accounting the registrant has used to prepare the financial statements included in this filing:

U.S. GAAP ☐    International Financial Reporting Standards ☒    Other ☐

as issued by the International Accounting Standards Board

If "Other" has been checked in response to the previous question, indicate by check mark which financial statement item the registrant has elected to follow

Item 17 ☐        Item 18 ☐

If this is an annual report, indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).

Yes ☐        No ☒

Securities registered or to be registered pursuant to Section 12(b) of the Act (as of February 29, 2016).

| Title of each class | Name of each exchange on which registered |
| --- | --- |
| Ordinary shares, no par value | New York Stock Exchange |
| 6.55 % Trust Preferred Securities of Deutsche Bank Contingent Capital Trust II | New York Stock Exchange |
| 6.55 % Company Preferred Securities of Deutsche Bank Contingent Capital LLC II* | |
| Subordinated Guarantees of Deutsche Bank AG in connection with Capital Securities* | |
| 7.60 % Trust Preferred Securities of Deutsche Bank Contingent Capital Trust III | New York Stock Exchange |
| 7.60 % Company Preferred Securities of Deutsche Bank Contingent Capital LLC III* | |
| Subordinated Guarantees of Deutsche Bank AG in connection with Capital Securities* | |
| 8.05 % Trust Preferred Securities of Deutsche Bank Contingent Capital Trust V | New York Stock Exchange |
| 8.05 % Company Preferred Securities of Deutsche Bank Contingent Capital LLC V* | |
| Subordinated Guarantees of Deutsche Bank AG in connection with Capital Securities* | |
| Fixed to Fixed Reset Rate Subordinated Tier 2 Notes Due 2028 | New York Stock Exchange |
| 4.50 % Fixed Rate Subordinated Tier 2 Notes Due 2025 | New York Stock Exchange |
| DB Agriculture Short Exchange Traded Notes due April 1, 2038 | NYSE Arca |
| DB Agriculture Long Exchange Traded Notes due April 1, 2038 | NYSE Arca |
| DB Agriculture Double Short Exchange Traded Notes due April 1, 2038 | NYSE Arca |
| DB Agriculture Double Long Exchange Traded Notes due April 1, 2038 | NYSE Arca |
| DB Base Metals Short Exchange Traded Notes due June 1, 2038 | NYSE Arca |
| DB Base Metals Long Exchange Traded Notes due June 1, 2038 | NYSE Arca |
| DB Base Metals Double Short Exchange Traded Notes due June 1, 2038 | NYSE Arca |
| DB Base Metals Double Long Exchange Traded Notes due June 1, 2038 | NYSE Arca |
| DB Commodity Short Exchange Traded Notes due April 1, 2038 | NYSE Arca |
| DB Commodity Long Exchange Traded Notes due April 1, 2038 | NYSE Arca |
| DB Commodity Double Long Exchange Traded Notes due April 1, 2038 | NYSE Arca |
| DB Commodity Double Short Exchange Traded Notes due April 1, 2038 | NYSE Arca |
| DB Crude Oil Short Exchange Traded Notes due June 1, 2038 | NYSE Arca |
| DB Crude Oil Long Exchange Traded Notes due June 1, 2038 | NYSE Arca |
| DB Crude Oil Double Short Exchange Traded Notes due June 1, 2038 | NYSE Arca |
| DB German Bund Futures Exchange Traded Notes due March 31, 2021 | NYSE Arca |
| DB Gold Double Long Exchange Traded notes due February 15, 2038 | NYSE Arca |
| DB Gold Double Short Exchange Traded notes due February 15, 2038 | NYSE Arca |
| DB Gold Short Exchange Traded notes due February 15, 2038 | NYSE Arca |
| DB Japanese Govt Bond Futures Exchange Traded Notes due March 31, 2021 | NYSE Arca |
| DB Inverse Japanese Govt Bond Futures Exchange Traded Notes due November 30, 2021 | NYSE Arca |
| DB 3x German Bund Futures Exchange Traded Notes due March 31, 2021 | NYSE Arca |
| DB 3x Japanese Govt Bond Futures Exchange Traded Notes due March 31, 2021 | NYSE Arca |
| DB 3x Inverse Japanese Govt Bond Futures Exchange Traded Notes due November 30, 2021 | NYSE Arca |
| DB 3x Long 25+ Year Treasury Bond Exchange Traded Notes due May 31, 2040 | NYSE Arca |
| DB 3x Short 25+ Year Treasury Bond Exchange Traded Notes due May 31, 2040 | NYSE Arca |
| ELEMENTS "Dogs of the Dow" Linked to the Dow Jones High Yield Select 10 Total Return Index due November 14, 2022 | NYSE Arca |
| ELEMENTS Linked to the Morningstar® Wide Moat Focus(SM) Total Return Index due October 24, 2022 | NYSE Arca |
| FI Enhanced Global High Yield Exchange Traded Notes Linked to the MSCI World High Dividend Yield USD Gross Total Return Index due October 12, 2023 | NYSE Arca |

* For listing purpose only, not for trading.

# Table of Contents

Table of Contents – 3
PART I – 8
Item 1: Identity of Directors, Senior Management and Advisers – 8
Item 2: Offer Statistics and Expected Timetable – 8
Item 3: Key Information – 8
   Selected Financial Data – 8
   Dividends – 10
   Exchange Rate and Currency Information – 11
   Capitalization and Indebtedness – 12
   Reasons for the Offer and Use of Proceeds – 12
   Risk Factors – 13
Item 4: Information on the Company – 41
   History and Development of the Company – 41
   Business Overview – 41
   Our Corporate Divisions – 47
   The Competitive Environment – 47
   Regulation and Supervision – 52
   Organizational Structure – 72
   Property and Equipment – 72
   Information Required by Industry Guide 3 – 73
Item 4A: Unresolved Staff Comments – 73
Item 5: Operating and Financial Review and Prospects – 73
   Overview – 73
   Significant Accounting Policies and Critical Accounting Estimates – 73
   Recently Adopted Accounting Pronouncements and New Accounting Pronouncements – 74
   Operating Results – 74
   **Results of Operations** – 75
   Financial Position – 75
   Liquidity and Capital Resources – 75
   Post-Employment Benefit Plans – 75
   Exposure to Monoline Insurers – 75
   Off-Balance Sheet Arrangements – 76
   Tabular Disclosure of Contractual Obligations – 76
   Research and Development, Patents and Licenses – 76
Item 6: Directors, Senior Management and Employees – 76
   Directors and Senior Management – 76
   Board Practices of the Management Board – 79
   Group Executive Committee – 80
   Compensation – 80
   Employees – 80
   Share Ownership – 80
Item 7: Major Shareholders and Related Party Transactions – 81
   Major Shareholders – 81
   Related Party Transactions – 81
   Interests of Experts and Counsel – 83
Item 8: Financial Information – 83
   Consolidated Statements and Other Financial Information – 83
   Significant Changes – 89

Item 9: The Offer and Listing – 89
   Offer and Listing Details and Markets – 89
   Plan of Distribution – 90
   Selling Shareholders – 90
   Dilution – 90
   Expenses of the Issue – 90
Item 10: Additional Information – 91
   Share Capital – 91
   Memorandum and Articles of Association – 91
   Notification Requirements – 95
   Material Contracts – 97
   Exchange Controls – 97
   Taxation – 98
   Dividends and Paying Agents – 101
   Statement by Experts – 101
   Documents on Display – 101
   Subsidiary Information – 101
Item 11: Quantitative and Qualitative Disclosures about Credit, Market and Other Risk – 102
Item 12: Description of Securities other than Equity Securities – 102
PART II – 103
Item 13: Defaults, Dividend Arrearages and Delinquencies – 103
Item 14: Material Modifications to the Rights of Security Holders and Use of Proceeds – 103
Item 15: Controls and Procedures – 103
   Disclosure Controls and Procedures – 103
   Management's Annual Report on Internal Control over Financial Reporting – 103
   Report of Independent Registered Public Accounting Firm – 104
   Change in Internal Control over Financial Reporting – 105
Item 16A: Audit Committee Financial Expert – 105
Item 16B: Code of Ethics – 105
Item 16C: Principal Accountant Fees and Services – 106
Item 16D: Exemptions from the Listing Standards for Audit Committees – 106
Item 16E: Purchases of Equity Securities by the Issuer and Affiliated Purchasers – 106
Item 16F: Change in Registrant's Certifying Accountant – 107
Item 16G: Corporate Governance – 107
Item 16H: Mine Safety Disclosure – 110
Disclosures Under Iran Threat Reduction and Syria Human Rights Act of 2012 – 111
PART III – 114
Item 17: Financial Statements – 114
Item 18: Financial Statements – 114
Item 19: Exhibits – 114
Signatures – 115
Annual Report – 116
Supplemental Financial Information (Unaudited) – S-1

Deutsche Bank Aktiengesellschaft, which we also call Deutsche Bank AG, is a stock corporation organized under the laws of the Federal Republic of Germany. Unless otherwise specified or required by the context, in this document, references to "we", "us", "our", "the Group" and "Deutsche Bank Group" are to Deutsche Bank Aktiengesellschaft and its consolidated subsidiaries.

Due to rounding, numbers presented throughout this document may not add up precisely to the totals we provide and percentages may not precisely reflect the absolute figures.

Our registered address is Taunusanlage 12, 60325 Frankfurt am Main, Germany, and our telephone number is +49-69-910-00.

## Inclusion of Our Annual Report 2015

We have included as an integral part of this Annual Report on Form 20-F our Annual Report 2015, to which we refer for the responses to certain items hereof. Certain portions of the Annual Report have been omitted, as indicated therein. The included Annual Report contains our consolidated financial statements, which we also incorporate by reference into this report, in response to Items 8.A and 18. Such consolidated financial statements differ from those contained in the Annual Report used for other purposes in that, for Notes 44 and 45 thereto, notes addressing non-U.S. requirements have been replaced with notes addressing U.S. requirements, and Note 46 thereto has been omitted. Such consolidated financial statements have been audited by KPMG AG Wirtschaftsprüfungsgesellschaft, as described in their "Report of Independent Registered Public Accounting Firm" included on page 389 of the Annual Report, which report is included only in the version of the Annual Report 2015 included in this Annual Report on Form 20-F.

## Cautionary Statement Regarding Forward-Looking Statements

We make certain forward-looking statements in this document with respect to our financial condition and results of operations. In this document, forward-looking statements include, among others, statements relating to:

— the potential development and impact on us of economic and business conditions and the legal and regulatory environment to which we are subject;
— the implementation of our strategic initiatives and other responses thereto;
— the development of aspects of our results of operations;
— our expectations of the impact of risks that affect our business, including the risks of losses on our trading processes and credit exposures; and
— other statements relating to our future business development and economic performance.

In addition, we may from time to time make forward-looking statements in our periodic reports to the United States Securities and Exchange Commission on Form 6-K, annual and interim reports, invitations to Annual General Meetings and other information sent to shareholders, offering circulars and prospectuses, press releases and other written materials. Our Management Board, Supervisory Board, officers and employees may also make oral forward-looking statements to third parties, including financial analysts.

Forward-looking statements are statements that are not historical facts, including statements about our beliefs and expectations. We use words such as "believe", "anticipate", "expect", "intend", "seek", "estimate", "project", "should", "potential", "reasonably possible", "plan", "aim" and similar expressions to identify forward-looking statements.

By their very nature, forward-looking statements involve risks and uncertainties, both general and specific. We base these statements on our current plans, estimates, projections and expectations. You should therefore not place too much reliance on them. Our forward-looking statements speak only as of the date we make them, and we undertake no obligation to update any of them in light of new information or future events.

6

We caution you that a number of important factors could cause our actual results to differ materially from those we describe in any forward-looking statement. These factors include, among others, the following:

— the potential development and impact on us of economic and business conditions;
— other changes in general economic and business conditions;
— changes and volatility in currency exchange rates, interest rates and asset prices;
— changes in governmental policy and regulation, including measures taken in response to economic, business, political and social conditions;
— the potential development and impact on us of legal and regulatory proceedings to which we are or may become subject;
— changes in our competitive environment;
— the success of our acquisitions, divestitures, mergers and strategic alliances;
— our success in implementing our strategic initiatives and other responses to economic and business conditions and the legal and regulatory environment and realizing the benefits anticipated therefrom; and
— other factors, including those we refer to in "Item 3: Key Information – Risk Factors" and elsewhere in this document and others to which we do not refer.

## Use of Non-GAAP Financial Measures

This document and other documents we have published or may publish contain non-GAAP financial measures. Non-GAAP financial measures are measures of our historical or future performance, financial position or cash flows that contain adjustments which exclude or include amounts that are included or excluded, as the case may be, from the most directly comparable measure calculated and presented in accordance with IFRS in our financial statements. Examples of our non-GAAP financial measures, and the most directly comparable IFRS financial measures, are as follows:

| Non-GAAP Financial Measure | Most Directly Comparable IFRS Financial Measure |
| --- | --- |
| IBIT attributable to Deutsche Bank shareholders | Income (loss) before income taxes |
| Adjusted costs | Noninterest expenses |
| Average active equity | Average shareholders' equity |
| Pre-tax return on average active equity | Pre-tax return on average shareholders' equity |
| Post-tax return on average active equity | Post-tax return on average shareholders' equity |
| Tangible shareholders' equity, Tangible book value | Total shareholders' equity (book value) |
| Post-tax return on average tangible shareholders' equity | Post-tax return on average shareholders' equity |

## CRR/CRD 4 Solvency Measures

Our regulatory assets, exposures, risk-weighted assets, capital and ratios thereof are calculated for regulatory purposes as of December 31, 2015 and December 31, 2014 and set forth throughout this document under the regulation on prudential requirements for credit institutions and investment firms ("CRR") and the Capital Requirements Directive 4 ("CRD 4") implementing Basel 3, which were published on June 27, 2013 and which apply on and after January 1, 2014. CRR/CRD 4 provides for "transitional" rules, under which capital instruments that are no longer eligible under the new rules are permitted to be phased-out as the new rules on regulatory adjustments are phased in, as well as regarding the risk weighting of certain categories of assets. Unless otherwise noted, our CRR/CRD 4 solvency measures as of December 31, 2015 and December 31, 2014 set forth in this document reflect these transitional rules.

We also set forth in this document such CRR/CRD 4 measures on a "fully loaded" basis, reflecting full application of the rules without consideration of the transitional provisions under CRR/CRD 4. As the final implementation of CRR/CRD 4 may differ from our expectations, and our competitors' assumptions and estimates regarding such implementation may vary, our fully loaded CRR/CRD 4 measures, which are non-GAAP financial measures, may not be comparable with similarly labeled measures used by our competitors.

Because CRR/CRD 4 was not yet applicable prior to January 1, 2014, our regulatory assets, exposures, risk-weighted assets, capital and ratios thereof were calculated for regulatory purposes as of December 31, 2013 under the previously applicable the Basel 2.5 capital rules.

We believe that these "fully loaded" and pro forma CRR/CRD 4 calculations provide useful information to investors as they reflect our progress against the new regulatory capital standards and as many of our competitors have been describing CRR/CRD 4 calculations on a "fully loaded" basis.

## Further Description and Reconciliation of Non-GAAP Financial Measures

For descriptions of these non-GAAP financial measures and the adjustments made to the most directly comparable financial measures under IFRS (or the CRR/CRD 4 rules, as applicable), please refer to "Supplementary Information: Non-GAAP Financial Measures" on pages 438 through 442 of the Annual Report 2015and, for the CRR/CRD 4 regulatory capital, risk-weighted assets, capital ratios and leverage ratio, to "Management Report: Risk Report: Risk and Capital Performance: Capital and Leverage Ratio" on pages 125 through 137 of the Annual Report 2015, which are incorporated by reference herein.

