# EXHIBIT 3

As filed with the Securities and Exchange Commission on March 20, 2017

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**

# Form 20-F

☐  REGISTRATION STATEMENT PURSUANT TO SECTION 12(b) OR (g) OF THE SECURITIES EXCHANGE ACT OF 1934

or

☒  ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 FOR THE FISCAL YEAR ENDED DECEMBER 31, 2016

or

☐  TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

or

☐  SHELL COMPANY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

Date of event requiring this shell company report………………………………..

**Commission file number 1-15242**

# Deutsche Bank Aktiengesellschaft

(Exact name of Registrant as specified in its charter)

**Deutsche Bank Corporation**

(Translation of Registrant's name into English)

**Federal Republic of Germany**

(Jurisdiction of incorporation or organization)

**Taunusanlage 12, 60325 Frankfurt am Main, Germany**

(Address of principal executive offices)

**Peter Burrill, +49-69-910-31781, peter.burrill@db.com, Taunusanlage 12, 60325 Frankfurt am Main, Germany**

(Name, Telephone, E-mail and/or Facsimile number and Address of Company Contact Person)

Securities registered or to be registered pursuant to Section 12(b) of the Act

See following page

Securities registered or to be registered pursuant to Section 12(g) of the Act.

NONE

(Title of Class)

Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act.

NONE

(Title of Class)

Indicate the number of outstanding shares of each of the issuer's classes of capital or common stock as of the close of the period covered by the annual report:

| | |
|---|---|
| Ordinary Shares, no par value | 1,379,069,689 |

(as of December 31, 2016)

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.

Yes ☒    No ☐

If this report is an annual or transition report, indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934.

Yes ☐    No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

Yes ☒    No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate website, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).

Yes ☐    No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act (Check one):

Large accelerated filer ☒    Accelerated filer ☐    Non-accelerated filer ☐

Indicate by check mark which basis of accounting the registrant has used to prepare the financial statements included in this filing:

U.S. GAAP ☐    International Financial Reporting Standards ☒    Other ☐
as issued by the International Accounting Standards Board

If "Other" has been checked in response to the previous question, indicate by check mark which financial statement item the registrant has elected to follow

Item 17 ☐    Item 18 ☐

If this is an annual report, indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).

Yes ☐    No ☒

Securities registered or to be registered pursuant to Section 12(b) of the Act (as of February 28, 2017)

| Title of each class | Name of each exchange on which registered |
| --- | --- |
| Ordinary shares, no par value | New York Stock Exchange |
| 6.55 % Trust Preferred Securities of Deutsche Bank Contingent Capital Trust II | New York Stock Exchange |
| 6.55 % Company Preferred Securities of Deutsche Bank Contingent Capital LLC II* | |
| Subordinated Guarantees of Deutsche Bank AG in connection with Capital Securities* | |
| 7.60 % Trust Preferred Securities of Deutsche Bank Contingent Capital Trust III | New York Stock Exchange |
| 7.60 % Company Preferred Securities of Deutsche Bank Contingent Capital LLC III* | |
| Subordinated Guarantees of Deutsche Bank AG in connection with Capital Securities* | |
| 8.05 % Trust Preferred Securities of Deutsche Bank Contingent Capital Trust V | New York Stock Exchange |
| 8.05 % Company Preferred Securities of Deutsche Bank Contingent Capital LLC V* | |
| Subordinated Guarantees of Deutsche Bank AG in connection with Capital Securities* | |
| Fixed to Fixed Reset Rate Subordinated Tier 2 Notes Due 2028 | New York Stock Exchange |
| 4.50 % Fixed Rate Subordinated Tier 2 Notes Due 2025 | New York Stock Exchange |
| DB Agriculture Short Exchange Traded Notes due April 1, 2038 | NYSE Arca |
| DB Agriculture Long Exchange Traded Notes due April 1, 2038 | NYSE Arca |
| DB Agriculture Double Short Exchange Traded Notes due April 1, 2038 | NYSE Arca |
| DB Agriculture Double Long Exchange Traded Notes due April 1, 2038 | NYSE Arca |
| DB Base Metals Short Exchange Traded Notes due June 1, 2038 | NYSE Arca |
| DB Base Metals Double Short Exchange Traded Notes due June 1, 2038 | NYSE Arca |
| DB Base Metals Double Long Exchange Traded Notes due June 1, 2038 | NYSE Arca |
| DB Commodity Short Exchange Traded Notes due April 1, 2038 | NYSE Arca |
| DB Commodity Long Exchange Traded Notes due April 1, 2038 | NYSE Arca |
| DB Commodity Double Long Exchange Traded Notes due April 1, 2038 | NYSE Arca |
| DB Commodity Double Short Exchange Traded Notes due April 1, 2038 | NYSE Arca |
| DB Crude Oil Short Exchange Traded Notes due June 1, 2038 | NYSE Arca |
| DB Crude Oil Long Exchange Traded Notes due June 1, 2038 | NYSE Arca |
| DB Crude Oil Double Short Exchange Traded Notes due June 1, 2038 | NYSE Arca |
| DB Gold Double Long Exchange Traded notes due February 15, 2038 | NYSE Arca |
| DB Gold Double Short Exchange Traded Notes due February 15, 2038 | NYSE Arca |
| DB Gold Short Exchange Traded notes due February 15, 2038 | NYSE Arca |
| ELEMENTS "Dogs of the Dow" Linked to the Dow Jones High Yield Select 10 Total Return Index due November 14, 2022 | NYSE Arca |
| ELEMENTS Linked to the Morningstar® Wide Moat Focus(SM) Total Return Index due October 24, 2022 | NYSE Arca |
| FI Enhanced Global High Yield Exchange Traded Notes Linked to the MSCI World High Dividend Yield USD Gross Total Return Index due October 12, 2023 | NYSE Arca |

* For listing purpose only, not for trading

# Table of Contents

Table of Contents – 3
PART I – 9
Item 1: Identity of Directors, Senior Management and Advisers – 9
Item 2: Offer Statistics and Expected Timetable – 9
Item 3: Key Information – 9
    Selected Financial Data – 9
    Dividends – 11
    Exchange Rate and Currency Information – 12
    Capitalization and Indebtedness – 13
    Reasons for the Offer and Use of Proceeds – 13
    Risk Factors – 14
Item 4: Information on the Company – 48
    History and Development of the Company – 48
    Business Overview – 48
    Our Corporate Divisions – 56
    The Competitive Environment – 56
    Regulation and Supervision – 63
    Organizational Structure – 84
    Property and Equipment – 85
    Information Required by Industry Guide 3 – 85
Item 4A: Unresolved Staff Comments – 86
Item 5: Operating and Financial Review and Prospects – 86
    Overview – 86
    Significant Accounting Policies and Critical Accounting Estimates – 86
    Recently Adopted Accounting Pronouncements and New Accounting Pronouncements – 87
    Operating Results – 87
    **Results of Operations** – 88
    Financial Position – 89
    Liquidity and Capital Resources – 89
    Post-Employment Benefit Plans – 89
    Off-Balance Sheet Arrangements – 89
    Tabular Disclosure of Contractual Obligations – 89
    Research and Development, Patents and Licenses – 89
Item 6: Directors, Senior Management and Employees – 90
    Directors and Senior Management – 90
    Board Practices of the Management Board – 93
    Compensation – 94
    Employees – 94
    Share Ownership – 94
Item 7: Major Shareholders and Related Party Transactions – 94
    Major Shareholders – 94
    Related Party Transactions – 95
    Interests of Experts and Counsel – 96
Item 8: Financial Information – 97
    Consolidated Statements and Other Financial Information – 97
    Significant Changes – 101
Item 9: The Offer and Listing – 101
    Offer and Listing Details and Markets – 101
    Plan of Distribution – 102
    Selling Shareholders – 102
    Dilution – 103
    Expenses of the Issue – 103

Item 10: Additional Information – 103
    Share Capital – 103
    Memorandum and Articles of Association – 103
    Notification Requirements – 107
    Material Contracts – 110
    Exchange Controls – 110
    Taxation – 111
    Dividends and Paying Agents – 114
    Statement by Experts – 114
    Documents on Display – 115
    Subsidiary Information – 115
Item 11: Quantitative and Qualitative Disclosures about Credit, Market and Other Risk – 115
Item 12: Description of Securities other than Equity Securities – 115
PART II – 116
Item 13: Defaults, Dividend Arrearages and Delinquencies – 116
Item 14: Material Modifications to the Rights of Security Holders and Use of Proceeds – 116
Item 15: Controls and Procedures – 116
    Disclosure Controls and Procedures – 116
    Management's Annual Report on Internal Control over Financial Reporting – 116
    Report of Independent Registered Public Accounting Firm – 117
    Change in Internal Control over Financial Reporting – 118
Item 16A: Audit Committee Financial Expert – 118
Item 16B: Code of Ethics – 118
Item 16C: Principal Accountant Fees and Services – 119
Item 16D: Exemptions from the Listing Standards for Audit Committees – 119
Item 16E: Purchases of Equity Securities by the Issuer and Affiliated Purchasers – 119
Item 16F: Change in Registrant's Certifying Accountant – 120
Item 16G: Corporate Governance – 120
Item 16H: Mine Safety Disclosure – 123
Disclosures Under Iran Threat Reduction and Syria Human Rights Act of 2012 – 124
PART III – 127
Item 17: Financial Statements – 127
Item 18: Financial Statements – 127
Item 19: Exhibits – 127
Signatures – 128
Annual Report – 129
Supplemental Financial Information (Unaudited) – S-1

Deutsche Bank Aktiengesellschaft, which we also call Deutsche Bank AG, is a stock corporation organized under the laws of the Federal Republic of Germany. Unless otherwise specified or required by the context, in this document, references to "we", "us", "our", "the Group", "Deutsche Bank" and "Deutsche Bank Group" are to Deutsche Bank Aktiengesellschaft and its consolidated subsidiaries.

Due to rounding, numbers presented throughout this document may not add up precisely to the totals we provide and percentages may not precisely reflect the absolute figures.

Our registered address is Taunusanlage 12, 60325 Frankfurt am Main, Germany, and our telephone number is +49-69-910-00.

## Inclusion of Our Annual Report

We have included as an integral part of this Annual Report on Form 20-F our Annual Report 2016, to which we refer for the responses to certain items hereof. Certain portions of the Annual Report 2016 have been omitted, as indicated therein. The included Annual Report 2016 contains our consolidated financial statements, which we also incorporate by reference into this report, in response to Items 8.A and 18. Such consolidated financial statements differ from those contained in the Annual Report 2016 used for other purposes in that, for Notes 45 and 46 thereto, notes addressing non-U.S. requirements have been replaced with notes addressing U.S. requirements, and Note 47 thereto has been omitted. Such consolidated financial statements have been audited by KPMG AG Wirtschaftsprüfungsgesellschaft, as described in their "Report of Independent Registered Public Accounting Firm" included on page 417 of the Annual Report 2016, which report is included only in the version of the Annual Report 2016 included in this Annual Report on Form 20-F.

## Cautionary Statement Regarding Forward-Looking Statements

We make certain forward-looking statements in this document with respect to our financial condition and results of operations. In this document, forward-looking statements include, among others, statements relating to:

– the potential development and impact on us of economic and business conditions and the legal and regulatory environment to which we are subject;
– the implementation of our strategic initiatives and other responses thereto;
– the development of aspects of our results of operations;
– our expectations of the impact of risks that affect our business, including the risks of losses on our trading processes and credit exposures; and
– other statements relating to our future business development and economic performance.

In addition, we may from time to time make forward-looking statements in our periodic reports to the United States Securities and Exchange Commission on Form 6-K, annual and interim reports, invitations to Annual General Meetings and other information sent to shareholders, offering circulars and prospectuses, press releases and other written materials. Our Management Board, Supervisory Board, officers and employees may also make oral forward-looking statements to third parties, including financial analysts.

Forward-looking statements are statements that are not historical facts, including statements about our beliefs and expectations. We use words such as "believe", "anticipate", "expect", "intend", "seek", "estimate", "project", "should", "potential", "reasonably possible", "plan", "aim" and similar expressions to identify forward-looking statements.

By their very nature, forward-looking statements involve risks and uncertainties, both general and specific. We base these statements on our current plans, estimates, projections and expectations. You should therefore not place too much reliance on them. Our forward-looking statements speak only as of the date we make them, and we undertake no obligation to update any of them in light of new information or future events.

We caution you that a number of important factors could cause our actual results to differ materially from those we describe in any forward-looking statement. These factors include, among others, the following:

– the potential development and impact on us of economic and business conditions;
– other changes in general economic and business conditions;
– changes and volatility in currency exchange rates, interest rates and asset prices;
– changes in governmental policy and regulation, including measures taken in response to economic, business, political and social conditions;
– the potential development and impact on us of legal and regulatory proceedings to which we are or may become subject;
– changes in our competitive environment;
– the success of our acquisitions, divestitures, mergers and strategic alliances;
– our success in implementing our strategic initiatives and other responses to economic and business conditions and the legal and regulatory environment and realizing the benefits anticipated therefrom; and
– other factors, including those we refer to in "Item 3: Key Information – Risk Factors" and elsewhere in this document and others to which we do not refer.

## Use of Non-GAAP Financial Measures

This document and other documents we have published or may publish contain non-GAAP financial measures. Non-GAAP financial measures are measures of our historical or future performance, financial position or cash flows that contain adjustments that exclude or include amounts that are included or excluded, as the case may be, from the most directly comparable measure calculated and presented in accordance with IFRS in our financial statements. Examples of our non-GAAP financial measures, and the most directly comparable IFRS financial measures, are as follows:

| Non-GAAP Financial Measure | Most Directly Comparable IFRS Financial Measure |
| --- | --- |
| Net income attributable to Deutsche Bank shareholders | Net income |
| Adjusted costs | Noninterest expenses |
| Tangible shareholders' equity, Tangible book value | Total shareholders' equity (book value) |
| Post-tax return on average shareholders' equity (based on Net income attributable to Deutsche bank shareholders) | Post-tax return on average shareholders' equity |
| Post-tax return on average tangible shareholders' equity | Post-tax return on average shareholders' equity |
| Tangible book value per share outstanding | Total shareholders' equity (book value) per share outstanding |

For descriptions of these non-GAAP financial measures and the adjustments made to the most directly comparable financial measures under IFRS, please refer to "Supplementary Information: Non-GAAP Financial Measures" on pages 467 through 472, which is incorporated by reference herein.

When used with respect to future periods, our non-GAAP financial measures are also forward-looking statements. We cannot predict or quantify the levels of the most directly comparable financial measures under IFRS that would correspond to these measures for future periods. This is because neither the magnitude of such IFRS financial measures, nor the magnitude of the adjustments to be used to calculate the related non-GAAP financial measures from such IFRS financial measures, can be predicted. Such adjustments, if any, will relate to specific, currently unknown, events and in most cases can be positive or negative, so that it is not possible to predict whether, for a future period, the non-GAAP financial measure will be greater than or less than the related IFRS financial measure.

## CRR/CRD 4 Solvency Measures

Our regulatory assets, exposures, risk-weighted assets, capital and ratios thereof are calculated for regulatory purposes as of December 31, 2016, December 31, 2015 and December 31, 2014 and set forth throughout this document under the regulation on prudential requirements for credit institutions and investment firms ("CRR") and the Capital Requirements Directive 4 ("CRD 4") implementing Basel 3, which were published on June 27, 2013 and which apply on and after January 1, 2014. CRR/CRD 4 provides for "transitional" (or "phase-in") rules, under which capital instruments that are no longer eligible under the new rules are permitted to be phased out as the new rules on regulatory adjustments are phased in, as well as regarding the risk weighting of certain categories of assets. In some cases, CRR/CRD 4 maintains transitional rules that had been adopted in earlier capital adequacy frameworks through Basel 2 or Basel 2.5. The transitional rules relate, e.g., to the risk weighting of certain categories of assets. Unless otherwise noted, our CRR/CRD 4 solvency measures as of December 31, 2016, December 31, 2015 and December 31, 2014 set forth in this document reflect these transitional rules.

We also set forth in this document such CRR/CRD 4 measures on a "fully loaded" basis, reflecting full application of the final CRR/CRD 4 framework without consideration of the transitional provisions under CRR/CRD 4, except as described below. Measures calculated pursuant to our fully loaded methodology are non-GAAP financial measures.

The transitional rules include rules permitting the grandfathering of equity investments at a risk-weight of 100 % instead of a risk weight between 190 % and 370 % determined based on Article 155 CRR that would apply under the CRR/CRD 4 fully loaded rules. Despite the grandfathering rule for equity investments not applying under the full application of the final CRR/CRD 4 framework, we continue to apply it in our CRR/CRD 4 fully loaded methodology for a limited subset of equity positions, based on our intention to mitigate the impact of the expiration of the grandfathering rule through sales of the underlying assets or other measures prior to its expiration at end of 2017. We are closely monitoring the market and potential impacts from illiquid markets or other similar difficulties which could make it unfeasible to exit these positions.

As the final implementation of CRR/CRD 4 may differ from our expectations, and our competitors' assumptions and estimates regarding such implementation may vary, our fully loaded CRR/CRD 4 measures may not be comparable with similarly labeled measures used by our competitors.

We believe that these fully loaded CRR/CRD 4 calculations provide useful information to investors as they reflect our progress against the new regulatory capital standards and as many of our competitors have been describing CRR/CRD 4 calculations on a "fully loaded" basis.

For descriptions of these fully loaded CRR/CRD 4 measures and the differences from the most directly comparable measures under the CRR/CRD 4 transitional rules, please refer to "Management Report: Risk Report: Risk and Capital Performance: Capital and Leverage Ratio" on pages 136 through 152 of the Annual Report 2016, in particular the subsections thereof entitled "Development of Regulatory Capital", "Development of Risk-Weighted Assets" and "Leverage Ratio", and, with respect to the effect of the grandfathering rule on our fully loaded CRR/CRD 4 measures, to "Supplementary Information: Non-GAAP Financial Measures: Fully loaded CRR/CRD 4 Measures" on pages 471 through 472 of the Annual Report 2016, each of which are incorporated by reference herein.

When used with respect to future periods, our fully loaded CRR/CRD 4 measures are also forward-looking statements. We cannot predict or quantify the levels of the most directly comparable transitional CRR/CRD 4 measures that would correspond to these fully loaded CRR/CRD 4 measures for future periods. In managing our business with the aim of achieving targets based on fully loaded CRR/CRD 4 measures, the relation between the fully loaded and transitional measures will depend upon, among other things, management action taken in light of future business, economic and other conditions.

## Use of Internet Addresses

This document contains inactive textual addresses of Internet websites operated by us and third parties. Reference to such websites is made for informational purposes only, and information found at such websites is not incorporated by reference into this document.

# PAGES 9-13 OMITTED PURSUANT TO D. N.J. ECF POLICIES AND PROCEDURES

# Risk Factors

An investment in our securities involves a number of risks. You should carefully consider the following information about the risks we face, together with other information in this document, when you make investment decisions involving our securities. If one or more of these risks were to materialize, it could have a material adverse effect on our financial condition, results of operations, cash flows or prices of our securities.

*Recent tepid economic growth, and uncertainties about prospects for growth going forward, especially in our home market of Europe, have affected and continue to negatively affect our results of operations and financial condition in some of our businesses and our strategic plans, while a continuing low interest environment and competition in the financial services industry have compressed margins in many of our businesses. If these conditions persist or worsen, our business, results of operations or strategic plans could continue to be adversely affected.*

Although economic data appear to have stabilized or improved somewhat during the course of 2016 in many of the countries in which we operate, our business, financial results and strategic plans continue to be negatively impacted by the low interest rate environment, uneven and tepid economic growth, especially in our home markets in Europe, and elevated political uncertainty. Recent and upcoming political events, including the UK referendum on European Union ("EU") membership, the recent U.S. presidential election, the Italian referendum on constitutional reform and upcoming national elections in France, Germany and the Netherlands, have contributed to considerable uncertainty concerning the current and future economic environment. Global economic growth also continues to be reliant on the supportive monetary policy stance of the major central banks. While somewhat improving economic conditions in the U.S. and the potential for fiscal stimulus have prompted the Federal Reserve to embark on a course of raising interest rates, the European Central Bank ("ECB") has continued its policy of negative interest rates on deposits and its program of monthly asset purchases, although it plans to do so at a somewhat reduced volume starting in April 2017.

The European economy remains subject to a number of potential obstacles to future economic growth beyond the political events summarized above, including renewed doubts about the future of the eurozone, a discussion about the appropriate monetary policy stance of the ECB, possible weakening exports growth should the euro strengthen again or if protectionist trade policies are adopted, a delay in implementing structural reforms and a renewed increase of the refugee inflow. In particular, sentiment towards the Italian banking sector deteriorated in 2016 driven by concerns around capitalization, nonperforming loans and the impact of the EU-wide stress tests. In contrast, global financial markets have reacted relatively positively to the beginning of the normalization of U.S. monetary policy and the potential growth-enhancing measures of the new U.S. presidential administration. Markets could, however, react more negatively to these actions as policy plans begin to take shape, for example if they do not quickly result in anticipated increased economic growth or if protectionist measures dampen global growth. In the emerging markets, growth remained relatively weak in 2016 and could be a source of global economic shocks going forward. A stronger than forecast increase of interest rates in the United States could result in strong capital outflows from the emerging markets, further dampening their outlook. In China, in particular, economic growth continued to slow in 2016, and the economic outlook remains subdued, even as the People's Bank of China may take actions to loosen its monetary supply. Should a severe economic contraction or a protracted period of stagnation occur, monetary policymakers, particularly in Europe and the United States but also in the emerging markets, have few tools left in their toolboxes to combat these developments.

Against this background, our results continue to be adversely impacted in particular by the protracted low interest environment and the macro-economic and political uncertainties. The simultaneous easing of monetary policy in the eurozone and the tightening of it in the United States may continue to have disruptive effects on many of our businesses. A further tightening of monetary policy by the Federal Reserve or any decision by central banks more generally to tighten their monetary policy if economies continue to improve could have a material adverse effect on perceptions of liquidity in the financial system and on the global economy more generally, and may adversely affect our business and

Case 1:22-cv-02854-JSR   Document 42-5   Filed 04/15/21   Page 12 of 62

15     Deutsche Bank                      PART I – 9              Signatures – 128
       Annual Report 2016 on Form 20-F    PART II – 116           Annual Report – 129
                                          PART III – 127          Supplemental Financial Information
                                                                  (Unaudited) – S-1

financial position. We may face further uncertainty if, as it currently appears, the net effect of monetary and fiscal policies in the U.S. and the eurozone is to continue to weaken the euro against the U.S. dollar. A stronger U.S. dollar can have a beneficial effect on our revenues, as a significant portion of our revenues is generated in the United States while our results are reported in euro. A stronger U.S. dollar will, however, also increase the euro values of our U.S. dollar-denominated costs and liabilities, including those incurred in respect of U.S. litigation and enforcement matters, and will also tend to significantly increase our risk weighted assets and leverage exposures that are denominated in U.S. dollars. If not fully hedged, this can lead to material declines in our capital ratios, as our capital is preponderantly denominated in euro.

Our results of operation and financial condition, in particular those of our Global Markets corporate division, continue to be negatively impacted by the challenging market environment, unfavorable macro-economic and geopolitical conditions, lower client activities, increased competition and regulation, and the immediate impacts resulting from our strategic decisions as we make progress on the implementation of our strategy. If we are unable to improve our profitability as we continue to face these headwinds as well as persistently high litigation costs, we may be unable to meet many of our strategic aspirations, and may have difficulty maintaining capital, liquidity and leverage ratios at levels expected by market participants and our regulators.

In 2016, our revenues declined in several of our corporate divisions, reflecting the negative impact of the challenging low interest rate market environment, sluggish economic conditions, especially in our home market of Europe, and lower client activities. The implementation of some of the strategic measures as part of our targets originally announced in October 2015 also continues to negatively impact our revenues in the short term. Even as the ultra-low interest rate environment, especially in the eurozone, has put pressure on our margins in our traditional banking business, our trading and markets businesses, in particular our fixed income securities franchise, have not matched the results of many of our international peers as differences in regional economic performance as well as the challenges specific to us have impacted our results.

