# EXHIBIT 11

Deutsche Bank



# Non-Financial Report 2018

# Contents

3 Letter of the Chairman of the Management Board
5 Purpose and management approach
6 Globally challenging and emerging trends
10 Culture and conduct
11 Business integrity
13 Business integrity in client relationships
15 Client satisfaction
18 Public policy and regulation
19 Tax
20 Anti-financial crime
25 Information security
27 Data protection
28 ESG in business
29 ESG due diligence
32 ESG product portfolio
38 Climate risks
41 Human rights
42 Employee matters
43 People strategy
49 Key employee figures
50 Society
51 Corporate social responsibility
57 Art, culture, and sports
58 Environmental commitment
59 In-house ecology
61 Eco-efficiency tables
64 Supplementary information
65 About this report
67 Reports of the Independent Auditor
71 GRI and UN Global Compact
78 Abbreviations
80 Imprint/Publications

# PAGES 3-19 OMITTED PURSUANT TO D. N.J. ECF POLICIES AND PROCEDURES

# Anti-financial crime

Deutsche Bank believes it is vital to combat financial crime in order to ensure the stability of banks and the integrity of the international financial system. Failure to identify and manage risks relating to financial crime exposes Deutsche Bank and its staff to potential criminal and/or regulatory liability, civil lawsuits, and a loss of reputation. As one of Europe's largest banks, we strongly support international efforts to combat money laundering, the financing of terrorism, and other criminal acts. Consequently, we have a zero-tolerance approach to financial crime, in line with our Code of Conduct. Given the strict regulatory and legal environment in which we operate, we regularly invest in our controls with a view to the prevention of all types of financial crime.

## Managing financial crime risks

Deutsche Bank's Management Board is ultimately responsible for the management and mitigation of financial crime risks within the bank. The Management Board delegates tasks relating to those obligations to the Anti-Financial Crime function (AFC). The Chief Regulatory Officer (CRegO) is the responsible Management Board member for AFC. AFC is a second-line-of-defence control function, managing and mitigating the financial crime risks assigned to it in the bank's Non-Financial Risk Type Taxonomy. This relates to the prevention of money laundering, countering terrorism financing, observing sanctions and embargoes, and the prevention of fraud, bribery, and corruption. AFC develops and implements, or oversees the development by other areas of the bank of, policies, procedures, and processes that form the bank's control framework for those risks. AFC also oversees the bank's broader control framework as it relates to countering other criminal activities, including controls for which other functions or divisions of the bank are accountable.

Within AFC, specialized functions exist to handle specific areas of financial crime risk. The Anti-Money Laundering (AML) function, among other things, institutes measures to prevent money laundering and combat the financing of terrorism and proliferation. The Anti-Fraud, Bribery and Corruption (AFBC) function monitors and advises on compliance with fraud, bribery, and corruption laws, regulations, and international standards; the ongoing design and development of appropriate measures; and the administration of controls and safeguards to mitigate fraud, bribery, and corruption risk. The Sanctions and Embargoes function is accountable for performing measures to comply with finance and trade sanctions and embargoes, especially detecting, evaluating, and, if required, ensuring the observance of sanctions, law-related publications, and binding requirements in connection with the financial and trade sanctions of the respective authorities. As the first line of defense managers and staff in Deutsche Bank's business divisions are accountable for the appropriate structuring and execution of business activities and their corresponding processes in accordance with applicable law, rules, regulations, and Deutsche Bank policies. In response to regulatory requirements and in line with the objective of further strengthening the AFC division in 2018, staff numbers rose by about 20 % during the year (Full Time Equivalent, FTE).

The AFC Charter sets out the mandate and responsibilities of AFC across Deutsche Bank. Global AFC policies set the minimum standards for the management of financial crime risks, which are supplemented by further, country-specific policy requirements. All AFC policy documents are reviewed at least once a year to ensure that relevant new or revised legislation and regulations are properly reflected, and to take into account any lessons learned.

In 2018, we enhanced our frameworks and policies (e.g. AFC Charter, KYC Policy, Sanctions Policy, Whistleblowing Policy, and Transaction Monitoring Policy) to further strengthen Deutsche Bank's risk management approach in these areas. We also upgraded our tools and systems across all AFC areas, including better identification of suspicious transactions and improved filtering of transactions in the Sanctions and Embargoes function; launch of a strategic daily client screening system; enhanced anti-fraud, bribery, and corruption controls; and improved processes for the identification of new legislation and regulations, and their reflection in AFC policy documents.

