# EXHIBIT 12

Deutsche Bank



# Non-Financial Report 2019

# Contents

3 Letter from the Chairman of the Management Board

5 Introduction
6 About Deutsche Bank
7 About this report
8 Stakeholder engagement
9 Sustainability ratings and indices

10 Combined separate non-financial report
11 Legal basis
14 Culture and integrity
17 Client-related matters
18 Product responsibility
20 Client satisfaction
23 Sustainable finance
31 Organizational matters
32 Anti-financial crime
37 Data protection
38 Information security
41 Public policy and regulation
44 Employee-related matters
45 Employment and employability
52 Key employee figures
53 Digital transformation
54 Digitization and innovation

57 GRI supplement
58 Approach to sustainability
61 Reputational risk
65 Human rights
67 Climate risk
71 Access and inclusion
72 Tax
73 In-house ecology
78 Corporate social responsibility
84 Art, culture and sports

85 Appendix
86 Reports of the independent auditor
90 GRI and UN Global Compact
103 Abbreviations
106 Imprint/publications

# PAGES 3-31 OMITTED PURSUANT TO D. N.J. ECF POLICIES AND PROCEDURES

# Anti-financial crime

**GRI 103-1**

Deutsche Bank is a leading European bank with a global footprint that provides a broad suite of products and services across its Corporate Bank (CB), Investment Bank (IB), Private Bank (PB), Asset Management (AM), and Capital Release Unit. The bank is exposed to diverse financial crime risks, including money laundering, terrorism financing, and sanctions, as well as other criminal activities, such as fraud, bribery, and corruption. In line with its legal and regulatory obligations, Deutsche Bank believes it is vital to combat financial crime in order to ensure the stability of banks and the integrity of the international financial system. Failure to manage financial crime risks exposes Deutsche Bank and its employees to potential criminal and/or regulatory liability, civil lawsuits, and a loss of reputation. Although it is not possible to eliminate these financial crime risks entirely, commensurate controls must be in place to minimize these risks.

Given the strict and challenging regulatory and legal environment in which it operates, Deutsche Bank continually invests in controls to enhance its management of financial crime risks. The media, authorities, and the general public have shown interest in the perceived or actual control gaps, while the evolution of global market structures poses new challenges, for example the emergence of new payment methods or fintechs. Deutsche Bank continues to be subject to various enforcement actions at its main locations, requiring ongoing focus and disciplined execution. Deutsche Bank is currently subject to increased levels of regulatory scrutiny and activities over its financial crime risk management. These regulatory activities have led to the appointment of a number of external monitors, one of them being KPMG as the Federal Financial Supervisory Authority (*Bundesanstalt für Finanzdienstleistungsaufsicht*, BaFin) Special Representative to oversee the implementation of the measures ordered by the BaFin.[4] If Deutsche Bank is unable to improve its infrastructure and control environment within given timelines, its business operation, financial condition and reputation could be materially and adversely affected. In response to these challenges, Deutsche Bank continued to actively improve its control environment during 2019.

## Governance

**GRI 102-15/17/20/29/31, 103-2/3**

Deutsche Bank's Management Board is ultimately responsible for the management and mitigation of financial crime risks. The Management Board delegates tasks relating to these obligations to the Anti-Financial Crime (AFC) function. Since the announcement of the new Management Board structure in July 2019, the Chief Risk Officer (CRO) has been the Management Board member responsible for the AFC function. AFC is a second-line-of-defense (2LoD) control function, overseeing the management and mitigation of the financial crime risks assigned as per the bank's non-financial risk type taxonomy. The business divisions as first line of defense are responsible for designing and implementing controls to mitigate the financial crime risks emerging from their respective business activities and processes.

---

4 For further details on specific regulatory activities incl. the order issued by BaFin, see the Annual Report 2019, Notes to the Consolidated Balance Sheet, Note 27 – Provisions.

The financial crime risks managed by AFC are defined as and grouped in the risk themes described below:

– Risk of money laundering: If Deutsche Bank knowingly or despite reasonable suspicion employs an inadequate framework of controls leading to Deutsche Bank products and services being misused to facilitate money laundering, terrorist financing, and/or tax evasion;
– Risk of violating sanctions or embargoes: If Deutsche Bank knowingly or despite reasonable suspicion engages in a sanctioned financial activity, including sectorial sanctions or project-based financing, or fails to take adequate measures to prevent or detect circumvention of existing controls;
– Risk of bribery and corruption: If Deutsche Bank engages in bribery either as a company or via an employee, third party, vendor, supplier, or intermediary, or provides products and services to clients in the public or private sector who abuse a position of power for an improper or business advantage, thus directly or indirectly facilitating the misuse of funds or financing by corrupt individuals or entities;
– Risk of fraud: If, either as a company or via an employee, Deutsche Bank performs any intentional act or omission, including a misrepresentation that misleads or conceals, or attempts to mislead or conceal, in order to gain a personal or business advantage, or to avoid a personal or business disadvantage; and
– Risk of failing to prevent "other criminal activities" that might jeopardize the institution's assets (derived from section 25h, German Banking Act).[5]

