**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ALI KARIMI, Individually and On Behalf of All Others Similarly Situated, | |
| Plaintiff, | |
| v. | Case No. 2:20-cv-08978-ES-MAH |
| DEUTSCHE BANK AKTIENGESELLSCHAFT, JOHN CRYAN, CHRISTIAN SEWING, MARCUS SCHENCK, and JAMES VON MOLTKE, | **Oral Argument Requested** |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO TRANSFER PURSUANT TO 28 U.S.C. § 1404(a), OR IN THE ALTERNATIVE, DISMISS PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT**

Mark Errico
SQUIRE PATTON BOGGS (US) LLP
382 Springfield Avenue
Summit, New Jersey 07869
(973) 848-5668
mark.errico@squirepb.com

David G. Januszewski (admitted *pro hac vice*)
Sheila C. Ramesh (admitted *pro hac vice*)
CAHILL GORDON & REINDEL LLP
32 Old Slip
New York, New York 10005
(212) 701-3000
djanuszewski@cahill.com
sramesh@cahill.com

*Attorneys for Defendants Deutsche Bank Aktiengesellschaft, John Cryan, Christian Sewing, Marcus Schenck, and James Von Moltke*

April 23, 2021

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

STATEMENT OF ALLEGED FACTS ................................................................................... 4

    A.    Deutsche Bank's Public Disclosures ............................................................ 6

    B.    Deutsche Bank's AML Controls and KYC Procedures ............................. 8

    C.    Allegations Against the Individual Defendants ........................................ 10

    D.    None of the Parties Is Based in New Jersey ............................................. 13

    E.    Plaintiffs' Claims Have No Connection to New Jersey ........................... 14

LEGAL STANDARD ............................................................................................................ 15

ARGUMENT ......................................................................................................................... 17

I.    The Action Should Be Transferred to the Southern District of New York Pursuant to
28 U.S.C. § 1404(a) .................................................................................................. 17

    A.    The Action Could Have Been Brought Originally in the Southern District of
New York ................................................................................................... 17

    B.    The Balance of Factors Compels Transfer to the Southern District of New
York ........................................................................................................... 18

        1.    The Private Interests Favor Transfer to the Southern District of New York
...................................................................................................... 18

        2.    Public Interests Also Favor Transfer to the Southern District of New York
...................................................................................................... 21

II.    Plaintiffs Fail to State a Claim of Securities Fraud Under Section 10(b) ........................ 23

    A.    Plaintiffs Fail to Allege an Actionable Misstatement or Omission ..................... 24

        1.    Deutsche Bank's Statements Concerning its Compliance Controls Were
Aspirational and Are Not Actionable ........................................................ 25

        2.    The Alleged Misstatements Are Immaterial as a Matter of Law ............. 27

        3.    Plaintiffs Do Not Adequately Allege the Falsity of the Alleged
Misstatements ........................................................................................ 30

        4.    Plaintiffs Fail to Plead an Actionable Omission ....................................... 32

    B.    Plaintiffs Fail to Adequately Allege Scienter ......................................... 33

        1.    Plaintiffs Do Not Allege That Deutsche Bank Had Any Motive to Defraud
...................................................................................................... 34

        2.    Plaintiffs Do Not Adequately Allege Conscious Misbehavior or
Recklessness ........................................................................................ 35

        3. Plaintiffs' Allegations Concerning Confidential Witness Statements Do Not
Support an Inference of Scienter ................................................................ 37

    4.   Plaintiffs Do Not Offer Any Other Basis From Which to Infer Scienter ....... 39

III.    Plaintiffs' Control Person Claim Fails as a Matter of Law................................. 40

CONCLUSION.......................................................................................................................... 41

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re 3M Co.*,
  2020 U.S. App. LEXIS 36961 (3d Cir. Nov. 18, 2020)...........................................2, 14, 20-21

*In re Advanta Corp. Securities Litigation*,
  180 F.3d 525 (3d Cir. 1999), *overruled in part on other grounds*, *Tellabs, Inc.*
  v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007).......................................26, 40

*In re Amarin Corp.*,
  2015 WL 3954190 (D. N.J. June 29, 2015) (Wolfson, J)......................................34

*American General Life Insurance Co.* v. *Altman Family Insurance Trust ex rel.*
  *Altman*,
  2009 WL 5214027 (D. N.J. Dec. 22, 2009) (Salas, J.) ..........................................10

*Ashcroft* v. *Iqbal*,
  556 U.S. 662 (2009)....................................................................................4n

*Basic Inc.* v. *Levinson*,
  485 U.S. 224 (1988)....................................................................................27

*Bell Atlantic* v. *Twombly*,
  550 U.S. 544 (2007)....................................................................................15

*Buck* v. *Hampton Township School District*,
  452 F.3d 256 (3d Cir. 2006)..........................................................................6n

*In re Burlington Coat Factory Securities Litigation*,
  114 F.3d 1410 (3d Cir. 1997).........................................................................35

*California Public Employees' Retirement System* v. *Chubb Corp.*,
  394 F.3d 126 (3d Cir. 2004)...........................................................................16

*In re Cancer Genetics, Inc. Securities Litigation*,
  2020 WL 3276740 (D. N.J. Feb. 26, 2020) (Salas, J.)...........................................10

*In re Cendant Corp. Securities Litigation*,
  76 F. Supp. 2d 539 (D. N.J. 1999) (Walls, J.).....................................................39

*Chan* v. *New Oriental Education & Technologies Grp.*,
  2019 WL 2865452 (D. N.J. July 3, 2019) (Hayden, J.)..........................................16

*Chiarella* v. *United States*,
  445 U.S. 222 (1980)....................................................................................33

*City of Edinburgh Council* v. *Pfizer, Inc.*,
   754 F.3d 159 (3d Cir. 2014)..................................................................24

*City of Pontiac Policemen's & Firemen's Retirement System* v. *UBS AG*,
   752 F.3d 173 (2d Cir. 2014)..................................................................26

*In re Cognizant Technology Solutions Corp. Securities Litigation*,
   2020 WL 3026564 (D. N.J. June 5, 2020) (Salas, J.) .................................24, 27, 35

*In re Deutsche Bank Aktiengesellschaft Securities Litigation*,
   2017 WL 4049253 (S.D.N.Y. June 28, 2017), *aff'd sub nom. Sfiraiala* v.
   *Deutsche Bank Aktiengesellschaft*, 729 F. App'x 55 (2d Cir. 2018) ............................ *passim*

*In re Eros International Securities Litigation*,
   2017 WL 6405846 (S.D.N.Y. Sept. 22, 2017), *aff'd*, 735 F. App'x 15 (2d Cir.
   2018) ................................................................................33

*Fain* v. *USA Technologies, Inc.*,
   707 F. App'x 91 (3d Cir. 2017) (Unpublished) ........................................33

*Fan* v. *StoneMor Partners LP*,
   927 F.3d 710 (3d Cir. 2019)...............................................................27, 30

*Flood* v. *Carlson Restaurants Inc.*,
   94 F. Supp. 3d 572 (S.D.N.Y. 2015).....................................................23

*Frato* v. *Swing Staging, Inc.*,
   2011 WL 3625064 (D. N.J. Aug. 17, 2011) (Salas, J.).........................15, 17, 19, 22

*In re Galena Biopharma, Inc. Securities Litigation*,
   2019 WL 5957859 (D. N.J. Nov. 12, 2019) (Vazquez, J.) .....................................33

*Gallagher* v. *Ocular Therapeutix, Inc.*,
   2017 WL 4882487 (D. N.J. Oct. 27, 2017) (Wettre, J.) .................................. 20-21

*Garber* v. *Legg Mason, Inc.*,
   347 F. App'x 665 (2d Cir. 2009) (Summary Order)............................................27

*Glaser* v. *The9, Ltd.*,
   772 F. Supp. 2d 573 (S.D.N.Y. 2011).....................................................39

*Goldsmith* v. *Weibo Corp.*,
   2018 WL 2733694 (D. N.J. June 7, 2018) (Chesler, J.)........................................27

*Green* v. *Deutsche Bank Aktiengesellschaft*,
   2019 WL 4805804 (S.D.N.Y. Sept. 30, 2019)............................................1, 17, 27

*Hall* v. *Johnson & Johnson*,
2019 WL 7207491 (D. N.J. Dec. 27, 2019) (Wolfson, C.J.) ...................................................26

*In re Hertz Global Holdings Inc.*,
905 F.3d 106 (3d Cir. 2018)....................................................................................................32

*In re Hertz Global Holdings, Inc. Securities Litigation*,
2015 WL 4469143 (D. N.J. July 22, 2015) (Arleo, J.) ...........................................................37

*Huang* v. *Sonus Networks, Inc.*,
2016 WL 1090436 (D. N.J. Mar. 21, 2016) (Wolfson, J.).................................................20, 23

*Ieradi* v. *Mylan Labs., Inc.*,
230 F.3d 594 (3d Cir. 2000)....................................................................................................30

*Institutional Investors Grp.* v. *Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009)............................................................................. 16, 34-35, 37

*Job Haines Home for the Aged* v. *Young*,
936 F. Supp. 223 (D. N.J. 1996) (Chesler, J.).................................................................. 21-22

*Johnson* v. *New York Life Insurance Co.*,
2013 WL 1003432 (D. Mass. Mar. 14, 2013)........................................................................23

*Jumara* v. *State Farm Insurance Co.*,
55 F.3d 873 (3d Cir. 1995)......................................................................................................18

*Kumar* v. *Kulicke & Soffa Industries, Inc.*,
2019 WL 5081896 (E.D. Pa. Oct. 9, 2019)............................................................................36

*In re Lehman Brothers Securities & ERISA Litigation*,
2013 WL 3989066 (S.D.N.Y. July 31, 2013) ........................................................................16

*LG Electronics, Inc.* v. *First International Computer, Inc.*,
138 F. Supp. 2d 574 (D. N.J. 2001) (Cooper, J.) ...................................................................22

*Long Miao* v. *Fanhua, Inc.*,
442 F. Supp. 3d 774 (S.D.N.Y. 2020)....................................................................................16

*In re Magnum Hunter Resources Securities Litigation*,
26 F. Supp. 3d 278 (S.D.N.Y. 2014), *aff'd*, 616 F. App'x 442 (2d Cir. 2015)...................5, 32

*Martin* v. *GNC Holdings, Inc.*,
757 F. App'x 151 (3d Cir. 2018) (Unpublished) ...................................................................37

*Matrixx Initiatives, Inc.* v. *Siracusano*,
563 U.S. 27 (2011)..................................................................................................................24

*McLean* v. *Alexander*,
    599 F.2d 1190 (3d Cir. 1979)............................................................................................35

*Messner* v. *United States Technologies, Inc.*,
    2016 WL 1466543 (E.D. Pa. Apr. 13, 2016), *aff'd sub. nom.*, *Fain* v. *USA
    Technologies, Inc.*, 707 F. App'x 91 (3d Cir. 2017)......................................................37

*In re Milestone Scientific Securities Litigation*,
    103 F. Supp. 2d 425 (D. N.J. 2000) (Lechner, J)............................................................40

*In re Morgan Stanley Information Fund Securities Litigation*,
    592 F.3d 347 (2d Cir. 2010)............................................................................................33

*Morrow* v. *Balaski*,
    719 F.3d 160 (3d Cir. 2013)............................................................................................15

*In re NAHC, Inc. Securities Litigation*,
    306 F.3d 1314 (3d Cir. 2002)..........................................................................................6n

*National Junior Baseball League* v. *Pharmanet Development Grp.*,
    720 F. Supp. 2d 517 (D. N.J. 2010) (Wolfson, J.)...................................................16, 37

*Novak* v. *Kasaks*,
    216 F.3d 300 (2d Cir. 2000)........................................................................................38-39

