# EXHIBIT 1



NEW YORK STATE
DEPARTMENT OF FINANCIAL SERVICES
ONE STATE STREET
NEW YORK, NEW YORK 10004

--------------------------------------------------------------------------------x

In the Matter of                                                            :

DEUTSCHE BANK AG,                                                           :
DEUTSCHE BANK AG NEW YORK BRANCH, and
DEUTSCHE BANK TRUST COMPANY OF THE AMERICAS   :

--------------------------------------------------------------------------------x

**CONSENT ORDER UNDER**
**NEW YORK BANKING LAW §§ 39 and 44**

The New York State Department of Financial Services (the "Department"), Deutsche

Bank AG, Deutsche Bank AG New York Branch, and Deutsche Bank Trust Company of the

Americas (collectively "Respondents," "Deutsche Bank," or the "Bank") are willing to resolve

the matters described herein without further proceedings.

**WHEREAS,** Deutsche Bank AG is a global financial institution headquartered in

Frankfurt, Germany;

**WHEREAS,** Deutsche Bank AG is licensed by the Department to operate a foreign bank

branch in the State of New York, the Deutsche Bank AG New York Branch (the "New York

Branch"), and also operates a trust company, Deutsche Bank Trust Company of the Americas

("DBTCA"), which is likewise licensed and supervised by the Department;

**WHEREAS,** the Department has been investigating various aspects of Deutsche Bank's operations, specifically, the Bank's relationship with Jeffrey Epstein and related entities and correspondent and dollar-clearing relationships with the Federal Bank of the Middle East Ltd. ("FBME") and Danske Bank A/S ("Danske");

**NOW THEREFORE,** to resolve this matter without further proceedings pursuant to the Superintendent's authority under Sections 39 and 44 of the Banking Law, the Department finds as follows:

## THE DEPARTMENT'S FINDINGS FOLLOWING INVESTIGATION

A.   <u>Introduction</u>

1.     Global financial institutions act as a critical line of defense against illegal financial transactions in an ever changing and interconnected financial network.

2.     The Federal Bank Secrecy Act ("BSA") requires financial institutions to have adequate anti-money laundering ("AML") policies and systems in place. New York State law requires financial institutions to devise and implement systems reasonably designed to identify and report suspicious activity and block transactions prohibited by law. All regulated institutions are expected to configure systems based on their unique risk factors, incorporating parameters such as institution size, presence in high-risk jurisdictions, and the specific lines of business involved, and the institutions have an affirmative duty to ensure that their systems run effectively.

3.     In addition to having effective AML controls in place, it is also necessary for financial institutions to monitor their customers for the purpose of preventing their customers from facilitating criminal activity using the institutions' facilities. Further, Federal and

Departmental regulations require correspondent banks to conduct due diligence on, and monitor, non-U.S. respondent bank clients.

4.     As such, KYC and customer due diligence are critically important, and financial institutions must collect customer information at the time of establishing new relationships with clients, including as necessary to assess the risks associated with the client. To properly consider these risks, financial institutions should consider relevant factors such as the nature of the client's business, the purpose of the client's accounts, and the nature and duration of the relationship. For correspondent banking customers that are also foreign financial institutions, the due diligence should consider reasonably available information as to the customer's own AML record, the types of customers and markets served, and the AML regime in the client's home jurisdiction.

5.     Financial institutions must also conduct KYC reviews for each client relationship at intervals commensurate to the AML risks posed by the client, including reviewing account activity to determine whether such activity fits with what would have been expected given the nature of the account. Each client's AML risk should also be re-assessed if material new information or unexpected account activity is identified.

6.     Financial institutions must also establish criteria for determining when a client relationship poses too high of a risk and therefore must be terminated. A financial institution may be liable under applicable laws if it maintains such a relationship despite repeated indications of facilitation of improper transactions.

7.     The Department has determined that Deutsche Bank failed in various respects to meet these obligations fully with respect to three different customer relationships: one direct customer relationship with Jeffrey Epstein and entities related to Mr. Epstein; and two dollar-

3

clearing/correspondent banking relationships with foreign banks, FBME and Danske. Each will be addressed in turn.

B.    The Bank's Relationship with Jeffrey Epstein and Related Entities

8.      Jeffrey Epstein was a wealthy financier with hundreds of millions of dollars in assets and an extensive network of friends and connections that included prominent financial institutions, politicians, royalty, and billionaires. Deutsche Bank maintained a relationship with Mr. Epstein and related individuals and entities from August 2013 until December 2018. At that point the Bank decided to terminate this relationship following additional negative press related to Mr. Epstein's past criminal conduct.

9.      Mr. Epstein also had a well-publicized reputation related to the trafficking and abuse of young women. Allegations against him began appearing in the press as early as March 2005 with the accusation that he paid a 14-year old girl for a "massage."

10.     That year, the Palm Beach (Florida) Police Department commenced an investigation into allegations against Mr. Epstein related to his activities in Palm Beach. The investigation quickly uncovered dozens of other alleged victims. In particular, the investigation identified a number of individuals who were responsible for recruiting young women to come to Mr. Epstein's house to give "massages" or otherwise furthering his abuse. Press reports state some of these women told victims they should inform Mr. Epstein that they were 18 years old and represented to victims that they would be paid for performing such "massages."

11.     According to press reports, in 2006 the State Attorney handling the case, after meeting privately with an attorney representing Mr. Epstein, referred the case to a state grand jury instead of charging Epstein and co-conspirators for crimes for which local police believed there was abundant evidence. As a result, the Palm Beach Police Chief publicly denounced the

State Attorney and referred the case to the Federal Bureau of Investigation, which subsequently

opened its own investigation and interviewed potential witnesses and victims.

12.     In September 2007, Mr. Epstein agreed to plead guilty to two prostitution charges

in state court, including the solicitation of a minor to engage in prostitution, in exchange for a

deferred prosecution agreement providing him with immunity from extensive federal sex-

trafficking charges. The deal included an 18-month sentence and Mr. Epstein was also required

to register as a sex offender upon his release. Mr. Epstein ultimately served only 13 months of

his 18-month sentence in the Palm Beach County jail, and was allowed work release privileges

that enabled him to leave jail six days a week for twelve hours a day.

13.     In 2009, Mr. Epstein's non-prosecution agreement with the U.S. Department of

Justice was made public when it was unsealed in connection with one of several civil suits by his

alleged victims. The agreement, among other things, outlines details from the investigation,

including that Mr. Epstein may have conspired to use a facility or means of interstate commerce

to induce minors to engage in prostitution, to engage in illicit sexual conduct with minors,

conspiring with others to do the same, and trafficking minors. That agreement also notes that the

United States had compiled "a list of individuals whom it [had] identified as victims," and that

Mr. Epstein would pay for legal representation for these alleged victims.

14.     Indeed, between 2005 and 2013, press reports outlined the allegations underlying

the plea agreement and to varying degrees detailed the involvement of Mr. Epstein's alleged co-

conspirators, including three individuals hereinafter identified as CO-CONSPIRATOR-1, CO-

CONSPIRATOR-2 and CO-CONSPIRATOR-3. Some articles reported that CO-

CONSPIRATORS 1 and 2 had invoked their Fifth Amendment right against self-incrimination,

and others reported that CO-CONSPIRATOR 3 had allegedly recruited underage girls to give

5

Mr. Epstein "massages." The names of these women and several other alleged co-conspirators were publicly known by 2013.

