# EXHIBIT 3

As filed with the Securities and Exchange Commission on March 16, 2018

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**

# Form 20-F

☐ REGISTRATION STATEMENT PURSUANT TO SECTION 12(b) OR (g) OF THE SECURITIES EXCHANGE ACT OF 1934

or

☒ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 FOR THE FISCAL YEAR ENDED DECEMBER 31, 2017

or

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

or

☐ SHELL COMPANY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

Date of event requiring this shell company report.......................................

**Commission file number 1-15242**

# Deutsche Bank Aktiengesellschaft

(Exact name of Registrant as specified in its charter)

**Deutsche Bank Corporation**

(Translation of Registrant's name into English)

**Federal Republic of Germany**

(Jurisdiction of incorporation or organization)

**Taunusanlage 12, 60325 Frankfurt am Main, Germany**

(Address of principal executive offices)

**Steve Morris, +44-207-54-75705, steve.morris@db.com, Taunusanlage 12, 60325 Frankfurt am Main, Germany**

(Name, Telephone, E-mail and/or Facsimile number and Address of Company Contact Person)

Securities registered or to be registered pursuant to Section 12(b) of the Act

See following page

Securities registered or to be registered pursuant to Section 12(g) of the Act.

NONE

(Title of Class)

Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act.

NONE

(Title of Class)

Indicate the number of outstanding shares of each of the issuer's classes of capital or capital stock as of the close of the period covered by the annual report:

Ordinary Shares, no par value                          2,066,402,041

(as of December 31, 2017)

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.

Yes ☒          No ☐

If this report is an annual or transition report, indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934.

Yes ☐          No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

Yes ☒          No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate website, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).

Yes ☒          No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or an emerging growth company. See definition of "large accelerated filer", "accelerated filer", and emerging growth company in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☒          Accelerated filer ☐

Non-accelerated filer ☐          Emerging growth company ☐

If an emerging growth company that prepares its financial statements in accordance with U.S. GAAP, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards* provided pursuant to Section 13(a) of the Exchange Act.

*The term "new or revised financial accounting standard" refers to any update issued by the Financial Accounting Standards Board to its Accounting Standards Codification after April 5, 2012.

Indicate by check mark which basis of accounting the registrant has used to prepare the financial statements included in this filing:

U.S. GAAP ☐          International Financial Reporting Standards ☒          Other ☐

as issued by the International Accounting Standards Board

If "Other" has been checked in response to the previous question, indicate by check mark which financial statement item the registrant has elected to follow

Item 17 ☐          Item 18 ☐

If this is an annual report, indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).

Yes ☐          No ☒

(APPLICABLE ONLY TO ISSUERS INVOLVED IN BANKRUPTCY PROCEEDINGS DURING THE PAST FIVE YEARS)

Indicate by check mark whether the registrant has filed all documents and reports required to be filed by Sections 12, 13 or 15(d) of the Securities Exchange Act of 1934 subsequent to the distribution of securities under a plan confirmed by a court.

Yes ☐          No ☐

Securities registered or to be registered pursuant to Section 12(b) of the Act (as of February 28, 2018)

| Title of each class | Name of each exchange on which registered |
| --- | --- |
| Ordinary shares, no par value | New York Stock Exchange |
| 6.55 % Trust Preferred Securities of Deutsche Bank Contingent Capital Trust II | New York Stock Exchange |
| 6.55 % Company Preferred Securities of Deutsche Bank Contingent Capital LLC II* | |
| Subordinated Guarantees of Deutsche Bank AG in connection with Capital Securities* | |
| 8.05 % Trust Preferred Securities of Deutsche Bank Contingent Capital Trust V | New York Stock Exchange |
| 8.05 % Company Preferred Securities of Deutsche Bank Contingent Capital LLC V* | |
| Subordinated Guarantees of Deutsche Bank AG in connection with Capital Securities* | |
| Fixed to Fixed Reset Rate Subordinated Tier 2 Notes Due 2028 | New York Stock Exchange |
| 4.50 % Fixed Rate Subordinated Tier 2 Notes Due 2025 | New York Stock Exchange |
| DB Agriculture Short Exchange Traded Notes due April 1, 2038 | NYSE Arca |
| DB Agriculture Long Exchange Traded Notes due April 1, 2038 | NYSE Arca |
| DB Agriculture Double Short Exchange Traded Notes due April 1, 2038 | NYSE Arca |
| DB Agriculture Double Long Exchange Traded Notes due April 1, 2038 | NYSE Arca |
| DB Base Metals Short Exchange Traded Notes due June 1, 2038 | NYSE Arca |
| DB Base Metals Double Short Exchange Traded Notes due June 1, 2038 | NYSE Arca |
| DB Base Metals Double Long Exchange Traded Notes due June 1, 2038 | NYSE Arca |
| DB Commodity Short Exchange Traded Notes due April 1, 2038 | NYSE Arca |
| DB Commodity Double Long Exchange Traded Notes due April 1, 2038 | NYSE Arca |
| DB Commodity Double Short Exchange Traded Notes due April 1, 2038 | NYSE Arca |
| DB Crude Oil Short Exchange Traded Notes due June 1, 2038 | NYSE Arca |
| DB Crude Oil Long Exchange Traded Notes due June 1, 2038 | NYSE Arca |
| DB Crude Oil Double Short Exchange Traded Notes due June 1, 2038 | NYSE Arca |
| DB Gold Double Long Exchange Traded notes due February 15, 2038 | NYSE Arca |
| DB Gold Double Short Exchange Traded notes due February 15, 2038 | NYSE Arca |
| DB Gold Short Exchange Traded notes due February 15, 2038 | NYSE Arca |
| ELEMENTS "Dogs of the Dow" Linked to the Dow Jones High Yield Select 10 Total Return Index due November 14, 2022 | NYSE Arca |
| ELEMENTS Linked to the Morningstar® Wide Moat Focus(SM) Total Return Index due October 24, 2022 | NYSE Arca |
| FI Enhanced Global High Yield Exchange Traded Notes Linked to the MSCI World High Dividend Yield USD Gross Total Return Index due October 12, 2023 | NYSE Arca |

* For listing purpose only, not for trading

# Table of Contents

Table of Contents – 3
PART I – 8
Item 1: Identity of Directors, Senior Management and Advisers – 8
Item 2: Offer Statistics and Expected Timetable – 8
Item 3: Key Information – 8
    Selected Financial Data – 8
    Dividends – 10
    Exchange Rate and Currency Information – 11
    Capitalization and Indebtedness – 12
    Reasons for the Offer and Use of Proceeds – 12
    Risk Factors – 13
Item 4: Information on the Company – 41
    History and Development of the Company – 41
    Business Overview – 41
    Our Corporate Divisions – 46
    The Competitive Environment – 46
    Regulation and Supervision – 51
    Organizational Structure – 69
    Property and Equipment – 69
    Information Required by Industry Guide 3 – 69
Item 4A: Unresolved Staff Comments – 70
Item 5: Operating and Financial Review and Prospects – 70
    Overview – 70
    Significant Accounting Policies and Critical Accounting Estimates – 70
    Recently Adopted Accounting Pronouncements and New Accounting Pronouncements – 70
    Operating Results – 71
    **Results of Operations** – 72
    Financial Position – 72
    Liquidity and Capital Resources – 72
    Post-Employment Benefit Plans – 72
    Off-Balance Sheet Arrangements – 72
    Tabular Disclosure of Contractual Obligations – 72
    Research and Development, Patents and Licenses – 72
Item 6: Directors, Senior Management and Employees – 73
    Directors and Senior Management – 73
    Board Practices of the Management Board – 75
    Compensation – 76
    Employees – 76
    Share Ownership – 76
Item 7: Major Shareholders and Related Party Transactions – 77
    Major Shareholders – 77
    Related Party Transactions – 77
    Interests of Experts and Counsel – 78
Item 8: Financial Information – 79
    Consolidated Statements and Other Financial Information – 79
    Significant Changes – 82
Item 9: The Offer and Listing – 83
    Offer and Listing Details and Markets – 83
    Plan of Distribution – 83
    Selling Shareholders – 83
    Dilution – 84
    Expenses of the Issue – 84
Item 10: Additional Information – 84
    Share Capital – 84
    Memorandum and Articles of Association – 84
    Notification Requirements – 87
    Material Contracts – 90
    Exchange Controls – 91
    Taxation – 91
    Dividends and Paying Agents – 94
    Statement by Experts – 94
    Documents on Display – 94

Subsidiary Information – 94
Item 11: Quantitative and Qualitative Disclosures about Credit, Market and Other Risk – 94
Item 12: Description of Securities other than Equity Securities – 94
PART II – 95
Item 13: Defaults, Dividend Arrearages and Delinquencies – 95
Item 14: Material Modifications to the Rights of Security Holders and Use of Proceeds – 95
Item 15: Controls and Procedures – 96
Disclosure Controls and Procedures – 96
Management's Annual Report on Internal Control over Financial Reporting – 96
Report of Independent Registered Public Accounting Firm – 96
Change in Internal Control over Financial Reporting – 97
Item 16A: Audit Committee Financial Expert – 98
Item 16B: Code of Ethics – 98
Item 16C: Principal Accountant Fees and Services – 98
Item 16D: Exemptions from the Listing Standards for Audit Committees – 98
Item 16E: Purchases of Equity Securities by the Issuer and Affiliated Purchasers – 98
Item 16F: Change in Registrant's Certifying Accountant – 99
Item 16G: Corporate Governance – 100
Item 16H: Mine Safety Disclosure – 102
Disclosures Under Iran Threat Reduction and Syria Human Rights Act of 2012 – 102
PART III – 105
Item 17: Financial Statements – 105
Item 18: Financial Statements – 105
Item 19: Exhibits – 105
Signatures – 106
Financial Report – 107
Supplemental Financial Information (Unaudited) – S-1

# PAGES 5-12 OMITTED PURSUANT TO D. N.J. ECF POLICIES AND PROCEDURES

# Risk Factors

An investment in our securities involves a number of risks. You should carefully consider the following information about the risks we face, together with other information in this document, when you make investment decisions involving our securities. If one or more of these risks were to materialize, it could have a material adverse effect on our financial condition, results of operations, cash flows or prices of our securities.

While the global economy was strong in 2017 as monetary policy remained generally accommodative, political risks, especially in Europe, did not materialize and election outcomes were broadly market-friendly, significant macroeconomic risks remain that could negatively affect the results of operations and financial condition in some of our businesses as well as our strategic plans. These include the possibility of an early recession in the United States, inflation risks, global imbalances, Brexit, the rise of Euroscepticism, and geopolitical risks, as well as the continuing low interest rate environment and competition in the financial services industry, which have compressed margins in many of our businesses. If these conditions persist or worsen, our business, results of operations or strategic plans could continue to be adversely affected.

The global economy was surprisingly strong in 2017 as monetary policy remained accommodative, despite the gradual tightening in the United States. Political risks, especially in Europe, did not materialize and election outcomes were broadly market-friendly. Against this backdrop, global economic growth increased to 3.8 % in 2017, following 3.2 % in 2016. This is the strongest economic expansion since 2011. Despite the higher growth momentum the global inflation rate remained at 2.9 %, as in 2016. GDP in industrialized countries grew by 2.2 % and consumer prices rose by 1.7 % while in emerging markets economies GDP increased by 4.8 % and inflation by 3.9 %.

The economic outlook for the euro area improved markedly. The Eurozone economy expanded by 2.5 %, roughly one percentage point above expectations at the start of the year. The economy gained momentum on the back of supportive fiscal and monetary policy. While monetary policy remains expansive, the European Central Bank (ECB) scaled back its asset purchases to € 60 billion per month from April until December 2017. Consumer prices rose by 1.5 %. The German economy also surprised to the upside with a GDP growth of 2.2 % in 2017, almost solely driven by the domestic economy. As a result, Germany's current account surplus decreased.

The United States economy performed close to expectations and expanded by 2.3 % in 2017. Investment spending became a major driver as corporate sentiment has picked up strongly, probably in anticipation of the tax reform legislation that was enacted at the end of the year. The key driver of the U.S. economy remained consumer spending backed by a well-functioning labor market. In 2017 fears of a persistent low inflation scenario have started to ease. The inflation rate was at 2.1 % -- slightly above target. The Federal Reserve's monetary policy responded with three interest rate hikes in 2017. The Federal Reserve also started to cut back the reinvestment of bonds held on its balance sheets.

The Japanese economy showed a balanced growth mix with both the domestic and external sector contributing to the GDP growth of 1.8 % in 2017. The external sector benefitted from the depreciation of the yen and the higher momentum of global trade. The strong export performance also boosted capital expenditures. As the inflation rate continues to hover around zero, the Bank of Japan was not under pressure to act.

In 2017 GDP growth in the emerging markets increased by 4.9 %. With GDP growth of 6.1 %, the emerging markets in Asia were once again the global driving force, as intra-Asian trade was strengthened. The Chinese economy expanded by 6.9 %, slightly higher than expected. Official Chinese inflation was well under control with 1.6 %. Risks from the overvalued real estate sector did not materialize.

The heat-map of global risks has changed little from 2017. An early recession in the United States due to changes in the structure of the yield curve, the Italian parliamentary elections in March as Eurosceptic parties remain popular, populist movements in Europe as well as geopolitical risks, particularly with respect to the Middle East and North Korea, could potentially have substantial adverse effects. While higher economic momentum may work as a shock absorber, the impact on the economy and financial markets may nevertheless be severe if any of these materialize in 2018. Notably, inflation risks, not an issue for several years, have resurfaced and as a key economic risk. A faster than expected pick-up in inflation could surprise markets and lead to a sharp reset of central bank rate rise expectations, which could be disruptive for risk assets – akin to 2013's "taper tantrum". Another risk is slowing growth in China, as we expect a deleveraging process to cool down the housing market. Authorities seem to have gotten more comfortable with slightly slower growth, and central banks are tightening monetary policy. We expect some policy easing in mid-2018 to support growth, but this option may be off the table if inflation is high, in which case the economy could then slow and could weigh on global growth.

Although economic data appear to have improved during the course of 2017 in many of the countries in which we operate, our business, financial results and strategic plans continue to be negatively impacted by the continued low interest rate environment, uneven and tepid economic growth, especially in our home markets in Europe, and elevated political uncertainty. Recent political events, including the notification by the UK of its withdrawal from European Union ("EU") membership ("Brexit"), and the rather unpractical political climate in the U.S. following the November 2016 presidential election, continue to contribute to considerable uncertainty concerning the current and future economic environment. Global economic growth also continues to be reliant on the supportive monetary policy stance of the major central banks, and could be harmed substantially if the current trend towards tightening overshoots the mark.

Our results of operation and financial condition, in particular those of our Corporate & Investment Bank corporate division, continue to be negatively impacted by the challenging market environment, uncertain macro-economic and geopolitical conditions, lower levels of client activity, increased competition and regulation, and the immediate impacts resulting from our strategic decisions as we continue to work on the implementation of our strategy. If we are unable to improve our profitability as we continue to face these headwinds as well as persistently high litigation costs, we may be unable to meet many of our strategic aspirations, and may have difficulty maintaining capital, liquidity and leverage at levels expected by market participants and our regulators.

In 2017, our revenues declined in each of our corporate divisions, reflecting the negative impact of a challenging market environment characterized by low interest rates and low volatility, uncertain macro-economic and geopolitical conditions, lower levels of client activity and increased competition and regulation. The implementation of some of the strategic measures towards our financial targets also continued to negatively impact our revenues. The ultra-low interest rate environment, especially in the eurozone, has put pressure on our margins in our traditional banking business and our trading and markets businesses, and the low volatility in the market has had a negative impact on our trading and client-driven businesses that perform well in more volatile environments. These conditions have impacted our fixed income franchise, as well as our Equities franchise, where results have not matched those of many of our international peers.

Changes in our business mix towards lower-margin, lower-risk products can limit our opportunities to profit from volatility. Regulators have generally encouraged the banking sector to focus more on the facilitation of client flow and less on risk taking. This has been effected in part by increasing capital requirements for higher-risk activities. In addition, some of our regulators have encouraged or welcomed changes to our business perimeter, consistent with their emphasis on lower-risk activities for banks. Our strategy provides for us to reduce our exposures in a number of businesses that focused on riskier but more capital-intensive products (but that in earlier periods also had the potential to be more highly profitable than those dependent on low-risk, low-margin flow in a very low interest rate environment). Further pressure on our revenues and profitability has resulted from long-term structural trends driven by regulation (especially increased regulatory capital, leverage and liquidity requirements and increased compliance costs) and competition that have further compressed our margins in many of our businesses. Should a combination of these factors continue to lead to reduced margins and subdued activity levels in our trading and markets business over the longer term, this could reflect structural challenges that may lead us to consider even further-reaching changes to aspects of our business mix than those contained in our financial targets.

Against this backdrop, we expect the costs to us arising from the resolution of litigation, enforcement and similar matters pending against us to continue to be significant in the near to medium term (although they vary considerably from period to period) and to adversely affect our business, financial condition and results of operations. In particular, these costs could substantially exceed the level of provisions that we established for our litigation, enforcement and similar matters, which can contribute to negative market perceptions about our financial health, costing us business. This, combined with the actual costs of litigation, enforcement and other matters, could in turn adversely affect our ability to maintain capital, liquidity and leverage at levels expected by market participants and our regulators. In particular, we suffered, at the end of the third quarter and beginning of the fourth quarter of 2016, some reduction in business volumes and outflows of funds, particularly in some parts of our Corporate & Investment Bank business and of our Wealth Management business, as a result of speculation about the potential magnitude of a settlement of civil claims then being negotiated with the U.S. Department of Justice ("DOJ") in connection with our issuance and underwriting of residential mortgage-backed securities. Although these negative effects on our business have abated since then and in some cases have reversed, future market speculation about potential settlement demands with respect to litigation and enforcement matters could have persistent adverse effects on our revenue levels. Negative news about us, including our reporting of lower revenues, can also harm perceptions of us in the market and lead to further pressure on revenues. These factors have placed pressure on the markets for our securities, along with concerns regarding our ability to overcome the numerous headwinds facing us. As a result of the substantial uncertainties with respect to the potential outflows in respect of litigation and enforcement matters as well as the broader prospects for our business, we may find it necessary or desirable to raise additional capital in the future to maintain our capital, liquidity and leverage at levels required by our regulators or viewed by market participants as necessary for our businesses in comparison with our international peers, which would result in dilution to our current shareholders.

**Continued elevated levels of political uncertainty could have unpredictable consequences for the financial system and the greater economy, and could contribute to an unwinding of aspects of European integration, potentially leading to declines in business levels, write-downs of assets and losses across our businesses. Our ability to protect ourselves against these risks is limited.**

The last several years have been characterized by increased political uncertainty as Europe in particular has been impacted by the European sovereign debt crisis, the outcomes of the referenda in the UK on EU membership and in Italy on constitutional reform, the refugee crisis and the increasing attractiveness to voters of populist and anti-austerity movements. Although the severity of the European debt crisis appeared to have abated somewhat over recent years as the actions by the ECB, the rescue packages and the economic recovery appeared to have stabilized the situation in Europe, political uncertainty has nevertheless continued to be at an elevated level in recent periods and could trigger the unwinding of aspects of European integration that have benefitted our businesses. Against this backdrop, the prospects for national structural reform and further integration among EU member states, both viewed as important tools to reduce the eurozone's vulnerabilities to future crises, appear to have worsened. These trends may ultimately result in material reductions in our business levels as our customers rein in activity levels in light of decreased economic output and increased uncertainty, which would materially adversely affect our operating results and financial condition.