When used with respect to future periods, our non-GAAP financial measures are also forward-looking statements. We cannot predict or quantify the levels of the most directly comparable financial measures under IFRS (or the CRR/CRD 4 rules) that would correspond to these non-GAAP financial measures for future periods. This is because neither the magnitude of such IFRS (or CRR/CRD 4) financial measures, nor the magnitude of the adjustments to be used to calculate the related non-GAAP financial measures from such IFRS (or CRR/CRD 4) financial measures, can be predicted. Such adjustments, if any, will relate to specific, currently unknown, events and in most cases can be positive or negative, so that it is not possible to predict whether, for a future period, the non-GAAP financial measure will be greater than or less than the related IFRS (or CRR/CRD 4) financial measure.

## Use of Internet Addresses

This document contains inactive textual addresses of Internet websites operated by us and third parties. Reference to such websites is made for informational purposes only, and information found at such websites is not incorporated by reference into this document.

# PAGES 8-12 OMITTED PURSUANT TO D. N.J. ECF POLICIES AND PROCEDURES

Case 1:22-cv-02854-JSR   Document 42-4   Filed 04/15/21   Page 10 of 40

13
Deutsche Bank
Annual Report 2015 on Form 20-F

PART I – 8
PART II – 103
PART III – 114

Signatures – 115
Annual Report – 116
Supplemental Financial Information
(Unaudited)– 1

# Risk Factors

An investment in our securities involves a number of risks. You should carefully consider the following information about the risks we face, together with other information in this document, when you make investment decisions involving our securities. If one or more of these risks were to materialize, it could have a material adverse effect on our financial condition, results of operations, cash flows or prices of our securities.

Recent tepid economic growth, and uncertainties about prospects for growth going forward, have affected and continue to negatively affect our results of operations and financial condition in some of our businesses, while a continuing low interest environment and competition in the financial services industry have compressed margins in many of our businesses. If these conditions persist or worsen, our business, results of operations or strategic plans could be adversely affected.

After a period earlier in 2015 when economic data appeared to be stabilizing or improving in many countries and the risk of a negative macro scenario and diminishing global growth appeared to be receding, developments late in the year 2015, as well as developments since the start of the new year, have caused these concerns to resurface, and markets, including equity markets in particular, have moved sharply downward. Eurozone data confirmed that the economy continued to grow at about its trend rate during much of 2015, propelled by real income gains provided by falling oil prices. Despite what appeared to be an improving growth background at the time, the European Central Bank ("ECB") cut the deposit rate to -0.30 per cent in December 2015 and announced an extension of the asset purchase program until March 2017 or beyond if inflation and inflation expectations do not materially improve. The economic outlook has dimmed somewhat since the start of the year largely in the face of political concerns and concerns about the global outlook, however, and thus the ECB will probably make its monetary policy even more expansionary in the course of the year. Similarly, the Bank of England surprised by pivoting toward a more dovish policy stance. In the U.S., meanwhile, strong labour market data finally prompted the Federal Reserve to end seven years of zero interest rates by increasing the Fed Funds target rate by 0.25 percentage points in December. Since then, however, U.S. data have been mixed, pointing towards a somewhat weaker winter half and causing the Federal Reserve once again to question the wisdom of further monetary tightening in the near term. Moreover, we now expect a lower trend growth rate in the U.S. for the coming years. While in the past falling oil prices were overwhelmingly positive for the U.S. economy, U.S. production levels given the "fracking" boom, and the economics of this business, have largely broken this historical relationship. In Emerging Markets, growth remains weak; while it appears to be bottoming out in some economies, others, particularly those for which oil exports are critical to the economy, may not yet be reaching their nadir. Political uncertainty is also taking an increasing toll in Emerging Markets. In China, prospects remain uncertain and prognostication difficult. While some leading indicators are still compatible with a modest improvement in near-term growth, others are less optimistic, and perceived risks to the Chinese growth rate over the medium term is heavily pressuring commodities markets worldwide. While China is supporting its economy with more expansionary monetary and fiscal policies, looser policy is placing pressure on the currency and structural problems are likely to slow down the intended shift towards domestic demand driven growth and the health of the financial sector remains open to question. Monetary policy in China will probably become more expansive in order to bolster the economy. In Japan, fiscal measures and the ongoing extremely expansionary monetary policy ("Abenomics") are supporting growth, while weak external demand has impacted negatively.

Numerous risks are currently increasing the uncertainty of our global forecast by a greater degree than usual. While on the one hand the global financial markets could react much more negatively to normalization of U.S. monetary policy than assumed, a delay in further tightening due to perceptions of faltering growth could also unsettle the markets. This could have a negative impact on household and corporate expenditure worldwide and result in much higher capital outflows from emerging markets as investors flee riskier asset classes in the light of continuing uncertainty and greater volatility. In any event, monetary policymakers in most industrialized countries have few tools left in their toolboxes to combat stagnation or contraction. The falling oil price is exacerbating the problems in the oil-producing countries and complicating the financing of energy-related investments. Moreover, geopolitical risks could escalate, especially those arising from conflicts in the Middle East. Also, a hard landing in China could trigger global upheaval. In Europe, a flare-up in the debate on monetary policy going forward and the future of the eurozone, insufficient deleveraging in the private and public sectors, a halt in implementing structural reforms or, also, an elevated level of political uncertainty could potentially have a substantial impact on our forecasts.

Against this background and these uncertainties, we have observed continued subdued client activity in a number of our businesses. The simultaneous easing of monetary policy in the eurozone and the tightening of it in the United States may have disruptive effects on many of our businesses. Our credit flow businesses continue to be affected by the potential tightening of monetary policy in the United States, even as the ultra-low interest rate environment, especially in the eurozone, where it may be sustained, and geopolitical uncertainties have also put pressure on our margins in several traditional banking sectors. We may face further uncertainty if, as it currently appears, the net effect of monetary policies in the U.S. and the eurozone is to continue to weaken the euro against the U.S. dollar. A stronger U.S. dollar can have a beneficial effect on our revenues, as a significant portion of our revenues is generated in the United States while our results are reported in euro. A stronger U.S. dollar will, however, also increase the euro values of our U.S. dollar-denominated costs and liabilities, including those incurred in respect of U.S. litigation and enforcement matters, and will also tend to significantly increase our risk-weighted assets, including those in the Non-Core Operations Unit (NCOU), that are denominated in U.S. dollars. This can lead to material declines in our capital ratios, as our capital is preponderantly denominated in euro.

Like many in the investment banking industry, we continue to rely on our trading and markets businesses as a primary source of profit. However, these "flow" businesses, in particular our fixed income securities franchise, have continued to face an extremely challenging environment, caused by cyclical uncertainty about the low interest rate environment, central bank intervention in markets and the gradual cessation thereof and overall sluggish economic growth. We are substantially dependent on the performance of our flow businesses, and this dependency exceeds that of many of our competitors. While some of our businesses can profit from market volatility, many businesses dependent on client flow are increasingly challenged in uncertain times, and our Strategy 2020 intends us to retreat from a number of businesses that focused on riskier asset classes or strategies (but that in earlier periods also had the potential to be more highly profitable than those dependent on low-risk, low-margin flow in a very low interest rate environment). Our strategic decisions on these businesses led in part to impairments we recognized in our Corporate Banking & Securities (CB&S) business division in 2015 and reflect a new view on the medium-term profit potential of these activities. These negative effects have been exacerbated by the impacts on our profitability from continued de-risking across the group and long-term structural trends driven by regulation (especially increased regulatory capital and leverage requirements and increased compliance costs) and competition that have further compressed our margins in many of our businesses. Should a combination of these factors continue to lead to reduced margins and subdued activity levels in our trading and markets business over the longer term, this could reflect structural challenges that may lead us to consider even further reaching changes to aspects of our business model than those contained in Strategy 2020.

If uncertainty about the macroeconomic environment or the financial sector persists or worsens, these trends are likely to continue to be difficult for us to counter. More generally, if economic conditions in the eurozone remain at their current subdued levels, or worsen, if growth falters in the U.S. or if economic growth stagnates in China or elsewhere, our results of operations may be materially and adversely affected. Continued quantitative easing by the ECB in response to this may lead to a continuation of the current environment of low interest rates and margin compression, which may also already affect our business and financial position. By contrast, any decision by the Federal Reserve or by central banks more generally to tighten their monetary policy if economies continue to improve could have a material adverse effect on perceptions of liquidity in the financial system and on the global economy more generally, and may adversely affect our business and financial position. In particular, we may in the future be unable to offset the potential negative effects on our profitability of the current macroeconomic and market conditions through performance in our other businesses.

Case 1:22-cv-02854-JSR   Document 42-4   Filed 04/15/21   Page 12 of 40

15        Deutsche Bank                    PART I – 8            Signatures – 115
          Annual Report 2015 on Form 20-F  PART II – 103         Annual Report – 116
                                           PART III – 114        Supplemental Financial Information
                                                                 (Unaudited)– 1

The challenges described above have been exacerbated as we continue to face headwinds from the continuing intensification of the regulatory environment. A continued high level of litigation and enforcement matters has given rise to reputational challenges, has put further pressure on our profitability and returns, and has made our periodic results more volatile as we often have little control as to the period in which we will resolve active matters. These factors, along with similar concerns regarding other financial institutions, have placed pressure on the markets for our securities, along with concerns regarding our ability to overcome the numerous headwinds facing us.

An elevated level of political uncertainty and the increasing attractiveness to voters of populist parties in a number of countries in the European Union could lead to a partial unwinding of European integration. Furthermore, anti-austerity movements in some member countries of the eurozone could undermine confidence in the continued viability of those countries' participation in the euro. An escalation of political risks could have unpredictable political consequences as well as consequences for the financial system and the greater economy, potentially leading to declines in business levels, write-downs of assets and losses across our businesses. Our ability to protect ourselves against these risks is limited.

Regulatory and political actions in response to the European sovereign debt crisis may not be sufficient to prevent the euro crisis from flaring up again. The severity of the European debt crisis appeared to have abated somewhat over recent years as the actions by the ECB, the rescue packages and the economic recovery starting by mid-2013 seemed to be stabilizing the situation in Europe. However, political uncertainty seems set to be on an elevated level in 2016 and could trigger the unwinding of some of the levels of European integration that have benefitted our businesses. An escalation of political risks could have unpredictable consequences both for the financial system and the greater economy as a whole, potentially leading to declines in business levels, write-downs of assets and losses across our businesses.

The European sovereign debt crisis, the UK referendum on EU membership ("Brexit"), which is looking more likely to take place in mid-2016, and the migration/refugee crisis have released centrifugal forces which will pose an ongoing huge challenge for European politics. Member states, particularly those on the external geographical border of the European Union, are increasingly looking for national solutions rather than a European solution. In some, populist or anti-austerity political parties or movements have garnered increased popular support and political stature. In Germany, Chancellor Merkel's focus on Europe-wide rather than single-state solutions has begun to undermine her domestic support, and has placed German policy increasingly at odds with that of many of its European partners. Against this background the prospects for meaningful national structural reform and further euro area integration, both seen as critical components to sustainably reducing euro area crisis vulnerabilities, look poor.

Any political decision by any member country to leave the eurozone could lead to tremendous pressure on other member countries to do so as well and could potentially lead to a significant deterioration of the sovereign debt market, especially if the exit did not result in the catastrophic effects on the exiting country that many have predicted. If one or more members of the eurozone defaults on their debt obligations or decides to leave the common currency, this would result in the reintroduction of one or more national currencies. Should a eurozone country conclude it must exit the common currency, the resulting need to reintroduce a national currency and restate existing contractual obligations could have unpredictable financial, legal, political and social consequences, leading not only to significant losses on sovereign debt but also on private debt in that country. Given the highly interconnected nature of the financial system within the eurozone, and the high levels of exposure we have to public and private counterparties around Europe, our ability to plan for such a contingency in a manner that would reduce our exposure to non-material levels is likely to be limited. If the overall economic climate deteriorates as a result of one or more departures from the eurozone, our businesses could be adversely affected, and, if overall business levels decline or we are forced to write down significant exposures among our various businesses, we could incur substantial losses. We could suffer similar effects should the UK choose in favor of "Brexit"; although the UK is not in the eurozone, its economy and those of the eurozone countries are very tightly linked as a result of EU integration projects other than the euro, and the scale of our businesses in the UK – especially those dependent on activity levels in the City of London, to which we are heavily exposed and which are likely to deteriorate considerably in the event of a Brexit – means that even modest effects in percentage terms can have a very substantial adverse effect on our businesses.

**We may be required to take impairments on our exposures to the sovereign debt of European or other countries if the European sovereign debt crisis reignites. The credit default swaps into which we have entered to manage sovereign credit risk may not be available to offset these losses.**

The effects of the continuing sovereign debt crisis have been especially evident in the financial sector, as a large portion of the sovereign debt of eurozone countries is held by European financial institutions, including us. As of December 31, 2015, we had a direct sovereign credit risk exposure of € 4.0 billion to Italy, € 725 million to Spain, € 112 million to Portugal, € 55 million to Ireland and € 0 million to Greece. Despite the apparent abatement of the crisis in recent years, it remains uncertain whether, in light of the current political environment, Greece or other eurozone sovereigns, such as Spain, Italy, Portugal and Cyprus, will be able to manage their debt levels in the future and whether Greece will attempt to renegotiate its past international debt restructuring. The rise of anti-austerity parties and populist sentiment in many of these countries poses a threat to the medium- to long-term measures recommended for these countries to alleviate the tensions in the euro caused by drastically differing economic situations among the eurozone states. In the future, negotiations or exchanges similar to the Greek debt restructuring in 2012 could take place with respect to the sovereign debt of these or other affected countries. The outcome of any negotiations regarding changed terms (including reduced principal amounts or extended maturities) of sovereign debt may result in additional impairments of assets on our balance sheet. Any negotiations are highly likely to be subject to political and economic pressures that we cannot control, and we are unable to predict their effects on the financial markets, on the greater economy or on ourselves.

In addition, any restructuring of outstanding sovereign debt may result in potential losses for us and other market participants that are not covered by payouts on hedging instruments that we have entered into to protect against the risk of default. These instruments largely consist of credit default swaps, generally referred to as CDSs, pursuant to which one party agrees to make a payment to another party if a credit event (such as a default) occurs on the identified underlying debt obligation. A sovereign restructuring that avoids a credit event through voluntary write-downs of value may not trigger the provisions in CDSs we have entered into, meaning that our exposures in the event of a write-down could exceed the exposures we previously viewed as our net exposure after hedging. Additionally, even if the CDS provisions are triggered, the amounts ultimately paid under the CDSs may not correspond to the full amount of any loss we incur. We also face the risk that our hedging counterparties have not effectively hedged their own exposures and may be unable to provide the necessary liquidity if payments under the instruments they have written are triggered. This may result in systemic risk for the European banking sector as a whole and may negatively affect our business and financial position.