We have experienced and may continue to experience mark-to-market losses on positions as we seek to manage long positions in our inventory that experience mark-to-market losses in times of high market volatility. These losses can more than offset volatility-driven increases in client activity. This factor, for example, negatively impacted some of the businesses in our Global Markets corporate division early in 2016.

In addition, changes in our business mix towards lower-margin, lower-risk products can limit our opportunities to profit from volatility. Regulators have generally encouraged the banking sector to focus more on the facilitation of client flow and less on risk taking. This has been effected in part by increasing capital requirements for higher-risk activities. In addition, some of our regulators have encouraged or welcomed changes to our business perimeter, consistent with their emphasis on lower-risk activities for banks. Our strategy provides for us to reduce our exposures in a number of businesses that focused on riskier but more capital-intensive products (but that in earlier periods also had the potential to be more highly profitable than those dependent on low-risk, low-margin flow in a very low interest rate environment). Further pressure on our revenues and profitability has resulted from long-term structural trends driven by regulation (especially increased regulatory capital and leverage requirements and increased compliance costs) and competition that have further compressed our margins in many of our businesses. Our strategic decisions on these businesses led in part to impairments we recognized in 2015 in our Corporate Banking & Securities business division (in 2016 part of our Global Markets and Corporate & Investment Banking corporate divisions) and reflect a new view on the medium-term profit potential of these activities. Should a combination of these factors continue to lead to reduced margins and subdued activity levels in our trading and markets business over the longer term, this could reflect structural challenges that may lead us to consider even further-reaching changes to aspects of our business mix than those contained in our targets originally announced in October 2015.

Against this backdrop, we expect the costs to us arising from the resolution of litigation, enforcement and similar matters pending against us to continue to be significant in the near to medium term and to adversely affect our business, financial condition and results of operations. In particular, these costs could substantially exceed the level of provisions

that we established for our litigation, enforcement and similar matters, which can contribute to negative market perceptions about our financial health, costing us business. This, combined with the actual costs of litigation, enforcement and other matters, could in turn adversely affect our ability to maintain capital, liquidity and leverage ratios at levels expected by market participants and our regulators. In particular, we suffered, at the end of the third quarter and beginning of the fourth quarter of 2016, some reduction in business volumes and asset outflows, particularly in some parts of our Global Markets business and of our Wealth Management business, as a result of speculation about the potential magnitude of a settlement of civil claims then being negotiated with the U.S. Department of Justice in connection with our issuance and underwriting of residential mortgage-backed securities. Although these negative effects on our business have abated since then and in some cases have reversed, future market speculation about potential settlement demands with respect to litigation and enforcement matters could have persistent adverse effects on our revenue levels. These factors have placed pressure on the markets for our securities, along with concerns regarding our ability to overcome the numerous headwinds facing us. As a result of the substantial uncertainties with respect to the potential outflows in respect of litigation and enforcement matters as well as the broader prospects for our business, we may find it necessary or desirable to raise additional capital in the future to maintain our capital, leverage and liquidity ratios at levels required by our regulators or viewed by market participants as necessary for our businesses in comparison with our international peers.

**Continued elevated levels of political uncertainty could have unpredictable consequences for the financial system and the greater economy, and could contribute to an unwinding of aspects of European integration, potentially leading to declines in business levels, write-downs of assets and losses across our businesses. Our ability to protect ourselves against these risks is limited.**
The last several years have been characterized by increased political uncertainty as Europe in particular has been impacted by the European sovereign debt crisis, the outcomes of the referenda in the UK on EU membership and in Italy on constitutional reform, the refugee crisis and the increasing attractiveness to voters of populist and anti-austerity movements. Although the severity of the European debt crisis appeared to have abated somewhat over recent years as the actions by the ECB, the rescue packages and the economic recovery appeared to have stabilized the situation in Europe, political uncertainty has nevertheless continued to be at an elevated level in recent periods and could trigger the unwinding of aspects of European integration that have benefitted our businesses. Against this backdrop, the prospects for national structural reform and further integration among EU member states, both viewed as important tools to reduce the eurozone's vulnerabilities to future crises, appear to have worsened. These trends may ultimately result in material reductions in our business levels as our customers rein in activity levels in light of decreased economic output and increased uncertainty, which would materially adversely affect our operating results and financial condition.

An escalation of political risks could have unpredictable consequences both for the financial system and the greater economy as a whole, potentially leading to declines in business levels, write-downs of assets and losses across our businesses. In particular, the UK voted on June 23, 2016 in a non-binding national referendum to withdraw from the EU ("Brexit"). On January 24, 2017, the UK Supreme Court ruled that the UK is not authorized to formally give notice to the European Council without an act of Parliament. Nonetheless, the UK appears to be on course to formally give notice to the European Council in March, at which time potentially tense and highly uncertain negotiations regarding the UK's exit from the EU would commence. Given these and other uncertainties in connection with the UK's withdrawal from the EU, it is difficult to determine the exact impact on us over the long term. We are also unable to determine with any precision the impact of Brexit on our current UK structure or business model in the short term, as there remains no clarity into the details or timing of the changes. However, the UK's economy and those of the eurozone countries are very tightly linked as a result of EU integration projects other than the euro, and the scale of our businesses in the UK – especially those dependent on activity levels in the City of London, to which we are heavily exposed and which may deteriorate as a result of Brexit – means that even modest effects in percentage terms can have a very substantial adverse effect on our businesses. In addition, a number of EU member states face national elections in 2017, including France, Germany and the Netherlands (and likely Italy), and political parties disfavoring current levels of European

PART I – 9
PART II – 116
PART III – 127

Signatures – 128
Annual Report – 129
Supplemental Financial Information
(Unaudited) – S-1

integration, or espousing the unwinding of European integration to varying extents, are performing relatively well in pre-election polling. The Brexit vote has also given a voice to some of these political parties to challenge European integration. The resulting uncertainty could have significant effects on the value of the euro and on prospects for member states' financial stability, which in turn could potentially lead to a significant deterioration of the sovereign debt market, especially if Brexit or any other member country's exit did not result in the catastrophic effects on the exiting country that many have predicted. If one or more members of the eurozone defaults on their debt obligations or decides to leave the common currency, this would result in the reintroduction of one or more national currencies. Should a eurozone country conclude it must exit the common currency, the resulting need to reintroduce a national currency and restate existing contractual obligations could have unpredictable financial, legal, political and social consequences, leading not only to significant losses on sovereign debt but also on private debt in that country. Given the highly interconnected nature of the financial system within the eurozone, and the high levels of exposure we have to public and private counterparties around Europe, our ability to plan for such a contingency in a manner that would reduce our exposure to non-material levels is likely to be limited. If the overall economic climate deteriorates as a result of one or more departures from the eurozone, our businesses could be adversely affected, and, if overall business levels decline or we are forced to write down significant exposures among our various businesses, we could incur substantial losses.

**We may be required to take impairments on our exposures to the sovereign debt of European or other countries if the European sovereign debt crisis reignites. The credit default swaps into which we have entered to manage sovereign credit risk may not be available to offset these losses.**
The effects of the sovereign debt crisis have been especially evident in the financial sector, as a large portion of the sovereign debt of eurozone countries is held by European financial institutions, including us. As of December 31, 2016, we had a direct sovereign credit risk exposure of € 2.7 billion to Italy, € 1.3 billion to Spain, € 61 million to Portugal, € 569 million to Ireland and € 89 million to Greece. Despite the apparent abatement of the crisis in recent years, it remains uncertain whether, in light of the current political environment, Greece or other eurozone sovereigns, such as Spain, Italy, Portugal and Cyprus, will be able to manage their debt levels in the future and whether Greece will attempt to renegotiate its past international debt restructuring. The rise of anti-austerity parties and populist sentiment in many of these countries poses a threat to the medium- to long-term measures recommended for these countries to alleviate the tensions in the eurozone caused by drastically differing economic situations among the eurozone states. In the future, negotiations or exchanges similar to the Greek debt restructuring in 2012 could take place with respect to the sovereign debt of these or other affected countries. The outcome of any negotiations regarding changed terms (including reduced principal amounts or extended maturities) of sovereign debt may result in additional impairments of assets on our balance sheet. Any negotiations are highly likely to be subject to political and economic pressures that we cannot control, and we are unable to predict their effects on the financial markets, on the greater economy or on ourselves.

In addition, any restructuring of outstanding sovereign debt may result in potential losses for us and other market participants that are not covered by payouts on hedging instruments that we have entered into to protect against the risk of default. These instruments largely consist of credit default swaps, generally referred to as CDSs, pursuant to which one party agrees to make a payment to another party if a credit event (such as a default) occurs on the identified underlying debt obligation. A sovereign restructuring that avoids a credit event through voluntary write-downs of value may not trigger the provisions in CDSs we have entered into, meaning that our exposures in the event of a write-down could exceed the exposures we previously viewed as our net exposure after hedging. Additionally, even if the CDS provisions are triggered, the amounts ultimately paid under the CDSs may not correspond to the full amount of any loss we incur. We also face the risk that our hedging counterparties have not effectively hedged their own exposures and may be unable to provide the necessary liquidity if payments under the instruments they have written are triggered. This may result in systemic risk for the European banking sector as a whole and may negatively affect our business and financial position.

**Our liquidity, business activities and profitability may be adversely affected by an inability to access the debt capital markets or to sell assets during periods of market-wide or firm-specific liquidity constraints. Credit rating downgrades have contributed to an increase in our funding costs, and any future downgrade could materially adversely affect our funding costs, the willingness of counterparties to continue to do business with us and significant aspects of our business model.**

We have a continuous demand for liquidity to fund our business activities. Our liquidity may be impaired by an inability to access secured and/or unsecured debt markets, an inability to access funds from our subsidiaries or otherwise allocate liquidity optimally across our businesses, an inability to sell assets or redeem our investments, or unforeseen outflows of cash or collateral. This situation may arise due to circumstances unrelated to our businesses and outside our control, such as disruptions in the financial markets, or circumstances specific to us, such as reluctance of our counterparties or the market to finance our operations due to perceptions about potential outflows resulting from litigation, regulatory and similar matters, actual or perceived weaknesses in our businesses, our business model or our strategy, as well as in our resilience to counter negative economic and market conditions. For example, we have over the last year, as well as in the past, experienced steep declines in the price of our shares and increases in the spread versus government bonds at which our debt trades in the secondary markets. Reflecting these conditions, our internal estimates of our available liquidity over the duration of a stressed scenario has at times been negatively impacted in recent periods. Such effects were particularly acute in the autumn of 2016 in response to market speculation about the potential magnitude of a settlement of civil claims then being negotiated with the U.S. Department of Justice in connection with our issuance and underwriting of residential mortgage-backed securities. In addition, negative developments concerning other financial institutions perceived to be comparable to us and negative views about the financial services industry in general have also affected us in recent years. These perceptions have affected the prices at which we have accessed the capital markets to obtain the necessary funding to support our business activities; should these perceptions worsen, our ability to obtain this financing on acceptable terms may be adversely affected. Among other things, an inability to refinance assets on our balance sheet or maintain appropriate levels of capital to protect against deteriorations in their value could force us to liquidate assets we hold at depressed prices or on unfavorable terms, and could also force us to curtail business, such as the extension of new credit. This could have an adverse effect on our business, financial condition and results of operations.

In addition, we have benefited in recent years from a number of incremental measures by the ECB and other central banks to provide additional liquidity to financial institutions and the financial markets, particularly in the eurozone. To the extent these actions are curtailed or halted, our funding costs could increase, or our funding supply could decrease, which could in turn result in a reduction in our business activities. In particular, any decision by the ECB to discontinue or reduce quantitative easing or further steps by the Federal Reserve to tighten its monetary policy or actions by central banks more generally to tighten their monetary policy will likely cause long-term interest rates to increase and accordingly impact the costs of our funding.

Since the start of the global financial crisis, the major credit rating agencies have lowered our credit ratings or placed them on review or negative watch on multiple occasions. These credit rating downgrades have contributed to an increase in our funding costs, and any future downgrade could materially affect our funding costs, although we are unable to predict whether this would be the case or the extent of any such effect. The effect would depend on a number of factors including whether a downgrade affects financial institutions across the industry or on a regional basis, or is intended to reflect circumstances specific to us, such as our potential settlement of regulatory, litigation and similar matters; any actions our senior management may take in advance of or in response to the downgrade; the willingness of counterparties to continue to do business with us; any impact of other market events and the state of the macroeconomic environment more generally. In particular, should any of the major credit rating agencies lower our credit rating to a level considered sub-investment grade, significant aspects of our business model would be materially and adversely affected.

Case 1:22-cv-02854-JSR   Document 42-5   Filed 04/15/21   Page 16 of 62

19    Deutsche Bank           PART I – 9                    Signatures – 128
      Annual Report 2016 on Form 20-F    PART II – 116               Annual Report – 129
                                    PART III – 127           Supplemental Financial Information
                                                      (Unaudited) – S-1

Additionally, under many of the contracts governing derivative instruments to which we are a party, a downgrade could require us to post additional collateral, lead to terminations of contracts with accompanying payment obligations for us or give counterparties additional remedies. We take these effects into account in our liquidity stress testing analysis, as further described in "Management Report: Risk Report: Liquidity Risk: Stress Testing and Scenario Analysis" on pages 129 through 130 of the Annual Report 2016.

**Regulatory reforms enacted and proposed in response to weaknesses in the financial sector, together with increased regulatory scrutiny more generally, have created significant uncertainty for us and may adversely affect our business and ability to execute our strategic plans, and competent regulators may prohibit us from making dividend payments or payments on our regulatory capital instruments or take other actions if we fail to comply with regulatory requirements.**

In response to the global financial crisis and the European sovereign debt crisis, governments, regulatory authorities and others have made and continue to make proposals to reform the regulatory framework for the financial services industry to enhance its resilience against future crises. Legislation has been enacted and regulations have been issued in response to many of these proposals, while others continue to be developed. The regulatory framework for financial institutions is likely to undergo further significant change. This creates significant uncertainty for us and the financial industry in general. The wide range of new laws and regulations or current proposals includes, among other things:

– provisions for more stringent regulatory capital, leverage and liquidity standards,
– restrictions on compensation practices,
– restrictions on proprietary trading and other investment activities,
– special bank levies and financial transaction taxes,
– recovery and resolution powers to intervene in a crisis including "bail-in" of creditors,
– large exposure limits,
– the creation of a single supervisory authority and a single resolution authority within the eurozone and any other participating member states,
– separation of certain businesses from deposit taking,
– stress testing and capital planning regimes,
– heightened reporting requirements, and
– reforms of derivatives, other financial instruments, investment products and market infrastructures.

In addition, regulatory scrutiny under existing laws and regulations has become more intense. The specific effects of a number of new laws and regulations remain uncertain because the drafting and implementation of these laws and regulations are still on-going. For example, in 2016 the Basel Committee on Banking Supervision published its final revised standards for market risk following the "Fundamental Review of the Trading Book", or "FRTB", and consultative documents on revising the standardized approach for credit risk, operational risk, constraining the use of internal models for credit risk, capital floors, and revisions to the leverage ratio. Also in 2016, the Basel Committee published, among other things, changes to the calculation of interest rate risk in the banking book, or "IRRBB". The changes contemplated by the FRTB and IRRBB as well as the proposals to implement the standardized approach for credit risk, among other things, are part of the EC proposals published on November 23, 2016 to change the CRR/CRD 4 legislative package. Furthermore, European Union and U.S. regulators have implemented or are expected to propose rules implementing the further revisions to credit risk, operational risk and capital floors in 2018. Full compliance with the European Union rules could be required at some point between 2020 and 2025. The proposed changes could lead to a significant increase of our risk-weighted assets and, as a result, a higher capital demand, changes in our deductions from our regulatory capital and the imposition of additional capital charges to cover credit, market and operational risk. These requirements may be in addition to regulatory capital buffers that may also be increased or be in addition to those already imposed on us and could themselves materially increase our capital requirements.

Regulatory authorities have substantial discretion in how to regulate banks, and this discretion, and the means available to the regulators, have been steadily increasing during recent years. Regulation may be imposed on an ad hoc basis by governments and regulators in response to ongoing or future crises, and may especially affect financial institutions such as us that are deemed to be systemically important.

In particular, the regulators with jurisdiction over us, including the ECB under the Single Supervisory Mechanism (also referred to as the "SSM"), may, in connection with the supervisory review and evaluation process ("SREP") or otherwise, conduct stress tests and have discretion to impose capital surcharges on financial institutions for risks, including for litigation, regulatory and similar matters, that are not otherwise recognized in risk-weighted assets or other surcharges depending on the individual situation of the bank and take or require other measures, such as restrictions on or changes to our business. In this context, the ECB may impose on us individual capital requirements resulting from the SREP which are referred to as "Pillar 2" requirements. "Pillar 2" requirements must be fulfilled with Common Equity Tier 1 capital in addition to the statutory minimum capital and buffer requirements and any non-compliance may have immediate legal consequences such as restrictions on dividend payments. Also following the SREP, the ECB may communicate to individual banks an expectation to hold a further "Pillar 2" Common Equity Tier 1 capital add-on, the so-called "Pillar 2" guidance. Although the "Pillar 2" guidance is not legally binding and failure to meet the "Pillar 2" guidance does not automatically trigger legal action, the ECB has stated that it expects banks to meet the "Pillar 2" guidance. Also, more generally, competent regulators may, if we fail to comply with regulatory requirements, in particular with statutory minimum capital requirements, "Pillar 2" requirements or buffer requirements, or if there are shortcomings in our governance and risk management processes, prohibit us from making dividend payments to shareholders or distributions to holders of our other regulatory capital instruments. This could occur, for example, if we fail to make sufficient profits due to declining revenues, or substantial outflows due to litigation, regulatory and similar matters. Generally, a failure to comply with the new quantitative and qualitative regulatory requirements could have a material adverse effect on our business, financial condition and results of operations, including our ability to pay out dividends to shareholders or distributions on our other regulatory capital instruments or, in certain circumstances, conduct business which we currently conduct or plan to conduct in the future.

**European and German legislation regarding the recovery and resolution of banks and investment firms could, if steps were taken to ensure our resolvability or resolution measures were imposed on us, significantly affect our business operations, and lead to losses for our shareholders and creditors.**
Germany participates in the Single Resolution Mechanism (referred to as the "SRM"), which centralizes at a European level the key competences and resources for managing the failure of any bank in member states of the European Union participating in the banking union. The SRM is based on the SRM Regulation and the Bank Recovery and Resolution Directive (or "BRRD"), which was implemented in Germany through the German Recovery and Resolution Act (Sanierungs- und Abwicklungsgesetz, "SAG"). In addition, the German Resolution Mechanism Act (Abwicklungsmechanismusgesetz) adapted German bank resolution laws to the SRM.

The SRM Regulation and the German Recovery and Resolution Act require the preparation of recovery and resolution plans for banks and grant broad powers to public authorities to intervene in a bank which is failing or likely to fail. For a bank directly supervised by the ECB, such as us, the Single Resolution Board (referred to as the "SRB") assesses its resolvability and may require legal and operational changes to the bank's structure to ensure its resolvability. In the event that such bank is failing or likely to fail and certain other conditions are met, the SRB is responsible for adopting a resolution scheme for resolving the bank pursuant to the SRM Regulation. The European Commission and, to a lesser extent, the Council of the European Union, have a role in endorsing or objecting to the resolution scheme proposed by the SRB. The resolution scheme would be addressed to and implemented by the competent national resolution authorities (in Germany: the Federal Agency for Financial Market Stabilization, "FMSA") in line with the national laws implementing the BRRD. Resolution measures that could be imposed upon a failing bank may include a range of measures including the transfer of shares, assets or liabilities of the bank to another legal entity, the reduction, including to zero, of the nominal value of shares, the dilution of shareholders of a failing bank or the cancellation of shares outright, or the amendment, modification or variation of the terms of the bank's outstanding debt instruments, for example by way of a deferral of payments or a reduction of the applicable interest rate. Furthermore, certain eligible unsecured liabilities, in particular certain senior unsecured debt instruments specified by the German Banking Act, as amended by the German Resolution Mechanism Act, may be written down, including to zero, or converted into equity (commonly referred to as "bail-in").

Case 1:22-cv-02854-JSR   Document 42-5   Filed 04/15/21   Page 18 of 62

21   Deutsche Bank
     Annual Report 2016 on Form 20-F

PART I – 9
PART II – 116
PART III – 127

Signatures – 128
Annual Report – 129
Supplemental Financial Information
(Unaudited) – S-1

In order to facilitate the authorities' bail-in powers, which became effective in Germany on January 1, 2015, banks are required to include in their eligible liabilities issued under non-EU law conditions to the effect that the respective counterparties recognize the regulatory powers to write down or convert such liabilities as well as other resolution powers. The SRM Regulation, the BRRD and the Recovery and Resolution Act are intended to eliminate, or reduce, the need for public support of troubled banks. Therefore, financial public support for such banks, if any, would be used only as a last resort after having assessed and exploited, to the maximum extent practicable, the resolution powers, including a bail-in. The taking of actions to ensure our resolvability or the exercise of resolution powers by the competent resolution authority could materially affect our business operations and lead to a significant dilution of our shareholders or even the total loss of our shareholders' or creditors' investment.

*Regulatory and legislative changes require us to maintain increased capital, in some cases (including in the United States) applying liquidity, risk management and capital adequacy rules to our local operations on a standalone basis. These requirements may significantly affect our business model, financial condition and results of operations as well as the competitive environment generally. Any perceptions in the market that we may be unable to meet our capital or liquidity requirements with an adequate buffer, or that we should maintain capital in excess of these requirements, could intensify the effect of these factors on our business and results.*

In December 2010, the Basel Committee on Banking Supervision published a set of comprehensive changes to the capital adequacy framework, known as Basel 3, which have been implemented into European Union law by a legislative package referred to as "CRR/CRD 4". The CRR/CRD 4 legislative package includes a European Union regulation (which is referred to as the Capital Requirements Regulation or "CRR") which is directly enforceable as law in every member state of the European Union, and a European Union directive (which is referred to as the Capital Requirements Directive or "CRD 4"), which has been implemented into national (in our case German) law. CRR/CRD 4 became effective on January 1, 2014, with some of the regulatory adjustments being gradually phased in through January 1, 2019. CRR/CRD 4 contains, among other things, detailed rules on regulatory banking capital, increased capital requirements and the introduction of additional capital buffers (which will increase from year to year) as well as new and tightened liquidity standards and the introduction of a leverage ratio not based upon risk-weightings. We are subject to additional capital buffers, including as a result of being designated a global systemically important bank, or "G-SIB". In July 2013, U.S. federal bank regulators issued final rules implementing many elements of the Basel 3 capital adequacy framework in the United States. The impact and implementation of the Basel 3 capital adequacy framework is being assessed and monitored by regulators on a regular basis. Further revisions, such as stricter rules on the measurement of risks proposed by the Basel Committee on Banking Supervision, could further increase risk-weighted assets and the corresponding capital demand for banks.

Furthermore, under the SRM Regulation, the BRRD and the German Recovery and Resolution Act, banks in the European Union are required to meet at all times a robust minimum requirement for own funds and eligible liabilities ("MREL") which is determined on a case-by-case basis by the competent resolution authority. In addition, on November 9, 2015, the Financial Stability Board ("FSB") published a new standard applicable to all G-SIBs (and not only European G-SIBs), such as us, that will require, when transposed as law, G-SIBs, such as us, to meet a new firm-specific minimum requirement for total loss-absorbing capacity ("TLAC") starting on January 1, 2019. Also in order to facilitate the meeting of TLAC requirements by German banks, obligations of banks under certain, specifically defined senior unsecured debt instruments issued by them (such as bonds that are not structured products) rank, as from 2017, junior to all other outstanding unsecured unsubordinated obligations of such bank (such as certain structured products), without technically constituting subordinated debt, but continue to rank in priority to contractually or otherwise subordinated debt instruments. Both the TLAC and MREL requirements are specifically designed to require banks to maintain a sufficient amount of instruments which are eligible to absorb losses in resolution with the aim of ensuring that failing banks can be resolved without recourse to taxpayers' money. On November 23, 2016, the European Commission published a proposal to implement the FSB's TLAC standard in the European Union and align it with MREL and also harmonize national rules on the priority of claims of banks' creditors in the European Union. This review comes as part of a broader review of the CRR/CRD 4 rules incorporating changes to the market risk framework, liquidity framework and leverage ratio calculation, amongst others. These rules are now subject to the EU co-decision process and will likely be subject to change over the coming months. Furthermore, on December 15, 2016, the Federal Reserve Board adopted final rules that implement the FSB's TLAC standard in the United States. The final rules, which apply beginning in 2019, require, among other things, the U.S. intermediate holding companies ("IHCs") of non-U.S. G-SIBs, in-

cluding our IHC, DB USA Corporation, to maintain a minimum amount of TLAC, and separately require them to maintain a minimum amount of long-term debt. While the final impact of the MREL and TLAC requirements will depend on their final implementation, the need to comply with such requirements, and the change in ranking of certain debt instruments issued by us, may affect our business, financial condition and results of operation and in particular may increase our financing costs.