To identify and assess the money-laundering, terrorism-financing, disregarding sanctions and embargos, fraud, bribery, and corruption risks resulting from our products, services, client activities, and operational geographies, the global AFC risk assessment team assess clients, products, and transactions annually, as well as quarterly via a Group-wide Top Risk reporting process, which is part of our non-financial risk framework. Assessments are continuously enhanced and reviewed so they can be adjusted to new regulatory requirements and take any lessons learned into account.

The vision of our AFC department is to proactively protect our clients, society, and the bank from financial crime risk. To achieve this vision, our key objectives for 2019 are:

– Enhance our connectivity with the business and other control functions to further increase effectiveness. We are working on a communication strategy for the AFC division as a key element to achieve this;
– Strengthen our transaction monitoring capabilities with a strong focus on better modelling, which will reduce the occurrence of unproductive alerts and improve our ability to focus investigative capacity on relevant alerts.

## Training and engaging employees

Awareness of the risks related to financial crime and our exposure to it is a prerequisite for combating financial crime and fulfilling our duties as a good corporate citizen. This not only protects the reputation and the financial health of Deutsche Bank, but by deepening our awareness of financial crime and by bolstering our internal controls and governance, we strengthen our ability to live up to what is expected of each and every one of us. To that end, we established a global awareness campaign to prevent financial crime. In 2018, the campaign entered its third and final wave in support of the Group-wide Anti-Financial Crime Transformation and Remediation Program, a key bank-wide initiative to ensure we better understand and manage the financial crime risks we face. Employees from across the globe saw the Wave 3 "Stay Sharp" posters, banners, and brand-screen displays to raise awareness of the need to continuously be aware of financial crime risks, and stay up to date with the latest skills essential to combating financial crime.

To ensure employees have the necessary technical knowledge and skills, and to keep pace with a constantly changing regulatory environment, Deutsche Bank offers training or development opportunities suited to a particular stage in an employee's career. Our AFC curriculum includes courses on anti-money laundering, anti-fraud, bribery, and corruption, and sanctions. The course uptake is very high, with minimal overdue ratios for late or non-completion of mandatory training. Participation is monitored and delayed completion will be escalated to an employee's line manager; it can also result in red flags for employees or their managers, which are taken into account in annual promotion and compensation decisions. Through Deutsche Bank's partnership with the Association of Certified Anti-Money Laundering Specialists, AFC employees have access to a broad range of specialist material, analyzes, and training.

## Knowing our customers

The Deutsche Bank's Know Your Customer (KYC) Policy lays down the rules governing our Group-wide approach. KYC is an ongoing process throughout the life cycle of a client relationship. As such, we not only need to know the client (including their ownership structure, ultimate beneficial owners, and source of funds where applicable), but also the anticipated nature of the client relationship.

The New Client Adoption process governs the onboarding of potential clients. No funds or assets may be accepted or transacted, nor any legal commitment entered into (e.g. operation of an account, sale of a product, or rendering of a service), until this process has been completed. As part of our regular client due diligence, we screen our relationships against internal and external criteria, e.g. relating to Politically Exposed Persons (PEPs), terrorism, or sanctions. As a consequence, a client relationship may be declined or subject to monitoring or conditions imposed on accounts, transactions, or product usage. In 2018, we further improved the effectiveness and efficiency of our screening program by investing in new technology, enhancing our methodology, and improving our alert investigation process.

In order to periodically assess client relationships, the relevant business function is required to ensure that regular reviews of all existing clients are initiated and duly performed. Review cycles depend on the risk category of a client relationship and take country, industry, product, and entity type risk into consideration. In general, high-risk clients have to be reviewed annually, medium-risk clients every two years, and low-risk clients every five years. For medium- and low-risk clients, Postbank brand normally carries out only event-related reviews and adjustments. The primary objective of risk segmenting the client base is to conduct appropriate due diligence and ensure a comprehensive client profile is in place so the results of ongoing monitoring can be compared and any discrepancies identified.

## Whistleblowing

The Whistleblowing Policy sets forth the framework for staff members to report any concerns or suspicions regarding possible violations, including the prohibition against retaliation. Deutsche Bank takes any reports of possible violations very seriously and investigates such reports as appropriate. One of the channels employees can use to report such issues is Deutsche Bank's Integrity Hotline, which can be used anonymously. The bank prohibits retaliation in any form against employees who make such reports in accordance with its Whistleblowing Policy. All individuals engaged for or on behalf of Deutsche Bank are called upon to report any concerns or suspicions regarding possible violations of laws, rules, or regulations, or possible violations of internal policies or procedures, including the bank's Code of Conduct. Any reports received are reviewed to establish their nature, content, and urgency. If necessary, an internal investigation of the incident will be initiated, which can, for example, result in disciplinary actions against employees or changes to our processes.