Two of these risks – money laundering, and sanctions and embargoes – are classified as group-wide Top Risks. Failing to manage any of these risks may have serious consequences for employees and Deutsche Bank. Hence, Deutsche Bank has set up the AFC function as follows in order to handle specific areas of financial crime risk:

– To prevent money laundering and combat the financing of terrorism, AFC, through various functions, undertakes measures to comply with rules and regulations regarding identification and verification of clients, including financial crime risk reviews of clients and transactions; to develop, update, and execute internal policies, procedures, and controls; and to detect and report suspicious transactions. In this way, valuable information is provided to regulatory and government bodies in line with existing legal and regulatory requirements to support the fight against financial crime;
– The Sanctions and Embargoes (S&E) function is accountable for performing measures to comply with finance and trade sanctions and embargoes, especially detecting, evaluating, and, if required, ensuring the observance of sanctions, law-related publications, and binding requirements in connection with the financial and trade sanctions of the respective authorities;
– The Anti-Fraud, Bribery, and Corruption (AFBC) function monitors and advises relevant functions, and administers controls and safeguards to mitigate fraud, bribery, and corruption risks, for example with respect to vendor fraud, joint ventures, offering and accepting gifts and entertainment, hiring practices, high-risk client relationships, transactions, and new products;
– AFC Investigations (AFCI) is mandated to centrally and consistently manage and/or coordinate the bank's response to fraud and internal misconduct-related investigations allocated to AFCI, and to facilitate decision-making and escalation processes via the AFC Governance Framework. After becoming fully operational at the end of 2018, AFCI acts to protect Deutsche Bank's integrity by ensuring it provides an impartial investigative response to fraud and internal misconduct in a holistic and effective manner;
– As the Head of AFC is responsible for having an adequate risk management framework in place for all "other criminal activities" that are not directly managed within the AFC function, a Global Financial Crime Governance Committee was additionally established to provide governance and oversight of all financial crime risks mentioned above; and
– In addition, AFC works closely with various groups of experts and financial crime networks (e.g. the Joint Money Laundering Intelligence Taskforce in the U.K. and the Wolfsberg Group of Banks) to assist its fight against financial crime.

From an organizational perspective, Deutsche Bank continuously developed the AFC function towards lean and sustainable governance structures in 2019. In line with Deutsche Bank's commitments to further strengthen the AFC function and in response to regulatory requirements, the AFC function had approximately 1,400 employees (FTE) by the end of December 2019. An additional approximately 200 employees (FTE) were supporting AFC in a Shared Services function for controls testing and quality assurance, risk management, management information, and training.

---

[5] The "other criminal activities" are derived by and large from the German Penal Code and include, for example, theft, damage to property, robbery, cybercrimes, and antitrust. Due to the thematic context and specific subject matter expertise relating to these risks, they remain with other infrastructure functions.

## Targets and measures

AFC has built the foundations across all risk types AFC is responsible for. Although Deutsche Bank continues to face severe pressure across jurisdictions on financial crime matters, it can now focus on strategic investments and establish better connectivity with the business and other control functions to further increase effectiveness. In order to execute this strategy, AFC developed a holistic five-year plan for 2019 until 2024. By the end of the five-year planning cycle, Deutsche Bank intends to have stabilized the environment for all core controls so that all AFC risks are constantly identified and assessed, employees across the bank understand their role in fighting financial crime, risk appetite is well-defined and fully embedded across business areas, client information is updated and of good quality, transactions are monitored across all relevant businesses, locations and products to generate early risk insights, and Deutsche Bank deploys technology to move from detective to preventative controls, wherever possible. This five-year plan will involve the following:

– Providing active support in designing and implementing better front-to-back Know Your Client (KYC) and monitoring processes across the business, Operations, and AFC;
– Investing in a more focused manner in technology and modeling to improve the quality of transaction alerts and deliver superior risk insights;
– Reducing reliance on external expertise, consultancy, and manual intervention in operational processes;
– Improving decision-making within AFC, and better aligning accountability and delivery by combining responsibility for change and daily risk management; and
– Leveraging the community of Risk, Compliance, and AFC practitioners to improve risk management, change delivery, and business engagement.