*Palladin Partners* v. *Gaon*,
    2006 WL 2460650 (D. N.J. Aug. 22, 2006) (Martini, J.)................................................40

*Patel* v. *L-3 Communications Holdings Inc.*,
    2016 WL 1629325 (S.D.N.Y. Apr. 21, 2016)..................................................................39

*Patel* v. *Zoompass Holdings, Inc.*,
    2018 WL 10154207 (D. N.J. Aug. 8, 2018) (Linares, C.J.).............................................39

*Pathfinder Management, Inc.* v. *Mayne Pharma PTY*,
    2008 WL 3192563 (D. N.J. Aug. 5, 2008) (Martini, J.)..................................................35

*Platinum Partners Value Arbitrage Fund, L.P.* v. *TD Bank, N.A.*,
    2011 WL 3329087 (D. N.J. Aug. 2, 2011) (Falk, J.).......................................................22

*Rescue Mission of El Paso, Inc.* v. *K-Sea Transportation Partners L.P.*,
    2013 WL 3087078 (D. N.J. June 14, 2013) (Walls, J.)...................................................16

*In re Rockefeller Center Properties, Inc. Securities Litigation*,
    311 F.3d 198 (3d Cir. 2002)............................................................................................40

*Santi* v. *National Business Records Management, LLC*,
    722 F. Supp. 2d 602 (D. N.J. 2010) (Rodriguez, J.).......................................................20

*Santomenno* v. *Transamerica Life Insurance Co.*,
  2012 WL 1113615 (D. N.J. Mar. 30, 2012) (Salas, J.) ........................................18

*Schiro* v. *Cemex, S.A.B. de C.V.*,
  396 F. Supp. 3d 283 (S.D.N.Y. 2019) ...............................................................38-39

*Seville Industry Machinery Corp.* v. *Southmost Machinery Corp.*,
  742 F.2d 786 (3d Cir. 1984) .................................................................................10

*Sfiraiala* v. *Deutsche Bank Aktiengesellschaft*,
  729 F. App'x 55 (2d Cir. 2018) (Summary Order) ........................................31, 36

*In re Synchronoss Technologies, Inc. Securities Litigation*,
  2019 WL 2849933 (D. N.J. July 2, 2019) (Wolfson, C.J.) ..................................37

*Takata* v. *Riot Blockchain, Inc.*,
  2020 WL 2079375 (D. N.J. Apr. 30, 2020) (Wolfson, C.J.) ..........................4n, 32

*In re Take-Two Interactive Securities Litigation*,
  551 F. Supp. 2d 247 (S.D.N.Y. 2008) .................................................................41

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ................................................................................ 5n, 33-34

*In re Tyson Foods, Inc. Securities Litigation*,
  2004 WL 1396269 (D. Del. June 17, 2004), *aff'd*, 155 F. App'x 53 (3d Cir.
  2005) ....................................................................................................................40

*In re UBS AG Securities Litigation*,
  2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012) ....................................................26

*United Food & Commercial Workers Union Local 880 Pension Fund* v.
  *Chesapeake Energy Corp.*,
  774 F.3d 1229 (10th Cir. 2014) ...........................................................................28

*Williams* v. *Globus Medical, Inc.*,
  869 F.3d 235 (3d Cir. 2017) .................................................................................33

*Winer Family Trust* v. *Queen*,
  503 F.3d 319 (3d Cir. 2007) ...................................................................16, 34, 36

*Yang* v. *Odom*,
  409 F. Supp. 2d 599 (D. N.J. 2006) (Pisano, J.) ...........................................20, 22

**Internet Sources**

District Courts-Combined Civil and Criminal Federal Court Management
      Statistics (Sept. 30, 2020),
      https://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distprofile09
      30.2020.pdf ................................................................................................................23

**Regulations**

17 C.F.R. § 240.10b-5(b) (2019) ................................................................................24

**Statutes**

15 U.S.C.
      § 78aa(a).............................................................................................................17
      § 78u–4(b)......................................................................................................15, 33

28 U.S.C. § 1404(a) ........................................................................................1, 15, 18

Defendants Deutsche Bank Aktiengesellschaft ("Deutsche Bank"), John Cryan, Christian Sewing, Marcus Schenck, and James Von Moltke (the "Individual Defendants") respectfully submit this memorandum in support of their motion to transfer this action to the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1404(a), or in the alternative, to dismiss Plaintiffs' Second Amended Class Action Complaint ("Complaint" or "SAC") pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

This action is the third attempt by the same plaintiffs' attorneys to recover damages from Deutsche Bank based on purported misstatements and omissions concerning its internal controls. The United States District Court for the Southern District of New York has already dismissed two of those actions, and one of those dismissals was affirmed by the United States Court of Appeals for the Second Circuit. *In re Deutsche Bank Aktiengesellschaft Securities Litigation*, 2017 WL 4049253 (S.D.N.Y. June 28, 2017) ("*In re DB*"), *aff'd sub nom. Sfiraiala* v. *Deutsche Bank Aktiengesellschaft*, 729 F. App'x 55 (2d Cir. 2018) (Summary Order); *Green* v. *Deutsche Bank Aktiengesellschaft*, 2019 WL 4805804 (S.D.N.Y. Sept. 30, 2019) ("*Green*") (together, the "Prior Dismissed Actions"). Refusing to accept the fatal flaws of their claims and the limitations of the securities laws, Named Plaintiff, Ali Karimi, and Lead Plaintiff, Yun Wang (together, "Plaintiffs") here attempt to repackage the same failed claims, based on the same disclosures, to try their luck in a different Circuit.

This Court should not countenance Plaintiffs' attempt to forum shop and avoid Second Circuit precedent by bringing their claims in this District. Despite the lack of any substantive nexus to the State of New Jersey, Plaintiffs filed this action in this Court for the apparent purpose of avoiding precedent arising from the Prior Dismissed Actions, which is dispositive of their

claims.  But this case has no connection to New Jersey.  Neither Named Plaintiff, Ali Karimi, nor

Lead Plaintiff, Yun Wang, purports to be a resident of New Jersey nor to have purchased the

securities upon which they premise their claims in New Jersey.  None of the Defendants are

alleged to be residents of New Jersey.  Nor do Plaintiffs allege that any wrongful conduct

occurred in New Jersey or that any relevant evidence or witnesses are likely to be found in New

Jersey.  The *only* link that Plaintiffs muster to connect their claims to this forum is the conclusory

allegation that, because Deutsche Bank securities trade on the New York Stock Exchange, there

"presumably" must be *some* class members based in New Jersey.  SAC ¶ 10.  That

unsubstantiated assumption is not enough to outweigh the inevitable inconvenience to both

parties and witnesses that will arise from being forced to litigate this action here.

In November 2020, the Third Circuit, ruling on a mandamus petition, vacated the District

Court's denial of a motion for transfer on facts similar to those presented here:  plaintiffs filed a

securities class action "aimed at redressing economic harm" in the District of New Jersey, which

was not their home.  *In re 3M Co.*, 2020 U.S. App. LEXIS 36961, at *5 (3d Cir. Nov. 18, 2020)

(Non-Precedential).  The Third Circuit held that New Jersey did not have a strong local interest

in deciding the case because nothing about the case was "'local' to New Jersey" in light of the

alleged class of "75,000 3M investors situated around the globe."  *Id.*  The Court also found that

plaintiffs' choice of forum was entitled to little deference because they did not select their home

forum.  *Id.* at *6.  The very same factors compel transfer here.  Plaintiffs' choice of forum does

not reflect a good-faith preference to litigate in New Jersey.  Instead, it is little more than a

transparent attempt at forum shopping.  Avoiding unfavorable precedent is not a legitimate basis

for maintaining this action here.  As a result, Defendants respectfully submit that this Court

should transfer the action to the Southern District of New York.

Should this Court choose to retain jurisdiction over this action, Plaintiffs' claims fail on their merits. In an effort to distract attention from the straightforward application of the securities laws requiring dismissal of their claims, Plaintiffs try to load up their new Complaint with press clippings concerning Jeffrey Epstein, Danske Bank, Russian oligarchs, and others. These news reports, however salacious they may be, are irrelevant to the claims asserted against Deutsche Bank here.

As an initial matter, alleged weaknesses in Deutsche Bank's internal controls were hardly a mystery to investors. Indeed, those weaknesses, many of which were also the subject of the Prior Dismissed Actions, were disclosed by Deutsche Bank and well known to the public, as were Deutsche Bank's ongoing efforts to correct those weaknesses. Knowing that those weaknesses alone cannot support their securities claims, Plaintiffs devote more than a third of their 232 paragraph complaint to listing a litany of headlines related to clients and regulatory matters. But these allegations represent, at best, claims that Deutsche Bank's taking on certain clients constituted corporate mismanagement, which courts have repeatedly found insufficient to constitute a violation of the securities laws. *See, e.g.*, SAC ¶ 2 (identifying alleged compliance failures within Deutsche Bank), ¶ 40 (alleging that Deutsche Bank exempted certain high net-worth individuals from rigorous diligence or Know Your Customer requirements), ¶ 53 (alleging Bank "should have never" onboarded certain clients), ¶ 64 (alleging "critical deficiencies" with Deutsche Bank's audit procedures), ¶ 100 (alleging certain clients "should have been subject to enhanced due diligence").

Additionally, despite Plaintiffs' best efforts to cherry-pick language from Deutsche Bank's public statements and filings, they cannot escape the well-established, black-letter rule that precludes securities claims based on aspirational statements like Deutsche Bank's

disclosures concerning the effectiveness of its internal controls. Even setting this dispositive

legal point aside, the full text of those disclosures, which Plaintiffs conveniently omit, described

the limitations of Deutsche Bank's controls, the challenges inherent in evolving those controls,

and additional weaknesses as determined by regulators. As a matter of law, no reasonable

investor could construe such statements as either false or misleading.

Plaintiffs' failure to adequately allege scienter as to any of the Defendants provides a

separate and independent basis for dismissal. Unable to identify any motive to defraud separate

from the pursuit of Deutsche Bank's profitability, which cannot sustain a securities fraud claim,

Plaintiffs attempt to satisfy the high bar of alleging conscious misbehavior or recklessness to

sustain their fraud claim. But they do not meet that standard because they cannot demonstrate

that any Defendant had any knowledge of any misstatement at the time it was made. Indeed,

Deutsche Bank fully disclosed any relevant deficiencies to the public.

Plaintiffs' attempt to recast their previously dismissed claims with accounts of the

misconduct of bad actors pulled from the headlines cannot cure the fatal deficiencies that led the

Second Circuit to affirm dismissal of their claims. Like the Prior Dismissed Actions, the

Complaint should be dismissed.

## STATEMENT OF ALLEGED FACTS[1]

It is no secret that Deutsche Bank's internal control environment has been the subject of

regulatory scrutiny over the past decade. Deutsche Bank has repeatedly disclosed those

regulatory matters that are required to be disclosed, and the press has written extensively about

them. In response to the scrutiny, Deutsche Bank has undertaken a series of measures designed

---

[1] The facts alleged by Plaintiffs are taken as true for purposes of this motion only. *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009); *Takata* v. *Riot Blockchain, Inc.*, 2020 WL 2079375, at *1 (D. N.J. Apr. 30, 2020) (Wolfson, C.J.).

to bolster its controls and remediate various issues identified by regulators.  As part of its

ongoing efforts, Deutsche Bank has "acknowledg[ed] the company's material weaknesses and

disclos[ed] [its] continued efforts to resolve them, only to learn of yet more."  *In re Magnum*

*Hunter Resources Securities Litigation*, 26 F. Supp. 3d 278, 297 (S.D.N.Y. 2014) (dismissing

action), *aff'd*, 616 F. App'x 442 (2d Cir. 2015).  But progress rarely proceeds in a straight line.