15.     Additionally, press reports during this time noted allegations that Mr. Epstein was involved with Eastern European women in particular and that a modeling agency he helped fund brought "young girls . . . often from Eastern Europe" to the U.S. on Mr. Epstein's private jets.

*Deutsche Bank Onboarded Epstein in 2013*

16.     In early 2013, Mr. Epstein, who had been banking with one of Deutsche Bank's competitors (herein, "US BANK-1"), began the process of moving his assets to Deutsche Bank.

17.     The relationship between Deutsche Bank and Mr. Epstein came about through a Deutsche Bank relationship manager (herein, "RELATIONSHIP MANAGER-1") who had left US BANK-1 to join the Bank's private wealth department. At US BANK-1, RELATIONSHIP MANAGER-1 had been a member of the team servicing Mr. Epstein's accounts.

18.     RELATIONSHIP MANAGER-1 joined Deutsche Bank in November 2012, and, soon after joining Deutsche Bank, suggested to senior management in Deutsche Bank that Mr. Epstein was a potential client who could generate millions of dollars of revenue as well as leads for other lucrative clients to the Bank. Although it is unclear who made the initial contact, RELATIONSHIP MANAGER-1 and Mr. Epstein began discussions in the spring of 2013 about a potential relationship between Deutsche Bank and Mr. Epstein.

19.     In April of 2013, in preparation for Mr. Epstein's onboarding, a junior relationship coordinator on the Epstein account (herein, "RELATIONSHIP COORDINATOR-1") prepared a memorandum for RELATIONSHIP MANAGER-1 to send to the Bank's then Co-Head of the Wealth Management Americas group (herein, "EXECUTIVE-1") and the Chief Operating Officer of Wealth Management Americas (herein, "EXECUTIVE-2").

20.     Among other things, the memorandum contained information concerning Mr. Epstein's previous plea deal and prison sentence. In particular, the memorandum stated that "Epstein was charged with soliciting an underage prostitution [SIC] in 2007," that "[h]e served 13 months out of his 18 month sentence," and that "[h]e was accused of paying young woman [SIC] for massages in his Florida home." It also highlights that Mr. Epstein was involved in 17 out-of-court civil settlements related to his conduct in the 2007 conviction.

21.     In the email to EXECUTIVE-1 and EXECUTIVE-2 attaching the memorandum, RELATIONSHIP MANAGER-1 noted how lucrative the relationship could be, stating "[e]stimated flows of $100-300 [million] overtime [SIC] (possibly more) w/ revenue of $2-4 million annually over time . . . ." In the same email, RELATIONSHIP MANAGER-1 proposed that all Epstein-related accounts be for "entities" affiliated with Mr. Epstein, "not personal accounts."

22.     On May 5, 2013, EXECUTIVE-1 sent an email (hereinafter, the "Approval Email") to RELATIONSHIP MANAGER-1 which read "spoke with [the Head of AML Compliance for Deutsche Bank Americas and the then-General Counsel for Deutsche Bank Americas, who at that time served as chair of the Bank's Americas Reputational Risk Committee ("ARRC")]. Neither suggest [that the Epstein relationship] requires rep risk and we can move ahead so long as nothing further is identified through KYC and AML client adoptions." The Bank has represented to the Department that it has no other record of this communication between EXECUTIVE-1 and the other officers, and the ARRC did not meet in connection with the initial onboarding of Mr. Epstein.

23.     "Rep risk" as referenced in the Approval Email referred to a review by the relevant regional reputational risk committee. Deutsche Bank's policies and procedures provide

that, should a Deutsche Bank business or compliance unit identify a client that they believe could pose a reputational risk to the Bank, they must escalate that client for review by the attendant reputational risk committee. In the case of the onboarding of the Epstein relationship, this was the ARRC.

24.     The relationship between Deutsche Bank and Mr. Epstein officially began on August 19, 2013, when the Bank opened brokerage accounts for Southern Trust Company Inc., a self-described "database company and services" founded in the U.S. Virgin Islands in 2011, and Southern Financial LLC, a wholly owned subsidiary of Southern Trust Company Inc. According to the KYC record, the purposes of the brokerage accounts were to "hold marketable securities and cash" and "to invest long term [SIC] with the bank," respectively. Over the course of the relationship, Mr. Epstein, his related entities, and associates would eventually open and fund more than 40 accounts at the Bank.

25.     A Bank AML compliance officer cleared the relationship based on EXECUTIVE-1's Approval Email. The Bank represented that there is no indication that the AML compliance officer spoke directly with EXECUTIVE-1 or with the other Compliance or Legal officers mentioned in the Approval Email.

*Epstein Used Deutsche Bank Accounts to Engage in Suspicious Transactions*

26.     From the time of Mr. Epstein's onboarding, the relationship was classified by Deutsche Bank as "high-risk" and therefore subject to enhanced due diligence. Although the Bank did not initially classify Mr. Epstein as a politically exposed person ("PEP"), the Bank did designate him an "Honorary PEP" because of his connections to prominent political figures. The high-risk classification and informal designation as an Honorary PEP resulted in enhanced

transaction monitoring of activity within Epstein's accounts. However, and as discussed below, this scrutiny was not tailored to the specific risks that he posed.

27.    As early as November 1, 2013, however, Mr. Epstein and his representatives began using Deutsche Bank accounts to send wires to people who had been alleged to be co-conspirators in his past criminal offenses. Over the course of the relationship, Mr. Epstein and his representatives used Deutsche Bank accounts to send dozens of wires, directly and indirectly, including at least 18 wires in the amount of $10,000 or more to alleged co-conspirators who had been the subject of past press reports, including CO-CONSPIRATORS-1, -2, and -3. The Bank was not always aware that the recipients of wire transfers were alleged co-conspirators. For example, the wire transfers in November 2013 were made to an entity that was only later publicly associated with a co-conspirator (in 2015). As described further below, however, the connection was made by Bank personnel for certain transactions.

28.    On January 24, 2014, Deutsche Bank opened checking and money market accounts for an Epstein-related trust named "The Butterfly Trust." The Butterfly Trust included a number of beneficiaries, including, among others, CO-CONSPIRATORS 1-3, and a number of women with Eastern European surnames. When Bank personnel asked Epstein and Epstein's representatives about his relationship with the beneficiaries, Epstein represented that they were employees or friends. The Bank's KYC records state that the purpose of the money market account was "to pay all expenses/disbursements related to the trust [such as] taxes, trust fee [SIC], etc."

29.    The Butterfly Trust accounts were, like the overall Epstein relationship itself, approved for onboarding based on the earlier Approval Email from EXECUTIVE-1, despite apparent reputational and possible financial crime risks. Specifically, the beneficiaries of the

9

Butterfly Trust included, among others, CO-CONSPIRATORS 1-3. The existence of co-conspirators as beneficiaries of the trust created the very real risk that payments through the Trust could be used to further or coverup criminal activity and perhaps even to endanger more young women.