An escalation of political risks could have unpredictable consequences both for the financial system and the greater economy as a whole, potentially leading to declines in business levels, write-downs of assets and losses across our businesses. In particular, the UK voted on June 23, 2016 in a non-binding national referendum to withdraw from the EU ("Brexit"). Following an act of Parliament adopted in early 2017, on March 29, 2017, the UK formally gave notice of its withdrawal from the EU to the European Council. Pursuant to the Treaty of the European Union, withdrawal would be effective on the date of entry into force of a withdrawal agreement that remains to be negotiated or, failing that, two years after the withdrawal notification unless the EU Council and UK agree to extend the two-year period. Following the notice of withdrawal, potentially tense and highly uncertain negotiations regarding the UK's exit from the EU commenced. Given these and other uncertainties in connection with the UK's withdrawal from the EU, it is difficult to determine the exact impact on us over the long term. We are also unable to determine with any precision the impact of Brexit on our current UK structure or business model in the short term, as there remains no clarity into the details or timing of the changes. However, the UK's economy and those of the eurozone countries are very tightly linked as a result of EU integration projects other than the euro, and the scale of our businesses in the UK – especially those dependent on activity levels in the City of London, to which we are heavily exposed and which may deteriorate as a result of Brexit – means that even modest effects in percentage terms can have a very substantial adverse effect on our businesses. In addition, in a number of EU member states which had national elections in 2017, including France, Germany and the Netherlands, political parties disfavoring current levels of European integration, or espousing the unwinding of European integration to varying extents, have attracted support. The Brexit vote has also given a voice to some of these political parties to challenge European integration. The resulting uncertainty could have significant effects on the value of the euro and on prospects for member states' financial stability, which in turn could potentially lead to a significant deterioration of the sovereign debt market, especially if Brexit or any other member country's exit did not result in the catastrophic effects on the exiting country that many have predicted. If one or more members of the eurozone defaults on their debt obligations or decides to leave the common currency, this would result in the reintroduction of one or more national currencies. Should a eurozone country conclude it must exit the common currency, the resulting need to reintroduce a national currency and restate existing contractual obligations could have unpredictable financial, legal, political and social consequences, leading not only to significant losses on sovereign debt but also on private debt in that country. Given the highly interconnected nature of the financial system within the eurozone, and the high levels of exposure we have to public and private counterparties around Europe, our ability to plan for such a contingency in a manner that would reduce our exposure to non-material levels is likely to be limited. If the overall economic climate deteriorates as a result of one or more departures from the eurozone, our businesses could be adversely affected, and, if overall business levels decline or we are forced to write down significant exposures among our various businesses, we could incur substantial losses.

**We may be required to take impairments on our exposures to the sovereign debt of European or other countries if the European sovereign debt crisis reignites. The credit default swaps into which we have entered to manage sovereign credit risk may not be available to offset these losses.**

The effects of the sovereign debt crisis have been especially evident in the financial sector, as a large portion of the sovereign debt of eurozone countries is held by European financial institutions, including us. As of December 31, 2017, we had a direct sovereign credit risk exposure of € 2.8 billion to Italy, € 1.7 billion to Spain, € 709 million to Ireland and € 55 million to Greece. Despite the apparent abatement of the crisis in recent years, it remains uncertain whether, in light of the current political envi-ronment, Greece or other eurozone sovereigns, such as Spain, Italy, Portugal and Cyprus, will be able to manage their debt levels in the future and whether Greece will attempt to renegotiate its past international debt restructuring. The rise of anti-austerity parties and populist sentiment in many of these countries poses a threat to the medium- to long-term measures rec-ommended for these countries to alleviate the tensions in the eurozone caused by drastically differing economic situations among the eurozone states. In the future, negotiations or exchanges similar to the Greek debt restructuring in 2012 could take place with respect to the sovereign debt of these or other affected countries. The outcome of any negotiations regarding changed terms (including reduced principal amounts or extended maturities) of sovereign debt may result in additional impair-ments of assets on our balance sheet. Any negotiations are highly likely to be subject to political and economic pressures that we cannot control, and we are unable to predict their effects on the financial markets, on the greater economy or on ourselves.

In addition, any restructuring of outstanding sovereign debt may result in potential losses for us and other market participants that are not covered by payouts on hedging instruments that we have entered into to protect against the risk of default. These instruments largely consist of credit default swaps, generally referred to as CDSs, pursuant to which one party agrees to make a payment to another party if a credit event (such as a default) occurs on the identified underlying debt obligation. A sovereign restructuring that avoids a credit event through voluntary write-downs of value may not trigger the provisions in CDSs we have entered into, meaning that our exposures in the event of a write-down could exceed the exposures we previously viewed as our net exposure after hedging. Additionally, even if the CDS provisions are triggered, the amounts ultimately paid under the CDSs may not correspond to the full amount of any loss we incur. We also face the risk that our hedging counterparties have not effectively hedged their own exposures and may be unable to provide the necessary liquidity if payments under the instruments they have written are triggered. This may result in systemic risk for the European banking sector as a whole and may negatively affect our business and financial position.

**Our liquidity, business activities and profitability may be adversely affected by an inability to access the debt capital mar-kets or to sell assets during periods of market-wide or firm-specific liquidity constraints. Credit rating downgrades have contributed to an increase in our funding costs, and any future downgrade could materially adversely affect our funding costs, the willingness of counterparties to continue to do business with us and significant aspects of our business model.**

We have a continuous demand for liquidity to fund our business activities. Our liquidity may be impaired by an inability to ac-cess secured and/or unsecured debt markets, an inability to access funds from our subsidiaries or otherwise allocate liquidity optimally across our businesses, an inability to sell assets or redeem our investments, or unforeseen outflows of cash or collat-eral. This situation may arise due to circumstances unrelated to our businesses and outside our control, such as disruptions in the financial markets, or circumstances specific to us, such as reluctance of our counterparties or the market to finance our operations due to perceptions about potential outflows resulting from litigation, regulatory and similar matters, actual or per-ceived weaknesses in our businesses, our business model or our strategy, as well as in our resilience to counter negative economic and market conditions. For example, we have experienced steep declines in the price of our shares and increases in the spread versus government bonds at which our debt trades in the secondary markets. Reflecting these conditions, our inter-nal estimates of our available liquidity over the duration of a stressed scenario have at times been negatively impacted in recent periods. Such effects were particularly acute in the autumn of 2016 in response to market speculation about the potential mag-nitude of a settlement of civil claims then being negotiated with the DOJ in connection with our issuance and underwriting of residential mortgage-backed securities. In addition, negative developments concerning other financial institutions perceived to be comparable to us and negative views about the financial services industry in general have also affected us in recent years. These perceptions have affected the prices at which we have accessed the capital markets to obtain the necessary funding to support our business activities; should these perceptions exist, continue or worsen, our ability to obtain this financing on ac-ceptable terms may be adversely affected. Among other things, an inability to refinance assets on our balance sheet or main-tain appropriate levels of capital to protect against deteriorations in their value could force us to liquidate assets we hold at depressed prices or on unfavorable terms, and could also force us to curtail business, such as the extension of new credit. This could have an adverse effect on our business, financial condition and results of operations.

In addition, we have benefited in recent years from a number of incremental measures by the ECB and other central banks to provide additional liquidity to financial institutions and the financial markets, particularly in the eurozone. To the extent these actions are curtailed or halted, our funding costs could increase, or our funding supply could decrease, which could in turn result in a reduction in our business activities. In particular, any decision by the ECB to discontinue or reduce quantitative easing or further steps by the Federal Reserve to tighten its monetary policy or actions by central banks more generally to tighten their monetary policy will likely cause long-term interest rates to increase and accordingly impact the costs of our funding.

Since the start of the global financial crisis, the major credit rating agencies have lowered our credit ratings or placed them on review or negative watch on multiple occasions. These credit rating downgrades have contributed to an increase in our funding costs, and any future downgrade could materially affect our funding costs, although we are unable to predict whether this would be the case or the extent of any such effect. The effect would depend on a number of factors including whether a downgrade affects financial institutions across the industry or on a regional basis, or is intended to reflect circumstances specific to us, such as our potential settlement of regulatory, litigation and similar matters; any actions our senior management may take in advance of or in response to the downgrade; the willingness of counterparties to continue to do business with us; any impact of other market events and the state of the macroeconomic environment more generally. In particular, should any of the major credit rating agencies lower our credit rating to a level considered sub-investment grade, significant aspects of our business model would be materially and adversely affected.

Additionally, under many of the contracts governing derivative instruments to which we are a party, a downgrade could require us to post additional collateral, lead to terminations of contracts with accompanying payment obligations for us or give counterparties additional remedies. We take these effects into account in our liquidity stress testing analysis, as further described in "Management Report: Risk Report: Liquidity Risk: Stress Testing and Scenario Analysis" in the Annual Report 2017.

**Regulatory reforms enacted and proposed in response to weaknesses in the financial sector, together with increased regulatory scrutiny more generally, have created significant uncertainty for us and may adversely affect our business and ability to execute our strategic plans, and competent regulators may prohibit us from making dividend payments or payments on our regulatory capital instruments or take other actions if we fail to comply with regulatory requirements.**
In response to the global financial crisis and the European sovereign debt crisis, governments, regulatory authorities and others have made and continue to make proposals to reform the regulatory framework for the financial services industry to enhance its resilience against future crises. Legislation has been enacted and regulations have been issued in response to many of these proposals, while others continue to be developed. The regulatory framework for financial institutions is likely to undergo further significant change. This creates significant uncertainty for us and the financial industry in general. The wide range of new laws and regulations or current proposals includes, among other things:

– provisions for more stringent regulatory capital, leverage and liquidity standards,
– restrictions on compensation practices,
– restrictions on proprietary trading and other investment activities,
– special bank levies and financial transaction taxes,
– recovery and resolution powers to intervene in a crisis including "bail-in" of creditors,
– large exposure limits,
– the creation of a single supervisory authority and a single resolution authority within the eurozone and any other participating member states,
– separation of certain businesses from deposit taking,
– stress testing and capital planning regimes,
– heightened reporting requirements, and
– reforms of derivatives, other financial instruments, investment products and market infrastructures.

In addition, regulatory scrutiny of compliance with existing laws and regulations has become more intense and supervisory expectations remain significant. The specific effects of a number of new laws and regulations remain uncertain because the drafting and implementation of these laws and regulations are still on-going and supervisory expectations continue to develop.

As a core element of the reform of the regulatory framework, in December 2010, the Basel Committee on Banking Supervision ("Basel Committee") published a set of comprehensive changes to minimum capital adequacy and liquidity standards, known as Basel 3, which have been implemented into European and national (in our case, German) law beginning in 2014, with the European legislative package also referred to as "CRR/CRD 4". In November 2016, the European Commission proposed a package (commonly referred to as "CRR 2" and "CRD 5", and referred to herein as the "November 2016 Package") of legislative reforms implementing various remaining elements of the regulatory framework agreed within the Basel Committee and the Financial Stability Board ("FSB") to refine and supplement the Basel 3 framework/CRR/CRD 4 legislative package. The November 2016 Package includes more risk-sensitive capital requirements, in particular in the area of market risk, counterparty credit risk and for exposures to central counterparties, methodologies that reflect more accurately the actual risks to which banks may be exposed, a binding leverage ratio of 3 % of Tier 1 capital, a binding net stable funding ratio ("NSFR"), tighter regulation of large exposures, and the implementation of the FSB's standard on total loss-absorbing capacity ("TLAC"). It is expected that most of the proposed amendments will start being applied at the end of 2020 at the earliest, save for the TLAC requirements, which are expected to apply from January 2019.

Furthermore, in December 2017 the Basel Committee published its final agreement ("December 2017 Agreement") on revisions to the Basel 3 framework that aim to increase consistency in risk-weighted asset calculations and improve the comparability of banks' capital ratios. The December 2017 Agreement includes, among other things, changes to the standardized and internal ratings-based approaches for determining credit risk, revisions to the operational risk framework, and an "output floor", set at 72.5 %. The "output floor" limits the amount of capital benefit a bank can obtain from its use of internal models relative to using the standardized approach. This package of reforms is intended to finalize the Basel 3 framework and would reduce the ability of banks to apply internal models, while making the standardized approaches more risk-sensitive and granular. In addition, the December 2017 Agreement introduces a leverage ratio buffer for global systemically important banks ("G-SIBs"), such as Deutsche Bank, to be met with Tier 1 capital and set at 50 % of the applicable risk-based G-SIB buffer requirement. The Basel Committee also reached agreement on an implementation date of this package of January 1, 2022, with a phase-in period of five years through January 1, 2027 for the output floor. The December 2017 Agreement also extends the implementation date for the final market risk framework resulting from the Basel Committee's "Fundamental Review of the Trading Book" to January 1, 2022.

The changes proposed by the November 2016 Package and the December 2017 Agreement must be implemented by the European Union and Germany, as the case may be, in order to become effective and binding on us. If implemented in their current form, the November 2016 Package and the December 2017 Agreement could lead to a significant increase of our risk-weighted assets and, as a result, a higher capital requirement, changes in our deductions from our regulatory capital and the imposition of additional capital charges. These requirements may be in addition to regulatory capital buffers that may also be increased or be in addition to those already imposed on us and could themselves materially increase our capital requirements.

Regulatory authorities have substantial discretion in how to regulate banks, and this discretion, and the means available to the regulators, have been steadily increasing during recent years. Regulation may be imposed on an ad hoc basis by governments and regulators in response to ongoing or future crises, and may especially affect financial institutions such as Deutsche Bank that are deemed to be systemically important.

In particular, the regulators with jurisdiction over us, including the ECB under the Single Supervisory Mechanism (also referred to as the "SSM"), may, in connection with the supervisory review and evaluation process ("SREP") or otherwise, conduct stress tests and have discretion to impose capital surcharges on financial institutions for risks, including for litigation, regulatory and similar matters, that are not otherwise recognized in risk-weighted assets or other surcharges depending on the individual situation of the bank and take or require other measures, such as restrictions on or changes to our business. In this context, the ECB may impose on us individual capital requirements resulting from the SREP which are referred to as "Pillar 2" requirements. "Pillar 2" requirements must be fulfilled with Common Equity Tier 1 capital in addition to the statutory minimum capital and buffer requirements and any non-compliance may have immediate legal consequences such as restrictions on dividend payments. Also following the SREP, the ECB may communicate to individual banks an expectation to hold a further "Pillar 2" Common Equity Tier 1 capital add-on, the so-called "Pillar 2" guidance. Although the "Pillar 2" guidance is not legally binding and failure to meet the "Pillar 2" guidance does not automatically trigger legal action, the ECB has stated that it expects banks to meet the "Pillar 2" guidance. Also, more generally, competent regulators may, if we fail to comply with regulatory requirements, in particular with statutory minimum capital requirements, "Pillar 2" requirements or buffer requirements, or if there are shortcomings in our governance and risk management processes, prohibit us from making dividend payments to shareholders or distributions to holders of our other regulatory capital instruments. This could occur, for example, if we fail to make sufficient profits due to declining revenues, or as a result of substantial outflows due to litigation, regulatory and similar matters. Generally, a failure to comply with the new quantitative and qualitative regulatory requirements could have a material adverse effect on our business, financial condition and results of operations, including our ability to pay out dividends to shareholders or distributions on our other regulatory capital instruments or, in certain circumstances, conduct business which we currently conduct or plan to conduct in the future.

**European and German legislation regarding the recovery and resolution of banks and investment firms could, if steps were taken to ensure our resolvability or resolution measures were imposed on us, significantly affect our business operations, and lead to losses for our shareholders and creditors.**

Germany participates in the Single Resolution Mechanism (referred to as the "SRM"), which centralizes at a European level the key competences and resources for managing the failure of any bank in member states of the European Union participating in the banking union. The SRM is based on the SRM Regulation and the Bank Recovery and Resolution Directive (or "BRRD"), which was implemented in Germany through the German Recovery and Resolution Act (Sanierungs- und Abwicklungsgesetz, "SAG"). In addition, the German Resolution Mechanism Act (Abwicklungsmechanismusgesetz) adapted German bank resolution laws to the SRM.

The SRM Regulation and the German Recovery and Resolution Act require the preparation of recovery and resolution plans for banks and grant broad powers to public authorities to intervene in a bank which is failing or likely to fail. For a bank directly supervised by the ECB, such as Deutsche Bank, the Single Resolution Board (referred to as the "SRB") assesses its resolvability and may require legal and operational changes to the bank's structure to ensure its resolvability. In the event that such bank is failing or likely to fail and certain other conditions are met, the SRB is responsible for adopting a resolution scheme for resolving the bank pursuant to the SRM Regulation. The European Commission and, to a lesser extent, the Council of the European Union, have a role in endorsing or objecting to the resolution scheme proposed by the SRB. The resolution scheme would be addressed to and implemented by the competent national resolution authorities (in Germany, since 2018, the German Federal Financial Supervisory Authority (Bundesanstalt für Finanzdienstleistungsaufsicht, "BaFin")) in line with the national laws implementing the BRRD. Resolution measures that could be imposed upon a failing bank may include a range of measures including the transfer of shares, assets or liabilities of the bank to another legal entity, the reduction, including to zero, of the nominal value of shares, the dilution of shareholders of a failing bank or the cancellation of shares outright, or the amendment, modification or variation of the terms of the bank's outstanding debt instruments, for example by way of a deferral of payments or a reduction of the applicable interest rate. Furthermore, certain eligible unsecured liabilities, in particular certain senior unsecured debt instruments specified by the German Banking Act, as amended by the German Resolution Mechanism Act, may be written down, including to zero, or converted into equity (commonly referred to as "bail-in") after the bank's regulatory capital has been exhausted.

In order to facilitate the authorities' bail-in powers, which became effective in Germany on January 1, 2015, banks are required to include in their eligible liabilities issued under non-EU law conditions to the effect that the respective counterparties recognize the regulatory powers to write down or convert such liabilities as well as other resolution powers. The SRM Regulation, the BRRD and the Recovery and Resolution Act are intended to eliminate, or reduce, the need for public support of troubled banks. Therefore, financial public support for such banks, if any, would be used only as a last resort after having assessed and exploited, to the maximum extent practicable, the resolution powers, including a bail-in. The taking of actions to ensure our resolvability or the exercise of resolution powers by the competent resolution authority could materially affect our business operations and lead to a significant dilution of our shareholders or even the total loss of our shareholders' or creditors' investment.

**Regulatory and legislative changes require us to maintain increased capital, in some cases (including in the United States) applying liquidity, risk management, capital adequacy and resolution planning rules to our local operations on a standalone basis. These requirements may significantly affect our business model, financial condition and results of operations as well as the competitive environment generally. Any perceptions in the market that we may be unable to meet our capital or liquidity requirements with an adequate buffer, or that we should maintain capital or liquidity in excess of these requirements or another failure to meet these requirements could intensify the effect of these factors on our business and results.**

The implementation of the CRR/CRD 4 legislative package resulted, among other things, in increased capital and tightened liquidity requirements, including additional capital buffer requirements which are being gradually phased into through January 1, 2019, and it also contained rules preparing the introduction of a binding non-risk based leverage ratio. Similarly, the U.S. federal bank regulators in 2013 issued final rules implementing elements of the Basel 3 capital adequacy framework that are applicable to U.S. banking organizations, such as DB USA Corporation. Further revisions, such as stricter rules on the measurement of risks and the changes proposed by the November 2016 Package and the December 2017 Agreement, could further increase risk-weighted assets and the corresponding capital demand for banks, as well as further tighten liquidity requirements.

Furthermore, under the SRM Regulation, the BRRD and the German Recovery and Resolution Act, banks in the European Union are required to meet at all times a robust minimum requirement for own funds and eligible liabilities ("MREL") which is determined on a case-by-case basis by the competent resolution authority. In addition, on November 9, 2015, the Financial Stability Board ("FSB") published a new standard applicable to all G-SIBs (and not only European G-SIBs), such as Deutsche Bank, that will require, when transposed as law, G-SIBs to meet a new firm-specific minimum requirement for total loss-absorbing capacity ("TLAC") starting from January 2019. Also in order to facilitate the meeting of TLAC requirements by German banks, obligations of German banks under certain, specifically defined senior unsecured debt instruments issued by them (such as bonds that are not structured debt instruments) rank, since 2017, junior to all other outstanding unsecured unsubordinated obligations of such bank (such as deposits, derivatives, money market instruments and certain structured debt instruments), but continue to rank in priority to contractually subordinated debt instruments (such as Tier 2 instruments). Both the TLAC and MREL requirements are specifically designed to require banks to maintain a sufficient amount of instruments which are eligible to absorb losses in resolution with the aim of ensuring that failing banks can be resolved without recourse to taxpayers' money.

As part of the November 2016 Package, the European Commission published a proposal to implement the FSB's TLAC standard in the European Union and align it with MREL and also harmonize national rules on the priority of claims of banks' creditors in the European Union. This review comes as part of a broader review of the CRR/CRD 4 rules incorporating changes to the market risk framework, liquidity framework and leverage ratio calculation, amongst others. These rules are now subject to the EU co-decision process and will likely be subject to change over the coming months. As regards the harmonization of the national rules on the priority of claims, on December 27, 2017, the European Union published a directive amending the BRRD. The BRRD amendment will allow banks to issue "senior non-preferred" debt instruments ranking according to their terms (and not only statutorily) junior to the bank's other unsubordinated debt instruments (including bonds that are not treated as "senior non-preferred" debt instruments), but in priority to the bank's contractually subordinated liabilities (such as Tier 2 instruments). Any such "senior non-preferred" debt instruments issued by Deutsche Bank AG under the new rules are expected to rank pari passu with its then outstanding "senior non-preferred" debt instruments under the current rules. The BRRD amendment is required to be implemented into German law by December 29, 2018.

In the United States, on December 15, 2016, the Federal Reserve Board adopted final rules that implement the FSB's TLAC standard in the United States. The final rules, which apply beginning in 2019, require, among other things, the U.S. intermediate holding companies ("IHCs") of non-U.S. G-SIBs, including our IHC, DB USA Corporation, to maintain a minimum amount of TLAC, and separately require them to maintain a minimum amount of long-term debt meeting certain requirements.