**We have a continuous demand for liquidity to fund our business activities. We may suffer during periods of market-wide or firm-specific liquidity constraints, and liquidity may not be available to us even if our underlying business remains strong.**

We are exposed to liquidity risk, which is the risk arising from our potential inability to meet all payment obligations when they become due or only being able to meet them at excessive cost. Our liquidity may become impaired due to reluctance of our counterparties or the market to finance our operations due to actual or perceived impairments in our businesses, our business model or our strategy, as well as in our resilience to counter negative economic and market conditions. Such impairments can also arise from circumstances unrelated to our businesses and outside our control, such as, but not limited to, disruptions in the financial markets. For example, we have in recent weeks, as well as in the past, experienced steep declines in the price of our shares and increases in the premium investors must pay when purchasing CDSs on our debt. In addition, negative developments concerning other financial institutions perceived to be comparable to us and negative views about the financial services industry in general have also affected us in recent years. These perceptions have affected the prices at which we have accessed the capital markets to obtain the necessary funding to support our business activities; should these perceptions worsen, our ability to obtain this financing on acceptable terms may be adversely affected. Among other things, an inability to refinance assets on our balance sheet or maintain appropriate levels of capital to protect against deteriorations in their value could force us to liquidate assets we hold at depressed prices or on unfavorable terms, and could also force us to curtail business, such as the extension of new credit. This could have an adverse effect on our business, financial condition and results of operations.

As a result of funding pressures arising from the European sovereign debt crisis and the global economic weakness more generally, there has been increased intervention by a number of central banks over the past several years, in particular by the ECB and the Federal Reserve (although after seven years of monetary easing, the Federal Reserve

Case 1:22-cv-02854-JSR   Document 42-4   Filed 04/15/21   Page 14 of 40

17   Deutsche Bank                    PART I – 8                Signatures – 115
     Annual Report 2015 on Form 20-F  PART II – 103             Annual Report – 116
                                      PART III – 114            Supplemental Financial Information
                                                                (Unaudited)– 1

reversed course in December 2015 by increasing the Fed Funds target interest rate by 0.25 percentage points). In September 2012, the ECB announced an unlimited sovereign bond buying program (referred to as the OMT Program) aimed at keeping the borrowing costs of affected eurozone countries low through the purchase of their debt instruments. In a court order dated January 14, 2014, the German Constitutional Court (Bundesverfassungsgericht) sought guidance from the Court of Justice of the European Union as to whether the OMT Program is compatible with European law. In its preliminary ruling of June 16, 2015, the Court of Justice of the European Union held that the OMT Program, subject to certain restrictions, was in compliance with European law. The final decision of the German Constitutional Court is still outstanding but could, if the OMT Program is found incompatible with German constitutional law, negatively impact the stability of the eurozone. Over the course of 2015, the ECB maintained its main refinancing rate at 0.05 %, and made liquidity available to the banks via targeted longer-term refinancing operations. In addition, the ECB has implemented a program commonly referred to as "quantitative easing", which is designed to keep long-term interest rates low through substantial purchases of long-term financial assets from private institutions. The Federal Reserve has also expanded its provision of U.S. dollar liquidity to the ECB, which the ECB has then made available to European banks.

To the extent these incremental measures, most of which have resulted in the availability of additional liquidity to financial institutions and the financial markets in the eurozone more generally, are curtailed or halted, this could adversely impact funding markets for financial institutions, including us. This could in turn lead to an increase in funding costs, or reduced funding supply, which could result in a reduction in business activity. In particular, any decision by the ECB to discontinue or reduce quantitative easing or further steps by the Federal Reserve to tighten its monetary policy or actions by central banks more generally to tighten their monetary policy will likely cause long-term interest rates to increase and accordingly impact the costs of our funding. In addition, negative perceptions concerning our business and prospects could develop as a result of large losses, changes of our credit ratings, a general decline in the level of business activity in the financial services sector, regulatory action, serious employee misconduct or illegal activity, as well as many other reasons outside our control and that we cannot foresee.

Since the start of the global financial crisis, the major credit rating agencies have lowered our credit ratings or placed them on review or watch on multiple occasions. On July 29, 2014, Moody's Investors Service downgraded our long-term debt and deposit ratings from A2 to A3. On January 25, 2016, Moody's further downgraded our long-term debt rating from A3 to Baa1 (while upgrading our deposit rating from A2 to A3), based on the German Resolution Mechanism Act, which provides that certain senior debt instruments will be paid after deposits and other liabilities in resolution or insolvency proceedings; Moody's outlook on both our long-term debt and deposit ratings is negative. On June 9, 2015, Standard & Poor's downgraded our long-term counterparty credit rating from A to BBB+. Fitch Ratings downgraded our long-term issuer default rating and senior debt ratings from A+ to A on May 19, 2015 and from A to A- on December 8, 2015. On September 29, 2015, DBRS Ratings downgraded our senior unsecured debt and deposit ratings from A+ to A. Recent credit rating downgrades have not materially affected our borrowing costs. However, any future downgrade could materially affect our funding costs, although we are unable to predict whether this would be the case or the extent of any such effect. The effect would depend on a number of factors including whether a downgrade affects financial institutions across the industry or on a regional basis, or is intended to reflect circumstances specific to us; any actions our senior management may take in advance of or in response to the downgrade; the willingness of counterparties to continue to do business with us; any impact of other market events and the state of the macroeconomic environment more generally.

Additionally, under many of the contracts governing derivative instruments to which we are a party, a downgrade could require us to post additional collateral, lead to terminations of contracts with accompanying payment obligations for us or give counterparties additional remedies. We take these effects into account in our liquidity stress testing analysis, as further described in "Management Report: Risk Report: Liquidity Risk: Stress Testing and Scenario Analysis" on page 181 of the Annual Report 2015.

Regulatory reforms enacted and proposed in response to weaknesses in the financial sector, together with increased regulatory scrutiny more generally, have created significant uncertainty for us and may adversely affect our business and ability to execute our strategic plans, and competent regulators may prohibit us from making dividend payments or payments on our regulatory capital instruments if we fail to comply with regulatory requirements.

In response to the global financial crisis and the European sovereign debt crisis, governments, regulatory authorities and others have made and continue to make proposals to reform the regulatory framework for the financial services industry to enhance its resilience against future crises. Legislation has been enacted and regulations have been issued in response to many of these proposals. The regulatory framework for financial institutions is likely to undergo further significant change. This creates significant uncertainty for us and the financial industry in general. The wide range of new laws and regulations or current proposals includes, among other things:

–   provisions for more stringent regulatory capital, leverage and liquidity standards,
–   restrictions on compensation practices,
–   restrictions on proprietary trading and other investment activities,
–   special bank levies and financial transaction taxes,
–   recovery and resolution powers to intervene in a crisis including "bail-in" of creditors,
–   large exposure limits,
–   the creation of a single supervisory authority and a single resolution authority within the eurozone and any other participating member states,
–   separation of certain businesses from deposit taking,
–   stress testing and capital planning regimes,
–   heightened reporting requirements, and
–   reforms of derivatives, other financial instruments, investment products and market infrastructures.

In addition, regulatory scrutiny under existing laws and regulations has become more intense. The specific effects of a number of new laws and regulations remain uncertain because the drafting and implementation of these laws and regulations are still on-going. One example of these uncertain effects is the possibility of stricter rules for the measurement of risks based on several initiatives of the Basel Committee on Banking Supervision. Stricter rules could lead to a significant increase of our risk-weighted assets and, as a result, a higher capital demand, changes in our deductions from our regulatory capital and the imposition of additional capital charges to cover financial, market and operational risk. These requirements may be in addition to regulatory capital buffers that may also be increased or be in addition to those already imposed on us and could themselves materially increase our capital requirements.

Regulatory authorities have substantial discretion in how to regulate banks, and this discretion, and the means available to the regulators, have been steadily increasing during recent years. Regulation may be imposed on an ad hoc basis by governments and regulators in response to ongoing or future crises, and may especially affect financial institutions such as us that are deemed to be systemically important.

In particular, the regulators with jurisdiction over us, including the ECB under the Single Supervisory Mechanism (also referred to as the "SSM"), may conduct stress tests and have discretion to impose capital surcharges on financial institutions for risks that are not otherwise recognized in risk-weighted assets or other surcharges depending on the individual situation of the bank and take or require other measures, such as restrictions on or changes to our business. Competent regulators may also, if we fail to comply with regulatory requirements, in particular with minimum capital requirements (including buffer requirements) or with liquidity requirements, or if there are shortcomings in our governance and risk management processes, prohibit us from making dividend payments to shareholders or distributions to holders of our regulatory capital instruments. Generally, a failure to comply with the new quantitative and qualitative regulatory requirements could have a material adverse effect on our business, financial condition and results of operations, including our ability to pay out dividends to shareholders or distributions on regulatory capital capital instruments.

19    Deutsche Bank
Annual Report 2015 on Form 20-F

Case 1:22-cv-02854-JSR   Document 42-4   Filed 04/15/21   Page 16 of 40

PART I – 8
PART II – 103
PART III – 114

Signatures – 115
Annual Report – 116
Supplemental Financial Information
(Unaudited)– 1

**European and German legislation regarding the recovery and resolution of banks and investment firms could, if steps were taken to ensure our resolvability or resolution measures were imposed on us, significantly affect our business operations, and lead to losses for our shareholders and creditors.**

On January 1, 2015, the German Recovery and Resolution Act (Sanierungs- und Abwicklungsgesetz) came into force and transposed the European Union directive establishing a framework for the recovery and resolution of credit institutions and investment firms (referred to as the Bank Recovery and Resolution Directive or "BRRD") into German law. In addition, starting on January 1, 2016, the Single Resolution Mechanism (referred to as the "SRM") under the European Union regulation establishing uniform rules and a uniform procedure for the resolution of credit institutions and certain investment firms (referred to as the "SRM Regulation") entered into force, which centralizes at a European level key competences and resources for managing the failure of any bank, such as us, within the eurozone and any other participating member states. In Germany, the German Resolution Mechanism Act (Abwicklungsmechanismusgesetz) adapted German bank resolution laws to the SRM.

The SRM Regulation and the German Recovery and Resolution Act require the preparation of recovery and resolution plans for banks and grant broad powers to public authorities to intervene in a bank which is failing or likely to fail. For a bank directly supervised by the ECB, such as us, the Single Resolution Board (referred to as the "SRB") assesses its resolvability and may require legal and operational changes to the bank's structure to ensure its resolvability. Under the SRM, the SRB is responsible for adopting a resolution scheme for resolving banks pursuant to the SRM Regulation in close cooperation with the ECB, the European Commission, and the competent national resolution authorities, in the event that such bank is failing or likely to fail and certain other conditions are met. Competent national resolution authorities in the European Union member states that participate in the SRM must implement any such resolution decisions in accordance with the powers conferred on them by national laws implementing the BRRD. Resolution measures that could be imposed upon a failing bank under the SRM Regulation and the German Recovery and Resolution Act include a range of measures including the transfer of shares, assets or liabilities of the bank to another legal entity, the reduction, including to zero, of the nominal value of shares, the dilution of shareholders of a failing bank or the cancellation of shares outright, or the amendment, modification or variation of the terms of the bank's outstanding debt instruments, for example resulting in a deferral of payments or a reduction of the applicable interest rate. Furthermore, certain eligible unsecured liabilities, in particular certain senior unsecured debt instruments specified by the Resolution Mechanism Act, may be written down, including to zero, or converted into equity (commonly referred to as "bail-in").

In order to facilitate the authorities' bail-in powers, which became effective in Germany on January 1, 2015, banks are required to include in their eligible liabilities issued under non-EU law conditions that recognize the regulatory powers to write down or convert such liabilities as well as other resolution powers. The SRM Regulation, the BRRD and the Recovery and Resolution Act are intended to eliminate the need for public support of troubled banks. Therefore, financial public support for such banks, if any, would be used only as a last resort after having assessed and exploited, to the maximum extent practicable, the resolution powers, including a bail-in. The taking of actions to ensure our resolvability or the exercise of resolution powers by the competent resolution authority could materially affect our business operations and lead to a significant dilution of our shareholders or even the total loss of our shareholders' or creditors' investment.

**Regulatory and legislative changes require us to maintain increased capital, in some cases (including the United States) applying capital rules to our local operations. These requirements may significantly affect our business model, financial condition and results of operations as well as the competitive environment generally. Any perceptions in the market that we may be unable to meet our capital requirements with an adequate buffer, or that we should maintain capital in excess of these requirements, could intensify the effect of these factors on our business and results.**

In December 2010, the Basel Committee on Banking Supervision published a set of comprehensive changes to the capital adequacy framework, known as Basel 3, which have been implemented into European Union law by a legislative package referred to as "CRR/CRD 4". CRR/CRD 4 became effective on January 1, 2014, with some of the regulatory adjustments being gradually phased in through January 1, 2019. CRR/CRD 4 contains, among other things, detailed rules on regulatory banking capital, increased capital requirements and the introduction of additional capital buffers (which will increase from year to year) as well as new and tightened liquidity standards and the introduction of a

leverage ratio not based upon risk-weightings. We are subject to additional capital buffers, including as a result of being designated a globally systemically important financial institution, or "G-SIFI". In July 2013, U.S. federal bank regulators issued final rules implementing many elements of the Basel 3 capital adequacy framework in the United States. The impact and implementation of the Basel 3 capital adequacy framework is being assessed and monitored by regulators on a regular basis. Further revisions, such as stricter rules on the measurement of risks proposed by the Basel Committee on Banking Supervision, could further increase risk-weighted assets and the corresponding capital demand for banks.

Furthermore, under the SRM Regulation, the BRRD and the German Recovery and Resolution Act, banks in the European Union are required to meet at all times a robust minimum requirement for own funds and eligible liabilities ("MREL") which is determined on a case-by-case basis by the competent resolution authority. In addition, on November 9, 2015, the Financial Stability Board ("FSB") published a new standard that will require, when implemented as law, global systemically important banks ("G-SIBs"), such as us, to meet a new firm-specific minimum requirement for total loss-absorbing capacity ("TLAC") starting on January 1, 2019. Also in order to facilitate the meeting of TLAC requirements by German banks, under the German Resolution Mechanism Act, certain specifically defined senior unsecured debt instruments issued by German banks such as us would from 2017 onwards rank junior to, without constituting subordinated debt, all other outstanding unsecured unsubordinated obligations of such bank. Both the TLAC and MREL requirements are specifically designed to require banks to maintain a sufficient amount of instruments which are eligible to absorb losses in resolution with the aim of ensuring that failing banks can be resolved without recourse to taxpayers' money. On October 30, 2015, the Federal Reserve Board published proposed rules that would implement in the United States the FSB's TLAC standard. The proposed rules would require, among other things, the U.S. intermediate holding companies ("IHCs") of non-U.S. G-SIBs, including our U.S. IHC, to maintain a minimum amount of internal TLAC and would separately require them to maintain a minimum amount of long-term debt. While the final impact of the MREL and TLAC requirements will depend on their final implementation, the need to comply with such requirements, and the change in ranking of certain debt instruments issued by us, may affect our business, financial condition and results of operation and in particular may increase our financing costs.

We may not have sufficient capital or other loss-absorbing liabilities to meet these increasing regulatory requirements. This could occur due to regulatory changes and other factors, such as the gradual phase out of our hybrid capital instruments as qualifying Additional Tier 1 (or AT1) capital or our inability to issue new securities which are recognized as regulatory capital or loss-absorbing liabilities under the new standards, due to an increase of risk-weighted assets based on more stringent rules for the measurement of risks or as a result of a continued decline in the value of the euro as compared to other currencies, due to stricter requirements for the compliance with the non-risk based leverage ratio, due to any substantial losses we may incur, which would reduce our retained earnings, a component of Common Equity Tier 1 capital, or due to a combination of these or other factors.