We may not have sufficient capital or other loss-absorbing liabilities to meet these increasing regulatory requirements. This could occur due to regulatory changes and other factors, such as the gradual phase out of our hybrid capital instruments qualifying as Additional Tier 1 (or AT1) capital or our inability to issue new securities which are recognized as regulatory capital or loss-absorbing liabilities under the new standards, due to an increase of risk-weighted assets based on more stringent rules for the measurement of risks or as a result of a continued decline in the value of the euro as compared to other currencies, due to stricter requirements for the compliance with the non-risk based leverage ratio, due to any substantial losses we may incur, which would reduce our retained earnings, a component of Common Equity Tier 1 capital, or due to a combination of these or other factors.

If we are unable to maintain sufficient capital to meet the statutory minimum capital requirements, the buffer requirements or any specific "Pillar 2" capital requirements imposed on us by the ECB or capital ratios expected by the market, we may become subject to enforcement actions and/or restrictions on the pay-out of dividends, share buybacks, payments on our other regulatory capital instruments, and discretionary compensation payments. In addition, any requirement to increase risk-based capital ratios or the leverage ratio could lead us to adopt a strategy focusing on capital preservation and creation over revenue generation and profit growth, including the reduction of higher margin risk-weighted assets. If we are unable to increase our capital ratios to the regulatory minimum in such a case or by raising new capital through the capital markets, through the reduction of risk-weighted assets or through other means, we may be required to activate our group recovery plan. If these actions or other private or supervisory actions do not restore capital ratios to the levels required under the CRR/CRD 4 legislative package, and we are failing or likely to fail, competent authorities may apply resolution powers under the SRM Regulation, the German Recovery and Resolution Act and other applicable rules and regulations, which could lead to a significant dilution of our shareholders' or even the total loss of our shareholders' or creditors' investment.

Moreover, we are required to hold and calculate capital and to comply with rules on liquidity and risk management separately for our local operations in different jurisdictions. In the United States, the Federal Reserve Board has adopted rules that impose enhanced prudential standards on our U.S. operations. In February 2014, the Federal Reserve Board adopted U.S. prudential reforms (the "FBO Rules") applicable to foreign banking organizations ("FBOs"). FBOs with U.S.\$ 50 billion or more in U.S. non-branch assets, such as us, were required to establish or designate a separately capitalized top-tier U.S. IHC to hold substantially all of the FBO's ownership interests in U.S. subsidiaries by July 1, 2016. On July 1, 2016, we designated DB USA Corporation as our IHC and, as of that date, DB USA Corporation became subject, on a consolidated basis, to the capital requirements under the U.S. Basel 3 capital framework, capital planning and stress testing requirements (on a phased-in basis), U.S. liquidity buffer requirements and other enhanced prudential standards comparable to those applicable to top-tier U.S. bank holding companies of a similar size. Certain of these requirements also apply to our New York branch. The Federal Reserve Board has the authority to examine DB USA Corporation and any of its subsidiaries, as well as our New York branch. U.S. leverage ratio and supplementary leverage ratio requirements applicable to the IHC will take effect beginning in January 2018.

In September 2014, the Federal Reserve Board and other U.S. regulators approved a final rule implementing liquidity coverage ratio ("LCR") requirements for large U.S. banking holding companies and certain of their subsidiary depositary institutions that are generally consistent with the Basel Committee's revised Basel 3 liquidity standards. Deutsche Bank Trust Corporation became subject to a modified, less stringent version of the LCR beginning in January 2016, and DB USA Corporation and Deutsche Bank Trust Company Americas will become subject to the full LCR on April 1, 2017. Once DB USA Corporation becomes subject to the full LCR, Deutsche Bank Trust Corporation will no longer be subject to a standalone LCR requirement.

23     Case 1:22-cv-02854-JSR    Document 42-5    Filed 04/15/21    Page 20 of 62

Deutsche Bank            PART I – 9            Signatures – 128
Annual Report 2016 on Form 20-F    PART II – 116        Annual Report – 129
                             PART III – 127       Supplemental Financial Information
                                                 (Unaudited) – S-1

On June 1, 2016, the Federal Reserve and other U.S. regulators proposed rules implementing the second element of the Basel 3 liquidity framework, the net stable funding ratio ("NSFR"), which measures whether an institution maintains sufficiently stable amounts of longer-term funding. Under the proposed rules DB USA Corporation and Deutsche Bank Trust Company Americas would be subject to the full NSFR on January 1, 2018.

Our combined U.S. operations, including our New York branch, are expected to become subject to additional quantitative requirements related to liquidity and risk management.

Deutsche Bank Trust Corporation is subject to risk-based and leverage capital requirements, liquidity requirements, and other enhanced prudential standards applicable to large U.S. bank holding companies. Deutsche Bank Trust Corporation also became subject to capital planning and stress testing requirements on June 30, 2014. On June 29, 2016, the Federal Reserve Board publicly indicated that it had objected to Deutsche Bank Trust Corporation's 2016 capital plan submission due to weaknesses in its capital planning processes. Deutsche Bank Trust Corporation's stressed Common Equity Tier 1 capital ratio, however, was forecast by the Federal Reserve Board to substantially exceed the minimum required ratio under the supervisory severely adverse scenario. Deutsche Bank Trust Corporation will submit its 2017 capital plan, incorporating enhancements to its processes, on April 5, 2017. The Federal Reserve has indicated that this capital plan will be judged publicly only on a quantitative basis. DB USA Corporation will provide its first capital plan submission to the Federal Reserve Board in April 2017; however, the results of its first submission will not be made public by the Federal Reserve Board. Deutsche Bank Trust Corporation will remain subject to the capital planning and stress-testing requirements and certain enhanced prudential standards until corresponding requirements applicable to DB USA Corporation become fully effective in January 2018. It is possible this compliance date will be amended when the final U.S. NSFR rule is published.

Title I of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (the "Dodd-Frank Act") and the implementing regulations require each bank holding company with assets of U.S.$ 50 billion or more, including Deutsche Bank AG, to prepare and submit annually a plan for the orderly resolution of subsidiaries and operations in the event of future material financial distress or failure (the "Title I US Resolution Plan"). For foreign-based covered companies such as Deutsche Bank AG, the Title I US Resolution Plan only relates to subsidiaries, branches, agencies and businesses that are domiciled in or conducted in whole or in material part in the United States. Deutsche Bank AG filed its most recent Title I US Resolution Plan in July 2015 and, as a foreign-based covered company, was not required to file one in 2016. In addition to the Title I US Resolution Plan, in 2014, Deutsche Bank Trust Company Americas ("DBTCA"), one of our insured depository institutions ("IDIs") in the United States, became subject to the FDIC's final rule requiring IDIs with total assets of U.S.$ 50 billion or more to submit periodically to the FDIC a plan for resolution in the event of failure (the "IDI Rule"). In 2014, we expanded our Title I US Resolution Plan to also be responsive to the IDI Rule requirements, and in 2015 DBTCA submitted a separate resolution plan under the IDI Rule. Our next Title I US Resolution Plan filing is expected to be due on July 1, 2017. If the Federal Reserve Board and the FDIC were to jointly deem our Title I US Resolution Plan not credible and we failed to remedy the deficiencies in the required timeframe, we could be required to restructure or reorganize businesses, legal entities, operational systems and/or intra-company transactions in ways that may negatively impact our operations and strategy, or could be subject to restrictions on growth. We could also eventually be subjected to more stringent capital, leverage or liquidity requirements, or be required to divest certain assets or operations.

U.S. rules and interpretations, including those described above, could cause us to reduce assets held in the United States, inject capital and/or liquidity into or otherwise change the structure of our U.S. operations. To the extent that we are required to reduce operations in the United States or deploy capital in the United States that could be deployed more profitably elsewhere, these requirements could have an adverse effect on our business, financial condition and results of operations.

Any increased capital or liquidity requirements, including those described above, could have adverse effects on our business, financial condition and results of operations, as well as on perceptions in the market of our stability, particularly if any such proposal becomes effective and results in our having to raise capital at a time when financial markets are distressed. If these regulatory requirements must be implemented more quickly than currently foreseen, we may decide that the quickest and most reliable path to compliance is to reduce the level of assets on our balance sheet, dispose of divisions or separate out certain activities or reduce or close down certain business lines. The effects on our capital raising efforts in such a case could be amplified due to the expectation that our competitors, at least those subject to the same or similar capital requirements, would likely also be required to raise capital at the same time. Moreover, some of our competitors, particularly those outside the European Union, may not face the same or similar regulations, which could put us at a competitive disadvantage.

In addition to these regulatory initiatives, market sentiment may encourage financial institutions such as us to maintain significantly more capital, liquidity and loss-absorbing capital instruments than regulatory-mandated minima, which could exacerbate the effects on us described above or, if we do not increase our capital to the encouraged levels, could lead to the perception in the market that we are undercapitalized relative to our peers generally.

It is unclear whether the increased U.S. capital and other requirements described above, as well as similar developments in other jurisdictions could lead to a fragmentation of supervision of global banks that could adversely affect our reliance on regulatory waivers allowing us to meet capital adequacy requirements, large exposure limits and certain organizational requirements on a consolidated basis only rather than on both a consolidated and non-consolidated basis. Should we no longer be entitled to rely on these waivers, we would have to adapt and take the steps necessary in order to meet regulatory capital requirements and other requirements on a consolidated as well as a non-consolidated basis, which could result also in significantly higher costs and potential effects on our profitability and dividend paying ability.

**Our regulatory capital and liquidity ratios and our funds available for distributions on our shares or regulatory capital instruments will be affected by our business decisions and, in making such decisions, our interests and those of the holders of such instruments may not be aligned, and we may take decisions in accordance with applicable law and the terms of the relevant instruments that result in no or lower payments being made on our shares or regulatory capital instruments.**

Our regulatory capital and liquidity ratios are affected by a number of factors, including decisions we make relating to our businesses and operations as well as the management of our capital position, of our risk-weighted assets and of our balance sheet in general, and external factors, such as regulations regarding the risk weightings we are permitted to allocate to our assets, commercial and market risks or the costs of our legal proceedings. While we and our management are required to take into account a broad range of considerations in our and their managerial decisions, including the interests of the Bank as a regulated institution and those of our shareholders and creditors, particularly in times of weak earnings and increasing capital requirements, the regulatory requirements to build capital and liquidity may become paramount. Accordingly, in making decisions in respect of our capital and liquidity management, we are not required to adhere to the interests of the holders of instruments we have issued that qualify for inclusion in our regulatory capital, such as our Additional Tier 1 capital instruments. We may decide not to take any measures, including increasing our capital at a time when it is feasible to do so (through securities issuances or otherwise), even if our failure to take such an action would result in a non-payment or a write-down or other recovery- or resolution-related measure in respect of any of our regulatory capital instruments. Our decisions could cause the holders of such regulatory capital instruments to lose all or part of the value of their investments in these instruments due to their effect on our regulatory capital ratios, and such holders will not have any claim against us relating to such decisions, even if they result in a non-payment or a write-down or other recovery- or resolution-related measure in respect of such instruments they hold.

In addition, our annual profit and distributable reserves form an important part of the funds available for us to pay dividends on our shares and make payments on our other regulatory capital instruments, as determined in the case of each such instrument by its terms or by operation of law, and any adverse change in our financial prospects, financial position or profitability, or our distributable reserves, each as calculated on an unconsolidated basis, may have a material adverse effect on our ability to make dividend or other payments on these instruments. In addition, as part of the

25   Case 1:22-cv-02854-JSR   Document 42-5   Filed 04/15/21   Page 22 of 62

Deutsche Bank              PART I – 9              Signatures – 128
Annual Report 2016 on Form 20-F   PART II – 116          Annual Report – 129
                          PART III – 127           Supplemental Financial Information
                                                   (Unaudited) – S-1

implementation of our strategy, we may record impairments that reduce the carrying value of subsidiaries on our un-consolidated balance sheet and reduce profits and distributable reserves. Future impairments or other events that reduce our profit or distributable reserves on an unconsolidated basis could lead us to be unable to make such payments in respect of future years in part or at all. In particular, the direct costs of our potential settlements of litigation, enforcement and similar matters, especially to the extent in excess of provisions we have established for them, and their related business impacts, if they occur, could impact such distributable amounts.

In addition, German law places limits on the distribution of annual profits and otherwise-distributable reserves, as calcu-lated on an unconsolidated basis, to be distributed to our shareholders or the holders of our other regulatory capital instruments, such as our Additional Tier 1 capital instruments. Our management also has, subject to applicable law, broad discretion under the applicable accounting principles to influence all amounts relevant for calculating funds avail-able for distribution. Such decisions may impact our ability to make dividend or other payments under the terms of our regulatory capital instruments.

Consistent with our updated strategy, our Management Board intends to propose to our Annual General Meeting in May 2017 to resolve the payment of a dividend of € 0.19 per share. The dividend to be paid out of Deutsche Bank AG's distributable profit for 2016 determined under German accounting rules for its stand-alone financial statements contains a component reflecting the distributable profit carried forward from 2015 of approximately € 165 million and a dividend of € 0.11 per share out of the remaining distributable profit for 2016. Overall we expect to pay out a total dividend of approximately € 400 million in 2017.

**Legislation in the United States and in Germany as well as proposals in the European Union regarding the prohibition of proprietary trading or its separation from the deposit-taking business may materially affect our business model.**

On December 10, 2013, U.S. regulators released the final version of the rules implementing the "Volcker Rule", as required by the Dodd-Frank Act. The final rules prohibit U.S. insured depository institutions and companies that control or are affiliated with U.S. insured depository institutions (such as us) from engaging in proprietary trading of certain securities, derivatives, commodity futures and options on these instruments, for their own account. The final rules also impose limits or restrictions on investments in, and other relationships with, hedge funds, private equity funds and other private funds and limit the ability of banking entities and their affiliates to enter into certain transactions with such funds with which they or their affiliates have certain relationships. The Volcker Rule requires banking entities to establish comprehensive compliance programs designed to help ensure and monitor compliance with restrictions under the Volcker Rule. The Federal Reserve Board has extended the Volcker Rule's general conformance period for invest-ments in and relationships with covered funds and certain foreign funds that were in place on or prior to December 31, 2013 until July 21, 2017. The extension of the conformance period does not apply to the Volcker Rule's prohibitions on proprietary trading or to any investments in and relationships with covered funds made or entered into after Decem-ber 31, 2013.

In Germany, the German Act on the Separation of Risks and Recovery and Resolution Planning for Credit Institutions and Banking Groups (Trennbankengesetz), referred to as the "Separation Act", provides that deposit-taking banks and their affiliates are prohibited from engaging in proprietary trading that does not constitute a service for others, high-frequency trading (with the exception of market-making activities), and credit or guarantee transactions with hedge funds and comparable enterprises, unless such activities are transferred to a separate legal entity. The separation requirement applies if certain thresholds are exceeded, which we exceed. In addition, the German Separation Act authorizes the BaFin, since July 1, 2016, to prohibit the deposit-taking bank and its affiliates, on a case-by-case basis, from engaging in market-making and other activities that are comparable to the activities prohibited by law, if these activities may put the solvency of the deposit-taking bank or any of its affiliates at risk. In the event that the BaFin or-ders such a prohibition, the respective activities must be discontinued or transferred to a separate legal entity (referred to as financial trading institution (Finanzhandelsinstitut)). The prohibition for deposit-taking banks and their affiliates to conduct activities associated with increased risks became effective on July 1, 2015, with a further transitional period of

twelve months to accomplish the separation requirement, unless the BaFin extends this period. For Deutsche Bank Group, the period to cease or transfer activities concerned was extended by the BaFin until June 30, 2017. Non-compliance with the prohibitions set forth in the German Separation Act could ultimately result in civil and criminal liability.

On January 29, 2014, the European Commission published a proposal for a regulation on structural measures improving the resilience of European Union credit institutions (referred to as "Proposed Regulation"), which if enacted, will impose measures similar to the German Separation Act. The Proposed Regulation would apply to large banks which are either identified as G-SIBs (such as us), or whose total assets and trading activities exceed certain thresholds (which we exceed). If the Proposed Regulation were enacted as proposed, it would, inter alia, ban proprietary trading in financial instruments and commodities. On June 19, 2015, the Council of the European Union agreed its position at first reading on the Proposed Regulation, which contains significant amendments to the Proposed Regulation. If adopted, the Proposed Regulation might overrule certain requirements set out in the German Separation Act at the national level. The ultimate impact on us of the Proposed Regulation will depend on the content of the final version.

The Volcker Rule, the German Separation Act and the Proposed Regulation may have significant implications for the future structure and strategy of our Group, and may increase our Group's funding costs. This could adversely affect our business, financial condition and results of operations.

Other regulatory reforms adopted or proposed in the wake of the financial crisis – for example, extensive new regulations governing our derivatives activities, compensation, bank levies, deposit protection or a possible financial transaction tax – may materially increase our operating costs and negatively impact our business model. Beyond capital requirements, recovery and resolution planning, separation of certain bank activities and other requirements discussed above, we are affected, or expect to be affected, by various additional regulatory reforms adopted or proposed in the wake of the financial crisis including, among other things, new regulations governing our derivatives activities, compensation, bank levies, deposit protection or a possible financial transaction tax.

On August 16, 2012, the EU Regulation on over-the-counter ("OTC") derivatives, central counterparties and trade repositories, referred to as EMIR, entered into force. While a number of the compliance requirements introduced by EMIR already apply, the European Securities and Markets Authority ("ESMA") is still in the process of finalizing some of the implementing rules mandated by EMIR. EMIR introduced a number of requirements, including clearing obligations for certain classes of OTC derivatives and various reporting and disclosure obligations. Although some of the particular effects brought about by EMIR are not yet fully foreseeable, many of its elements have led and may lead to changes which may negatively impact our profit margins, require us to adjust our business practices or increase our costs (including compliance costs). The new Markets in Financial Instruments Directive ("MiFID II") and the corresponding Regulation ("MiFIR") introduce, among other changes, a trading obligation for those OTC derivatives which are subject to mandatory clearing and which are sufficiently standardized. MiFID II/MiFIR are foreseen to be applicable to us starting on January 3, 2018. MiFID II needs yet to be transposed into national law, and ESMA and the European Commission yet have to finalize several related implementing regulations. We will also be impacted by the BCBS-IOSCO final minimum standards for margin requirements for non-centrally cleared derivatives, for which enabling legislation exists in the EU (EMIR) but where much of the impact depends on how these requirements are implemented.

In the United States, the Dodd-Frank Act has numerous provisions that may affect our operations. Pursuant to regulations implementing provisions of the Dodd-Frank Act, we registered as a swap dealer with the U.S. Commodity Futures Trading Commission ("CFTC") and became subject to the CFTC's extensive oversight. Regulation of swap dealers by the CFTC imposes numerous corporate governance, business conduct, capital, margin, reporting, clearing, execution and other regulatory requirements on us. It also requires us to comply with certain U.S. rules in some circumstances with respect to transactions conducted outside of the United States or with non-U.S. persons. Although the coverage of EMIR and CFTC regulations implementing the Dodd-Frank Act is in many ways similar, certain swaps may be subject to both regulatory regimes to a significant extent. However, the CFTC's guidance on cross-border swaps regulation, as well as the margin requirements recently adopted by the U.S. bank regulatory agencies and the CFTC, may allow us to comply with some, but not all, U.S. regulatory requirements on a substituted basis by complying with EMIR and MiFID. The new requirements under the Dodd-Frank Act may adversely affect our derivatives business and make us less

Case 1:22-cv-02854-JSR   Document 42-5   Filed 04/15/21   Page 24 of 62

27   Deutsche Bank
Annual Report 2016 on Form 20-F

PART I – 9
PART II – 116
PART III – 127

Signatures – 128
Annual Report – 129
Supplemental Financial Information
(Unaudited) – S-1

competitive, especially as compared to competitors not subject to such regulation. Additionally, under the Dodd-Frank Act, security-based swaps are subject to a standalone regulatory regime under the jurisdiction of the U.S. Securities and Exchange Commission ("SEC"). The SEC is finalizing rules for its security-based swap regime that are expected to be parallel to, but not identical to, the CFTC's regulation of swaps. This will impose further regulation of our derivatives business.

In addition, CRD 4 provides for executive compensation reforms including caps on bonuses that may be awarded to "material risk takers" and other employees as defined in CRD 4, the German Banking Act and other applicable rules and regulations such as the Remuneration Regulation for Institutions (Institutsvergütungsverordnung). The compensation reforms of CRD 4, including any guidelines issued by the EBA to further implement them, could put us at a disadvantage to our competitors in attracting and retaining talented employees, especially compared to those outside the European Union that are not subject to these caps and other constraints.

Following the financial crisis, bank levies have been introduced in some countries including, among others, Germany and the United Kingdom. We accrued € 342 million for bank levies in 2014, € 653 million in 2015 and € 771 million in 2016. Also, we are required to contribute substantially to the Single Resolution Fund ("SRF") under the SRM (which is intended to reach a target level of 1 % of insured deposits of all banks in member states participating in the SRM by the end of 2023) and the statutory deposit guarantee and investor compensation schemes under the recast European Union directive on deposit guarantee schemes ("DGS Directive") and the European Union directive on investor compensation schemes. The DGS Directive defines a 0.8 % target level of prefunding by 2024 (similar to resolution funds), which has significantly increased the costs of the statutory deposit protection scheme. In addition, in this context, on November 24, 2015, the European Commission proposed a regulation to establish a European Deposit Insurance Scheme, or "EDIS" for bank deposits of all credit institutions that are members of any of the current national statutory deposit guarantee schemes of member states participating in the banking union. While the total impact of these future levies cannot currently be quantified, they may have a material adverse effect on our business, financial condition and results of operations in future periods.

Separately, on January 22, 2013, the Council of the European Union adopted a decision authorizing eleven EU member states (Austria, Belgium, Estonia, France, Germany, Greece, Italy, Portugal, Slovakia, Slovenia and Spain) to proceed with the introduction of a financial transaction tax under the European Union's "enhanced cooperation procedure". The European Commission on February 14, 2013 adopted a draft directive for the implementation of the financial transaction tax. Since then, the introduction of the financial transaction tax is subject to ongoing controversial discussions at the European Union level with the result that the final scope, design and entry into force of the financial transaction tax remain uncertain. Estonia is no longer participating. Depending on the final details, the proposed financial transaction tax could result in compliance costs as well as market consequences and have a materially adverse effect on our profits and business. Different forms of national financial transaction taxes have already been implemented in a number of European jurisdictions, including France and Italy.

**Adverse market conditions, asset price deteriorations, volatility and cautious investor sentiment have affected and may in the future materially and adversely affect our revenues and profits, particularly in our investment banking, brokerage and other commission- and fee-based businesses. As a result, we have in the past incurred and may in the future incur significant losses from our trading and investment activities.**
As a global investment bank, we have significant exposure to the financial markets and are more at risk from adverse developments in the financial markets than are institutions engaged predominantly in traditional banking activities. Sustained market declines have in the past caused and can in the future cause our revenues to decline, and, if we are unable to reduce our expenses at the same pace, can cause our profitability to erode or cause us to show material losses. Volatility can also adversely affect us, by causing the value of financial assets we hold to decline or the expense of hedging our risks to rise. Reduced customer activity can also lead to lower revenues in our "flow" business.

Specifically, our investment banking revenues, in the form of financial advisory and underwriting fees, directly relate to the number and size of the transactions in which we participate and are susceptible to adverse effects from sustained market downturns. These fees and other income are generally linked to the value of the underlying transactions and therefore can decline with asset values. In addition, periods of market decline and uncertainty tend to dampen client

appetite for market and credit risk, a critical driver of transaction volumes and investment banking revenues, especially transactions with higher margins. In recent and other times in the past, decreased client appetite for risk has led to lower levels of activity and lower levels of profitability in our Corporate & Investment Banking corporate division. Our revenues and profitability could sustain material adverse effects from a significant reduction in the number or size of debt and equity offerings and merger and acquisition transactions.