## Combating money laundering and terrorism financing

The AML unit has been designed in such a way as to comply, as a minimum, with German rules and with the local laws and regulations in all countries Deutsche Bank operates in. This includes policies, procedures, a designated Money Laundering Officer, independent controls, and regular employee training. Deutsche Bank is part of the Wolfsberg Group of Banks, has adopted the Wolfsberg Anti-Money Laundering Principles, and has signed the Wolfsberg Statement on the Suppression of the Financing of Terrorism.

The AML unit undertakes measures to comply with rules and regulations regarding identification (authentication), recording, and archiving; to develop, update and execute internal policies, procedures, and controls; and to detect suspicious transactions and process suspicious activity alerts. In this way, we provide valuable information to regulatory and government bodies in line with existing legal and regulatory requirements, and hence support them in their fight against financial crime. In addition, we receive and use information from authorities and law enforcement enquiries to strengthen our control and detection environment. We also share information with peer institutions, within legal boundaries, as part of financial crime networks such as the Joint Money Laundering Intelligence Taskforce (JMLIT) in the UK, which consists of representatives of law enforcement agencies and leading financial institutions. In parallel, irrespective of the value or amount involved, if there is reasonable suspicion that funds have been derived from illegal origins or may be used in the context of terrorism financing, a transaction will always be declined.

As AML is considered to be a Top Risk under the bank's Non-Financial Risk Management Framework, this unit is closely monitored. A Transformation & Remediation Program has been set up to improve key processes, such as KYC and transaction monitoring.

## Respecting sanctions and embargoes

At Deutsche Bank we have a responsibility to monitor, evaluate, and observe laws and binding requirements relating to financial and trade sanctions set by the EU, the Bundesbank, Germany's Federal Office for Economic Affairs and Export Control, and other authorities, such as the US Office of Foreign Assets Control (OFAC) and the UK Treasury Department. Our Group-wide Sanctions Policy and a specific policy relating to the US OFAC have procedures that help us to assess and reduce client risk as part of our on-boarding process and periodically thereafter. These policies also help us to manage risks relating to particular transactions, countries, and goods. The bank has entered into agreements with certain US regulatory and law enforcement agencies to resolve investigations concerning US embargo-related matters, as further outlined in our Annual Report 2018, Notes to the Consolidated Balance Sheet, Note 29 – Provsions.

As breaching sanctions and embargoes is considered to be a Top Risk under the bank's Non-Financial Risk Management Framework, this function and topic is closely monitored. A Sanctions & Embargoes Transformation Program has been set up to deliver strategic improvements to the control environment.

## Preventing fraud

Our Group-wide Anti-Fraud Policy defines fraud as any intentional act or omission, including a misrepresentation that misleads or conceals, or attempts to mislead or conceal, in order to gain a personal or business advantage, or to avoid a personal or business disadvantage. The Anti-Fraud Policy applies to all employees and explains how to immediately escalate any known or suspected fraudulent incident. Employees who engage in fraudulent acts may be subject to internal disciplinary action, prosecution, and/or regulatory sanction. Deutsche Bank may refer such employees to law enforcement agencies and regulatory agencies and may seek redress from the employee. Employees are also expected to comply with any local requirements relating to fraud.

In relevant business divisions (excluding Postbank brand), mandatory time away (MTA) is an important anti-fraud control mechanism for preventing or detecting unauthorized or inappropriate activity by staff in sensitive positions. MTA enforcement acts as a deterrent to employees from undertaking any unauthorized or inappropriate activity that might require continuous on-site presence and/or system access.

## Combating bribery and corruption

In accordance with our Code of Conduct and international law (e.g. the UK Bribery Act 2010, the US Foreign Corrupt Practices Act 1977, the German Criminal Code (StGB), Singapore's Prevention of Corruption Act (PCA), and the OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions), Deutsche Bank does not accept or tolerate any knowing or willfully negligent involvement in or association with bribery and corruption in any form. This includes a clear prohibition on giving or authorizing facilitation payments.