Deutsche Bank's Risk & Control Assessment (RCA) process comprises a series of bottom–up assessments of the risks generated by business divisions and infrastructure functions (1LoDs), the effectiveness of the controls in place to manage them, and the remediation actions required to bring the risks outside of risk appetite back into risk appetite. This enables both the 1LoD and 2LoD to have a clear view of the bank's material operational risks. In 2019, Deutsche Bank launched an integrated risk and control assessment that combined the risk assessments led by AFC, Compliance, and NFRM in a coordinated way. The coordinated approach aims to improve visibility across various risk types and to streamline risk assessment processes, tools, and reporting across the three risk control functions, creating efficiencies and improving engagement. Alongside the integration of risk assessments, Deutsche Bank further enhanced its central control inventory and started the development of a new control assurance framework to enhance the transparency of control assurance activities across various levels of Deutsche Bank.

## Policies

The AFC Charter sets out the mandate and responsibilities of AFC across Deutsche Bank. Global AFC policies set the minimum standards for the management of financial crime risks, which are supplemented by further, country-specific policy requirements. All AFC policy documents are reviewed at least once a year to ensure that relevant new or revised legislation and regulations are properly reflected, and to take into account any lessons learned. All Deutsche Bank employees are required to comply with global and local requirements relating to internal policies.

The progress made in 2019 included materially upgraded KYC, AML, and Sanctions Policies that reflect the latest legal and regulatory standards. A special focus for AFC in 2019 was to ensure regulatory adherence with the fifth Anti-Money Laundering Directive (5AMLD) of the European Union[6]. Major progress has been made in reflecting all the respective requirements and, generally speaking, in ensuring 5AMLD adherence is on track for Deutsche Bank. AFC successfully coordinated the implementation and publication of the new KYC Policy and AML Policy in July 2019, as appendices to the existing policies. Both policies replaced previous versions and became fully effective on January 1, 2020. The Group Sanctions Policy was revised in May 2019 in order to comply with the group-wide requirements for policies.

---

[6] 5AMLD introduces: (i) Additional due diligence requirements for client relationships and transactions involving high-risk third countries; (ii) creation of beneficial ownership registers for corporates and trusts as well as central bank account registers; (iii) AML regulations that will now apply to virtual currencies providers, real-estate agents, auditors, external accountants, tax advisors, and art dealers; and (iv) lifting of the anonymity of electronic money products, such as pre-paid cards, and restricting the use of these when the country of issuance is outside of the EU and regulation is not EU-equivalent.

# Training and awareness

**GRI 103-1, 404-2**

AFC Training & Awareness forms part of the AFC risk and governance frameworks to govern, mitigate, and report on financial crime risks. Here, training is a key control measure in raising employee awareness to identify AFC-related risks and understand how and when to escalate.

To ensure employees have the necessary technical knowledge and skills, and to keep pace with a constantly changing regulatory environment, Deutsche Bank delivered a mandatory AFC curriculum developed via a robust year-on-year Annual Training Needs Analysis process. This process engages key stakeholders across the second line of defense (2LoD) to identify where training can help to mitigate AFC risks and identify training requirements arising from regulation, policy, and legislation. Course development is managed via Training Advisory Groups comprised of internal subject matter experts. To support a continuous cycle of improvement, training evaluations are conducted to improve course quality and assess the impact on employees' awareness. The 2019 AFC mandatory curriculum included updated courses on anti-money laundering, anti-fraud, bribery and corruption, and sanctions. The course completion rate is very high, with minimal overdue ratios for late or non-completion of mandatory training. Participation is monitored and delayed completion is escalated to an employee's line manager. This can result in red flags for employees or their managers, which are taken into account in annual promotion and compensation decisions.

Through Deutsche Bank's partnership with the Association of Certified Anti-Money Laundering Specialists (ACAMS), AFC employees themselves have access to a wide range of learning resources and tools dedicated to AFC professionals.

# Risk monitoring processes

**GRI 102-15/31**

## Know Your Client

Know Your Client (KYC) is an ongoing process throughout the life cycle of a client relationship. As such, Deutsche Bank not only needs to know the client (including their ownership structure, ultimate beneficial owners, and source of funds where applicable), but also the anticipated nature of the client relationship. AFC and the business divisions continued to pro-actively address KYC matters in 2019, especially by further improving the control environment via the various projects undertaken. The New Client Adoption process governs the onboarding of potential clients with the intention that no funds or assets may be accepted or transacted, nor any legal commitment entered into (e.g. operation of an account, sale of a product, or rendering of a service), until this process has been completed, barring very limited circumstances (e.g. certain corporate finance mandates and block transactions). As part of its regular client due diligence, Deutsche Bank screens its client relationships against internal and external criteria, for instance relating to politically exposed persons, terrorism, or sanctions. As a consequence, a client relationship may be declined or subject to monitoring or conditions imposed on accounts, transactions, or product usage. In addition, payments are screened prior to being made (see below).