The Second Amended Complaint acknowledges Deutsche Bank's history (SAC ¶¶ 2, 3, 34), just

as plaintiffs in the Prior Dismissed Actions published a fulsome list of the regulatory issues that

Deutsche Bank has faced since 2002.

Plaintiffs' purported Class Period spans from March 14, 2017 through May 12, 2020

(SAC ¶ 1), a period in which Deutsche Bank self-disclosed regulatory actions, internal control

deficiencies, and a series of ongoing remedial efforts.  For example, the Complaint relies heavily

on the content of a July 2020 consent order which Deutsche Bank entered with the New York

Department of Financial Services ("DFS") (the "2020 DFS Consent Order").  *See, e.g.*, SAC

¶ 192.  Among other things, the 2020 DFS Consent Order identified certain shortcomings in

Deutsche Bank's control processes and required it to undertake remediation efforts in connection

with DFS's investigation of transactions involving Jeffery Epstein, Danske Estonia, and FBME

Bank.  Notably absent from Plaintiffs' Complaint, however, are the statements in the 2020 DFS

Consent Order commending "[Deutsche] Bank's ongoing efforts to remediate the shortcomings

identified in [the] Consent Order including the fact that these efforts commenced before the

inception of the Department's investigations . . . ."  April 23, 2021 Declaration of Sheila C.

Ramesh (the "Ramesh Decl."), Ex. 1 (2020 DFS Consent Order) ¶ 110.[2]  Those efforts included,

---

[2]  The Court may properly consider these documents in connection with this motion.  *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (in ruling on a motion to dismiss, the Court "must consider . . . documents incorporated into the complaint by reference,

among other things, a "demonstrated . . . commitment to remediation by devoting significant financial and other resources to enhance the Bank's AML program, including through changes to its policies, procedures, systems, governance structures, and personnel, as well as its ongoing cooperation with the independent monitor selected by the Department . . . and by reducing the Bank's portfolio of  high-risk clients in its correspondent banking and Wealth Management businesses." *Id.*

Deutsche Bank has made a number of other disclosures relating to various regulatory inquiries, fines, and settlements informing the public of certain weaknesses in its internal controls. *See* Ramesh Decl. Ex. 2 (2017 Annual Report) at 277; Ramesh Decl. Ex. 3 (2017 Form 20-F) at 31, 34, 80, 81.  Throughout this same period, Deutsche Bank actively engaged in continuing to remediate the issues in its control environment identified by its regulators, a process that required time, diligence, and significant resources.

A.      **Deutsche Bank's Public Disclosures**

Deutsche Bank's Annual Reports and Form 20-Fs contain a number of aspirational statements concerning Deutsche Bank's efforts to comply with anti-money laundering ("AML") and know-your-customer ("KYC") procedures, as well as local laws and regulations.  SAC ¶¶ 136, 139, 154, 169; *see also* Ramesh Decl. Ex. 4 (2016 Form 20-F) at 33-34; Ramesh Decl. Ex. 5 (2016 Annual Report) at 40-41; 2017 Form 20-F at 29; 2017 Annual Report at 286; Ramesh

---

and matters of which a court may take judicial notice.").  This includes SEC filings (*In re NAHC, Inc. Securities Litigation*, 306 F.3d 1314, 1331 (3d Cir. 2002) (court may take judicial notice of SEC filings, whether or not referenced in complaint)), as well as "documents that are attached to or submitted with the complaint . . . and any matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, and items appearing in the record of the case." *Buck* v. *Hampton Township School District*, 452 F.3d 256, 260 (3d Cir. 2006) (internal quotation marks and citation omitted).

Decl. Ex. 6 (2018 Form 20-F) at 29-30; Ramesh Decl. Ex. 7 (2018 Annual Report) at 5, 321;
Ramesh Decl. Ex. 8 (2019 Form 20-F) at 31-32, 64.

Deutsche Bank's Annual Reports, Non-Financial Report supplements, and the Annual
Financial Statements and Management Reports published on Deutsche Bank's official website
contained similar statements concerning Deutsche Bank's endeavors to comply with AML
procedures and KYC processes, as well as aspirational statements regarding initiatives that
Deutsche Bank was undertaking to improve its culture of compliance.  SAC ¶¶ 136, 145, 147,
149, 151, 162, 164, 166, 175; *see also* 2016 Annual Report at 40-41; Ramesh Decl. Ex. 9 (2017
Non-Financial Report) at 42-43; 2017 Annual Report at 286; Ramesh Decl. Ex. 10 (2017 Annual
Financial Statements and Management Report of Deutsche Bank AG) at 107-08; Ramesh Decl.
Ex. 11 (2018 Non-Financial Report) at 20-22; 2018 Annual Report at 5, 321; Ramesh Decl. Ex.
12 (2018 Annual Financial Statements and Management Report of Deutsche Bank AG) at 114-
16; Ramesh Decl. Ex. 13 (2019 Non-Financial Report) at 34-36.

Plaintiffs allege that the statements in Deutsche Bank's Form 20-Fs, Annual Reports,
Non-Financial Reports, and Annual Financial Statements and Management Reports were false
and misleading because, in retrospect, "Defendants repeatedly exempted high-net-worth
individuals (including people sponsoring terrorism) and PEPs [politically exposed persons] from
any meaningful due diligence, enabling their criminal activities through the use of the Bank's
facilities" (SAC ¶ 5), and allegedly exposing Deutsche Bank to risk of investigation and
disciplinary action by governmental and regulatory authorities.  These allegations are made in
hindsight and constitute, at most, allegations of corporate mismanagement, not securities fraud.
Plaintiffs repeatedly cherry-pick language from these public filings and associated press releases.
*See*, *e.g.*, SAC ¶¶ 136-76.  Defendants identify several of those omissions herein, and, in order to

provide necessary context that the Complaint omits, have annexed relevant portions of these

disclosures as exhibits to the Ramesh Declaration, submitted herewith.

**B.     Deutsche Bank's AML Controls and KYC Procedures**

Throughout the alleged Class Period, Deutsche Bank maintained and enhanced its AML

and KYC protocols in an effort to promote compliance with laws and regulations.  In particular,

Deutsche Bank developed AML controls, which encompassed Deutsche Bank's KYC

procedures, to fulfill its obligations as a regulated financial institution.  SAC ¶¶ 4, 36.  The

Management Board, on which each of the Individual Defendants served, oversaw the AML and

KYC procedures.  SAC ¶¶ 15-20.  The AML controls were meant to identify and report

suspicious activity, and block transactions that might violate pertinent laws and regulations.

SAC ¶ 36.  Deutsche Bank developed KYC procedures for the purpose of monitoring customers

to prevent them from using Deutsche Bank's products to perpetuate wrongdoing.  SAC ¶¶ 4, 36.

Deutsche Bank undertook a KYC review when its AML controls indicated that a client may be at

risk of committing an AML violation.  SAC ¶ 37.

In their quotations from Deutsche Bank's disclosures concerning its AML and KYC

procedures, Plaintiffs neglect to recognize the numerous instances, throughout the Class Period,

where Deutsche Bank acknowledged limitations in its internal controls, including with respect to

AML and KYC procedures, and continuing issues with its remediation efforts.  *See* 2016 Form

20-F; 2017 Form 20-F; 2018 Form 20-F; 2019 Form 20-F.  For example, in its 2016 Form 20-F,

Deutsche Bank expressly cautioned about these limits:

> In order to improve [our AML and KYC procedures], we are undertaking several
> major initiatives to enhance the efficacy of the transaction processing
> environment, strengthen our controls and manage non-financial
> risks. . . . ***However, we may be unable to complete these initiatives as quickly as
> we intend or as our regulators demand, and our efforts may be insufficient to
> prevent all future deficiencies*** in our control environment or to result in fewer

litigations or regulatory and enforcement investigations and proceedings in the future.

2016 Form 20-F at 34 (emphasis added).

Deutsche Bank also warned that "[it] *may not always have the personnel with the appropriate experience, seniority and skill levels to compensate for shortcomings* in [its] processes and infrastructure, *or to identify, manage or control risks*, and it often has been difficult to attract and retain the requisite talent. *This has impacted [its] ability to remediate existing weaknesses* and manage the risks inherent in [its] activity." 2017 Form 20-F at 29 (emphasis added). Additional disclosures contained in the same filings cited by Plaintiffs, to which Plaintiffs conveniently turn a blind eye, made the general condition of Deutsche Bank's internal controls abundantly clear:

- *Id.* at 26, 28-29 ("We are undertaking several major initiatives to . . . strengthen our controls . . . in particular as a response to the circumstances that have resulted in many of the litigations and regulatory and enforcement investigations . . . to which the Bank has been subject in recent years. . . . [*W*]*e have identified the need to strengthen our internal control environment . . . Both our internal control environment and the infrastructure that underlies it fall short in a number of areas of our standards for completeness and comprehensiveness and are not well integrated across the Bank*. . . . [R]eviews and audits have identified various areas for improvement relating to a number of elements of our control environment.") (emphasis added);

- *Id.* at 97 ("*A control system, no matter how well conceived and operated, can provide only reasonable, not absolute, assurance that the objectives of the control system are met.*") (emphasis added).

In its 2019 Form 20-F, Deutsche Bank reiterated this concern. *See* 2019 Form 20-F at 31, 111. Moreover, Deutsche Bank reported ongoing regulatory reviews of weaknesses in its AML and KYC processes. *See id.* ("Our principal regulators, including the BaFin, the ECB and the Federal Reserve Board, have also conducted numerous reviews focused on our internal controls and the related infrastructure. These *regulators have required us formally to commit to*

*remediate our AML and other weaknesses, including the fragmented and manual nature of our infrastructure*.") (emphasis added).

    **C.**    <u>Allegations Against the Individual Defendants</u>

"[I]n order to satisfy the requirements of Rule 9(b), plaintiffs must 'plead with particularity the circumstances of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior.'" *American General Life Insurance Co.* v. *Altman Family Insurance Trust ex rel. Altman*, 2009 WL 5214027, at *4 (D. N.J. Dec. 22, 2009) (Salas, J.) (quoting *Seville Industry Machinery Corp.* v. *Southmost Machinery Corp.*, 742 F.2d 786, 791 (3d Cir. 1984)). "Under the PSLRA's exacting pleading standard for scienter, any private securities complaint alleging that the defendant made a false or misleading statement must state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *In re Cancer Genetics, Inc. Securities Litigation*, 2020 WL 3276740, at *3 (D. N.J. Feb. 26, 2020) (Salas, J.). Here, the Complaint fails to satisfy even these fundamental pleading requirements as to the Individual Defendants.

    <u>**John Cryan.**</u>  In Plaintiffs' 74-page, 232-paragraph Complaint, Defendant Cryan is mentioned by name only 11 times. He is listed as a Defendant, and described as "Chairman of the Management Board and Chief Executive Officer ("CEO") from July 2015 until April 8, 2018." SAC ¶ 15. Over half of Plaintiffs' mentions of Cryan pertain only to his having signed some of Deutsche Bank's Annual Reports and Form 20-Fs. SAC ¶¶ 136, 138, 145, 149, 151, and 153. Through second-hand knowledge, the few remaining references vaguely describe Cryan's alleged involvement with AML and KYC procedures at Deutsche Bank. SAC ¶¶ 57-59.

    That is it. There is no specific allegation of scienter or of any false or misleading statement by Cryan. There is no allegation that Cryan did not honestly believe in the accuracy of

the documents he signed at the time that he signed them.  There is no allegation that, in carrying

out his duties as a senior executive, Cryan acted with any improper motive or recklessness.  In

addition, there are no allegations that Cryan lived in, worked from, or engaged in relevant

conduct in New Jersey.