30.     At the time of onboarding of the Butterfly Trust accounts, Bank personnel were aware that one of the Trust's beneficiaries was an alleged co-conspirator of Epstein's prior offenses. In October 2013, a compliance officer performed background checks on the beneficiaries of the trust and flagged for RELATIONSHIP COORDINATOR-1 that one of the beneficiaries, CO-CONSPIRATOR-2, had been alleged to be one of Epstein's co-conspirators. In reply RELATIONSHIP COORDINATOR-1 confirmed that "[CO-CONSPIRATOR-2] was accused as a co-conspirator in a case but was never brought to trial nor ever convicted. . . . The account for which she will be associated is a trust account which names her as a beneficiary." The alert was cleared citing the Approval Email from Executive-1.

31.     While Epstein held accounts at Deutsche Bank, he used the Butterfly Trust account and various other accounts to send over 120 wires totaling $2.65 million to beneficiaries of the Butterfly Trust, including some transfers to alleged co-conspirators or women with Eastern European surnames, for the stated purpose of covering hotel expenses, tuition, and rent.

32.     Although payments related to legal expenses are not inherently suspicious, Mr. Epstein also used his various accounts for what appear to have been multiple settlement payments totaling over $7 million to law firms, as well as dozens of payments to law firms totaling over $6 million for what appear to have been the legal expenses of Mr. Epstein and co-conspirators.

*ARRC's Consideration of the Epstein Relationship*

33.     At the end of 2014 and into 2015, the Bank's Anti-Financial Crime department escalated issues concerning Mr. Epstein. The first issue arose in connection with the Bank's opening of a Global Markets account for Mr. Epstein. In January 2015, during the onboarding process for that account, an AML Compliance Officer ("AML OFFICER-1") identified recent developments in the press concerning Mr. Epstein, including (a) a June 2014 federal appeals court ruling that some of Mr. Epstein's alleged victims would be granted access to the details of the 2008 plea bargain, potentially reopening their cases, and (b) additional allegations in the press regarding Mr. Epstein's relationships with a prominent former U.S. politician and a member of a European royal family.

34.     AML OFFICER-1 escalated these issues to a more senior AML officer ("AML OFFICER-2"). In response, AML OFFICER-2 initially noted that the same negative allegations against Epstein had been approved by EXECUTIVE-1, the former Head of AML and the former General Counsel for the Americas and attached a copy of the Approval Email. AML OFFICER-1 responded that they should still run the issue by the then Head of AFC Americas because: the Approval Email was "not a direct approval by [the Head of AML Compliance for Deutsche Bank Americas and the [then] General Counsel for Deutsche Bank Americas]; it's a statement by a front office MD about his conversation with them and their alleged opinion not to escalate to Rep Risk;" the Head of AML Compliance was no longer at the Bank; and there were new developments in Epstein's case that could lead to the reopening of his 2008 conviction.

35.     As a result of these discussions and additional media reports regarding Epstein's association with prominent political figures, AML OFFICER-2 put the question of whether to escalate before EXECUTIVE-2, who agreed to escalate to the ARRC. In the email to EXECUTIVE-2, AML OFFICER-2 noted that the communication underpinning the Approval

Letter occurred before these new developments and for further background also noted, among other things, that "[b]y 2011, 40 underage girls had come forward with testimony of Epstein sexually assaulting them" and that "Epstein [had] managed to settle at least 17 lawsuits out of court."

36.     Later that month, on January 22, 2015, in preparation for the ARRC meeting, EXECUTIVE-1 and RELATIONSHIP MANAGER-1 met in person with Mr. Epstein at his New York home. During the meeting, EXECUTIVE-1 asked Mr. Epstein about the veracity of the recent allegations and appeared to be satisfied by Mr. Epstein's response. The Bank has represented to the Department that it is not in possession of contemporaneous records reflecting the substance of EXECUTIVE-1's meeting with Epstein and is not aware of any other steps taken at the time to investigate the veracity of the allegations beyond speaking with Mr. Epstein.

37.     On January 30, 2015, members of the ARRC met to discuss the Epstein relationship. Despite the fact that Deutsche Bank's policies and procedures mandate that detailed minutes of such meetings be kept, the Bank has represented to the Department that there are no recorded minutes from that particular meeting. Later that day, however, a member of the ARRC emailed EXECUTIVE-1 to say, without explanation, that the committee was "comfortable with things continuing" with Mr. Epstein, and that another member of the committee had "noted a number of sizable deals recently."

_Conditions on the Epstein Relationship Were Communicated to Neither the Relationship Managers nor the Relevant Transaction Monitoring Team_

38.     The following week, another member of the ARRC (the Bank's Head of Compliance, Americas) reiterated the ARRC's decision in an email to other executives, stating that ARRC had agreed to "continue business as usual with Jeff Epstein based upon [EXECUTIVE-1]'s due diligence visit with him."

12

39.     That same email outlined three conditions, however, that the ARRC placed on the relationship:

      a.   Mr. Epstein would be allowed to continue to "conduct trades and transactions in existing accounts without Compliance pre-approval, provided that the business had determined these transactions do not involve any unusual and/or suspicious activity or are in a size that is unusually significant or novel in structure."

      b.   The Bank's Corporate Banking and Securities unit would be allowed to "also 'open' accounts to facilitate activity as a booking matter where the activity has already been approved by [the Bank's America's Wealth Management division]."

      c.   The business would "need to monitor for any further developments in connection with the reputational risk of the client relationship and to review transactions/activity conducted in the accounts for any activity, size or structure as described in [the first condition]."

40.     These mandatory conditions were communicated to several senior Bank personnel, up to and including the Bank's CEO of the Americas. Inexplicably, however, they were apparently never communicated to all members of the Epstein relationship team. Epstein's relationship managers continued conducting business with Epstein in the same manner as they had prior to the ARRC meeting.

41.     This failure was then substantially compounded when AML OFFICER-2 purportedly misinterpreted the conditions; as a result they were also not communicated to the transaction monitoring team responsible for monitoring the Epstein relationship. Specifically, AML OFFICER-2 interpreted the clause "transactions [with] unusual and/or suspicious activity or are in a size that is unusually significant or novel in structure" to mean transactions that were

unusual, suspicious, or novel *as compared to the prior history of transactions related to the Epstein relationship*. He communicated this interpretation to the rest of the transaction monitoring team responsible for the Epstein relationship. The interpretation was exemplified by a later email exchange in March of 2017, when a member of the transaction monitoring team responded to an alert about payments to a Russian model and Russian publicity agent, stating, "[s]ince this type of activity is normal for this client it is not deemed suspicious."

42.     Instead of monitoring the accounts for all potential crimes and suspicious activity that could be implicated by Mr. Epstein's alleged past conduct, including payments to co-conspirators and those that could be related to sex trafficking involving adults, AML OFFICER-2 only instructed the relevant transaction monitoring team to verify, using internet searches, that any woman involved with transactions related to the Epstein relationship was at least 18 years old and to only flag transactions if they could not discern a rational reason for the transaction, a standard which had little if any effect on the Bank's relationship with Mr. Epstein.