While the final impact of the MREL and TLAC requirements will depend on their final implementation, the need to comply with such requirements may affect our business, financial condition and results of operation and in particular may increase our financing costs.

We may not have sufficient capital or other loss-absorbing liabilities to meet these increasing regulatory requirements. This could occur due to regulatory changes and other factors, such as the gradual phase out of our hybrid capital instruments qualifying as Additional Tier 1 (or AT1) capital or our inability to issue new securities which are recognized as regulatory capital or loss-absorbing liabilities under the new standards, due to an increase of risk-weighted assets based on more stringent rules for the measurement of risks or as a result of a future decline in the value of the euro as compared to other currencies, due to stricter requirements for the compliance with the non-risk based leverage ratio, due to any substantial losses we may incur, which would reduce our retained earnings, a component of Common Equity Tier 1 capital, or due to a combination of these or other factors.

If we are unable to maintain sufficient capital to meet the statutory minimum capital requirements, the buffer requirements or any specific "Pillar 2" capital requirements imposed on us by the ECB or capital ratios expected by the market, we may become subject to enforcement actions and/or restrictions on the pay-out of dividends, share buybacks, payments on our other regulatory capital instruments, and discretionary compensation payments. In addition, any requirement to increase risk-based capital ratios or the leverage ratio could lead us to adopt a strategy focusing on capital preservation and creation over revenue generation and profit growth, including the reduction of higher margin risk-weighted assets. If we are unable to increase our capital ratios to the regulatory minimum in such a case or by raising new capital through the capital markets, through the reduction of risk-weighted assets or through other means, we may be required to activate our group recovery plan. If these actions or other private or supervisory actions do not restore capital ratios to the levels required under the CRR/CRD 4 legislative package, and we are failing or likely to fail, competent authorities may apply resolution powers under the SRM Regulation, the German Recovery and Resolution Act and other applicable rules and regulations, which could lead to a significant dilution of our shareholders' or even the total loss of our shareholders' or creditors' investment.

Moreover, we are required to hold and calculate capital and to comply with rules on liquidity and risk management separately for our local operations in different jurisdictions. In the United States, the Federal Reserve Board has adopted rules that impose enhanced prudential standards on our U.S. operations. In February 2014, the Federal Reserve Board adopted U.S. prudential reforms (the "FBO Rules") applicable to foreign banking organizations ("FBOs"). FBOs with U.S.\$ 50 billion or more in U.S. non-branch assets, such as Deutsche Bank, were required to establish or designate a separately capitalized top-tier U.S. IHC to hold substantially all of the FBO's ownership interests in U.S. subsidiaries by July 1, 2016. On July 1, 2016, we designated DB USA Corporation as our IHC and, as of that date, DB USA Corporation became subject, on a sub-consolidated basis, to the capital requirements under the U.S. Basel 3 capital framework, capital planning and stress testing requirements (on a phased-in basis), U.S. liquidity buffer requirements and other enhanced prudential standards comparable to those applicable to top-tier U.S. bank holding companies of a similar size. Certain of these requirements also apply to our New York branch. U.S. leverage ratio and supplementary leverage ratio requirements applicable to DB USA Corporation as an IHC took effect beginning in January 2018. The Federal Reserve Board has the authority to examine an IHC, including DB USA Corporation, and any of its subsidiaries, and the U.S. branches and agencies of an FBO, including our New York branch.

In September 2014, the Federal Reserve Board and other U.S. regulators approved a final rule implementing liquidity coverage ratio ("LCR") requirements for large U.S. banking holding companies and certain of their subsidiary depositary institutions that are generally consistent with the Basel Committee's revised Basel 3 liquidity standards. DB USA Corporation and our principal U.S. bank subsidiary Deutsche Bank Trust Company Americas ("DBTCA") became subject to the full LCR on April 1, 2017.

On June 1, 2016, the Federal Reserve Board and other U.S. regulators proposed rules implementing the second element of the Basel 3 liquidity framework, the net stable funding ratio ("NSFR"), which measures whether an institution maintains sufficiently stable amounts of longer-term funding. Under the proposed rules, DB USA Corporation and DBTCA would be subject to the full NSFR, but this proposal has yet to be finalized and is not yet in effect.

Our combined U.S. operations, including our New York branch, are expected to become subject to additional quantitative requirements related to liquidity and risk management.

DB USA Corporation is subject to enhanced prudential standards applicable to large U.S. bank holding companies, including the requirement to submit a capital plan detailing proposed capital distributions and showing how, under stressed economic conditions, it would still meet or exceed its minimum regulatory requirements. DB USA Corporation provided its first capital plan submission to the Federal Reserve Board in April 2017; however, the results of its first submission were not made public by the Federal Reserve Board. DB USA Corporation will make its second capital plan submission to the Federal Reserve Board in April 2018 as part of the Federal Reserve Board's annual Comprehensive Capital Analysis and Review ("CCAR"), the results of which will be made public by the Federal Reserve Board.

Title I of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (the "Dodd-Frank Act") and the implementing regulations require each bank holding company with assets of U.S.\$ 50 billion or more, including Deutsche Bank AG, to prepare and submit annually a plan for the orderly resolution of subsidiaries and operations in the event of future material financial distress or failure (the "U.S. Resolution Plan"). For foreign-based covered companies such as Deutsche Bank AG, the U.S. Resolution Plan only relates to subsidiaries, branches, agencies and businesses that are domiciled in or conducted in whole or in material part in the United States. Deutsche Bank AG filed its most recent U.S. Resolution Plan in July 2015 and, as a foreign-based covered company, was not required to file one in 2016 or 2017. Our next U.S. Resolution Plan filing is due on July 1, 2018. If the Federal Reserve Board and the FDIC were to jointly deem our U.S. Resolution Plan not credible and we failed to remedy the deficiencies in the required timeframe, we could be required to restructure or reorganize businesses, legal entities, operational systems and/or intra-company transactions in ways that may negatively impact our operations and strategy, or could be subject to restrictions on growth. We could also eventually be subjected to more stringent capital, leverage or liquidity requirements, or be required to divest certain assets or operations.

U.S. rules and interpretations, including those described above, could cause us to reduce assets held in the United States, inject capital and/or liquidity into or otherwise change the structure of our U.S. operations. To the extent that we are required to reduce operations in the United States or deploy capital in the United States that could be deployed more profitably elsewhere, these requirements could have an adverse effect on our business, financial condition and results of operations.

Part I

Any increased capital or liquidity requirements, including those described above, could have adverse effects on our business, financial condition and results of operations, as well as on perceptions in the market of our stability, particularly if any such proposal becomes effective and results in our having to raise capital at a time when we or the financial markets are distressed, or take other measures to increase liquidity in certain jurisdictions due to local requirements. These measures we might be required or find necessary to take in response to these shifting local requirements may be inconsistent with, and hinder the achievement of our strategic goals. In addition, if these regulatory requirements must be implemented more quickly than currently foreseen, we may decide that the quickest and most reliable path to compliance is to reduce the level of assets on our balance sheet, dispose of divisions or otherwise segregate certain activities or reduce or close down certain business lines. The effects on our capital raising efforts in such a case could be amplified due to the expectation that our competitors, at least those subject to the same or similar capital requirements, would likely also be required to raise capital at the same time. Moreover, some of our competitors, particularly those outside the European Union, may not face the same or similar regulations, which could put us at a competitive disadvantage.

In addition to these regulatory initiatives, market sentiment may encourage financial institutions such as Deutsche Bank to maintain significantly more capital, liquidity and loss-absorbing capital instruments than regulatory-mandated minima, which could exacerbate the effects on us described above or, if we do not increase our capital to the encouraged levels, could lead to the perception in the market that we are undercapitalized relative to our peers generally.

It is unclear whether the increased U.S. capital and other requirements described above, as well as similar developments in other jurisdictions could lead to a fragmentation of supervision of global banks that could adversely affect our reliance on regulatory waivers allowing us to meet capital adequacy requirements, large exposure limits and certain organizational requirements on a consolidated basis only rather than on both a consolidated and non-consolidated basis. Should we no longer be entitled to rely on these waivers, we would have to adapt and take the steps necessary in order to meet regulatory capital requirements and other requirements on a consolidated as well as a non-consolidated basis, which could result also in significantly higher costs and potential effects on our profitability and dividend paying ability.

Our regulatory capital and liquidity ratios and our funds available for distributions on our shares or regulatory capital instruments will be affected by our business decisions and, in making such decisions, our interests and those of the holders of such instruments may not be aligned, and we may take decisions in accordance with applicable law and the terms of the relevant instruments that result in no or lower payments being made on our shares or regulatory capital instruments.

Our regulatory capital and liquidity ratios are affected by a number of factors, including decisions we make relating to our businesses and operations as well as the management of our capital position, of our risk-weighted assets and of our balance sheet in general, and external factors, such as regulations regarding the risk weightings we are permitted to allocate to our assets, commercial and market risks or the costs of our legal or regulatory proceedings. While we and our management are required to take into account a broad range of considerations in our and their managerial decisions, including the interests of the Bank as a regulated institution and those of our shareholders and creditors, particularly in times of weak earnings and increasing capital requirements, the regulatory requirements to build capital and liquidity may become paramount. Accordingly, in making decisions in respect of our capital and liquidity management, we are not required to adhere to the interests of the holders of instruments we have issued that qualify for inclusion in our regulatory capital, such as our Additional Tier 1 capital instruments. We may decide not to take any measures, including increasing our capital at a time when it is feasible to do so (through securities issuances or otherwise), even if our failure to take such an action would result in a non-payment or a write-down or other recovery- or resolution-related measure in respect of any of our regulatory capital instruments. Our decisions could cause the holders of such regulatory capital instruments to lose all or part of the value of their investments in these instruments due to their effect on our regulatory capital ratios, and such holders will not have any claim against us relating to such decisions, even if they result in a non-payment or a write-down or other recovery- or resolution-related measure in respect of such instruments they hold.

In addition, our annual profit and distributable reserves form an important part of the funds available for us to pay dividends on our shares and make payments on our other regulatory capital instruments, as determined in the case of each such instrument by its terms or by operation of law, and any adverse change in our financial prospects, financial position or profitability, or our distributable reserves, each as calculated on an unconsolidated basis, may have a material adverse effect on our ability to make dividend or other payments on these instruments. In addition, as part of the implementation of our strategy, we may record impairments that reduce the carrying value of subsidiaries on our unconsolidated balance sheet and reduce profits and distributable reserves. Future impairments or other events that reduce our profit or distributable reserves on an unconsolidated basis could lead us to be unable to make such payments in future years in part or at all. In particular, the direct costs of our potential settlements of litigation, enforcement and similar matters, especially to the extent in excess of provisions we have established for them, and their related business impacts, if they occur, could impact such distributable amounts.

In addition, German law places limits on the extent to which annual profits and otherwise-distributable reserves, as calculated on an unconsolidated basis, may be distributed to our shareholders or the holders of our other regulatory capital instruments, such as our Additional Tier 1 capital instruments. Our management also has, subject to applicable law, broad discretion under the applicable accounting principles to influence all amounts relevant for calculating funds available for distribution. Such decisions may impact our ability to make dividend or other payments under the terms of our regulatory capital instruments.

Consistent with our updated strategy, our Management Board intends to propose to our Annual General Meeting in May 2018 to resolve the payment of a dividend of € 0.11 per share.

**Legislation in the United States and in Germany regarding the prohibition of proprietary trading or its separation from the deposit-taking business has required us to modify our business activities to comply with applicable restrictions. This could adversely affect our business, financial condition and results of operations.**
Rules implementing the U.S. "Volcker Rule" prohibit U.S. insured depository institutions and companies that control or are affiliated with U.S. insured depository institutions (such as Deutsche Bank) from engaging in proprietary trading of certain securities, derivatives, commodity futures and options on these instruments, for their own account. The final rules also impose limits or restrictions on investments in, and other relationships with, hedge funds, private equity funds and other private funds and limit the ability of banking entities and their affiliates to enter into certain transactions with such funds with which they or their affiliates have certain relationships. The Volcker Rule requires banking entities to establish comprehensive compliance programs designed to help ensure and monitor compliance with restrictions under the Volcker Rule.

In Germany, the German Act on the Separation of Risks and Recovery and Resolution Planning for Credit Institutions and Banking Groups (Trennbankengesetz), referred to as the "Separation Act", provides that deposit-taking banks and their affiliates are prohibited from engaging in proprietary trading that does not constitute a service for others, high-frequency trading (with the exception of market-making activities), and credit or guarantee transactions with hedge funds and comparable enterprises, unless such activities are transferred to a separate legal entity. The separation requirement applies if certain thresholds are exceeded, which is the case for Deutsche Bank. In addition, the German Separation Act authorizes the BaFin, since July 1, 2016, to prohibit the deposit-taking bank and its affiliates, on a case-by-case basis, from engaging in market-making and other activities that are comparable to the activities prohibited by law, if these activities may put the solvency of the deposit-taking bank or any of its affiliates at risk. In the event that the BaFin orders such a prohibition, the respective activities must be discontinued or transferred to a separate legal entity (referred to as financial trading institution (Finanzhandelsinstitut)). The prohibition for deposit-taking banks and their affiliates to conduct activities associated with increased risks became effective on July 1, 2015, with a further transitional period of twelve months to accomplish the separation requirement, unless the BaFin extends this period. The German Separation Act became applicable to Deutsche Bank Group on July 1, 2017, after the extension of the period to cease or transfer the activities concerned expired on June 30, 2017. The German Separation Act requires ongoing surveillance of the activities of banks within the scope of the legislation and assessment of compliance and control frameworks to ensure that no prohibited activities are conducted. Non-compliance with the prohibitions set forth in the German Separation Act could ultimately result in civil and criminal liability.

The Volcker Rule and the German Separation Act have required us to modify our business activities to comply with their restrictions, as well as to implement detailed compliance programs. As a result, we no longer engage in certain business activities from which we once profited. This could adversely affect our business, financial condition and results of operations.

**Other regulatory reforms adopted or proposed in the wake of the financial crisis – for example, extensive new regulations governing our derivatives activities, compensation, bank levies, deposit protection or a possible financial transaction tax – may materially increase our operating costs and negatively impact our business model.**
Beyond capital requirements, recovery and resolution planning, separation of certain bank activities and other requirements discussed above, we are affected, or expect to be affected, by various additional regulatory reforms adopted or proposed in the wake of the financial crisis including, among other things, new regulations governing our derivatives activities, compensation, bank levies, deposit protection or a possible financial transaction tax.

On August 16, 2012, the EU Regulation on over-the-counter ("OTC") derivatives, central counterparties and trade repositories, referred to as EMIR, entered into force. EMIR introduced a number of requirements, including clearing obligations for certain classes of OTC derivatives and various reporting and disclosure obligations. Although some of the particular effects brought about by EMIR are not yet fully foreseeable, many of its elements have led and may lead to changes which may negatively impact our profit margins, require us to adjust our business practices or increase our costs (including compliance costs). The revised Markets in Financial Instruments Directive ("MiFID 2") and the corresponding Regulation ("MiFIR") became applicable to us on January 3, 2018 and provide for, among other things, a trading obligation for those OTC derivatives which are subject to mandatory clearing and which are sufficiently standardized. We will also be impacted by the BCBS-IOSCO final minimum standards for margin requirements for non-centrally cleared derivatives, for which enabling legislation exists in the EU (EMIR and implementing regulations) but where much of the impact depends on how these requirements are further implemented.

In the United States, the Dodd-Frank Act has numerous provisions that affect or may affect our operations. Pursuant to regulations implementing provisions of the Dodd-Frank Act, we provisionally registered as a swap dealer with the U.S. Commodity Futures Trading Commission ("CFTC") and became subject to the CFTC's extensive oversight. Regulation of swap dealers by the CFTC imposes numerous corporate governance, business conduct, capital, margin, reporting, clearing, execution and other regulatory requirements on us. It also requires us to comply with certain U.S. rules in some circumstances with respect to transactions conducted outside of the United States or with non-U.S. persons. Although the coverage of EMIR and CFTC regulations implementing the Dodd-Frank Act is in many ways similar, certain swaps may be subject to both regulatory regimes to a significant extent. However, the CFTC's guidance on cross-border swaps regulation, as well as the margin requirements recently adopted by the U.S. bank regulatory agencies and the CFTC, may allow us to comply with some, but not all, U.S. regulatory requirements on a substituted basis by complying with EMIR and MiFID. The requirements under the Dodd-Frank Act may adversely affect our derivatives business and make us less competitive, especially as compared to competitors not subject to such regulation. Additionally, under the Dodd-Frank Act, security-based swaps are subject to a standalone regulatory regime under the jurisdiction of the U.S. Securities and Exchange Commission ("SEC"). The SEC is finalizing rules for its security-based swap regime that are expected to be parallel to, but not identical to, the CFTC's regulation of swaps. This will impose further regulation of our derivatives business.

In addition, the CRR/CRD 4 legislative package provides for executive compensation reforms including caps on bonuses that may be awarded to "material risk takers" and other employees as defined therein and in the German Banking Act and other applicable rules and regulations such as the Remuneration Regulation for Institutions (Institutsvergütungsverordnung). Such restrictions on compensation, including any guidelines issued by the EBA to further implement them, could put us at a disadvantage to our competitors in attracting and retaining talented employees, especially compared to those outside the European Union that are not subject to these caps and other constraints.

Following the financial crisis, bank levies have been introduced in some countries including, among others, Germany and the United Kingdom. We accrued € 596 million for bank levies in 2017, € 547 million in 2016 and € 653 million in 2015. Also, we are required to contribute substantially to the Single Resolution Fund ("SRF") under the SRM (which is intended to reach a target level of 1 % of insured deposits of all banks in member states participating in the SRM by the end of 2023) and the statutory deposit guarantee and investor compensation schemes under the recast European Union directive on deposit guarantee schemes ("DGS Directive") and the European Union directive on investor compensation schemes. The DGS Directive defines a 0.8 % target level of prefunding by 2024 (similar to resolution funds), which has significantly increased the costs of the statutory deposit protection scheme. In addition, in this context, on November 24, 2015, the European Commission proposed a regulation to establish a European Deposit Insurance Scheme, or "EDIS" for bank deposits of all credit institutions that are members of any of the current national statutory deposit guarantee schemes of member states participating in the banking union. While the total impact of these future levies cannot currently be quantified, they may have a material adverse effect on our business, financial condition and results of operations in future periods.

Separately, on January 22, 2013, the Council of the European Union adopted a decision authorizing eleven EU member states (Austria, Belgium, Estonia, France, Germany, Greece, Italy, Portugal, Slovakia, Slovenia and Spain) to proceed with the introduction of a financial transaction tax under the European Union's "enhanced cooperation procedure". The European Commission on February 14, 2013 adopted a draft directive for the implementation of the financial transaction tax. Following several rounds of political discussions there is currently no timetable for the conclusion of an agreement. If a financial transaction tax is ultimately adopted, depending on its final details, it could result in compliance costs as well as market consequences and have a material adverse effect on our profit and business.

Adverse market conditions, asset price deteriorations, volatility and cautious investor sentiment have affected and may in the future materially and adversely affect our revenues and profits, particularly in our investment banking, brokerage and other commission- and fee-based businesses. As a result, we have in the past incurred and may in the future incur significant losses from our trading and investment activities.

As a global investment bank, we have significant exposure to the financial markets and are more at risk from adverse developments in the financial markets than are institutions engaged predominantly in traditional banking activities. Sustained market declines have in the past caused and can in the future cause our revenues to decline, and, if we are unable to reduce our expenses at the same pace, can cause our profitability to erode or cause us to show material losses. Volatility can also adversely affect us, by causing the value of financial assets we hold to decline or the expense of hedging our risks to rise. Reduced customer activity can also lead to lower revenues in our "flow" business.

Specifically, our investment banking revenues, in the form of financial advisory and underwriting fees, directly relate to the number and size of the transactions in which we participate and are susceptible to adverse effects from sustained market downturns. These fees and other income are generally linked to the value of the underlying transactions and therefore can decline with asset values. In addition, periods of market decline and uncertainty tend to dampen client appetite for market and credit risk, a critical driver of transaction volumes and investment banking revenues, especially transactions with higher margins. In recent and other times in the past, decreased client appetite for risk has led to lower levels of activity and lower levels of profitability in our Corporate & Investment Bank corporate division. Our revenues and profitability could sustain material adverse effects from a significant reduction in the number or size of debt and equity offerings and merger and acquisition transactions.