If we are unable to maintain sufficient capital to meet the minimum capital and buffer requirements established by regulators and expected by the market, we may become subject to restrictions on the pay-out of dividends, share buybacks and discretionary compensation payments. In addition, any requirement to increase risk-based capital ratios or the leverage ratio could lead us to adopt a strategy focusing on capital preservation and creation over revenue generation and profit growth, including the reduction in higher margin risk-weighted assets. If we are unable to increase our capital ratios to the regulatory minimum in such a case or by raising new capital through the capital markets, through the reduction of risk-weighted assets or through other means, we may be required to activate our group recovery plan. If these actions or other private or supervisory actions do not restore capital ratios to the levels required under the CRR/CRD 4 legislative package, and we are failing or likely to fail, competent authorities may apply resolution powers under the SRM Regulation, the German Recovery and Resolution Act and other applicable rules and regulations, which could lead to a significant dilution of our shareholders or even the total loss of our shareholders' or creditors' investment.

Moreover, we are required to hold and calculate capital separately for our operations in different jurisdictions. In the United States, the Federal Reserve Board has adopted rules that impose enhanced prudential standards on our U.S. operations. In February 2014, the Federal Reserve Board adopted U.S. prudential reforms (the "FBO Rules") applicable to foreign banking organizations ("FBOs"). FBOs with U.S.$ 50 billion or more in U.S. non-branch assets, such as

Case 1:22-cv-02854-JSR    Document 42-4    Filed 04/15/21    Page 18 of 40

21      Deutsche Bank                          PART I – 8            Signatures – 115
        Annual Report 2015 on Form 20-F        PART II – 103         Annual Report – 116
                                               PART III – 114        Supplemental Financial Information
                                                                     (Unaudited)– 1

us, will be required to establish or designate a separately capitalized top-tier U.S. IHC to hold substantially all of the FBO's ownership interests in U.S. subsidiaries by July 1, 2016. Beginning on that date, our IHC will be subject, on a consolidated basis, to the risk-based capital requirements under the U.S. Basel 3 capital adequacy framework, capital planning and stress testing requirements (on a phased-in basis), U.S. liquidity buffer requirements and other enhanced prudential standards comparable to those applicable to top-tier U.S. bank holding companies of a similar size. The Federal Reserve Board will have the authority to examine the IHC and any of its subsidiaries. U.S. leverage require-ments applicable to the IHC will take effect beginning in January 2018. The Federal Reserve Board's proposal to re-quire the IHC subsidiaries of non-U.S. G-SIBs to meet minimum internal TLAC and long-term debt requirements would also apply to our IHC, with a phase-in expected to begin in 2019. The Federal Reserve Board has also stated that it intends, through future rulemakings, to apply the Basel 3 liquidity coverage ratio and net stable funding ratio to the U.S. operations of some or all large foreign banking organizations. In September 2014, the Federal Reserve Board and other U.S. regulators approved a final rule implementing liquidity coverage ratio ("LCR") requirements for certain U.S. banking holding companies and depositary institutions that are generally consistent with the Basel Committee's revised Basel 3 liquidity standards. The Federal Reserve Board has reaffirmed its plans to issue an additional rulemaking to address the application of an LCR requirement to the U.S. operations of some or all foreign banking organizations with U.S.$ 50 billion or more in combined U.S. assets which could impact the LCR requirements applicable to our IHC. Our combined U.S. operations, including our New York branch, will also be subject to additional quantitative requirements related to liquidity and risk management.

As of January 1, 2015, our existing U.S. bank holding company subsidiary, Deutsche Bank Trust Corporation, became subject to risk-based and leverage capital requirements, liquidity requirements, and other enhanced prudential stan-dards applicable to large U.S. bank holding companies. Deutsche Bank Trust Corporation also became subject to capital planning and stress testing requirements on June 30, 2014. Deutsche Bank Trust Corporation will remain sub-ject to the capital planning and stress testing requirements and certain enhanced prudential standards until correspond-ing requirements applicable to the IHC become effective. On March 5, 2015, the Federal Reserve Board released the results of the 2015 supervisory stress tests, which confirmed that Deutsche Bank Trust Corporation's capital ratios would significantly exceed the required minimum levels even in the severely adverse economic stress test scenario. The capital plan did not include any planned dividends or share repurchases. However, on March 11, 2015, the Fed-eral Reserve Board announced that it objected on qualitative grounds to the capital plan submitted by Deutsche Bank Trust Corporation as part of the 2015 Comprehensive Capital Analysis and Review ("CCAR") process, citing numerous and significant deficiencies across Deutsche Bank Trust Corporation's risk-identification, measurement, and aggrega-tion processes, approaches to loss and revenue projection, and internal controls. Deutsche Bank Trust Corporation will submit its 2016 capital plan incorporating enhancements to its processes by April 5, 2016.

Title I of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (the "Dodd-Frank Act") and the implementing regulations require each bank holding company with assets of U.S.$ 50 billion or more, including Deutsche Bank AG, to prepare and submit annually a plan for the orderly resolution of subsidiaries and operations in the event of future material financial distress or failure (the "Title I US Resolution Plan"). For foreign-based covered companies such as Deutsche Bank AG, the Title I US Resolution Plan only relates to subsidiaries, branches, agencies and businesses that are domiciled in or conducted in whole or in material part in the United States. In addition to the Title I US Resolution Plan, in 2014, Deutsche Bank Trust Company Americas ("DBTCA"), one of our insured depository institutions ("IDIs") in the United States, became subject to the FDIC's final rule requiring IDIs with total assets of U.S.$ 50 billion or more to submit periodically to the FDIC a plan for resolution in the event of failure (the "IDI Rule"). In 2014, we expanded our Title I US Resolution Plan to also be responsive to the IDI Rule requirements, and in 2015 DBTCA submitted a separate resolution plan under the IDI Rule.

These new U.S. rules and interpretations could require us to reduce assets held in the United States, inject capital into or otherwise change the structure of our U.S. operations. To the extent that we are required to reduce operations in the United States or deploy capital in the United States that could be deployed more profitably elsewhere, these require-ments could have an adverse effect on our business, financial condition and results of operations.

Any increased capital or liquidity requirements, including those described above, could have adverse effects on our business, financial condition and results of operations, as well as on perceptions in the market of our stability, particularly if any such proposal becomes effective and results in our having to raise capital at a time when financial markets are distressed. If these regulatory requirements must be implemented more quickly than currently foreseen, we may decide that the quickest and most reliable path to compliance is to reduce the level of assets on our balance sheet, dispose of divisions or separate out certain activities or reduce or close down certain business lines. The effects on our capital raising efforts in such a case could be amplified due to the expectation that our competitors, at least those subject to the same or similar capital requirements, would likely also be required to raise capital at the same time. Moreover, some of our competitors, particularly those outside the European Union, may not face the same or similar regulations, which could put us at a competitive disadvantage.

In addition to these regulatory initiatives, market sentiment may encourage financial institutions such as us to maintain significantly more capital than regulatory-mandated minima, which could exacerbate the effects on us described above or, if we do not increase our capital to the encouraged levels, could lead to the perception in the market that we are undercapitalized relative to our peers generally.

It is unclear whether the increased U.S. capital and other requirements described above, as well as similar developments in other jurisdictions could lead to a fragmentation of supervision of global banks that could adversely affect our reliance on regulatory waivers allowing us to meet capital adequacy requirements, large exposure limits and certain organizational requirements on a consolidated basis only rather than on both a consolidated and non-consolidated basis. Should we no longer be entitled to rely on these waivers, we would have to adapt and take the steps necessary in order to meet regulatory capital requirements and other requirements on a consolidated as well as a non-consolidated basis, which could result also in significantly higher costs and potential effects on our profitability and dividend paying ability.

Against this backdrop, our results of operation and financial condition have been negatively affected in recent quarters by a large number of claims, disputes, legal proceedings and government investigations. The extent of our financial exposure to these and other matters could continue to be material and could substantially exceed the level of provisions that we established for such litigation, regulatory and similar matters. In this environment, our compliance costs have also substantially increased.

As a result of the substantial uncertainties with respect to our calculation of our capital requirements and the potential outflows in respect of litigation and enforcement matters, we have found it necessary and may find it necessary or desirable to raise additional capital in the future to maintain our capital at levels required by our regulators or viewed by market participants as necessary for our businesses in comparison with our international peers.

*Our regulatory capital ratios and our funds available for distributions on our shares or regulatory capital instruments will be affected by our business decisions and, in making such decisions, our interests and those of the holders of such instruments may not be aligned, and we may take decisions in accordance with applicable law and the terms of the relevant instruments that result in no or lower payments being made on our shares or regulatory capital instruments.*

Our regulatory capital ratios are affected by a number of factors, including decisions we make relating to our businesses and operations as well as the management of our capital position, of our risk-weighted assets and of our balance sheet in general, and external factors, such as regulations regarding the risk weightings we are permitted to allocate to our assets, commercial and market risks or the costs of our legal proceedings. While we and our management are required to take into account a broad range of considerations in our and their managerial decisions, including the interests of the Bank as a regulated institution and those of our shareholders and creditors, particularly in times of weak earnings and increasing capital requirements, the regulatory requirements to build capital may become paramount. Accordingly, in making decisions in respect of our capital management, we are not required to adhere to the interests of the holders of instruments we have issued that qualify for inclusion in our regulatory capital, such as our Additional Tier 1 capital instruments. We may decide not to take any measures, including increasing our capital at a time when it is feasible to do so (through securities issuances or otherwise), even if our failure to take such an action would result in a non-payment or a writedown or other recovery- or resolution-related measure in respect of any of our

23

Deutsche Bank
Annual Report 2015 on Form 20-F

Case 1:22-cv-02854-JSR   Document 42-4   Filed 04/15/21   Page 20 of 40

PART I – 8
PART II – 103
PART III – 114

Signatures – 115
Annual Report – 116
Supplemental Financial Information
(Unaudited)– 1

regulatory capital instruments. Our decisions could cause the holders of such regulatory capital instruments to lose all or part of the value of their investments in these instruments due to their effect on our regulatory capital ratios, and such holders will not have any claim against us relating to such decisions, even if they result in a non-payment or a writedown or other recovery- or resolution-related measure in respect of such instruments they hold.

In addition, our annual profit and distributable reserves form an important part of the funds available for us to pay dividends on our shares and make payments on our other regulatory capital instruments, as determined in the case of each such instrument by its terms or by operation of law, and any adverse change in our financial prospects, financial position or profitability, or our distributable reserves, each as calculated on an unconsolidated basis, may have a material adverse effect on our ability to make dividend or other payments on these instruments. For example, as part of the implementation of our Strategy 2020, we recorded large impairments that in some cases reduced the carrying value of subsidiaries on our unconsolidated balance sheet and reduced profits and distributable reserves in 2015. While we plan to make all scheduled payments calculated by reference to our 2015 results on our regulatory capital instruments other than our shares, future impairments or other events that reduce our profit or distributable reserves on an unconsolidated basis could lead us to be unable to make such payments in respect of future years in part or at all.

In addition, German law places limits on the distribution of annual profits and otherwise-distributable reserves, as calculated on an unconsolidated basis, to be distributed to our shareholders or the holders of our regulatory capital instruments, such as our Additional Tier 1 capital instruments. Our management has, subject to applicable law, broad discretion under the applicable accounting principles to influence all amounts relevant for calculating funds available for distribution. Such decisions may impact our ability to make dividend or other payments under the terms of our regulatory capital instruments.

As we have previously announced in connection with the implementation of our Strategy 2020, we do not expect to pay dividends on our shares in respect of either the 2015 or the 2016 fiscal years.

**Legislation in the United States and in Germany as well as proposals in the European Union regarding the prohibition of proprietary trading or its separation from the deposit-taking business may materially affect our business model.**

On December 10, 2013, U.S. regulators released the final version of the rules implementing the "Volcker Rule", as required by the Dodd-Frank Act. The final rules prohibit U.S. insured depository institutions and companies affiliated with U.S. insured depository institutions (such as us) from engaging in short-term proprietary trading of certain securities, derivatives, commodity futures and options on these instruments, for their own account. The final rules also impose limits on investments in, and other relationships with, hedge funds, private equity funds and other private funds and limit the ability of banking entities and their affiliates to enter into certain transactions with such funds with which they or their affiliates have certain relationships. The Volcker Rule requires banking entities to establish comprehensive compliance programs designed to help ensure and monitor compliance with restrictions under the Volcker Rule. In December 2013, the Federal Reserve Board extended the end of the conformance period for the Volcker Rule generally until July 21, 2015. In December 2014, the Federal Reserve Board issued an order extending the Volcker Rule's general conformance period until July 21, 2016 for investments in and relationships with covered funds and certain foreign funds that were in place on or prior to December 31, 2013 ("legacy covered funds"), and stated its intention to grant a final one-year extension of the general conformance period, to July 21, 2017, for banking entities to conform ownership interests in and relationships with legacy covered funds. The extension of the conformance period does not apply to the Volcker Rule's prohibitions on proprietary trading or to any investments in and relationships with covered funds made or entered into after December 31, 2013.

In Germany, the German Act on the Separation of Risks and Recovery and Resolution Planning for Credit Institutions and Banking Groups (Trennbankengesetz), referred to as the "Separation Act", regulates the activities of banks that take deposits or other repayable funds from the public and lend them for their own account (referred to as "CRR Banks"). CRR Banks are required to cease or transfer certain activities deemed to be high risk to a financial trading institution, which may be established within the same banking group, if certain independence requirements are met. Banks concerned, such as us, generally have until July 1, 2016 to cease or transfer the relevant business activities, unless the German Federal Financial Supervisory Authority (Bundesanstalt für Finanzdienstleistungsaufsicht, "BaFin")

extends this period. For Deutsche Bank Group, the period to cease or transfer the activities concerned was extended by the BaFin until June 30, 2017.

On January 29, 2014, the European Commission published a draft Regulation on Structural Measures Improving the Resilience of EU Banks and Transparency of the Financial Sector, referred to as the "Proposed Regulation", which, if enacted as proposed, would prohibit certain large banks from engaging in proprietary trading in financial instruments and commodities and investing in hedge funds or other entities that engage in proprietary trading, for the sole purpose of making a profit for its own account. The Proposed Regulation would also grant supervisors broad powers to require these banks to separate certain activities deemed to be high risk from other businesses, such as deposit-taking and lending. Once enacted, the Proposed Regulation might overrule certain requirements set out in the Separation Act at the national level. The ultimate impact on us will depend on the content of the final version of the Proposed Regulation.

The Volcker Rule, the Separation Act and the Proposed Regulation may have significant implications for the future structure and strategy of our Group, and may increase our Group's funding costs. This could adversely affect our business, financial condition and results of operations.

Other regulatory reforms adopted or proposed in the wake of the financial crisis – for example, extensive new regulations governing our derivatives activities, compensation, bank levies, deposit protection or a possible financial transaction tax – may materially increase our operating costs and negatively impact our business model. On August 16, 2012, the EU Regulation on over-the-counter ("OTC") derivatives, central counterparties and trade repositories, referred to as EMIR, entered into force. While a number of the compliance requirements introduced by EMIR already apply, the European Securities and Markets Authority ("ESMA") is still in the process of finalizing some of the implementing rules mandated by EMIR. EMIR introduced a number of requirements, including clearing obligations for certain classes of OTC derivatives and various reporting and disclosure obligations. Although some of the particular effects brought about by EMIR are not yet fully foreseeable, many of its elements have led and may lead to changes which may negatively impact our profit margins, require us to adjust our business practices or increase our costs (including compliance costs). The new Markets in Financial Instruments Directive (which comprises a regulation ("MiFIR") and a directive ("MiFID II")) introduces, among other changes, a trading obligation for those OTC derivatives which are subject to mandatory clearing and which are sufficiently standardized. Originally, most requirements introduced by MiFID II/MiFIR were foreseen to be applicable to us starting on January 3, 2017. On February 10, 2016, however, the European Commission published proposals to delay the application of MiFID II/MiFIR by one year to January 3, 2018. This needs now to be agreed by the bodies of the European Union through the co-decision process. MiFID II needs yet to be transposed into national law, and ESMA and the European Commission yet have to finalize several related implementing regulations. We will also be impacted by the BCBS-IOSCO final minimum standards for margin requirements for non-centrally cleared derivatives, for which enabling legislation exists in the EU (EMIR) but where much of the impact depends on how these requirements are implemented.