Market downturns also have led and may in the future lead to declines in the volume of transactions that we execute for our clients and, therefore, to declines in our noninterest income. In addition, because the fees that we charge for managing our clients' portfolios are in many cases based on the value or performance of those portfolios, a market downturn that reduces the value of our clients' portfolios or increases the amount of withdrawals reduces the revenues we receive from our asset management and private banking businesses. Even in the absence of a market downturn, below-market or negative performance by our investment funds may result in increased withdrawals and reduced inflows, which would reduce the revenue we receive from our asset management business. While our clients would be responsible for losses we incur in taking positions for their accounts, we may be exposed to additional credit risk as a result of their need to cover the losses where we do not hold adequate collateral or cannot realize it. Our business may also suffer if our clients lose money and we lose the confidence of clients in our products and services.

In addition, the revenues and profits we derive from many of our trading and investment positions and our transactions in connection with them can be directly and negatively impacted by market prices, which have been volatile in recent years. In each of the product and business lines in which we enter into these trading and investment positions, part of our business entails making assessments about the financial markets and trends in them. When we own assets, market price declines can expose us to losses. Many of the more sophisticated transactions of our Global Markets corporate division are designed to profit from price movements and differences among prices. If prices move in a way we have not anticipated, we may experience losses. Also, when markets are volatile, the assessments we have made may prove to lead to lower revenues or profits, or may lead to losses, on the related transactions and positions. In addition, we commit capital and take market risk to facilitate certain capital markets transactions; doing so can result in losses as well as income volatility. Such losses may especially occur on assets we hold for which there are not very liquid markets initially. Assets that are not traded on stock exchanges or other public trading markets, such as derivatives contracts between banks, may have values that we calculate using models other than publicly-quoted prices. Monitoring the deterioration of prices of assets like these is difficult and could lead to losses we did not anticipate. We can also be adversely affected if general perceptions of risk cause uncertain investors to remain on the sidelines of the market, curtailing their activity and in turn reducing the levels of activity in those of our businesses dependent on transaction flow.

**We announced the next phase of our strategy in April 2015, gave further details on it in October 2015 and announced an update in March 2017. If we are unable to implement our strategic plans successfully, we may be unable to achieve our financial objectives, or we may incur losses or low profitability or erosions of our capital base, and our financial condition, results of operations and share price may be materially and adversely affected.**
We announced the next phase of our strategy in April 2015, gave further details on it in October 2015 and announced an update in March 2017. Our plans included becoming simpler and more efficient by focusing on the markets, products and clients where we are better positioned to succeed, becoming less risky by modernizing our technology and by withdrawing from higher-risk client relationships, becoming better capitalized and running the Bank in a more disciplined way. In October 2015 we announced specific execution measures for each business division and updated our financial targets to highlight the financial objectives of our strategy. In March 2017, we announced an update that includes a number of new steps to further strengthen the Bank and place it in a better position to pursue growth opportunities, including a € 8 billion capital raise, the reorganization of our business into three distinct units, the combination of Postbank's and PCB's German business, the establishment of a cost reduction plan as described below, and an update to the Group's targets. The details of our strategy are set forth in Item 4: "Information on the Company – Business Overview – Our Business Strategy."

Our strategy's goals are subject to various internal and external factors including market, regulatory, economic and political uncertainties, and to limitations relating to our operating model. These could negatively impact or prevent the implementation of our strategic goals or the realization of their anticipated benefits. Economic uncertainties such as the recurrence of extreme turbulence in the markets; weakness in global, regional and national economic conditions; the

Case 1:22-cv-02854-JSR   Document 42-5   Filed 04/15/21   Page 26 of 62

29       Deutsche Bank                    PART I – 9         Signatures – 128
         Annual Report 2016 on Form 20-F  PART II – 116      Annual Report – 129
                                          PART III – 127     Supplemental Financial Information
                                                             (Unaudited) – S-1

continuation of the low interest rate environment; increased competition for business; and political instability, especially in Europe, may impact our ability to achieve our strategic goals. Regulatory changes could also adversely impact our ability to achieve our strategic aims. In particular, regulators could demand changes to our business model or organization that could reduce our profitability, or we may be forced to make changes that reduce our profitability in an effort to remain compliant with law and regulation. We are also involved in numerous litigation, arbitration and regulatory proceedings and investigations in Germany and in a number of jurisdictions outside of Germany, especially in the U.S. Such matters are subject to many uncertainties. We expect the litigation environment to continue to be challenging. If litigation and regulatory matters continue to occur at the same rate and magnitude as in recent years or if we are subject to sustained market speculation about our potential settlement of such matters, we may not be able to achieve our strategic aspirations.

In particular, macroeconomic risks and the risks relating to regulatory changes and our legal proceedings may impact our ability to meet our financial and capital targets. As financial targets, we are aiming to achieve a post-tax return on tangible equity of approximately 10 %, assuming a normalized operating environment, in addition to the cost-related targets and net revenues expectations referred to below. Our capital targets comprise a fully loaded Common Equity Tier 1 capital ratio comfortably above 13.0 %, and a leverage ratio of 4.5 % over time. Furthermore, we intend to target a competitive dividend payout ratio for the financial year 2018 and thereafter. Our strategy is based on an ambitious financial plan with, we believe, some buffer for downside scenarios and contingencies. However, the base case scenario for our financial and capital plan includes revenue growth estimates which are dependent on positive macroeconomic developments. Stagnation or a downturn in the macroeconomic environment could significantly impact our ability to generate the revenue growth necessary to achieve these strategic financial and capital targets. Furthermore, even if we are able to grow our revenues in accordance with our strategic plans, the materialization of any of the regulatory changes or the costs for us – in terms of the outcomes or necessary changes to our businesses – of the litigation and regulatory matters mentioned above, including market speculation about our potential settlement of them, or any other unforeseen risk, could adversely impact our net income and thereby cause us to fall short of our strategic financial and capital targets.

Our capital targets are further dependent on our ability to reduce the size of our balance sheet in accordance with our strategy. We plan disposals of a number of smaller businesses with identified risk-weighted assets (RWAs) of approximately € 10 billion and leverage exposure of approximately € 30 billion, the majority of which are expected to take place over the next 18 months. We also plan for CIB to separately manage identified legacy asset portfolios with approximately € 20 billion of RWA and approximately € 60 billion leverage exposure, with a target to reduce them to approximately € 12 billion of RWA and approximately € 30 billion leverage exposure, respectively, by 2020. Difficult market conditions or regulatory uncertainties may prevent us from being able to dispose of assets at all, or at prices we would consider to be reasonable, thereby causing us either to sell these assets for losses (or losses that are higher than expected) or hold these assets for a longer period of time than desired or planned. If we cannot reduce our RWAs according to plan, we may not be able to achieve the capital targets set out under our strategy.

Our strategy's financial plan also includes substantial cost reduction targets, which we plan to achieve through efficiency gains from implementation of various initiatives. We aim to reduce our adjusted costs to approximately € 22 billion by 2018 and approximately € 21 billion by 2021, including the impact of retaining Postbank's adjusted costs (€ 2.7 billion in 2016). (We define 'adjusted costs' as noninterest expenses excluding impairment of goodwill and other intangible assets, litigation and restructuring and severance. In 2016 and prior years, we also reported adjusted costs, which in addition excluded policyholder benefits and claims arising from Abbey Life Assurance, which was sold at the end of 2016.) In respect of our reorganized Corporate & Investment Bank division, we expect efficiencies from the combination of the current CIB with GM to result in a reduction of adjusted costs by approximately € 0.7 billion by 2018. In respect of our reorganized Private & Commercial Bank division, we estimate the planned restructuring to produce approximately € 0.9 billion of cost savings by 2022, and are targeting a cost-income ratio of below 65 % following the completion of its restructuring. Our planned exit from certain businesses, offboarding of certain clients and disposals of certain assets may entail higher costs or take more time than anticipated and thereby impede us from achieving the cost reductions we have targeted as scheduled or at all. Furthermore, additional costs could arise from any number of anticipated or unanticipated developments, such as costs relating to compliance with additional regulatory requirements and increased regulatory charges. In order to achieve our strategic goals, we expect to incur restructuring and

severance costs of approximately € 2 billion over the period 2017 to 2021, approximately 70 % of which is expected to be incurred within the next two years. In respect of our reorganized Private & Commercial Bank division, we estimate that restructuring and severance costs for the planned restructuring measures will be approximately € 1.0 billion by 2022. Our estimated restructuring and severance charges could ultimately run higher than anticipated, preventing us from achieving our adjusted costs target and the related divisional targets.

In the near term, in relation to our reorganized business divisions Corporate & Investment Bank, Private & Commercial Bank and Deutsche Asset Management, we have communicated our expectations for 2017 in respect of the directional development of our net revenues in the main businesses within each of those divisions.

Our ability to implement our strategy and meet its stated targets, both in the near term and thereafter, is based on a number of additional key assumptions relating to our business and operating model:

– We assume that we will be able to overcome significant challenges arising from our business model. We continue to rely on our trading and markets businesses as a significant source of profit. However, these businesses, in particular our fixed income securities franchise, have continued to face an extremely challenging environment, caused by uncertainty about the duration of the low interest rate environment, central bank intervention in markets and the gradual cessation thereof and overall sluggish economic growth. We are substantially dependent on the performance of these businesses, and this dependency exceeds that of many of our competitors. Many of our businesses dependent on client flow are increasingly challenged in uncertain times. In addition, some of our businesses may be resistant to change, posing risks to the implementation of changes to our business model. Should we be unable to implement this new business model successfully, or should the new business model fail to be profitable, we may not be able to achieve some or all of our strategic goals.
– We assume a continuation of the positive inflows and the return of many clients that we have seen in the first quarter of 2017 following the significant asset outflows and loss of clients in the third quarter of 2016 resulting from negative market perceptions concerning Deutsche Bank around our negotiations with the U.S. Department of Justice. Nevertheless, overall levels remain below those seen before impact of the negative market perceptions, and a renewed negative market focus on Deutsche Bank could end or reverse these positive inflows.
– We assume that we will be able to continue to attract and retain highly qualified staff. Given the operating environment in 2016, the Management Board decided to cancel the discretionary bonus element of the compensation for the Bank's senior employees. Across all our businesses, we need to attract and retain highly qualified staff. The decision to cancel the discretionary bonus element for 2016 may adversely affect our ability to succeed in attracting or retaining highly qualified employees. If our efforts to attract and/or retain employees should fail, this may have a material adverse effect on our ability to implement our strategy.
– We assume that we will be able to significantly upgrade and reduce the complexity of our infrastructure. We currently operate a highly complex infrastructure, which can compromise the quality of the overall control environment. Establishing a more efficient bank with a strong control environment depends on successfully streamlining and simplifying the IT landscape as well as cultural change. Furthermore, capital and execution plans require robust monitoring and tracking that is dependent on accurate, timely and relevant data. We have undertaken initiatives designed to address existing challenges in our IT and data architecture as well as in our data aggregation capabilities. Potential delays and challenges to implementing these initiatives would impact our ability to achieve efficiency improvements and enhance the control environment, thereby affecting our ability to implement our strategy successfully.
– We assume that we will be able to improve our internal control environment. A robust and effective internal control environment is necessary to ensure that we conduct our business in compliance with the laws and regulations applicable to us. We are undertaking several major initiatives to enhance the efficacy of the transaction processing environment, strengthen our controls and manage non-financial risks, in particular as a response to the circumstances that have resulted in many of the litigations and regulatory and enforcement investigations and proceedings to which the Bank has recently been subject. However, we may be unable to complete these initiatives as quickly as we intend or as our regulators demand, and our efforts may be insufficient to prevent all future deficiencies in our control environment or to result in fewer litigations or regulatory and enforcement investigations and proceedings in the future. Furthermore, implementation of enhanced controls may result in higher than expected costs of regulatory compliance that could offset efficiency gains. Any of these factors could affect our ability to implement our strategy in a timely manner or at all.

31

Case 1:22-cv-02854-JSR   Document 42-5   Filed 04/15/21   Page 28 of 62

Deutsche Bank
Annual Report 2016 on Form 20-F

PART I – 9
PART II – 116
PART III – 127

Signatures – 128
Annual Report – 129
Supplemental Financial Information
(Unaudited) – S-1

– We assume that the buffers we have included in our financial targets will be sufficient to reflect a plausible range of downside scenarios and that absent more substantial dislocations we will be able to achieve the targets. However, the buffers that we have provided for in order to achieve these goals may prove to be insufficient in a downside scenario. Should this risk materialize as a result of the macroeconomic, regulatory, litigation or other factors discussed above, we may fail to meet our strategic targets.

– Our plan for 2017 is based on assumed foreign exchange rates of EUR/USD 1.01 and EUR/GBP 0.88.

If we fail to implement our strategic initiatives in whole or in part or should the initiatives that are implemented fail to produce the anticipated benefits, or should the costs we incur to implement our initiatives exceed the amounts anticipated, or should we fail to achieve the publicly communicated targets we have set for implementation of these initiatives, we may fail to achieve our financial objectives, or incur losses or low profitability or erosions of our capital base, and our financial condition, results of operations and share price may be materially and adversely affected.

As part of our March 2017 updates to our strategy, we announced our intention to reconfigure our Global Markets, Corporate Finance and Transaction Banking businesses into a single, corporate client-led Corporate & Investment Banking division to position ourselves for growth through increased cross-selling opportunities for Deutsche Bank's higher return corporate clients. Clients may choose not to expand their businesses or portfolios with us, thereby negatively influencing our ability to capitalize on these opportunities.

As part of our strategic initiatives announced in March 2017, we intend to reconfigure our Global Markets, Corporate Finance and Transaction Banking businesses into a single, corporate client-led Corporate & Investment Banking division. The combination is intended to promote a more seamless and aligned offering of products to clients, meaningfully enhance cross selling opportunities, ensure better client rationalization with resources being focused on higher return relationships, and achieve greater cost and asset efficiencies to drive improved returns. The franchise is intended to be primarily a corporate-client focused business, while retaining a focused institutional client business. Our corporate clients' product needs, business plans and general willingness to engage into a deeper banking relationship with us will ultimately determine whether we are successful in capturing this anticipated spending. Should we be unable to deliver on the cross-selling efforts due to either lack of client demand, product availability or quality or delivery, there is a risk that this could negatively influence our ability to capitalize on these opportunities. The aforementioned macroeconomic, geo-political and regulatory risks also pose a challenge to the operating models of our Corporate & Investment Bank clients, and our ability to capture the incremental opportunity. In addition, in connection with the formation of the new Corporate & Investment Bank division, we will be required by the relevant accounting rules to allocate the businesses being reconfigured into one or more cash generating units (CGU) within the new division. Depending on the outcome of this accounting determination, some or all of the goodwill in the existing Corporate & Investment Banking CGU, amounting to EUR 532 million as of December 31, 2016, may be offset by the shortfall in recoverable amount of the current Global Markets CGU such that this goodwill would be written off on consummation of the reconfiguration. Any such writedown would have an equivalent adverse effect on the statement of income of the Group for the period in which it occurs.

As part of our March 2017 updates to our strategy, we announced our intention to retain and combine Deutsche Postbank AG (together with its subsidiaries, "Postbank") with our existing retail and commercial operations, after earlier having announced our intention to dispose of Postbank. We may face difficulties integrating Postbank into the Group following the completion of operational separability from the Group. Consequently, the cost savings and other benefits we expect to realize may only come at a higher cost than anticipated, or may not be realized at all.

As part of our strategy, we initially announced our intention to dispose of Postbank. However, we have since decided to retain Postbank and combine it with our existing German retail and commercial operations over the next five years. This shift from the prior strategy reflects a number of evolving factors, including our belief that growth in small and mid-sized German corporate clients and private banking clients will continue, changes in the expected regulatory requirements and market expectations for leverage ratios of European banks, the positive impact on the business model of retaining a large and stable business with a substantial deposit base, our revised view on the possible degree of integration of Postbank and the resulting scale and incremental synergies, and future growth opportunities we have identified, reflecting a potential improvement in the macroeconomic outlook and the changing dynamics in private and commercial banking, the growing likelihood of eventual industry consolidation in German retail banking and the contin-

ued positive opportunities presented by digitization. We expect that the integration of Postbank will create Germany's largest private and commercial bank. This integration is intended to achieve cost efficiencies by more readily permitting rationalization of central functions, improved efficiency across technology platforms and infrastructure and more efficient investment in areas including digitization, distribution channels and regulatory change.

In furtherance of the earlier plan to deconsolidate Postbank, we engaged in a project to separate Postbank operationally from the Deutsche Bank Group. This process was completed at the end of the second quarter of 2016. We estimate that the total cost of the planned restructuring measures to integrate Postbank into the Group will be € 1.9 billion, with restructuring and severance costs estimated to be approximately € 1.0 billion by 2022 and the remainder related to IT and other costs, and we are targeting benefits of € 0.9 billion in annual cost savings by 2022. By the end of 2018 we expect to finalize the existing transformation programs which we anticipate will result in cost reductions of € 0.4 billion. Unforeseen difficulties may emerge in connection with the integration efforts, including potential difficulties due to differing IT systems, difficulties in integrating personnel, the commitment of management resources in connection with the integration process and the potential loss of key personnel. The benefits, cost and timeframe of the integration could be adversely affected by any of these factors, as well as a variety of factors beyond our and Postbank's control, such as negative market developments. Should any of these risks materialize, the cost savings and other benefits we expect to realize from the integration may only come at a higher cost than anticipated, or may not be realized within the period we anticipate or to the extent we plan, or at all.

As part of our March 2017 updates to our strategy, we announced our intention to create an operationally segregated Asset Management division through a partial initial public offer (IPO). If economic or market conditions, or the financial position, results of operations and business prospects of Deutsche AM, are unfavorable, or if any required regulatory approvals are not obtained or would be available only on disadvantageous terms, we may not be able to sell a stake in Deutsche AM at a favorable price or timing, or at all. Additionally, we may not be able to capitalize on the expected benefits that we believe an operationally segregated Deutsche AM can offer.

One of the three incremental strategic initiatives we announced in March 2017 is our intention to create a segregated Asset Management business and offer a portion of it in an initial public offer (IPO). We believe that the growth potential of Deutsche Asset Management (Deutsche AM) has been constrained by its full ownership by the Bank, with reputational issues and wider market concerns around Deutsche Bank's capital strength in late 2016 affecting Deutsche AM. Additionally, resourcing limitations, as Deutsche Bank has pursued its restructuring efforts, further constrained Deutsche AM. We therefore believe that Deutsche AM remains undervalued in the current corporate structure. Accordingly, we intend to sell a minority stake in Deutsche AM and provide the division with more flexibility to enhance its ability to pursue growth opportunities globally and gain market share. We intend to complete the IPO over the next 24 months, subject to market conditions.

However, we may have difficulties selling a stake in Deutsche AM at a favorable price or timing, or at all. Our ability to sell a stake in Deutsche AM will, among other things, depend on economic, regulatory and market conditions, particularly those relevant to the asset management business in Germany. Our ability to sell a stake in Deutsche AM will also depend on the financial position, results of operations and business prospects of Deutsche AM. Furthermore, the steps necessary to implement an IPO, even of a minority stake, may require the approval of relevant regulators in the European Union, the United States and elsewhere. If economic, regulatory or market conditions, or the financial position, results of operations and business prospects of Deutsche AM, are unfavorable, or if regulatory approvals are not obtained or would be available only on disadvantageous terms, we may not be able to sell a stake in Deutsche AM at a favorable price or timing, or at all.

Additionally, we may not be able to capitalize upon the expected benefits that we believe a more operationally segregated Deutsche AM has to offer. Furthermore, an IPO of Deutsche AM may not entirely mitigate the market concerns about Deutsche Bank that impacted Deutsche AM's business in 2016.

Case 1:22-cv-02854-JSR   Document 42-5   Filed 04/15/21   Page 30 of 62

33      Deutsche Bank
        Annual Report 2016 on Form 20-F

PART I – 9
PART II – 116
PART III – 127

Signatures – 128
Annual Report – 129
Supplemental Financial Information
(Unaudited) – S-1

**We may have difficulties selling companies, businesses or assets at favorable prices or at all and may experience material losses from these assets and other investments irrespective of market developments.**

As part of our strategy, we are seeking to continue to reduce our assets, including in particular those of our Global Markets corporate division (which will become part of the new CIB corporate division), which include assets transferred to such division at the beginning of 2017 upon the closing of our Non-Core Operations Unit. We are planning to dispose of businesses with identified risk-weighted assets of approximately € 10 billion and leverage exposure of approximately € 30 billion, the majority of which we plan to complete over the next 18 months. We also plan for CIB to separately manage identified legacy asset portfolios with approximately € 20 billion of RWA and approximately € 60 billion leverage exposure, with a target to reduce them to approximately € 12 billion of RWA and approximately € 30 billion leverage exposure, respectively, by 2020. We also have other assets that are not part of our core business, and we may seek to sell them or otherwise reduce the amount and the risk of our exposure to them.

These reductions are part of our strategy to simplify and focus our business and to meet or exceed the new capital and leverage requirements by reducing risk-weighted assets and leverage exposures and thereby improving our capital and leverage ratios, as well as to help us meet our return on tangible equity target. This strategy may prove difficult in the current and future market environment as many of our competitors are also seeking to dispose of assets to improve their capital and leverage ratios and returns on equity. We have already sold a substantial portion of our non-core assets, and our remaining non-core assets may be particularly difficult for us to sell as quickly as we have expected at prices we deem acceptable. Also, we are often a passive investor in such investments and as such we are reliant on the actions of third parties. Where we sell companies or businesses, we may remain exposed to certain of their losses or risks under the terms of the sale contracts, and the process of separating and selling such companies or businesses may give rise to operating risks or other losses. Unfavorable business or market conditions may make it difficult for us to sell companies, businesses or assets at favorable prices, or may preclude a sale altogether.

If we cannot reduce our assets according to plan, we may not be able to achieve the capital targets set out under our strategy.

**A robust and effective internal control environment is necessary to ensure that we conduct our business in compliance with the laws and regulations applicable to us. We have identified the need to strengthen our internal control environment and have embarked on initiatives to accomplish this. If these initiatives are not successful or are delayed, our reputation, regulatory position and financial condition may be materially adversely affected, and our ability to achieve our strategic ambitions may be impaired.**

Our businesses are highly dependent on our ability to maintain a robust and effective internal control environment. This is needed for the Bank to process and monitor, on a daily basis, a wide variety of transactions – many of which are highly complex and occur at high speeds, volumes and frequencies, across numerous and diverse markets and currencies. However, the infrastructure (comprising people, policies and procedures, controls testing and IT systems) that underlies our internal control environment sometimes is not sufficiently comprehensive or well integrated across the Bank. In particular, the infrastructure requires, especially in the case of our IT infrastructure, the use of numerous platforms that are fragmented across the Bank. Therefore our business processes often require manual procedures and actions that make information available for management more prone to human error than would be the case with more seamlessly integrated systems. These processes span processing and settling transactions, valuation of assets, identifying risks, escalating reviews and mitigation and remediating actions, as well as regulatory reporting and other data processing and compliance activities. As a result, it is often difficult and labor intensive for us to obtain information of a consistently high quality and on a timely basis to manage our risk levels and to comply with regulatory reporting and other compliance requirements. Furthermore, it takes intensive efforts to identify, when possible, inappropriate behavior by our staff and attempts by third parties to misuse our services as a conduit for prohibited activities, including those relating to anti-financial crime laws and regulation.

Against this backdrop, our regulators, our Management Board and our Group Audit function have increasingly and more intensively focused on our internal controls through numerous formal reviews and audits of its operations. These reviews and audits have identified various areas for improvement relating to certain elements of our control environment. These include the infrastructure relating to transaction capturing and recognition, classification of assets, asset valuation frameworks and data and process consistency. They also include regulatory reporting, anti-money laundering

(AML), "know your customer" and other internal processes that are aimed at preventing use of our products and services for the purpose of committing or concealing financial crime. As one example, our recent settlement with the UK Financial Conduct Authority (FCA) relating to trading activities involving our Russian operations stemmed in part from the FCA's review of the AML control functions in our investment bank.