The Anti-Bribery and Corruption (ABC) Policy sets out the minimum standards that govern Deutsche Bank's approach to the mitigation and detection of bribery and corruption risk, and the behavior expected by all employees. These requirements also apply to partners, suppliers, service providers, and third parties to the extent they perform services for Deutsche Bank and counterparts contractually bound to Deutsche Bank or associated with Deutsche Bank's business and business interests. The ABC team administers controls and safeguards to mitigate bribery and corruption risks, for example in respect of joint ventures, offering and accepting gifts and entertainment, hiring practices, high-risk client relationships, transactions, and new products.

Every employee is responsible for the prevention, detection, and reporting of bribery and other forms of corruption in connection with the bank's business. Bribery and corruption have serious consequences for employees and the bank as they may result in legal, reputational, and regulatory risks. We take action against employees who violate the bank's ABC Policy, Code of Conduct, or applicable laws and regulations. Deutsche Bank will terminate relationships with any third party if they violate the ABC Policy, give, receive, or agree to give or receive a bribe, commit a criminal and/or regulatory offence, and potentially expose the bank to corporate criminal and/or regulatory liability, as well as civil lawsuits, locally and globally. To deliver on this policy, regional teams are responsible for reviewing and analyzing escalated ABC matters, developing and administering controls, monitoring, advising on compliance with ABC obligations, training, and awareness. Details of settlements or ongoing legal cases are outlined in the Annual Report 2018, Notes to the Consolidated Balance Sheet, Note 29 – Provsions.

## Preventing other criminal activities

The Head of AFC is also responsible for ensuring that measures to prevent any other criminal activities that could endanger institutional assets (see Section 25, German Banking Act) are fit for purpose. The examples derived from the German Penal Code include damage to property, robbery, cybercrimes, antitrust, and tax offences. The Head of AFC has established and chairs a Global Financial Crime Governance Committee to support the governance and oversight of the Financial Crime risks, as defined in Section 25h, German Banking Act. The Global Financial Crime Governance Committee is supported by the Regional Financial Crime Governance Committees, which are chaired by the respective Regional Heads of AFC.

## Reporting on recent events

Despite all our efforts to prevent money laundering, there have been instances in which the bank agreed to pay civil monetary penalties to settle investigations into the bank's AML control function, as further outlined in our Annual Report 2018, Notes to the Consolidated Balance Sheet, Note 29 – Provisions.

On September 21, 2018, the BaFin issued an order requiring us to implement measures on specified timelines over the coming months and years to improve our control and compliance infrastructure relating to anti-money laundering and, in particular, the Know Your Customer (KYC) processes in CIB. The BaFin also appointed KPMG as special representative, reporting to the BaFin, to monitor the implementation of these measures. In February 2019, the BaFin extended the special representative's mandate to cover our internal controls in the correspondent banking business.

In October and November 2018, there were media reports about Deutsche Bank's involvement in activities performed by Danske Bank AS Estonia Branch (Danske Estonia). Deutsche Bank acted as one of the correspondent banks for Danske Estonia. Our role was to process correspondent banking transactions on behalf of customers of Danske Estonia prior to cessation of the corresponding banking relationship with that branch in 2015. We are conducting an internal investigation into these matters, including of whether any violations of law, regulation or policy occurred and the effectiveness of the related internal control environment, and are cooperating with the investigating authorities. Separately, over the last two to three years Deutsche Bank has completed a significant de-risking of its Correspondent Banking client portfolio. Additionally, the Correspondent Banking business at Deutsche Bank went through a comprehensive remediation program, significantly strengthening the overall risk management framework including policies and procedures, governance and oversight, and client due diligence/KYC. As a result of these measures, Deutsche Bank has reduced its global Correspondent Banking client portfolio substantially since 2016, including clients rated as high risk.

On November 29, 2018, several Deutsche Bank offices in Germany were searched by German law enforcement authorities in connection with information available through the so-called Panama Papers leak. The Public Prosecutor's Office in Frankfurt/Main accuses two Deutsche Bank employees – and as-yet unidentified further individuals – of potentially aiding and abetting money-laundering activities, and specifically that they did not report indications of potential money laundering immediately, but only after publication of the Panama Papers in the media. The Bank is cooperating in the investigation, as has been publicly acknowledged by the Frankfurt Public Prosecutor's Office. Independently of this, Deutsche Bank had already concluded an internal review into the Panama Papers and in January 2018, BaFin had informed us that it was closing its own investigation and requested no further action from us.

# PAGES 25-82 OMITTED PURSUANT TO D. N.J. ECF POLICIES AND PROCEDURES