The High Risk Clients Review was completed as required in ten months, while simultaneously making improvements in core aspects of the KYC process. In the Investment Bank (IB), Corporate Bank (CB) and Wealth Management (WM) divisions, significant efforts were invested in KYC file quality improvement, with the IB and CB activities conducted under the BaFin order covering KYC. However, further improvements in quality are still required. Significant progress has been made in delivering the future IB and CB KYC client file management application. A new Client Financial Crime Risk Council, composed of AFC, other 2LoD and business representatives, was set up to identify, monitor, and manage adherence to global risk appetite at the client level, including periodic reporting on material client financial crime risks with the goal of de-risking the bank's portfolio by exiting clients of concern. This also contributed to the work undertaken to address the BaFin order regarding correspondent banking.

A consistent Client Risk Rating Methodology (CRRM), which makes use of quantitative measures to calculate the individual risk of every client, was rolled out to IB, CB, Capital Release Unit, and AM. Deployments for other businesses are currently ongoing. Furthermore, AFC reviewed the CRRM in line with 5AMLD and incorporating correspondent banking-specific risks, which will be rolled out in 2020. AFC also continues to work towards an enhanced methodology design that reflects the specifics of the retail business.

## Anti-money laundering and prevention of terrorism financing

Despite AFC being able to enhance its control environment during 2019, media attention on Deutsche Bank, which mostly related to legacy AML issues, remained high. Major improvements have been made to key technology controls such as Name List Screening (NLS) and Transaction Monitoring (TM). NLS has been rolled out globally to ensure all clients are screened on a daily basis against the applicable regulatory lists. A new TM system has been implemented in the U.S. and Germany focusing on correspondent banking, which provides coverage of 95 % of the corresponding banking volumes globally. This tool will be further rolled out as necessary to cover additional risks. Further, Deutsche Bank is continuously enhancing its TM capabilities across all business lines and regions which includes the development of money laundering detection scenarios and rollout of new systems.

By utilizing the AFC control environment, Deutsche Bank provided information that led to a successful raid on one of Europe's largest dark net money laundering infrastructures.

AFC also partnered with IB, CB, and the Capital Release Unit to enhance their account activity review process. This control requires client coverage leads to assess whether transaction activity was consistent with the expected nature of the client's business and the purpose for which it maintains a business relationship with Deutsche Bank.

## Sanctions and embargoes

The inherent risk regarding the complexity of sanctions regimes increased in 2019 due, for example, to sanctions against Russia, Venezuela, and (temporarily) Turkey. In order to manage the intrinsic risk, Deutsche Bank has implemented several measures, one example being the Russian Oligarchs Framework using a risk-based approach for clients who are or have a nexus to Russian oligarchs. All relevant relationships have to be presented to the Regional Reputational Risk Committee for a decision to maintain or exit.

Deutsche Bank implemented daily screening across its customer base and monitors all transactions against different sanctions' lists. This enables Deutsche Bank to stop transactions, end customer relationships, and avoid forbidden customer relationships.

## Anti-fraud, bribery, and corruption

**GRI 103-2/3, GRI 205-1**

The Anti-Bribery and Corruption (ABC) Policy, which was revised in 2019, sets out Deutsche Bank's arrangements in connection with the identification, escalation, and management of bribery and corruption risk, and the behavior expected by all employees and with respect to associated persons and other third parties. In turn, the Anti-Fraud Policy sets out the bank's minimum standards in line with the identification, escalation, and management of internal and external fraud in compliance with applicable obligations and within the risk appetite scope detailed in Deutsche Bank's Financial Crime Risk Appetite Statement.

Over the past two years, AFBC has made progress in improving controls and monitoring. For example, a tool was implemented to manage the life cycle of business development consultants (BDCs), standardized request and monitoring processes were implemented to manage gifts and entertainment (G&E) for 95 % of the total G&E volume, and monitoring was delivered for BDCs and joint ventures. From a fraud perspective in 2019, the Fraud Monitoring Capability delivered improvements particularly for online banking. Further enhancements apply to the areas of Risk Appetite Statement, Management Information Strategy and Reporting, and enhancements through the Global Conduct and Internal Fraud Risk Management Framework Policy.

# PAGES 37-108 OMITTED PURSUANT TO D. N.J. ECF POLICIES AND PROCEDURES