**Christian Sewing.**  Defendant Sewing is mentioned by name only 13 times.  He is

described as "Deutsche Bank's CEO since April 8, 2018," as having served as "a member of the

Bank's Management Board on January 1, 2015," and "appointed President as of March 5, 2017."

SAC ¶¶ 16, 58.  The Complaint details other roles he has held throughout his time at Deutsche

Bank:  "[s]ince January 2016, he had been the Head of Private, Wealth & Commercial Clients.

Effective September 1, 2017, he was appointed Co-Head of Private & Commercial Bank.  As a

member of the Management Board, he was responsible for Legal, Incident Management Group

and Group Audit.  Before assuming his role on the Management Board, Sewing was Global

Head of Group Audit (from June 2013 until February 2015) and held a number of positions

before that in Risk, including Deputy Chief Risk Officer (from 2012 to 2013) and Chief Credit

Officer (from 2010 to 2012) of Deutsche Bank."  SAC ¶ 16.  Over a third of Plaintiffs' mentions

of Sewing pertain only to his signing some of Deutsche Bank's Annual Reports and Form 20-Fs.

SAC ¶¶ 162, 164, 166, 168, and 175.  Two of the remaining references to Sewing generally

describe his interactions with co-workers.  *See* SAC ¶ 64 (identifying his working relationship

with Max Ng); SAC ¶ 67 (explaining that Mark Cullen reported to him).  Finally, the last

reference to Sewing relies solely on second-hand knowledge to allege that Sewing was aware of

infirmities with KYC protocol and intended to remediate those weakness, a fact which Deutsche

Bank has itself disclosed to the public on many occasions through its Annual Reports and Form

20-Fs.  SAC ¶ 71; *see also* 2016 Form 20-F; 2017 Form 20-F; 2018 Form 20-F; 2019 Form 20-F.

As with Defendant Cryan, the Complaint does not include any specific allegation of scienter or of any false or misleading statement by Sewing. There is no allegation that Sewing did not honestly believe in the accuracy of the documents he signed at the time that he signed them. Nor is there any allegation that he contravened AML and KYC procedures for any improper motive or in a reckless manner. In fact, Plaintiffs recognize Sewing's intention to fix these controls. SAC ¶ 71. The Complaint also fails to allege that Sewing lived in, worked from, or engaged in relevant conduct in New Jersey

**Marcus Schenck.** Defendant Schenck is mentioned by name only four times. He is described as "Deutsche Bank's Chief Financial Officer ("CFO")" until June 30, 2017, as having served as "a member of Deutsche Bank's Management Board on May 21, 2015 and was appointed President as of March 5, 2017." SAC ¶ 17. The remaining two references to Schenck pertain to his signing some of Deutsche Bank's Annual Reports and Form 20-Fs. SAC ¶¶ 136, 138.

Once again, the Complaint lacks any allegation of scienter or of any false or misleading statement by Schenck. There is no allegation that Schenck did not honestly believe in the accuracy of the documents he signed at the time that he signed them. Nor are there any allegations that Schenck lived in, worked from, or engaged in relevant conduct in New Jersey.

**James von Moltke.** Finally, Defendant von Moltke is mentioned by name only seven times. He is described as "Deutsche Bank's CFO [since] July 2017," and as having become "a member of Deutsche Bank's Management Board on July 1, 2017." SAC ¶ 18. All of the remaining references to von Moltke pertain to his signing certain of Deutsche Bank's Annual Reports and Form 20-Fs. SAC ¶¶ 149, 151, 153, 164, 166, and 168.

-12-

As with each of the other Individual Defendants described above, the Complaint lacks: (1) any specific allegation of scienter or of any false or misleading statement by von Moltke, (2) any allegation that von Moltke did not honestly believe in the accuracy of the documents he signed at the time that he signed them; or (3) any allegation that von Moltke lived in, worked from, or engaged in relevant conduct in New Jersey

**D.**   **None of the Parties Is Based in New Jersey**

Neither the Second Amended Complaint and its accompanying shareholder verification, nor Plaintiffs' submissions in support of their applications for lead plaintiff status identify either: (a) where Named or Lead Plaintiff resides, or (b) where either acquired his Deutsche Bank stock. The only clue to Plaintiffs' residence is the original civil cover sheet in this action, which indicates that Named Plaintiff, Ali Karimi, resides in New Haven, Connecticut.  *See* Class Action Complaint, Civil Cover Sheet (July 15, 2020), ECF 1-1.

Defendant Deutsche Bank is incorporated under the laws of Germany where it also maintains its principal executive offices.  SAC ¶ 14.  Deutsche Bank's United States operations are controlled primarily from its New York branch, located at 60 Wall Street, New York, New York, 10005.  *See* 2019 Form 20-F at 71 ("We engage in U.S. banking activities directly through our New York branch.").  Deutsche Bank's New York Branch is described in detail in each of the four SEC Form 20-Fs referenced by Plaintiffs as having a crucial role in Deutsche Bank's United States' operations, as well as the applicable rules and requirements it must abide by under New York state law.  2016 Form 20-F at 82–83; 2017 Form 20-F at 67-68; 2018 Form 20-F at 71; 2019 Form 20-F at 76–77.

While the Complaint refers to office space that either Deutsche Bank or an unnamed non-party affiliate maintains in New Jersey, Plaintiffs do not allege (even upon information and belief) that *any* conduct relevant to this action occurred at that location.  SAC ¶ 10.

-13-

Nor do Plaintiffs allege that any of the Individual Defendants lives in, works from, or engaged in relevant conduct in New Jersey. *See supra* at 10-13.

### E.     Plaintiffs' Claims Have No Connection to New Jersey

Plaintiffs premise their claims on the theory that Deutsche Bank made misrepresentations and omissions concerning its internal control systems that ultimately affected its share price. SAC ¶¶ 4, 7. Absent from the Complaint, however, is any allegation that the relevant statements, primarily contained in Deutsche Bank's Annual Reports, SEC Form 20-Fs, non-financial report supplements, or annual financial statements and management reports, were made in or directed to New Jersey. *See* SAC ¶¶ 136, 138, 145, 147, 149, 151, 154, 162, 164, 166, 169, 175. Instead, Plaintiffs generally allege that certain of Deutsche Bank's statements regarding these systems were misleading in light of the 2020 DFS Consent Order pursuant to New York banking law. SAC ¶ 41 n.2; 2020 DFS Consent Order. In addition to the content of the 2020 DFS Consent Order, the Complaint alleges wrongful conduct by Deutsche Bank's Americas Reputational Risk Committee (SAC ¶¶ 56, 57, 86), which is not alleged to meet in New Jersey; certain New York-based Deutsche Bank employees (SAC ¶¶ 58, 68, 84, 89, 102, 192), none of whom are alleged to have been based in New Jersey; and other regulatory inquires and/or settlements by New York and federal regulators (SAC ¶¶ 178, 196).

The only connection that Plaintiffs allege between their claims and New Jersey is the generic theory that because Deutsche Bank shares trade widely across the United States on the New York Stock Exchange, some unidentified members of the putative class likely reside in New Jersey. SAC ¶ 10 ("[T]here are presumably hundreds, if not thousands, of investors in Deutsche Bank's ordinary shares located within the U.S., some of whom undoubtedly reside in the State of New Jersey."). As the Third Circuit's ruling in *In re 3M* demonstrates, that is not enough.

## **LEGAL STANDARD**

This court "may transfer any civil action to any other district where it might have been brought" if transfer serves the "the convenience of the parties and witnesses" and "the interest of justice." 28 U.S.C. § 1404(a).  "Accordingly, in a Section 1404(a) motion to transfer, a court must determine:  (1) whether the proposed forum is one in which Plaintiffs could have originally brought suit, and (2) whether transfer would be in the interest of justice and for the convenience of parties and witnesses." *Frato* v. *Swing Staging, Inc.*, 2011 WL 3625064, at *2 (D. N.J. Aug. 17, 2011) (Salas, J.) (citation omitted).

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic* v. *Twombly*, 550 U.S. 544, 570 (2007); *Morrow* v. *Balaski*, 719 F.3d 160, 165 (3d Cir. 2013) (courts are "not compelled to accept unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation").

Securities fraud claims are subject to the heightened pleading requirements of both Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA").  Rule 9(b) requires plaintiffs to set forth "with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).  The PSLRA compels plaintiffs to "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading."  15 U.S.C. § 78u–4(b)(1)(B).  Plaintiffs have not satisfied this high standard in any of their allegations, including by engaging in improper group pleading.  Plaintiffs repeatedly make vague allegations about "Defendants" and the "Individual Defendants" without specifying which particular defendant is responsible for which particular statement.  *See, e.g.*, SAC ¶¶ 21, 22, 222, 223.  "The PSLRA 'requires plaintiffs to specify the role of each defendant, demonstrating each defendant's involvement in misstatements and omissions.'  Because

-15-

Plaintiffs have failed to detail specific actions of the individual board members, Plaintiffs have not sufficiently pled under the PSLRA." *Rescue Mission of El Paso, Inc.* v. *K-Sea Transportation Partners L.P.*, 2013 WL 3087078, at *28 (D. N.J. June 14, 2013) (Walls, J.) (quoting *Winer Family Trust* v. *Queen*, 503 F.3d 319, 335-36 (3d Cir. 2007)).

In order to rely on a confidential witness statement, Plaintiffs must plead the "bas[e]s of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, . . . the coherence and plausibility of the allegations, and similar indicia," *California Public Employees' Retirement System* v. *Chubb Corp.*, 394 F.3d 126, 147 (3d Cir. 2004), including "(1) the time period that the confidential source worked at the defendant-company, (2) the dates on which the relevant information was acquired, . . . (3) the facts detailing how the source obtained access to the information," *National Junior Baseball League* v. *Pharmanet Development Grp.*, 720 F. Supp. 2d 517, 538 (D. N.J. 2010) (Wolfson, J.) (citation omitted), and (4) that plaintiffs have spoken directly with the confidential witnesses, *Long Miao* v. *Fanhua, Inc.*, 442 F. Supp. 3d 774, 800 n.22 (S.D.N.Y. 2020); *In re Lehman Brothers Securities & ERISA Litigation,* 2013 WL 3989066, at *4 (S.D.N.Y. July 31, 2013). The quantity of statements included in the Complaint cannot overcome these fundamental pleading deficiencies. *Chan* v. *New Oriental Education & Technologies Grp.*, 2019 WL 2865452, at *9 (D. N.J. July 3, 2019) (Hayden, J.). Plaintiffs' failure to satisfy these standards should preclude the Court's consideration of the confidential witness statements alleged in the Complaint.[3] *See Institutional Investors Grp.* v. *Avaya, Inc.*, 564 F.3d 242, 263 (3d Cir. 2009).