*The Bank Continued to Maintain the Relationship for Years Despite Additional Red Flags*

43.     On July 21, 2015, Mr. Epstein requested an increase in his trading limits. Several days later, a member of Epstein's coverage team ("COVERAGE TEAM MEMBER-1"), who was aware of the ARRC's conditions on the relationship, escalated this request to AML OFFICER-2, who in turn escalated the issue to the Chairman of the ARRC. On July 29, 2015, after conferring with other members of the ARRC but without formally meeting, the Chairman replied to AML OFFICER-2 stating they had no objections. The Chairman added, "I also checked in with [EXECUTIVE-1] last night to make sure he supports this and has heard nothing negative on the client. [EXECUTIVE-1] confirmed both."

14

44.     On January 4, 2016, an accountant representing Mr. Epstein (herein, "ACCOUNTANT-1") requested that the Bank open a brokerage account for Gratitude America, Mr. Epstein's private charity. COVERAGE TEAM MEMBER-1 escalated the request to AML OFFICER-2, who directed the inquiry to the Secretary for the ARRC. The Secretary of the ARRC conferred with a member of the ARRC and ordered that an external due diligence report be prepared on Mr. Epstein. In response to the request for additional information, ACCOUNTANT-1 informed the Bank of Mr. Epstein's resignation from Gratitude America and withdrew the request to open the account. As a result, no due diligence report was run on Mr. Epstein.

45.     By April 2016, RELATIONSHIP MANAGER-1 was replaced by another relationship manager (herein, "RELATIONSHIP MANAGER-2") to handle accounts associated with Mr. Epstein. Although RELATIONSHIP MANAGER-2 had Mr. Epstein's KYC file and had been made aware of the prior escalation of the relationship to the ARRC, he was not made aware by anyone at the Bank of the three conditions the ARRC placed on the relationship after its February 2015 review.

46.     In a May 2018 email, a compliance officer submitted an inquiry to RELATIONSHIP MANAGER-2 about payments to the accounts of women with Eastern European surnames at a Russian bank, and asking for an explanation of the purpose of the wire transactions and Epstein's relationship with the counterparties. After submitting the questions to ACCOUNTANT-1, RELATIONSHIP MANAGER-2 forwarded ACCOUNTANT-1's response to the compliance officer, which read "SENT TO A FRIEND FOR TUITION FOR SCHOOL." When the compliance officer followed up, asking "[w]hy is this client using this account to . . . pay school tuition?," RELATIONSHIP MANAGER-2 replied "[g]enerally, Jeffrey has separate

15

accounts to manage each of his properties. This is one of them. However, when making one-off

transfers to people, he and his finance staff have the flexibility to use any account they like that

is funded." The Bank has represented to the Department that it has no records of the compliance

officer asking further follow-up questions, and the transaction was cleared.

47.     In addition, payments from the Butterfly Trust accounts and other Epstein

accounts were used for lawsuit settlement payments to alleged victims, and rent, legal, and

immigration expenses made to or on behalf of young (albeit adult) women, including additional

women with Eastern European surnames.

*Deutsche Bank Was Aware of Suspicious Cash Activity Throughout the Relationship*

48.     Several of Mr. Epstein's employees or agents had authority to conduct

transactions in the accounts on Mr. Epstein's behalf. One of them, Mr. Epstein's personal

attorney (herein, "ATTORNEY-1"), was active in withdrawing cash for Mr. Epstein.

ATTORNEY-1, on behalf of Mr. Epstein, made a total of 97 withdrawals from the Bank's Park

Avenue (New York City) Branch from 2013 to 2017 from personal accounts belonging to Mr.

Epstein. The transactions in question occurred roughly two to three times per month, all in the

amount of $7,500 per withdrawal, the Bank's limit for third-party withdrawals (*i.e.*, withdrawals

made by an authorized user who is not a primary account holder). When Bank personnel asked

ATTORNEY-1 why Epstein needed cash, ATTORNEY-1 replied Epstein used it for travel,

tipping and expenses.

49.     Under federal regulations, banks and other financial institutions must file

Currency Transaction Reports ("CTRs") with the U.S. Treasury Department when there are cash

transactions with an individual in excess of $10,000 in one day. Breaking up transactions to

avoid the CTR reporting is a criminal offense commonly referred to as "structuring." When

ATTORNEY-1's cash activity triggered reporting requirements, the Bank complied and filed the

requisite CTRs. The Bank also monitored ATTORNEY-1's activity for suspicious activity reporting.

50.     In May 2014, ATTORNEY-1 inquired into how often he could withdraw cash on behalf of Mr. Epstein without triggering an alert. The record is unclear as to whether anyone from the Bank ever responded to ATTORNEY-1's inquiry. RELATIONSHIP COORDINATOR-1 sent an email to the branch manager stating that ATTORNEY-1 "asked how often they could come in to withdraw cash without creating some sort of alert," and asking "Is it once a week? Twice a week? Once every other week?" The Bank has represented that it has no record of any response. RELATIONSHIP COORDINATOR-1 has since represented that she understood ATTORNEY-1's inquiry related to ATTORNEY-1's desire to withdraw more than the $7,500 limit for third-party withdrawals, and not to CTR filing requirements.

51.     In 2017, ATTORNEY-1 again inquired about triggering an alert. Specifically, in July 2017, ATTORNEY-1 had, among other things, asked a teller whether a withdrawal transaction in excess of $10,000 would require reporting and, upon being advised that it would, broke up the withdrawal transaction over two days. In July of that year, members of the Bank's Wealth Management AML transaction monitoring team, including AML OFFICER-2, met to discuss suspicions of cash structuring to avoid currency transaction reports ("CTRs") by ATTORNEY-1. AML OFFICER-2, among others, spoke with ATTORNEY-1 and advised that (a) his patterns gave the appearance of structuring, (b) this pattern was unacceptable, and (c) he would be provided with additional information about CTR reporting requirements. ATTORNEY-1 represented that he had not intended to structure cash withdrawals. Bank personnel found ATTORNEY-1 credible and permitted him to continue to withdraw cash from his own and Epstein's accounts. In 2018, just prior to the Bank's closing of the Park Avenue

Branch, which was located nearby Mr. Epstein's house, ATTORNEY-1 withdrew $100,000.00 in cash on behalf of Mr. Epstein. When later questioned why ATTORNEY-1 withdrew these sums from the Bank, ATTORNEY-1 reported that Mr. Epstein needed the funds for tipping and household expenses.

52.     In total, in a roughly four-year period, ATTORNEY-1 withdrew on Mr. Epstein's behalf more than $800,000 in cash from Mr. Epstein's personal accounts. Throughout the Epstein relationship the Bank filed CTRs appropriately, but there is no indication that the Bank ever sought or received any explanation for Epstein's cash activity beyond the travel, tipping, and expenses explanation provided by ATTORNEY-1.

### *Termination of the Epstein Relationship*

53.     In November 2018, the *Miami Herald* released an article on Mr. Epstein detailing his 2008 plea deal. The article prompted senior members of Wealth Management to reassess the relationship's reputational risk and ultimately terminate the Epstein Relationship. On December 21, 2018, the Bank informed Mr. Epstein by letter that they would no longer be servicing his accounts.

54.     Despite the Bank's decision to offboard all Epstein accounts due to reputational risks, RELATIONSHIP MANAGER-2 drafted reference letters to two other financial institutions, on Deutsche Bank letterhead, indicating in one such letter that he was "unaware of any problems relating to the operation or use of [the] accounts."