Market downturns also have led and may in the future lead to declines in the volume of transactions that we execute for our clients and, therefore, to declines in our noninterest income. In addition, because the fees that we charge for managing our clients' portfolios are in many cases based on the value or performance of those portfolios, a market downturn that reduces the value of our clients' portfolios or increases the amount of withdrawals reduces the revenues we receive from our asset management and private banking businesses. Even in the absence of a market downturn, below-market or negative performance by our investment funds may result in increased withdrawals and reduced inflows, which would reduce the revenue we receive from our asset management business. While our clients would be responsible for losses we incur in taking positions for their accounts, we may be exposed to additional credit risk as a result of their need to cover the losses where we do not hold adequate collateral or cannot realize it. Our business may also suffer if our clients lose money and we lose the confidence of clients in our products and services.

In addition, the revenues and profits we derive from many of our trading and investment positions and our transactions in connection with them can be directly and negatively impacted by market prices, which have been volatile in prior years. In each of the product and business lines in which we enter into these trading and investment positions, part of our business entails making assessments about the financial markets and trends in them. When we own assets, market price declines can expose us to losses. Many of the more sophisticated transactions of our Corporate & Investment Bank corporate division are designed to profit from price movements and differences among prices. If prices move in a way we have not anticipated, we may experience losses. Also, when markets are volatile, the assessments we have made may prove to lead to lower revenues or profits, or may lead to losses, on the related transactions and positions. In addition, we commit capital and take market risk to facilitate certain capital markets transactions; doing so can result in losses as well as income volatility. Such losses may especially occur on assets we hold for which there are not very liquid markets initially. Assets that are not traded on stock exchanges or other public trading markets, such as derivatives contracts between banks, may have values that we calculate using models other than publicly-quoted prices. Monitoring the deterioration of prices of assets like these is difficult and could lead to losses we did not anticipate. We can also be adversely affected if general perceptions of risk cause uncertain investors to remain on the sidelines of the market, curtailing their activity and in turn reducing the levels of activity in those of our businesses dependent on transaction flow.

**We announced the next phase of our strategy in April 2015, gave further details on it in October 2015 and announced an update in March 2017. If we are unable to implement our strategic plans successfully, we may be unable to achieve our financial objectives, or we may incur losses or low profitability or erosions of our capital base, and our financial condition, results of operations and share price may be materially and adversely affected.**
We announced the next phase of our strategy in April 2015, gave further details on it in October 2015 and announced an update in March 2017. Our plans included becoming simpler and more efficient by focusing on the markets, products and clients where we are better positioned to succeed, becoming less risky by modernizing our technology and by withdrawing from higher-risk client relationships, becoming better capitalized and running the Bank in a more disciplined way. In October 2015 we announced specific execution measures for each business division and updated our financial targets to highlight the financial objectives of our strategy. In March 2017, we announced an update that includes a number of new steps to further strengthen the Bank and place it in a better position to pursue growth opportunities, including a € 8 billion capital raise, the reorganization of our business into three distinct units, the combination of Postbank's and PCB's German business, the establishment of a cost reduction plan as described below, and an update to the Group's targets. The details of our strategy are set forth in "Item 4: Information on the Company – Business Overview – Our Business Strategy."

Our strategic goals are subject to various internal and external factors including market, regulatory, economic and political uncertainties, and to limitations relating to our operating model. These could negatively impact or prevent the implementation of our strategic goals or the realization of their anticipated benefits. Economic uncertainties such as the recurrence of extreme turbulence in the markets; potential weakness in global, regional and national economic conditions; the continuation of a market environment characterized by low interest rates and low volatility; increased competition for business; and political instability, especially in Europe, may impact our ability to achieve our strategic goals. Regulatory changes could also adversely impact our ability to achieve our strategic aims. In particular, regulators could demand changes to our business model or organization that could reduce our profitability, or we may be forced to make changes that reduce our profitability in an effort to remain compliant with law and regulation. We are also involved in numerous litigation, arbitration and regulatory proceedings and investigations in Germany and in a number of jurisdictions outside of Germany, especially in the U.S. Such matters are subject to many uncertainties. We expect the litigation environment to continue to be challenging. If litigation and regulatory matters continue to occur at the same rate and magnitude as in recent years or if we are subject to sustained market speculation about our potential settlement of such matters, we may not be able to achieve our strategic aspirations.

In particular, macroeconomic risks and the risks relating to regulatory changes and our legal proceedings may impact our ability to meet our financial and capital targets. As financial targets, we are aiming to achieve a post-tax return on tangible equity of approximately 10 %, assuming a normalized operating environment, in addition to the cost-related targets and net revenues expectations referred to below. Our capital targets comprise a fully loaded Common Equity Tier 1 capital ratio comfortably above 13.0 %, and a leverage ratio of 4.5 % over time. Furthermore, we intend to target a competitive dividend payout ratio for the financial year 2018 and thereafter. Our strategy is based on an ambitious financial plan with, we believe, some buffer for downside scenarios and contingencies. However, the base case scenario for our financial and capital plan includes revenue

growth estimates which are dependent on positive macroeconomic developments. Stagnation or a downturn in the macroeco-nomic environment could significantly impact our ability to generate the revenue growth necessary to achieve these strategic financial and capital targets. Furthermore, even if we are able to grow our revenues in accordance with our strategic plans, the materialization of any of the regulatory changes or the costs for us – in terms of the outcomes or necessary changes to our businesses – of the litigation and regulatory matters mentioned above, including market speculation about our potential settle-ment of them, or any other unforeseen risk, could adversely impact our net income and thereby cause us to fall short of our strategic financial and capital targets.

In March 2017, we announced an adjusted costs target of approximately € 22 billion for 2018 including approximately € 900 million of planned cost savings through business disposals. While we have made some progress on planned disposals, some of them have been delayed or in some cases suspended. As a result, we currently do not expect to achieve the planned € 900 million of cost savings in 2018. Furthermore, we expect higher costs from Brexit and MiFID II implementation in 2018 than we had anticipated when we set our adjusted costs target. Additionally, some of the cost synergies we expected to realize in 2018 from the merger of Postbank into our German banking entity have been delayed as we now expect this merger to be completed in the second quarter of 2018. Those savings are now expected to be realized in 2019. Therefore, we now expect our adjusted costs in 2018 will be about € 23 billion, which reflects our original € 22 billion target plus the cost impact of the delayed and suspended business disposals. We target a further reduction in our adjusted costs in the years to 2021 to € 21 billion. This target, however, depends in part on our ability to execute those business disposals that we do expect to complete by 2021 successfully and within the timeframes we now plan for them. We may be unable to complete those business disposals we intend to complete on a delayed basis due to market developments or an inability to achieve dispositions on sufficiently attrac-tive terms. Our achievement of our adjusted costs targets may also be hindered if our efforts to improve our internal control environment and enhance our regulatory compliance functions prove to be more expensive than we anticipate.

Our capital targets are further dependent on our ability to reduce the size of our balance sheet in accordance with our strategy. We plan disposals of a number of smaller businesses, and we also plan for CIB to separately manage identified legacy asset portfolios. Difficult market conditions or regulatory uncertainties may prevent us from being able to dispose of assets at all, or at prices we would consider to be reasonable, thereby causing us either to sell these assets for losses (or losses that are higher than expected) or hold these assets for a longer period of time than desired or planned. If we cannot reduce our risk-weighted assets or leverage exposure according to plan, we may not be able to achieve the capital targets set out under our strategy.

Our strategic objectives are also subject to the following assumptions and risks:

– We assume that we will be able to overcome significant challenges arising from our business model. We continue to rely on our trading and markets businesses as a significant source of profit. However, these businesses, in particular our fixed in-come securities franchise, have continued to face an extremely challenging environment, caused by uncertainty about the duration of the market environment characterized by low interest rates and low volatility, low levels of client activity, negative perceptions about our business and central bank intervention in markets and the gradual cessation thereof. We are substan-tially dependent on the performance of these businesses, and this dependency exceeds that of many of our competitors. Many of our businesses dependent on client flow are increasingly challenged in the current market environment. In addition, some of our businesses may be resistant to change, posing risks to the implementation of changes to our business model. Should we be unable to implement this new business model successfully, or should the new business model fail to be profit-able, we may not be able to achieve some or all of our strategic goals.
– While asset and client levels have largely rebounded from the impact of the negative market perceptions in the fourth quarter 2016, a renewed negative market focus on Deutsche Bank could result in new client and asset outflows.
– Given the operating environment in 2016, the Management Board decided to cancel the discretionary bonus element of the compensation for the Bank's senior employees for that year. Across all our businesses, we need to attract and retain highly qualified staff. The decision to cancel the discretionary bonus element for 2016 may adversely affect our ability to succeed in attracting or retaining highly qualified employees. We restored this element of compensation for 2017 even though our oper-ating environment remains challenging. If our efforts to attract and/or retain employees should fail, this may have a material adverse effect on our ability to implement our strategy and may reduce our future compensation flexibility.
– We currently operate a highly complex infrastructure, which can compromise the quality of the overall control environment. Establishing a more efficient bank with a strong control environment depends on successfully streamlining and simplifying the IT landscape as well as cultural change. Furthermore, capital and execution plans require robust monitoring and tracking that is dependent on accurate, timely and relevant data. We have undertaken initiatives designed to address existing chal-lenges in our IT and data architecture as well as in our data aggregation capabilities. Potential delays and challenges to im-plementing these initiatives would impact our ability to achieve efficiency improvements and enhance the control environment, thereby affecting our ability to implement our strategy successfully.
– A robust and effective internal control environment is necessary to ensure that we conduct our business in compliance with the laws and regulations applicable to us. We are undertaking several major initiatives to enhance the efficacy of the trans-action processing environment, strengthen our controls and manage non-financial risks, in particular as a response to the circumstances that have resulted in many of the litigations and regulatory and enforcement investigations and proceedings to which the Bank has been subject in recent years. However, we may be unable to complete these initiatives as quickly as we intend or as our regulators demand, and our efforts may be insufficient to prevent all future deficiencies in our control en-

vironment or to result in fewer litigations or regulatory and enforcement investigations and proceedings in the future. Furthermore, implementation of enhanced controls may result in higher than expected costs of regulatory compliance that could offset efficiency gains. Any of these factors could affect our ability to implement our strategy in a timely manner or at all.

– The buffers that we have provided for in our financial targets may prove to be insufficient in a downside scenario. We have already seen challenges to our adjusted costs target for 2018 due to delays and suspensions in planned business disposals. Should we exhaust buffers we have included in other financial targets, whether as a result of the macroeconomic, regulatory, litigation or other factors discussed above or for reasons we have not yet anticipated, we may fail to meet our strategic targets.

– If we fail to implement our strategic initiatives in whole or in part or should the initiatives that are implemented fail to produce the anticipated benefits, or should the costs we incur to implement our initiatives exceed the amounts anticipated, or should we fail to achieve the publicly communicated targets we have set for implementation of these initiatives, we may fail to achieve our financial objectives, or incur losses or low profitability or erosions of our capital base, and our financial condition, results of operations and share price may be materially and adversely affected.

As part of our strategic initivatives announced in March 2017, we reconfigured our Global Markets, Corporate Finance and Transaction Banking businesses into a single Corporate & Investment Bank division to position ourselves for growth through increased cross-selling opportunities for Deutsche Bank's higher return corporate clients. Clients may choose not to expand their businesses or portfolios with us, thereby negatively influencing our ability to capitalize on these opportunities.

As part of our strategic initiatives announced in March 2017, we reconfigured our Global Markets, Corporate Finance and Transaction Banking businesses into a single Corporate & Investment Bank division. The combination, which took effect in the second quarter of 2017, is intended to promote a more seamless and aligned offering of products to clients, meaningfully enhance cross selling opportunities, ensure better client rationalization with resources being focused on higher return relationships, and achieve greater cost and asset efficiencies to drive improved returns. Our clients' product needs, business plans and general willingness to engage into a deeper banking relationship with us will ultimately determine whether we are successful in capturing this anticipated spending. Should we be unable to deliver on the cross-selling efforts due to either lack of client demand, product availability or quality or delivery, there is a risk that this could negatively influence our ability to capitalize on these opportunities. The aforementioned macroeconomic, geo-political and regulatory risks also pose a challenge to the operating models of our Corporate & Investment Bank clients, and our ability to capture the incremental opportunity.

As part of our March 2017 updates to our strategy, we announced our intention to retain and combine Deutsche Postbank AG (together with its subsidiaries, "Postbank") with our existing retail and commercial operations, after earlier having announced our intention to dispose of Postbank. We may face difficulties integrating Postbank into the Group following the completion of operational separability from the Group. Consequently, the cost savings and other benefits we expect to realize may only come at a higher cost than anticipated, or may not be realized at all.

As part of our March 2017 updates to our strategy, we announced our intention to retain and combine Postbank with our existing retail and commercial operations, both of which are part of our Private & Commercial Bank division, after earlier having announced our intention to dispose of Postbank. This shift from the prior strategy reflects a number of evolving factors, including our belief that growth in small and mid-sized German corporate clients and private banking clients will continue, changes in the expected regulatory requirements and market expectations for leverage ratios of European banks, the positive impact on the business model of retaining a large and stable business with a substantial deposit base, our revised view on the possible degree of integration of Postbank and the resulting scale and incremental synergies, and future growth opportunities we have identified, reflecting a potential improvement in the macroeconomic outlook and the changing dynamics in private and commercial banking, the growing likelihood of eventual industry consolidation in German retail banking and the continued positive opportunities presented by digitization.

To this end, Postbank and Deutsche Bank Privat- und Geschaeftskunden AG will be merged into one single legal entity by the end of the second quarter of 2018. We expect that the integration of Postbank will create Germany's largest private and commercial bank. This integration is intended to achieve cost efficiencies by more readily permitting rationalization of central functions, improved efficiency across technology platforms and infrastructure and more efficient investment in areas including digitization, distribution channels and regulatory change.

We estimate that the total cost of the planned restructuring measures to integrate Postbank into the Group and other investments will be € 1.9 billion, with restructuring and severance costs estimated to be approximately € 1.0 billion by 2022 and the remainder related to IT and other costs, and we are targeting substantial synergies, gradually rising to about € 0.9 billion annually by 2022. Unforeseen difficulties may emerge in connection with the integration efforts, including potential difficulties due to differing IT systems, difficulties in integrating personnel, the commitment of management resources in connection with the integration process and the potential loss of key personnel. The benefits, cost and timeframe of the integration could be adversely affected by any of these factors, as well as a variety of factors beyond our and Postbank's control, such as negative market developments. Should any of these risks materialize, the cost savings and other benefits we expect to realize from the integration may only come at a higher cost than anticipated, or may not be realized within the period we anticipate or to the extent we plan, or at all.

As part of our March 2017 updates to our strategy, we announced our intention to create an operationally segregated Asset Management division through a partial initial public offering (IPO). If economic or market conditions, or the financial position, results of operations and business prospects of Deutsche AM, are unfavorable, we may not be able to sell a stake in Deutsche AM at a favorable price or timing, or at all. Additionally, we may not be able to capitalize on the expected benefits that we believe an operationally segregated Deutsche AM can offer.

In March 2017, we announced our intention to create a segregated Asset Management business and sell a minority interest in it in an initial public offering (IPO). We believe that the growth potential of Deutsche Asset Management (Deutsche AM) has been constrained by its full ownership by the Bank, with reputational issues and wider market concerns around Deutsche Bank's capital strength in late 2016 affecting Deutsche AM. Additionally, resourcing limitations, as Deutsche Bank has pursued its restructuring efforts, further constrained Deutsche AM. We therefore believe that Deutsche AM remains undervalued in the current corporate structure. Accordingly, we intend to sell a minority stake in Deutsche AM and provide the division with more flexibility to enhance its ability to pursue growth opportunities globally and gain market share.

We may, however, have difficulties selling a stake in Deutsche AM at a favorable price or timing, or at all. Our ability to sell a stake in Deutsche AM will, among other things, depend on economic, regulatory and market conditions, particularly those relevant to the asset management business in Germany. Our ability to sell a stake in Deutsche AM will also depend on the financial position, results of operations and business prospects of Deutsche AM. If economic, regulatory or market conditions, or the financial position, results of operations and business prospects of Deutsche AM, are unfavorable, we may not be able to sell a stake in Deutsche AM at a favorable price or timing, or at all. Additionally, we may not be able to capitalize upon the expected benefits that we believe a more operationally segregated Deutsche AM has to offer. Furthermore, an IPO of Deutsche AM may not entirely mitigate the market concerns about Deutsche Bank that impacted Deutsche AM's business in 2016 or that may arise from new circumstances with a similar impact.

We may have difficulties selling companies, businesses or assets at favorable prices or at all and may experience material losses from these assets and other investments irrespective of market developments.

As part of our strategy, we are seeking to continue to reduce our assets, including in particular those of our CIB corporate division, as described above. We also have other assets that are not part of our core business, and we may seek to sell them or otherwise reduce the amount and the risk of our exposure to them. These reductions are part of our strategy to simplify and focus our business and to meet or exceed the new capital and leverage requirements by reducing risk-weighted assets and leverage exposures and thereby improving our capital and leverage ratios, as well as to help us meet our return on tangible equity target. This strategy may prove difficult in the current and future market environment as many of our competitors are also seeking to dispose of assets to improve their capital and leverage ratios and returns on equity. We have already sold a substantial portion of our non-core assets, and our remaining non-core assets may be particularly difficult for us to sell as quickly as we have expected at prices we deem acceptable. Also, we are often a passive investor in such investments and as such we are reliant on the actions of third parties. Where we sell companies or businesses, we may remain exposed to certain of their losses or risks under the terms of the sale contracts, and the process of separating and selling such companies or businesses may give rise to operating risks or other losses. Unfavorable business or market conditions may make it difficult for us to sell companies, businesses or assets at favorable prices, or may preclude a sale altogether. If we cannot reduce our assets according to plan, we may not be able to achieve the capital targets set out under our strategy.

A robust and effective internal control environment and adequate infrastructure (comprising people, policies and procedures, controls testing and IT systems) are necessary to ensure that we conduct our business in compliance with the laws, regulations and associated supervisory expectations applicable to us. We have identified the need to strengthen our internal control environment and infrastructure and have embarked on initiatives to accomplish this. If these initiatives are not successful or are delayed, our reputation, regulatory position and financial condition may be materially adversely affected, and our ability to achieve our strategic ambitions may be impaired.

Our businesses are highly dependent on our ability to maintain a robust and effective internal control environment. This is needed for the Bank to process and monitor, on a daily basis, a wide variety of transactions, many of which are highly complex and occur at high speeds, volumes and frequencies, and across numerous and diverse markets and currencies. Such a robust and effective control environment is in turn dependent on the sufficiency of our infrastructure to support that environment. This infrastructure consists broadly of internal policies and procedures, testing protocols, and the IT systems and employees needed to enforce and enable them. An effective control environment is dependent on infrastructure systems and procedures that cover the processing and settling of transactions; the valuation of assets; the identification, monitoring, aggregation, measurement and reporting of risks and positions against various metrics; the evaluation of counterparties and customers for legal, regulatory and compliance purposes; the escalation of reviews; and the taking of mitigating and remedial actions where necessary. They are also critical for regulatory reporting and other data processing and compliance activities.

Both our internal control environment and the infrastructure that underlies it fall short in a number of areas of our standards for completeness and comprehensiveness and are not well integrated across the Bank. Our IT infrastructure, in particular, is fragmented, with numerous distinct platforms, many of which need significant upgrades, in operation across the Bank. Our business processes and the related control systems often require manual procedures and actions that increase the risks of human error and other operational problems that can lead to delays in reporting information to management and to the need for more adjustments and revisions than would be the case with more seamlessly integrated and automated systems and processes. As a result, it is often difficult and labor-intensive for us to obtain or provide information of a consistently high quality and on a timely basis to comply with regulatory reporting and other compliance requirements or to meet regulatory expectations on a consistent basis and, in certain cases, to manage our risk comprehensively. Furthermore, it often takes intensive efforts to identify, when possible, inappropriate behavior by our staff and attempts by third parties to misuse our services as a conduit for prohibited activities, including those relating to anti-financial crime laws and regulation.

In addition, we may not always have the personnel with the appropriate experience, seniority and skill levels to compensate for shortcomings in our processes and infrastructure, or to identify, manage or control risks, and it often has been difficult to attract and retain the requisite talent. This has impacted our ability to remediate existing weaknesses and manage the risks inherent in our activity.

Against this backdrop, our regulators, our Management Board and our Group Audit function have increasingly and more intensively focused on our internal controls and infrastructure through numerous formal reviews and audits of our operations. These reviews and audits have identified various areas for improvement relating to a number of elements of our control environment and infrastructure. These include the infrastructure relating to transaction capturing and recognition, classification of assets, asset valuation frameworks, data and process consistency, risk identification, measurement and management and other processes required by laws, regulations, and supervisory expectations. They also include regulatory reporting, anti-money laundering (AML), "know your customer" and other internal processes that are aimed at preventing use of our products and services for the purpose of committing or concealing financial crime. As one example, our January 2017 settlement with the UK Financial Conduct Authority (FCA) relating to trading activities involving our Russian operations stemmed in part from the FCA's review of the AML control functions in our investment bank.