In the United States, the Dodd-Frank Act has numerous provisions that may affect our operations. Pursuant to regulations implementing provisions of the Dodd-Frank Act, we registered as a swap dealer with the U.S. Commodity Futures Trading Commission ("CFTC") and became subject to the CFTC's extensive oversight. Regulation of swap dealers by the CFTC imposes numerous corporate governance, business conduct, capital, margin, reporting, clearing, execution and other regulatory requirements on us. It also requires us to comply with certain U.S. rules in some circumstances with respect to transactions conducted outside of the United States or with non-U.S. persons. Although the coverage of EMIR and CFTC regulations implementing the Dodd-Frank Act is in many ways similar, certain swaps may be subject to both regulatory regimes to a significant extent. However, the CFTC's guidance on cross-border swaps regulation, as well as the margin requirements recently adopted by the U.S. bank regulatory agencies and the CFTC, may allow us to comply with some, but not all, U.S. regulatory requirements on a substituted basis by complying with EMIR and MiFID. The new requirements under the Dodd-Frank Act may adversely affect our derivatives business and make us less competitive, especially as compared to competitors not subject to such regulation. Additionally, under the Dodd-Frank Act, security-based swaps will be subject to a standalone regulatory regime under the jurisdiction of the U.S. Securities and Exchange Commission ("SEC"). The SEC is in the early stages of finalizing rules for its security-based swap regime but it is expected to be parallel to, but not identical to, the CFTC's regulation of swaps. This may impose further regulation of our derivatives business.

Case 1:22-cv-02854-JSR   Document 42-4   Filed 04/15/21   Page 22 of 40

25    Deutsche Bank

Annual Report 2015 on Form 20-F

PART I – 8
PART II – 103
PART III – 114

Signatures – 115
Annual Report – 116
Supplemental Financial Information
(Unaudited)– 1

In addition, CRD 4 provides for executive compensation reforms including caps on bonuses that may be awarded to "material risk takers" and other employees as defined in CRD 4, the German Banking Act and other applicable rules and regulations such as the Remuneration Regulation for Institutions (Institutsvergütungsverordnung). The compensation reforms of CRD 4, including any guidelines issued by the EBA to further implement them, could put us at a disadvantage to our competitors in attracting and retaining talented employees, especially compared to those outside the European Union that are not subject to these caps.

Bank levies also have been introduced in some countries including Germany and the United Kingdom and other countries. We accrued € 197 million for bank levies in 2013, € 342 million in 2014 and € 653 million in 2015. We will also be required to contribute substantially to the single resolution fund under the SRM (which is expected to reach a target size of approximately € 55 billion by January 1, 2024, of which approximately € 15 billion is expected to be contributed by German banks) and the statutory deposit guarantee schemes under the recast European Union Deposit Guarantee Schemes Directive. Generally, however, the total impact of these future levies cannot currently be quantified and they may have a material adverse effect on our business, financial condition and results of operations in future periods.

Separately, on January 22, 2013, the Council of the European Union adopted a decision authorizing eleven EU member states (Austria, Belgium, Estonia, France, Germany, Greece, Italy, Portugal, Slovakia, Slovenia and Spain) to proceed with the introduction of a financial transaction tax under the European Union's "enhanced cooperation procedure". The European Commission on February 14, 2013 adopted a draft directive for the implementation of the financial transaction tax. Since then, the introduction of the financial transaction tax is subject to ongoing controversial discussions at the European Union level with the result that the final scope, design and entry into force of the financial transaction tax are uncertain. Estonia is understood to be no longer participating. Depending on the final details, the proposed financial transaction tax could have a materially adverse effect on our profits and business. Different forms of national financial transaction taxes have already been implemented in a number of European jurisdictions, including France and Italy, and these taxes may result in compliance costs as well as market consequences which may affect our revenues.

**Adverse market conditions, historically low prices, volatility and cautious investor sentiment have affected and may in the future materially and adversely affect our revenues and profits, particularly in our investment banking, brokerage and other commission- and fee-based businesses. As a result, we have in the past incurred and may in the future incur significant losses from our trading and investment activities.**

As a global investment bank, we have significant exposure to the financial markets and are more at risk from adverse developments in the financial markets than are institutions engaged predominantly in traditional banking activities. Sustained market declines have in the past caused and can in the future cause our revenues to decline, and, if we are unable to reduce our expenses at the same pace, can cause our profitability to erode or cause us to show material losses. Volatility can also adversely affect us, by causing the value of financial assets we hold to decline or the expense of hedging our risks to rise. Reduced customer activity can also lead to lower revenues in our "flow" business.

Specifically, our investment banking revenues, in the form of financial advisory and underwriting fees, directly relate to the number and size of the transactions in which we participate and are susceptible to adverse effects from sustained market downturns. These fees and other income are generally linked to the value of the underlying transactions and therefore can decline with asset values. In addition, periods of market decline and uncertainty tend to dampen client appetite for market and credit risk, a critical driver of transaction volumes and investment banking revenues, especially transactions with higher margins. In recent and other times in the past, decreased client appetite for risk has led to lower levels of activity and lower levels of profitability in our Corporate Banking & Securities Corporate Division. Our revenues and profitability could sustain material adverse effects from a significant reduction in the number or size of debt and equity offerings and merger and acquisition transactions.

Market downturns also have led and may in the future lead to declines in the volume of transactions that we execute for our clients and, therefore, to declines in our noninterest income. In addition, because the fees that we charge for managing our clients' portfolios are in many cases based on the value or performance of those portfolios, a market downturn that reduces the value of our clients' portfolios or increases the amount of withdrawals reduces the revenues we receive from our asset management and private banking businesses. Even in the absence of a market downturn,

below-market or negative performance by our investment funds may result in increased withdrawals and reduced inflows, which would reduce the revenue we receive from our asset management business. While our clients would be responsible for losses we incur in taking positions for their accounts, we may be exposed to additional credit risk as a result of their need to cover the losses where we do not hold adequate collateral or cannot realize it. Our business may also suffer if our clients lose money and we lose the confidence of clients in our products and services.

In addition, the revenues and profits we derive from many of our trading and investment positions and our transactions in connection with them can be directly and negatively impacted by market prices, which have been volatile in recent years. In each of the product and business lines in which we enter into these trading and investment positions, part of our business entails making assessments about the financial markets and trends in them. When we own assets, market price declines can expose us to losses. Many of the more sophisticated transactions of our Corporate Banking & Securities Corporate Division and our Non-Core Operations Unit are designed to profit from price movements and differences among prices. If prices move in a way we have not anticipated, we may experience losses. Also, when markets are volatile, the assessments we have made may prove to lead to lower revenues or profits, or may lead to losses, on the related transactions and positions. In addition, we commit capital and take market risk to facilitate certain capital markets transactions; doing so can result in losses as well as income volatility. Such losses may especially occur on assets we hold for which there are not very liquid markets initially. Assets that are not traded on stock exchanges or other public trading markets, such as derivatives contracts between banks, may have values that we calculate using models other than publicly-quoted prices. Monitoring the deterioration of prices of assets like these is difficult and could lead to losses we did not anticipate. We can also be adversely affected if general perceptions of risk cause uncertain investors to remain on the sidelines of the market, curtailing their activity and in turn reducing the levels of activity in those of our businesses dependent on transaction flow.

**We announced the next phase of our strategy, Strategy 2020, in April 2015 and gave further details on it in October 2015. If we are unable to implement our strategic plans successfully, we may be unable to achieve our financial objectives, or we may incur losses or low profitability or erosions of our capital base, and our financial condition, results of operations and share price may be materially and adversely affected.**
In April 2015, we announced the next phase of our strategy, Strategy 2020, and gave further details on it in October 2015. Among our Strategy 2020 plans are to become simpler and more efficient by focusing on the markets, products and clients where we are better positioned to succeed, to become less risky by modernizing our technology and by withdrawing from higher-risk client relationships, to become better capitalized and to run the Bank in a more disciplined way. We also announced specific success measures for each business division and updated our financial targets to highlight the financial objectives of Strategy 2020. The details of Strategy 2020 are set forth in Item 4: "Information on the Company – Business Overview – Our Business Strategy."

Our Strategy 2020 goals are subject to various internal and external factors including market, regulatory, economic and political uncertainties, and to limitations relating to our operating model. These could negatively impact or prevent the implementation of our strategic goals or the realization of their anticipated benefits. Economic uncertainties such as the recurrence of extreme turbulence in the markets; weakness in global, regional and national economic conditions; the continuation of the low interest rate environment; increased competition for business; and political instability, especially in Europe, may impact our ability to achieve our strategic goals. Regulatory changes could also adversely impact our ability to achieve our strategic aims. In particular, regulators could demand changes to our business model or organization that could reduce our profitability, or we may be forced to make changes that reduce our profitability in an effort to remain compliant with law and regulation. We are also involved in numerous litigation, arbitration and regulatory proceedings and investigations in Germany and in a number of jurisdictions outside of Germany, especially in the U.S. Such matters are subject to many uncertainties. While we have resolved a number of important legal matters and made progress on others, we expect the litigation environment to continue to be challenging. If litigation and regulatory matters continue to occur at the same rate and magnitude as in recent years, we may not be able to achieve our Strategy 2020 aspirations.

Case 1:22-cv-02854-JSR    Document 42-4    Filed 04/15/21    Page 24 of 40

27

Deutsche Bank
Annual Report 2015 on Form 20-F

PART I – 8
PART II – 103
PART III – 114

Signatures – 115
Annual Report – 116
Supplemental Financial Information
(Unaudited)– 1

In particular, macroeconomic risks and the risks relating to regulatory changes and our legal proceedings may impact our ability to meet our financial and capital targets articulated as part of Strategy 2020. As financial targets, we are aiming to achieve a cost-income ratio of approximately 70 % by 2018 and approximately 65 % by 2020 and a post-tax return on tangible equity of greater than 10 % by 2018. Our capital targets comprise a Common Equity Tier 1 capital ratio of at least 12.5 % from the end of 2018 and a leverage ratio of at least 4.5 % at the end of 2018 and at least 5 % at the end of 2020. Strategy 2020 is based on an ambitious financial plan with, we believe, some buffer for downside scenarios and contingencies. However, the base case scenario for our financial and capital plan includes revenue growth estimates which are dependent on positive macroeconomic developments. Stagnation or a downturn in the macroeconomic environment could significantly impact our ability to generate the revenue growth necessary to achieve these Strategy 2020 financial and capital targets. Furthermore, even if we are able to grow our revenues in accordance with our strategic plans, the materialization of any of the regulatory changes or the costs for us – in terms of the outcomes or necessary changes to our businesses – of the litigation and regulatory matters mentioned above, or any other unforeseen risk, could adversely impact our net income and thereby cause us to fall short of our Strategy 2020 financial and capital targets.

Our capital targets are further dependent on our ability to reduce the size of our balance sheet in accordance with Strategy 2020. We aim to reduce risk-weighted assets (RWAs) by approximately € 90 billion to approximately € 320 billion by 2018 and € 310 billion by 2020, excluding RWA inflation due to stricter regulatory requirements, which we expect will amount to at least € 100 billion by 2019/2020. Key components of executing this plan are the disposal of Postbank, the sale of our noncontrolling 19.99 % stake in Hua Xia Bank and the substantial wind-down of the Non-Core Operations Unit (NCOU) as well as the exit of selected Global Markets businesses. Difficult market conditions or regulatory uncertainties may prevent us from being able to dispose of assets at all, or at prices we would consider to be reasonable, thereby causing us to either sell these assets for losses (or losses that are higher than expected) or hold these assets for a longer period of time than desired or planned. If we cannot reduce our RWAs according to plan, we may not be able to achieve the capital targets set out under Strategy 2020.

Strategy 2020's financial plan also includes substantial cost reduction targets, which we plan to achieve through efficiency gains from implementation of various initiatives. By 2018, we aim to produce net savings in our adjusted costs (defined as total noninterest expenses excluding restructuring and severance, litigation, impairment of goodwill and other intangible assets and policyholder benefits and claims) of approximately € 1.0 to € 1.5 billion, against restructuring and severance costs of approximately € 3.0 to € 3.5 billion, such that we would reduce total adjusted costs to below € 22 billion. Our planned exit from certain businesses and clients may entail higher costs or take more time than anticipated and thereby impede us from achieving the cost reductions we have targeted. Furthermore, additional costs could arise from any number of anticipated or unanticipated developments, such as costs relating to compliance with additional regulatory requirements and increased regulatory charges. Our estimated restructuring and severance charges could ultimately run higher than anticipated, preventing us from achieving our adjusted cost target. Any failure to meet our cost reduction targets may also affect our ability to achieve our target cost-income ratio of approximately 70 % by 2018 and approximately 65 % by 2020.

Our ability to implement Strategy 2020 and meet its stated targets is based on a number of additional key assumptions relating to our business and operating model:

— We assume that we will be able to overcome significant challenges arising from our business model. We continue to rely on our trading and markets businesses as a primary source of profit. However, these "flow" businesses, in particular our fixed income securities franchise, have continued to face an extremely challenging environment, caused by cyclical uncertainty about the low interest rate environment, central bank intervention in markets and the gradual cessation thereof and overall sluggish economic growth. We are substantially dependent on the performance of our flow businesses, and this dependency exceeds that of many of our competitors. While some of our businesses can profit from market volatility, many businesses dependent on client flow are increasingly challenged in uncertain times. Under Strategy 2020, we intend to retreat from a number of businesses that focused on riskier asset classes or strategies. In addition, some of our businesses may be resistant to change, posing risks to the implementation of changes to our business model. Should we be unable to implement this new business model successfully, or should the new business model fail to be profitable, we may not be able to achieve some or all of Strategy 2020's goals.

— We assume that we will be able significantly to upgrade and reduce the complexity of our infrastructure. We currently operate a highly complex infrastructure, which can compromise the quality of the overall control environment. Establishing a more efficient bank with a strong control environment depends on successfully streamlining and simplifying the IT landscape as well as cultural change. Furthermore, capital and execution plans require robust monitoring and tracking that is dependent on accurate, timely and relevant data. We have undertaken initiatives designed to address existing challenges in our IT and data architecture as well as in our data aggregation capabilities. Potential delays and challenges to implementing these initiatives would impact our ability to achieve efficiency improvements and enhance the control environment, thereby affecting our ability to implement Strategy 2020 successfully.

— We assume that we will be able to improve our internal control environment. A robust internal control framework is necessary to achieve Strategy 2020's ambitions. We are undertaking several initiatives to strengthen our controls, enhance the efficacy of our safeguards and manage non-financial risks, in particular as a response to the circumstances that have resulted in the numerous litigation and regulatory investigations to which the Bank has recently been subject. However, we can provide no assurance that an improved control environment will result in fewer litigations or investigations in the future. Furthermore, implementation of enhanced controls may result in higher than expected costs of regulatory compliance and offset efficiency gains, and thereby affect our ability to implement Strategy 2020 successfully.

— We assume that the buffers we have included in our Strategy 2020 targets will be sufficient to reflect a plausible range of downside scenarios and that absent more substantial disclocations we will be able to achieve the targets. However, the buffers that we have provided in order to achieve these goals may prove to be insufficient in a downside scenario. Should this risk materialize as a result of the macroeconomic, regulatory, litigation or other factors discussed above, we may fail to meet our Strategy 2020 targets.