In order to improve in the areas discussed above, we are undertaking several major initiatives to enhance the efficacy of the transaction processing environment, strengthen our controls and manage non-financial risks. We believe that these initiatives will better enable us to avoid the circumstances that have resulted in many of the litigations and regulatory and enforcement investigations and proceedings to which we have recently been subject. In particular, we are making efforts to reduce the complexity of our business and to integrate and automate processes and business line controls. We have also exited certain businesses, for example in Russia, selectively off-boarded a number of clients, worked to strengthen our compliance culture and control functions and increased the size of our Group Audit function. However, we may be unable to complete these initiatives as quickly as we intend or as our regulators demand, and our efforts may be insufficient to prevent all future deficiencies in our control environment or to result in fewer litigations or regulatory and enforcement investigations and proceedings in the future. If we are unable to significantly improve our control environment in a timely manner, some of our regulators may require us to reduce our exposure to certain kinds of products or businesses, counterparties or regions, which could, depending on the extent of such requirement, significantly challenge our ability to operate profitably under our current business model.

Regulators can also impose capital surcharges, requiring capital buffers in addition to those directly required under the regulatory capital rules applicable to us, to reflect the additional risks posed by deficiencies in our control environment. In extreme cases, regulators can suspend our permission to operate in the businesses and regions within their jurisdictions. Furthermore, implementation of enhanced controls may result in higher than expected costs of regulatory compliance that could offset or exceed efficiency gains. Any of these factors could affect our ability to implement our strategy in a timely manner or at all.

**We operate in a highly and increasingly regulated and litigious environment, potentially exposing us to liability and other costs, the amounts of which may be substantial and difficult to estimate, as well as to legal and regulatory sanctions and reputational harm.**

The financial services industry is among the most highly regulated industries. Our operations throughout the world are regulated and supervised by the central banks and regulatory authorities in the jurisdictions in which we operate. In recent years, regulation and supervision in a number of areas has increased, and regulators, law enforcement authorities, governmental bodies and others have sought to subject financial services providers to increasing oversight and scrutiny, which in turn has led to additional regulatory investigations or enforcement actions. This trend has accelerated markedly as a result of the global financial crisis and the European sovereign debt crisis. There has been a steep escalation in the severity of the terms which regulators and law enforcement authorities have required to settle legal and regulatory proceedings against financial institutions, with recent settlements including unprecedented monetary penalties as well as criminal sanctions. As a result, we may continue to be subject to increasing levels of liability and regulatory sanctions, and may be required to make greater expenditures and devote additional resources to addressing these liabilities and sanctions. Regulatory sanctions may include status changes to local licenses or orders to discontinue certain business practices.

We and our subsidiaries are involved in various litigation proceedings, including civil class action lawsuits, arbitration proceedings and other disputes with third parties, as well as regulatory proceedings and investigations by both civil and criminal authorities in jurisdictions around the world. We expect that the costs to us arising from the resolution of litigation, enforcement and similar matters pending against us to continue to be significant in the near to medium term and to adversely affect our business, financial condition and results of operations. Litigation and regulatory matters are subject to many uncertainties, and the outcome of individual matters is not predictable with assurance. We may settle litigation or regulatory proceedings prior to a final judgment or determination of liability. We may do so for a number of reasons, including to avoid the cost, management efforts or negative business, regulatory or reputational consequences of continuing to contest liability, even when we believe we have valid defenses to liability. We may also do so when the potential consequences of failing to prevail would be disproportionate to the costs of settlement. Furthermore, we may, for similar reasons, reimburse counterparties for their losses even in situations where we do not believe that we

Case 1:22-cv-02854-JSR   Document 42-5   Filed 04/15/21   Page 32 of 62

35       Deutsche Bank                          PART I – 9                Signatures – 128
         Annual Report 2016 on Form 20-F        PART II – 116             Annual Report – 129
                                                PART III – 127            Supplemental Financial Information
                                                                          (Unaudited) – S-1

are legally compelled to do so. The financial impact of legal risks might be considerable but may be difficult or impossible to estimate and to quantify, so that amounts eventually paid may exceed the amount of provisions made or contingent liabilities assessed for such risks.

We are under continuous examination by tax authorities in the jurisdictions in which we operate. Tax laws are increasingly complex. In the current political and regulatory environment, tax administrations' and courts' interpretation of tax laws and regulations and their application are evolving, and scrutiny by tax authorities has become increasingly intense. Wide ranging changes in the principles of international taxation emanating from the OECD's Base Erosion and Profit Shifting agenda are generating significant uncertainties for us and our subsidiaries and may result in an increase in instances of bilateral tax disputes going forward, as member states may take different approaches in transposing these requirements into national law. In addition, tax administrations have focused on the eligibility of taxpayers for relief from or reduced withholding taxes on dividends in connection with certain cross-border lending or derivative transactions as well as reduced withholding taxes on other payments (with Germany recently reforming the German Investment Tax Act (*Investmentsteuergesetz*) in this area), thus causing uncertainties in the application of existing withholding tax principles. As a result, the cost to us arising from the conclusion and resolution of routine tax examinations, tax litigation and other forms of tax proceedings or tax disputes, as well as from rapidly changing and increasingly complex and uncertain tax laws and principles, may increase and may adversely affect our business, financial condition and results of operation.

Actions currently pending against us or our current or former employees may not only result in judgments, settlements, fines or penalties, but may also cause substantial reputational harm to us. The risk of damage to our reputation arising from such proceedings is also difficult or impossible to quantify.

Regulators have increasingly sought admissions of wrongdoing in connection with settlement of matters brought by them. This could lead to increased exposure in subsequent civil litigation or in consequences under so-called "bad actor" laws, in which persons or entities determined to have committed offenses under some laws can be subject to limitations on business activities under other laws, as well as adverse reputational consequences. In addition, the U.S. Department of Justice ("DOJ") conditions the granting of cooperation credit in civil and criminal investigations of corporate wrongdoing on the company involved having provided to investigators all relevant facts relating to the individuals responsible for the alleged misconduct. This policy may result in increased fines and penalties if the DOJ determines that we have not provided sufficient information about applicable individuals in connection with an investigation. Other governmental authorities could adopt similar policies.

In addition, the financial impact of legal risks arising out of matters similar to some of those we face have been very large for a number of participants in the financial services industry, with fines and settlement payments greatly exceeding what market participants may have expected and, as noted above, escalating steeply over the last few years to unprecedented levels. The experience of others, including settlement terms, in similar cases is among the factors we take into consideration in determining the level of provisions we maintain in respect of these legal risks. Recent developments in cases involving other financial institutions have led to greater uncertainty as to the predictability of outcomes and could lead us to add to our provisions. Moreover, the costs of our investigations and defenses relating to these matters are themselves substantial. Further uncertainty may arise as a result of a lack of coordination among regulators from different jurisdictions or among regulators with varying competencies in a single jurisdiction, which may make it difficult for us to reach concurrent settlements with each regulator. Should we be subject to financial impacts arising out of litigation and regulatory matters to which we are subject in excess of those we have calculated in accordance with our expectations and the relevant accounting rules and contrary to our publicly communicated expectation that 2015 and 2016 were peak years for the financial impact of litigation and regulatory matters, our provisions in respect of such risks may prove to be materially insufficient to cover these impacts. This could have a material adverse effect on our results of operations, financial condition or reputation as well as on our ability to maintain capital, leverage and liquidity ratios at levels expected by market participants and our regulators. In such an event, we could find it necessary to reduce our risk-weighted assets (including on terms disadvantageous to us) or substantially cut costs to improve these ratios, in an amount corresponding to the adverse effects of the provisioning shortfall.

Regulatory and law enforcement agencies globally are currently investigating us in connection with alleged misconduct relating to manipulation of foreign exchange rates. The extent of our financial exposure to these matters could be material, and our reputation may suffer material harm as a result.

We have received requests for information from certain regulatory and law enforcement agencies globally who are investigating trading, and various other aspects, of the foreign exchange market. We are cooperating with these investigations. The investigations underway have the potential to result in the imposition of significant financial penalties and other consequences for us. Relatedly, we have conducted our own internal global review of foreign exchange trading and other aspects of our foreign exchange business.

The CFTC Division of Enforcement has issued a letter notifying us that the CFTC has closed its foreign exchange investigation of us, and the DOJ, Criminal Division, Fraud Section, has issued a letter notifying Deutsche Bank that the DOJ has closed its criminal inquiry concerning possible violations of federal criminal law in connection with the foreign exchange markets. Both letters noted that the respective authorities may reopen their investigations in the future. Further, such letters have no binding impact on other regulatory and law enforcement agency investigations regarding our foreign exchange trading and practices, which remain pending. On December 7, 2016, it was announced that we have reached an agreement with CADE, the Brazilian antitrust enforcement agency, to settle an investigation into conduct in the foreign exchange market by a former Brazil-based Deutsche Bank trader. This has had the effect of bringing to a close CADE's administrative process as far as it relates to us. Investigations conducted by certain other regulatory and law enforcement agencies are ongoing and we are cooperating with these investigations.

We have also been named as a defendant in multiple putative class actions brought in the U.S. District Court for the Southern District of New York alleging antitrust and U.S. Commodity Exchange Act claims relating to the alleged manipulation of foreign exchange rates. There are now four actions pending. The first pending action is a consolidated action brought on behalf of putative classes of over-the-counter traders and central-exchange traders and alleges illegal agreements to restrain competition with respect to and to manipulate both benchmark rates and spot rates, particularly the spreads quoted on those spot rates; the complaint further alleges that those supposed conspiracies, in turn, resulted in artificial prices on centralized exchanges for foreign exchange futures and options. Our motion to dismiss the consolidated action was granted in part and denied in part on September 20, 2016. A second action tracks the allegations in the consolidated action and asserts that such purported conduct gave rise to, and resulted in a breach of, defendants' fiduciary duties under the U.S. Employment Retirement Income Security Act of 1974 ("ERISA"). The third putative class action alleges that we rejected FX orders placed over electronic trading platforms through the application of a function referred to as "Last Look" and that these orders were later filled at prices less favorable to putative class members. Plaintiff has asserted claims for breach of contract, quasi-contractual claims, and claims under New York statutory law. The fourth putative class action tracks the allegations in the consolidated action and asserts that such purported conduct injured "indirect purchasers" of FX instruments. These claims are brought pursuant to the Sherman Act, New York's Donnelly Act, California's Cartwright Act and California's Unfair Competition Law.

On August 24, 2016, the Court granted defendants' motion to dismiss the ERISA action. Plaintiffs in that action filed an appellate brief in the United States Court of Appeals for the Second Circuit on January 9, 2017. On February 14, 2017, the court granted in part and denied in part our motion to dismiss the Last Look action. We moved to dismiss the indirect purchasers action on January 24, 2017. Discovery has commenced in the consolidated and Last Look actions. Discovery has not yet commenced in the ERISA and indirect purchasers actions.

We have also been named as a defendant in two Canadian class proceedings brought in the provinces of Ontario and Quebec. Filed on September 10, 2015, these class actions assert factual allegations similar to those made in the consolidated action in the United States and seek damages pursuant to the Canadian Competition Act as well as other causes of action.

Many of these matters are not advanced enough to estimate their outcome or any fines that may be levied by governmental bodies or damages that may be incurred from private litigation. A number of other financial institutions are also currently being investigated. Any settlements by these institutions may adversely affect the outcomes for other financial institutions, such as us, in similar actions, especially as large settlements may be used as the basis or template for other settlements. As a result, these matters may expose us to substantial monetary damages and defense costs in

Case 1:22-cv-02854-JSR   Document 42-5   Filed 04/15/21   Page 34 of 62

37      Deutsche Bank                    PART I – 9              Signatures – 128
        Annual Report 2016 on Form 20-F  PART II – 116           Annual Report – 129
                                         PART III – 127          Supplemental Financial Information
                                                                 (Unaudited) – S-1

addition to criminal and civil penalties, and they could accordingly have a material adverse effect on our results of operations, financial condition or reputation.

We are currently the subject of industry-wide investigations by regulatory and law enforcement agencies relating to interbank offered rates, as well as civil actions. Due to a number of uncertainties, including those related to the high profile of the matters and other banks' settlement negotiations, the eventual outcome of these matters is unpredictable, and may materially and adversely affect our results of operations, financial condition and reputation.

We have received requests for information from various regulatory and law enforcement agencies, including various U.S. states attorneys general, in connection with industry-wide investigations concerning the setting of the London Interbank Offered Rate (LIBOR), Euro Interbank Offered Rate (EURIBOR), Tokyo Interbank Offered Rate (TIBOR) and other interbank offered rates. We are cooperating with these investigations. The investigations underway have the potential to result in the imposition of significant financial penalties and other consequences for the Bank.

As previously reported, we reached a settlement with the European Commission on December 4, 2013 as part of a collective settlement to resolve the European Commission's investigations in relation to anticompetitive conduct in the trading of Euro interest rate derivatives and Yen interest rate derivatives. Under the terms of the settlement agreement, we agreed to pay € 725 million in total.

Also as previously reported, on April 23, 2015, we entered into separate settlements with the DOJ, the CFTC, the UK Financial Conduct Authority ("FCA"), and the New York State Department of Financial Services ("DFS") to resolve investigations into misconduct concerning the setting of LIBOR, EURIBOR, and TIBOR. Under the terms of these agreements, we agreed to pay penalties of U.S.$ 2.175 billion to the DOJ, CFTC and DFS and GBP 226.8 million to the FCA. These fines have been paid in full, save for U.S.$150 million that is payable to the DOJ, subject to court approval (currently scheduled for March 28, 2017), following the sentencing of DB Group Services (UK) Ltd. (an indirectly-held, wholly-owned subsidiary of ours) in connection with its guilty plea to one count of wire fraud. As part of the resolution with the DOJ, we entered into a Deferred Prosecution Agreement with a three year term pursuant to which we agreed (among other things) to the filing of an Information in the U.S. District Court for the District of Connecticut charging us with one count of wire fraud and one count of price fixing in violation of the Sherman Act.

Factual admissions we have made in connection with these settlements could make it difficult for us to defend against pending and future claims.

As reported above, we are subject to an inquiry by a working group of U.S. state attorneys general in relation to the setting of LIBOR, EURIBOR, and TIBOR. We continue to cooperate with the U.S. state attorneys generals' inquiry. Other investigations of us concerning the setting of various interbank offered rates remain ongoing, and we remain exposed to further action.

In addition, we are party to 47 civil actions concerning alleged manipulation relating to the setting of various Interbank Offered Rates. Most of the civil actions, including putative class actions, are pending in the U.S. District Court for the Southern District of New York (SDNY), against us and numerous other defendants. All but six of the civil actions were filed on behalf of parties who allege losses as a result of manipulation relating to the setting of U.S. dollar LIBOR. The six civil actions pending against us that do not relate to U.S. dollar LIBOR are also pending in the SDNY, and include two actions concerning Yen LIBOR and Euroyen TIBOR, one action concerning EURIBOR, one consolidated action concerning Pound Sterling (GBP) LIBOR, one action concerning Swiss franc (CHF) LIBOR, and one action concerning two Singapore Dollar (SGD) benchmark rates, the Singapore Interbank Offered Rate (SIBOR) and the Swap Offer Rate (SOR).

We cannot predict the effect on us of the interbank offered rates matters, which could include fines levied by government bodies, damages from private litigation for which we may be liable, legal and regulatory sanctions (including possible criminal sanctions) and other consequences.

This uncertainty is further exacerbated by several factors outside of our control, such as the high profile of these matters and the contours of other financial institutions' settlement negotiations. In addition, regulatory and law enforcement authorities may make assessments about the conduct of institutions in the industry as a whole, which may influence their actions with respect to us. Any fines, damages, legal or regulatory sanctions or other consequences may have a material adverse effect, beyond provisions taken, on our results of operations, financial condition or reputation.

We have received inquiries from regulatory and law enforcement authorities, including requests for information and documents, pertaining to investigations of precious metals trading and related conduct. The investigations underway have the potential to result in the imposition of significant financial penalties and other consequences for us. We are also named as a defendant in several putative class action complaints in respect of precious metals trading and related conduct.

We have received inquiries from certain regulatory and law enforcement authorities, including requests for information and documents, pertaining to investigations of precious metals trading and related conduct. We are cooperating with these investigations and engaging with relevant authorities, as appropriate. The investigations underway have the potential to result in the imposition of significant financial penalties and other consequences for us. Relatedly, we have been conducting our own internal review of our historic participation in the precious metals benchmarks and other aspects of our precious metals trading and precious metals business.

In addition, we are a defendant in Canadian class action proceedings in the province of Ontario concerning gold and in the provinces of Ontario and Quebec concerning silver. Each of the proceedings seeks damages for alleged violations of the Canadian Competition Act and other causes of action. These complaints may result in material liability for us.

We have investigated the circumstances around equity trades entered into by certain clients in Moscow and London and have advised regulators and law enforcement authorities in several jurisdictions about those trades. In the event that violations of law or regulation are found to have occurred, any resulting penalties against us may materially and adversely affect our results of operations, financial condition and reputation.

We have investigated the circumstances around equity trades entered into by certain clients with us in Moscow and London that offset one another. The total volume of the transactions under review is significant. Our internal investigation of potential violations of law, regulation and policy and into the related internal control environment has concluded, and we are assessing the findings identified during the investigation; to date we have identified certain violations of our policies and deficiencies in our control environment. We have advised regulators and law enforcement authorities in several jurisdictions (including Germany, Russia, the UK and U.S.) of this investigation and have taken disciplinary measures with regards to certain individuals in this matter and will continue to do so with respect to others as warranted. On January 30 and 31, 2017, the New York State Department of Financial Services (DFS) and UK Financial Conduct Authority (FCA) announced settlements with the Bank related to their investigations into this matter. The settlements conclude the DFS and the FCA's investigations into the bank's anti-money laundering (AML) control function in its investment banking division, including in relation to the equity trading described above. Under the terms of the settlement agreement with the DFS, Deutsche Bank entered into a Consent Order, and agreed to pay civil monetary penalties of U.S.$ 425 million and to engage an independent monitor to conduct a comprehensive review of its existing AML compliance programs that pertain to or affect activities conducted by or through DBTCA and our New York branch for a term of up to two years. Under the terms of the settlement agreement with the FCA, Deutsche Bank agreed to pay civil monetary penalties of approximately GBP 163 million. The settlement amounts were already materially reflected in existing litigation reserves. Deutsche Bank is cooperating with other regulators and law enforcement authorities (including the DOJ and the Federal Reserve), which have their own ongoing investigations into these securities trades. In the event that violations of law or regulation are found to have occurred, legal and regulatory sanctions in respect thereof may materially and adversely affect our results of operations, financial condition and reputation.

**Regulatory and law enforcement agencies in the United States are investigating whether our historical processing of certain U.S. dollar payment orders for parties from countries subject to U.S. embargo laws complied with U.S. federal and state laws. While we have settled some matters, other investigations are still in progress and the eventual outcomes of these matters are unpredictable, and may continue materially and adversely to affect our results of operations, financial condition and reputation.**

We have received requests for information from certain regulatory and law enforcement agencies concerning our historical processing of U.S. dollar payment orders through U.S. financial institutions for parties from countries subject to U.S. embargo laws. These agencies are investigating whether such processing complied with U.S. federal and state laws. On November 3, 2015, we entered into agreements with the New York State Department of Financial Services and the Federal Reserve Bank of New York to resolve their investigations of us. We paid the two agencies U.S.$ 200 million and U.S.$ 58 million, respectively, and agreed to terminate certain employees, not rehire certain former employees and install an independent monitor for one year. In addition, the Federal Reserve Bank of New York ordered certain remedial measures, specifically, the requirement to ensure an effective OFAC compliance program and an annual review of such program by an independent party until the Federal Reserve Bank of New York is satisfied as to its effectiveness. We continue to provide information to and otherwise cooperate with other investigating agencies (which include the DOJ). While it is too early to predict, the eventual outcomes of the investigations to which we are subject may materially and adversely affect our results of operations, financial condition and reputation.

**We have been subject to contractual claims, litigation and governmental investigations in respect of our U.S. residential mortgage loan business that may materially and adversely affect our results of operations, financial condition or reputation.**

From 2005 through 2008, as part of our U.S. residential mortgage loan business, we sold approximately U.S.$ 84 billion of loans into private label securitizations and U.S.$ 71 billion through whole loan sales. We have been, and may in the future be, presented with demands to repurchase loans from purchasers, investors and financial insurers based on alleged material breaches of representations and warranties or to indemnify such persons with respect to losses allegedly caused thereby. Our general practice is to process valid repurchase claims that are presented in compliance with contractual rights and applicable statutes of limitations. As of December 31, 2016, we have approximately U.S.$ 847 million of mortgage repurchase demands outstanding and not subject to agreements to rescind (based on original principal balance of the loans). Against these outstanding demands, we have established provisions of U.S.$ 173 million (€ 164 million) as of December 31, 2016 (for part of which we are indemnified). As with provisions generally, however, it is possible that the provisions we have established may ultimately be insufficient, either with respect to particular claims or with respect to the full set of claims that have been or may be presented. There are other potential mortgage repurchase demands that we anticipate may be made, but we cannot reliably estimate their timing or amount. As of December 31, 2016, we have completed repurchases, obtained agreements to rescind or otherwise settled claims on loans with an original principal balance of approximately U.S.$ 8.8 billion. In connection with those repurchases, agreements and settlements, we have obtained releases for potential claims on approximately U.S.$ 98.1 billion of loans sold by us as described above.

From 2005 through 2008, we or our affiliates have also acted as an underwriter of approximately U.S.$ 105 billion of U.S. residential mortgage-backed securities (referred to as "RMBS") for third-party originators.

As is the case with a significant number of other participants in the mortgage securitizations market and as described in Note 30 "Provisions" to the consolidated financial statements, we have received subpoenas and requests for information from certain regulators and government entities concerning our activities regarding the origination, purchase, securitization, sale, valuation and/or trading of mortgage loans, RMBS, commercial mortgage-backed securities (CMBS), collateralized debt obligations (CDOs), other asset-backed securities and credit derivatives. We are cooperating fully in response to those subpoenas and requests for information. Some of these investigations are similar in nature to those that led to other financial institutions entering into settlements with members of the Residential Mortgage-Backed Securities Working Group of the U.S. Financial Fraud Enforcement Task Force and paying significant penalties.

Discussions with the DOJ concerning a settlement of potential claims that the DOJ was considering bringing based on its investigation of our RMBS origination and securitization activities began with an initial demand of U.S.$ 14 billion on September 12, 2016. On December 23, 2016, we announced that we reached a settlement-in-principle with the DOJ

to resolve potential claims related to our RMBS business conducted from 2005 to 2007. The settlement became final and was announced by the DOJ on January 17, 2017. Under the settlement, we paid a civil monetary penalty of U.S.$ 3.1 billion and agreed to provide U.S.$ 4.1 billion in consumer relief. Other investigations of us concerning the foregoing businesses remain ongoing, and we remain exposed to further action.

We also have numerous pending lawsuits against us or our affiliates as issuer, underwriter and/or trustee of RMBS. Such pending RMBS litigations are in various stages and we continue to defend these actions vigorously while seeking opportunities to achieve sensible out of court resolutions.

Legal and regulatory proceedings are subject to many uncertainties, and the outcome of individual matters is not pre-dictable. The extent of our financial exposure to these matters could be material, and our reputation may suffer material harm as a result of these matters.

We are currently involved in civil proceedings in connection with our voluntary takeover offer for the acquisition of all shares of Postbank. The extent of our financial exposure to this matter could be material, and our reputation may be harmed.
On September 12, 2010, we announced the decision to make a voluntary takeover offer for the acquisition of all shares in Deutsche Postbank AG. On October 7, 2010, we published the official offer document. In our takeover offer, we offered Postbank shareholders consideration of € 25 for each Postbank share. The takeover offer was accepted for a total of approximately 48.2 million Postbank shares.

In November 2010, a former shareholder of Postbank, Effecten-Spiegel AG, which had accepted the takeover offer, brought a claim against us alleging that the offer price was too low and was not determined in accordance with the applicable law of the Federal Republic of Germany. The plaintiff alleges that we had been obliged to make a mandatory takeover offer for all shares in Deutsche Postbank AG, at the latest, in 2009. The plaintiff avers that, at the latest in 2009, the voting rights of Deutsche Post AG in Deutsche Postbank AG had to be attributed to us pursuant to Section 30 of the German Takeover Act. Based thereon, the plaintiff alleges that the consideration offered by us for the shares in Deutsche Postbank AG in the 2010 voluntary takeover offer needed to be raised to € 57.25 per share.