---

[3] Specifically, Plaintiffs do not explain *how* the confidential witnesses obtained access to the alleged information. *See, e.g.*, SAC ¶¶ 57, 58, 64, 65, 67. Nor do they allege *how* the alleged misstatements were false or misleading *when they were made.*

## ARGUMENT

**I.    THE ACTION SHOULD BE TRANSFERRED TO THE SOUTHERN DISTRICT OF NEW YORK PURSUANT TO 28 U.S.C. § 1404(A)**

**A.    The Action Could Have Been Brought Originally in the Southern District of New York**

There is little doubt that the Southern District of New York is a proper venue for this action. *Frato*, 2011 WL 3625064, at *3 ("The first step in a court's analysis of a motion to transfer is to determine whether venue would be proper in the proposed transferee district.") (citation omitted); 15 U.S.C. § 78aa(a) (any action under the Securities Exchange Act "may be brought . . . in the district wherein the defendant is found or is an inhabitant or transacts business."). The Complaint is a virtual carbon copy of claims that the same Plaintiffs' counsel previously filed in (and which were dismissed by) the courts of the Southern District of New York and the Second Circuit Court of Appeals. *See supra* at 1. As in *In re DB* and *Green*, Plaintiffs themselves alleged both that Deutsche Bank "transacts business" in the Southern District of New York and that "a majority of the events giving rise to this action occurred in New York." *Frato*, 2011 WL 3625064, at *3. For example, Plaintiffs allege that "Deutsche Bank's ordinary shares trade on the New York Stock Exchange," which is located in the Southern District of New York. SAC ¶ 10. And while Plaintiffs purport to represent a nationwide class of investors in Deutsche Bank securities, their claims rely heavily on statements made in Deutsche Bank's Form 20-F, which explains that Deutsche Bank's operations in the United States are based in New York. 2019 Form 20-F at 71 ("We engage in U.S. banking activities directly through our New York branch."); *id.* at 48 ("Our agent in the United States is: DB USA Corporation, c/o Office of the Secretary, 60 Wall Street . . . New York, NY 10005."). Even setting aside the substantial business that Deutsche Bank transacts in the Southern District of New York, the bulk of Plaintiffs' allegations focus on New York-based conduct. As described

further in Section I.B *infra*, Plaintiffs' claims arise from alleged operational failures that were addressed by a public settlement with a New York regulator, and involved Deutsche Bank employees in both New York and Jacksonville, Florida.  *See, e.g.*, SAC ¶¶ 94-95, 185.

**B.**   **The Balance of Factors Compels Transfer to the Southern District of New York**

Transfer to the Southern District of New York is appropriate in light of the litigation's strong connection to New York.  The Third Circuit has articulated certain "public" and "private" interests implicated by § 1404(a).  *Jumara* v. *State Farm Insurance Co.*, 55 F.3d 873, 879 (3d Cir. 1995).  "The private interests may include: (1) plaintiff's forum preference; (2) the defendant's preference; (3) whether the claim arose elsewhere; (4) the convenience of the parties; (5) the convenience of the witnesses; and (6) the location of books and records."  *Santomenno* v. *Transamerica Life Insurance Co.*, 2012 WL 1113615, at *2 (D. N.J. Mar. 30, 2012) (Salas, J.) (citing *Jumara*, 55 F.3d at 879).  Public interests include, *inter alia*: (1) practical considerations that could make the trial easy, expeditious, or inexpensive; (2) the relative administrative difficulty in the two fora from court congestion; (3) the local interest in deciding controversies at home; and (4) the public policies of the fora.  *Id.*  Here, the balance of interests supports transfer to the Southern District of New York.

**1.   The Private Interests Favor Transfer to the Southern District of New York**

Transfer to the Southern District of New York is appropriate in light of the action's strong factual connection to New York.  The Complaint is replete with allegations concerning Deutsche Bank's operations in New York.  For example, the 2020 DFS Consent Order, around which the bulk of Plaintiffs' claims revolve, involved the New York State Department of Financial Services, Deutsche Bank AG (which is licensed by the DFS to operate a foreign bank branch in the State of New York), Deutsche Bank AG New York Branch, and Deutsche Bank

Trust Company of the Americas (which is a "New York state-chartered bank," 2019 Form 20-F at 75). The 2020 DFS Consent Order cited, *inter alia*, allegations of wrongdoing under New York State law by Deutsche Bank employees based in New York. 2020 DFS Consent Order ¶¶ 112-13. The Complaint here draws heavily from the terms of that Consent Order, including by repeating verbatim allegations concerning the onboarding of various clients in New York and meetings and compliance operations in New York.

In contrast, Plaintiffs allege no nexus whatsoever between the District of New Jersey and their claims. None of the parties are alleged to reside in New Jersey. And while the Complaint identifies various Deutsche Bank employees who are located in New York, it makes no mention of *any* witnesses or evidence likely to be found in New Jersey. Indeed, the sole reference to Deutsche Bank's operations in New Jersey concerns office space that Plaintiffs allege, based on information and belief, was operated by either Deutsche Bank or an unidentified affiliate or subsidiary, none of which are connected to any conduct relevant to the claims at issue. SAC ¶ 10 ("[U]pon information and belief, Deutsche Bank and/or an affiliate or subsidiary of [Deutsche] Bank maintained an office at Harborside Financial Center Platform, Jersey City, New Jersey, 07311 during the Class Period. In addition, upon information and belief, Deutsche Bank and/or an affiliate or subsidiary of Deutsche Bank had multiple offices throughout New Jersey during the Class Period.").

Against this backdrop, Plaintiffs' choice of forum, which is the *sole* factor weighing in favor of litigating this action in New Jersey, is entitled to little, if any, deference. *Frato*, 2011 WL 3625064, at *4 (when the "operative facts of [the] action bear little connection to the [selected forum]" of the lawsuit, the plaintiff's choice of forum "is entitled to little deference"); *Santi* v. *National Business Records Management, LLC*, 722 F. Supp. 2d 602, 607 (D. N.J. 2010)

(Rodriguez, J.) ("[C]ourts give substantially less weight to a plaintiff's forum choice when the dispute at the heart of a lawsuit occurred almost entirely in another state.").

Indeed, even if Plaintiffs could muster some substantive connection between their claims and this District (which they cannot), their choice of a forum that is not their home forum is entitled to little weight. *See In re 3M*, 2020 U.S. App. LEXIS 36961, at *4 ("When a plaintiff brings its charges in a venue that is not its home forum . . . that choice of forum is entitled to less deference.") (quotation marks omitted). Nor is there any relevance to Plaintiffs' conclusory assertion that *some* unidentified members of a nationwide class of investors are likely to be found in New Jersey. *See, e.g.*, SAC ¶ 10. Given that Deutsche Bank's securities trade globally, New Jersey has no stronger connection to this dispute than any other forum. Furthermore, "courts in [the Third] Circuit have held that deference to a plaintiff's choice of forum is lessened considerably in securities fraud class actions." *Gallagher* v. *Ocular Therapeutix, Inc.*, 2017 WL 4882487, at *4 (D. N.J. Oct. 27, 2017) (Wettre, J.); *see also Huang* v. *Sonus Networks, Inc.*, 2016 WL 1090436, at *2 (D. N.J. Mar. 21, 2016) (Wolfson, J.) ("[A] plaintiff's choice of forum 'becomes substantially less important [where] he sues representatively on behalf of a class.'"). "This is particularly true here, where the class may consist of 'hundreds or thousands of members' throughout the nation . . . and . . . this forum has no meaningful connection to the action." *Gallagher*, 2017 WL 4882487, at *4.

The only connection between this matter and New Jersey is that Plaintiffs filed this action here. But that fact is not sufficient to outweigh the opposing interests of the remaining parties and witnesses. *See Yang* v. *Odom*, 409 F. Supp. 2d 599, 607 (D. N.J. 2006) (Pisano, J.) (the Northern District of Georgia was a more convenient forum than the District of New Jersey where although one defendant was a New Jersey resident "the other four Defendants are residents of the

-20-

Northern District of Georgia" and "[t]he District of New Jersey is no more geographically convenient for the Plaintiffs than the Northern District of Georgia considering that the lead plaintiffs are residents of South Carolina, Indiana, and California and the potential class members are apparently located throughout the country."); *see also Job Haines Home for the Aged* v. *Young*, 936 F. Supp. 223, 231, 231 n.9 (D. N.J. 1996) (Chesler, J.) (convenience of parties in the transfer analysis weighed in favor of defendants where all defendants either resided or did business in the transferee district and plaintiffs in class action were located all over the United States).  Indeed, the connection between Plaintiffs' claims and the forum is even more tenuous than those the Third Circuit rejected in *In re 3M*.  There, plaintiffs, who were not based in New Jersey, had at least alleged that one of the thirty-one alleged misstatements arose in the forum.  *In re 3M Co.*, 2020 U.S. App. LEXIS 36961, at *6.  Here, in contrast, Plaintiffs do not (and cannot) allege that *any* alleged misstatement arose in New Jersey.  Nor can Plaintiffs here identify any plausible local interest that New Jersey has in adjudicating the clams here.  *See id.* at *5 ("nothing about this [securities fraud] case" was "'local' to New Jersey" where respondents represented a class of 75,000 investors situated around the globe and the bulk of alleged misstatements were made outside of New Jersey).

### 2.  Public Interests Also Favor Transfer to the Southern District of New York

Public interest concerns also favor transfer to New York.  First, the practical considerations involved in this action, including but not limited to allegations regarding the location of parties and witnesses, the location of books and records, and where the claims arose, favor transfer to New York.  *See Gallagher*, 2017 WL 4882487, at *5 ("The practical considerations affecting the expense and expedition of trial strongly favor transfer, for many of the reasons detailed above with respect to the private interests."); *Frato*, 2011 WL 3625064, at

*7 (transfer was practical where the District of New Jersey had "invested few of its resources to this action" given that the case was "in its infancy").

Second, New York has a strong interest in adjudicating this dispute.  When, as here, the alleged facts make clear that the public interest in an action is in a transferee venue, the original venue has "no real public interest in hosting [the] dispute."  *Platinum Partners Value Arbitrage Fund, L.P.* v. *TD Bank, N.A.*, 2011 WL 3329087, at *5 (D. N.J. Aug. 2, 2011) (Falk, J.). Because Deutsche Bank's U.S. operations are based in New York and the conduct that Plaintiffs allege forms the basis of their securities fraud claims took place in New York, the Southern District of New York has a "particular local interest in deciding this dispute."  *Yang*, 409 F. Supp. 2d at 609 (citing *LG Electronics, Inc.* v. *First International Computer, Inc*., 138 F. Supp. 2d 574, 592 (D. N.J. 2001) (Cooper, J.) (the local interest in deciding disputes weighed in favor of transfer to the Northern District of California where the "center of gravity" of the lawsuit was California and where that district had familiarity with the matter)); *see also Platinum Partners Value Arbitrage Fund*, 2011 WL 3329087, at *5 ("The scheme was perpetrated by a Florida lawyer through his Florida based law firm. The alleged wrongs committed by TD Bank supposedly occurred in a Florida branch involving employees within that branch.  It is clear that Florida has a substantially greater interest in the disposition of this case than New Jersey.").

The public interest also favors transfer here in order to discourage Plaintiffs' transparent forum shopping.  *Job Haines*, 936 F. Supp. at 234 ("Although Plaintiffs may not like the results they have been getting in California, that is not a factor which is considered on a 1404(a) transfer.  Familiarity of a court with the subject matter of an action, and concern about consistent results, most certainly are, however.").  Having failed to identify any relevant nexus between their claims and this forum, Plaintiffs' attempt to avoid unfavorable precedent in the Second

Circuit cannot support litigating here.  *See also See Flood* v. *Carlson Restaurants Inc.*, 94 F. Supp. 3d 572, 576 (S.D.N.Y. 2015) ("[T]he more it appears the decision is motivated by forum shopping reasons, the less deference will be accorded to it.") (citation and internal quotation marks omitted); *Johnson* v. *New York Life Insurance Co.*, 2013 WL 1003432, at *3 (D. Mass. Mar. 14, 2013) ("[W]here, as here, the same counsel has filed class actions asserting the same federal claim in two different districts, and the second claim was filed after the federal claim was dismissed in the first-filed case, the usual weight given to the plaintiffs' choice of forum is not justified. Rather, to give it such weight would abet a form of forum shopping that should not be encouraged.").

Finally, transferring the action to the Southern District of New York would preserve judicial resources and alleviate court congestion.  As of September 30, 2020, the District Court of New Jersey had 1,218 fillings per Judgeship and the Southern District of New York had 470 fillings per Judgeship.  *See* District Courts-Combined Civil and Criminal Federal Court Management Statistics (Sept. 30, 2020), https://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distprofile0930.2020.pdf; *see also Huang*, 2016 WL 1090436, at *4 (considering filings per judgeship and determining that "the relative administrative difficulty resulting from court congestion . . . favors transfer.").