### *Conclusions Regarding the Epstein Accounts*

55.     If a financial institution decides to do business with a high-risk client, that institution is required to conduct due diligence commensurate with that risk and to tailor its

transaction monitoring to detect suspicious or unlawful activity based on what the risk is. In this case, Deutsche Bank failed to do so.

56.     The Bank's fundamental failure was that, although the Bank properly classified Mr. Epstein as high-risk, the Bank failed to scrutinize the activity in the accounts for the kinds of activity that were obviously implicated by Mr. Epstein's past. The Bank was well aware not only that Mr. Epstein had pled guilty and served prison time for engaging in sex with a minor but also that there were public allegations that his conduct was facilitated by several named co-conspirators. Despite this knowledge, the Bank did little or nothing to inquire into or block numerous payments to named co-conspirators, and to or on behalf of numerous young women, or to inquire how Mr. Epstein was using, on average, more than $200,000 per year *in cash*.

57.     Whether or to what extent those payments or that cash was used by Mr. Epstein to cover up old crimes, to facilitate new ones, or for some other purpose are questions that must be left to the criminal authorities, but the fact that they were suspicious should have been obvious to Bank personnel at various levels. The Bank's failure to recognize this risk constitutes a major compliance failure.

58.     This substantive failure was compounded by a series of procedural failures, mistakes, and sloppiness in how the Bank managed and oversaw the Epstein accounts. Despite the nature of Mr. Epstein's prior criminal history, the initial onboarding of the first account was not reviewed by the Bank's regional reputational risk committee but was instead approved in what appears to have been an off-hand conversation reflected only in the Approval Email. That Approval Email was then relied upon, substantially without additional scrutiny, to open numerous other Epstein-related accounts. When the relationship was finally elevated to the full ARRC in early 2015, no minutes were taken of that meeting, contrary to Bank policy, and the

committee was satisfied enough to continue the relationship based primarily on a brief due diligence meeting between two front-office personnel and Mr. Epstein himself, the substance of which was also not reflected in writing. Moreover, the conditions imposed by the ARRC — conditions that, if followed, might have detected and prevented many subsequent suspicious transactions — (a) were not transmitted to the majority of the relationship team; and (b) were misinterpreted by a compliance officer in a way that resulted in very little change in how the monitoring of the accounts occurred going forward. Throughout the relationship, very few problematic transactions were ever questioned, and when they were, they were usually cleared without satisfactory explanation.

59.     These errors are unacceptable in the context of a major international bank and inexcusable in the context of the heightened scrutiny that should have occurred in the monitoring of a high-risk customer.

C.      The Bank's Correspondent Banking Relationships with FBME and Danske Bank

60.     Deutsche Bank has had correspondent banking relationships with foreign banks, including several that were in high-risk jurisdictions or themselves had customers operating in high-risk industries. The Department has concluded that Deutsche Bank failed to adequately monitor and manage those relationships, including, in particular, with FBME and Danske.

*FBME*

61.     In 1982, FBME was established in Cyprus as a subsidiary of the Federal Bank of Lebanon, which was founded in 1952.

62.     In January 1984, FBME opened a correspondent banking account with Bankers Trust, which Deutsche Bank acquired in 1999 and later renamed to Deutsche Bank Trust Company Americas, though this account was mostly unused for years as FBME did limited

business with Western financial institutions until Cyprus' 2004 acceptance into the European Union.

63.     Due to Cypriot laws that placed restrictions on domestic financial institutions that primarily provided offshore banking services, FBME was incorporated in the Cayman Islands in 1986, though it would remain headquartered and staffed in Cyprus. In 1987, FBME's Cyprus branch was granted a license by the Central Bank of Cyprus to assume banking activities within its jurisdiction.

64.     In April 2001, FBME's Cyprus branch opened a second account with DBTCA.

65.     After the September 11, 2001 terrorist attacks on the United States and in accordance with the USA PATRIOT Act, the Cayman Islands implemented legislation requiring all banks registered within the country to establish a physical local presence. In response, rather than complying with the new directive, FBME management elected to begin the process of relocating to Tanzania. In 2003 FBME was reincorporated in Tanzania, and also received a banking license from the Bank of Tanzania.

66.     Cyprus' acceptance to the European Union in May of 2004 precipitated the active correspondent banking relationship between FBME and Deutsche Bank. On August 23, 2004, FBME's Cyprus branch opened a third account with DBTCA.

67.     Deutsche Bank was aware of potential issues with FBME's compliance regime from very early in the active phase of the correspondent banking relationship. A May 2005, "Annual Anti-Money Laundering Discussion" memo for FBME, for example, shows that the Bank was aware that:

    a.  FBME's Compliance Officer headed a department comprised of two staff members;

21

  b. the Compliance Officer was at the time "trying to develop a back office compliance [SIC]";

  c. FBME was at the time still using a transaction monitoring system that was partially manual; and

  d. FBME at the time considered the cost of compliance with AML and KYC regulations to be the most significant issue challenging the Cyprus banking sector.

  68. Later-in-time "Anti-Money Laundering Discussions" for FBME showed that certain aspects of FBME's compliance program did not change over subsequent years, although those memos did reflect that the number of AML Compliance staff at FBME generally increased each year between 2005 and 2013 and FBME implemented automated transaction monitoring and sanction screening tools in 2009 and 2010, respectively.

  69. On November 17, 2005, Deutsche Bank's North American Client Screening Committee ("CSC") assigned FBME a Risk Assessment Customer ("RAC") score of eight, thereby designating it as a high-risk client. At Deutsche Bank, RAC scores are graded on a scale of one to ten, with one being the lowest level of risk and ten the highest. Clients who receive a score of eight and above are considered high-risk.

  70. During the relevant period, FBME Cyprus was always rated high-risk, with Deutsche Bank's records indicating that it was assigned a RAC score, over the years, of eight or nine. The Bank's records show that FBME Tanzania over this time period had a RAC score of seven in 2007, and eight thereafter.

  71. At the time of the initial risk rating, information provided to the CSC included that other banks had alleged in the past that FBME had been associated with money laundering linked to Russian organized crime. A 2005 memo provided to the CSC stated that the USA

PATRIOT Act and the EU Money Laundering Directive limited FBME's ability to commit money laundering in the hypothetical event that it chose to engage in such conduct. The same memo noted that the Central Bank of Cyprus ("CBC") had represented to Deutsche Bank that the CBC regarded FBME as excellent from a KYC and AML perspective, and that FBME's Compliance Officer was the most experienced in the Cypriot market. This, in part, served as the justification of Deutsche Bank's continued relationship with FBME.

72.    In January 2007, a former Bank Director of U.S. Anti-Financial Crimes (herein, "AML COMPLIANCE DIRECTOR-1"), along with executives from Deutsche Bank's Greece office, met with FBME executives in Cyprus. Over the course of this meeting and subsequent in-person meetings, Deutsche Bank executives became well aware of the state of FBME's compliance operations and provided annual seminars or "AML workshops" for Cypriot clients, including FBME, starting in June 2010.