Our principal regulators, including the ECB and the Federal Reserve Board, have also conducted numerous reviews focused on various aspects of our internal controls and the related infrastructure, including among others, controls around AML and around valuation. These regulators have required us formally to commit to remediate our AML and other weaknesses, including the fragmented and manual nature of our infrastructure. Local regulators in other countries in which we do business also review the sufficiency of our control environment and infrastructure with respect to their jurisdictions. While the overall goals of the various prudential regulators having authority over us in the many places in which we do business are broadly consistent, and the general themes of our deficiencies in internal controls and the supporting infrastructure are similar, the regulatory frameworks applicable to us in the area of internal controls are generally applicable at a national or EU-wide level and are not always consistent across the jurisdictions in which we operate around the world. This adds complexity and cost to our efforts to reduce fragmentation and put in place automated systems that communicate seamlessly and quickly with one another.

In order to improve in the areas discussed above, we are undertaking several major initiatives to enhance the efficacy of the transaction processing environment, strengthen our controls and infrastructure, manage non-financial risks and enhance the skill set of our personnel. We believe that these initiatives will better enable us to avoid the circumstances that have resulted in many of the litigations and regulatory and enforcement investigations and proceedings to which we have recently been subject, and will improve our ability to comply with laws and regulations and meet supervisory expectations. In particular, we are making efforts to reduce the complexity of our business and to integrate and automate processes and business and second-line controls. We have also exited certain businesses, for example in Russia, selectively off-boarded a number of clients, worked to strengthen our compliance culture and control functions and increased the size of and strengthened our Group Audit function. However, we may be unable to complete these initiatives as quickly as we intend or as our regulators demand, and our efforts may be insufficient to remediate existing deficiencies and prevent future deficiencies or to result in fewer litigations or regulatory and enforcement investigations, proceedings and criticism in the future. We may also, when faced with the considerable expense of these initiatives, fail to provide sufficient resources for them quickly enough or at all, especially during periods when our operating performance and profitability are challenged. If we are unable to significantly improve our infrastructure and control environment in a timely manner, some of our regulators may require us to reduce our exposure to or terminate certain kinds of products or businesses, counterparties or regions, which could, depending on the extent of such requirement, significantly challenge our ability to operate profitably under our current business model.

Part I

Regulators can also impose capital surcharges, requiring capital buffers in addition to those directly required under the regulatory capital rules applicable to us, to reflect the additional risks posed by deficiencies in our control environment. In extreme cases, regulators can suspend our permission to operate in the businesses and regions within their jurisdictions or require extensive and costly remedial actions. Furthermore, implementation of enhanced infrastructure and controls may result in higher-than-expected costs of regulatory compliance that could offset or exceed efficiency gains or significantly affect our profitability. Any of these factors could affect our ability to implement our strategy in a timely manner or at all.

**We operate in a highly and increasingly regulated and litigious environment, potentially exposing us to liability and other costs, the amounts of which may be substantial and difficult to estimate, as well as to legal and regulatory sanctions and reputational harm.**

The financial services industry is among the most highly regulated industries. Our operations throughout the world are regulated and supervised by the central banks and regulatory authorities in the jurisdictions in which we operate. In recent years, regulation and supervision in a number of areas has increased, and regulators, law enforcement authorities, governmental bodies and others have sought to subject financial services providers to increasing oversight and scrutiny, which in turn has led to additional regulatory investigations or enforcement actions. This trend has accelerated markedly as a result of the global financial crisis. There has been a steep escalation in the severity of the terms which regulators and law enforcement authorities have required to settle legal and regulatory proceedings against financial institutions, with recent settlements including unprecedented monetary penalties as well as criminal sanctions. As a result, we may continue to be subject to increasing levels of liability and regulatory sanctions, and may be required to make greater expenditures and devote additional resources to addressing these liabilities and sanctions. Regulatory sanctions may include status changes to local licenses or orders to discontinue certain business practices.

We and our subsidiaries are involved in various litigation proceedings, including civil class action lawsuits, arbitration proceedings and other disputes with third parties, as well as regulatory proceedings and investigations by both civil and criminal authorities in jurisdictions around the world. We expect that the costs to us arising from the resolution of litigation, enforcement and similar matters pending against us to continue to be significant in the near to medium term and to adversely affect our business, financial condition and results of operations. Litigation and regulatory matters are subject to many uncertainties, and the outcome of individual matters is not predictable with assurance. We may settle litigation or regulatory proceedings prior to a final judgment or determination of liability. We may do so for a number of reasons, including to avoid the cost, management efforts or negative business, regulatory or reputational consequences of continuing to contest liability, even when we believe we have valid defenses to liability. We may also do so when the potential consequences of failing to prevail would be disproportionate to the costs of settlement. Furthermore, we may, for similar reasons, reimburse counterparties for their losses even in situations where we do not believe that we are legally compelled to do so. The financial impact of legal risks might be considerable but may be difficult or impossible to estimate and to quantify, so that amounts eventually paid may exceed the amount of provisions made or contingent liabilities assessed for such risks.

We are under continuous examination by tax authorities in the jurisdictions in which we operate. Tax laws are increasingly complex. In the current political and regulatory environment, tax administrations' and courts' interpretation of tax laws and regulations and their application are evolving, and scrutiny by tax authorities has become increasingly intense. On December 22, 2017, the new U.S. tax legislation, known as the "Tax Cuts and Jobs Act" or "TCJA", was signed into law. The TCJA includes a number of provisions, such as the Base Erosion Anti-Abuse Tax, that are subject to interpretation and for which further interpretative guidance through technical corrections or treasury regulations may be issued over the coming months and years. In addition, wide ranging changes in the principles of international taxation emanating from the OECD's Base Erosion and Profit Shifting agenda are generating significant uncertainties for us and our subsidiaries and may result in an increase in instances of bilateral tax disputes going forward, as member states may take different approaches in transposing these requirements into national law. Tax administrations have also been focusing on the eligibility of taxpayers for reduced withholding taxes on dividends in connection with certain cross-border lending or derivative transactions with the German Federal Ministry of Finance having issued administrative guidance in this area. As a result, the cost to us arising from the conclusion and resolution of routine tax examinations, tax litigation and other forms of tax proceedings or tax disputes, as well as from rapidly changing and increasingly complex and uncertain tax laws and principles, may increase and may adversely affect our business, financial condition and results of operation.

Investigations involving the Bank and actions currently pending against us or our current or former employees may not only result in judgments, settlements, fines or penalties, but may also cause substantial reputational harm to us. The risk of damage to our reputation arising from such investigations and actions is also difficult or impossible to quantify.

Regulators have increasingly sought admissions of wrongdoing in connection with settlement of matters brought by them. This could lead to increased exposure in subsequent civil litigation or in consequences under so-called "bad actor" laws, in which persons or entities determined to have committed offenses under some laws can be subject to limitations on business activities under other laws, as well as adverse reputational consequences. In addition, the DOJ conditions the granting of cooperation credit in civil and criminal investigations of corporate wrongdoing on the company involved having provided to investigators all relevant facts relating to the individuals responsible for the alleged misconduct. This policy may result in increased fines and penalties if the DOJ determines that we have not provided sufficient information about applicable individuals in connection with an investigation. Other governmental authorities could adopt similar policies.

In addition, the financial impact of legal risks arising out of matters similar to some of those we face have been very large for a number of participants in the financial services industry, with fines and settlement payments greatly exceeding what market participants may have expected and, as noted above, escalating steeply over the last few years to unprecedented levels. The experience of others, including settlement terms, in similar cases is among the factors we take into consideration in determining the level of provisions we maintain in respect of these legal risks. Recent developments in cases involving other financial institutions have led to greater uncertainty as to the predictability of outcomes and could lead us to add to our provisions. Moreover, the costs of our investigations and defenses relating to these matters are themselves substantial. Further uncertainty may arise as a result of a lack of coordination among regulators from different jurisdictions or among regulators with varying competencies in a single jurisdiction, which may make it difficult for us to reach concurrent settlements with each regulator. Should we be subject to financial impacts arising out of litigation and regulatory matters to which we are subject in excess of those we have calculated in accordance with our expectations and the relevant accounting rules and contrary to our publicly communicated expectation that 2015 and 2016 were peak years for the financial impact of litigation and regulatory matters, our provisions in respect of such risks may prove to be materially insufficient to cover these impacts. This could have a material adverse effect on our results of operations, financial condition or reputation as well as on our ability to maintain capital, leverage and liquidity ratios at levels expected by market participants and our regulators. In such an event, we could find it necessary to reduce our risk-weighted assets (including on terms disadvantageous to us) or substantially cut costs to improve these ratios, in an amount corresponding to the adverse effects of the provisioning shortfall.

**We are currently the subject of industry-wide investigations by regulatory and law enforcement agencies relating to interbank offered rates, as well as civil actions. Due to a number of uncertainties, including those related to the high profile of the matters and other banks' settlement negotiations, the eventual outcome of these matters is unpredictable, and may materially and adversely affect our results of operations, financial condition and reputation.**
We have received requests for information from various regulatory and law enforcement agencies in connection with industry-wide investigations concerning the setting of the London Interbank Offered Rate (LIBOR), Euro Interbank Offered Rate (EURIBOR), Tokyo Interbank Offered Rate (TIBOR) and other interbank offered rates. We are cooperating with these investigations. The investigations underway have the potential to result in the imposition of significant financial penalties and other consequences for the Bank.

As previously reported, we reached a settlement with the European Commission in 2013 as part of a collective settlement to resolve its investigations in relation to anticompetitive conduct in the trading of Euro and Yen interest rate derivatives, pursuant to which we agreed to pay € 725 million in total. Also as previously reported, on April 23, 2015, we reached settlements with the DOJ, the CFTC, FCA, and the New York State Department of Financial Services ("DFS") to resolve investigations into misconduct concerning the setting of LIBOR, EURIBOR, and TIBOR. Under the terms of these agreements, we agreed to pay penalties of U.S.$ 2.175 billion to the DOJ, CFTC and DFS and GBP 226.8 million to the FCA. As part of the resolution with the DOJ, DB Group Services (UK) Ltd. (an indirectly-held, wholly-owned subsidiary of ours) pled guilty to one count of wire fraud in the U.S. District Court for the District of Connecticut and we entered into a Deferred Prosecution Agreement with a three year term. On October 25, 2017, we entered into a settlement with a working group of U.S. state attorneys general resolving their interbank offered rate investigation. Among other conditions, we made a settlement payment of U.S.$ 220 million. Factual admissions we have made in connection with these settlements could make it difficult for us to defend against pending and future claims. Other investigations of us concerning the setting of various interbank offered rates remain ongoing, and we remain exposed to further action.

In addition, we are party to 43 U.S. civil actions concerning alleged manipulation relating to the setting of various Interbank Offered Rates, as well as one action pending in the UK. Most of the civil actions, including putative class actions, are pending in the U.S. District Court for the Southern District of New York (SDNY), against us and numerous other defendants. All but four of the U.S. civil actions were filed on behalf of parties who allege losses as a result of manipulation relating to the setting of U.S. dollar LIBOR. The four civil actions pending against us that do not relate to U.S. dollar LIBOR are also pending in the SDNY, and include one action concerning EURIBOR, one consolidated action concerning Pound Sterling (GBP) LIBOR, one action concerning Swiss franc (CHF) LIBOR, and one action concerning two Singapore Dollar (SGD) benchmark rates, the Singapore Interbank Offered Rate (SIBOR) and the Swap Offer Rate (SOR).

We cannot predict the effect on us of the interbank offered rates matters, which could include fines levied by government bodies, damages from private litigation for which we may be liable, legal and regulatory sanctions (including possible criminal sanctions) and other consequences.

**Regulators and law enforcement authorities are investigating, among other things, our compliance with the U.S. Foreign Corrupt Practices Act and other laws with respect to our hiring practices related to candidates referred by clients, potential clients and government officials, and its engagement of finders and consultants.**

Certain regulators and law enforcement authorities in various jurisdictions, including the U.S. Securities and Exchange Commission and the DOJ, are investigating, among other things, our compliance with the U.S. Foreign Corrupt Practices Act and other laws with respect to our hiring practices related to candidates referred by clients, potential clients and government officials, and our engagement of finders and consultants. We are responding to and continuing to cooperate with these investigations. Certain regulators in other jurisdictions have also been briefed on these investigations. In the event that any violations of law or regulation are found to have occurred or are alleged to have occurred, and an enforcement action is filed, legal and regulatory sanctions in respect thereof may materially and adversely affect our results of operations, financial condition and reputation.

**We have been subject to litigation claims in respect of our U.S. residential mortgage loan trust administration business that may materially and adversely affect our results of operations, financial condition or reputation. We have also been subject to other contractual claims, litigation and governmental investigations in respect of our U.S. residential mortgage loan business.**

We or our affiliates have been sued by investors in civil litigation concerning their roles as trustees of over 600 residential mortgage backed securities (referred to as "RMBS") trusts. Investor plaintiffs in these cases assert claims for alleged violation of the U.S. Trust Indenture Act, violation of New York's Streit Act, breach of contract, breach of fiduciary duty, breach of trust, negligence and/or negligent misrepresentation based on alleged failures to perform duties as trustees for the trusts. More specifically, the investor plaintiffs allege that we or our affiliates failed to perform purported duties as trustee to enforce, for the benefit of investors, claims that (a) loan sellers breached representations and warranties made in respect of mortgage loans backing the RMBS and (b) loan servicers breached obligations to service mortgage loans in accordance with RMBS contracts. The investor plaintiffs allege that realized and future RMBS trust losses, which in the aggregate may exceed U.S.$ 100 billion, have been exacerbated by our or our affiliates' alleged failure, as trustee, to enforce such claims. The investor plaintiffs have brought similar suits against other banks that acted as trustees for RMBS. Such pending RMBS litigations are in various stages and we continue to defend these actions vigorously.

From 2005 to 2008, as part of our U.S. residential mortgage loan business, we sold large volumes of loans into private label securitizations and via whole loan sales. We have been, and may in the future be, presented with demands to repurchase loans from purchasers, investors and financial insurers based on alleged material breaches of representations and warranties or to indemnify such persons with respect to losses allegedly caused thereby. Our general practice is to process valid repurchase claims that are presented in compliance with contractual rights and applicable statutes of limitations.

In addition, we have been named as defendant in numerous civil litigations brought by private parties in connection with our various roles, including issuer or underwriter, in offerings of RMBS and other asset-backed securities. We have also received subpoenas and requests for information from certain regulators and government entities concerning our activities regarding the origination, purchase, securitization, sale, valuation and/or trading of mortgage loans, RMBS, commercial mortgage-backed securities (CMBS), collateralized debt obligations (CDOs), other asset-backed securities and credit derivatives. Though we have resolved some of these civil litigation and regulatory and governmental matters, including entering into a settlement in January 2017 with the DOJ to resolve potential claims related to our RMBS business under which we paid a civil monetary penalty of U.S.$ 3.1 billion and agreed to provide U.S.$ 4.1 billion in consumer relief, others remain outstanding.

Legal proceedings are subject to many uncertainties, and the outcome of individual matters is not predictable. The extent of our financial exposure to these matters could be material, and our reputation may suffer material harm as a result of these matters.

**We are currently involved in civil proceedings in connection with our voluntary takeover offer for the acquisition of all shares of Postbank. The extent of our financial exposure to this matter could be material, and our reputation may be harmed.**

On September 12, 2010, we announced the decision to make a voluntary takeover offer for the acquisition of all shares in Deutsche Postbank AG (Postbank). On October 7, 2010, we published the official offer document. In our takeover offer, we offered Postbank shareholders consideration of € 25 for each Postbank share. The takeover offer was accepted for a total of approximately 48.2 million Postbank shares.

In November 2010, a former shareholder of Postbank, Effecten-Spiegel AG, which had accepted the takeover offer, brought a claim against us alleging that the offer price was too low and was not determined in accordance with the applicable law of the Federal Republic of Germany. The plaintiff alleges that we had been obliged to make a mandatory takeover offer for all shares in Postbank, at the latest, in 2009. The plaintiff avers that, at the latest in 2009, the voting rights of Deutsche Post AG in Postbank had to be attributed to us pursuant to Section 30 of the German Takeover Act. Based thereon, the plaintiff alleges that the consideration offered by us for the shares in Postbank in the 2010 voluntary takeover offer needed to be raised to € 57.25 per share.

The Cologne District Court dismissed the claim in 2011 and the Cologne appellate court dismissed the appeal in 2012. The Federal Court set aside the Cologne appellate court's judgment and referred the case back to the appellate court. In its judgment, the Federal Court stated that the appellate court had not sufficiently considered the plaintiff's allegation that we and Deutsche Post AG "acted in concert" in 2009.

Starting in 2014, additional former shareholders of Postbank, who accepted the 2010 tender offer, brought similar claims as Effecten-Spiegel AG against Deutsche Bank which are pending with the Cologne District Court and the Higher Regional Court of Cologne, respectively. On October 20, 2017, the Cologne District Court handed down a decision granting the claims in a total of 14 cases which were combined in one proceeding. The Cologne District Court took the view that Deutsche Bank was obliged to make a mandatory takeover offer already in 2008 so that the appropriate consideration to be offered in the takeover offer should have been € 57.25 per share. Taking the consideration paid into account, the additional consideration per share owed to shareholders which have accepted the takeover offer would thus amount to € 32.25. Deutsche Bank appealed this decision and the appeal has been assigned to the 13th Senate of the Higher Regional Court of Cologne, which also is hearing the appeal of Effecten-Spiegel AG.

On November 8, 2017, a hearing took place before the Higher Regional Court of Cologne in the Effecten-Spiegel case. In that hearing, the Higher Regional Court indicated that it disagreed with the conclusions of the Cologne District Court and took the preliminary view that Deutsche Bank was not obliged to make a mandatory takeover offer in 2008 or 2009. Initially the Higher Regional Court resolved to announce a decision on December 13, 2017. However, this was postponed to February 2018 because the plaintiff challenged the three members of the 13th Senate of the Higher Regional Court of Cologne for alleged prejudice. The challenge was rejected by the Higher Regional Court of Cologne at the end of January 2018. In February 2018, the court granted a motion by Effecten-Spiegel AG to re-open the hearing and scheduled a further hearing for June 29, 2018.

Deutsche Bank has been served with a large number of additional lawsuits filed against Deutsche Bank shortly before the end of the year 2017 and these claims are now pending with the District Court of Cologne. Some of the new plaintiffs allege that the consideration offered by Deutsche Bank AG for the shares in Postbank in the 2010 voluntary takeover should be raised to € 64.25 per share.

The claims for payment against Deutsche Bank in relation to these matters total almost € 700 million (excluding interest). In February 2018, a law firm representing some plaintiffs in the above-mentioned civil actions also filed a criminal complaint with the public prosecutor in Frankfurt am Main against certain Deutsche Bank personnel alleging that they engaged in fraudulent conduct in connection with the takeover offer.

In September 2015, former shareholders of Postbank filed in the Cologne District Court shareholder actions against Postbank to set aside the squeeze-out resolution taken in the shareholders meeting of Postbank in August 2015. Among other things, the plaintiffs allege that Deutsche Bank was subject to a suspension of voting rights with respect to its shares in Postbank based on the allegation that Deutsche Bank failed to make a mandatory takeover offer at a higher price in 2009. The squeeze out is final and the proceeding itself has no reversal effect, but may result in damage payments. The claimants in this proceeding refer to legal arguments similar to those asserted in the Effecten-Spiegel proceeding described above. In a decision on October 20, 2017, the Cologne District Court declared the squeeze-out resolution to be void. The court, however, did not rely on a suspension of voting rights due to an alleged failure of Deutsche Bank to make a mandatory takeover offer, but argued that Postbank violated information rights of Postbank shareholders in Postbank's shareholders meeting in August 2015. Postbank has appealed this decision.

The legal question whether Deutsche Bank had been obliged to make a mandatory takeover offer for all Postbank shares prior to its 2010 voluntary takeover may also impact two pending appraisal proceedings (*Spruchverfahren*). These proceedings were initiated by former Postbank shareholders with the aim to increase the cash compensation offered in connection with the squeeze-out of Postbank shareholders in 2015 and the cash compensation offered and annual guaranteed dividend paid in connection with the execution of a domination and profit and loss transfer agreement (*Beherrschungs- und Gewinnabführungsvertrag*) between DB Finanz-Holding AG (now DB Beteiligungs-Holding GmbH) and Postbank in 2012. The Cologne District Court issued resolutions indicating that it is inclined to consider a potential obligation of Deutsche Bank to make a mandatory takeover offer for Postbank at an offer price of € 57.25 when determining the adequate cash compensation in the appraisal proceedings. The cash compensation paid in connection with the domination and profit and loss transfer agreement was € 25.18 and was accepted for approximately 0.5 million shares. The squeeze-out compensation paid in 2015 was € 35.05 and approximately 7 million shares were squeezed-out.