If we fail to implement our strategic initiatives in whole or in part or should the initiatives that are implemented fail to produce the anticipated benefits, or should the costs we incur to implement our initiatives exceed the amounts anticipated, or should we fail to achieve the publicly communicated targets we have set for implementation of these initiatives in 2016, we may fail to achieve our financial objectives, or incur losses or low profitability or erosions of our capital base, and our financial condition, results of operations and share price may be materially and adversely affected.

**As part of Strategy 2020, we announced our intention to dispose of Deutsche Postbank AG (together with its subsidiaries, "Postbank"). We may have difficulties disposing of Postbank at a favorable price or on favorable terms, or at all, and may experience material losses from our holding or disposition of Postbank. We may remain subject to the risks of or other obligations associated with Postbank following a disposal.**
As part of our Strategy 2020, we announced our intention to dispose of Postbank. Such disposal may occur by means of a sale of all or part of our holding in Postbank in a public offering of Postbank's shares or to one or more purchasers in a private transaction. Deutsche Postbank AG became a consolidated, majority-owned subsidiary of ours in December 2010 following a public takeover offer by us. In 2012 Deutsche Postbank AG and a wholly-owned subsidiary of ours entered into a domination and profit and loss transfer agreement. As a preparatory step for the planned disposal, in December 2015, Deutsche Postbank AG, became a wholly owned subsidiary of ours, following a squeeze-out of minority shareholders.

We may have difficulties disposing of Postbank at a favorable price or on favorable terms or timing, or at all. Our ability to dispose of Postbank will, among other things, depend on economic and market conditions, particularly those relevant to the banking industry in Germany. Our ability to dispose of Postbank will also depend on the financial position, results of operations and business prospects of Postbank. If economic or market conditions, or the financial position, results of operations and business prospects of Postbank, are unfavorable, we may not be able to dispose of all or a portion of Postbank at a favorable price or on favorable terms or timing, or at all. A disposal of Postbank may require the approval of relevant regulators in the European Union and elsewhere, which may not be received on favorable terms or at all or which may be subject to disadvantageous conditions. During the period in which Postbank has been a subsidiary of ours, we have sought to integrate certain of its operations into ours and vice versa, and to develop intensified mutual service relationships. We have and will need to make investments in Postbank or incur other expenditures in preparation for its disposal, including the separation of contractual interlinkages, businesses, IT systems and other functions. We may need to make investments in Deutsche Bank to ensure the separation from Postbank and to re-

29
Deutsche Bank
Annual Report 2015 on Form 20-F

Case 1:22-cv-02854-JSR   Document 42-4   Filed 04/15/21   Page 26 of 40

PART I – 8
PART II – 103
PART III – 114

Signatures – 115
Annual Report – 116
Supplemental Financial Information
(Unaudited)– 1

establish certain systems and other functions. To prepare Postbank for disposal, we will need to enable businesses and functions at Postbank, particularly those that rely on support from Deutsche Bank, to operate on a stand-alone basis, while maintaining efficiency, service quality and compliance with relevant regulations. In addition, prior to the disposal of Postbank we may terminate certain financial transactions with Postbank, transfer certain legal entities to Postbank, and terminate certain contractual relationships. Execution of these preparatory measures is required before a disposal can take place, and a failure to do so properly could hinder the disposal or give rise to financial losses.

Prior to its disposal, we remain exposed to the risks of Postbank and could be adversely affected by losses or obligations incurred by it, which losses or obligations could also adversely affect our ability to effect the disposal. In the event of a disposal of only part of our interest in Postbank, we would remain exposed to the economic risks of the portion of our interest that we did not dispose. In addition, we may remain exposed to certain of the risks of Postbank even following disposal of all or part of our interest in Postbank, if the terms of the sale, our previous relationship with Postbank, or applicable law, subject us to temporary or continuing obligations.

Any failure to dispose of Postbank on favorable terms, or any write-down for Postbank, whether upon its sale or otherwise, could have a material adverse effect on our net assets, financial condition and results of operations.

**We may have difficulties selling companies, businesses or assets at favorable prices or at all and may experience material losses from these assets and other investments irrespective of market developments.**
As part of Strategy 2020, we are seeking to reduce our assets, including in particular those of our Non-Core Operations Unit, but also those in our Global Markets business division. Such sales are part of our strategy to simplify and focus our business and to meet or exceed the new capital requirements by reducing risk-weighted assets and thereby improving our capital ratios. This strategy may prove difficult in the current and future market environment as many of our competitors are also seeking to dispose of assets to improve their capital ratios. We have already sold a substantial portion of our non-core assets, and our remaining non-core assets may be particularly difficult for us to sell as quickly as we have expected at prices we deem acceptable. Unfavorable business or market conditions may make it difficult for us to sell such assets at favorable prices, or may preclude such a sale altogether.

In addition, we have made significant investments in individual companies and have other assets that are not part of our core business such as our stake in Maher Terminals. While our intention remains to sell or otherwise reduce the amount and the risk of these exposures, if present market conditions persist, such sales will be difficult and may be delayed. Also, we are often a passive investor in such investments and as such we are reliant on the actions of third parties. This may also have an impact on our ability to effect sales or other risk reducing transactions with respect to such investments.

**We operate in a highly and increasingly regulated and litigious environment, potentially exposing us to liability and other costs, the amounts of which may be substantial and difficult to estimate, as well as to legal and regulatory sanctions and reputational harm.**
The financial services industry is among the most highly regulated industries. Our operations throughout the world are regulated and supervised by the central banks and regulatory authorities in the jurisdictions in which we operate. In recent years, regulation and supervision in a number of areas has increased, and regulators, law enforcement authorities, governmental bodies and others have sought to subject financial services providers to increasing oversight and scrutiny, which in turn has led to additional regulatory investigations or enforcement actions. This trend has accelerated markedly as a result of the global financial crisis and the European sovereign debt crisis. There has been a steep escalation in the severity of the terms which regulators and law enforcement authorities have required to settle legal and regulatory proceedings against financial institutions, with recent settlements including unprecedented monetary penalties as well as criminal sanctions. As a result, we may continue to be subject to increasing levels of liability and regulatory sanctions, and may be required to make greater expenditures and devote additional resources to addressing these liabilities and sanctions. Regulatory sanctions may include status changes to local licenses or orders to discontinue certain business practices.

We and our subsidiaries are involved in various litigation proceedings, including civil class action lawsuits, arbitration proceedings and other disputes with third parties, as well as regulatory proceedings and investigations by both civil and criminal authorities in jurisdictions around the world. We expect that we will continue to experience a high level of litigation, regulatory proceedings and investigations. Litigation and regulatory matters are subject to many uncertainties, and the outcome of individual matters is not predictable with assurance. We may settle litigation or regulatory proceedings prior to a final judgment or determination of liability. We may do so for a number of reasons, including to avoid the cost, management efforts or negative business, regulatory or reputational consequences of continuing to contest liability, even when we believe we have valid defenses to liability. We may also do so when the potential consequences of failing to prevail would be disproportionate to the costs of settlement. Furthermore, we may, for similar reasons, reimburse counterparties for their losses even in situations where we do not believe that we are legally compelled to do so. The financial impact of legal risks might be considerable but may be hard or impossible to estimate and to quantify, so that amounts eventually paid may exceed the amount of provisions made or contingent liabilities assessed for such risks.

Actions currently pending against us or our current or former employees may not only result in judgments, settlements, fines or penalties, but may also cause substantial reputational harm to us. The risk of damage to our reputation arising from such proceedings is also hard or impossible to quantify. For example, we are unable to quantify the harm to our reputation that could arise from the investigation by the public prosecutor for the City of Munich of statements made by certain former and present management board members in connection with the litigation relating to the former Kirch Group.

Regulators have increasingly sought admissions of wrongdoing in connection with settlement of matters brought by them. This could lead to increased exposure in subsequent civil litigation or in consequences under so-called "bad actor" laws, in which persons or entities determined to have committed offenses under some laws can be subject to limitations on business activities under other laws, as well as adverse reputational consequences. In addition, the U.S. Department of Justice (DOJ) conditions the granting of cooperation credit in civil and criminal investigations of corporate wrongdoing on the company involved having provided to investigators all relevant facts relating to the individuals responsible for the alleged misconduct. This policy may result in increased fines and penalties if the DOJ determines that we have not provided sufficient information about applicable individuals in connection with an investigation. Other governmental authorities could adopt similar policies.

In addition, the financial impact of legal risks arising out of matters similar to some of those we face have been very large for a number of participants in the financial services industry, with fines and settlement payments greatly exceeding what market participants may have expected and, as noted above, escalating steeply over the last year to unprecedented levels. The experience of others, including settlement terms, in similar cases is among the factors we take into consideration in determining the level of provisions we maintain in respect of these legal risks. Recent developments in cases involving other financial institutions have led to greater uncertainty as to the predictability of outcomes and could lead us to add to our provisions. Moreover, the costs of our investigations and defenses relating to these matters are themselves substantial. Further uncertainty may arise as a result of a lack of coordination among regulators from different jurisdictions, which may make it difficult for us to reach concurrent settlements with each regulator. Should we be subject to financial impacts arising out of litigation and regulatory matters to which we are subject in excess of those we have calculated in accordance with our expectations and the relevant accounting rules and contrary to our publicly communicated expectation that the overall financial impact in 2016 will be below the 2015 levels, our provisions in respect of such risks may prove to be materially insufficient to cover these impacts. This could have a material adverse effect on our results of operations, financial condition or reputation.

**Regulatory and law enforcement agencies globally are currently investigating us in connection with misconduct relating to manipulation of foreign exchange rates. The extent of our financial exposure to these matters could be material, and our reputation may suffer material harm as a result.**
We have received requests for information from certain regulatory and law enforcement agencies globally who are investigating trading, and various other aspects, of the foreign exchange market. We are cooperating with these investigations. The investigations underway have the potential to result in the imposition of significant financial penalties and

Case 1:22-cv-02854-JSR   Document 42-4   Filed 04/15/21   Page 28 of 40

31

Deutsche Bank
Annual Report 2015 on Form 20-F

PART I – 8
PART II – 103
PART III – 114

Signatures – 115
Annual Report – 116
Supplemental Financial Information
(Unaudited)– 1

other consequences for us. Relatedly, we are conducting our own internal global review of foreign exchange trading and other aspects of our foreign exchange business.

We have also been named as a defendant in multiple putative class actions brought in the U.S. District Court for the Southern District of New York alleging antitrust and U.S. Commodity Exchange Act claims relating to the alleged manipulation of foreign exchange rates. There are now three actions pending. A pending consolidated action has been brought on behalf of putative classes of over-the-counter traders and central-exchange traders and alleges illegal agreements to restrain competition with respect to and to manipulate both benchmark rates and spot rates, particularly the spreads quoted on those spot rates; the complaint further alleges that those supposed conspiracies, in turn, resulted in artificial prices on centralized exchanges for foreign exchange futures and options. A second action tracks the allegations in the consolidated action and asserts that such purported conduct gave rise to, and resulted in a breach of, defendants' fiduciary duties under the U.S. Employment Retirement Income Security Act of 1974 (ERISA). The third putative class action alleges that we rejected FX orders placed over electronic trading platforms that were later filled at prices less favorable to putative class members. Plaintiff has asserted claims for breach of contract, quasi-contractual claims, and claims under New York statutory law. We have moved or intend to move to dismiss these actions.

We have also been named as a defendant in two Canadian class proceedings brought in the provinces of Ontario and Quebec. Filed on September 10, 2015, these class actions assert factual allegations similar to those made in the consolidated action in the United States and seek damages pursuant to the Canadian Competition Act as well as other causes of action.

Many of these matters are not advanced enough to estimate their outcome or any fines that may be levied by governmental bodies or damages that may be incurred from private litigation. A number of other financial institutions are also currently being investigated. Any settlements by these institutions may adversely affect the outcomes for other financial institutions, such as us, in similar actions, especially as large settlements may be used as the basis or template for other settlements. As a result, these matters may expose us to substantial monetary damages and defense costs in addition to criminal and civil penalties, and they could accordingly have a material adverse effect on our results of operations, financial condition or reputation.

**We are currently the subject of regulatory and criminal industry-wide investigations relating to interbank offered rates, as well as civil actions. Due to a number of uncertainties, including those related to the high profile of the matters and other banks' settlement negotiations, the eventual outcome of these matters is unpredictable, and may materially and adversely affect our results of operations, financial condition and reputation.**

We have received subpoenas and requests for information from various regulatory and law enforcement agencies in Europe, North America and Asia/Pacific, including various U.S. states attorneys general, in connection with industry-wide investigations concerning the setting of London Interbank Offered Rate (LIBOR), Euro Interbank Offered Rate (EURIBOR), Tokyo Interbank Offered Rate (TIBOR) and other interbank offered rates. We are cooperating with these investigations.

The investigations underway have the potential to result in the imposition of significant financial penalties and other consequences for the Bank.

As previously reported, we reached a settlement with the European Commission on December 4, 2013 as part of a collective settlement to resolve the European Commission's investigations in relation to anticompetitive conduct in the trading of Euro interest rate derivatives and Yen interest rate derivatives. Under the terms of the settlement agreement, we agreed to pay € 725 million in total.

Also as previously reported, on April 23, 2015, we entered into separate settlements with the U.S. Department of Justice (DOJ), the U.S. Commodity Futures Trading Commission (CFTC), the U.K. Financial Conduct Authority (FCA), and the New York State Department of Financial Services (NYSDFS) to resolve investigations into misconduct concerning the setting of LIBOR, EURIBOR, and TIBOR. Under the terms of these agreements, we agreed to pay penalties of U.S.$ 2.175 billion to the DOJ, CFTC and NYSDFS and GBP 226.8 million to the FCA. The agreements also contained provisions requiring various undertakings with respect to our benchmark rate submissions in the future, as well as

provisions requiring the appointment of an independent corporate monitor. We were also required to take further disciplinary action against certain employees who were working at the Bank at the time of the agreements.

As part of the resolution with the DOJ, we entered into a Deferred Prosecution Agreement with a three-year term pursuant to which it agreed (among other things) to the filing of a two-count criminal Information in the U.S. District Court for the District of Connecticut charging us with one count of wire fraud and one count of price-fixing, in violation of the Sherman Act. As part of the agreement, DB Group Services (UK) Ltd. (an indirectly held, wholly-owned subsidiary of Deutsche Bank AG) entered into a Plea Agreement with the DOJ, pursuant to which the company pled guilty to a one-count criminal Information filed in the same court and charging the company with wire fraud. A fine of U.S.$ 150 million, which is included in the U.S.$ 2.175 billion in total penalties referenced above, is (subject to court approval) expected to be paid by Deutsche Bank following sentencing of DB Group Services (UK) Ltd., expected in October 2016.

Factual admissions we have made in connection with these settlements could make it difficult for us to defend against pending and future claims.

Other regulatory investigations of us concerning the setting of various interbank offered rates remain ongoing, and we remain exposed to further regulatory action.

In addition, we are party to 47 civil actions concerning manipulation relating to the setting of various Interbank Offered Rates. Most of the civil actions, including putative class actions, are pending in the U.S. District Court for the Southern District of New York (SDNY), against us and numerous other banks. All but six of the civil actions were filed on behalf of parties who allege losses as a result of manipulation relating to the setting of U.S. dollar LIBOR. The six civil actions pending against us that do not relate to U.S. dollar LIBOR are also pending in the SDNY, and include two actions concerning Yen LIBOR and Euroyen TIBOR, one action concerning EURIBOR, two actions concerning Pound Sterling (GBP) LIBOR and one action concerning Swiss franc (CHF) LIBOR.