The Cologne District Court dismissed the claim in 2011 and the Cologne appellate court dismissed the appeal in 2012. The Federal Court set aside the Cologne appellate court's judgment and referred the case back to the appellate court. In its judgment, the Federal Court stated that the appellate court had not sufficiently considered the plaintiff's allegation that we and Deutsche Post AG "acted in concert" in 2009. The Cologne appellate court has scheduled a further hearing for November 8, 2017.

Starting in 2014, additional former shareholders of Deutsche Postbank AG, who accepted the 2010 tender offer, brought similar claims as Effecten-Spiegel AG against us which are pending with the Cologne District Court, and three of these plaintiffs applied for model case proceedings (Musterverfahren) under the German Capital Markets Model Case Act. The Cologne District Court has heard these follow-on matters on January 27, 2017 and announced its inten-tion to publish a decision on April 28, 2017.

In September 2015, former shareholders of Deutsche Postbank AG filed in the Cologne District Court shareholder actions against Deutsche Postbank AG to set aside the squeeze-out resolution taken in the shareholders meeting of Deutsche Postbank AG in August 2015. Among other things, the plaintiffs allege that we (Deutsche Bank AG) were subject to a suspension of voting rights with respect to our shares in Postbank based on the allegation that we failed to make a mandatory takeover offer at a higher price in 2009. The squeeze out is final and the proceeding itself has no reversal effect, but may result in damage payments. The claimants in this proceeding refer to legal arguments similar to those asserted in the Effecten-Spiegel proceeding described above. The Cologne District Court indicated its intention to announce a decision in the spring of 2017.

The extent of our financial exposure to this matter could be material, and our reputation may be harmed.

41

Case 1:22-cv-02854-JSR   Document 42-5   Filed 04/15/21   Page 38 of 62

Deutsche Bank
Annual Report 2016 on Form 20-F

PART I – 9
PART II – 116
PART III – 127

Signatures – 128
Annual Report – 129
Supplemental Financial Information
(Unaudited) – S-1

**We are currently involved in civil and criminal proceedings in connection with transactions with Monte dei Paschi di Siena. The extent of our financial exposure to these matters could be material, and our reputation may be harmed.**

In February 2013 Banca Monte Dei Paschi Di Siena, which we refer to as "MPS", issued civil proceedings in Italy against us alleging that we assisted former MPS senior management in an accounting fraud on MPS, by undertaking repo transactions with MPS and "Santorini", a wholly owned SPV of MPS, which helped MPS defer losses on a previous transaction undertaken with us. Subsequently, in July 2013, the Fondazione Monte Dei Paschi, MPS' largest shareholder, also commenced civil proceedings in Italy for damages based on substantially the same facts. In December 2013, we reached an agreement with MPS to settle the civil proceedings and the transactions were unwound at a discount for MPS. The civil proceedings by the Fondazione Monte Dei Paschi, in which damages of between € 220 million and € 381 million are claimed, remain pending. The Fondazione's separate claim filed in July 2014 against their former administrators and a syndicate of 12 banks including DB S.p.A. for € 286 million has resumed before the Florence Court.

A criminal investigation was launched by the Siena Public Prosecutor into the transactions and certain unrelated transactions entered into by MPS with other parties. Such investigation was moved in summer 2014 from Siena to the Milan Public Prosecutors as a result of a change in the alleged charges being investigated. On February 16, 2016, the Milan Public Prosecutors issued a request of committal to trial against us and six current and former employees. The committal process concluded with a hearing on October 1, 2016, during which the Milan court committed all defendants in the criminal proceedings to trial. Our potential exposure is for administrative liability under Italian Legislative Decree n. 231/2001 and for civil vicarious liability as an employer of current and former employees who are being criminally prosecuted. Trial commenced on December 15, 2016 and is ongoing. We continue to cooperate and update our regulators. The extent of our financial exposure to these matters could be material, and our reputation may suffer material harm as a result of these matters.

**We are currently involved in a legal dispute with the German tax authorities in relation to the tax treatment of certain income received with respect to our pension plan assets. The proceeding is pending in front of the relevant lower fiscal court. Should the courts ultimately rule in favor of the German tax authorities, the outcome could have a material effect on our comprehensive income and financial condition.**

We sponsor a number of post-employment benefit plans on behalf of our employees. In Germany, the pension assets that fund the obligations under these pension plans are held by Benefit Trust GmbH. The German tax authorities are challenging the tax treatment of certain income received by Benefit Trust GmbH in the years 2010 to 2013 with respect to its pension plan assets. For the year 2010 Benefit Trust GmbH paid the amount of tax and interest assessed of € 160 million to the tax authorities and is seeking a refund of the amounts paid in litigation with the relevant lower fiscal court. For 2011 to 2013 the matter is stayed pending the outcome of the 2010 tax litigation. The amount of tax and interest under dispute for years 2011 to 2013, which also has been paid to the tax authorities, amounts to € 456 million. Any decision by the lower fiscal court is potentially subject to appeal by either party and thus a resolution of the matter may not take place for a number of years. An ultimate decision by the courts that is unfavorable to us could materially and adversely affect our comprehensive income and financial condition.

**Guilty pleas by or convictions of us or our affiliates in criminal proceedings may have consequences that have adverse effects on certain of our businesses.**

We and our affiliates have been and are subjects of criminal proceedings or investigations. In particular, as part of the resolution of the investigation of the DOJ into misconduct relating to interbank offered rates, our subsidiary DB Group Services (UK) Ltd. entered into a plea agreement with the DOJ, pursuant to which the company pled guilty to one count of wire fraud. Also, in connection with the KOSPI Index unwind matters, our subsidiary Deutsche Securities Korea Co. was convicted of vicarious corporate criminal liability in respect of spot/futures linked market manipulation by its employees. We and our subsidiaries are also subjects of other criminal proceedings or investigations.

Guilty pleas or convictions against us or our affiliates could lead to our ineligibility to use an important trading exemption under ERISA. In particular, such guilty pleas or convictions could cause our affiliates to no longer qualify as a "qualified professional asset manager" ("QPAM") under the QPAM Prohibited Transaction Exemption, which exemption is relied on to provide asset management services to certain pension plans in connection with certain asset management strategies. Loss of QPAM status could cause customers who rely on such status (whether because they are legally required to do so or because we have agreed contractually with them to maintain such status) to cease to do business or refrain from doing business with us and could negatively impact our reputation more generally. In addition, other clients may mistakenly see the loss as a signal that we are somehow no longer approved by the U.S. Department of Labor (DOL), the agency responsible for ERISA, and cease to do business or refrain from doing business with us for that reason. This could have a material adverse effect on our results of operations, particularly those of our asset management business in the United States. We have filed an application with the DOL for exemptive relief permitting us to retain our QPAM status despite both the guilty plea of DB Group Services (UK) Ltd. and the conviction of Deutsche Securities Korea Co. The DOL has granted us a temporary QPAM exemption, effective through the earlier of April 23, 2017 or the effective date of a permanent QPAM exemption, if granted to us by the DOL, covering both the guilty plea and the conviction. We have provided additional information to the DOL in support of our QPAM application which is still pending with the DOL. It is unclear whether the QPAM application will be approved, and a denial, and thus loss of QPAM status, could occur, with the potential for the adverse effects described above.

In addition to our traditional banking businesses of deposit-taking and lending, we also engage in nontraditional credit businesses in which credit is extended in transactions that include, for example, our holding of securities of third parties or our engaging in complex derivative transactions. These nontraditional credit businesses materially increase our exposure to credit risk.

As a bank and provider of financial services, we are exposed to the risk that third parties who owe us money, securities or other assets will not perform their obligations. Many of the businesses we engage in beyond the traditional banking businesses of deposit-taking and lending also expose us to credit risk.

In particular, much of the business we conduct through our Global Markets corporate division entails credit transactions, frequently ancillary to other transactions. Nontraditional sources of credit risk can arise, for example, from holding securities of third parties; entering into swap or other derivative contracts under which counterparties have obligations to make payments to us; executing securities, futures, currency or commodity trades that fail to settle at the required time due to nondelivery by the counterparty or systems failure by clearing agents, exchanges, clearing houses or other financial intermediaries; and extending credit through other arrangements. Parties to these transactions, such as trading counterparties, may default on their obligations to us due to bankruptcy, political and economic events, lack of liquidity, operational failure or other reasons.

Many of our derivative transactions are individually negotiated and non-standardized, which can make exiting, transferring or settling the position difficult. Certain credit derivatives require that we deliver to the counterparty the underlying security, loan or other obligation in order to receive payment. In a number of cases, we do not hold, and may not be able to obtain, the underlying security, loan or other obligation. This could cause us to forfeit the payments otherwise due to us or result in settlement delays, which could damage our reputation and ability to transact future business, as well as impose increased costs on us. Recently enacted legislation in the European Union (EMIR) and the U.S. (the Dodd-Frank Act) has introduced requirements for the standardization, margining, central clearing and transaction reporting of certain over-the-counter derivatives. While such requirements are aimed at reducing the risk posed to counterparties and the financial system by such derivatives, they may reduce the volume and profitability of the transactions in which we engage, and compliance with such provisions may impose substantial costs on us.

The exceptionally difficult market conditions experienced since the global financial crisis severely adversely affected certain areas in which we do business that entail nontraditional credit risks, including the leveraged finance and structured credit markets, and may do so in the future.

Case 1:22-cv-02854-JSR   Document 42-5   Filed 04/15/21   Page 40 of 62

43    Deutsche Bank        PART I – 9        Signatures – 128
      Annual Report 2016 on Form 20-F    PART II – 116      Annual Report – 129
                                  PART III – 127    Supplemental Financial Information
                                                (Unaudited) – S-1

**A substantial proportion of the assets and liabilities on our balance sheet comprise financial instruments that we carry at fair value, with changes in fair value recognized in our income statement. As a result of such changes, we have incurred losses in the past, and may incur further losses in the future.**

A substantial proportion of the assets and liabilities on our balance sheet comprise financial instruments that we carry at fair value, with changes in fair value recognized in the income statement. Fair value is defined as the price at which an asset or liability could be exchanged in an arm's length transaction between knowledgeable, willing parties, other than in a forced or liquidation sale. If the value of an asset carried at fair value declines (or the value of a liability carried at fair value increases) a corresponding unfavorable change in fair value is recognized in the income statement. These changes have been and could in the future be significant. Additionally, in recent periods there has been a significant difference between fair value and book value for some assets.

Observable prices or inputs are not available for certain classes of financial instruments. Fair value is determined in these cases using valuation techniques we believe to be appropriate for the particular instrument. The application of valuation techniques to determine fair value involves estimation and management judgment, the extent of which will vary with the degree of complexity of the instrument and liquidity in the market. Management judgment is required in the selection and application of the appropriate parameters, assumptions and modeling techniques. If any of the assumptions change due to negative market conditions or for other reasons, subsequent valuations may result in significant changes in the fair values of our financial instruments, requiring us to record losses.

Our exposure and related changes in fair value are reported net of any fair value gains we may record in connection with hedging transactions related to the underlying assets. However, we may never realize these gains, and the fair value of the hedges may change in future periods for a number of reasons, including as a result of deterioration in the credit of our hedging counterparties. Such declines may be independent of the fair values of the underlying hedged assets or liabilities and may result in future losses.

**Our risk management policies, procedures and methods leave us exposed to unidentified or unanticipated risks, which could lead to material losses.**

We have devoted significant resources to developing our risk management policies, procedures and assessment methods and intend to continue to do so in the future. Nonetheless, the risk management techniques and strategies have not been and may in the future not be fully effective in mitigating our risk exposure in all economic market environments or against all types of risk, including risks that we fail to identify or anticipate. Some of our quantitative tools and metrics for managing risk are based upon our use of observed historical market behavior. We apply statistical and other tools to these observations to arrive at quantifications of our risk exposures. During the financial crisis, the financial markets experienced unprecedented levels of volatility (rapid changes in price direction) and the breakdown of historically observed correlations (the extent to which prices move in tandem) across asset classes, compounded by extremely limited liquidity. In this volatile market environment, our risk management tools and metrics failed to predict some of the losses we experienced, particularly in 2008, and may in the future fail to predict important risk exposures. In addition, our quantitative modeling does not take all risks into account and makes numerous assumptions regarding the overall environment, which may not be borne out by events. As a result, risk exposures have arisen and could continue to arise from factors we did not anticipate or correctly evaluate in our statistical models. This has limited and could continue to limit our ability to manage our risks especially in light of geopolitical developments, many of the outcomes of which are currently unforeseeable. Our losses thus have been and may in the future be significantly greater than the historical measures indicate.

In addition, our more qualitative approach to managing those risks not taken into account by our quantitative methods could also prove insufficient, exposing us to material unanticipated losses. Also, if existing or potential customers or counterparties believe our risk management is inadequate, they could take their business elsewhere or seek to limit their transactions with us. This could harm our reputation as well as our revenues and profits. See "Management Report: Risk Report" beginning on page 88 of the Annual Report 2016 for a more detailed discussion of the policies, procedures and methods we use to identify, monitor and manage our risks.

Operational risks, which may arise from errors in the performance of our processes, the conduct of our employees, instability, malfunction or outage of our IT system and infrastructure, or loss of business continuity, or comparable issues with respect to our vendors, may disrupt our businesses and lead to material losses.

We face operational risk arising from errors, inadvertent or intentional, made in the execution, confirmation or settlement of transactions or from instructions not being properly recorded, evaluated or accounted for. An example of this risk concerns our derivative contracts, which are not always confirmed with the counterparties on a timely basis. For so long as the transaction remains unconfirmed, we are subject to heightened credit and operational risk and in the event of a default may find it more difficult to enforce the contract. The European sovereign debt crisis and the global financial crisis, in which the risk of counterparty default increased, have increased the possibility that this operational risk materializes.

In addition, our businesses are highly dependent on our ability to process manually or through our systems a large number of transactions on a daily basis, across numerous and diverse markets in many currencies. Some of the transactions have become increasingly complex. Moreover, management relies heavily on its financial, accounting and other data processing systems that include manual processing components. If any of these processes or systems do not operate properly, or are disabled, or subject to intentional or inadvertent human error, we could suffer financial loss, a disruption of our businesses, liability to clients, regulatory intervention or reputational damage.

We are also dependent on our employees to conduct our business in accordance with applicable laws, regulations and generally accepted business standards. If our employees do not conduct our business in this manner, we may be exposed to material losses. Furthermore, if an employee's misconduct reflects fraudulent intent, we could also be exposed to reputational damage. We categorize these risks as conduct risk, which comprises inappropriate business practices, including selling products that are not suitable for a particular customer, fraud, unauthorized trading and failure to comply with applicable regulations, laws and internal policies.

We in particular face the risk of loss events due to the instability, malfunction or outage of our IT system and IT infrastructure. Such losses could materially affect our ability to perform business processes and may, for example, arise from the erroneous or delayed execution of processes as either a result of system outages or degraded services in systems and IT applications. A delay in processing a transaction, for example, could result in an operational loss if market conditions worsen during the period after the error. IT-related errors may also result in the mishandling of confidential information, damage to our computer systems, financial losses, additional costs for repairing systems, reputational damage, customer dissatisfaction or potential regulatory or litigation exposure.

Business continuity risk is the risk of incurring losses resulting from the interruption of normal business activities. We operate in many geographic locations and are frequently subject to the occurrence of events outside of our control. Despite the contingency plans we have in place, our ability to conduct business in any of these locations may be adversely impacted by a disruption to the infrastructure that supports our business, whether as a result of, for example, events that affect our third party vendors or the community or public infrastructure in which we operate. Any number of events could cause such a disruption including deliberate acts such as sabotage, terrorist activities, bomb threats, strikes, riots and assaults on the bank's staff; natural calamities such as hurricanes, snow storms, floods, disease pandemic and earthquakes; or other unforeseen incidents such as accidents, fires, explosions, utility outages and political unrest. Any such disruption could have a material adverse effect on our business and financial position.

Services provided by third-party vendors bear comparable risks as if they were performed by ourselves, and we are ultimately responsible for the services. We are dependent on our vendors to conduct our business services in accordance with applicable laws, regulations and generally accepted business standards. If our vendors do not conduct our business in this manner, we may be exposed to material losses and could be subject to regulatory action. Furthermore, if a vendor's misconduct reflects fraudulent intent, we could also be exposed to reputational damage.

45

Case 1:22-cv-02854-JSR   Document 42-5   Filed 04/15/21   Page 42 of 62

Deutsche Bank
Annual Report 2016 on Form 20-F

PART I – 9
PART II – 116
PART III – 127

Signatures – 128
Annual Report – 129
Supplemental Financial Information
(Unaudited) – S-1

**Our operational systems are subject to an increasing risk of cyber attacks and other internet crime, which could result in material losses of client or customer information, damage our reputation and lead to regulatory penalties and financial losses.**

Among the operational risks we face is the risk of breaches of the security of our computer systems due to unauthorized access to networks or resources, the introduction of computer viruses or malware, or other forms of cyber attack or internet crime. Such breaches could threaten the confidentiality of our clients' data and the integrity of our systems. We devote significant resources toward the protection of our computer systems against such breaches. To address the evolving cyber threat risk, we have expended significant resources to modify and enhance our protective measures and to investigate and remediate any information security vulnerabilities. Nevertheless, a residual risk remains that such measures may not be effective against all threats. Given our global footprint and the volume of transactions we process, certain errors or actions may be repeated or compounded before they are discovered and rectified.

We and other financial institutions have experienced attacks on computer systems, including attacks aimed at obtaining unauthorized access to confidential company or customer information or damaging or interfering with company data, resources or business activities. The increasing frequency and sophistication of recent cyber-attacks has resulted in an elevated risk profile for many organizations around the world, and significant attention by our management has been paid to the overall level of preparedness against such attacks. Cyber security is growing in importance due to factors such as the continued and increasing reliance on our technology environment. Although we have to date not experienced any material loss of data from these attacks, it is possible, given the use of new technologies and increasing reliance on the Internet and the varying nature and evolving sophistication of such attacks, that we may not be able to effectively anticipate and prevent all such attacks. A successful attack could have a significant negative impact on us, including as a result of disclosure or misappropriation of client or proprietary information, damage to computer systems, financial losses, additional costs to us (such as for investigation and reestablishing services), reputational damage, customer dissatisfaction and potential regulatory or litigation exposure.

**The size of our clearing operations exposes us to a heightened risk of material losses should these operations fail to function properly.**

We have large clearing and settlement businesses and an increasingly complex and interconnected information technology (IT) landscape. These give rise to the risk that we, our customers or other third parties could lose substantial sums if our systems fail to operate properly for even short periods. This will be the case even where the reason for the interruption is external to us. In such a case, we might suffer harm to our reputation even if no material amounts of money are lost. This could cause customers to take their business elsewhere, which could materially harm our revenues and profits.

**We may have difficulty in identifying and executing acquisitions, and both making acquisitions and avoiding them could materially harm our results of operations and our share price.**

We consider business combinations from time to time. Even though we review the companies, businesses, assets, liabilities or contracts we plan to acquire, it is generally not feasible for these reviews to be complete in all respects. As a result, we may assume unanticipated liabilities, or an acquisition may not perform as well as expected. Were we to announce or complete a significant business combination transaction, our share price could decline significantly if investors viewed the transaction as too costly or unlikely to improve our competitive position. In addition, we might have difficulty integrating any entity with which we combine our operations. Failure to complete announced business combinations or failure to integrate acquired businesses successfully into ours could materially and adversely affect our profitability. It could also affect investors' perception of our business prospects and management, and thus cause our share price to fall. It could also lead to departures of key employees, or lead to increased costs and reduced profitability if we felt compelled to offer them financial incentives to remain.

**Intense competition, in our home market of Germany as well as in international markets, could materially adversely impact our revenues and profitability.**

Competition is intense in all of our primary business areas, in Germany as well as in international markets. If we are unable to respond to the competitive environment in these markets with attractive product and service offerings that are profitable for us, we may lose market share in important areas of our business or incur losses on some or all of our activities. In addition, downturns in the economies of these markets could add to the competitive pressure, through, for example, increased price pressure and lower business volumes for us.

In recent years there has been substantial consolidation and convergence among financial services companies, culminating in unprecedented consolidations in the course of the global financial crisis. This trend has significantly increased the capital base and geographic reach of some of our competitors and has hastened the globalization of the securities and other financial services markets. As a result, we must compete with financial institutions that may be larger and better capitalized than we are and that may have a stronger position in local markets. Also, governmental action in response to the global financial crisis may place us at a competitive disadvantage.

In addition to our traditional competitors such as other universal banks and financial services firms, an emerging group of future competitors in the form of start-ups and technology firms are showing an increasing interest in banking services and products. These new competitors could increase competition in both core products, e.g., payments, basic accounts and loans and investment advisory, as well as in new products, e.g., peer to peer lending and equity crowd funding.

**Transactions with counterparties in countries designated by the U.S. State Department as state sponsors of terrorism or persons targeted by U.S. economic sanctions may lead potential customers and investors to avoid doing business with us or investing in our securities, harm our reputation or result in regulatory action which could materially and adversely affect our business.**

We engage or have engaged in a limited amount of business with counterparties, including government-owned or -controlled counterparties, in certain countries or territories that are subject to comprehensive sanctions, including Iran and Cuba (referred to as "Sanctioned Countries"), or with persons targeted by U.S. economic sanctions (referred to as "Sanctioned Persons"). U.S. law generally prohibits U.S. persons or any other persons acting within U.S. jurisdiction from doing business with Sanctioned Countries or Sanctioned Persons. Thus, U.S. regulations may extend to activities in other geographic areas and by non-U.S. persons depending on the circumstances. Our U.S. subsidiaries, branch offices, and employees are and our non-U.S. subsidiaries, branch offices, and employees may become subject to those prohibitions and other regulations. We are a German bank and our activities with respect to Sanctioned Countries and Sanctioned Persons have been subject to policies and procedures designed to avoid the involvement of persons acting within U.S. jurisdiction in any managerial or operational role and to ensure compliance with United Nations, European Union and German embargoes; in reflection of legal developments in recent years, we further developed our policies and procedures with the aim of ensuring compliance with regulatory requirements extending to other geographic areas regardless of jurisdiction. However, should our policies prove to have been ineffective, we may be subject to regulatory action that could materially and adversely affect our business. By 2007, our Management Board decided that we will not engage in new business with counterparties in countries such as Iran, Syria, Sudan and North Korea and to exit existing business to the extent legally possible. It also decided to limit our business with counterparties in Cuba. Of these, Iran, Sudan and Syria are currently designated as state sponsors of terrorism by the U.S. State Department.

We had a representative office in Tehran, Iran, which we discontinued at December 31, 2007. Our remaining business with Iranian counterparties consists mostly of participations as lender and/or agent in a few large trade finance facilities arranged before 2007 to finance the export contracts of exporters in Europe and Asia. The lifetime of most of these facilities is ten years or more and we are legally obligated to fulfill our contractual obligations. We do not believe our business activities with Iranian counterparties are material to our overall business, with the outstanding loans to Iranian borrowers representing substantially less than 0.01 % of our total assets as of December 31, 2016 and the revenues from all such activities representing less than 0.01 % of our total revenues for the year ended December 31, 2016.

Case 1:22-cv-02854-JSR   Document 42-5   Filed 04/15/21   Page 44 of 62

47        Deutsche Bank                    PART I – 9              Signatures – 128
          Annual Report 2016 on Form 20-F  PART II – 116          Annual Report – 129
                                           PART III – 127         Supplemental Financial Information
                                                                  (Unaudited) – S-1

In recent years, the United States has taken steps, including the passage of the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010, the National Defense Authorization Act for Fiscal Year 2012, the Iran Threat Reduction and Syria Human Rights Act of 2012, the Iran Freedom and Counter-Proliferation Act of 2012, and a number of Executive Orders, to deter foreign companies from dealing with Iran by providing for possible sanctions against companies that provide services in support of certain Iranian activity in (among others) the financial, energy, shipping or military sectors or with certain Iranian counterparties, whether or not such dealings occur within U.S jurisdiction. Among the targets of these indirect, or "secondary", U.S. economic sanctions are foreign financial institutions that, among other things, facilitate significant transactions with, or provide significant financial services to, a wide range of Iranian entities, persons, and financial institutions.