## II.    PLAINTIFFS FAIL TO STATE A CLAIM OF SECURITIES FRAUD UNDER SECTION 10(B)

To allege a claim under Section 10(b) and Rule 10b-5, Plaintiffs must plead six elements: "(1) a material misrepresentation or omission, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) loss causation."  *City of Edinburgh*

*Council* v. *Pfizer, Inc.*, 754 F.3d 159, 167 (3d Cir. 2014).  Because Plaintiffs' claim fails under

the first two prongs, the Court need not address the latter four on this motion.

A.     <u>**Plaintiffs Fail to Allege an Actionable Misstatement or Omission**</u>

Rule 10b-5 makes it unlawful for any person "[t]o make any untrue statement of a

material fact or to omit to state a material fact necessary in order to make the statements made, in

light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-

5(b) (2019).  In order to state a claim for fraud under Section 10(b), "'a plaintiff must show that

the defendant made a statement [or omission] that was '*misleading* as to a *material* fact.'"  *In re*

*Cognizant Technology Solutions Corp. Securities Litigation*, 2020 WL 3026564, at *10 (D. N.J.

June 5, 2020) (Salas, J.) (citing *Matrixx Initiatives, Inc.* v. *Siracusano*, 563 U.S. 27, 38 (2011));

*see also Pfizer*, 754 F.3d at 168 (plaintiffs must allege with "exacting" particularity the reasons

why and how the statements were false and misleading when made).

Here, Plaintiffs allege that the following statements in various filings and public

statements spanning four years are materially false and misleading:

- "We are exiting client relationships where we consider . . . risks to be too high while
  also strengthening our client on-boarding and know-your client (KYC) procedures."
  Annual Report 2016 at 41; Annual report 2017 at 5; Annual report 2018 at 5; SAC ¶¶
  136, 151, 166.

-  "Major achievements in 2016 included . . . substantial investment in our control
  functions, including the ongoing implementation of a more comprehensive Know-
  Your-Client (KYC) process and an off-boarding process for higher risk clients."
  2016 Form 20-F at 49.

- "Compliance: Conformity with the law and adherence to regulations and standards.
  How we assess and accept clients: We have developed effective procedures for
  assessing clients (Know Your Customer or KYC) and a process for accepting new
  clients in order to facilitate comprehensive compliance. Furthermore they help us to
  minimize risks relating to money laundering, financing of terrorism and other
  economic crime. Our KYC procedures start with intensive checks before accepting a
  client and continue in the form of regular reviews. Our procedures apply not only to
  individuals and corporations that are or may become our direct business partners, but

also to people and entities that stand behind them or are indirectly linked to them."
SAC ¶¶ 141, 156, 171.

- "DB has developed and implemented a comprehensive set of measures to identify,
  manage and control its AML risk. These measures are: A robust and strict KYC
  program. . . . 6.3. KYC Program.  DB has implemented a strict group-wide KYC
  program to ensure all kinds of customers (natural or legal persons or legal structures,
  correspondent banks) are subject to adequate identification, risk rating and
  monitoring measures. This program has been implemented globally and throughout
  all business divisions. KYC includes not only knowing the clients and entities the
  Bank deals with (either as a single transaction or ongoing relationship), or renders
  services to, but also the Ultimate Beneficial Owners (UBOs), Legal Representatives
  and Authorised Signatories as appropriate. The program includes strict identification
  requirements, name screening procedures and the ongoing monitoring and regular
  review of all existing business relationships. Special safeguards are implemented for
  business relationships with politically exposed persons (PEPs) and clients from
  countries or industries deemed high risk."  SAC ¶¶ 143, 158, 173.

- "KYC is an ongoing process throughout the life cycle of a client relationship . . . As
  part of our regular client due diligence, we screen our relationships against internal
  and external criteria, e.g. relating to Politically Exposed Persons (PEPs), terrorism, or
  sanctions."  SAC ¶¶ 162, 175.

- "[T]hat the Bank's newly-implemented KYC program "pay[s] special attention to
  high-risk clients (such as politically exposed persons [PEP]) . . . Clients are assessed
  as part of due diligence and are regularly screened against internal and external
  criteria. In 2017, we continued to roll out an extended screening program, which
  serves as the basis for further enhancement with regards to screening effectiveness
  and efficiency."  SAC ¶ 145.

Each of these statements was included as a part of Deutsche Bank's disclosures

concerning its ongoing efforts to strengthen and remediate deficiencies with AML and KYC

processes.  *See* 2017 Form 20-F at 28-29; 2017 Non-Financial Report at 42.  None of these

statements gives rise to an actionable violation of the securities laws.

### 1.   Deutsche Bank's Statements Concerning its Compliance Controls Were Aspirational and Are Not Actionable

Plaintiffs' attempt to transform Deutsche Bank's statements concerning compliance

procedures into misstatements that support their securities fraud claims fails on its face, because

it is well-established that "vague and general statements of optimism" and "aspirational goal

statements" are not actionable. *Hall* v. *Johnson & Johnson*, 2019 WL 7207491, at *15 (D. N.J.

Dec. 27, 2019) (Wolfson, C.J.) (citing *In re Advanta Corp. Securities Litigation*, 180 F.3d 525,

538 (3d Cir. 1999), *overruled in part on other grounds*, *Tellabs*, 551 U.S. 308).

Plaintiffs allege that Deutsche Bank "made materially false and misleading statements

regarding Deutsche Bank's [KYC] processes, a critical part of the Bank's AML procedures,"

including statements that "Deutsche Bank has 'developed effective procedures for assessing

clients . . . in order to facilitate comprehensive compliance,'" that its "KYC procedures start with

intensive checks," and that "its 'robust and strict' KYC program 'includes strict identification

requirements.'" SAC ¶ 4. But Deutsche Bank's statements regarding its belief as to the

effectiveness of its internal controls were statements of opinion, not guarantees, which cannot

sustain securities claims. *See, e.g.*, *City of Pontiac Policemen's & Firemen's Retirement System*

v. *UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014) ("It is well-established that general statements

about reputation, integrity, and compliance with ethical norms are inactionable 'puffery,'

meaning that they are 'too general to cause a reasonable investor to rely upon them.'"); *In re*

*UBS AG Securities Litigation*, 2012 WL 4471265, at *34 (S.D.N.Y. Sept. 28, 2012) (statements

that UBS went "above and beyond what laws and regulations require" and that UBS "adheres to

high ethical standards" to be non-actionable puffery).

Indeed, courts have already dismissed actions based on nearly identical statements in

Deutsche Bank's public disclosures. For example, in a decision affirmed by the Second Circuit

Court of Appeals, the Southern District of New York in *In re DB* rejected as inactionable

statements that Deutsche Bank "compl[ied] with all laws or regulations," "[did] not engage with

any external party that [wa]s involved in illegal or improper activities," was "geared to strict

conformity with the law and has been achieving good results for years," and "[wa]s committed to

ensuring the robust risk management of financial crime." 2017 WL 4049253, at *6 n.4. In

finding these alleged misstatements inadequate, the court reaffirmed the well-settled notion that

"statements of general corporate optimism," such as those described above and those listed in the

Complaint, "do not give rise to securities violations." *Id.* at *6; *see also Green*, 2019 WL

4805804, at *3 (statements concerning the effectiveness of Deutsche Bank's internal controls

were not actionable). Because Plaintiffs premise their securities claims on precisely this type of

statement, their claims must be dismissed.

### 2.  The Alleged Misstatements Are Immaterial as a Matter of Law

In order to state a claim for securities fraud, "a plaintiff must show that the defendant

made a statement [or omission] that was '*misleading* as to a *material* fact.'" *In re Cognizant*,

2020 WL 3026564, at *10 (citation omitted). A misrepresentation or omission of fact is material

"if there is a substantial likelihood that a reasonable shareholder would consider it important" in

making an investment decision, and there is a "substantial likelihood that the disclosure of the

omitted fact would have been viewed by the reasonable investor as having significantly altered

the 'total mix' of information made available." *Basic Inc*. v. *Levinson*, 485 U.S. 224, 231-32

(1988) (citation omitted); *Fan* v. *StoneMor Partners LP*, 927 F.3d 710, 716 (3d Cir. 2019)

("Materiality may be found when certain information, if disclosed, 'would have been viewed by

the reasonable investor as having significantly altered the total mix of information available to

that investor.'") (citation omitted).

The "total mix" for purposes of the materiality inquiry includes all information

reasonably available to the shareholders, including information contained in SEC filings. *See*

*Goldsmith* v. *Weibo Corp*., 2018 WL 2733694, at *11 (D. N.J. June 7, 2018) (Chesler, J.). This

also includes information in the public domain. *See Garber* v. *Legg Mason, Inc*., 347 F. App'x

665, 668 (2d Cir. 2009) (Summary Order) (noting that when deciding whether there has been a

material misrepresentation or omission, a court should consider "the 'total mix' of information

made available," including "information already in the public domain and facts known or

reasonably available to the shareholders") (citations omitted); *United Food & Commercial

Workers Union Local 880 Pension Fund* v. *Chesapeake Energy Corp.*, 774 F.3d 1229, 1238

(10th Cir. 2014) (same).  Here, the investing public was provided with more than enough

information to understand the state of Deutsche Bank's AML and KYC processes.

    *First*, as detailed above and in the Complaint, Deutsche Bank has been subject repeatedly

to regulatory scrutiny, particularly in relation to its efforts to remediate AML deficiencies, and

has disclosed each of those regulatory inquiries to the extent required, as well as Deutsche

Bank's efforts to address them.  SAC ¶ 2 ("Deutsche Bank has been the subject of repeated

scandals, investigations and regulatory enforcements for years because of its anti-money

laundering ('AML') compliance failures and deficiencies in its disclosure controls and

procedures, causing it to have one of the lowest gradings offered by the U.S. Federal Reserve.");

*id.* ¶ 34 ("Many recent financial crimes and AML scandals have left deep scars on Deutsche

Bank's reputation, once the world's largest financial institution by assets."); *id.* ¶ 74 ("On

January 30, 2017, as part of a settlement agreement, the U.K. Financial Conduct Authority

('Authority') fined Deutsche Bank for permitting billions of dollars in laundered money to occur

through the Bank's facilities. . . .  That assessment commenced in 2015 and 'found serious

deficiencies in Deutsche Bank's AML control framework and serious CDD [customer due

diligence], EDD [enhanced due diligence], and ongoing monitoring failings.'"); *id.* ¶ 75

("Specifically, the Authority found that '[a]ll of the medium and low risk files reviewed during

the SAMLP [the Authority's Systematic Anti-Money Laundering Programme] had inadequate

CDD, including: missing identification and verification documents; inadequate information

about UBOs [ultimate beneficial owners]; a lack of information about corporate ownership structures . . . and a failure to identify PEPs as connected parties. ***Similarly, almost all of the higher risk files had inadequate EDD, with deficiencies such as: limited evidence of meetings with customers; and inappropriate disregarding of negative press coverage. The common theme in both the CDD and EDD was a failure to evidence source of funds and wealth where appropriate*** *and a lack of understanding of the customer's business.*'"); *id.* ¶ 76 ("Moreover, in late 2016 and early 2017, during their meetings with the Authority, Deutsche Bank admitted to the Authority that there were around 5000 orphan accounts within the Bank as of 2014, which 'had not been onboarded in line with KYC requirements.'").  Deutsche Bank's 2015 Form 20-F, which was filed prior to the purported Class Period, also disclosed a variety of control deficiencies faced by Deutsche Bank.  *See* Ramesh Decl. Ex. 14 (2015 Form 20-F) at 33 ("We are investigating the circumstances around equity trades entered into by certain clients in Moscow and London and have advised regulators and law enforcement authorities in several jurisdictions about those trades. . . .  The total volume of the transactions under review is significant. Our internal investigation of potential violations of law, regulation and policy and into the related internal control environment remains ongoing; to date it has identified certain violations of our policies and deficiencies in our control environment."); *see also* 2016 Form 20-F at 98 (disclosing failure of Bank employees to issue suspicious activity reports under the Anti-Money Laundering Act in connection with the trading of $CO_2$ emission rights).