73.    In March 2007, FBME's Cyprus branch, opened a fourth account with Deutsche Bank's New York Branch.

74.    Since 2008, the Bank identified a total of 826 suspicious transactions that referenced FBME, with 96 alone in 2008. That year, Deutsche Bank performed an analysis of the volume of suspicious transactions related to FBME and concluded that FBME presented an average to greater-than-average risk compared to other banks in an already high-risk market.

75.    This number increased to 125 suspicious transactions in 2009 and eventually peaked at 132 the following year. While the number of suspicious transactions decreased to 77 in 2012, there was a significant increase in 2014, with the Bank identifying a total of 131 suspicious transactions concerning FBME.

76.     Despite the high number of suspicious transactions in relation to FBME, the Bank facilitated 478,379 dollar-denominated transactions totaling more than $618 billion over the course of the relationship.

77.     In communications with Deutsche Bank, FBME sometimes refused to disclose in writing the ultimate beneficial owners of its own corporate clients, explaining that such information could not be shared without violating local law. For example, in March of 2007, a Deutsche Bank official in Greece contacted FBME concerning additional information regarding OFFSHORE COMPANY-1. In response, FBME stated that the company was a privately-owned company whose business activities included trading in securities and that FBME had conducted their own due diligence checks which identified the beneficial owner. However, FBME stated that it could not share the underlying information with the Bank without violating Cypriot law governing client confidentiality unless ordered by a court to do so. Three years later, Deutsche Bank flagged an additional transaction concerning OFFSHORE COMPANY-1, noting that they had inquired about the same FBME customer before. Despite this lack of transparency with respect to this FBME customer, Deutsche Bank continued its banking relationship with FBME. After Deutsche Bank decided to close the FBME relationship in July 2014, the U.S. Government determined that OFFSHORE COMPANY-1's ultimate beneficial owner was a Russian businessman who was affiliated with a Syrian research facility responsible for developing and producing non-conventional weapons.

78.     This was apparently not an isolated incident. Although the Department has not found that the Bank was aware at the time, many ultimate beneficial owners of clients of FBME have subsequently been associated in the press with "weapons proliferators, terrorists, and transnational organized criminals."

79.     On July 15, 2014, the U.S. Treasury's Financial Crimes Enforcement Network ("FinCEN") named FBME a foreign financial institution of primary money laundering concern pursuant to Section 311 of the USA PATRIOT Act (the "311 Designation"), and proposed prohibiting U.S. financial institutions from opening or maintaining correspondent accounts or payable through accounts for or on behalf of FBME.

80.     At this time, Deutsche Bank was the largest of the few remaining Western banks that had continued to maintain correspondent banking relationships with FBME.

81.     In response to the 311 Designation, Deutsche Bank decided by July 18, 2014 to end its relationship with FBME.

82.     The Department concludes that the high-risk nature of the FBME relationship, the red flags, numerous suspicious transactions, and overt lack of transparency exhibited by FBME should have prompted Deutsche Bank to exit the relationship before the 311 Designation, yet it failed to do so.

### *Danske Estonia*

83.     In 2007, Danske Bank A/S, the largest financial institution in Denmark, acquired the Baltic business of a Finnish financial institution, Sampo Bank. The segment of the business located in the nation of Estonia became known as Danske Estonia.

84.     The relationship between Deutsche Bank and Danske Estonia began on October 1, 2007, with the latter institution's opening of a correspondent banking account with Deutsche Bank. Deutsche Bank assigned Danske Estonia a RAC Score of eight in 2007, *i.e.,* high-risk, due to Danske Estonia's high-risk jurisdiction, the volume of AML alerts and cases involving Danske Estonia's customers, and the high-risk market segments serviced by Danske Estonia.

85.     Because it was a high-risk client, Danske Estonia was required to undergo annual due diligence reviews as part of the Bank's KYC process for correspondent banking clients. This process included a discussion between the client relationship manager and Danske Estonia personnel focused on AML and KYC issues, including any changes in the relevant laws and regulations, changes to the client's internal policies and procedures, major banking issues in the client's country, and the client's risk analysis of its own customers.

86.     By June 2008, Deutsche Bank was aware of issues at Danske Estonia concerning its non-resident customer accounts. Specifically, Deutsche Bank observed an increase in AML-related alerts generated by the Bank's monitoring systems involving non-resident customers of Danske Estonia "with a Russian or Latvian (indirectly Russia[n]) connection." These AML alerts prompted Bank officials from the U.S. and Germany to meet with Danske Estonia in New York, at which point they were assured that Danske Estonia was moving away from its non-resident client portfolio.

87.     Additionally, a plan to place the Estonian Branch on the same IT platform as Danske's home office fell through in 2008. Failure to implement the IT protocols resulted in the Estonian Branch not having the same AML checks as Danske Bank's home office, despite its location in a higher-risk jurisdiction.

88.     In July 2009, Deutsche Bank was sufficiently concerned about AML risks posed by Danske Estonia that AML COMPLIANCE DIRECTOR-1 provided on-site training to Danske Estonia staff to address AML and KYC topics, which consisted of an overview of U.S. regulatory requirements.

89.     Just a few months later, in November 2009, Deutsche Bank increased Danske Estonia's RAC score to a nine due to the lack of improvement in compliance seen at the client bank, despite its assurances a year earlier.

90.     In September 2010, Deutsche Bank elected to increase Danske Estonia's RAC score again, to a ten, the maximum on the Bank's risk scale, after it continued to see insufficient improvements from Danske Estonia regarding its non-resident customer portfolio. The score was expressly based on "the volume and nature" of suspicious activity involving Danske Estonia and its customers, as well as "law enforcement inquiries related to Danske Estonia and its customers." Despite this lack of improvement, the Bank elected to continue its relationship with Danske Estonia.

91.     Deutsche Bank's perception that Danske Bank was not improving was accurate. Danske Estonia saw a notable increase in non-residential business from Russia and other former Soviet states in 2010. This business was disproportionately large and lucrative for Danske Bank — in 2011 alone, Danske Estonia generated 11% of Danske Bank's total profits despite only accounting for 0.5% of the bank's assets.

92.     In April 2011, AML COMPLIANCE DIRECTOR-1 and other Bank employees met with Danske Estonia personnel once again to discuss Deutsche Bank's concerns regarding the volume of AML investigations involving Danske Estonia customers. During the April 2011 meeting, Deutsche Bank personnel expressed concerns to Danske Estonia involving its non-resident portfolio. In particular, the Bank noted that it would need to consider reassessing its relationship, including possible termination of Danske Estonia's accounts, unless Danske Estonia was able to mitigate the AML-related issues involving its non-resident customers. The number of

suspicious transactions involving Danske Estonia's customers slightly decreased between 2010 (21 transactions) and 2011 (17 transactions).

93.     These concerns persisted, however, and the question of whether to retain Danske Estonia as a client was raised again in late 2013. In a November 1, 2013 email, AML COMPLIANCE DIRECTOR-1 stated that Deutsche Bank was "[o]nce again, not happy with what [they had] experience[d] with some of Danske Bank Estonia's clients in addition to some AML and sanctions controls." AML COMPLIANCE DIRECTOR-1 further stated that the Bank "value[s] the relationship [with Danske Estonia], but must see improvements."