The extent of our financial exposure to this matter could be material, and our reputation may be harmed.

We have investigated the circumstances around equity trades entered into by certain clients in Moscow and London and have advised regulators and law enforcement authorities in several jurisdictions about those trades. In the event that violations of law or regulation are found to have occurred, any resulting penalties against us may materially and adversely affect our results of operations, financial condition and reputation.

We have investigated the circumstances around equity trades entered into by certain clients with us in Moscow and London that offset one another. The total volume of transactions reviewed is significant. Our internal investigation of potential violations of law, regulation and policy and into the related internal control environment has concluded, and we are assessing the findings identified during the investigation; to date we have identified certain violations of our policies and deficiencies in our control environment. We have advised regulators and law enforcement authorities in several jurisdictions (including Germany, Russia, the UK and U.S.) of this investigation and have taken disciplinary measures with regards to certain individuals in this matter and will continue to do so with respect to others as warranted.

On January 30 and 31, 2017, the DFS and FCA announced settlements with the Bank related to their investigations into this matter. The settlements conclude the DFS and the FCA's investigations into the bank's anti-money laundering (AML) control function in its investment banking division, including in relation to the equity trading described above. Under the terms of the settlement agreement with the DFS, Deutsche Bank entered into a consent order, and agreed to pay civil monetary penalties of U.S.$ 425 million and to engage an independent monitor to conduct a comprehensive review of its existing AML compliance programs that pertain to or affect activities conducted by or through our U.S. bank subsidiary DBTCA and our New York branch for a term of up to two years. Under the terms of the settlement agreement with the FCA, Deutsche Bank agreed to pay civil monetary penalties of approximately GBP 163 million. On May 30, 2017, the Federal Reserve announced its settlement with us resolving this matter as well as additional AML issues identified by the Federal Reserve. We paid a penalty of U.S.$ 41 million. We also agreed to retain independent third parties to assess our Bank Secrecy Act/AML program and review certain foreign correspondent banking activity of DBTCA. We are also required to submit written remediation plans and programs.

We continue to cooperate with regulators and law enforcement authorities, including the DOJ, which has its own ongoing investigation into these securities trades. In the event that violations of law or regulation are found to have occurred, legal and regulatory sanctions in respect thereof may materially and adversely affect our results of operations, financial condition and reputation.

We are currently involved in civil and criminal proceedings in connection with transactions with Monte dei Paschi di Siena. The extent of our financial exposure to these matters could be material, and our reputation may be harmed.

In February 2013, Banca Monte Dei Paschi Di Siena ("MPS") issued civil proceedings in Italy against us alleging that we assisted former MPS senior management in an accounting fraud on MPS, by undertaking repo transactions with MPS and "Santorini", a wholly owned special-purpose vehicle of MPS, which helped MPS defer losses on a previous transaction undertaken with us. Subsequently, in July 2013, the Fondazione Monte Dei Paschi, MPS' largest shareholder, also commenced civil proceedings in Italy for damages based on substantially the same facts. In December 2013, we reached an agreement with MPS to settle the civil proceedings and the transactions were unwound. The civil proceedings by the Fondazione Monte Dei Paschi, in which damages of between € 220 million and € 381 million are claimed, remain pending. The Fondazione's separate claim filed in July 2014 against their former administrators and a syndicate of 12 banks including DB S.p.A. for € 286 million has resumed before the Florence Court.

A criminal investigation was launched by the Siena Public Prosecutor into the transactions and certain unrelated transactions entered into by MPS with other parties. Such investigation was moved in summer 2014 from Siena to the Milan Public Prosecutors as a result of a change in the alleged charges being investigated. On February 16, 2016, the Milan Public Prosecutors issued a request of committal to trial against us and six current and former employees. The committal process concluded with a hearing on October 1, 2016, during which the Milan court committed all defendants in the criminal proceedings to trial. Our potential exposure is for administrative liability under Italian Legislative Decree n. 231/2001 and for civil vicarious liability as an employer of current and former employees who are being criminally prosecuted. Trial commenced on December 15, 2016 and is ongoing. We continue to cooperate and update our regulators. The extent of our financial exposure to these matters could be material, and our reputation may suffer material harm as a result of these matters.

We are currently involved in a legal dispute with the German tax authorities in relation to the tax treatment of certain income received with respect to our pension plan assets. The proceeding is pending in front of the German supreme fiscal court (Bundesfinanzhof). Should the courts ultimately rule in favor of the German tax authorities, the outcome could have a material effect on our comprehensive income and financial condition.

We sponsor a number of post-employment benefit plans on behalf of our employees. In Germany, the pension assets that fund the obligations under these pension plans are held by Benefit Trust GmbH. The German tax authorities are challenging the tax treatment of certain income received by Benefit Trust GmbH in the years 2010 to 2013 with respect to its pension plan assets. For the year 2010 Benefit Trust GmbH paid the amount of tax and interest assessed of € 160 million to the tax authorities and is seeking a refund of the amounts paid in litigation with the relevant lower fiscal court. For 2011 to 2013 the matter is stayed pending the outcome of the 2010 tax litigation. The amount of tax and interest under dispute for years 2011 to 2013, which also has been paid to the tax authorities, amounts to € 456 million. In March 2017, the lower fiscal court ruled in favor of Benefit Trust GmbH and in September 2017 the tax authorities appealed the decision to the German supreme fiscal court (Bundesfinanzhof). A decision by the supreme fiscal court is not expected for a number of years. An ultimate decision by the courts that is unfavorable to us could materially and adversely affect our comprehensive income and financial condition.

Guilty pleas by or convictions of us or our affiliates in criminal proceedings may have consequences that have adverse effects on certain of our businesses.

We and our affiliates have been and are subjects of criminal proceedings or investigations. In particular, as part of the resolution of the investigation of the DOJ into misconduct relating to interbank offered rates, our subsidiary DB Group Services (UK) Ltd. entered into a plea agreement with the DOJ, pursuant to which the company pled guilty to one count of wire fraud. Also, in connection with the KOSPI Index unwind matters, our subsidiary Deutsche Securities Korea Co. was convicted of vicarious corporate criminal liability in respect of spot/futures linked market manipulation by its employees. We and our subsidiaries are also subjects of other criminal proceedings or investigations.

Guilty pleas or convictions against us or our affiliates could lead to our ineligibility to use an important trading exemption under ERISA. In particular, such guilty pleas or convictions could cause our affiliates to no longer qualify as a "qualified professional asset manager" ("QPAM") under the QPAM Prohibited Transaction Exemption, which exemption is relied on to provide asset management services to certain pension plans in connection with certain asset management strategies. Loss of QPAM status could cause customers who rely on such status (whether because they are legally required to do so or because we have agreed contractually with them to maintain such status) to cease to do business or refrain from doing business with us and could negatively impact our reputation more generally. In addition, other clients may mistakenly see the loss as a signal that we are somehow no longer approved by the U.S. Department of Labor (DOL), the agency responsible for ERISA, and cease to do business or refrain from doing business with us for that reason. This could have a material adverse effect on our results of operations, particularly those of our asset management business in the United States. On December 9, 2017, the DOL published an individual exemption permitting certain of our affiliates to retain their QPAM status despite both the guilty plea of DB Group Services (UK) Ltd. and the conviction of Deutsche Securities Korea Co. The exemption applies through April 17, 2021 and would terminate immediately if, among other things, we or our affiliates are convicted of crimes in other matters. The disqualification period arising from the guilty plea and conviction extends until April 17, 2027, and so we would need to obtain a further exemption by April 18, 2021 to avoid a loss of QPAM status at that time, with the potential for the adverse effects described above.

In addition to our traditional banking businesses of deposit-taking and lending, we also engage in nontraditional credit businesses in which credit is extended in transactions that include, for example, our holding of securities of third parties or our engaging in complex derivative transactions. These nontraditional credit businesses materially increase our exposure to credit risk.

As a bank and provider of financial services, we are exposed to the risk that third parties who owe us money, securities or other assets will not perform their obligations. Many of the businesses we engage in beyond the traditional banking businesses of deposit-taking and lending also expose us to credit risk.

In particular, much of the business we conduct through our Corporate & Investment Bank corporate division entails credit transactions, frequently ancillary to other transactions. Nontraditional sources of credit risk can arise, for example, from holding securities of third parties; entering into swap or other derivative contracts under which counterparties have obligations to make payments to us; executing securities, futures, currency or commodity trades that fail to settle at the required time due to nondelivery by the counterparty or systems failure by clearing agents, exchanges, clearing houses or other financial intermediaries; and extending credit through other arrangements. Parties to these transactions, such as trading counterparties, may default on their obligations to us due to bankruptcy, political and economic events, lack of liquidity, operational failure or other reasons.

Many of our derivative transactions are individually negotiated and non-standardized, which can make exiting, transferring or settling the position difficult. Certain credit derivatives require that we deliver to the counterparty the underlying security, loan or other obligation in order to receive payment. In a number of cases, we do not hold, and may not be able to obtain, the underlying security, loan or other obligation. This could cause us to forfeit the payments otherwise due to us or result in settlement delays, which could damage our reputation and ability to transact future business, as well as impose increased costs on us. Recently enacted legislation in the European Union (EMIR) and the U.S. (the Dodd-Frank Act) has introduced requirements for the standardization, margining, central clearing and transaction reporting of certain over-the-counter derivatives. While such requirements are aimed at reducing the risk posed to counterparties and the financial system by such derivatives, they may reduce the volume and profitability of the transactions in which we engage, and compliance with such provisions may impose substantial costs on us.

The exceptionally difficult market conditions experienced during the global financial crisis severely adversely affected certain areas in which we do business that entail nontraditional credit risks, including the leveraged finance and structured credit markets, and may do so in the future.

**A substantial proportion of the assets and liabilities on our balance sheet comprise financial instruments that we carry at fair value, with changes in fair value recognized in our income statement. As a result of such changes, we have incurred losses in the past, and may incur further losses in the future.**
A substantial proportion of the assets and liabilities on our balance sheet comprise financial instruments that we carry at fair value, with changes in fair value recognized in the income statement. Fair value is defined as the price at which an asset or liability could be exchanged in an arm's length transaction between knowledgeable, willing parties, other than in a forced or liquidation sale. If the value of an asset carried at fair value declines (or the value of a liability carried at fair value increases) a corresponding unfavorable change in fair value is recognized in the income statement. These changes have been and could in the future be significant. Additionally, in recent periods there has been a significant difference between fair value and book value for some assets.

Observable prices or inputs are not available for certain classes of financial instruments. Fair value is determined in these cases using valuation techniques we believe to be appropriate for the particular instrument. The application of valuation techniques to determine fair value involves estimation and management judgment, the extent of which will vary with the degree of complexity of the instrument and liquidity in the market. Management judgment is required in the selection and application of the appropriate parameters, assumptions and modeling techniques. If any of the assumptions change due to negative market conditions or for other reasons, subsequent valuations may result in significant changes in the fair values of our financial instruments, requiring us to record losses.

Our exposure and related changes in fair value are reported net of any fair value gains we may record in connection with hedging transactions related to the underlying assets. However, we may never realize these gains, and the fair value of the hedges may change in future periods for a number of reasons, including as a result of deterioration in the credit of our hedging counterparties. Such declines may be independent of the fair values of the underlying hedged assets or liabilities and may result in future losses.

**Our risk management policies, procedures and methods leave us exposed to unidentified or unanticipated risks, which could lead to material losses.**
We have devoted significant resources to developing our risk management policies, procedures and assessment methods and intend to continue to do so in the future. Nonetheless, the risk management techniques and strategies have not been and may in the future not be fully effective in mitigating our risk exposure in all economic market environments or against all types of risk, including risks that we fail to identify or anticipate. Some of our quantitative tools and metrics for managing risk are based upon our use of observed historical market behavior. We apply statistical and other tools to these observations to arrive at quantifications of our risk exposures. During the financial crisis, the financial markets experienced unprecedented levels of volatility (rapid changes in price direction) and the breakdown of historically observed correlations (the extent to which prices move in tandem) across asset classes, compounded by extremely limited liquidity. In this volatile market environment, our risk management tools and metrics failed to predict some of the losses we experienced, particularly in 2008, and may in the future fail to predict important risk exposures. In addition, our quantitative modeling does not take all risks into account and makes numerous assumptions regarding the overall environment, which may not be borne out by events. As a result, risk exposures have arisen and could continue to arise from factors we did not anticipate or correctly evaluate in our statistical models. This has limited and could continue to limit our ability to manage our risks especially in light of geopolitical developments, many of the outcomes of which are currently unforeseeable. Our losses thus have been and may in the future be significantly greater than the historical measures indicate.

In addition, our more qualitative approach to managing those risks not taken into account by our quantitative methods could also prove insufficient, exposing us to material unanticipated losses. Also, if existing or potential customers or counterparties believe our risk management is inadequate, they could take their business elsewhere or seek to limit their transactions with us. This could harm our reputation as well as our revenues and profits. See "Management Report: Risk Report" in the Annual Report 2017 for a more detailed discussion of the policies, procedures and methods we use to identify, monitor and manage our risks.

**Operational risks, which may arise from errors in the performance of our processes, the conduct of our employees, instability, malfunction or outage of our IT system and infrastructure, or loss of business continuity, or comparable issues with respect to our vendors, may disrupt our businesses and lead to material losses.**

We face operational risk arising from errors, inadvertent or intentional, made in the execution, confirmation or settlement of transactions or from transactions not being properly recorded, evaluated or accounted for. An example of this risk concerns our derivative contracts, which are not always confirmed with the counterparties on a timely basis. For so long as the transaction remains unconfirmed, we are subject to heightened credit and operational risk and in the event of a default may find it more difficult to enforce the contract. The European sovereign debt crisis and the global financial crisis, in which the risk of counterparty default increased, have increased the possibility that this operational risk materializes.

In addition, our businesses are highly dependent on our ability to process manually or through our systems a large number of transactions on a daily basis, across numerous and diverse markets in many currencies. Some of the transactions have become increasingly complex. Moreover, management relies heavily on its financial, accounting and other data processing systems that include manual processing components. If any of these processes or systems do not operate properly, or are disabled, or subject to intentional or inadvertent human error, we could suffer financial loss, a disruption of our businesses, liability to clients, regulatory intervention or reputational damage.

We are also dependent on our employees to conduct our business in accordance with applicable laws, regulations and generally accepted business standards. If our employees do not conduct our business in this manner, we may be exposed to material losses. Furthermore, if an employee's misconduct reflects fraudulent intent, we could also be exposed to reputational damage. We categorize these risks as conduct risk, which comprises inappropriate business practices, including selling products that are not suitable for a particular customer, fraud, unauthorized trading and failure to comply with applicable regulations, laws and internal policies.

We in particular face the risk of loss events due to the instability, malfunction or outage of our IT system and IT infrastructure. Such losses could materially affect our ability to perform business processes and may, for example, arise from the erroneous or delayed execution of processes as either a result of system outages or degraded services in systems and IT applications. A delay in processing a transaction, for example, could result in an operational loss if market conditions worsen during the period after the error. IT-related errors may also result in the mishandling of confidential information, damage to our computer systems, financial losses, additional costs for repairing systems, reputational damage, customer dissatisfaction or potential regulatory or litigation exposure.

Business continuity risk is the risk of incurring losses resulting from the interruption of normal business activities. We operate in many geographic locations and are frequently subject to the occurrence of events outside of our control. Despite the contingency plans we have in place, our ability to conduct business in any of these locations may be adversely impacted by a disruption to the infrastructure that supports our business, whether as a result of, for example, events that affect our third party vendors or the community or public infrastructure in which we operate. Any number of events could cause such a disruption including deliberate acts such as sabotage, terrorist activities, bomb threats, strikes, riots and assaults on the bank's staff; natural calamities such as hurricanes, snow storms, floods, disease pandemic and earthquakes; or other unforeseen incidents such as accidents, fires, explosions, utility outages and political unrest. Any such disruption could have a material adverse effect on our business and financial position.

**We utilize a variety of vendors in support of our business and operations. Services provided by vendors pose risks to us comparable to those we bear when we perform the services ourselves, and we remain ultimately responsible for the services our vendors provide. Furthermore, if a vendor does not conduct business in accordance with applicable standards or our expectations, we could be exposed to material losses or regulatory action or litigation or fail to achieve the benefits we sought from the relationship.**

We utilize a variety of vendors in support of our business and operations. We do so in order to focus on our core competencies and to seek improvements in costs, efficiency and effectiveness in our operations, for instance in connection with our IT modernization efforts. Services provided by vendors pose risks to us comparable to those we bear when we perform the services ourselves, and we remain ultimately responsible for the services our vendors provide. We depend on our vendors to conduct their delivery of services in compliance with applicable laws, regulations and generally accepted business standards and in accordance with the contractual terms and service levels they have agreed with us. If our vendors do not conduct business in accordance with these standards, we may be exposed to material losses and could be subject to regulatory action or litigation as well as be exposed to reputational damage. More generally, if a vendor relationship does not meet our expectations, we could be exposed to financial risks, such as the costs and expenses associated with migration of the services to another vendor

and business and operational risks related to the transition, and we could fail to achieve the benefits we sought from the relationship.

**Our operational systems are subject to an increasing risk of cyber-attacks and other internet crime, which could result in material losses of client or customer information, damage our reputation and lead to regulatory penalties and financial losses.**

Among the operational risks we face is the risk of breaches of the security of our or our vendors' computer systems due to unauthorized access to networks or resources, the introduction of computer viruses or malware, or other forms of cybersecurity attacks or incidents. Such breaches could threaten the confidentiality of our or our clients' data and the integrity of our systems. We devote significant resources toward the protection of our computer systems against such breaches and toward ensuring that our vendors employ appropriate cybersecurity safeguards. To address the evolving cyber threat risk, we have expended significant resources to modify and enhance our protective measures and to investigate and remediate any information security vulnerabilities. These measures, however, may not be effective against the many security threats we face.

The increasing frequency and sophistication of recent cyber-attacks has resulted in an elevated risk profile for many organizations around the world, and significant attention by our management has been paid to the overall level of preparedness against such attacks. Cybersecurity is growing in importance due to factors such as the continued and increasing reliance on our technology environment. We and other financial institutions have experienced attacks on computer systems, including attacks aimed at obtaining unauthorized access to confidential company or customer information or damaging or interfering with company data, resources or business activities, or otherwise exploiting vulnerabilities in our infrastructure. We expect to continue to be the target of such attacks in the future. Although we have to date not experienced any material business impact from these attacks, we may not be able to effectively anticipate and prevent more material attacks from occurring in the future. A successful attack could have a significant negative impact on us, including as a result of disclosure or misappropriation of client or proprietary information, damage to computer systems, financial losses, remediation costs (such as for investigation and reestablishing services), increased cybersecurity costs (such as for additional personnel, technology, or third-party vendors), reputational damage, customer dissatisfaction and potential regulatory or litigation exposure.

**The size of our clearing operations exposes us to a heightened risk of material losses should these operations fail to function properly.**

We have large clearing and settlement businesses and an increasingly complex and interconnected information technology (IT) landscape. These give rise to the risk that we, our customers or other third parties could lose substantial sums if our systems fail to operate properly for even short periods. This will be the case even where the reason for the interruption is external to us. In such a case, we might suffer harm to our reputation even if no material amounts of money are lost. This could cause customers to take their business elsewhere, which could materially harm our revenues and profits.

**We may have difficulty in identifying and executing acquisitions, and both making acquisitions and avoiding them could materially harm our results of operations and our share price.**

We consider business combinations from time to time. Even though we review the companies, businesses, assets, liabilities or contracts we plan to acquire, it is generally not feasible for these reviews to be complete in all respects. As a result, we may assume unanticipated liabilities, or an acquisition may not perform as well as expected. Were we to announce or complete a significant business combination transaction, our share price could decline significantly if investors viewed the transaction as too costly or unlikely to improve our competitive position. In addition, we might have difficulty integrating any entity with which we combine our operations. Failure to complete announced business combinations or failure to integrate acquired businesses successfully into ours could materially and adversely affect our profitability. It could also affect investors' perception of our business prospects and management, and thus cause our share price to fall. It could also lead to departures of key employees, or lead to increased costs and reduced profitability if we felt compelled to offer them financial incentives to remain.

If we avoid entering into additional business combination transactions or fail to identify attractive companies to acquire, market participants may perceive us negatively. We may also be unable to expand our businesses, especially into new business areas, as quickly or successfully as our competitors if we do so through organic growth alone. These perceptions and limitations could cost us business and harm our reputation.