We cannot predict the effect on us of the interbank offered rates matters, which could include fines levied by government bodies, damages from private litigation for which we may be liable, legal and regulatory sanctions (including possible criminal sanctions) and other consequences.

This uncertainty is further exacerbated by several factors outside of our control, such as the high profile of these matters and the contours of other financial institutions' settlement negotiations. In addition, regulatory and law enforcement authorities may make assessments about the conduct of institutions in the industry as a whole, which may influence their actions with respect to us. Any fines, damages, legal or regulatory sanctions or other consequences may have a material adverse effect, beyond provisions taken, on our results of operations, financial condition or reputation.

**We are defendants in civil actions asserting clawback claims in respect of the insolvency of Kaupthing hf. The extent of our financial exposure to this matter could be material, and our reputation may suffer material harm as a result of this matter.**

In June 2012, Kaupthing hf, an Icelandic stock corporation, acting through its winding-up committee, issued Icelandic law clawback claims for approximately € 509 million (plus interest calculated on a damages rate basis and penalty rate basis) against us in both Iceland and England. The claims relate to leveraged credit linked notes ("CLNs"), referencing Kaupthing, issued by us to two British Virgin Island special purpose vehicles ("SPVs") in 2008. The SPVs were ultimately owned by high net worth individuals. Kaupthing claims to have funded the SPVs and alleges that we were or should have been aware that Kaupthing itself was economically exposed in the transactions. Kaupthing claims that the transactions are voidable by Kaupthing on a number of alternative grounds, including the ground that the transactions were improper because one of the alleged purposes of the transactions was to allow Kaupthing to influence the market in its own CDS (credit default swap) and thereby its listed bonds. Additionally, we have been served with similar claims in England by Kaupthing and by the SPVs and their joint liquidators. We have filed a defense in these proceedings and continue to defend them. The extent of our financial exposure to this matter could be material, and our reputation may suffer material harm as a result of this matter.

Case 1:22-cv-02854-JSR   Document 42-4   Filed 04/15/21   Page 30 of 40

33   Deutsche Bank
     Annual Report 2015 on Form 20-F

PART I – 8
PART II – 103
PART III – 114

Signatures – 115
Annual Report – 116
Supplemental Financial Information
(Unaudited)– 1

We have received inquiries from regulatory and law enforcement authorities, including requests for information and documents, pertaining to investigations of precious metals trading and related conduct. The investigations underway have the potential to result in the imposition of significant financial penalties and other consequences for us. We are also named as a defendant in several putative class action complaints in respect of precious metals trading and related conduct.

We have received inquiries from certain regulatory and law enforcement authorities, including requests for information and documents, pertaining to investigations of precious metals trading and related conduct. We are cooperating with these investigations and engaging with relevant authorities, as appropriate. The investigations underway have the potential to result in the imposition of significant financial penalties and other consequences for us. Relatedly, we have been conducting our own internal review of our historic participation in the precious metals benchmarks and other aspects of our precious metals trading and precious metals business.

We are also named as a defendant in several putative class action complaints, which have been consolidated in two lawsuits pending in the U. S. District Court for the Southern District of New York. These suits allege violations of U.S. antitrust law, the U.S. Commodity Exchange Act, and related state law arising out of the alleged manipulation of gold and silver prices through participation in the Gold and Silver Fixes, but do not specify the damages sought. The U.S. class action complaints are in the early stages. In addition, we have been named as a defendant in a Canadian class action proceeding in the Ontario Superior Court of Justice concerning gold, in which plaintiffs seek damages for alleged violations of the Canadian Competition Act as well as other causes of action. These complaints may result in material liability for us.

We are investigating the circumstances around equity trades entered into by certain clients in Moscow and London and have advised regulators and law enforcement authorities in several jurisdictions about those trades. In the event that violations of law or regulation are found to have occurred, any resulting penalties against us may materially and adversely affect our results of operations, financial condition and reputation.

We are investigating the circumstances around equity trades entered into by certain clients with us in Moscow and London that offset one another. The total volume of the transactions under review is significant. Our internal investigation of potential violations of law, regulation and policy and into the related internal control environment remains ongoing; to date it has identified certain violations of our policies and deficiencies in our control environment. We have advised regulators and law enforcement authorities in several jurisdictions (including Germany, Russia, the U.K. and U.S.) of this investigation and have taken disciplinary measures with regards to certain individuals in this matter and will continue to do so with respect to others as warranted. In the event that violations of law or regulation are found to have occurred, legal and regulatory sanctions in respect thereof may materially and adversely affect our results of operations, financial condition and reputation.

Regulatory and law enforcement agencies in the United States are investigating whether our historical processing of certain U.S. dollar payment orders for parties from countries subject to U.S. embargo laws complied with U.S. federal and state laws. While we have settled some matters, other investigations are still in progress and the eventual outcomes of these matters are unpredictable, and may materially and adversely affect our results of operations, financial condition and reputation.

We have received requests for information from certain regulatory and law enforcement agencies concerning our historical processing of U.S. dollar payment orders through U.S. financial institutions for parties from countries subject to U.S. embargo laws. These agencies are investigating whether such processing complied with U.S. federal and state laws. On November 3, 2015, we entered into agreements with the New York State Department of Financial Services and the Federal Reserve Bank of New York to resolve their investigations of Deutsche Bank. We paid the two agencies U.S.$ 200 million and U.S.$ 58 million, respectively, and agreed to terminate certain employees, not rehire certain former employees and install an independent monitor for one year. In addition, the Federal Reserve Bank of New York ordered certain remedial measures, specifically, the requirement to ensure an effective OFAC compliance program and an annual review of such program by an independent party until the Federal Reserve Bank of New York is satisfied as to its effectiveness. We continue to provide information to and otherwise cooperate with other investigating agencies. While it is too early to predict, the eventual outcomes of the investigations to which we are subject may materially and adversely affect our results of operations, financial condition and reputation.

**We have been subject to contractual claims, litigation and governmental investigations in respect of our U.S. residential mortgage loan business that may materially and adversely affect our results of operations, financial condition or reputation.**

From 2005 through 2008, as part of our U.S. residential mortgage loan business, we sold approximately U.S.$ 84 billion of loans into private label securitizations and U.S.$ 71 billion through whole loan sales. We have been, and in the future may be, presented with demands to repurchase loans from or to indemnify purchasers, investors or financial insurers with respect to losses allegedly caused by material breaches of representations and warranties. Our general practice is to process valid repurchase claims that are presented in compliance with contractual rights and applicable statutes of limitations. As of December 31, 2015, we have approximately U.S.$ 2.4 billion of mortgage repurchase demands outstanding and not subject to agreements to rescind (based on original principal balance of the loans). Against these outstanding demands, we have established provisions of U.S.$ 445 million (€ 409 million) as of December 31, 2015 (for part of which we are indemnified). As with provisions generally, however, it is possible that the provisions we have established may ultimately be insufficient, either with respect to particular claims or with respect to the full set of claims that have been or may be presented. There are other potential mortgage repurchase demands that we anticipate may be made, but we cannot reliably estimate their timing or amount. As of December 31, 2015, we have completed repurchases, obtained agreements to rescind or otherwise settled claims on loans with an original principal balance of approximately U.S.$ 7.2 billion. In connection with those repurchases, agreements and settlements, we have obtained releases for potential claims on approximately U.S.$ 93.0 billion of loans sold by us as described above.

From 2005 through 2008, we or our affiliates have also acted as an underwriter of approximately U.S.$ 105 billion of U.S. residential mortgage-backed securities (referred to as "RMBS") for third-party originators.

As is the case with a significant number of other participants in the mortgage securitizations market and as described in Note 29 "Provisions" to the consolidated financial statements, we have received subpoenas and requests for information from certain regulators and government entities concerning our RMBS businesses. We are cooperating fully in response to those subpoenas and requests for information. Some of these investigations are similar in nature to those that led to other financial institutions entering into settlements with members of the Residential Mortgage-Backed Securities Working Group of the U.S. Financial Fraud Enforcement Task Force and paying significant penalties. We have a number of pending lawsuits against us or our affiliates as issuer, underwriter and/or trustee of RMBS. Such pending RMBS litigations are in various stages and we continue to defend these actions vigorously while seeking opportunities to achieve sensible out of court resolutions. Legal and regulatory proceedings are subject to many uncertainties, and the outcome of individual matters is not predictable.

**Criminal and regulatory authorities are currently investigating or seeking information from us in connection with transactions with Monte dei Paschi di Siena. The extent of our financial exposure to these matters could be material, and our reputation may be harmed.**

In February 2013 Banca Monte Dei Paschi Di Siena, which we refer to as "MPS", issued civil proceedings in Italy against us alleging that we assisted former MPS senior management in an accounting fraud on MPS, by undertaking repo transactions with MPS and "Santorini", a wholly owned SPV of MPS, which helped MPS defer losses on a previous transaction undertaken with us. Subsequently, in July 2013, the Fondazione Monte Dei Paschi, MPS' largest shareholder, also issued civil proceedings in Italy for damages based on substantially the same facts. In December 2013, we reached an agreement with MPS in relation to the transactions that resolves the civil proceedings by MPS. The civil proceedings by the Fondazione Monte Dei Paschi remain pending.

A criminal investigation was launched by the Siena Public Prosecutor into the transactions and certain unrelated transactions entered into by a number of other international banks with MPS. Such investigation was moved in September 2014 from Siena to the Milan Public Prosecutors as a result of a change in the alleged charges being investigated. On February 16, 2016, the Milan Public Prosecutors issued a request of committal to trial against us and six current and former employees. The preliminary hearing before the judge for the preliminary investigation phase (who has to decide whether to adhere to the request of committal to trial or not) is scheduled to take place in March 2016. Separately, we have also received requests for information from certain regulators relating to the transactions, including with respect to our accounting for the transactions and alleged failures by our management adequately to supervise the

35    Deutsche Bank
Annual Report 2015 on Form 20-F

Case 1:22-cv-02854-JSR    Document 42-4    Filed 04/15/21    Page 32 of 40

PART I – 8
PART II – 103
PART III – 114

Signatures – 115
Annual Report – 116
Supplemental Financial Information
(Unaudited)– 1

individuals involved in the matter. We are cooperating with these regulators. The extent of our financial exposure to these matters could be material, and our reputation may suffer material harm as a result of these matters.

### Guilty pleas by or convictions of us or our affiliates in criminal proceedings may have consequences that have adverse effects on certain of our businesses.

We and our affiliates have been and are subjects of criminal proceedings or investigations. In particular, as part of the resolution of the investigation of U.S. Department of Justice (DOJ) into misconduct relating to interbank offered rates, our subsidiary DB Group Services (UK) Ltd. entered into a plea agreement with the DOJ, pursuant to which the company pled guilty to one count of wire fraud. Also, in connection with the KOSPI Index unwind matters, our subsidiary Deutsche Securities Korea Co. was convicted of vicarious corporate criminal liability in respect of spot/futures linked market manipulation by its employees. We and our subsidiaries are also subjects of other criminal proceedings or investigations.

Guilty pleas or convictions against us or our affiliates could lead to our ineligibility to use an important trading exemption under the U.S. Employee Retirement Income Security Act of 1974 (ERISA). In particular, such guilty pleas or convictions could cause our affiliates to no longer qualify as a "qualified professional asset manager" (QPAM) under the QPAM Prohibited Transaction Exemption, which exemption is relied on to provide asset management services to certain pension plans in connection with certain asset management strategies. Loss of QPAM status could cause customers who rely on such status (whether because they are legally required to do so or because we have agreed contractually with them to maintain such status) to cease to do business or refrain from doing business with us and could negatively impact our reputation more generally. This could have a material adverse effect on our results of operations, particularly those of our asset management and wealth management businesses in the United States. We have filed an application with the U.S. Department of Labor (DOL), the agency responsible for ERISA, for exemptive relief permitting us to retain our QPAM status despite both the guilty plea of DB Group Services (UK) Ltd. and the conviction of Deutsche Securities Korea Co. The DOL has tentatively denied our QPAM application but has granted us a temporary QPAM exemption, effective through October 25, 2016. We have provided additional information to the DOL in support of our QPAM application and are seeking to address the DOL's concerns in connection with its tentative denial letter. It is unclear whether the QPAM application will be approved, and a denial, and thus loss of QPAM status, could occur, with the potential for the adverse effects described above.

### Our non-traditional credit businesses materially add to our traditional banking credit risks.

As a bank and provider of financial services, we are exposed to the risk that third parties who owe us money, securities or other assets will not perform their obligations. Many of the businesses we engage in beyond the traditional banking businesses of deposit-taking and lending also expose us to credit risk.

In particular, much of the business we conduct through our Corporate Banking & Securities Corporate Division and our Non-Core Operations Unit entails credit risk, frequently incidental to other transactions. Nontraditional sources of credit risk can arise, for example, from holding securities of third parties; entering into swap or other derivative contracts under which counterparties have obligations to make payments to us; executing securities, futures, currency or commodity trades that fail to settle at the required time due to nondelivery by the counterparty or systems failure by clearing agents, exchanges, clearing houses or other financial intermediaries; and extending credit through other arrangements. Parties to these transactions, such as trading counterparties, may default on their obligations to us due to bankruptcy, political and economic events, lack of liquidity, operational failure or other reasons.

Many of our derivative transactions are individually negotiated and non-standardized, which can make exiting, transferring or settling the position difficult. Certain credit derivatives require that we deliver to the counterparty the underlying security, loan or other obligation in order to receive payment. In a number of cases, we do not hold, and may not be able to obtain, the underlying security, loan or other obligation. This could cause us to forfeit the payments otherwise due to us or result in settlement delays, which could damage our reputation and ability to transact future business, as well as impose increased costs on us. Recently enacted legislation in the European Union (EMIR) and the U.S. (the Dodd-Frank Act) has introduced requirements for the standardization, margining, central clearing and transaction reporting of certain over-the-counter derivatives. While such requirements are aimed at reducing the risk posed to coun-

terparties and the financial system by such derivatives, they may reduce the volume and profitability of the transactions in which we engage, and compliance with such provisions may impose substantial costs on us.

The exceptionally difficult market conditions experienced since the global financial crisis severely adversely affected certain areas in which we do business that entail nontraditional credit risks, including the leveraged finance and structured credit markets, and may do so in the future.

### We have incurred losses, and may incur further losses, as a result of changes in the fair value of our financial instruments.

A substantial proportion of the assets and liabilities on our balance sheet comprise financial instruments that we carry at fair value, with changes in fair value recognized in the income statement. Fair value is defined as the price at which an asset or liability could be exchanged in an arm's length transaction between knowledgeable, willing parties, other than in a forced or liquidation sale. If the value of an asset carried at fair value declines (or the value of a liability carried at fair value increases) a corresponding unfavorable change in fair value is recognized in the income statement. These changes have been and could in the future be significant. Additionally, in recent periods there has been a significant difference between fair value and book value for some assets.

Observable prices or inputs are not available for certain classes of financial instruments. Fair value is determined in these cases using valuation techniques we believe to be appropriate for the particular instrument. The application of valuation techniques to determine fair value involves estimation and management judgment, the extent of which will vary with the degree of complexity of the instrument and liquidity in the market. Management judgment is required in the selection and application of the appropriate parameters, assumptions and modeling techniques. If any of the assumptions change due to negative market conditions or for other reasons, subsequent valuations may result in significant changes in the fair values of our financial instruments, requiring us to record losses.