Following the occurrence on January 16, 2016 of "Implementation Day" of the Joint Comprehensive Plan of Action between the "P5+1" parties and Iran, pursuant to which Iran agreed to limits on its nuclear program and the P5+1 parties agreed to provide certain sanctions relief, secondary sanctions targeting Iran have been narrowed but not eliminated. Following the Implementation Day, we engage in new activities with respect to Iran, but only to a limited extent. We execute cash payments in Euro from or to Iran on behalf of our own non-Iranian clients with enhanced due diligence. In principle, we remain restrictive towards any new trade finance activities and do not plan to engage in loan arrangements with Iranian counterparties.

We do not believe we have engaged in activities sanctionable under these statutes, but the U.S. authorities have considerable discretion in applying the statutes, and any imposition of sanctions against us could be material. It is also possible that primary and secondary sanctions imposed by the U.S. and other jurisdictions could be expanded in the future, particularly if the Joint Comprehensive Plan of Action with Iran is not considered to be effective. Proposals for expanded sanctions are discussed on a continuing basis in the U.S. Congress and elsewhere.

As required by Section 219 of the Iran Threat Reduction and Syria Human Rights Act of 2012 (Section 13(r) of the Securities Exchange Act of 1934, as amended) we have disclosed certain information regarding our activities or transactions with persons subject to U.S. sanctions against Iran and other persons subject to such provision. Such disclosure is set forth in the section of this document entitled "Disclosures Under Iran Threat Reduction and Syria Human Rights Act of 2012", which follows "Item 16H: Mine Safety Disclosure".

We are also engaged in a limited amount of business with counterparties domiciled in Cuba, which is not subject to any United Nations, European Union or German embargo. The business consists of a limited number of letters of credit, as well as claims resulting from letters of credit, and it represented substantially less than 0.01 % of our assets as of December 31, 2016. The transactions served to finance commercial products such as machinery as well as medical products.

We are aware, through press reports and other means, of initiatives by governmental and non-governmental entities in the United States and elsewhere to adopt laws, regulations or policies prohibiting transactions with or investment in, or requiring divestment from, entities doing business with Sanctioned Countries, particularly Iran. Such initiatives may result in our being unable to gain or retain entities subject to such prohibitions as customers or as investors in our securities. In addition, our reputation may suffer due to our association with such countries. Such a result could have significant adverse effects on our business or the price of our securities. It is also possible that new direct or indirect secondary sanctions could be imposed by the United States or other jurisdictions without warning as a result of geopolitical developments.

# Item 4: Information on the Company

## History and Development of the Company

The legal and commercial name of our company is Deutsche Bank Aktiengesellschaft. It is a stock corporation orga-
nized under the laws of Germany.

Deutsche Bank Aktiengesellschaft originated from the reunification of Norddeutsche Bank Aktiengesellschaft, Hamburg,
Rheinisch-Westfälische Bank Aktiengesellschaft, Düsseldorf, and Süddeutsche Bank Aktiengesellschaft, Munich.
Pursuant to the Law on the Regional Scope of Credit Institutions, these were disincorporated in 1952 from Deutsche
Bank, which had been founded in 1870. The merger and the name were entered in the Commercial Register of the
District Court Frankfurt am Main on May 2, 1957.

We are registered under registration number HRB 30 000. Our registered address is Taunusanlage 12, 60325 Frank-
furt am Main, Germany, and our telephone number is +49-69-910-00. Our agent in the United States is: Deutsche Bank
Americas, c/o Office of the Secretary, 60 Wall Street, Mail Stop NYC60-4099, New York, NY 10005.

For information on significant capital expenditures and divestitures, please see "Management Report: Operating and
Financial Review: Deutsche Bank Group: Significant Capital Expenditures and Divestitures" on page 46 of the Annual
Report 2016.

## Business Overview

### Our Organization

Please see "Management Report: Operating and Financial Review: Deutsche Bank Group: Our Organization" on
page 38 of the Annual Report 2016. For information on net revenues by geographic area and by corporate division
please see Note 4 "Business Segments and Related Information: Entity-Wide Disclosures" to the consolidated financial
statements and "Management Report: Operating and Financial Review: Results of Operations: Segment Results of
Operations" on pages 56 through 58 of the Annual Report 2016.

### Management Structure

Please see "Management Report: Operating and Financial Review: Deutsche Bank Group: Management Structure" on
page 39 of the Annual Report 2016.

49

Case 1:22-cv-02854-JSR   Document 42-5   Filed 04/15/21   Page 46 of 62

Deutsche Bank
Annual Report 2016 on Form 20-F

PART I – 9
PART II – 116
PART III – 127

Signatures – 128
Annual Report – 129
Supplemental Financial Information
(Unaudited) – S-1

# Our Business Strategy

We are a leading European bank with a global reach supported by a strong home base in Germany, Europe's largest economy. We serve the real economy needs of our corporate, institutional, asset management and private clients, providing services in transaction banking, corporate finance and capital markets, asset management, wealth management and retail banking.

Our franchise remained strong across our core businesses despite a challenging environment in 2016. We were a top three investment bank in Europe, the Middle East and Africa (EMEA) on the basis of investment banking fees according to Dealogic; a top-five global transaction bank on the basis of publicly reported revenues; a top-six global sales & trading franchise and the number one franchise among European banks based on publicly reported sales & trading revenues; a leading asset manager that is the second largest provider of exchange traded products and exchange traded funds in Europe and the largest retail asset management presence in Germany based on publicly reported assets under management; the largest private and commercial bank in Germany with over 20 million clients; and the number one wealth manager in Germany based on assets under management.

## Update on Strategy Execution

We outlined a multi-year strategy in October 2015 to build on the core strengths of our business model and client franchise. The four key goals were to be: simpler and more efficient, less risky, better capitalized and better run with more disciplined execution.

In 2016, we made material progress towards our goals in what proved to be an unexpectedly challenging market environment. Major achievements in 2016 included:

– A reduction of our adjusted costs[1] by 7 % (by 5 % excluding the effect of changes in exchange rates) in 2016 to € 24.7 billion.
– The completion, on schedule, of the accelerated wind down of the Non-Core Operations Unit, which was then closed at the start of 2017.
– The settlement or resolution of over two dozen major litigation matters, including some of our most significant litigation matters such as the settlement with the U.S. Department of Justice (DOJ) relating to U.S. residential mortgage-backed securities (RMBS).
– The completion of key strategic disposals, including the sale of our stake in the Hua Xia Bank and the sales of Abbey Life and the U.S. Private Client Services.
– All previously announced country exits completed or on track for completion in 2017.
– The transformation of the German retail business including branch reductions is well on track.
– The strengthening of our CET1 ratio to 11.8 % on a fully loaded basis and 13.4 % on a phase-in basis at year end 2016, increases of 70 basis points and 20 basis points respectively from December 31, 2015. The strengthening of the CET1 ratios largely reflected managed reductions in risk-weighted assets (RWA) over the course of 2016.
– Substantial investment in our control functions, including the ongoing implementation of a more comprehensive Know-Your-Client (KYC) process and an off-boarding process for higher risk clients.
– The replacement or reassignment of approximately 70 % of top management to drive improved execution of our strategy.

Global Markets (GM) has completed the reshaping of the Securitized Trading business (ahead of the targeted timeline), substantially completed its targeted leverage reduction in Agency RMBS, strengthened Know-Your-Client (KYC) processes and controls, ceased active coverage of approximately 3,800 clients identified as high risk/low potential, completed most of its country optimization strategy in 2016 (ahead of schedule), and remains on target to complete the remainder on time. GM has also completed the exit of its residual presence in South Korea, Russia and Brazil.

Corporate & Investment Banking (CIB) has sharpened its focus on priority clients and banker productivity to optimize returns across the CIB business. Despite a challenging macroeconomic environment in the eurozone, we remained a top 3 investment bank in EMEA and continued to be involved in some of the largest deals. We also continued to deliver resilient Transaction Banking results in a challenging market environment with prolonged low interest rates, a volatile geo-political backdrop, and its implications for global trade. A new global head was recently appointed to lead the Global Transaction Banking business.

The Deutsche Asset Management (Deutsche AM) franchise continues to perform very well amidst some challenging and volatile market conditions. We recently completed the sale of the Abbey Life unit to Phoenix Life Holdings. This improved the Bank's CET1 ratio by approximately 10 basis points. The Bank also hired and appointed a new head of Asset Management, Nicolas Moreau, to drive the future growth of the Deutsche AM business going forward.

The Private, Wealth & Commercial Clients (PW&CC) franchise is closing branches and reducing staff in the German retail business. PCC International branch closures are ahead of plan. PW&CC has also made significant progress on digitization initiatives, including the opening of the Digital Factory in Frankfurt in September 2016.

As per 2016 targets, the former corporate division NCOU successfully executed its de-risking strategy and achieved its 2016 year-end target risk weighted assets (RWA) of less than € 10 billion. At the end of 2016, NCOU had € 9.2 billion RWA and € 7.9 billion leverage exposure, down from € 32.9 billion RWA and € 36.6 billion leverage exposure at the end of 2015. The residual NCOU assets have been transferred back to respective divisions they originally came from, as of the start of 2017.

In addition to the difficult operating environment in 2016 driven in large part by macroeconomic and geopolitical uncertainty, we also faced substantial challenges specific to Deutsche Bank itself. These challenges arose from adverse speculation about our financial health. This led to concerns among some clients and counterparties and negatively affected revenues in 2016. That was particularly the case in the late third and early fourth quarters around the purported size of a settlement with the DOJ in respect of the RMBS matter and its potential impact on us.

[1] We define "adjusted costs" as total noninterest expenses excluding impairment of goodwill and other intangible assets, litigation, restructuring and severance, and policyholder benefits and claims (until the disposition of Abbey Life). To exclude the effect of changes in exchange rates, 2015 adjusted costs were recalculated using 2016 monthly average exchange rates.

## Overview of New Strategic Measures

The macroeconomic, geopolitical, and regulatory outlook has changed substantially since we launched our strategy in 2015. As a result of these changes in the operating environment and the substantial challenges specific to Deutsche Bank in 2016, we undertook an updated planning process and strategic review in late 2016 and early 2017.

This review has now been completed. Its fundamental conclusion is that our core business model of being a global bank, which serves a range of institutional, corporate and private clients combined with a strong home base in Germany with a resilient corporate, institutional, asset management and private client franchise, remains the foundation of our strength and long-term growth prospects.

Nonetheless, our management decided to undertake a number of new steps to further strengthen the bank and place it in a better position to pursue growth opportunities. These actions include:

– Substantially strengthened capitalization through a capital increase, expected to result in net proceeds of approximately € 8 billion, which is expected to result in a CRR/CRD4 fully loaded Common Equity Tier 1 capital ratio (fully loaded CET 1 ratio) of approximately 14 % and a CRR/CRD4 fully loaded leverage ratio of approximately 4 % pro forma as of December 31, 2016.
– Up to € 2 billion of incremental capital creation targeted through the planned initial public offering (IPO) of a minority stake in the Deutsche Asset Management division (Deutsche AM), and from additional business disposals with an identified RWA of approximately € 10 billion and leverage exposure of approximately € 30 billion, the majority of which we plan to complete over the next 18 months.
– Reorganization of our business divisions into three distinct units, with the goals of strengthening the businesses of each, enhancing client coverage, improving market share and driving efficiencies and growth:
   – The new Corporate & Investment Bank (CIB) that combines our markets, advisory, financing and transaction banking businesses.
   – Private & Commercial Bank (PCB) that combines Postbank and our existing private, commercial and wealth management businesses.
   – An operationally segregated Deutsche Asset Management (Deutsche AM).
– The integration of Postbank and PCB's German business with the goal of creating a market leading retail presence in Germany, driving greater efficiency through scale and better earnings and funding stability for Deutsche Bank.
– The establishment of a cost reduction program targeting to achieve adjusted costs of approximately € 22 billion in 2018 and approximately € 21 billion by 2021, which would include the impact of retaining Postbank's adjusted costs (€ 2.7 billion in 2016).
– Separately managing identified legacy asset portfolios with approximately € 20 billion of RWA and approximately € 60 billion leverage exposure targeted to be reduced to approximately € 12 billion of RWA and approximately € 30 billion leverage exposure, respectively, by 2020.
– The incurrence of restructuring and severance costs of approximately € 2 billion, the majority of which is expected to be incurred in 2017 to 2019.
– Targeting a competitive dividend payout ratio for the financial year 2018 and thereafter with an intention that the Management Board will recommend at the Annual General Meeting in May 2017 to pay a dividend of € 0.19 per share out of distributable profit for 2016. The dividend to be paid out of Deutsche Bank AG's distributable profit for 2016 contains a component reflecting the distributable profit carried forward from 2015 of approximately € 165 million and a dividend of € 0.11 per share out of the remaining distributable profit for 2016. Overall, we expect to pay out a total dividend of approximately € 400 million in 2017.
– Targeting a Post-tax Return on Average Tangible Equity (RoTE) of circa 10 % in a normalized operating environment.

The fundamental goal of these additional strategic measures is to make Deutsche Bank a stronger, safer bank that is well positioned to pursue growth opportunities through its strong global client franchise. Our management believes we will be able to achieve this by:

– having capital levels the sufficiency of which are beyond question,
– having a leading CIB franchise with the scale and strength to successfully compete and grow globally,
– occupying the number one private and commercial banking position in our home market of Germany,
– giving our world class Deutsche AM division operational segregation that can support accelerated growth,
– reducing the size of our corporate center and cost base in part through more front to back alignment and shifting large portions of infrastructure functions to the business divisions, and
– shifting our earnings and business mix more towards stable businesses.

## Impact of the Proposed Capital Raise

The proposed capital raise aims to make us much stronger from a capital perspective with an intention to remain comfortably above 13 % on a fully-loaded CET1 basis. The immediate impact of the capital raise, assuming it raises net proceeds of € 8 billion, but excluding any additional capital impact resulting from the planned IPO of a minority stake in Deutsche AM or the additional portfolio of asset disposals, will be:

**Phase-in CET1 Ratio:**

– An increase from 13.4 % as reported on December 31, 2016 to 15.7 % on a pro-forma basis as of that date.
– An improvement in the CET1 ratio under the phase-in rules effective January 1, 2017 from 12.6 % to 14.9 % on a pro-forma basis as of that date.

**Fully loaded CET1 Ratio** would increase from 11.8 % as reported on December 31, 2016 to 14.1 % on a pro-forma basis as of that date.

**Fully loaded leverage ratio** would improve from 3.5 % as of December 31, 2016 to 4.1 % on a 2016 pro-forma basis as of the same date.

## New Financial Targets

We have adopted new financial targets that replace the targets announced in October 2015. The new targets are:

– Adjusted costs of € 22 billion by 2018, and € 21 billion by 2021, which includes the adjusted costs of Postbank.
– Post-tax RoTE of approximately 10 % in a normalized operating environment.
– CET1 Ratio comfortably above 13 % on a fully loaded basis.
– Leverage Ratio of 4.5 %. The pro forma 2016 leverage ratio reflecting the impact of the proposed capital raise is 4.1 %, which we aim to increase to 4.5 % over time.
– Targeting a competitive dividend payout ratio for the financial year 2018 and thereafter.

Our plan for 2017 is based on assumed foreign exchange rates of EUR/USD 1.01 and EUR/GBP 0.88.

53  Case 1:22-cv-02854-JSR    Document 42-5    Filed 04/15/21    Page 50 of 62

Deutsche Bank
Annual Report 2016 on Form 20-F

PART I – 9
PART II – 116
PART III – 127

Signatures – 128
Annual Report – 129
Supplemental Financial Information
(Unaudited) – S-1

## New Business Division Structure

Effective in 2017, we plan to have three business divisions going forward: the new CIB, PCB and Deutsche AM. CIB will combine the existing Corporate & Investment Banking and Global Markets divisions. PCB will consist of private and commercial banking, including Postbank, and wealth management. Deutsche Asset Management will be more operationally segregated with a minority stake traded on the public markets, assuming the planned IPO is successfully undertaken, while Deutsche Bank retains a majority stake.

Geographically, Germany will remain our anchor – our home market where we intend not only to maintain, but to further expand our leading position in all three of our business divisions. PCB will be primarily focused in Germany, with wealth management businesses around the world. Given the global nature of our core corporate clients, we intend to retain CIB capabilities across Germany and EMEA (ex-Germany), the U.S. and Canada, and in Asia Pacific (APAC). While we intend to have a global institutional client footprint, we expect to be primarily focused on Germany and EMEA (ex-Germany) where our competitive franchise is strongest. We also intend to maintain a strong but more focused U.S. footprint. Deutsche AM intends to retain its core focus in Germany and EMEA (ex-Germany), with selective capabilities in the U.S. and APAC.

Fundamentally, we intend to retain our global capabilities, but plan to focus those capabilities where our management believes our franchise is the strongest, the growth potential the largest, and the potential risk adjusted returns the highest. Our management believes that the reorganization of the business divisions will be critical to achieve this.

## Strategy in Corporate & Investment Bank

Our current CIB division primarily serves corporate clients, infrastructure and private equity, governments and financial institutions in treasury and financing solutions, leveraged lending, advisory and corporate finance (including debt and equity issuance), risk management and transaction banking.

The current Global Markets division operates alongside CIB and primarily serves large institutional clients (asset managers, pension funds, banks) in key capital markets areas including foreign exchange, rates, money markets, and credit. The two divisions currently work jointly to serve clients when appropriate.

We will merge the existing CIB and GM divisions into a new division to be called Corporate & Investment Bank (CIB). Based on a pro forma combination of net revenues for 2016, CIB would have had revenues of € 16.8 billion and would have been the largest division in Deutsche Bank.

The combined CIB division is intended to promote a more seamless and aligned offering of products to clients, meaningfully enhance cross selling opportunities, ensure better client rationalization with resources being focused on higher return relationships, and achieve greater cost and asset efficiencies to drive improved returns. CIB's franchise is intended to be primarily a corporate-client led business, while retaining a focused institutional client business.

We believe there to be a substantial opportunity to capture market share from clients through the reorganized CIB. Currently, two-thirds of our large corporate clients in the newly combined CIB division have a relationship with just one part of CIB (markets, corporate finance or transaction banking). Integrating CIB and GM should support more efficient and seamless client coverage and product offering, better rationalization of clients and the ability to direct resources to the highest return relationships, and ultimately increase our share of clients' "wallet" (amounts they spend on banking products).

As part of the new focus of CIB, we will separately manage a portfolio of legacy assets within the division. These assets are both residual NCOU assets that were transferred to the relevant divisions at the beginning of 2017 and other assets deemed non-strategic, reflecting in part the result of the reshaping of GM's business portfolio (primarily derivatives in Rates and Credit). The legacy asset portfolio at year-end 2016 accounted for approximately € 20 billion of RWA (€ 36 billion including associated operational risk RWA), and approximately € 60 billion of leverage exposure. We estimate that these legacy assets represent an approximate 200 basis point reduction of the return on equity of CIB per annum. While many of these legacy assets are long dated, we will seek to accelerate their wind down when economic to do so.

Over time, to improve its asset efficiency and returns, CIB expects that approximately 65 % of its RWA will be eventually deployed to support corporate clients (versus 55 % on the basis of a combined division at year-end 2016), and 35 % to institutional clients, excluding any remaining legacy asset portfolio. Despite the increased focus on corporate clients, Deutsche Bank remains committed to its institutional capabilities as they are critical to the success of CIB, and Deutsche Bank has no intention to exit any whole business lines offered in the current GM division.

CIB also intends to target further cost efficiencies. The combination of the current CIB and GM is intended to support accelerated front-to-back office optimization and the rationalization of support staff, which we expect to result in a reduction in CIB's adjusted costs by approximately € 0.7 billion.

Through the above measures, and our strengthened capital position, our management believes that CIB will be better placed to grow globally and intends to pursue a number of objectives to achieve this:

– In **Origination and Advisory**, we intend to regain our number one position in EMEA as measured by revenues and to strengthen its franchise globally, with particular emphasis on deepening strategic client relationships to drive M&A and equity capital market mandates. Additionally, we intend to grow our leading debt capital markets franchise with an emphasis on Financial Institutions, and Sovereign, Supranational and Agency clients.
– In **Transaction Banking**, we intend to continue to capitalize on our top five position by improved cross selling of cash management on the back of our strong trade finance franchise and by continuing to drive improved cost income ratios through infrastructure investments.
– In **Financing,** we intend to maintain our leading Credit Financing & Solutions franchise with particular emphasis in Asset Backed Securities, Commercial Real Estate, and the Transport, Infrastructure and Energy sector.
– In **Debt Sales & Trading**, we intend to occupy a top-five position globally and a top-three position in EMEA. Of particular focus will be deepening strategic partnerships in Rates with insurance and pension clients and continuing to invest in cutting edge technology with the goal of becoming the top provider of foreign exchange payments and treasury solutions services.
– In **Equity Sales & Trading**, we are targeting to be an international equity franchise ranked amongst the top ten competitors by reported revenues with leading Prime and Investment Solution platforms through enhancing our liquidity and collateral management product offerings, and selectively gaining share in equity trading and derivatives.

## Strategy in Private & Commercial Bank (PCB)

We have decided that we will retain Postbank and combine it with our existing German operations over the next three to five years. This is a shift from the prior strategy and reflects a number of evolving factors.

We believe that good opportunities exist in PCB in Germany despite the challenging environment from low interest rates and high competition. In particular, we believe that growth in small and midsized German corporate clients and private banking clients will continue. These two client segments represent a majority of the identified fee pool in Germany and both are client segments that we believe we are well positioned to serve. In the more standard retail banking segment where fee pools are expected to be flat, we will respond with continued efficiency efforts and market share gains through digitization.

Case 1:22-cv-02854-JSR   Document 42-5   Filed 04/15/21   Page 52 of 62

55      Deutsche Bank                          PART I – 9              Signatures – 128
        Annual Report 2016 on Form 20-F        PART II – 116          Annual Report – 129
                                               PART III – 127         Supplemental Financial Information
                                                                      (Unaudited) – S-1

Additional factors that contributed to the decision to retain and integrate Postbank include:

– A lower targeted leverage ratio, which we initially set at 5 % when we announced our strategy in 2015. This reflects changes in the expected regulatory requirements and market expectations for leverage ratios of European banks. We have set 4.5 % as our new leverage ratio target.
– The positive impact on the business model of retaining a large and stable business with a substantial deposit base.
– Revised view on the possible degree of integration of Postbank and resulting scale and incremental synergies.
– Future growth opportunities we have identified, reflecting both a potential improvement in the macroeconomic outlook, but more importantly the changing dynamics in private and commercial banking in Germany. The likelihood of eventual industry consolidation is growing in German retail banking as well as the continued positive opportunities presented by digitalization.

The integration of Postbank will create Germany's largest private and commercial bank with over 20 million clients.

PCB intends to continue to operate with two distinct brands in Germany. By building one joint banking platform for all clients, the Deutsche Bank brand will remain focused on affluent, wealth management and commercial clients. Both franchises significantly improved their starting position in the last two years. Postbank, in particular, will offer a highly standardized and digitized banking service to retail clients. We expect our ongoing digital efforts not only to support efficiency goals, but also create an opportunity to gain market share among the Millennials client segment.

PCB intends to continue to execute its ongoing strategic initiatives including:

– Continued transformation of its private & commercial clients business, including cost reduction programs.
– The current branch rationalization efforts (additional 180 branches are scheduled to close in Germany by the end of 2017).
– Ongoing efforts to automate key processes and ongoing investment into digitalization.
– Investment in and expansion of the wealth management business.

In terms of products, PCB will focus on three key offerings: current account & transaction banking, lending products (which continue to serve as an anchor product) and distinct and tailor-made investment and insurance advice to our private clients. All of these come with a comprehensive digital offering as well as onsite branch advice to provide a full omni-channel banking experience.

A critical part of the PCB restructuring is the planned integration of Postbank. This integration is intended to more readily facilitate rationalization of central functions, improved efficiency across technology platforms and infrastructure and more efficient investment in areas including digitalization, distribution channels, and regulatory change.