*Second*, Deutsche Bank self-disclosed shortfalls in its internal control environment in its 2017, 2018, and 2019 Forms 20-F within the Class Period — the very documents Plaintiffs claim to be materially false or misleading.  *See, e.g.*, 2017 Form 20-F at 28-29 ("We have identified the need to strengthen our internal control environment . . . Both our internal control environment

-29-

and the infrastructure that underlies it fall short in a number of areas of our standards for completeness and comprehensiveness and are not well integrated across the Bank. . . . [R]eviews and audits have identified various areas for improvement relating to a number of elements of our control environment. . . .").  These public filings also acknowledge, before each alleged misstatement identified by Plaintiffs, that there are "inherent limitations to the effectiveness of any control system, including disclosure controls and procedures.  Accordingly, even effective disclosure controls and procedures can provide only reasonable assurance of achieving their control objectives."  *Id.* at 96; Compl. ¶ 33.

No reasonable investor could have been misled by Deutsche Bank's aspirational statements regarding AML remediation efforts and effective internal controls over financial reporting.  *See Fan*, 927 F.3d at 716-17 ("statements Plaintiffs identify as fraudulently misleading are rendered immaterial given the pertinent disclosures") (citing *Ieradi* v. *Mylan Labs., Inc.*, 230 F.3d 594, 599-600 (3d Cir. 2000) (discussing how disclosures present in Defendant's Form 10-Qs were sufficient to alert a reasonable investor to the relevant risks)).

### 3. Plaintiffs Do Not Adequately Allege the Falsity of the Alleged Misstatements

The Complaint improperly conflates alleged failures in Deutsche Bank's internal controls with misstatements concerning Deutsche Bank's attempts to improve those systems over time.  Specifically, Plaintiffs allege misrepresentations concerning deficiencies in Deutsche Bank's AML and KYC processes (*see, e.g.*, SAC ¶¶ 4, 46, 47, 136, 145, 162, 175) and attempt to link these publicly acknowledged deficiencies to regulatory actions against Deutsche Bank concerning Jeffery Epstein, Russian and Eastern European oligarchs, and individuals and organizations purportedly connected to criminal activities.  This overreaching fails because, as in *In re DB*, "[t]he complaint alleges no facts to suggest that the Bank did not, for example, review

-30-

or strengthen its compliance and AML programs, that the Bank did not frequently review its

AML goals."  2017 WL 4049253, at *6.  While Plaintiffs allege that Deutsche Bank's AML and

KYC procedures may have been deficient, they do not, and cannot, allege that Deutsche Bank

did not actually make efforts to improve them, even if those efforts were ultimately less than

completely successful.  *Id.* at *7 ("These statements are not actionable because 'Plaintiff alleges

neither facts showing that the descriptions of the processes were false or misleading at the time

they were included in the public statements, nor facts showing that the processes were not

followed.'").  Moreover, while Plaintiffs allege that "[d]uring the Class Period, the Bank failed to

comply with KYC procedures" (SAC ¶ 34), the Complaint omits Deutsche Bank's repeated

warnings in the same filings that it "may be unable to complete these initiatives as quickly as we

intend or as our regulators demand, and our efforts may be insufficient to remediate existing

deficiencies and prevent future deficiencies or to result in fewer litigations or regulatory and

enforcement investigations, proceedings and criticism in the future."  2017 Form 20-F at 29.

These fulsome disclosures preclude Plaintiffs' claims.  *Sfiraiala*, 729 F. App'x at 59 (considering

"all of plaintiffs' arguments on [] appeal and find[ing] in them no basis for reversal").

Plaintiffs' entire theory of liability is premised on the concept that Deutsche Bank failed

to address the numerous deficiencies and failures of Deutsche Bank's AML and KYC controls.

*See, e.g.*, SAC ¶ 61 ("CW3, recounted that during the Class Period, there were critical audit

findings in three different areas showing that Deutsche Bank's AML processes were deficient.");

*id.* ¶ 66 ("CW4 also recounted that during his/her employment with the Bank, an audit of the

Bank's Enhanced Due Diligence ('EDD') research and reporting process found that the EDD

reports lacked key details and supporting files – such as the outcome of a client that was found to

be under investigation."); *id.* ¶ 67 ("In a similar vein, CW5 recalled that during his/her tenure at

Deutsche Bank, including in 2017 and 2018, there were numerous 'critical audit findings' related to improper KYC and customer due diligence practices when dealing with high-net-worth clients."); *id.* ¶ 68 ("CW6 recounted that his/her team frequently presented concerns about the sources of funds of oligarchs who were the Bank's clients, and about their questionable business practices during Risk Identification Forums ('RIF'), up to and including October 2020."); *id.* ¶ 134 ("CW11 said the AFC unit regularly approved new clients, despite their cases being escalated because of red flags linked to adverse news findings, location, industry and other information that came up during the KYC/due diligence process."). At best, this laundry list of allegations reflects a claim of corporate mismanagement, which is not actionable. *See In re Hertz Global Holdings Inc.*, 905 F.3d 106, 117 (3d Cir. 2018) ("We have long held 'that an allegation of mismanagement on the part of a defendant will not alone support' a securities fraud claim.") (citation omitted); *Takata*, 2020 WL 2079375, at *13 ("It is well-settled law that corporate mismanagement is not actionable under Section 10(b).") (citation omitted); *In re Magnum Hunter*, 26 F. Supp. 3d at 284, 292 ("[T]he allegations support an inference of the defendant having had . . . control deficiencies . . . [however] there is no factual basis in the complaint to infer that, when the company made its statements . . . it was acting with a knowledge of falsity or an intent to defraud . . . Mere allegations of corporate mismanagement are not actionable.").

### 4.  Plaintiffs Fail to Plead an Actionable Omission

Plaintiffs allege that Deutsche Bank failed to disclose that it was not conducting due diligence on high-net-worth clients. SAC ¶¶ 142, 146, 157, 161, 172. But Deutsche Bank had no duty to disclose any such information because it had already reported all relevant material information in the robust disclosures it included in its filings. *See In re DB*, 2017 WL 4049253, at *7 ("Plaintiffs' argu[ment] that Defendants had a duty to disclose the Bank's internal control

deficiencies . . . fails.").  As discussed in Section II.A.3, this type of alleged omission may only

support a nonactionable claim for corporate mismanagement; it cannot sustain Plaintiffs' claim

for securities fraud.

A duty to disclose arises when disclosure is necessary to make other related statements

not misleading or where required by statute.  *Williams* v. *Globus Medical, Inc.*, 869 F.3d 235,

241 (3d Cir. 2017) ("[Section] 10(b) and Rule 10b-5(b) do not create an affirmative duty to

disclose any and all material information."); *see also Chiarella* v. *United States*, 445 U.S. 222,

235 (1980) ("We hold that a duty to disclose under § 10(b) does not arise from the mere

possession of nonpublic market information."); *In re Eros International Securities Litigation*,

2017 WL 6405846, at *6 (S.D.N.Y. Sept. 22, 2017) ("Disclosure is not required simply because

an investor might find the information relevant or of interest."), *aff'd*, 735 F. App'x 15 (2d Cir.

2018).  "[D]isclosure is not a rite of confession, and companies do not have a duty to disclose

uncharged, unadjudicated wrongdoing." *In re Galena Biopharma, Inc. Securities Litigation*,

2019 WL 5957859, at *10 (D. N.J. Nov. 12, 2019) (Vazquez, J.) (citing *In re Morgan Stanley

Information Fund Securities Litigation*, 592 F.3d 347, 365 (2d Cir. 2010)).  No duty to disclose

arises here, where Deutsche Bank fully disclosed all relevant information.

**B.**     **Plaintiffs Fail to Adequately Allege Scienter**

Plaintiffs' Section 10(b) claim fails for the additional and independent reason that

Plaintiffs do not allege facts supporting a strong inference of scienter — a state of mind

"embracing intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319.  A securities

fraud claim will not survive a motion to dismiss unless it "state[s] with particularity facts giving

rise to a strong inference that the defendant acted with the required state of mind [*i.e.*, scienter]."

15 U.S.C. § 78u–4(b)(2)(A); *Fain* v. *USA Technologies, Inc.*, 707 F. App'x 91, 95 (3d Cir. 2017)

(Unpublished) (The PSLRA requires that a complaint state "with particularity facts giving rise to

a 'strong inference' that the defendants acted with intent to deceive, manipulate, or defraud."). For an inference of scienter to qualify as "strong," it "must be more than merely 'reasonable' or 'permissible' — it must be cogent and compelling, thus strong in light of other explanations." *Tellabs*, 551 U.S. at 324; *see also Winer Family Trust*, 503 F.3d at 327 (finding that the inference must be "at least as compelling as any opposing inference" of non-fraudulent intent).  "When the defendant is a corporate entity . . . the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter."  *In re DB*, 2017 WL 4049253, at *8.  Plaintiffs' generic allegations do not satisfy this high standard.

### 1.  Plaintiffs Do Not Allege That Deutsche Bank Had Any Motive to Defraud

Plaintiffs' theory of scienter rests entirely upon conclusory allegations that the prospect of profits incentivized Defendants to commit the alleged fraud.  This is precisely the type of "generic corporate motive" that cannot support the requisite strong inference of scienter.  *In re Amarin Corp.*, 2015 WL 3954190, at *11 (D. N.J. June 29, 2015) (Wolfson, J).  Indeed, lone allegations of "motive and opportunity," as Plaintiffs have asserted here, are not independently sufficient to plead scienter.  *Id* at *10.  Instead, "plaintiffs must assert a concrete and personal benefit" to the individuals who allegedly perpetrated the fraud.  *Avaya*, 564 F.3d at 278.

Plaintiffs' profit motive claims here are similar to those rejected by the Third Circuit in *Avaya*.  In affirming dismissal of a motion to dismiss, the Third Circuit found that plaintiffs failed to allege a sufficient motive and opportunity where they merely alleged "general motives to aid the company" and inflate stock prices.  *Id*. at 279.  Here, Plaintiffs make nearly identical claims, only alleging that Defendants acted with the same motives common to virtually all corporate officers and corporations.  *See, e.g.*, SAC ¶ 6 (alleging that "Deutsche Bank's relentless pursuit of profits has been its modus operandi for years, commencing with its former CEOs onboarding, retaining and servicing Russian oligarchs and other unsavory high-net-worth

individuals and their affiliated companies."), SAC ¶ 42 ("To profiteer from the fees and referrals generated by Epstein, Deutsche Bank continuously allowed Epstein to use the Bank's services to cover up old crimes and to facilitate new ones—a major compliance failure and reputational stain on the Bank."); SAC ¶ 48 ("Deutsche Bank repeatedly put the pursuit of profits above its responsibilities to safeguard against financial and other crimes, and repeatedly traded its reputation for profits."); SAC ¶ 82 (reputational concerns were "meaningless to Deutsche Bank, whose main goal was profiteering").  These allegations are wholly insufficient to support the requisite strong inference of scienter.  *Avaya*, 564 F.3d at 278.