94.     The following week, on November 6, 2013, AML COMPLIANCE DIRECTOR-1 drafted an internal memorandum after conducting an on-site visit at Danske Estonia. The draft memorandum concluded that there was a "basis for closure" of the Danske Estonia accounts largely due to a lack of improvements in AML controls. The memorandum also advocated that the Bank limit Danske Estonia's transactions to processing payments which originated from Danske Estonia's customers who were residents of Estonia. This draft memorandum does not appear to have been sent to any other Deutsche Bank personnel (or third party) prior to the termination of the Danske Estonia correspondent banking relationship in October 2015.

95.     Two days later, on November 8, 2013, U.S. AFC officers from the Bank had a phone conversation with their colleagues in Germany. On that call, concerns were raised regarding recent law enforcement inquiries into Danske Estonia's customers, as well as an increase in suspicious transactions. It was also mentioned during the call that Danske Estonia was "not cooperative enough" and had "not improved," despite the Bank's suggestions. This was subsequently discussed in an in-person meeting on November 20, 2013, in which AML

COMPLIANCE DIRECTOR-1 advocated to maintain the relationship while mitigating the risks involving Danske Estonia's non-resident customer portfolio.

96.     Notwithstanding these concerns, Deutsche Bank decided to maintain the relationship for two reasons: 1) Danske Estonia was viewed an important component of the Bank's global relationship with Danske Bank A/S; and 2) Deutsche Bank believed that it could effectively mitigate and control the risks.

97.     By early 2014, other major Western financial institutions began de-risking efforts in the Baltic region related to money laundering risks. Deutsche Bank elected to continue to do business in the region, however.

98.     The Bank was aware that the risks mostly centered on high-risk non-resident ("HRNR") accounts held in the region with beneficial owners located largely in Russia and other former Soviet states. When later questioned about whether Deutsche Bank was concerned with the volume of HRNR accounts maintained at Danske Estonia and other financial institutions based in the Baltics, the Bank's relationship manager stated that "there were legitimate reasons for former Soviet businesses and individuals to use non-resident banks," and that "such customers often operated and lived under governments that were corrupt and rapacious, and thus there were valid reasons for them to hold their money overseas."

99.     In response to the Bank's efforts to mitigate and control the AML risk posed by Danske Estonia, Danske Estonia did in fact undergo some reforms over the course of 2014, but these underscored the failings up to that point. For example:

      a.  Danske Estonia introduced a "customer risk level determination" procedure, the first change in five years to Danske Estonia's policies and procedures for evaluating a client's risk.

b.   While Danske Estonia had previously screened outgoing payments against the

U.S. Treasury Department's Office of Foreign Asset Control and European Union

sanctions lists, it began screening incoming payments against those lists.

100.   Deutsche Bank was aware of the lack of such reforms prior to 2014. For example,

Deutsche Bank's annual AML Discussions, which were required by internal Bank policy for

high-risk clients, reflect that certain aspects of Danske Estonia's AML/KYC program were

largely holdovers from the Sampo Bank era, with the AML Discussions simply listing "[n]o

changes to previous discussion," year after year, with only minor changes.

101.   On September 29, 2014, AML COMPLIANCE DIRECTOR-1 stated in a

transition memo that "the Baltics suffer from an inherently high client AML risk . . . .

[C]ontinued monitoring should be placed on . . . Danske Bank Estonia. If the situation for

Danske Bank Estonia worsens, I recommend that the account be closed."

102.   Despite this recommendation from a high-ranking and seasoned compliance

professional, Deutsche Bank continued its relationship with Danske Estonia yet again.

103.   During the eight-year period between 2007 and 2015, Deutsche Bank cleared

more than $267 billion in 1,638,844 transactions for Danske Estonia. Out of this total, Danske

transferred at least $150 billion in payments from Russia and other former Soviet states through

Deutsche Bank.

104.   Between 2007 and 2015, Deutsche Bank identified a total of 340 suspicious

transactions that referenced Danske Estonia's U.S. dollar correspondent accounts. The high

number of suspicious transactions, the history of high RAC scores, and various dialogues that the

Bank had with its client concerning AML policies and controls, put Deutsche Bank on notice that

there were issues that required timely further action.

105.    Despite this, the Bank maintained its relationship with Danske Estonia until October 7, 2015, a year in which Deutsche Bank identified 87 additional suspicious transactions concerning Danske Estonia.

*The Bank's Compliance Failures in its Correspondent Banking Relationships*

106.    In connection with the Bank's relationships with these high-risk correspondent banking customers, the Bank failed to maintain policies that set out sufficiently specific criteria, such as patterns of high RAC scores or high suspicious activity volumes, under which the Bank would determine whether to terminate a correspondent banking relationship or whether lesser risk-mitigation measures would be appropriate.

107.    During part of these relationships, the Bank failed to maintain policies that clearly provided for the closure of accounts based on the failure to obtain or update a USA PATRIOT Act certification from its correspondent banking clients.

108.    Finally, the Bank failed to consistently maintain policies that provided practical guidance to facilitate their implementation, such as procedures for determining whether other foreign banks use the respondent's correspondent account, or explanations of how employees could verify the identities of respondents' beneficial owners.

D.    Deutsche Bank's Substantial Cooperation and Remediation

109.    The Department recognizes and credits the Bank's exemplary cooperation during the course of the Department's investigations of the Bank's former relationships with Danske Bank, FBME, and Jeffrey Epstein. This cooperation, which occurred over several years, included conducting comprehensive and thorough internal investigations of each of those former relationships and sharing the results of those investigations with the Department in a detailed and transparent manner; collecting, analyzing and producing numerous documents and other

31

information to the Department; and providing timely and detailed responses to the Department's inquiries.

110.    The Department also recognizes and credits the Bank's ongoing efforts to remediate the shortcomings identified in this Consent Order, including the fact that these efforts commenced before the inception of the Department's investigations of the former relationships described herein. Among other things, the Bank has demonstrated its commitment to remediation by devoting significant financial and other resources to enhance the Bank's AML program, including through changes to its policies, procedures, systems, governance structures, and personnel, as well as its ongoing cooperation with the independent monitor selected by the Department (as referenced in paragraph 117 below), and by reducing the Bank's portfolio of high-risk clients in its correspondent banking and Wealth Management businesses.

111.    Consistent with the requirements of New York Banking Law § 44(5), the Department has given substantial weight to the commendable conduct described in paragraphs 109 and 110 above.

## **Violations of Laws and Regulations**

112.    The Department finds that Deutsche Bank conducted business in an unsafe and unsound manner, in violation of New York Banking Law § 44.

113.    The Department finds that Deutsche Bank failed to maintain an effective and compliant anti-money laundering program, in violation of 3 NYCRR § 116.2.

NOW THEREFORE, to resolve this matter without further proceedings, pursuant to the Superintendent's authority under Sections 39 and 44 of the Banking Law, the Department and Respondents stipulate and agree to the following terms and conditions:

## SETTLEMENT PROVISIONS

Monetary Penalty

114.    Deutsche Bank shall pay a penalty to the Department, pursuant to New York Banking Law §§ 39 and 44, in the amount of one hundred fifty million U.S. dollars ($150,000,000.00). The entire amount shall be paid to the Department within ten (10) business days of executing this Consent Order.