**Intense competition, in our home market of Germany as well as in international markets, could materially adversely impact our revenues and profitability.**

Competition is intense in all of our primary business areas, in Germany as well as in international markets. If we are unable to respond to the competitive environment in these markets with attractive product and service offerings that are profitable for us, we may lose market share in important areas of our business or incur losses on some or all of our activities. In addition, downturns in the economies of these markets could add to the competitive pressure, through, for example, increased price pressure and lower business volumes for us.

In recent years there has been substantial consolidation and convergence among financial services companies, culminating in unprecedented consolidations in the course of the global financial crisis. This trend has significantly increased the capital base and geographic reach of some of our competitors and has hastened the globalization of the securities and other financial services markets. As a result, we must compete with financial institutions that may be larger and better capitalized than we are and that may have a stronger position in local markets. Also, governmental action in response to the global financial crisis may place us at a competitive disadvantage.

In addition to our traditional competitors such as other universal banks and financial services firms, an emerging group of future competitors in the form of start-ups and technology firms are showing an increasing interest in banking services and products. These new competitors could increase competition in both core products, e.g., payments, basic accounts and loans and investment advisory, as well as in new products, e.g., peer to peer lending and equity crowd funding.

**Transactions with counterparties in countries designated by the U.S. State Department as state sponsors of terrorism or persons targeted by U.S. economic sanctions may lead potential customers and investors to avoid doing business with us or investing in our securities, harm our reputation or result in regulatory or enforcement action which could materially and adversely affect our business.**
We engage or have engaged in a limited amount of business with counterparties, including government-owned or -controlled counterparties, in certain countries or territories that are subject to comprehensive U.S. sanctions, including Iran and Cuba (referred to as "Sanctioned Countries"), or with persons targeted by U.S. economic sanctions (referred to as "Sanctioned Persons"). U.S. law generally prohibits U.S. persons or any other persons acting with U.S. jurisdiction from doing business with Sanctioned Countries or Sanctioned Persons. Additionally, U.S. indirect or "secondary" sanctions threaten retaliation against certain activities, including categories of transactions with certain entities and countries, by non-U.S. persons entirely outside of U.S. jurisdiction. Thus, U.S. regulations may extend to activities in other geographic areas and by non-U.S. persons depending on the circumstances. Our U.S. subsidiaries, branch offices, and employees are, and our non-U.S. subsidiaries, branch offices, and employees may become, subject to those prohibitions and other regulations.

We are a German bank and our activities with respect to Sanctioned Countries and Sanctioned Persons have been subject to policies and procedures designed to avoid the involvement of persons acting within U.S. jurisdiction in any managerial or operational role and to ensure compliance with United Nations, European Union and German sanctions and embargoes; in reflection of legal developments in recent years, we have further developed our policies and procedures with the aim of ensuring compliance with regulatory requirements extending to other geographic areas regardless of jurisdiction. However, should our policies prove to have been ineffective, we may be subject to regulatory or enforcement action that could materially and adversely affect our reputation, financial condition, or business. We have taken action to reduce the risk of compliance violations. In 2007, our Management Board decided that we will not engage in new business with counterparties in countries such as Iran, Syria, Sudan and North Korea and to exit existing business to the extent legally possible. It also decided to limit our business with counterparties in Cuba. Iran, North Korea Sudan and Syria are currently designated as state sponsors of terrorism by the U.S. State Department.

We had a representative office in Tehran, Iran, which we discontinued on December 31, 2007. Our remaining business with Iranian counterparties consists mostly of participations as lender and/or agent in a few large trade finance facilities arranged before 2007 to finance the export contracts of exporters in Europe and Asia. The lifetime of most of these facilities is ten years or more and we are legally obligated to fulfil our contractual obligations. We do not believe our business activities with Iranian counterparties are material to our overall business, with the outstanding loans to Iranian borrowers representing substantially less than 0.01 % of our total assets as of December 31, 2017 and the revenues from all such activities representing less than 0.01 % of our total revenues for the year ended December 31, 2017.

In recent years, the United States has taken steps to deter foreign companies from dealing with Iran by providing for a variety of secondary sanctions against companies engaged in targeted activities there. The bulk of these secondary sanctions were suspended following the occurrence on January 16, 2016 of "Implementation Day" of the Joint Comprehensive Plan of Action (referred to as the "JCPOA") between the "P5+1" parties and Iran, pursuant to which Iran agreed to limits on its nuclear program and the P5+1 parties agreed to provide certain sanctions relief. However, non-U.S. persons remain exposed to secondary sanctions for knowingly engaging in significant transactions with any "specially designated nationals" ("SDNs") in Iran or any SDNs outside of Iran designated in connection with Iranian weapons of mass destruction, terrorism, or the Iranian Revolutionary Guard Corps. Following the Implementation Day, we engage in new activities with respect to Iran, but only to a limited extent. We execute cash payments in Euro from or to Iran on behalf of our own non-Iranian clients with enhanced due diligence. In principle, we remain restrictive towards any new trade finance activities and do not plan to engage in loan arrangements with Iranian counterparties. We do not believe we have engaged in activities sanctionable under Iran-related secondary sanctions, but the U.S. authorities have considerable discretion in applying the statutes, and any imposition of sanctions against us could be material. It is also possible that primary and secondary sanctions imposed by the U.S. and other jurisdictions against Iran could be expanded in the future, particularly if the JCPOA with Iran is abandoned. The JCPOA and U.S. sanctions against Iran remain a contentious issue in the United States and proposals for expanded sanctions are discussed on a continuing basis in the U.S. Administration, the U.S. Congress and elsewhere. On October 13, 2017, President Trump declined to certify Iran's compliance with the terms of the JPCOA but did not take any action to reimpose suspended U.S. sanctions on Iran. In January

2018, President Trump extended U.S. sanctions relief under the JCPOA but threatened to terminate the agreement unless it is amended by the end of the extension period in May 2018. Given the substantial uncertainty surrounding the JCPOA, there is a risk that the U.S. secondary sanctions suspended under the JCPOA could be reimposed were the United States to declare that Iran is in violation of the JCPOA or otherwise abandon the agreement. If the suspended sanctions against Iran were reimposed, it is possible that our ongoing activities related to Iran may need to be terminated on short notice. However, we do not believe that such activities are material to our business.

As required by Section 219 of the Iran Threat Reduction and Syria Human Rights Act of 2012 (Section 13(r) of the Securities Exchange Act of 1934, as amended) we have disclosed certain information regarding our activities or transactions with persons subject to U.S. sanctions against Iran and other persons subject to such provision. Such disclosure is set forth in the section of this document entitled "Disclosures Under Iran Threat Reduction and Syria Human Rights Act of 2012", which follows "Item 16H: Mine Safety Disclosure".

We are also engaged in a limited amount of business with counterparties domiciled in Cuba, which is not subject to any United Nations, European Union or German embargo. The business consists of a limited number of letters of credit, as well as claims resulting from letters of credit, and it represented substantially less than 0.01 % of our assets as of December 31, 2017. The transactions served to finance commercial products such as machinery as well as medical products.

We are aware of and quickly adapted to other substantial changes in United States economic sanctions that occurred in 2017. On August 2, 2017, the United States signed into law the "Countering America's Adversaries Through Sanctions Act" (referred to as "CAATSA"), which codifies existing U.S. sanctions against Russia (including designation of Russian entities under U.S. sanctions), expands U.S. secondary sanctions against Russia, tightens existing sectoral sanctions (targeting specific sectors of the Russian economy), and permits the imposition of sectoral sanctions against additional sectors of the Russian economy. In particular, expanded U.S. secondary sanctions under CAATSA now allow for the imposition of U.S. sanctions on non-U.S. entities who engage in "significant" transactions with Russian SDNs or specific entities in the Russian defense and intelligence sectors. We have set up appropriate processes and procedures aimed at complying with the expanded U.S. sanctions under CAATSA to the extent that such sanctions are applicable to our activities. We do not believe we have engaged or are currently engaged in any transactions with Russian entities that violate, or are sanctionable under, U.S. sanctions. However, given the broad discretion U.S. authorities have in interpreting and enforcing U.S. sanctions, there can be no assurances that U.S. authorities will not bring enforcement actions against us, or impose secondary sanctions on us for our ongoing activities. Any such actions could have a material impact on our business and harm our reputation. It is also possible that the United States could impose broader sanctions on Russia or Russian entities in the future and that such sanctions could have a material impact on our business activities.

Additionally, on August 24, 2017, the U.S. Administration imposed sanctions on the Government of Venezuela. These sanctions prohibit transactions or other dealings by U.S. persons or within the United States involving new debt of and certain bonds issued by the Government of Venezuela or the direct or indirect purchases of securities from the Government of Venezuela. While the U.S. Administration has provided several general licenses to mitigate the impact of these sanctions, a substantial portion of economic activity within U.S. jurisdiction involving the Government of Venezuela is now prohibited by U.S. sanctions. We have taken appropriate steps and established appropriate processes and procedures aimed at complying with the new U.S. sanctions against the Government of Venezuela. In response to these new U.S. sanctions, we have wound down several client relationships. With respect to entities of the Government of Venezuela, we are currently only engaged in legacy transactions. We do not believe that any of our remaining activities related to the Government of Venezuela violate U.S. sanctions. However, given the broad discretion U.S. authorities have in interpreting and enforcing U.S. sanctions, there can be no assurances that U.S. authorities do not allege that our ongoing activities violate U.S. sanctions.

We are aware, through press reports and other means, of initiatives by governmental and non-governmental entities in the United States and elsewhere to adopt laws, regulations or policies prohibiting transactions with or investment in, or requiring divestment from, entities doing business with Sanctioned Countries, particularly Iran. Such initiatives may result in our being unable to gain or retain entities subject to such prohibitions as customers or as investors in our securities. In addition, our reputation may suffer due to our association with such countries. Such a result could have significant adverse effects on our business or the price of our securities. It is also possible that new direct or indirect secondary sanctions could be imposed by the United States or other jurisdictions without warning as a result of geopolitical developments.

# PAGES 41-66 OMITTED PURSUANT TO D. N.J. ECF POLICIES AND PROCEDURES

State-chartered banks (such as DBTCA) and state-licensed branches and agencies of foreign banks (such as our New York branch) may not, with certain exceptions that require prior regulatory approval, engage as a principal in any type of activity not permissible for their federally chartered or licensed counterparts. In addition, DBTCA and Deutsche Bank Trust Company Delaware are subject to their respective state banking laws pertaining to legal lending limits and permissible investments and activities. Likewise, the United States federal banking laws also subject state branches and agencies to the same single-borrower lending limits that apply to federal branches or agencies, which are substantially similar to the lending limits applicable to national banks. These single-borrower lending limits are based on the worldwide capital of the entire foreign bank (i.e., Deutsche Bank AG in the case of the New York branch).

The Federal Reserve Board may terminate the activities of any U.S. office of a foreign bank if it determines that the foreign bank is not subject to comprehensive supervision on a consolidated basis in its home country or that there is reasonable cause to believe that such foreign bank or its affiliate has violated the law or engaged in an unsafe or unsound banking practice in the United States or, for a foreign bank that presents a risk to the stability of the United States financial system, the home country of the foreign bank has not adopted, or made demonstrable progress toward adopting, an appropriate system of financial regulation to mitigate such risk.

The lending limits applicable to our FDIC-insured state-chartered bank subsidiaries take into account credit exposures arising from derivative transactions, and the lending limits applicable to our New York branch take into account both credit exposures arising from derivative transactions as well as securities borrowing and lending transactions and repurchase and reverse repurchase agreements with counterparties.

Also, under the so-called swap "push-out" provisions of the Dodd-Frank Act, certain structured finance derivatives activities of FDIC-insured banks and U.S. branch offices of foreign banks (including our New York branch) are restricted.

In addition, the regulations which the Consumer Financial Protection Bureau may adopt could affect the nature of the consumer activities which a bank (including our FDIC-insured bank subsidiaries and our New York branch) may conduct, and may impose restrictions and limitations on the conduct of such activities.

There are various qualitative and quantitative restrictions on the extent to which we and our nonbank subsidiaries can borrow or otherwise obtain credit from our U.S. banking subsidiaries or engage in certain other transactions involving those subsidiaries. In general, these transactions must be on terms that would ordinarily be offered to unaffiliated entities, must be secured by designated amounts of specified collateral and are subject to volume limitations. These restrictions also apply to certain transactions of our New York branch with our U.S. broker-dealers and certain of our other affiliates. Credit exposure arising from derivative transactions, securities borrowing and lending transactions, and repurchase/reverse repurchase agreements is subject to these collateral and volume limitations.

A major focus of U.S. governmental policy relating to financial institutions is aimed at preventing money laundering and terrorist financing and compliance with economic sanctions in respect of designated countries or activities. Failure of an institution to have policies and procedures and controls in place to prevent, detect and report money laundering and terrorist financing could in some cases have serious legal, financial and reputational consequences for the institution.

## New York Branch

The New York branch of Deutsche Bank AG is licensed by the Superintendent of the New York State Department of Financial Services to conduct a commercial banking business and is required to maintain eligible high-quality assets with banks in the State of New York (up to a maximum of U.S.$ 100 million of assets pledged so long as the New York branch remains "well-rated" by the Superintendent of Financial Services). Should our New York branch cease to be "well-rated", we may need to maintain substantial additional amounts of eligible assets. The Superintendent of Financial Services may also establish asset maintenance requirements for branches of foreign banks. In addition, the Federal Reserve Board is authorized to establish asset maintenance requirements for our New York branch under certain conditions, pursuant to the FBO Rules. Currently, no such requirements have been imposed upon our New York branch.

The New York State Banking Law authorizes the Superintendent of Financial Services to take possession of the business and property of a New York branch of a foreign bank under certain circumstances, generally involving violation of law, conduct of business in an unsafe manner, impairment of capital, suspension of payment of obligations, or initiation of liquidation proceedings against the foreign bank at its domicile or elsewhere. In liquidating or dealing with a branch's business after taking possession of a branch, only the claims of depositors and other creditors which arose out of transactions with a branch are to be accepted by the Superintendent of Financial Services for payment out of the business and property of the foreign bank in the State of New York, without prejudice to the rights of the holders of such claims to be satisfied out of other assets of the foreign bank. After such claims are paid, the Superintendent of Financial Services will turn over the remaining assets, if any, to the foreign bank or its duly appointed liquidator or receiver.

# Deutsche Bank Trust Company Americas

The Federal Deposit Insurance Corporation Improvement Act of 1991 ("FDICIA") provides for extensive regulation of depository institutions (such as DBTCA and its direct and indirect parent companies), including requiring federal banking regulators to take "prompt corrective action" with respect to FDIC-insured banks that do not meet minimum capital requirements. As an insured bank's capital level declines and the bank falls into lower categories (or if it is placed in a lower category by the discretionary action of its supervisor), greater limits are placed on its activities and federal banking regulators are authorized (and, in many cases, required) to take increasingly more stringent supervisory actions, which could ultimately include the appointment of a conservator or receiver for the bank (even if it is solvent). In addition, FDICIA generally prohibits an FDIC-insured bank from making any capital distribution (including payment of a dividend) or payment of a management fee to its holding company if the bank would thereafter become "undercapitalized". If an insured bank becomes "undercapitalized", it is required to submit to federal regulators a capital restoration plan guaranteed by the bank's holding company. Since the enactment of FDICIA, both of our U.S. insured banks have maintained capital above the "well capitalized" standards, the highest capital category under applicable regulations.

DBTCA, like other FDIC-insured banks, is required to pay assessments to the FDIC for deposit insurance under the FDIC's Deposit Insurance Fund (calculated using the FDIC's risk-based assessment system). The minimum reserve ratio for the Deposit Insurance Fund was increased under the Dodd-Frank Act from 1.15 % to 1.35 %, with the target of 1.35 % to be reached by 2020 and with the incremental cost charged to banks with more than U.S.$ 10 billion in assets. In addition, the FDIC has set the designated reserve ratio at 2 % as a long-term goal. This shift has had financial implications for all FDIC-insured banks, including DBTCA. In order to achieve the 1.35 % goal, in March 2016, the FDIC adopted a rule imposing an additional surcharge of 4.5 % per $ 100 of the quarterly assessments (after making certain adjustments) of insured depository institutions with total consolidated assets of U.S.$ 10 billion or more, including DBTCA. The surcharge took effect on July 1, 2016, and the FDIC expects it to remain in place for two years. The surcharge has increased costs for DBTCA and may be material to the results of operation of DBTCA. The FDIC's standard maximum deposit insurance amount per customer at an insured depository institution is U.S.$ 250,000.

# Other

In the United States, our U.S.-registered broker-dealers are regulated by the SEC. Broker-dealers are subject to regulations that cover all aspects of the securities business, including sales methods, trade practices among broker-dealers, use and safekeeping of customers' funds and securities, capital structure, recordkeeping, the financing of customers' purchases and the conduct of directors, officers and employees.

Our principal U.S. SEC-registered broker-dealer subsidiary, Deutsche Bank Securities Inc., is a member of the New York Stock Exchange and is regulated by the Financial Industry Regulatory Authority, Inc. ("FINRA") and the individual state securities authorities in the states in which it operates. The U.S. government agencies and self-regulatory organizations, as well as state securities authorities in the United States having jurisdiction over our U.S. broker-dealer affiliates, are empowered to conduct administrative proceedings that can result in censure, fine, the issuance of cease-and-desist orders or the suspension or expulsion of a broker-dealer or its directors, officers or employees. Deutsche Bank Securities Inc. is also registered with and regulated by the SEC as an investment adviser, and by the CFTC and the National Futures Association as a futures commission merchant and commodity pool operator.

Under the Dodd-Frank Act, with certain exceptions, our entities that are swap dealers, security-based swap dealers, major swap participants or major security-based swap participants are registered or will be required to register with the SEC or CFTC, or both. Currently, Deutsche Bank AG is provisionally registered as a swap dealer. At a future date, we will be required to register one or more subsidiaries as security-based swap dealers with the SEC and may be required to register additional subsidiaries as swap dealers with the CFTC and certain subsidiaries as CFTC-regulated major swap participants and/or SEC-regulated major security-based swap participants. Registration, including provisional registration, as swap dealers, security-based swap dealers, major swap participants or major security-based swap participants subjects us to requirements as to capital, margin, business conduct and recordkeeping, among other requirements.

# PAGES 69-78 OMITTED PURSUANT TO D. N.J. ECF POLICIES AND PROCEDURES

# Item 8: Financial Information

## Consolidated Statements and Other Financial Information

### Consolidated Financial Statements

The Financial Statements of this Annual Report on Form 20-F consist of the Consolidated Financial Statements including Notes 1 to 44 thereto, which are set forth as Part 2 of the Annual Report 2017, and, as described in Note 1 "Significant Accounting Policies and Critical Accounting Estimates" thereto in the third paragraph under "Basis of Accounting", certain parts of the Management Report set forth as Part 1 of the Annual Report 2017. Such Consolidated Financial Statements have been audited by KPMG AG Wirtschaftsprüfungsgesellschaft, as described in their "Report of Independent Registered Public Accounting Firm" included in the Annual Report 2017.

### Legal Proceedings

**General.** We and our subsidiaries operate in a legal and regulatory environment that exposes us to significant litigation risks. As a result, we are involved in litigation, arbitration and regulatory proceedings and investigations in Germany and in a number of jurisdictions outside Germany, including the United States. Please refer to Note 29 "Provisions" to the Consolidated Financial Statements for descriptions of certain significant legal proceedings. Additional legal proceedings that may have, or have had in the recent past, significant effects on our financial position or profitability are described below.

**Bank Bill Swap Rate Claims.** On August 16, 2016, a putative class action was filed in the U.S. District Court for the Southern District of New York against Deutsche Bank and other defendants, bringing claims based on alleged collusion and manipulation in connection with the Australian Bank Bill Swap Rate ("BBSW"). The complaint alleges that the defendants, among other things, engaged in money market transactions intended to influence the BBSW fixing, made false BBSW submissions, and used their control over BBSW rules to further the alleged misconduct. Plaintiffs bring suit on behalf of persons and entities that engaged in U.S.-based transactions in BBSW-linked financial instruments from 2003 through the present. An amended complaint was filed on December 16, 2016, and is the subject of fully briefed motions to dismiss. The court held argument on January 23, 2018. On February 23, 2018, defendants filed a renewed motion to dismiss on certain grounds that had been previously raised.