Our exposure and related changes in fair value are reported net of any fair value gains we may record in connection with hedging transactions related to the underlying assets. However, we may never realize these gains, and the fair value of the hedges may change in future periods for a number of reasons, including as a result of deterioration in the credit of our hedging counterparties. Such declines may be independent of the fair values of the underlying hedged assets or liabilities and may result in future losses.

### Our risk management policies, procedures and methods leave us exposed to unidentified or unanticipated risks, which could lead to material losses.

We have devoted significant resources to developing our risk management policies, procedures and assessment methods and intend to continue to do so in the future. Nonetheless, the risk management techniques and strategies have not been and may in the future not be fully effective in mitigating our risk exposure in all economic market environments or against all types of risk, including risks that we fail to identify or anticipate. Some of our quantitative tools and metrics for managing risk are based upon our use of observed historical market behavior. We apply statistical and other tools to these observations to arrive at quantifications of our risk exposures. During the financial crisis, the financial markets experienced unprecedented levels of volatility (rapid changes in price direction) and the breakdown of historically observed correlations (the extent to which prices move in tandem) across asset classes, compounded by extremely limited liquidity. In this volatile market environment, our risk management tools and metrics failed to predict some of the losses we experienced, particularly in 2008, and may in the future fail to predict important risk exposures. In addition, our quantitative modeling does not take all risks into account and makes numerous assumptions regarding the overall environment, which may not be borne out by events. As a result, risk exposures have arisen and could continue to arise from factors we did not anticipate or correctly evaluate in our statistical models. This has limited and could continue to limit our ability to manage our risks especially in light of geopolitical developments, many of the outcomes of which are currently unforeseeable. Our losses thus have been and may in the future be significantly greater than the historical measures indicate.

Case 1:22-cv-02854-JSR   Document 42-4   Filed 04/15/21   Page 34 of 40

37    Deutsche Bank                PART I – 8          Signatures – 115
      Annual Report 2015 on Form 20-F   PART II – 103       Annual Report – 116
                                   PART III – 114      Supplemental Financial Information
                                                       (Unaudited)– 1

In addition, our more qualitative approach to managing those risks not taken into account by our quantitative methods could also prove insufficient, exposing us to material unanticipated losses. Also, if existing or potential customers or counterparties believe our risk management is inadequate, they could take their business elsewhere or seek to limit their transactions with us. This could harm our reputation as well as our revenues and profits. See "Management Report: Risk Report" beginning on page 79 of the Annual Report 2015for a more detailed discussion of the policies, procedures and methods we use to identify, monitor and manage our risks.

### Operational risks may disrupt our businesses.

We face operational risk arising from errors, inadvertent or intentional, made in the execution, confirmation or settlement of transactions or from transactions not being properly recorded, evaluated or accounted for. An example of this risk concerns our derivative contracts, which are not always confirmed with the counterparties on a timely basis. For so long as the transaction remains unconfirmed, we are subject to heightened credit and operational risk and in the event of a default may find it more difficult to enforce the contract. The European sovereign debt crisis and the global financial crisis, in which the risk of counterparty default increased, have increased the possibility that this operational risk materializes.

In addition, our businesses are highly dependent on our ability to process manually or through our systems a large number of transactions on a daily basis, across numerous and diverse markets in many currencies. Some of the transactions have become increasingly complex. Moreover, management relies heavily on its financial, accounting and other data processing systems that include manual processing components. If any of these processes or systems do not operate properly, or are disabled, or subject to intentional or inadvertent human error, we could suffer financial loss, a disruption of our businesses, liability to clients, regulatory intervention or reputational damage.

We are also dependent on our employees to conduct our business in accordance with applicable laws, regulations and generally accepted business standards. If our employees do not conduct our business in this manner, we may be exposed to material losses. Furthermore, if an employee's misconduct reflects fraudulent intent, we could also be exposed to reputational damage. We categorize these risks as conduct risk, which comprises inappropriate business practices, including selling products that are not suitable for a particular customer, fraud, unauthorized trading and failure to comply with applicable regulations, laws and internal policies.

We in particular face the risk of loss events due to the instability, malfunction or outage of our IT system and IT infrastructure. Such losses could materially affect our ability to perform business processes and may, for example, arise from the erroneous or delayed execution of processes as either a result of system outages or degraded services in systems and IT applications. A delay in processing a transaction, for example, could result in an operational loss if market conditions worsen during the period after the error. IT-related errors may also result in the mishandling of confidential information, damage to our computer systems, financial losses, additional costs for repairing systems, reputational damage, customer dissatisfaction or potential regulatory or litigation exposure.

Business continuity risk is the risk of incurring losses resulting from the interruption of normal business activities. We operate in many geographic locations and are frequently subject to the occurrence of events outside of our control. Despite the contingency plans we have in place, our ability to conduct business in any of these locations may be adversely impacted by a disruption to the infrastructure that supports our business, whether as a result of, for example, events that affect our third party vendors or the community or public infrastructure in which we operate. Any number of events could cause such a disruption including deliberate acts such as sabotage, terrorist activities, bomb threats, strikes, riots and assaults on the bank's staff; natural calamities such as hurricanes, snow storms, floods, disease pandemic and earthquakes; or other unforeseen incidents such as accidents, fires, explosions, utility outages and political unrest. Any such disruption could have a material adverse effect on our business and financial position.

**Our operational systems are subject to an increasing risk of cyber attacks and other internet crime, which could result in material losses of client or customer information, damage our reputation and lead to regulatory penalties and financial losses.**

Among the operational risks we face is the risk of breaches of the security of our computer systems due to unauthorized access to networks or resources, the introduction of computer viruses or malware, or other forms of cyber attack or internet crime. Such breaches could threaten the confidentiality of our clients' data and the integrity of our systems. We devote significant resources toward the protection of our computer systems against such breaches. To address the evolving cyber threat risk, we are currently expending significant additional resources to modify and enhance our protective measures and to investigate and remediate any information security vulnerabilities. Nevertheless, a residual risk remains that such measures may not be effective against all threats. Given our global footprint and the volume of transactions we process, certain errors or actions may be repeated or compounded before they are discovered and rectified.

We and other financial institutions have experienced attacks on computer systems, including attacks aimed at obtaining unauthorized access to confidential company or customer information or damaging or interfering with company data, resources or business activities. The increasing frequency and sophistication of recent cyber-attacks has resulted in an elevated risk profile for many organizations around the world, and significant attention by our management has been paid to the overall level of preparedness against such attacks. Cyber security is growing in importance due to factors such as the continued and increasing reliance on our technology environment. Although we have to date not experienced any material loss of data from these attacks, it is possible, given the use of new technologies and increasing reliance on the Internet and the varying nature and evolving sophistication of such attacks, that we may not be able to effectively anticipate and prevent all such attacks. A successful attack could have a significant negative impact on us, including as a result of disclosure or misappropriation of client or proprietary information, damage to computer systems, financial losses, additional costs to us (such as for investigation and reestablishing services), reputational damage, customer dissatisfaction and potential regulatory or litigation exposure.

**The size of our clearing operations exposes us to a heightened risk of material losses should these operations fail to function properly.**

We have large clearing and settlement businesses and an increasingly complex and interconnected information technology (IT) landscape. These give rise to the risk that we, our customers or other third parties could lose substantial sums if our systems fail to operate properly for even short periods. This will be the case even where the reason for the interruption is external to us. In such a case, we might suffer harm to our reputation even if no material amounts of money are lost. This could cause customers to take their business elsewhere, which could materially harm our revenues and profits.

**We may have difficulty in identifying and executing acquisitions, and both making acquisitions and avoiding them could materially harm our results of operations and our share price.**

We consider business combinations from time to time. Even though we review the companies, businesses, assets, liabilities or contracts we plan to acquire, it is generally not feasible for these reviews to be complete in all respects. As a result, we may assume unanticipated liabilities, or an acquisition may not perform as well as expected. Were we to announce or complete a significant business combination transaction, our share price could decline significantly if investors viewed the transaction as too costly or unlikely to improve our competitive position. In addition, we might have difficulty integrating any entity with which we combine our operations. Failure to complete announced business combinations or failure to integrate acquired businesses successfully into ours could materially and adversely affect our profitability. It could also affect investors' perception of our business prospects and management, and thus cause our share price to fall. It could also lead to departures of key employees, or lead to increased costs and reduced profitability if we felt compelled to offer them financial incentives to remain.

Case 1:22-cv-02854-JSR   Document 42-4   Filed 04/15/21   Page 36 of 40

39    Deutsche Bank                     PART I – 8            Signatures – 115
       Annual Report 2015 on Form 20-F   PART II – 103         Annual Report – 116
                                          PART III – 114        Supplemental Financial Information
                                                                (Unaudited)– 1

**Intense competition, in our home market of Germany as well as in international markets, could materially adversely impact our revenues and profitability.**

Competition is intense in all of our primary business areas, in Germany as well as in international markets. If we are unable to respond to the competitive environment in these markets with attractive product and service offerings that are profitable for us, we may lose market share in important areas of our business or incur losses on some or all of our activities. In addition, downturns in the economies of these markets could add to the competitive pressure, through, for example, increased price pressure and lower business volumes for us.

In recent years there has been substantial consolidation and convergence among financial services companies, culminating in unprecedented consolidations in the course of the global financial crisis. This trend has significantly increased the capital base and geographic reach of some of our competitors and has hastened the globalization of the securities and other financial services markets. As a result, we must compete with financial institutions that may be larger and better capitalized than we are and that may have a stronger position in local markets. Also, governmental action in response to the global financial crisis may place us at a competitive disadvantage.

**Transactions with counterparties in countries designated by the U.S. State Department as state sponsors of terrorism or persons targeted by U.S. economic sanctions may lead potential customers and investors to avoid doing business with us or investing in our securities, harm our reputation or result in regulatory action which could materially and adversely affect our business.**

We engage or have engaged in a limited amount of business with counterparties, including government-owned or -controlled counterparties, in certain countries or territories that are subject to comprehensive sanctions, including Iran and Cuba (referred to as "Sanctioned Countries"), or with persons targeted by U.S. economic sanctions (referred to as "Sanctioned Persons"). U.S. law generally prohibits U.S. persons or any other persons acting within U.S. jurisdiction from doing business with Sanctioned Countries or Sanctioned Persons. Thus, U.S. regulations may extend to activities in other geographic areas and by non-U.S. persons depending on the circumstances. Our U.S. subsidiaries, branch offices, and employees are and our non-U.S. subsidiaries, branch offices, and employees may become subject to those prohibitions and other regulations. We are a German bank and our activities with respect to Sanctioned Countries and Sanctioned Persons have been subject to policies and procedures designed to avoid the involvement of persons acting within U.S. jurisdiction in any managerial or operational role and to ensure compliance with United Nations, European Union and German embargoes; in reflection of legal developments in recent years, we further developed our policies and procedures with the aim of ensuring compliance with regulatory requirements extending to other geographic areas regardless of jurisdiction. However, should our policies prove to have been ineffective, we may be subject to regulatory action that could materially and adversely affect our business. By 2007, our Management Board decided that we will not engage in new business with counterparties in countries such as Iran, Syria, Sudan and North Korea and to exit existing business to the extent legally possible. It also decided to limit our business with counterparties in Cuba. Of these, Iran, Sudan and Syria are currently designated as state sponsors of terrorism by the U.S. State Department.

We had a representative office in Tehran, Iran, which we discontinued at December 31, 2007. Our remaining business with Iranian counterparties consists mostly of participations as lender and/or agent in a few large trade finance facilities arranged before 2007 to finance the export contracts of exporters in Europe and Asia. The lifetime of most of these facilities is ten years or more and we are legally obligated to fulfil our contractual obligations. We do not believe our business activities with Iranian counterparties are material to our overall business, with the outstanding loans to Iranian borrowers representing substantially less than 0.01 % of our total assets as of December 31, 2015 and the revenues from all such activities representing less than 0.01 % of our total revenues for the year ended December 31, 2015.

In recent years, the United States has taken steps, including the passage of the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010, the National Defense Authorization Act for Fiscal Year 2012, the Iran Threat Reduction and Syria Human Rights Act of 2012, the Iran Freedom and Counter-Proliferation Act of 2012, and a number of Executive Orders, to deter foreign companies from dealing with Iran by providing for possible sanctions against companies that provide services in support of certain Iranian activity in (among others) the financial, energy, shipping or military sectors or with certain Iranian counterparties, whether or not such dealings occur within U.S jurisdiction. Among the targets of these indirect, or "secondary", U.S. economic sanctions are foreign financial institutions that, among other things, facilitate significant transactions with, or provide significant financial services to a wide range of Iranian entities, persons, and financial institutions. We do not believe we have engaged in activities sanctionable under these statutes, but the U.S. authorities have considerable discretion in applying the statutes, and any imposition of sanctions against us could be material. Following the occurrence on January 16, 2016 of "Implementation Day" of the Joint Comprehensive Plan of Action between the "P5+1" parties and Iran, pursuant to which Iran agreed to limits on its nuclear program and the P5+1 parties agreed to provide certain sanctions relief, secondary sanctions targeting Iran have been narrowed but not eliminated.

As required by Section 219 of the Iran Threat Reduction and Syria Human Rights Act of 2012 (Section 13(r) of the Securities Exchange Act of 1934, as amended) we have disclosed certain information regarding our activities or transactions with persons subject to U.S. sanctions against Iran and other persons subject to such provision. Such disclosure is set forth in the section of this document entitled "Disclosures Under Iran Threat Reduction and Syria Human Rights Act of 2012", which follows "Item 16H: Mine Safety Disclosure".

We are also engaged in a limited amount of business with counterparties domiciled in Cuba, which is not subject to any United Nations, European Union or German embargo. The business consists of a limited number of letters of credit, as well as claims resulting from letters of credit, and it represented substantially less than 0.01 % of our assets as of December 31, 2015. The transactions served to finance commercial products such as machinery and electrical equipment as well as medical products.

We are aware of current or proposed laws, regulations, policies or other initiatives by governmental and nongovernmental entities in the United States and elsewhere to prohibit transactions with or investment in, or require divestment from, entities doing business with Sanctioned Countries, particularly Iran and Sudan. Such initiatives may result in our being unable to gain or retain entities subject to such prohibitions as customers or as investors in our securities. In addition, our reputation may suffer due to our association with such countries. Such a result could have significant adverse effects on our business or the price of our securities. It is also possible that new direct or indirect secondary sanctions could be imposed by the United States or other jurisdictions without warning as a result of geopolitical developments.

# PAGES 41-114 OMITTED PURSUANT TO D. N.J. ECF POLICIES AND PROCEDURES

Case 1:22-cv-02854-JSR   Document 42-4   Filed 04/15/21   Page 39 of 40

115
Deutsche Bank
Annual Report 2015 on Form 20-F

PART I – 8
PART II – 103
PART III – 114

Signatures – 115
Annual Report – 116
Supplemental Financial Information
(Unaudited)– 1

# Signatures

The registrant hereby certifies that it meets all of the requirements for filing on Form 20-F and has duly caused and authorized the undersigned to sign this annual report on its behalf.

Date: March 11, 2016
Deutsche Bank Aktiengesellschaft

/s/      JOHN CRYAN

John Cryan
Co-Chairman of the Management Board

/s/      JUERGEN FITSCHEN

Juergen Fitschen
Co-Chairman of the Management Board

/s/      MARCUS SCHENCK

Marcus Schenck
Member of the Management Board
Chief Financial Officer

# ANNUAL REPORT AND EXHIBITS ANNEXED TO 2015 FORM 20-F OMITTED PURSUANT TO D. N.J. ECF POLICIES AND PROCEDURES