We estimate that the planned restructuring in PCB will produce an estimated € 0.9 billion of annual synergies by 2022. The total cost of the planned restructuring measures is estimated to be € 1.9 billion, with restructuring and severance costs estimated to be approximately € 1.0 billion by 2022 and the remainder related to IT and other costs. By the end of 2018 we expect to finalize the existing transformation programs, which we anticipate will result in cost reductions of € 0.4 billion. PCB is targeting a cost income ratio of below 65 % following completion of this restructuring.

## Strategy in Deutsche Asset Management

Deutsche AM is a core business for us that has generated stable income and relatively higher returns on equity than many other businesses by earning recurring, fee-based revenues. It has a market-leading position as the largest retail asset manager in Germany and the number four retail asset manager in Europe, the number two position in Europe and number six position globally in passive/ETFs, all based on publicly disclosed assets under management. Deutsche AM also has a strong track record in the Alternatives business, particularly in infrastructure.

We believe that Deutsche AM's growth potential has been constrained by its full ownership by Deutsche Bank. Reputational issues in Deutsche Bank have affected Deutsche AM as did wider market concerns around our capital strength in late 2016. Additionally, resourcing limitations as we have pursued our restructuring efforts further constrained Deutsche AM.

Deutsche AM's growth prospects are rooted in core strengths of passive/ETFs and active multi-asset solutions as well as alternative investments, including real estate and infrastructure. We believe that allowing Deutsche AM to operate with more operational segregation can enhance its ability to pursue growth opportunities globally and gain market share.

We believe that Deutsche AM remains under-valued in the current corporate structure. We expect that a separate Deutsche AM operating company will permit its value to be enhanced over time while also positioning the business for future growth. An operationally segregated asset management business should also reduce the impact of any idiosyncratic impacts linked to the Deutsche Bank group, place the business on a more level competitive footing in the market, enhance its market profile, and make it easier for Deutsche AM to attract and retain talent through a separate compensation model with its own equity to fund and reward business growth.

We intend to sell a minority stake in Deutsche AM through an IPO. In preparation for this transaction, all asset management and supporting activity will be aligned to the Deutsche AM division. Going forward, the division is expected to have sufficient flexibility to better manage the resourcing and cost profile of the business and build a scale-efficient platform.

Deutsche AM has already completed its feasibility assessment of the separation alternatives and the target legal entity structure required to prepare the unit for an IPO. We intend to complete the IPO over the next 24 months, subject to market conditions.

# Our Corporate Divisions

Please see "Management Report: Operating and Financial Review: Deutsche Bank Group: Corporate Divisions" beginning on page 39 of the Annual Report 2016.

# The Competitive Environment

## Competitor Landscape

The economic environment stabilized or improved in many countries during the course of 2016, despite the heightened political uncertainty we experienced in this period, which in particular reflected the outcome of the UK referendum on EU membership and the U.S. presidential election. Central banks of the major economies played a key role in this recovery by continuing to support the global economy through expansionary monetary policy.

The Eurozone economy surpassed its average annual growth rate since the inception of the Euro in 2016, driven by consumption and investment. This supported import growth, even as exports were weighted down as a result of some adverse developments in global trade. The monetary policy stance of the European Central Bank ("ECB") continues to be highly expansionary, as reflected in negative interest rates and asset purchases ranging from € 60 to 85 billion per month. In December 2016, the ECB extended this asset purchase program until the end of 2017, but with a reduction in purchases to a maximum volume of € 60 billion per month, starting from April 2017. This implies a prolonged low interest rate environment in 2017, which creates a fundamental challenge for the European financial services sector.

The economic outlook for Europe as a whole also remains challenging. The upcoming elections and related political uncertainty may hold European growth back in the first six months of 2017. Assuming that further political risks do not

# PAGES 57-96 OMITTED PURSUANT TO D. N.J. ECF POLICIES AND PROCEDURES

Case 1:22-cv-02854-JSR   Document 42-5   Filed 04/15/21   Page 55 of 62

97     Deutsche Bank                PART I – 9              Signatures – 128
       Annual Report 2016 on Form 20-F    PART II – 116         Annual Report – 129
                                    PART III – 127          Supplemental Financial Information
                                                            (Unaudited) – S-1

# Item 8: Financial Information

## Consolidated Statements and Other Financial Information

### Consolidated Financial Statements

The Financial Statements of this Annual Report on Form 20-F consist of the Consolidated Financial Statements including Notes 1 to 46 thereto, which are set forth as Part 2 of the Annual Report 2016, and, as described in Note 1 "Significant Accounting Policies and Critical Accounting Estimates" thereto in the third paragraph under "Basis of Accounting", certain parts of the Management Report set forth as Part 1 of the Annual Report 2016. Such Consolidated Financial Statements have been audited by KPMG AG Wirtschaftsprüfungsgesellschaft, as described in their "Report of Independent Registered Public Accounting Firm" included on page 441 of the Annual Report 2016.

### Legal Proceedings

**General.** We and our subsidiaries operate in a legal and regulatory environment that exposes us to significant litigation risks. As a result, we are involved in litigation, arbitration and regulatory proceedings and investigations in Germany and in a number of jurisdictions outside Germany, including the United States. Please refer to Note 30 "Provisions" to the Consolidated Financial Statements for descriptions of certain significant legal proceedings. Additional legal proceedings that may have, or have had in the recent past, significant effects on our financial position or profitability are described below.

**Charter/BMY Matter.** On December 8, 2014, the United States Department of Justice ("DOJ") filed a civil complaint against, among others, Deutsche Bank, seeking to recover more than U.S.$ 190 million in taxes, penalties, and interest owed by a third party relating to two transactions that occurred between March and May 2000. The DOJ's complaint arises out of Deutsche Bank's March 2000 acquisition of Charter Corp. ("Charter") and its subsequent sale in May 2000 of Charter to an unrelated entity, BMY Statutory Trust (the "Trust"). Charter's primary asset, both at the time of purchase by Deutsche Bank and sale to the Trust, was appreciated Bristol-Myers Squibb Company ("BMY") stock. When the BMY stock was sold by the Trust, the Trust offset its gain with a loss from an unrelated transaction. The Internal Revenue Service subsequently disallowed the loss on audit exposing the BMY gain to taxation. The IRS assessed additional tax, penalties and interest against the Trust, which have not been paid. Relying on certain theories, including fraudulent conveyance, the DOJ sought to recoup from Deutsche Bank the taxes, plus penalties and interest, owed by the Trust. Deutsche Bank and the DOJ agreed to a final settlement of the case, and the Court dismissed the case with prejudice on January 4, 2017. Under the terms of the settlement, Deutsche Bank agreed to pay U.S.$ 95 million.

**Contestation of the General Meeting's Resolution Not to Pay a Dividend for the 2015 Fiscal Year.** In May 2016, our General Meeting resolved that no dividend was to be paid to our shareholders for the 2015 fiscal year. Some shareholders filed a lawsuit with the Frankfurt am Main District Court (Landgericht), contesting (amongst others) the resolution on the grounds that we were required by law to pay a minimum dividend in an amount equal to 4% of our share capital. In December 2016, the district court ruled in favor of the plaintiffs. We initially appealed the court's decision. However, consistent with our updated strategy, we intend to withdraw the appeal, as this decision is concerned, whereupon the contested resolution will become void. Our Management Board intends to propose to the annual General Meeting in May 2017 to resolve the payment of a dividend of approximately € 400 million from our distributable profit for 2016 which amount contains a component reflecting the distributable profit carried forward from 2015 of approximately € 165 million.

**$CO_2$ Emission Rights.** The Frankfurt am Main Office of Public Prosecution (the "OPP") is investigating alleged value-added tax (VAT) fraud in connection with the trading of $CO_2$ emission rights by certain trading firms, some of which also engaged in trading activity with Deutsche Bank. The OPP alleges that certain employees of Deutsche Bank knew that their counterparties were part of a fraudulent scheme to avoid VAT on transactions in $CO_2$ emission rights, and it searched Deutsche Bank's head office and London branch in April 2010 and issued various requests for documents. In December 2012, the OPP widened the scope of its investigation and again searched Deutsche Bank's head office. It alleges that certain employees deleted e-mails of suspects shortly before the 2010 search and failed to issue a suspicious activity report under the Anti-Money Laundering Act which, according to the OPP, was required. It also alleges that Deutsche Bank filed an incorrect VAT return for 2009 and incorrect monthly returns for September 2009 to February 2010. Deutsche Bank is cooperating with the OPP. On June 13, 2016, the Frankfurt District Court sentenced seven former Deutsche Bank employees for VAT evasion and for aiding and abetting VAT evasion in connection with their involvement in $CO_2$ emissions trading. Appeals are pending with respect to some of such former employees. The investigation by the OPP with respect to other employees is continuing.

The insolvency administrators of several German traders who sold emission certificates to Deutsche Bank in 2009/2010 are trying to refute the transactions as a voidable preference under German insolvency law and, in some cases, have started civil litigation. There is only one court decision so far, under which the Frankfurt District Court dismissed the relevant insolvency administrator's claim in full. The appeal against the decision is pending. In 2015, five insolvent English companies, which are alleged to have been involved in VAT fraud in connection with trading $CO_2$ emission rights in the UK, and their respective liquidators, started civil proceedings in London against four defendants including Deutsche Bank AG claiming that the defendants dishonestly assisted directors of the insolvent companies in breaching duties, and alternatively that the defendants were party to carrying on the companies' business with fraudulent intent (giving rise to a claim under Section 213 of the Insolvency Act 1986). Deutsche Bank is defending the claim and the proceedings are at an early stage.

**Deutsche Bank Shareholder Litigation.** Deutsche Bank and certain of its current and former officers and management board members are the subject of two purported class actions, filed in the United States District Court for the Southern District of New York, asserting claims under the federal securities laws on behalf of persons who purchased or otherwise acquired securities of Deutsche Bank on a United States exchange or pursuant to other transactions within the United States between April 15, 2013 and April 29, 2016. Plaintiffs allege that Deutsche Bank's SEC Annual Reports on Form 20-F for the years 2012, 2013, 2014 and 2015 were materially false and misleading in failing to disclose (i) serious and systemic failings in controls against financing terrorism, money laundering, aiding organizations subject to international sanctions and committing financial crime and (ii) that the Bank's internal control over financial reporting and its disclosure controls and procedures were not effective. The court consolidated the two actions and on October 4, 2016 appointed a lead plaintiff and lead counsel. On December 16, 2016, plaintiffs filed a consolidated amended complaint, expanding the proposed class period to January 31, 2013 through July 26, 2016, and adding several additional defendants. On February 21, 2017, Deutsche Bank moved to dismiss the consolidated amended complaint.

**EVAF Matter.** RREEF European Value Added Fund I, L.P. (the "Fund") is a fund managed by Deutsche Bank's subsidiary, Deutsche Alternative Asset Management (UK) Limited (the "Manager"). On September 4, 2015, the Fund (acting through a committee of independent advisers of the General Partner of the Fund, which is also a Deutsche Bank subsidiary) filed in the English High Court a claim against the Manager alleging that the Manager's decision to make a German real estate investment had been grossly negligent and had caused the Fund losses of at least € 158.9 million plus interest, for which the Manager was liable in damages. On January 25, 2017, the Fund and the Manager reached a settlement of the proceedings. The settlement amount is already fully reflected in existing litigation provisions and has been paid in the first quarter of 2017.

99    Deutsche Bank      Case 1:22-cv-02854-JSR    Document 42-5    Filed 04/15/21    Page 57 of 62

Deutsche Bank
Annual Report 2016 on Form 20-F

PART I – 9
PART II – 116
PART III – 127

Signatures – 128
Annual Report – 129
Supplemental Financial Information
(Unaudited) – S-1

**High Frequency Trading/Dark Pool Trading.** On December 16, 2016, the United States Securities and Exchange Commission ("SEC"), the State of New York Office of the Attorney General ("NYAG"), and the U.S. Financial Industry Regulatory Authority ("FINRA") announced settlements with the Bank relating to the Bank's electronic order routing, its alternative trading system ("ATS" or "Dark Pool") SuperX, and related disclosures. The SEC and NYAG settlements primarily involve a first-generation order routing algorithm used by the Bank prior to 2014, while the FINRA settlement primarily involves disclosure concerning certain functionality available to customers utilizing SuperX. The Bank admitted the allegations made by the SEC and NYAG, but neither admitted nor denied FINRA's allegations. In connection with the resolution of all three matters, the Bank agreed to pay a total of U.S.$ 40.25 million.

**ISDAFIX.** Deutsche Bank has received requests for information from certain regulatory authorities concerning the setting of ISDAFIX benchmarks, which provide average mid-market rates for fixed interest rate swaps. The Bank is cooperating with these requests. In addition, the Bank has been named as a defendant in five putative class actions that were consolidated in the United States District Court for the Southern District of New York asserting antitrust, fraud, and other claims relating to an alleged conspiracy to manipulate the U.S. dollar ISDAFIX benchmark. On April 8, 2016, Deutsche Bank settled the class actions for U.S.$ 50 million, which is subject to final court approval. The settlement was preliminarily approved by the court on May 11, 2016.

**Monte Dei Paschi.** In February 2013 Banca Monte Dei Paschi Di Siena ("MPS") issued civil proceedings in Italy against Deutsche Bank alleging that Deutsche Bank assisted former MPS senior management in an accounting fraud on MPS, by undertaking repo transactions with MPS and "Santorini", a wholly owned SPV of MPS, which helped MPS defer losses on a previous transaction undertaken with Deutsche Bank. Subsequently, in July 2013, the Fondazione Monte Dei Paschi, MPS' largest shareholder, also commenced civil proceedings in Italy for damages based on substantially the same facts. In December 2013, Deutsche Bank reached an agreement with MPS to settle the civil proceedings and the transactions were unwound at a discount for MPS. The civil proceedings by the Fondazione Monte Dei Paschi, in which damages of between € 220 million and € 381 million are claimed, remain pending. The Fondazione's separate claim filed in July 2014 against their former administrators and a syndicate of 12 banks including DB S.p.A. for € 286 million has resumed before the Florence Court.

A criminal investigation was launched by the Siena Public Prosecutor into the transactions and certain unrelated transactions entered into by MPS with other parties. Such investigation was moved in summer 2014 from Siena to the Milan Public Prosecutors as a result of a change in the alleged charges being investigated. On February 16, 2016, the Milan Public Prosecutors issued a request of committal to trial against Deutsche Bank AG and six current and former employees. The committal process concluded with a hearing on October 1, 2016, during which the Milan court committed all defendants in the criminal proceedings to trial. Deutsche Bank's potential exposure is for administrative liability under Italian Legislative Decree n. 231/2001 and for civil vicarious liability as an employer of current and former DB employees who are being criminally prosecuted. Trial commenced on December 15, 2016 and is ongoing. Deutsche Bank continues to cooperate and update its regulators.

**Parmalat Litigation.** Following the bankruptcy of the Italian company Parmalat, prosecutors in Parma conducted a criminal investigation against various bank employees, including employees of Deutsche Bank, and brought charges of fraudulent bankruptcy against a number of Deutsche Bank employees and others. The trial commenced in September 2009 and is ongoing, although it is in its final stages and is anticipated will conclude in the course of 2017.

Certain retail bondholders and shareholders have alleged civil liability against Deutsche Bank in connection with the above-mentioned criminal proceedings. Deutsche Bank has made a formal settlement offer to those retail investors who have asserted claims against Deutsche Bank. This offer has been accepted by some of the retail investors. The outstanding claims will be heard during the criminal trial process.

**Pas-de-Calais Habitat.** On May 31, 2012, Pas-de-Calais Habitat ("PDCH"), a public housing office, initiated proceedings before the Paris Commercial Court against Deutsche Bank in relation to four swap contracts entered into in 2006, restructured on March 19, 2007 and January 18, 2008 and subsequently restructured in 2009 and on June 15, 2010. PDCH asks the Court to declare the March 19, 2007 and January 18, 2008 swap contracts null and void, or terminated, or to grant damages to PDCH in an amount of approximately € 170 million on the grounds, inter alia, that Deutsche

Bank committed fraudulent and deceitful acts, manipulated the LIBOR and EURIBOR rates which are used as a basis for calculating the sums due by PDCH under the swap contracts and breached its obligations to warn, advise and inform PDCH. A decision on the merits is not expected until the third quarter of 2017 at the earliest.

**Pension Plan Assets.** The Group sponsors a number of post-employment benefit plans on behalf of its employees. In Germany, the pension assets that fund the obligations under these pension plans are held by Benefit Trust GmbH. The German tax authorities are challenging the tax treatment of certain income received by Benefit Trust GmbH in the years 2010 to 2013 with respect to its pension plan assets. For the year 2010 Benefit Trust GmbH paid the amount of tax and interest assessed of € 160 million to the tax authorities and is seeking a refund of the amounts paid in litigation with the relevant lower fiscal court. For 2011 to 2013 the matter is stayed pending the outcome of the 2010 tax litigation. The amount of tax and interest under dispute for years 2011 to 2013, which also has been paid to the tax authorities, amounts to € 456 million. Any decision by the lower fiscal court is potentially subject to appeal by either party and thus a resolution of the matter may not take place for a number of years.

**Sebastian Holdings Litigation.** Litigation with Sebastian Holdings Inc. ("SHI") in respect of claims arising from FX trading activities concluded in the UK Commercial Court in November 2013 when the court awarded Deutsche Bank approximately U.S.$ 236 million plus interest and dismissed all of SHI's claims. On January 27, 2016, the New York court dismissed substantially similar claims by SHI against Deutsche Bank when it granted Deutsche Bank's motion for summary judgment based on the UK Commercial Court's judgment. The New York court also denied SHI's motion for leave to file an amended complaint. SHI has appealed the New York court's decisions.

**Vestia.** In December 2016, Stichting Vestia, a Dutch housing association, commenced proceedings against Deutsche Bank in England. The proceedings relate to derivatives entered into between Stichting Vestia and Deutsche Bank between 2005 and 2012. Stichting Vestia alleges that certain of the transactions entered into by it with Deutsche Bank should be set aside on the grounds that they were not within its capacity and/or were induced by the bribery of Vestia's treasurer by an intermediary involved in those transactions. The sums claimed by Stichting Vestia are made up of different elements, some of which have not yet been quantified. The quantum of the claims as articulated at this stage ranges between € 717 million and € 834 million, plus compound interest. Deutsche Bank is defending the claim.

# Dividend Policy

Consistent with our updated strategy, we do not intend to pay more than the minimum dividend required by German law for the fiscal years until and including 2016. Accordingly, the Management Board intends to propose to the annual General Meeting in May 2017 to resolve the payment of a dividend per share of € 0.19 out of the distributable profit for 2016, reflecting the pay out of the distributable profit carried forward from 2015 of approximately € 165 million and a dividend per share of € 0.11 from the remaining distributable profit for 2016. For the fiscal year 2017, the Management Board intends to propose at least a minimum dividend per share of € 0.11 (paid after the annual General Meeting in 2018). Historically, however, we have paid dividends at higher levels, including dividends per share of € 0.75 for 2014, and intend to pay competitive dividends above the minimum amount no later than for 2018 (paid after the annual General Meeting in 2019). However, we cannot assure investors that we will pay dividends as for 2014 or previous years, or at any other level, or at all, in any future period. If the company is not profitable, we may not pay dividends at all.

Furthermore, if Deutsche Bank AG fails to meet the regulatory capital adequacy requirements under CRR/CRD 4 (including individually imposed capital requirements (so-called "Pillar 2" requirements) and the combined buffer requirement), it may be prohibited from making, and the ECB or the BaFin may suspend or limit, the payment of dividends. In addition, the ECB expects banks to meet "Pillar 2" guidance. If Deutsche Bank AG operates or expects to operate below "Pillar 2" guidance, the ECB will review the reasons why the Bank's capital level has fallen or is expected to fall and may take appropriate and proportionate measures in connection with such shortfall. Any such measures might have an impact on Deutsche Bank AG's willingness or ability to pay dividends. For further information on regulatory capital adequacy requirements and the powers of Deutsche Bank AG's regulators to suspend dividend payments, see "Item 4: Information on the Company – Regulation and Supervision – Capital Adequacy Requirements" and "– Investigative and Enforcement Powers."

Case 1:22-cv-02854-JSR   Document 42-5   Filed 04/15/21   Page 59 of 62

101   Deutsche Bank                    PART I – 9              Signatures – 128
      Annual Report 2016 on Form 20-F  PART II – 116          Annual Report – 129
                                       PART III – 127         Supplemental Financial Information
                                                              (Unaudited) – S-1

Under German law, Deutsche Bank AG's dividends are based on the unconsolidated results of Deutsche Bank AG as prepared in accordance with German accounting rules. Deutsche Bank AG's Management Board, which prepares the annual financial statements of Deutsche Bank AG on an unconsolidated basis, and its Supervisory Board, which reviews them, first allocate part of Deutsche Bank AG's annual surplus (if any) to Deutsche Bank AG's statutory reserves and to any losses carried forward, as it is legally required to do. They then allocate the remainder between other revenue reserves (or retained earnings) and balance sheet profit. They may allocate up to one-half of this remainder to other revenue reserves, and must allocate at least one-half to balance sheet profit. A profit distribution from balance sheet profit is only permitted to the extent that the balance sheet profit plus distributable earnings exceeds potential dividend blocking items, which consist of deferred tax assets, self-developed software and unrealized gains on plan assets, all net of respective deferred tax liabilities.

Deutsche Bank AG then distributes the full amount of the balance sheet profit not subject to dividend blocking of Deutsche Bank AG if the Annual General Meeting so resolves. The Annual General Meeting may resolve a non-cash distribution instead of, or in addition to, a cash dividend. However, Deutsche Bank AG is not legally required to distribute its balance sheet profit to its shareholders to the extent that it has issued participatory rights (Genussrechte) or granted a silent participation (stille Gesellschaft) that accord their holders the right to a portion of Deutsche Bank AG's distributable profit.

Should the annual General Meeting resolve to carry forward profits or to allocate profits to the reserves, pursuant to German corporate law, shareholders may contest the resolution of the General Meeting if such carrying forward or allocation is not, on the basis of a reasonable commercial assessment, deemed necessary to ensure the viability or economic resilience of the company and the shareholders do not receive a minimum dividend in the amount equal to 4 % of the share capital. On these grounds, shareholders challenged the resolution of the 2016 annual General Meeting not to pay a dividend for 2015. Consistent with our updated strategy, the Management Board intends to propose to the annual General Meeting in May 2017 to resolve the payment of a dividend of approximately € 400 million, reflecting the pay out of the distributable profit carried forward from 2015 of approximately € 165 million and a dividend per share of € 0.11 from the remaining distributable profit for 2016. For more information on the shareholder challenge referred to above, see "Legal Proceedings – Contestation of the General Meeting's Resolution Not to Pay a Dividend for the 2015 Fiscal Year".

Deutsche Bank AG declares dividends by resolution of the Annual General Meeting and pays them (if any) once a year. Dividends approved at a General Meeting are payable on the third business day after that meeting, unless a later date has been determined at that meeting or by the Articles of Association. In accordance with the German Stock Corporation Act, the record date for determining which holders of Deutsche Bank AG's ordinary shares are entitled to the payment of dividends, if any, or other distributions whether cash, stock or property, is the date of the General Meeting at which such dividends or other distributions are declared.

## Significant Changes

Except as otherwise stated in this document, there have been no significant changes subsequent to December 31, 2016.

# Item 9: The Offer and Listing

## Offer and Listing Details and Markets

Our share capital consists of ordinary shares issued in registered form without par value. Under German law, shares without par value are deemed to have a "nominal" value equal to the total amount of share capital divided by the number of shares. Our shares have a nominal value of € 2.56 per share.

# PAGES 102-127 OMITTED PURSUANT TO D. N.J. ECF POLICIES AND PROCEDURES

# Signatures

The registrant hereby certifies that it meets all of the requirements for filing on Form 20-F and has duly caused and authorized the undersigned to sign this annual report on its behalf.

Date: March 20, 2017
Deutsche Bank Aktiengesellschaft

/s/ _____ JOHN CRYAN _____

John Cryan
Chairman of the Management Board

/s/ _____ MARCUS SCHENCK _____

Marcus Schenck
Member of the Management Board
Chief Financial Officer

# ANNUAL REPORT AND EXHIBITS ANNEXED TO 2016 FORM 20-F OMITTED PURSUANT TO D. N.J. ECF POLICIES AND PROCEDURES