### 2. Plaintiffs Do Not Adequately Allege Conscious Misbehavior or Recklessness

Unable to allege any plausible motive to commit fraud, Plaintiffs must instead meet the more onerous burden of pleading, with particularity, facts that constitute "strong circumstantial evidence of conscious misbehavior or recklessness." *In re Cognizant*, 2018 WL 3772675, at *13 (citing *In re Burlington Coat Factory Securities Litigation*, 114 F.3d 1410, 1418 (3d Cir. 1997)). This they cannot do.  Conscious misbehavior means "intentional fraud or other deliberate illegal behavior." *Pathfinder Management, Inc.* v. *Mayne Pharma PTY*, 2008 WL 3192563, at *12-*13 (D. N.J. Aug. 5, 2008) (Martini, J.) ("[I]t is not enough for plaintiffs to merely allege that defendants 'knew their statements were fraudulent or that defendants 'must have known' their statements were false.") (citing *McLean* v. *Alexander*, 599 F.2d 1190, 1197 (3d Cir. 1979)). Reckless disregard requires that Plaintiffs show "an extreme departure from the standards of ordinary care, . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *In re Cognizant*, 2018 WL 3772675, at *14 (citing *Avaya*, 564 F.3d at 267 n.42).

Plaintiffs' inability to allege that any Defendant had knowledge of or access to any information contrary to any purported misrepresentation precludes them from adequately alleging either conscious misbehavior or recklessness.  *See Winer Family Trust*, 503 F.3d at 328; *see also In re DB*, 2017 WL 4049253, at *8 (finding no scienter where plaintiffs failed to "allege specific facts allowing for a 'strong inference' that defendants acted recklessly in their statements to the public").  Not only are Plaintiffs unable to allege that Deutsche Bank did not implement any remediation efforts to resolve alleged AML weaknesses, but Plaintiffs also fail to allege that any Individual Defendant was aware of any specific contradictory information at the time they made the statements at issue (*see infra* Section III.B.3).  *See Sfiraiala*, 729 F. App'x at 59 ("[P]laintiffs' reliance on regulatory reports . . . further fails to raise an inference of scienter because the reports largely do not concern . . . the subject matter of the alleged misrepresentations.").  For example, Plaintiffs allege that Defendant Cryan "became personally involved with a 2016 SAR filed by Bank of America on Deutsche Bank" regarding "concerns that Deutsche Bank's KYC procedures were not robust and permitted money laundering."  SAC ¶ 59.  This conclusory allegation neither indicates that John Cryan engaged in any wrongdoing nor that he possessed any information that would lead him to believe that Deutsche Bank's statements concerning its AML and KYC processes were false when made.

Deutsche Bank's open acknowledgment of its internal control challenges and its disclosures of its effort to resolve them supports the more plausible, benign inference that Deutsche Bank was earnestly attempting to resolve ongoing issues.  *See Sfiraiala*, 729 F. App'x at 59; *Kumar* v. *Kulicke & Soffa Industries, Inc.*, 2019 WL 5081896, at *9 (E.D. Pa. Oct. 9, 2019) (remedial efforts "after the discovery of weaknesses supports the non-culpable inference that [defendant] was attempting to improve its processes to prevent future mistakes"); *see also*

*Messner* v. *United States Technologies, Inc.*, 2016 WL 1466543, at *11 (E.D. Pa. Apr. 13, 2016) (recognizing that a company's plans for "significant remedial actions" supported a non-culpable inference because the plans demonstrated that the defendants had discovered an error, and were attempting to improve their business practices in an effort to reduce the likelihood of another reporting error), *aff'd sub. nom.*, *Fain*, 707 F. App'x 91.

### 3. Plaintiffs' Allegations Concerning Confidential Witness Statements Do Not Support an Inference of Scienter

Plaintiffs' reliance on allegations based on information from purported confidential witnesses does not mitigate the requirement that Plaintiffs plead scienter with particularity. *See Avaya*, 564 F.3d at 263 ("[The] PSLRA imposes a particularity requirement on all allegations, whether they are offered in support of a statement's falsity or of a defendant's scienter."). Because the confidential witness statements alleged in the Complaint do not connect the confidential witnesses' supposed personal knowledge to Defendants' personal knowledge, they do not support an inference of scienter. *See Martin* v. *GNC Holdings, Inc.*, 757 F. App'x 151, 154 (3d Cir. 2018) (Unpublished) (dismissing securities claims for lack of scienter where confidential witnesses failed to provide specific facts about defendants "learning of potentially tainted products prior to making the actionable statements" concerning the quality of defendants' products); *In re Hertz Global Holdings, Inc. Securities Litigation*, 2015 WL 4469143, at *20 (D. N.J. July 22, 2015) (Arleo, J.) ("The CW allegations . . . imply nothing about Defendants' views on [the relevant] issues.  The CW allegations therefore fail to support a strong inference of scienter."); *In re Synchronoss Technologies, Inc. Securities Litigation*, 2019 WL 2849933, at *9 (D. N.J. July 2, 2019) (Wolfson, C.J.) (finding confidential witness allegations failed to establish that defendant knew alleged misstatements were false when made); *National Junior Baseball League*, 720 F. Supp. 2d at 555-56 ("In sum, in over fifty paragraphs of statements made by

confidential witnesses, not one witness claims to have met, emailed with, spoken to, or otherwise heard or read anything by, either of the Individual Defendants . . . which would sufficiently raise a strong inference of scienter that Individual Defendants knew their public statements and disclosures were false.").

For example, Plaintiffs rely on CW1 to allege that Deutsche Bank onboarded and maintained relationships with high-risk individual clients who were introduced by members of Deutsche Bank's Board despite red flags of misconduct.  SAC ¶ 49.  To support this claim, Plaintiffs describe CW1's impression of a 2018 incident in which Defendant Cryan personally intervened to facilitate the sale of property to "a controversial Russian PEP," allegedly overruling the U.S. Reputational Risk Committee's decision to block the sale.  SAC ¶ 57.  But Plaintiffs also allege that CW1 left Deutsche Bank in mid-2015, well before the alleged incident purportedly occurred.  SAC ¶ 23.  Because there is no basis to plausibly assert that CW1 had any personal knowledge of the alleged event, the Court should disregard these allegations.  *See Schiro* v. *Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 305 (S.D.N.Y. 2019) ("In order for a court to credit the allegations of confidential witnesses, the witnesses must be 'described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.'") (citing *Novak* v. *Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000)).

Similarly, Plaintiffs rely on CW2 to allege that Deutsche Bank's Management Board approved onboarding and extending loans to high-risk clients over the objections of other Deutsche Bank employees.  SAC ¶ 58.  As an initial matter, this allegation should be set aside because Plaintiffs fail to allege that anyone ever shared any specific concerns or objections regarding any of these clients with any specific Defendant, much less the details of any particular

incident tied to any certain date or time.  *See Schiro*, 396 F. Supp. 3d at 304 ("As a matter of

common sense, 'red flags are only suggestive of fraud to those who were or should have been

aware of them.'") (citation omitted); *Glaser* v. *The9, Ltd.*, 772 F. Supp. 2d 573, 589-

90 (S.D.N.Y. 2011) ("[E]ven confidential high level executives' statements will be insufficient

absent some allegation that the witness communicated with the individual defendants claimed

against in the case, or else that the witness was privy to the individual defendants' knowledge.").

Plaintiffs also fail to sufficiently plead any basis for CW2's knowledge, and instead ask the

Court to simply infer that CW2 had direct knowledge of the described events.  *See Schiro*, 396 F.

Supp. 3d at 305.  These conclusory allegations cannot support an inference of scienter.  *See Patel*

v. *L-3 Communications Holdings Inc*., 2016 WL 1629325, at *9 (S.D.N.Y. Apr. 21, 2016)

(finding no scienter where plaintiffs failed to allege "what the Whistleblower actually told

personnel"); *Novak*, 216 F.3d at 309 ("Where plaintiffs contend defendants had access to

contrary facts, they must specifically identify the reports or statements containing this

information.").

### 4.  **Plaintiffs Do Not Offer Any Other Basis From Which to Infer Scienter**

Plaintiffs' allegations that the Individual Defendants signed public filings (*e.g.*, SAC ¶¶

136, 138, 145, 149) are also insufficient to establish scienter, *In re Cendant Corp. Securities*

*Litigation*, 76 F. Supp. 2d 539, 547 (D. N.J. 1999) (Walls, J.) ("Allegations that a director or

officer signed public disclosures and/or was involved in the company's daily operations, standing

alone, will not satisfy the pleading requirements of the PSLRA or Rule 9(b)."), as are claims that

Individual Defendants should have known that their statements were false simply by virtue of

their corporate positions.  *Patel* v. *Zoompass Holdings, Inc.*, 2018 WL 10154207, at *9 (D. N.J.

Aug. 8, 2018) (Linares, C.J.) (finding that allegations that defendants "should have known that

their statements were false or misleading because of their position within the company is the type

of '[g]eneralized imputation of knowledge' that is insufficient to support an inference of scienter.") (citing *In re Advanta*, 180 F.3d at 539); *Palladin Partners* v. *Gaon*, 2006 WL 2460650, at *13 (D. N.J. Aug. 22, 2006) (Martini, J.) ("[M]ere membership on an audit committee is 'insufficient to establish a strong inference of scienter unless plaintiffs could plead that the audit committee was given information that should have alerted [defendant] to the fact that the company's financials were false.'") (citation omitted).

Plaintiffs also may not rely on a theory of "collective scienter" to establish scienter as to the Individual Defendants, because Plaintiffs provide no basis on which to impute the knowledge of other Deutsche Bank employees to them. *See, e.g.*, *In re Tyson Foods, Inc. Securities Litigation*, 2004 WL 1396269, *12 (D. Del. June 17, 2004), *aff'd*, 155 F. App'x 53 (3d Cir. 2005) (dismissing securities fraud claims against a corporate defendant where there was insufficient evidence of scienter on the part of individual corporate officers and directors of the company).

## III.   PLAINTIFFS' CONTROL PERSON CLAIM FAILS AS A MATTER OF LAW

Because a "control person" claim under Section 20(a) is derivative in nature, it requires that Plaintiffs plead a predicate violation of the federal securities laws. Control person liability cannot exist in the absence of an independent, primary violation of the federal securities laws. *In re Advanta*, 180 F.3d at 541; *In re Milestone Scientific Securities Litigation*, 103 F. Supp. 2d 425, 474 (D. N.J. 2000) (Lechner, J). Thus, Section 20(a) liability must be predicated upon an independent, primary violation of the federal securities laws. *In re Rockefeller Center Properties, Inc. Securities Litigation*, 311 F.3d 198, 211 (3d Cir. 2002). Because Plaintiffs fail to state a claim under Section 10(b), the control person claim under Section 20(a) fails as a matter of law. *See In re Advanta*, 180 F.3d at 541.

Plaintiffs' control person claim fails for an additional reason:  the total absence of any particularized allegations of culpable conduct by the allegedly controlling persons in the particular transaction at issue.  *See In re Take-Two Interactive Securities Litigation*, 551 F. Supp. 2d 247, 307-08 (S.D.N.Y. 2008) ("Plaintiffs must plead culpable participation with particularity, as required by the PSLRA.") (citations omitted).

## **CONCLUSION**

For the foregoing reasons, this action should be transferred to the Southern District of New York, or in the alternative, Plaintiffs' Second Amended Complaint should be dismissed.


Dated: April 23, 2021

/s/ Mark C. Errico
Mark C. Errico
Squire Patton Boggs (US) LLP
382 Springfield Avenue
Summit, New Jersey 07901
973-848-5600
973-848-5601
mark.errico@squirepb.com

David G. Januszewski (admitted *pro hac vice*)
Sheila C. Ramesh (admitted *pro hac vice*)
Cahill Gordon & Reindel LLP
32 Old Slip
New York, New York 10005
212-701-3000
djanuszewski@cahill.com
sramesh@cahill.com

*Attorneys for Defendants Deutsche Bank Aktiengesellschaft, John Cryan, Christian Sewing, Marcus Schenck, and James Von Moltke*