115.    Deutsche Bank agrees that it will not claim, assert, or apply for a tax deduction or tax credit with regard to any U.S. federal, state, or local tax, directly or indirectly, for any portion of the civil monetary penalty paid pursuant to this Consent Order.

116.    Deutsche Bank further agrees that it shall neither seek nor accept, directly or indirectly, reimbursement or indemnification with respect to payment of the penalty amount, including but not limited to payment made pursuant to any insurance policy.

Remediation

117.    An independent monitor selected by the Department is already engaged to assist the Bank pursuant to the Consent Order entered into between the Bank and the Department dated January 30, 2017. The Department has directed the monitor to address the compliance failures implicated by the instant Consent Order in the context and within the timetables of that engagement. The Bank reconfirms its commitment to cooperate fully with the monitor and acknowledges that, although no extension of the monitorship is currently contemplated, the Department may, in its sole regulatory discretion, extend the scope of duration of the monitorship to address the Bank's failures described herein.

Full and Complete Cooperation

118.    The Bank commits and agrees that it will fully cooperate with the Department regarding all terms of this Consent Order, and as noted above, the Bank has already provided exemplary cooperation in these and related matters.

Waiver of Rights

119.    The parties understand and agree that no provision of this Consent Order is subject to review in any court or tribunal outside the Department.

Parties Bound by the Consent Order

120.    This Consent Order is binding on the Department, Deutsche Bank, including its New York Branch, as well as any of their successors and assigns. This Consent Order does not bind any federal or other state agency or any law enforcement authority.

121.    No further action will be taken by the Department against the Bank for the conduct set forth in this Consent Order provided that the Bank complies with the terms of this Consent Order. For the sake of clarity, such conduct includes (a) the Bank's AML control deficiencies with respect to the onboarding and monitoring of foreign bank customers to whom the Bank provided dollar-clearing services through the date of this Order, including but not limited to the Bank's relationships with FBME and Danske Estonia discussed herein, but only to the extent that such deficiencies do not constitute knowing and willful misconduct that would be subject to penalty under New York Banking Law § 44(4); and (b) the Bank's relationship with Jeffrey Epstein and related individuals and entities.

122.    Notwithstanding any other provision in this Consent Order, the Department may undertake action against Deutsche Bank for transactions or conduct in connection with FBME, Danske Bank, and Jeffrey Epstein and his related entities that Deutsche Bank did not disclose to

the Department in the presentations and written materials submitted to the Department in connection with these matters.

Breach of Consent Order

123.     In the event that the Department believes any party to this Consent Order to be in material breach of the Consent Order, the Department will provide written notice to the party, and the party must, within ten (10) business days of receiving such notice, or on a later date if so determined in the Department's sole discretion, appear before the Department to demonstrate that no material breach has occurred or, to the extent pertinent, that the breach is not material or has been cured.

124.     The parties understand and agree that any party's failure to make the required showing within the designated time period shall be presumptive evidence of that party's breach. Upon a finding that a breach of this Consent Order has occurred, the Department has all the remedies available to it under New York Banking and Financial Services Law and may use any evidence available to the Department in any ensuing hearings, notices, or orders.

Notices

125.     All notices or communications regarding this Consent Order shall be sent to:

For the Department:

Terri-Anne Caplan
Senior Assistant Deputy Superintendent for Enforcement
New York State Department of Financial Services
One State Street
New York, NY 10004

Randolph Hall
Assistant Counsel for Enforcement
New York State Department of Financial Services
One State Street
New York, NY 10004

Zachary Shapiro
Attorney for Enforcement
New York State Department of Financial Services
One State Street
New York, NY 10004

For Deutsche Bank:
Joe Salama
Global Head of Litigation and Regulatory Enforcement
60 Wall Street
New York, NY, 10005-2836

Andrew Stemmer
Head of Litigation & Regulatory Enforcement - Americas
60 Wall Street
New York, NY, 10005-2836

Miscellaneous

126.    Each provision of this Consent Order shall remain effective and enforceable until

stayed, modified, suspended, or terminated by the Department.

127.    No promise, assurance, representation, or understanding other than those

contained in this Consent Order has been made to induce any party to agree to the provisions of

the Consent Order.

*(The remainder of this page is intentionally blank.)*

IN WITNESS WHEREOF, the parties have caused this Consent Order to be signed this 6th  day of July, 2020.

NEW YORK STATE DEPARTMENT
OF FINANCIAL SERVICES

By: _____
    R. BRUCE WELLS
    Associate Counsel
    Consumer Protection & Financial
    Enforcement Division

By: _____
    KEVIN R. PUVALOWSKI
    Senior Deputy Superintendent
    Consumer Protection & Financial
    Enforcement Division

By: _____
    KATHERINE A. LEMIRE
    Executive Deputy Superintendent
    Consumer Protection & Financial
    Enforcement Division

By: _____
    LINDA A. LACEWELL
    Superintendent of Financial Services

DEUTSCHE BANK AG

By: _____
    Karen Kuder
    General Counsel

By: _____
    Thorsten Seyfried
    General Counsel – Germany and
    EMEA

DEUTSCHE BANK AG,
NEW YORK BRANCH

By: _____
    Joe Salama
    Global Head of Litigation and
    Regulatory Enforcement

By: _____
    Andrew Stemmer
    Head of Litigation & Regulatory
    Enforcement - Americas

DEUTSCHE BANK TRUST
COMPANY OF THE AMERICAS

By: _____
    Joe Salama
    Global Head of Litigation and
    Regulatory Enforcement

By: _____
    Andrew Stemmer
    Head of Litigation & Regulatory
    Enforcement - Americas

IN WITNESS WHEREOF, the parties have caused this Consent Order to be signed this <u>6th</u> day of July, 2020.

NEW YORK STATE DEPARTMENT                    DEUTSCHE BANK AG
OF FINANCIAL SERVICES


By: _____            By: *Karen Kuder*
    R. BRUCE WELLS                          Karen Kuder
    Associate Counsel                       General Counsel
    Consumer Protection & Financial
    Enforcement Division
                                            By: _____
                                            Thorsten Seyfried
By: _____            General Counsel – Germany and
    KEVIN R. PUVALOWSKI                      EMEA
    Senior Deputy Superintendent
    Consumer Protection & Financial
    Enforcement Division                    DEUTSCHE BANK AG,
                                            NEW YORK BRANCH

By: _____            By: *Joe Salama*
    KATHERINE A. LEMIRE                      Joe Salama
    Executive Deputy Superintendent         Global Head of Litigation and
    Consumer Protection & Financial         Regulatory Enforcement
    Enforcement Division
                                            By: *Andrew Stemmer*
By: _____            Andrew Stemmer
    LINDA A. LACEWELL                       Head of Litigation & Regulatory
    Superintendent of Financial Services    Enforcement – Americas


                                            DEUTSCHE BANK TRUST
                                            COMPANY OF THE AMERICAS

                                            By: *Joe Salama*
                                            Joe Salama
                                            Global Head of Litigation and
                                            Regulatory Enforcement

                                            By: _____
                                            Steven F. Reich
                                            General Counsel – Americas