**Canadian Dealer Offered Rate Matter.** On January 12, 2018, the Fire & Police Pension Association of Colorado filed a putative class action lawsuit in the U.S. District Court for the Southern District of New York relating to the Canadian Dealer Offered Rate ("CDOR"), a Canadian dollar-denominated interest rate benchmark, against numerous financial institutions including Deutsche Bank and its subsidiaries Deutsche Bank Securities Inc. and Deutsche Bank Securities Limited. The complaint alleges that the defendants, members of the panel of banks that provided CDOR submissions and their affiliates, suppressed their CDOR submissions from at latest August 9, 2007 through at earliest June 30, 2014 in order to benefit their positions in CDOR-referencing financial instruments. The complaint asserts claims under the U.S. Sherman Act, U.S. Commodity Exchange Act, and the U.S. Racketeer Influenced and Corrupt Organizations Act, as well as state common law contract and unjust enrichment claims.

**Contestation of the General Meeting's Resolution Not to Pay a Dividend for the 2015 Fiscal Year.** In May 2016, Deutsche Bank AG's General Meeting resolved that no dividend was to be paid to Deutsche Bank's shareholders for the 2015 fiscal year. Some shareholders filed a lawsuit with the Frankfurt am Main District Court (Landgericht), contesting (among other things) the resolution on the grounds that Deutsche Bank was required by law to pay a minimum dividend in an amount equal to 4 % of Deutsche Bank's share capital. In December 2016, the district court ruled in favor of the plaintiffs. Deutsche Bank initially appealed the court's decision. However, consistent with Deutsche Bank's updated strategy, Deutsche Bank withdrew the appeal, as this decision is concerned, prior to Deutsche Bank's 2017 General Meeting, whereupon the contested resolution became void. Deutsche Bank's General Meeting in May 2017 resolved the payment of a dividend of approximately € 400 million from Deutsche Bank's distributable profit for 2016 which amount contains a component reflecting the distributable profit carried forward from 2015 of approximately € 165 million. Such dividend was paid to the shareholders shortly after the annual General Meeting. The decision meanwhile was contested at court, again, claiming that the way the decision was taken was not correct. On January 18 2018, the Frankfurt am Main District Court dismissed the shareholder actions as regards the dividend resolution taken in May 2017. The plaintiffs have appealed the decision to the Higher Regional Court Frankfurt am Main.

**CO2 Emission Rights.** The Frankfurt am Main Office of Public Prosecution (the "OPP") is investigating alleged value-added tax (VAT) fraud in connection with the trading of $CO_2$ emission rights by certain trading firms, some of which also engaged in trading activity with Deutsche Bank. The OPP alleges that certain employees of Deutsche Bank knew that their counterparties were part of a fraudulent scheme to avoid VAT on transactions in $CO_2$ emission rights, and it searched Deutsche Bank in April 2010 and December 2012. On June 13, 2016, the Frankfurt am Main District Court sentenced seven former Deutsche Bank employees for VAT evasion and for aiding and abetting VAT evasion in connection with their involvement in $CO_2$ emissions trading.

Appeals are pending with respect to some of such former employees. Investigations by the OPP with respect to other employees are ongoing.

The insolvency administrators of three German traders who sold emission certificates to Deutsche Bank in 2009/2010 were trying to refute the transactions as a voidable preference under German insolvency law and, in some cases, started civil litigation. In mid-2015, the Frankfurt am Main District Court dismissed the insolvency administrator's claim in full in one of the cases. An appeal was filed against the decision. In July 2017, a settlement was agreed with the three insolvency administrators.

In 2015, five insolvent English companies, which are alleged to have been involved in VAT fraud in connection with trading CO2 emission rights in the UK, and their respective liquidators, started civil proceedings in London against four defendants including Deutsche Bank AG claiming that the defendants dishonestly assisted directors of the insolvent companies in breaching duties, and alternatively that the defendants were party to carrying on the companies' business with fraudulent intent (giving rise to a claim under Section 213 of the Insolvency Act 1986). On September 29, 2017, Deutsche Bank agreed a settlement with the claimants.

**Deutsche Bank Shareholder Litigation.** Deutsche Bank and certain of its current and former officers and management board members are the subject of a purported class action, filed in the U.S. District Court for the Southern District of New York, asserting claims under Sections 10(b) and 20(a) of the U.S. Securities Exchange Act of 1934 on behalf of persons who purchased or otherwise acquired securities of Deutsche Bank on a United States exchange or pursuant to other transactions within the United States between January 31, 2013 and July 26, 2016. Plaintiffs allege that Deutsche Bank's SEC Annual Reports on Form 20-F for the years 2012, 2013, 2014 and 2015 were materially false and misleading in failing to disclose (i) serious and systemic failings in controls against financing terrorism, money laundering, aiding organizations subject to international sanctions and committing financial crime and (ii) that the Bank's internal control over financial reporting and its disclosure controls and procedures were not effective. On February 21, 2017, Deutsche Bank and the individual defendants served at the time with the summons and complaint moved to dismiss the consolidated amended complaint. On June 28, 2017, the court granted the motion to dismiss as to all defendants, without leave to replead. On June 30, 2017, the court entered judgment dismissing the lawsuit. On July 14, 2017, plaintiffs moved to alter or amend the court's order and judgment, and for leave to file an amended complaint. On August 16, 2017, the court denied plaintiffs' motion. Plaintiffs filed a notice of appeal and the appeal has been fully briefed as of January 22, 2018.

**ISDAFIX.** On February 1, 2018, the Bank entered into a settlement with the U.S. Commodity Futures Trading Commission (CFTC) to resolve the CFTC's investigation concerning the Bank's involvement in the setting of U.S. dollar ISDAFIX benchmark. The Bank agreed to pay a civil monetary penalty of U.S.$ 70 million and to remedial undertakings, including maintaining systems and controls reasonably designed to prevent potential manipulation of interest rate swaps benchmarks.

In addition, the Bank has been named as a defendant in five putative class actions that were consolidated in the U.S. District Court for the Southern District of New York asserting antitrust, fraud, and other claims relating to an alleged conspiracy to manipulate the U.S. dollar ISDAFIX benchmark. On April 8, 2016, Deutsche Bank settled the class actions for U.S.$ 50 million, which is subject to final court approval. The settlement was preliminarily approved by the court on May 11, 2016.

**Life Settlements Investigation.** On May 2, 2017, the U.S. Attorney's Office for the Southern District of New York notified the Bank that it has closed its investigation of the Bank's historical life settlements business, which included the origination and purchase of investments in life insurance assets during the 2005 to 2008 period. As is customary, the U.S. Attorney's Office further informed the Bank that the it may reopen its investigation if it obtains additional information or evidence.

**Monte Dei Paschi.** In February 2013, Banca Monte dei Paschi Di Siena ("MPS") issued civil proceedings in Italy against Deutsche Bank alleging that Deutsche Bank assisted former MPS senior management in an accounting fraud on MPS, by undertaking repo transactions with MPS and "Santorini", a wholly owned special-purpose vehicle of MPS, which helped MPS defer losses on a previous transaction undertaken with Deutsche Bank. Subsequently, in July 2013, the Fondazione Monte Dei Paschi, MPS' largest shareholder, also commenced civil proceedings in Italy for damages based on substantially the same facts. In December 2013, Deutsche Bank reached an agreement with MPS to settle the civil proceedings and the transactions were unwound. The civil proceedings by the Fondazione Monte Dei Paschi, in which damages of between € 220 million and € 381 million are claimed, remain pending. The Fondazione's separate claim filed in July 2014 against their former administrators and a syndicate of 12 banks including Deutsche Bank S.p.A. for € 286 million has resumed before the Florence Court.

A criminal investigation was launched by the Siena Public Prosecutor into the transactions and certain unrelated transactions entered into by MPS with other parties. Such investigation was moved in summer 2014 from Siena to the Milan Public Prosecutors as a result of a change in the alleged charges being investigated. On February 16, 2016, the Milan Public Prosecutors issued a request of committal to trial against Deutsche Bank AG and six current and former employees. The committal process concluded with a hearing on October 1, 2016, during which the Milan court committed all defendants in the criminal proceedings to trial. Deutsche Bank's potential exposure is for administrative liability under Italian Legislative Decree n. 231/2001 and for civil vicarious liability as an employer of current and former Deutsche Bank employees who are being criminally prosecuted. Trial commenced on December 15, 2016 and is ongoing. Deutsche Bank continues to cooperate and update its regulators.

**Parmalat Litigation.** Following the bankruptcy of the Italian company Parmalat, prosecutors in Parma conducted a criminal investigation against various bank employees, including employees of Deutsche Bank, and brought charges of fraudulent bankruptcy and usury against a number of Deutsche Bank employees and others. The trial commenced in September 2009 and a verdict was recently delivered in July 2017. The Deutsche Bank employees were acquitted and, as a result thereof, Deutsche Bank will not be held to have vicarious liability in connection with the actions of the bank employees. The court published its reasoning in January 2018, and the matter currently remains open to the prosecutors to consider the possibility of an appeal.

**Pas-de-Calais Habitat.** On May 31, 2012, Pas-de-Calais Habitat ("PDCH"), a public housing office, initiated proceedings before the Paris Commercial Court against Deutsche Bank in relation to four swap contracts entered into in 2006, restructured on March 19, 2007 and January 18, 2008 and subsequently restructured in 2009 and on June 15, 2010. PDCH asks the Court to declare the March 19, 2007 and January 18, 2008 swap contracts null and void, or terminated, or to grant damages to PDCH in an amount of approximately € 170 million on the grounds, inter alia, that Deutsche Bank committed fraudulent and deceitful acts, manipulated the LIBOR and EURIBOR rates which are used as a basis for calculating the sums due by PDCH under the swap contracts and breached its obligations to warn, advise and inform PDCH. A decision on the merits is not expected until the second quarter of 2018 at the earliest.

**Pension Plan Assets.** The Group sponsors a number of post-employment benefit plans on behalf of its employees. In Germany, the pension assets that fund the obligations under these pension plans are held by Benefit Trust GmbH. The German tax authorities are challenging the tax treatment of certain income received by Benefit Trust GmbH in the years 2010 to 2013 with respect to its pension plan assets. For the year 2010 Benefit Trust GmbH paid the amount of tax and interest assessed of € 160 million to the tax authorities and is seeking a refund of the amounts paid in litigation. For 2011 to 2013 the matter is stayed pending the outcome of the 2010 tax litigation. The amount of tax and interest under dispute for years 2011 to 2013, which also has been paid to the tax authorities, amounts to € 456 million. In March 2017, the lower fiscal court ruled in favor of Benefit Trust GmbH and in September 2017 the tax authorities appealed the decision to the German supreme fiscal court (Bundesfinanzhof). A decision by the supreme fiscal court is not expected for a number of years.

**Precious Metals Investigations and Litigations.** Deutsche Bank has received inquiries from certain regulatory and law enforcement authorities, including requests for information and documents, pertaining to investigations of precious metals trading and related conduct. Deutsche Bank is cooperating with these investigations, and engaging with relevant authorities, as appropriate. On January 29, 2018, the Bank entered into a U.S.$ 30 million settlement with the CFTC to resolve the CFTC's investigation concerning spoofing, manipulation and attempted manipulation in precious metals futures, as well as the manipulation and attempted manipulation of stop loss orders. The order requires that the Bank, among other things, maintain systems and controls reasonably designed to detect spoofing, and maintain training regarding spoofing, manipulation and attempted manipulation. The Order also requires the Bank to continue to cooperate with the CFTC.

Deutsche Bank is a defendant in two consolidated class action lawsuits pending in the U.S. District Court for the Southern District of New York. The suits allege violations of U.S. antitrust law, the U.S. Commodity Exchange Act and related state law arising out of the alleged manipulation of gold and silver prices through participation in the Gold and Silver Fixes, but do not specify the damages sought. Deutsche Bank has reached agreements to settle the Gold action for U.S.$ 60 million and the Silver action for U.S. $ 38 million. The agreements remain subject to final court approval.

In addition, Deutsche Bank is a defendant in Canadian class action proceedings in the provinces of Ontario and Quebec concerning gold and silver. Each of the proceedings seeks damages for alleged violations of the Canadian Competition Act and other causes of action.

**Sebastian Holdings Litigation.** Litigation with Sebastian Holdings Inc. ("SHI") in respect of claims arising from FX trading activities concluded in the UK Commercial Court in November 2013 when the court awarded Deutsche Bank approximately U.S.$ 236 million plus interest and dismissed all of SHI's claims. On January 27, 2016, a New York court dismissed substantially similar claims by SHI against Deutsche Bank when it granted Deutsche Bank's motion for summary judgment based on the UK Commercial Court's judgment. The New York court also denied SHI's motion for leave to file an amended complaint. The New York court's decisions were affirmed on appeal on February 28, 2017. The New York State Court of Appeals denied SHI's motion for leave to appeal on June 6, 2017. The time for SHI to seek review by the U.S. Supreme Court has expired, and the decision is now final.

**Vestia.** In December 2016, Stichting Vestia, a Dutch housing association, commenced proceedings against Deutsche Bank in England. The proceedings relate to derivatives entered into between Stichting Vestia and Deutsche Bank between 2005 and 2012. Stichting Vestia alleges that certain of the transactions entered into by it with Deutsche Bank should be set aside on the grounds that they were not within its capacity and/or were induced by the bribery of Vestia's treasurer by an intermediary involved in those transactions. The sums claimed by Stichting Vestia are made up of different elements, some of which have not yet been quantified. The quantum of the claims as articulated at this stage ranges between € 717 million and € 834 million, plus compound interest. Deutsche Bank is defending the claim.

## Dividend Policy

For 2017, the Management Board will propose to the General Meeting to pay a dividend of € 0.11 per share. In 2015, we did not pay a dividend. In 2016, we paid a dividend of € 0.19 in the aggregate out of the distributable profit for 2016, reflecting the payout of € 0.08 per share eligible for a dividend for the 2015 financial year out of the distributable profit carried forward from 2015 of approximately € 165 million and a dividend of € 0.11 per share eligible for a dividend for the 2016 financial year from the remaining distributable profit for 2016. Historically, however, we have paid dividends at higher levels, including dividends per share of € 0.75 for 2014, and we intend to pay competitive dividends beginning in 2018 (paid after the annual General Meeting in 2019). However, we cannot assure investors that we will pay dividends as for 2014 or previous years, or at any other level, or at all, in any future period. If the company is not profitable, we may not pay dividends at all.

Furthermore, if Deutsche Bank AG fails to meet the regulatory capital adequacy requirements under CRR/CRD 4 (including individually imposed capital requirements (so-called "Pillar 2" requirements) and the combined buffer requirement), it may be prohibited from making, and the ECB or the BaFin may suspend or limit, the payment of dividends. In addition, the ECB expects banks to meet "Pillar 2" guidance. If Deutsche Bank AG operates or expects to operate below "Pillar 2" guidance, the ECB will review the reasons why the Bank's capital level has fallen or is expected to fall and may take appropriate and proportionate measures in connection with such shortfall. Any such measures might have an impact on Deutsche Bank AG's willingness or ability to pay dividends. For further information on regulatory capital adequacy requirements and the powers of Deutsche Bank AG's regulators to suspend dividend payments, see "Item 4: Information on the Company – Regulation and Supervision – Capital Adequacy Requirements" and "– Investigative and Enforcement Powers."

Under German law, Deutsche Bank AG's dividends are based on the unconsolidated results of Deutsche Bank AG as prepared in accordance with German accounting rules. Deutsche Bank AG's Management Board, which prepares the annual financial statements of Deutsche Bank AG on an unconsolidated basis, and its Supervisory Board, which reviews them, first allocate part of Deutsche Bank AG's annual surplus (if any) to Deutsche Bank AG's statutory reserves and to any losses carried forward, as it is legally required to do. They then allocate the remainder between other revenue reserves (or retained earnings) and balance sheet profit. They may allocate up to one-half of this remainder to other revenue reserves, and must allocate at least one-half to balance sheet profit. A profit distribution from balance sheet profit is only permitted to the extent that the balance sheet profit plus distributable earnings exceeds potential dividend blocking items, which consist of deferred tax assets, self-developed software and unrealized gains on plan assets, all net of respective deferred tax liabilities.

Deutsche Bank AG then distributes up to the full amount of the balance sheet profit not subject to dividend blocking of Deutsche Bank AG if the annual General Meeting so resolves. The annual General Meeting may resolve a non-cash distribution instead of, or in addition to, a cash dividend. However, Deutsche Bank AG is not legally required to distribute its balance sheet profit to its shareholders to the extent that it has issued participatory rights (Genussrechte) or granted a silent participation (stille Gesellschaft) that accord their holders the right to a portion of Deutsche Bank AG's distributable profit.

German corporate law provided that, should the annual General Meeting resolve to carry forward profits or to allocate profits to the reserves, shareholders may contest the resolution of the General Meeting if such carrying forward or allocation is not, on the basis of a reasonable commercial assessment, deemed necessary to ensure the viability or economic resilience of the company and the shareholders do not receive a minimum dividend in the amount equal to 4 % of the share capital. On these grounds, shareholders challenged the distribution of the 2016 annual General Meeting not to pay a dividend for 2015. Meanwhile, according to Section 10 (5) of the German Banking Act ("Kreditwesengesetz") as amended in July 2017, this provision of German corporate law is no longer applicable to credit institutions subject to the CRR, i.e. the minimum dividend requirement no longer applies to Deutsche Bank AG.

Deutsche Bank AG declares dividends by resolution of the annual General Meeting and pays them (if any) once a year. Dividends approved at a General Meeting are payable on the third business day after that meeting, unless a later date has been determined at that meeting or by the Articles of Association. In accordance with the German Stock Corporation Act, the record date for determining which holders of Deutsche Bank AG's ordinary shares are entitled to the payment of dividends, if any, or other distributions whether cash, stock or property, is the date of the General Meeting at which such dividends or other distributions are declared.

# Significant Changes

Except as otherwise stated in this document, there have been no significant changes subsequent to December 31, 2017.

# PAGES 83-95 OMITTED PURSUANT TO D. N.J. ECF POLICIES AND PROCEDURES

Part I

# Item 15: Controls and Procedures

## Disclosure Controls and Procedures

An evaluation was carried out under the supervision and with the participation of our management, including our Chairman and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934) as of December 31, 2017. There are, as described below, inherent limitations to the effectiveness of any control system, including disclosure controls and procedures. Accordingly, even effective disclosure controls and procedures can provide only reasonable assurance of achieving their control objectives. Based upon such evaluation, our Chairman and Chief Financial Officer concluded that the design and operation of our disclosure controls and procedures were effective as of December 31, 2017.

## Management's Annual Report on Internal Control over Financial Reporting

Management of Deutsche Bank Aktiengesellschaft, together with its consolidated subsidiaries, is responsible for establishing and maintaining adequate internal control over financial reporting. Our internal control over financial reporting is a process designed under the supervision of our principal executive officer and our principal financial officer to provide reasonable assurance regarding the reliability of financial reporting and the preparation of the firm's financial statements for external reporting purposes in accordance with International Financial Reporting Standards as issued by the International Accounting Standards Board and as endorsed by the European Union. As of December 31, 2017, management conducted an assessment of the effectiveness of our internal control over financial reporting based on the framework established in Internal Control – Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on the assessment performed, management has determined that our internal control over financial reporting as of December 31, 2017 was effective based on the COSO framework (2013).

KPMG AG Wirtschaftsprüfungsgesellschaft, the registered public accounting firm that audited the financial statements included in this document, has issued a report on our internal control over financial reporting, which is set forth below.

## Report of Independent Registered Public Accounting Firm

To the Supervisory Board of Deutsche Bank Aktiengesellschaft:

### Opinion on Internal Control over Financial Reporting

We have audited Deutsche Bank Aktiengesellschaft's and subsidiaries' (the "Company" or "Deutsche Bank") internal control over financial reporting as of December 31, 2017, based on criteria established in Internal Control – Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2017, based on criteria established in Internal Control – Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated balance sheets of the Company as of December 31, 2017 and 2016, the related consolidated statements of income, comprehensive income, changes in equity, and cash flows for each of the years in the three-year period ended December 31, 2017, and the related notes, and the specific disclosures described in Note 1 to the consolidated financial statements as being part of the financial statements (collectively, the "consolidated financial statements") and our report dated March 12, 2018 expressed an unqualified opinion on those consolidated financial statements.

# PAGES 97-105 OMITTED PURSUANT TO D. N.J. ECF POLICIES AND PROCEDURES

# Signatures

The registrant hereby certifies that it meets all of the requirements for filing on Form 20-F and has duly caused and authorized the undersigned to sign this annual report on its behalf.

Date: March 16, 2018
Deutsche Bank Aktiengesellschaft

/s/      JOHN CRYAN

John Cryan
Chairman of the Management Board

/s/      JAMES VON MOLTKE

James von Moltke
Member of the Management Board
Chief Financial Officer

# ANNUAL REPORT AND EXHIBITS ANNEXED TO 2017 FORM 20-F OMITTED PURSUANT TO D. N.J. ECF POLICIES AND PROCEDURES