# EXHIBIT 6

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**
**Form 20-F**

☐ REGISTRATION STATEMENT PURSUANT TO SECTION 12(b) OR (g) OF THE SECURITIES EXCHANGE ACT OF 1934

or

☒ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 FOR THE FISCAL YEAR ENDED DECEMBER 31, 2018

or

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

or

☐ SHELL COMPANY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

Date of event requiring this shell company report…………………………….

Commission file number 1-15242

# Deutsche Bank Aktiengesellschaft

(Exact name of Registrant as specified in its charter)

**Deutsche Bank Corporation**
(Translation of Registrant's name into English)

**Federal Republic of Germany**
(Jurisdiction of incorporation or organization)

**Taunusanlage 12, 60325 Frankfurt am Main, Germany**
(Address of principal executive offices)

**Andreas Loetscher, +49-69-910-44468, andreas.loetscher@db.com, Taunusanlage 12, 60325 Frankfurt am Main, Germany**
(Name, Telephone, E-mail and/or Facsimile number and Address of Company Contact Person)

Securities registered or to be registered pursuant to Section 12(b) of the Act
See following page

Securities registered or to be registered pursuant to Section 12(g) of the Act.
NONE
(Title of Class)

Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act.
NONE
(Title of Class)

Indicate the number of outstanding shares of each of the issuer's classes of capital or common stock as of the close of the period covered by the annual report:

Ordinary Shares, no par value      2,065,428,987

(as of December 31, 2018)

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.
Yes ☐    No ☒

If this report is an annual or transition report, indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934.
Yes ☐    No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.
Yes ☒    No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).
Yes ☒    No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or an emerging growth company. See definition of "large accelerated filer", "accelerated filer", and emerging growth company in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☒      Accelerated filer ☐
Non-accelerated filer ☐      Emerging growth company ☐

If an emerging growth company that prepares its financial statements in accordance with U.S. GAAP, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards* provided pursuant to Section 13(a) of the Exchange Act. ☐

*The term "new or revised financial accounting standard" refers to any update issued by the Financial Accounting Standards Board to its Accounting Standards Codification after April 5, 2012.

Indicate by check mark which basis of accounting the registrant has used to prepare the financial statements included in this filing:

U.S. GAAP ☐    International Financial Reporting Standards ☒    Other ☐
as issued by the International Accounting Standards Board

If "Other" has been checked in response to the previous question, indicate by check mark which financial statement item the registrant has elected to follow
Item 17 ☐    Item 18 ☐

If this is an annual report, indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).
Yes ☐    No ☒

(APPLICABLE ONLY TO ISSUERS INVOLVED IN BANKRUPTCY PROCEEDINGS DURING THE PAST FIVE YEARS)

Indicate by check mark whether the registrant has filed all documents and reports required to be filed by Sections 12, 13 or 15(d) of the Securities Exchange Act of 1934 subsequent to the distribution of securities under a plan confirmed by a court.
Yes ☐    No ☐

Securities registered or to be registered pursuant to Section 12(b) of the Act (as of February 28, 2019)

| Title of each class | Name of each exchange on which registered |
|---|---|
| Ordinary shares, no par value | New York Stock Exchange |
| 6.55% Trust Preferred Securities of Deutsche Bank Contingent Capital Trust II | New York Stock Exchange |
| 6.55% Company Preferred Securities of Deutsche Bank Contingent Capital LLC II* | |
| Subordinated Guarantees of Deutsche Bank AG in connection with Capital Securities* | |
| 8.05% Trust Preferred Securities of Deutsche Bank Contingent Capital Trust V | New York Stock Exchange |
| 8.05% Company Preferred Securities of Deutsche Bank Contingent Capital LLC V* | |
| Subordinated Guarantees of Deutsche Bank AG in connection with Capital Securities* | |
| Fixed to Fixed Reset Rate Subordinated Tier 2 Notes Due 2028 | New York Stock Exchange |
| 4.50% Fixed Rate Subordinated Tier 2 Notes Due 2025 | New York Stock Exchange |
| DB Agriculture Long Exchange Traded Notes due April 1, 2038 | NYSE Arca |
| DB Agriculture Double Long Exchange Traded Notes due April 1, 2038 | NYSE Arca |
| DB Base Metals Short Exchange Traded Notes due June 1, 2038 | NYSE Arca |
| DB Base Metals Double Short Exchange Traded Notes due June 1, 2038 | NYSE Arca |
| DB Base Metals Double Long Exchange Traded Notes due June 1, 2038 | NYSE Arca |
| DB Commodity Short Exchange Traded Notes due April 1, 2038 | NYSE Arca |
| DB Commodity Double Long Exchange Traded Notes due April 1, 2038 | NYSE Arca |
| DB Crude Oil Short Exchange Traded Notes due June 1, 2038 | NYSE Arca |
| DB Crude Oil Long Exchange Traded Notes due June 1, 2038 | NYSE Arca |
| DB Crude Oil Double Short Exchange Traded Notes due June 1, 2038 | NYSE Arca |
| DB Gold Double Long Exchange Traded Notes due February 15, 2038 | NYSE Arca |
| DB Gold Double Short Exchange Traded Notes due February 15, 2038 | NYSE Arca |
| DB Gold Short Exchange Traded Notes due February 15, 2038 | NYSE Arca |
| ELEMENTS "Dogs of the Dow" Linked to the Dow Jones High Yield Select 10 Total Return Index due November 14, 2022 | NYSE Arca |
| ELEMENTS Linked to the Morningstar® Wide Moat Focus(SM) Total Return Index due October 24, 2022 | NYSE Arca |
| FI Enhanced Global High Yield Exchange Traded Notes Linked to the MSCI World High Dividend Yield USD Gross Total Return Index due October 12, 2023 | NYSE Arca |

* For listing purpose only, not for trading

1

Deutsche Bank
Annual Report 2018 on Form 20-F

# Table of Contents

Table of Contents – 2
PART I – 7
Item 1: Identity of Directors, Senior Management and Advisers – 7
Item 2: Offer Statistics and Expected Timetable – 7
Item 3: Key Information – 7
    **Selected Financial Data – 7**
    **Dividends – 9**
    **Capitalization and Indebtedness – 10**
    **Reasons for the Offer and Use of Proceeds – 10**
    **Risk Factors – 11**
Item 4: Information on the Company – 44
    **History and Development of the Company – 44**
    **Business Overview – 44**
    **Our Corporate Divisions – 50**
    **The Competitive Environment – 50**
    **Regulation and Supervision – 55**
    **Organizational Structure – 73**
    **Property and Equipment – 73**
    **Information Required by Industry Guide 3 – 73**
Item 4A: Unresolved Staff Comments – 73
Item 5: Operating and Financial Review and Prospects – 74
    **Overview – 74**
    **Significant Accounting Policies and Critical Accounting Estimates – 74**
    **Recently Adopted Accounting Pronouncements and New Accounting Pronouncements – 74**
    **Operating Results – 75**
    **Results of Operations – 76**
    **Financial Position – 76**
    **Liquidity and Capital Resources – 76**
    **Post-Employment Benefit Plans – 76**
    **Off-Balance Sheet Arrangements – 76**
    **Tabular Disclosure of Contractual Obligations – 76**
    **Research and Development, Patents and Licenses – 76**
Item 6: Directors, Senior Management and Employees – 77
    **Directors and Senior Management – 77**
    **Board Practices of the Management Board – 79**
    **Compensation – 80**
    **Employees – 80**
    **Share Ownership – 80**
Item 7: Major Shareholders and Related Party Transactions – 81
    **Major Shareholders – 81**
    **Related Party Transactions – 81**
    **Interests of Experts and Counsel – 82**
Item 8: Financial Information – 83
    **Consolidated Statements and Other Financial Information – 83**
    **Significant Changes – 88**
Item 9: The Offer and Listing – 88
    **Offer and Listing Details and Markets – 88**
    **Plan of Distribution – 89**
    **Selling Shareholders – 89**
    **Dilution – 89**
    **Expenses of the Issue – 89**
Item 10: Additional Information – 89
    **Share Capital – 89**
    **Memorandum and Articles of Association – 89**
    **Notification Requirements – 93**
    **Material Contracts – 96**
    **Exchange Controls – 96**
    **Taxation – 96**
    **Dividends and Paying Agents – 99**
    **Statement by Experts – 99**
    **Documents on Display – 99**
    **Subsidiary Information – 99**
Item 11: Quantitative and Qualitative Disclosures about Credit, Market and Other Risk – 99
Item 12: Description of Securities other than Equity Securities – 99

PART II – 100
Item 13: Defaults, Dividend Arrearages and Delinquencies – 100
Item 14: Material Modifications to the Rights of Security Holders and Use of Proceeds – 100
Item 15: Controls and Procedures – 101
    **Disclosure Controls and Procedures – 101**
    **Management's Annual Report on Internal Control over Financial Reporting – 101**
    **Report of Independent Registered Public Accounting Firm – 101**
    **Change in Internal Control over Financial Reporting – 102**
Item 16A: Audit Committee Financial Expert – 103
Item 16B: Code of Ethics – 103
Item 16C: Principal accountant fees and services – 103
Item 16D: Exemptions from the Listing Standards for Audit Committees – 103
Item 16E: Purchases of Equity Securities by the Issuer and Affiliated Purchasers – 104
Item 16F: Change in Registrant's Certifying Accountant – 105
Item 16G: Corporate Governance – 105
Item 16H: Mine Safety Disclosure – 107
Disclosures Under Iran Threat Reduction and Syria Human Rights Act of 2012 – 108
PART III – 110
Item 17: Financial Statements – 110
Item 18: Financial Statements – 110
Item 19: Exhibits – 110
Signatures – 111
Annual Report – 112
Supplemental Financial Information (Unaudited) – S-1

# PAGES 4-10 OMITTED PURSUANT TO D. N.J. ECF POLICIES AND PROCEDURES

# Risk Factors

An investment in our securities involves a number of risks. You should carefully consider the following information about the risks we face, together with other information in this document, when you make investment decisions involving our securities. If one or more of these risks were to materialize, it could have a material adverse effect on our financial condition, results of operations, cash flows or prices of our securities.

**Risks Relating to the Macroeconomic, Geopolitical and Market Environment**

While the global economy showed robust growth in 2018, significant macroeconomic risks remain that could negatively affect the results of operations and financial condition in some of our businesses as well as our strategic plans, including deterioration of the economic outlook for the euro area and slowing in emerging markets, trade tensions between the United States and China as well between the United States and Europe, inflation risks, Brexit, European elections and geopolitical risks.

The global economy showed robust growth, while emerging markets slowed somewhat towards the end of the year 2018. Trade tensions between the United States and China as well between the United States and Europe reached a level that weighed on global trade. Meanwhile, the strong US economy provided positive impetus for global growth. Against this backdrop, global economic growth remained flat at 3.8 % in 2018, following 3.8 % in 2017. The global inflation rate increased to 3.3 % in 2018.

Over the course of 2018, the economic outlook for the euro area slowly deteriorated with Italy and Germany in or close to a technical recession in the second half of the year. The European economy expanded by 1.8 %, roughly 0.5 percentage points below the expectations at the start of the year, due to temporary effects in some member states as well as the worsened external economic environment. Growth was supported by domestic demand underpinned by solid income growth and accommodative financial conditions. While monetary policy remained accommodative, the European Central Bank ("ECB") phased out its net asset purchases. Consumer prices in the euro area rose by 1.7 % in 2018. German GDP growth of 1.4 % in 2018 surprised to the downside.

The US economy showed a strong performance. Supported by tax cuts, fiscal spending as well as supportive financial conditions and consumer spending backed by wage growth and a tight labor market, US GDP grew by 2.9 % in 2018. The inflation rate reached 2.4 % and thus stood above the Federal Reserve's target of 2 %. The US central bank's monetary policy responded with four interest rate increases in 2018.

Japan's GDP growth slowed considerably to 0.7 % in 2018. In 2018, GDP in the emerging markets increased by 4.9 %. At 6.6 %, the Chinese economy grew somewhat more strongly than expected at the beginning of 2018. Chinese exports were resilient despite growing trade tensions throughout 2018.

Our heat-map of global risks has modestly changed in 2019 compared to 2018. Macroeconomic risks are now more pronounced to the downside, especially in Asia and Europe. China's GDP growth is slowing as policymakers focus on deleveraging and tightening fiscal policy, but officials still have available tools to respond to a downturn and we expect further easing of Chinese monetary policy this year. In Europe, growth is stagnating and the debt burden in some countries, especially Italy, is a concern. Political risks also remain elevated, which may weigh on business investment and economic activity, as Brexit negotiations continue and elections for the European Parliament are due in May 2019. Other elections are possible across the major European countries. In the United States, we remain attuned to the risk of higher inflation, given the extremely tight levels of labor market supply, as well as any signs of a more substantive slowdown. We anticipate a slower pace of growth in 2019 versus 2018, but do not view a US recession as likely. A failure to secure a trade deal between the United States and China, the imposition of additional tariffs in the automobile sector as well as on remaining China imports, or an escalation of conflicts beyond trade, could further reduce growth.

If these risks materialize, or current negative conditions persist or worsen, our business, results of operations or strategic plans could be adversely affected.

In the European Union, continued elevated levels of political uncertainty could have unpredictable consequences for the financial system and the greater economy, and could contribute to European de-integration in certain areas, potentially leading to declines in business levels, write-downs of assets and losses across our businesses. Our ability to protect ourselves against these risks is limited.

The last several years have been characterized by increased political uncertainty as Europe in particular has been impacted by the European sovereign debt crisis, the potential withdrawal of the United Kingdom from the European Union ("Brexit"), Italian political and economic developments, protests in France, the refugee crisis and the increasing attractiveness to voters of populist and anti-austerity movements. A disorderly Brexit could aggravate the already uncertain economic outlook in the UK and Europe and hamper growth. In Continental Europe, the confrontation between Italy and the European Commission, an escalation of the "Yellow Vest" movement in France, or uncertainties around upcoming European Parliamentary elections could heighten volatility and harm eurozone growth. Although the severity of the European debt crisis appeared to have abated somewhat over recent years as the actions by the ECB, the rescue packages and the economic recovery appeared to have stabilized the situation in Europe, political uncertainty has nevertheless continued to be at an elevated level in recent periods and could trigger unwinding of aspects of European integration that have benefitted our businesses. Against this backdrop, the prospects for national structural reform and further integration among EU member states, both viewed as important tools to reduce the eurozone's vulnerabilities to future crises, appear to have worsened. These trends may ultimately result in material reductions in our business levels as our customers rein in activity levels in light of decreased economic output and increased uncertainty, which would materially adversely affect our operating results and financial condition.

An escalation of political risks could have consequences both for the financial system and the greater economy as a whole, potentially leading to declines in business levels, write-downs of assets and losses across our businesses.

In addition, in a number of EU member states which had national elections since 2017, including France, Germany and the Netherlands, political parties disfavoring current levels of European integration, or espousing the unwinding of European integration to varying extents, have attracted support. The Brexit vote has also given a voice to some of these political parties to challenge European integration. The resulting uncertainty could have significant effects on the value of the euro and on prospects for member states' financial stability, which in turn could potentially lead to a significant deterioration of the sovereign debt market, especially if Brexit or any other member country's exit did not result in the strongly adverse effects on the exiting country that many have predicted. If one or more members of the eurozone defaults on their debt obligations or decides to leave the common currency, this would result in the reintroduction of one or more national currencies. Should a eurozone country conclude it must exit the common currency, the resulting need to reintroduce a national currency and restate existing contractual obligations could have unpredictable financial, legal, political and social consequences, leading not only to significant losses on sovereign debt but also on private debt in that country. Given the highly interconnected nature of the financial system within the eurozone, and the high levels of exposure we have to public and private counterparties around Europe, our ability to plan for such a contingency in a manner that would reduce our exposure to non-material levels is likely to be limited. If the overall economic climate deteriorates as a result of one or more departures from the eurozone, our businesses could be adversely affected, and, if overall business levels decline or we are forced to write down significant exposures among our various businesses, we could incur substantial losses.

The potential withdrawal of the United Kingdom from the European Union – Brexit – may have adverse effects on our business, results of operations or strategic plans.

The UK voted on June 23, 2016 in a non-binding national referendum to withdraw from the European Union. Following an act of Parliament adopted in early 2017, on March 29, 2017, the UK formally gave notice of its withdrawal from the European Union to the European Council. Pursuant to the Treaty of the European Union, withdrawal would be effective on the date of entry into force of a withdrawal agreement or, failing that, two years after the withdrawal notification – that is, March 29, 2019 – unless the European Council and UK agree to extend the two-year period. In January 2019, the UK Parliament rejected a proposed withdrawal agreement, leaving open the possibility that withdrawal without an agreement – a so-called "no deal" or "hard" Brexit – would take place on March 29, 2019.

Given this and other uncertainties in connection with the UK's withdrawal from the European Union, it is difficult to determine the exact impact on us over the long term. However, the UK's economy and those of the eurozone countries are very tightly linked as a result of EU integration projects other than the euro, and the scale of our businesses in the UK – especially those dependent on activity levels in the City of London, to which we are heavily exposed and which may deteriorate as a result of Brexit – means that even modest effects in percentage terms can have a very substantial adverse effect on our businesses. Brexit could, in particular, lead to a disruption of the provision of cross-border financial services. A withdrawal of the UK from the EU without a withdrawal agreement may lead to greater costs to reorganize part of our business than would have been the case with an agreed phase-in solution and may restrict our ability to provide financial services to and from the UK. The currently unsettled future relationship between the EU and the UK is also likely to lead to further uncertainty in relation to the regulation of cross-border business activities.

Brexit is virtually certain to impact the structure and business model of our UK operations, though we are unable to determine this impact with any precision, as there remains a lack of clarity as to the details and timing of the changes. To prepare for the departure of the UK from the European Union, we are in the process of applying for UK authorization to continue to undertake regulated activity in the UK (previously undertaken pursuant to the European Passport provisions). The UK Prudential Regulatory Authority ("PRA") and the UK Financial Conduct Authority ("FCA") are in the process of settling new rulebooks in anticipation of UK law and regulatory regime changing as the UK withdraws from the European Union. We expect that we will be subject to additional and new UK regulation (prudential and conduct requirements), that our activities in the UK will be subject to increased supervision and monitoring by both the PRA and the FCA and that we may have to undertake operational change to comply with the new regulatory landscape in the UK.

Despite our preparations, as a result of Brexit, our business, results of operations or strategic plans could be adversely affected.

**We may be required to take impairments on our exposures to the sovereign debt of European or other countries if the European sovereign debt crisis reignites. The credit default swaps into which we have entered to manage sovereign credit risk may not be available to offset these losses.**

The effects of the sovereign debt crisis have been especially evident in the financial sector, as a large portion of the sovereign debt of eurozone countries is held by European financial institutions, including Deutsche Bank. As of December 31, 2018, we had a direct sovereign credit risk exposure of € 3.6 billion to Italy, € 1.8 billion to Spain, € 334 million to Ireland and € 53 million to Greece. Despite the apparent abatement of the crisis in recent years, it remains uncertain whether, in light of the current political environment, Greece or other eurozone sovereigns, such as Spain, Italy, Portugal and Cyprus, will be able to manage their debt levels in the future and whether Greece will attempt to renegotiate its past international debt restructuring. The rise of anti-austerity parties and populist sentiment in many of these countries poses a threat to the medium- to long-term measures recommended for these countries to alleviate the tensions in the eurozone caused by drastically differing economic situations among the eurozone states. In the future, negotiations or exchanges similar to the Greek debt restructuring in 2012 could take place with respect to the sovereign debt of these or other affected countries. The outcome of any negotiations regarding changed terms (including reduced principal amounts or extended maturities) of sovereign debt may result in additional impairments of assets on our balance sheet. Any negotiations are highly likely to be subject to political and economic pressures that we cannot control, and we are unable to predict their effects on the financial markets, on the greater economy or on ourselves.

In addition, any restructuring of outstanding sovereign debt may result in potential losses for us and other market participants that are not covered by payouts on hedging instruments that we have entered into to protect against the risk of default. These instruments largely consist of credit default swaps, generally referred to as CDSs, pursuant to which one party agrees to make a payment to another party if a credit event (such as a default) occurs on the identified underlying debt obligation. A sovereign restructuring that avoids a credit event through voluntary write-downs of value may not trigger the provisions in CDSs we have entered into, meaning that our exposures in the event of a write-down could exceed the exposures we previously viewed as our net exposure after hedging. Additionally, even if the CDS provisions are triggered, the amounts ultimately paid under the CDSs may not correspond to the full amount of any loss we incur. We also face the risk that our hedging counterparties have not effectively hedged their own exposures and may be unable to provide the necessary liquidity if payments under the instruments they have written are triggered. This may result in systemic risk for the European banking sector as a whole and may negatively affect our business and financial position.

**Risks Relating to Our Business and Strategy**

Our results of operation and financial condition, in particular those of our Corporate & Investment Bank, continue to be negatively impacted by the challenging market environment, uncertain macroeconomic and geopolitical conditions, lower levels of client activity, increased competition and regulation, and the immediate impact of our strategic decisions. If we are unable to improve our profitability as we continue to face these headwinds, we may be unable to meet many of our strategic aspirations, and may have difficulty maintaining capital, liquidity and leverage at levels expected by market participants and our regulators.

In 2018, revenues declined in each of our corporate divisions, reflecting the negative impact of a challenging market environment characterized by low interest rates and low volatility, uncertain macroeconomic and geopolitical conditions, lower levels of client activity and increased competition and regulation. The ultra-low interest rate environment, especially in the eurozone, has put pressure on our margins in our traditional banking business and our trading and markets businesses. Additionally, the low volatility in the market has had a negative impact on our trading and client-driven businesses that may perform well in more volatile environments.

Changes in our business mix towards lower-margin, lower-risk products can limit our opportunities to profit from volatility. Regulators have generally encouraged the banking sector to focus more on the facilitation of client flow and less on risk taking. This has been effected in part by increasing capital requirements for higher-risk activities. In addition, some of our regulators have encouraged or welcomed changes to our business perimeter, consistent with their emphasis on lower-risk activities for banks. In recent years, we have reduced our exposure to a number of businesses that focused on riskier but more capital-intensive products (but that in earlier periods also had the potential to be more highly profitable). Further pressure on our revenues and profitability has resulted from long-term structural trends driven by regulation (especially increased regulatory capital, leverage and liquidity requirements and increased compliance costs) and competition that have further compressed our margins in many of our businesses. Should a combination of these factors continue to lead to reduced margins and subdued activity levels in our trading and markets business over the longer term, this could reflect structural challenges that may lead us to consider even further-reaching changes to aspects of our business mix than those embedded in our business planning and that support our financial targets.

Although we have in recent years made considerable progress resolving litigation, enforcement and similar matters broadly within our established reserves, this pattern may not continue. We currently expect these costs to be higher than in the most recent years, potentially significantly higher than the relatively low level seen in 2018. In particular, these costs could substantially exceed the level of provisions that we established for our litigation, enforcement and similar matters, which can contribute to negative market perceptions about our financial health, costing us business. This, combined with the actual costs of litigation, enforcement and other matters, could in turn adversely affect our ability to maintain capital, liquidity and leverage at levels expected by market participants and our regulators.

Market speculation about potential legal, regulatory and enforcement matters, or about other matters, could have persistent adverse effects on our business or revenue levels. In particular, in late 2018 we suffered some reductions in business volumes and client balances, particularly in some parts of our Corporate & Investment Bank, as a result of speculation relating to our correspondent banking relationship with Danske Bank's Estonia branch and a raid by German law enforcement authorities on our offices in November 2018 relating to alleged failure to report suspicious activities potentially related to money laundering. Adverse developments, including our reporting of lower revenues, can also harm perceptions of us in the market and lead to further pressure on employee engagement, client relationships and revenues. These factors have placed pressure on the markets for our securities, along with concerns regarding our ability to overcome the numerous headwinds facing us.

As a result of this as well as the broader prospects for our business, we may find it necessary or desirable to raise additional capital in the future to maintain our capital, liquidity and leverage at levels required by our regulators or viewed by market participants as necessary for our businesses in comparison with our international peers, which would result in dilution to our current shareholders.

Market speculation about potential consolidation in the financial sector in Europe and our role in that consolidation could also have adverse effects on our business and revenue levels. Speculation has intensified in recent months concerning our participation in industry consolidation. Given the overall trend in the industry, we consider business combinations from time to time.  Although speculation concerning consolidation is frequent, there are numerous impediments to completing transactions in our sector, including those posed by the regulatory environment, differing business models, valuation issues and the protracted headwinds facing the industry, including the low interest rate environment, market pressures and the high costs associated with rationalizing and simplifying institutions' businesses. Accordingly, we may determine to cease consideration of business combinations, or may determine not to pursue available opportunities. The markets may perceive us negatively if we fail to participate in industry consolidation or if we do not complete transactions that market participants expect.  This could have material adverse effects on our business, and accordingly on our financial condition, results of operations and liquidity, as well as on our share price.

**We may have difficulty in identifying and executing business combinations, and both engaging in combinations and avoiding them could materially harm our results of operations and our share price.**

We consider business combinations from time to time. Were we to announce or complete a significant business combination transaction, our share price or the share price of the combined entity could decline significantly if investors viewed the transaction as too costly, dilutive to existing shareholders or unlikely to improve our competitive position. It is generally not feasible for our reviews of any business with which we might engage in a combination to be complete in all respects. As a result, a combination may not perform as well as expected. In addition, we may fail to integrate our operations successfully with any entity with which we participate in a business combination. Failure to complete announced business combinations or failure to achieve the expected benefits of any such combination could materially and adversely affect our profitability. Such failures could also affect investors' perception of our business prospects and management, and thus cause our share price to fall. They could also lead to departures of key employees, or lead to increased costs and reduced profitability if we felt compelled to offer them financial incentives to remain.

If we avoid entering into business combination transactions or if announced or expected transactions fail to materialize, market participants may perceive us negatively. We may also be unable to expand our businesses, especially into new business areas, as quickly or successfully as our competitors if we do so through organic growth alone. These perceptions and limitations could cost us business and harm our reputation, which could have material adverse effects on our financial condition, results of operations and liquidity.

**Adverse market conditions, asset price deteriorations, volatility and cautious investor sentiment have affected and may in the future materially and adversely affect our revenues and profits, particularly in our investment banking, brokerage and other commission- and fee-based businesses. As a result, we have in the past incurred and may in the future incur significant losses from our trading and investment activities.**

As a global investment bank, we have significant exposure to the financial markets and are more at risk from adverse developments in the financial markets than are institutions engaged predominantly in traditional banking activities. Sustained market declines have in the past caused and can in the future cause our revenues to decline, and, if we are unable to reduce our expenses at the same pace, can cause our profitability to erode or cause us to show material losses. Volatility can also adversely affect us, by causing the value of financial assets we hold to decline or the expense of hedging our risks to rise. Reduced customer activity can also lead to lower revenues in our "flow" business.

Specifically, our investment banking revenues, in the form of financial advisory and underwriting fees, directly relate to the number and size of the transactions in which we participate and are susceptible to adverse effects from sustained market downturns. These fees and other income are generally linked to the value of the underlying transactions and therefore can decline with asset values. In addition, periods of market decline and uncertainty tend to dampen client appetite for market and credit risk, a critical driver of transaction volumes and investment banking revenues, especially transactions with higher margins. In recent and other times in the past, decreased client appetite for risk has led to lower levels of activity and lower levels of profitability in our Corporate & Investment Bank corporate division. Our revenues and profitability could sustain material adverse effects from a significant reduction in the number or size of debt and equity offerings and merger and acquisition transactions.

Market downturns also have led and may in the future lead to declines in the volume of transactions that we execute for our clients and, therefore, to declines in our noninterest income. In addition, because the fees that we charge for managing our clients' portfolios are in many cases based on the value or performance of those portfolios, a market downturn that reduces the value of our clients' portfolios or increases the amount of withdrawals reduces the revenues we receive from our asset management and private banking businesses. Even in the absence of a market downturn, below-market or negative performance by our investment funds may result in increased withdrawals and reduced inflows, which would reduce the revenue we receive. While our clients would be responsible for losses we incur in taking positions for their accounts, we may be exposed to additional credit risk as a result of their need to cover the losses where we do not hold adequate collateral or cannot realize it. Our business may also suffer if our clients lose money and we lose the confidence of clients in our products and services.

Part I

In addition, the revenues and profits we derive from many of our trading and investment positions and our transactions in connection with them can be directly and negatively impacted by market prices. In each of the product and business lines in which we enter into these trading and investment positions, part of our business entails making assessments about the financial markets and trends in them. When we own assets, market price declines can expose us to losses. Many of the more sophisticated transactions of our Corporate & Investment Bank corporate division are influenced by price movements and differences among prices. If prices move in a way we have not anticipated, we may experience losses. Also, when markets are volatile, the assessments we have made may prove to lead to lower revenues or profits, or may lead to losses, on the related transactions and positions. In addition, we commit capital and take market risk to facilitate certain capital markets transactions; doing so can result in losses as well as income volatility. Such losses may especially occur on assets we hold for which there are not very liquid markets to begin with. Assets that are not traded on stock exchanges or other public trading markets, such as derivatives contracts between banks, may have values that we calculate using models other than publicly-quoted prices. Monitoring the deterioration of prices of assets like these is difficult and could lead to losses we did not anticipate. We can also be adversely affected if general perceptions of risk cause uncertain investors to remain on the sidelines of the market, curtailing their activity and in turn reducing the levels of activity in those of our businesses dependent on transaction flow.

Our liquidity, business activities and profitability may be adversely affected by an inability to access the debt capital markets or to sell assets during periods of market-wide or firm-specific liquidity constraints. Credit rating downgrades have contributed to an increase in our funding costs, and any future downgrade could materially adversely affect our funding costs, the willingness of counterparties to continue to do business with us and significant aspects of our business model.

We have a continuous demand for liquidity to fund our business activities. Our liquidity may be impaired by an inability to access secured and/or unsecured debt markets, an inability to access funds from our subsidiaries or otherwise allocate liquidity optimally across our businesses, an inability to sell assets or redeem our investments, or unforeseen outflows of cash or collateral. This situation may arise due to circumstances unrelated to our businesses and outside our control, such as disruptions in the financial markets, or circumstances specific to us, such as reluctance of our counterparties or the market to finance our operations due to perceptions about potential outflows resulting from litigation, regulatory and similar matters, actual or perceived weaknesses in our businesses, our business model or our strategy, as well as in our resilience to counter negative economic and market conditions. For example, we have experienced steep declines in the price of our shares and increases in the spread versus government bonds at which our debt trades in the secondary markets. Reflecting these conditions, our internal estimates of our available liquidity over the duration of a stressed scenario have at times been negatively impacted in recent periods. Such effects were particularly acute in the autumn of 2016 in response to market speculation about the potential magnitude of a settlement of civil claims then being negotiated with the US Department of Justice ("DOJ") in connection with our issuance and underwriting of residential mortgage-backed securities. In addition, negative developments concerning other financial institutions perceived to be comparable to us and negative views about the financial services industry in general have also affected us in recent years. These perceptions have affected the prices at which we have accessed the capital markets to obtain the necessary funding to support our business activities; should these perceptions exist, continue or worsen, our ability to obtain this financing on acceptable terms may be adversely affected. Among other things, an inability to refinance assets on our balance sheet or maintain appropriate levels of capital to protect against deteriorations in their value could force us to liquidate assets we hold at depressed prices or on unfavorable terms, and could also force us to curtail business, such as the extension of new credit. This could have an adverse effect on our business, financial condition and results of operations.

In addition, we have benefited in recent years from a number of incremental measures by the ECB and other central banks to provide additional liquidity to financial institutions and the financial markets, particularly in the eurozone. To the extent these actions are curtailed or halted, our funding costs could increase, or our funding supply could decrease, which could in turn result in a reduction in our business activities. In particular, any decision by the ECB to discontinue or reduce quantitative easing or further steps by the Federal Reserve to tighten its monetary policy or actions by central banks more generally to tighten their monetary policy will likely cause long-term interest rates to increase and accordingly impact the costs of our funding.

Since the start of the global financial crisis, the major credit rating agencies have lowered our credit ratings or placed them on review or negative watch on multiple occasions. These credit rating downgrades have contributed to an increase in our funding costs. Our elevated spread levels (meaning the difference between the yields on our securities as compared to benchmark government bonds) are sensitive to further adverse developments and any future downgrade could bring our credit rating into the non-investment grade category. This could materially and adversely affect our funding costs and significant aspects of our business model. The effect would depend on a number of factors including whether a downgrade affects financial institutions across the industry or on a regional basis, or is intended to reflect circumstances specific to us, such as our potential settlement of regulatory, litigation and similar matters; any actions our senior management may take in advance of or in response to the downgrade; the willingness of counterparties to continue to do business with us; any impact of other market events and the state of the macroeconomic environment more generally.

Additionally, under many of the contracts governing derivative instruments to which we are a party, a downgrade could require us to post additional collateral, lead to terminations of contracts with accompanying payment obligations for us or give counterparties additional remedies. We take these effects into account in our liquidity stress testing analysis, as further described in "Management Report: Risk Report: Liquidity Risk: Stress Testing and Scenario Analysis" in the Annual Report 2018.

In the second quarter of 2018, we announced changes to our strategy and updates to our financial targets. If we are unable to implement our strategic plans successfully, we may be unable to achieve our financial objectives, or we may incur losses or low profitability, and our financial condition, results of operations and share price may be materially and adversely affected.

In the second quarter of 2018, we announced changes to our strategy and updates to our financial targets. Management is focused on materially improving returns to shareholders over time and on deploying our balance sheet and other resources to the highest return activities consistent with our client franchise and risk appetite. To achieve these primary objectives we have defined four key strategic imperatives: First, shift the bank to a more stable revenue and earnings profile. Second, execute on clearly defined strategies in our Private & Commercial Bank (PCB) and our Asset Management (AM) businesses. Third, reshape our Corporate & Investment Bank (CIB) towards a model which emphasizes our core strength in transaction banking, capital markets, financing and treasury solutions. And fourth, reduce our costs and commit to an uncompromising cost culture.

Our Private & Commercial Bank comprises the three business units Private and Commercial Business (Germany), Private and Commercial Business (International) and Wealth Management (Global).

Private and Commercial Business (Germany) serves more than 20 million private and commercial clients through two main brands: Deutsche Bank and Postbank. The two brands operate through a single company following the May 2018 merger of Postbank AG and Deutsche Bank Privat- und Geschäftskunden AG to form DB Privat- und Firmenkundenbank AG. We have targeted cost and revenue synergies for this business of € 900 million annually which we aim to fully realize in 2022 and beyond. A new operating model with a joint infrastructure and product platform as well as a joint management is being implemented to support pursuit of these targets. We estimate that the total cost of the planned restructuring measures to integrate Postbank into the Group and other investments will be € 1.9 billion, resulting from restructuring and severance costs as well as IT and other costs. Unforeseen difficulties may emerge in connection with the integration efforts, including potential difficulties due to differing IT systems, difficulties in integrating personnel, commitment of management resources in connection with the integration process and the potential loss of key personnel. The benefits, cost and timeframe of the integration could be adversely affected by any of these factors, as well as a variety of factors beyond our control, such as negative market developments. Should any of these risks materialize, the cost savings and other benefits we expect to realize from the integration may only come at a higher cost than anticipated, or may not be realized within the period we anticipate or to the extent we plan.

In our Private and Commercial Business (International), we continue to sharpen focus and invest into our core markets. While streamlining our geographic footprint with the completed partial exit from Poland and the ongoing disposal of our business in Portugal, we are investing into our Italian, Spanish, Belgian and Indian operations as we view them as attractive and growing markets. In Wealth Management we seek to grow our market share, both in Germany and internationally. In PCB we are also proceeding with our investments in digital solutions for banking and non-banking products through further equity investments into strategic partners and enhancements of our digital platform. We may not be able to achieve the growth we seek by the strategies for these businesses.

For DWS, with the IPO now completed, we focus on growing assets under management, improving efficiency and profitability and driving strong DWS shareholder return, including a robust dividend. The integration of service and infrastructure functions from DB Group into DWS Group seeks to enable us to achieve further operational efficiencies across the platform, including process improvements to reduce costs and enhance client experience. The IPO of DWS may not entirely mitigate the market concerns about Deutsche Bank that impacted our AM business in the past or that may arise from new challenges, and DWS may fail to grow assets under management, become more efficient or profitable or be able to achieve high levels of return for DWS shareholders. As the continued majority owner of DWS, we continue to be adversely affected by any of these factors as well.

We intend for CIB to remain a leading European corporate and investment bank with global reach. As part of the restructuring announced and completed in 2018, CIB will focus on its core product strengths and key markets. Actions from 2018 including reducing our commitment to certain businesses and investing in others. In 2019, CIB is focused on delivering controlled revenue growth from targeted resource deployment and investment. Reducing our commitment on certain businesses might negatively impact our client servicing capacity, therefore impacting our existing revenue streams. In businesses where we are increasing our investment, clients may choose not to expand their business or portfolio with us, thereby negatively influencing our ability to capitalize on these opportunities.

We aim to reduce adjusted costs in 2019 by € 1 billion to € 21.8 billion and to reduce our internal workforce to below 90,000 full-time employees by year-end 2019. We are also working towards a target for Post-tax Return on Average Tangible Equity of greater than 4 % in 2019. Over time, we aspire to achieve a circa 10 % Post-Tax Return on Tangible Equity in a normalized environment and on the basis of the achievement of our cost target.

As we execute on our near- and long-term operating targets, we intend to continue managing our balance sheet conservatively, with capital targets of a CRR/CRD 4 Common Equity Tier 1 capital ratio above 13.0 % and a CRR/CRD 4 Leverage Ratio (phase-in) of 4.5 % over time. Furthermore, we intend to target a competitive dividend payout ratio.

Our targets reflect our expectation of solid macroeconomic growth in 2019, with growth in the US specifically remaining strong, and no material distortions in foreign exchange rates. We also expect to benefit from a more normalized tax rate.

Our strategic goals are subject to various internal and external factors including those described above and to market, regulatory, economic and political uncertainties, and to limitations relating to our operating model. These could negatively impact or prevent the implementation of our strategic goals or the realization of their anticipated benefits. Economic uncertainties such as the recurrence of extreme turbulence in the markets; potential weakness in global, regional and national economic conditions; the continuation of a market environment characterized by low interest rates and low volatility; increased competition for business; and political instability, especially in Europe, may impact our ability to achieve our strategic goals. Regulatory changes could also adversely impact our ability to achieve our strategic aims. In particular, regulators could demand changes to our business model or organization that could reduce our profitability, or we may be forced to make changes that reduce our profitability in an effort to remain compliant with law and regulation. We are also involved in numerous litigation, arbitration and regulatory proceedings and investigations in Germany and in a number of jurisdictions outside of Germany, especially in the United States. Such matters are subject to many uncertainties. We expect the litigation environment to continue to be challenging. If litigation and regulatory matters occur at the same or higher rate and magnitude than they have in some recent years or if we are subject to sustained market speculation about our potential exposure to such matters, we may not be able to achieve our strategic aspirations.

The base case scenario for our financial and capital plan includes revenue growth estimates which are dependent on positive macroeconomic developments. Stagnation or a downturn in the macroeconomic environment could significantly impact our ability to generate the revenue growth necessary to achieve these strategic financial and capital targets. While market conditions have improved as compared to those experienced in the fourth quarter of 2018, they are somewhat weaker than we had anticipated. Furthermore, even if we are able to grow our revenues in accordance with our strategic plans, the materialization of any of the regulatory changes or the costs for us – in terms of the outcomes or necessary changes to our businesses – of the litigation and regulatory matters mentioned above, including market speculation about our potential exposure to them, or any other unforeseen risk, could adversely impact our net income and thereby cause us to fall short of our strategic financial and capital targets.

Our strategic objectives are also subject to the following assumptions and risks:

– We assume that we will be able to overcome significant challenges arising from our business model. We continue to rely on our trading and markets businesses as a significant source of profit. However, these businesses, in particular our fixed income securities franchise, have continued to face an extremely challenging environment, caused by uncertainty about the duration of the market environment characterized by low interest rates and low volatility, low levels of client activity, negative perceptions about our business and central bank intervention in markets and the gradual cessation thereof. We are substantially dependent on the performance of these businesses, and this dependency exceeds that of many of our competitors. Many of our businesses dependent on client flow are increasingly challenged in the current market environment. In addition, some of our businesses may be resistant to change, posing risks to the implementation of changes to our business model. Should we be unable to implement this new business model successfully, or should the new business model fail to be profitable, we may not be able to achieve some or all of our strategic goals.
– Asset and client levels were impacted by the negative market perceptions of Deutsche Bank in the fourth quarter 2016 and again in late 2018. A continued or renewed negative market focus on Deutsche Bank could result in new client and asset outflows.
– We currently operate a highly complex infrastructure, which can compromise the quality of the overall control environment. Establishing a more efficient bank with a strong control environment depends on successfully streamlining and simplifying the IT landscape as well as cultural change. Furthermore, capital and execution plans require robust monitoring and tracking that is dependent on accurate, timely and relevant data. We have undertaken initiatives designed to address existing challenges in our IT and data architecture as well as in our data aggregation capabilities. Potential delays and challenges to implementing these initiatives would impact our ability to achieve efficiency improvements and enhance the control environment, thereby affecting our ability to implement our strategy successfully.
– A robust and effective internal control environment is necessary to ensure that we conduct our business in compliance with the laws and regulations applicable to us. We are undertaking several major initiatives to enhance the efficacy of the transaction processing environment, strengthen our controls and manage non-financial risks, in particular as a response to the circumstances that have resulted in many of the litigations and regulatory and enforcement investigations and proceedings to which the Bank has been subject in recent years. However, we may be unable to complete these initiatives as quickly as we intend or as our regulators demand, and our efforts may be insufficient to prevent all future deficiencies in our control environment or to result in fewer litigations or regulatory and enforcement investigations and proceedings in the future. Furthermore, implementation of enhanced controls may result in higher than expected costs of regulatory compliance that could offset efficiency gains. Any of these factors could affect our ability to implement our strategy in a timely manner or at all.

If we fail to implement our strategic initiatives in whole or in part or should the initiatives that are implemented fail to produce the anticipated benefits, or should the costs we incur to implement our initiatives exceed the amounts anticipated, or should we fail to achieve the publicly communicated targets we have set for implementation of these initiatives, we may fail to achieve our financial objectives, or incur losses or low profitability or erosions of our capital base, and our financial condition, results of operations and share price may be materially and adversely affected.

**We may have difficulties selling companies, businesses or assets at favorable prices or at all and may experience material losses from these assets and other investments irrespective of market developments.**

We may seek to sell or otherwise reduce our exposure to assets that are not part of our core business or as part of our strategy to simplify and focus our business and to meet or exceed capital and leverage requirements, as well as to help us meet our return on tangible equity target. This may prove difficult in the current and future market environment as many of our competitors are also seeking to dispose of assets to improve their capital and leverage ratios and returns on equity. We have already sold a substantial portion of our non-core assets, and our remaining non-core assets may be particularly difficult for us to sell as quickly as we have expected at prices we deem acceptable. Where we sell companies or businesses, we may remain exposed to certain of their losses or risks under the terms of the sale contracts, and the process of separating and selling such companies or businesses may give rise to operating risks or other losses. Unfavorable business or market conditions may make it difficult for us to sell companies, businesses or assets at favorable prices, or may preclude a sale altogether. If we cannot reduce our assets according to plan, we may not be able to achieve the capital targets set out under our strategy.

**Intense competition, in our home market of Germany as well as in international markets, has and could continue to materially adversely impact our revenues and profitability.**

Competition is intense in all of our primary business areas, in Germany as well as in international markets. If we are unable to respond to the competitive environment in these markets with attractive product and service offerings that are profitable for us, we may lose market share in important areas of our business or incur losses on some or all of our activities. In addition, downturns in the economies of these markets could add to the competitive pressure, through, for example, increased price pressure and lower business volumes for us.

There has been substantial consolidation and convergence among financial services companies. This trend has significantly increased the capital base and geographic reach of some of our competitors and has hastened the globalization of the securities and other financial services markets. As a result, we must compete with financial institutions that may be larger and better capitalized than we are and that may have a stronger position in local markets.

In addition to our traditional competitors such as other universal banks and financial services firms, an emerging group of future competitors in the form of start-ups and technology firms are showing an increasing interest in banking services and products. These new competitors could increase competition in both core products, e.g., payments, basic accounts and loans and investment advisory, as well as in new products, e.g., peer to peer lending and equity crowd funding.

**Risks Relating to Regulation and Supervision**

**Regulatory reforms enacted and proposed in response to weaknesses in the financial sector, together with increased regulatory scrutiny more generally, have had and continue to have a significant impact on us and may adversely affect our business and ability to execute our strategic plans. Competent regulators may prohibit us from making dividend payments or payments on our regulatory capital instruments or take other actions if we fail to comply with regulatory requirements.**

In response to the global financial crisis and the European sovereign debt crisis, governments and regulatory authorities have worked to enhance the resilience of the financial services industry against future crises through changes to the regulatory framework. The pace of change of new proposals has slowed as the focus turns more to implementation of the various elements of the regulatory reform agenda outlined by the Basel Committee on Banking Supervision ("Basel Committee") and other standard-setting bodies. As a result, there continues to be uncertainty for us and the financial industry in general, though the level of uncertainty is reduced from prior periods. The range of new laws and regulations or current proposals includes, among other things:

– provisions for more stringent regulatory capital, leverage and liquidity standards;
– restrictions on compensation practices,
– restrictions on proprietary trading and other investment services;
– special bank levies and financial transaction taxes,
– recovery and resolution powers to intervene in a crisis including the "bail-in" of creditors;
– tightened large exposure limits;
– the creation of a single supervisory authority and a single resolution authority within the eurozone and any other participating member states,
– separation of certain businesses from deposit taking,
– stress testing and capital planning regimes,
– heightened reporting requirements, and
– reforms of derivatives, other financial instruments, investment products and market infrastructures.

As a core element of the reform of the regulatory framework, in December 2010, the Basel Committee published a set of comprehensive changes to minimum capital adequacy and liquidity standards, known as Basel 3, which have been implemented into European and national (in our case, German) law beginning in 2014, with the European legislative package also referred to as "CRR/CRD 4" and the Bank Recovery and Resolution Directive (or "BRRD").

In addition, regulatory scrutiny of compliance with existing laws and regulations has become more intense and supervisory expectations remain significant. The specific effects of a number of new laws and regulations remain uncertain because the drafting and implementation of these laws and regulations are still on-going and supervisory expectations continue to develop.

On November 23, 2016, the European Commission published a comprehensive package of reforms (referred to in the following as the "banking reform package") to further strengthen the resilience of European Union banks. The proposals will incorporate various remaining elements of the regulatory framework agreed within the Basel Committee and the Financial Stability Board ("FSB") to refine and supplement the global regulatory framework established by the Basel Committee, the so-called Basel Accords (Basel 1, 2 and 3). This includes more risk-sensitive capital requirements, in particular in the areas of market risk, counterparty credit risk, and for exposures to central counterparties, methodologies that reflect more accurately the actual risks to which banks may be exposed, a binding leverage ratio, a binding net stable funding ratio, tighter regulation of large exposures, and a requirement for global systemically important institutions ("G-SIIs"), such as Deutsche Bank, to hold certain minimum levels of capital and other instruments which are capable of bearing losses in resolution ("Total Loss-Absorbing Capacity" or "TLAC"). Other proposed measures are aimed at improving banks' lending capacity to support the European Union economy and at further facilitating the role of banks in achieving deeper and more liquid European Union capital markets. On December 4, 2018, the European Parliament and the Council of the European Union reached a provisional political agreement with respect to the banking reform package. The banking reform package is expected to enter into force in the first half of 2019. While many provisions will not apply until 2021, certain parts, including the TLAC requirements, are expected to apply immediately when the provisions of the banking reform package enter into force.

Furthermore, in December 2017 the Basel Committee published its final agreement ("December 2017 Agreement") on further revisions to the Basel 3 framework that aim to increase consistency in risk-weighted asset calculations and improve the comparability of banks' capital ratios. The December 2017 Agreement includes, among other things, changes to the standardized and internal ratings-based approaches for determining credit risk, revisions to the operational risk framework, and an "output floor", set at 72.5 %. The "output floor" limits the amount of capital benefit a bank can obtain from its use of internal models relative to using the standardized approach. This package of reforms is intended to finalize the Basel 3 framework and would reduce the ability of banks to apply internal models, while making the standardized approaches more risk-sensitive and granular. In addition, the December 2017 Agreement introduces a leverage ratio buffer for global systemically important banks ("G-SIBs"), such as Deutsche Bank, to be met with Tier 1 capital and sets it at 50 % of the applicable risk-based G-SIB buffer requirement. The Basel Committee also reached agreement on an implementation date for this package of January 1, 2022, with a phase-in period of five years through January 1, 2027 for the output floor.

The banking reform package, when it enters into force, will likely affect our business by raising our regulatory capital and liquidity requirements and by leading to increased costs. The December 2017 Agreement could also affect our business by imposing higher capital charges when adopted into law.

These requirements may be in addition to regulatory capital buffers that may also be increased or be in addition to those already imposed on us and could themselves materially increase our capital requirements.

Regulatory authorities have substantial discretion in how to regulate banks, and this discretion, and the means available to the regulators, have been steadily increasing during recent years. Regulation may be imposed on an ad hoc basis by governments and regulators in response to ongoing or future crises, and may especially affect financial institutions such as Deutsche Bank that are deemed to be systemically important.

In particular, the regulators with jurisdiction over us, including the ECB under the Single Supervisory Mechanism (also referred to as the "SSM"), may, in connection with the supervisory review and evaluation process ("SREP") or otherwise, conduct stress tests and have discretion to impose capital surcharges on financial institutions for risks, including for litigation, regulatory and similar matters, that are not otherwise recognized in risk-weighted assets or other surcharges depending on the individual situation of the bank and take or require other measures, such as restrictions on or changes to our business. In this context, the ECB may impose, and has imposed, on us individual capital requirements resulting from the SREP which are referred to as "Pillar 2" requirements. "Pillar 2" requirements must be fulfilled with Common Equity Tier 1 capital in addition to the statutory minimum capital and buffer requirements and any non-compliance may have immediate legal consequences such as restrictions on dividend payments.

Also following the SREP, the ECB may communicate to individual banks, and has communicated to us, an expectation to hold a further "Pillar 2" Common Equity Tier 1 capital add-on, the so-called "Pillar 2" guidance. Although the "Pillar 2" guidance is not legally binding and failure to meet the "Pillar 2" guidance does not automatically trigger legal action, the ECB has stated that it expects banks to meet the "Pillar 2" guidance.

Also, more generally, competent regulators may, if we fail to comply with regulatory requirements, in particular with statutory minimum capital requirements, "Pillar 2" requirements or buffer requirements, or if there are shortcomings in our governance and risk management processes, prohibit us from making dividend payments to shareholders or distributions to holders of our other regulatory capital instruments. This could occur, for example, if we fail to make sufficient profits due to declining revenues, or as a result of substantial outflows due to litigation, regulatory and similar matters. Generally, a failure to comply with the quantitative and qualitative regulatory requirements could have a material adverse effect on our business, financial condition and results of operations, including our ability to pay out dividends to shareholders or distributions on our other regulatory capital instruments or, in certain circumstances, conduct business which we currently conduct or plan to conduct in the future.

Regulatory and legislative changes require us to maintain increased capital and abide by tightened liquidity requirements. These requirements may significantly affect our business model, financial condition and results of operations as well as the competitive environment generally. Any perceptions in the market that we may be unable to meet our capital or liquidity requirements with an adequate buffer, or that we should maintain capital or liquidity in excess of these requirements or another failure to meet these requirements could intensify the effect of these factors on our business and results.

The implementation of the CRR/CRD 4 legislative package resulted, among other things, in increased capital and tightened liquidity requirements, including additional capital buffer requirements which were gradually phased in through January 1, 2019. Further revisions, such as stricter rules on the measurement of risks and the changes proposed by the banking reform package and the December 2017 Agreement, could further increase risk-weighted assets and the corresponding capital demand for banks, as well as further tighten liquidity requirements (such as the introduction of a binding net stable funding ratio). In addition, the introduction of a binding leverage ratio by the banking reform package may affect our business model, financial conditions and results of operations.

Furthermore, under the SRM Regulation, the BRRD and the German Recovery and Resolution Act (Sanierungs- und Abwicklungsgesetz), we are required to meet at all times a robust minimum requirement for own funds and eligible liabilities ("MREL") which is determined on a case-by-case basis by the competent resolution authority. In addition, the banking reform package will implement the FSB's TLAC standard for G-SIBs (such as us) by introducing a new Pillar 1 MREL requirement for G-SIIs (the European equivalent term for G-SIBs). This new requirement is based on both risk-based and non-risk-based denominators and is expected to be set at the higher of 18 % of total risk exposure and 6.75% of the leverage ratio exposure measure following a transition period. It can be met with Tier 1 or Tier 2 capital instruments or debt that meets specific eligibility criteria. Deduction rules will apply for holdings by G-SIIs of TLAC instruments of other G-SIIs. In addition, the competent authorities will have the ability to impose a TLAC add-on requirement on G-SIIs. Such new rules are expected to apply to us with the minimum requirement starting from the moment of entry into force of the banking reform package, i.e. expected in the first half of 2019.

Both the TLAC and MREL requirements are specifically designed to require banks to maintain a sufficient amount of instruments which are eligible to absorb losses in resolution with the aim of ensuring that failing banks can be resolved without recourse to taxpayers' money. To that end, in order to facilitate the meeting of TLAC requirements by German banks, obligations of German banks under certain, specifically defined senior unsecured debt instruments issued by them (such as bonds that are not structured debt instruments) rank, since 2017, junior to all other outstanding unsecured unsubordinated obligations of such bank (such as deposits, derivatives, money market instruments and certain structured debt instruments), but continue to rank in priority to contractually subordinated debt instruments (such as Tier 2 instruments).

As part of the harmonization of national rules on the priority of claims of banks' creditors in the European Union, the BRRD now allows banks to issue "senior non-preferred" debt instruments ranking according to their terms (and not only statutorily) junior to the bank's other unsubordinated debt instruments (including bonds that are not treated as "senior non-preferred" debt instruments), but in priority to the bank's contractually subordinated liabilities (such as Tier 2 instruments). Any such "senior non-preferred" debt instruments issued by Deutsche Bank AG under such rules rank on parity with its then outstanding "senior non-preferred" debt instruments under the prior rules. This BRRD amendment was finalized and implemented into German law as of July 21, 2018.

The need to comply with these requirements may affect our business, financial condition and results of operation and in particular may increase our financing costs.

We may not have sufficient capital or other loss-absorbing liabilities to meet these increasing regulatory requirements. This could occur due to regulatory changes and other factors, such as the gradual phase out of our hybrid capital instruments qualifying as Additional Tier 1 (or AT1) capital or our inability to issue new securities which are recognized as regulatory capital or loss-absorbing liabilities under the new standards, due to an increase of risk-weighted assets based on more stringent rules for the measurement of risks or as a result of a future decline in the value of the euro as compared to other currencies, due to stricter requirements for the compliance with the non-risk based leverage ratio, due to any substantial losses we may incur, which would reduce our retained earnings, a component of Common Equity Tier 1 capital, or due to a combination of these or other factors.

If we are unable to maintain sufficient capital to meet the applicable minimum capital ratios, the buffer requirements, any specific "Pillar 2" capital requirements or TLAC or MREL requirements, we may become subject to enforcement actions and/or restrictions on the pay-out of dividends, share buybacks, payments on our other regulatory capital instruments, and discretionary compensation payments. In addition, any requirement to increase risk-based capital ratios or the leverage ratio could lead us to adopt a strategy focusing on capital preservation and creation over revenue generation and profit growth, including the reduction of higher margin risk-weighted assets. If we are unable to increase our capital ratios to the regulatory minimum in such a case or by raising new capital through the capital markets, through the reduction of risk-weighted assets or through other means, we may be required to activate our group recovery plan. If these actions or other private or supervisory actions do not restore capital ratios to the required levels, and we are deemed to be failing or likely to fail, competent authorities may apply resolution powers under the Single Resolution Mechanism ("SRM") and applicable rules and regulations, which could lead to a significant dilution of our shareholders' or even the total loss of our shareholders' or creditors' investment.

The CRR introduced a new liquidity coverage requirement intended to ensure that banks have an adequate stock of unencumbered high quality liquid assets that can be easily and quickly converted into cash to meet their liquidity needs for a 30 calendar day liquidity stress scenario. The required liquidity coverage ratio ("LCR") is calculated as the ratio of a bank's liquidity buffer to its net liquidity outflows. Also, banks must regularly report the composition of the liquid assets in their liquidity buffer to their competent authorities.

In addition, the Basel 3 framework introduced a net stable funding ratio ("NSFR") to reduce medium- to long-term funding risks by requiring banks to fund their activities with sufficiently stable sources of funding over a one-year period. The CRR contains interim reporting requirements on stable funding but does not yet include substantive provisions relating to the NSFR. Among the banking reform package is a proposal to introduce a binding NSFR. According to this proposal, the NSFR is defined as the ratio of a bank's available stable funding relative to the amount of required stable funding over a one-year period. According to the proposal, banks must maintain an NSFR of at least 100 %.

The ECB may impose on individual banks liquidity requirements which are more stringent than the general statutory requirements if the bank's continuous liquidity would otherwise not be ensured.

On February 6, 2019, the ECB launched a liquidity stress testing exercise. The exercise will constitute the supervisory stress test of 2019. The results of the exercise will feed into the ECB's ongoing supervisory assessments of banks' liquidity risk management frameworks, including the SREP. However, the outcome of the stress test will not affect supervisory capital and liquidity requirements in a mechanical way.

If we fail to meet liquidity requirements, we may become subject to enforcement actions. In addition, any requirement to maintain or increase liquidity could lead us to reduce activities that pursue revenue generation and profit growth.

**In some cases, we are required to hold and calculate capital and to comply with rules on liquidity and risk management separately for our local operations in different jurisdictions, in particular in the United States.**

We are required to hold and calculate capital and to comply with rules on liquidity and risk management separately for our local operations in different jurisdictions. In the United States, the Federal Reserve Board has adopted rules that impose enhanced prudential standards on our US operations. In February 2014, the Federal Reserve Board adopted rules that set forth how the US operations of certain foreign banking organizations ("FBOs"), such as Deutsche Bank, are required to be structured in the United States, as well as the enhanced prudential standards that apply to our US operations (the "FBO Rules"). Under the FBO Rules, as of July 1, 2016, a large FBO with US$ 50 billion or more in US non-branch assets, such as Deutsche Bank, was required to establish or designate a separately capitalized top-tier US intermediate holding company (an "IHC") that would hold substantially all of the FBO's ownership interests in its US subsidiaries. The Federal Reserve Board may permit an FBO subject to the US IHC requirement to establish or designate multiple US IHCs upon written request. On July 1, 2016, we designated DB USA Corporation as our IHC. In March 2018, we completed the partial initial public offering of our Asset Management division, to form DWS Group GmbH & Co. KGaA ("DWS"), in which we retain approximately 80 % of the shares. In April 2018, DWS USA Corporation was formed as a subsidiary of DWS, and, following receipt of Federal Reserve Board approval, we designated it as our second IHC, through which our US asset management subsidiaries are held. As of the date of designation or formation of each of these IHCs, they each became subject, on a consolidated basis, to the risk-based and leverage capital requirements under the US Basel 3 capital framework, capital planning and stress testing requirements (on a phased-in basis), US liquidity buffer requirements and other enhanced prudential standards comparable to those applicable to top-tier US bank holding companies of a similar size. Supplementary leverage ratio requirements applicable to DB USA Corporation took effect beginning in January 2018 and were applicable to DWS USA Corporation upon its formation. The Federal Reserve Board has the authority to examine an IHC, such as DB USA Corporation and DWS USA Corporation, and its subsidiaries, as well as US branches and agencies of FBOs, such as our New York branch.

As a bank holding company with assets of US$ 250 billion or more, Deutsche Bank AG is required under Title I of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, as amended (the "Dodd-Frank Act"), and the implementing regulations therefor to prepare and submit periodically to the Federal Reserve Board and the Federal Deposit Insurance Corporation ("FDIC") a plan for the orderly resolution of its subsidiaries and operations in the event of future material financial distress or failure (the "US Resolution Plan"). For foreign-based companies subject to these resolution planning requirements such as Deutsche Bank AG, the US Resolution Plan relates only to subsidiaries, branches, agencies and businesses that are domiciled in or whose activities are carried out in whole or in material part in the United States. Deutsche Bank AG filed its most recent US Resolution Plan in June 2018 and received written regulatory feedback in December 2018. The Federal Reserve Board and FDIC found that Deutsche Bank's US Resolution Plan had no deficiencies but identified one shortcoming in the plan, associated with governance mechanisms and related escalation triggers. Deutsche Bank is required to submit a response to its December 2018 feedback letter by April 5, 2019. Deutsche Bank's response will discuss the remediation of the shortcoming as well as enhancements of its resolution capabilities. Both the remediation of the shortcoming and enhancements must be completed prior to the submission of our next US Resolution Plan, which is currently expected to be due on July 1, 2020. If the Federal Reserve Board and the FDIC were to jointly deem our US Resolution Plan not credible and we failed to remedy the deficiencies in the required timeframe, we could be required to restructure or reorganize businesses, legal entities, operational systems and/or intra-company transactions in ways that may negatively impact our operations and strategy, or could be subject to restrictions on growth. We could also eventually be subjected to more stringent capital, leverage or liquidity requirements, or be required to divest certain assets or operations.

DB USA Corporation was subject to the Federal Reserve Board's Comprehensive Capital Analysis and Review ("CCAR") for 2018. On June 28, 2018, the Federal Reserve Board publicly indicated that it did not object to DB USA Corporation's 2018 capital plan on a quantitative basis, but that it did object for qualitative reasons. As a result of the Federal Reserve's objection, DB USA Corporation may not make any capital distribution unless the Federal Reserve has indicated in writing its non-objection to the distribution. DB USA Corporation's stressed Common Equity Tier 1 capital ratio was forecast by the Federal Reserve Board to fall to as low as 12.2 % under the supervisory severely adverse scenario. This hypothetical stressed ratio would be substantially above the minimum required ratio of 4.5 %. Stress testing results are based on hypothetical adverse scenarios and should not be viewed or interpreted as forecasts of expected outcomes or capital adequacy or of the actual financial condition of DB USA Corporation. DB USA Corporation will make its next capital plan submission to the Federal Reserve Board in April 2019, at which time DWS USA Corporation will submit its initial capital plan to the Federal Reserve Board. If the Federal Reserve Board were to object to these capital plans we could be required to increase capital or restructure businesses in ways that may negatively impact our operations and strategy or could be subject to restrictions on growth.

The US federal bank regulators in 2013 issued final rules implementing elements of the Basel 3 capital adequacy framework that are applicable to US banking organizations.

In September 2014, the Federal Reserve Board and other US regulators approved a final rule implementing liquidity coverage ratio ("LCR") requirements for large US banking holding companies and certain of their subsidiary depositary institutions that are generally consistent with the Basel Committee's revised Basel 3 liquidity standards. DB USA Corporation and our US bank subsidiary, Deutsche Bank Trust Company Americas ("DBTCA"), became subject to the full LCR requirements on April 1, 2017 and DWS USA Corporation became subject to LCR requirements on a phased-in basis upon its formation in April 2018.

On June 1, 2016, the Federal Reserve Board and other US regulators proposed rules implementing the second element of the Basel 3 liquidity framework, the net stable funding ratio ("NSFR"), which measures whether an institution maintains sufficiently stable amounts of longer-term funding. Under the proposed rules, DB USA Corporation, DWS USA Corporation and DBTCA would be subject to the full NSFR, but this proposal has yet to be finalized and is not yet in effect.

On December 15, 2016, the Federal Reserve Board adopted final rules that implement the FSB's TLAC standard in the United States. The final rules, which took effect on January 1, 2019, require, among other things, US IHCs of non-US G-SIBs, including our IHCs, DB USA Corporation and DWS USA Corporation, to maintain a minimum amount of TLAC, and separately require them to maintain a minimum amount of long-term debt meeting certain requirements.

US rules and interpretations, including those described above, could cause us to reduce assets held in the United States, inject capital and/or liquidity into or otherwise change the structure of our US operations, and could also restrict the ability of our US subsidiaries to pay dividends to us. To the extent that we are required to reduce operations in the United States or deploy capital in the United States that could be deployed more profitably elsewhere, these requirements could have an adverse effect on our business, financial condition and results of operations.

Any increased capital or liquidity requirements, including those described above, could have adverse effects on our business, financial condition and results of operations, as well as on perceptions in the market of our stability, particularly if any such proposal becomes effective and results in our having to raise capital at a time when we or the financial markets are distressed, or take other measures to increase liquidity in certain jurisdictions due to local requirements. These measures we might be required or find necessary to take in response to these shifting local requirements may be inconsistent with, and hinder the achievement of our strategic goals. In addition, if these regulatory requirements must be implemented more quickly than currently foreseen, we may decide that the quickest and most reliable path to compliance is to reduce the level of assets on our balance sheet, dispose of divisions or otherwise segregate certain activities or reduce or close down certain business lines. The effects on our capital raising efforts in such a case could be amplified due to the expectation that our competitors, at least those subject to the same or similar capital requirements, would likely also be required to raise capital at the same time. Moreover, some of our competitors, particularly those outside the European Union, may not face the same or similar regulations, which could put us at a competitive disadvantage.

In addition to these regulatory initiatives, market sentiment may encourage financial institutions such as Deutsche Bank to maintain significantly more capital, liquidity and loss-absorbing capital instruments than regulatory-mandated minima, which could exacerbate the effects on us described above or, if we do not increase our capital to the encouraged levels, could lead to the perception in the market that we are undercapitalized relative to our peers generally.

It is unclear whether the US capital and other requirements described above, as well as similar developments in other jurisdictions could lead to a fragmentation of supervision of global banks that could adversely affect our reliance on regulatory waivers allowing us to meet capital adequacy requirements, large exposure limits and certain organizational requirements on a consolidated basis only rather than on both a consolidated and non-consolidated basis. Should we no longer be entitled to rely on these waivers, we would have to adapt and take the steps necessary in order to meet regulatory capital requirements and other requirements on a consolidated as well as a non-consolidated basis, which could result also in significantly higher costs and potential adverse effects on our profitability and dividend paying ability.

Part I

**Our regulatory capital and liquidity ratios and our funds available for distributions on our shares or regulatory capital instruments will be affected by our business decisions and, in making such decisions, our interests and those of the holders of such instruments may not be aligned, and we may make decisions in accordance with applicable law and the terms of the relevant instruments that result in no or lower payments being made on our shares or regulatory capital instruments.**

Our regulatory capital and liquidity ratios are affected by a number of factors, including decisions we make relating to our businesses and operations as well as the management of our capital position, of our risk-weighted assets and of our balance sheet in general, and external factors, such as regulations regarding the risk weightings we are permitted to allocate to our assets, commercial and market risks or the costs of our legal or regulatory proceedings. While we and our management are required to take into account a broad range of considerations in our and their managerial decisions, including the interests of the Bank as a regulated institution and those of our shareholders and creditors, particularly in times of weak earnings and increasing capital requirements, the regulatory requirements to build capital and liquidity may become paramount. Accordingly, in making decisions in respect of our capital and liquidity management, we are not required to adhere to the interests of the holders of instruments we have issued that qualify for inclusion in our regulatory capital, such as our shares or Additional Tier 1 capital instruments. We may decide to refrain from taking certain actions, including increasing our capital at a time when it is feasible to do so (through securities issuances or otherwise), even if our failure to take such actions would result in a non-payment or a write-down or other recovery- or resolution-related measure in respect of any of our regulatory capital instruments. Our decisions could cause the holders of such regulatory capital instruments to lose all or part of the value of their investments in these instruments due to their effect on our regulatory capital ratios, and such holders will not have any claim against us relating to such decisions, even if they result in a non-payment or a write-down or other recovery- or resolution-related measure in respect of such instruments they hold.

In addition, our annual profit and distributable reserves form an important part of the funds available for us to pay dividends on our shares and make payments on our other regulatory capital instruments, as determined in the case of each such instrument by its terms or by operation of law, and any adverse change in our financial prospects, financial position or profitability, or our distributable reserves, each as calculated on an unconsolidated basis, may have a material adverse effect on our ability to make dividend or other payments on these instruments. In addition, as part of the implementation of our strategy, we may record impairments that reduce the carrying value of subsidiaries on our unconsolidated balance sheet and reduce profits and distributable reserves. Future impairments or other events that reduce our profit or distributable reserves on an unconsolidated basis could lead us to be unable to make such payments in respect of future years in part or at all. In particular, the direct costs of our potential settlements of litigation, enforcement and similar matters, especially to the extent in excess of provisions we have established for them, and their related business impacts, if they occur, could impact such distributable amounts.

In addition, German law places limits on the extent to which annual profits and otherwise-distributable reserves, as calculated on an unconsolidated basis, may be distributed to our shareholders or the holders of our other regulatory capital instruments, such as our Additional Tier 1 capital instruments. Our management also has, subject to applicable law, broad discretion under the applicable accounting principles to influence all amounts relevant for calculating funds available for distribution. Such decisions may impact our ability to make dividend or other payments under the terms of our regulatory capital instruments.

**European and German legislation regarding the recovery and resolution of banks and investment firms could, if steps were taken to ensure our resolvability or resolution measures were imposed on us, significantly affect our business operations, and lead to losses for our shareholders and creditors.**

Germany participates in the SRM, which centralizes at a European level the key competences and resources for managing the failure of any bank in member states of the European Union participating in the banking union. The SRM is based on the SRM Regulation and the BRRD, which was implemented in Germany through the German Recovery and Resolution Act. In addition, the German Resolution Mechanism Act (Abwicklungsmechanismusgesetz) adapted German bank resolution laws to the SRM.

The SRM Regulation and the German Recovery and Resolution Act require the preparation of recovery and resolution plans for banks and grant broad powers to public authorities to intervene in a bank which is failing or likely to fail. For a bank directly supervised by the ECB, such as Deutsche Bank, the Single Resolution Board (referred to as the "SRB") assesses its resolvability and may require legal and operational changes to the bank's structure to ensure its resolvability. In the event that such bank is deemed by the ECB or the SRB as failing or likely to fail and certain other conditions are met, the SRB is responsible for adopting a resolution scheme for resolving the bank pursuant to the SRM Regulation. The European Commission and, to a lesser extent, the Council of the European Union, have a role in endorsing or objecting to the resolution scheme proposed by the SRB. The resolution scheme would be addressed to and implemented by the competent national resolution authorities (in Germany, the German Federal Financial Supervisory Authority (Bundesanstalt für Finanzdienstleistungsaufsicht, "BaFin")) in line with the national laws implementing the BRRD. Resolution measures that could be imposed upon a bank in resolution may include the transfer of shares, assets or liabilities of the bank to another legal entity, the reduction, including to zero, of the nominal value of shares, the dilution of shareholders or the cancellation of shares outright, or the amendment, modification or variation of the terms of the bank's outstanding debt instruments, for example by way of a deferral of payments or a reduction of the applicable interest rate. Furthermore, certain eligible unsecured liabilities, in particular certain senior "non-preferred" debt instruments specified by the German Banking Act, may be written down, including to zero, or converted into equity (commonly referred to as "bail-in") if the bank becomes subject to resolution.

The SRM is intended to eliminate, or reduce, the need for public support of troubled banks. Therefore, financial public support for such banks, if any, would be used only as a last resort after having assessed and exploited, to the maximum extent practicable, the resolution powers, including a bail-in. The taking of actions to ensure our resolvability or the exercise of resolution powers by the competent resolution authority could materially affect our business operations and lead to a significant dilution of our shareholders or even the total loss of our shareholders' or creditors' investment.

Other regulatory reforms adopted or proposed in the wake of the financial crisis – for example, extensive new regulations governing our derivatives activities, compensation, bank levies, deposit protection, data protection or a possible financial transaction tax – may materially increase our operating costs and negatively impact our business model.

Beyond capital requirements and the other requirements discussed above, we are affected, or expect to be affected, by various additional regulatory reforms, including, among other things, regulations governing our derivatives activities, compensation, bank levies, deposit protection, data protection or a possible financial transaction tax.

On August 16, 2012, the EU Regulation on over-the-counter ("OTC") derivatives, central counterparties and trade repositories, referred to as European Market Infrastructure Regulation ("EMIR"), entered into force. EMIR introduced a number of requirements, including clearing obligations for certain classes of OTC derivatives and various reporting and disclosure obligations. EMIR implementation has led and may lead to changes that may negatively impact our profit margins. The revised Markets in Financial Instruments Directive ("MiFID 2") and the corresponding Regulation ("MiFIR") became applicable to us on January 3, 2018 and provide for, among other things, a trading obligation for those OTC derivatives which are subject to mandatory clearing and which are sufficiently standardized.

In the United States, the Dodd-Frank Act has numerous provisions that affect or may affect our operations. Pursuant to regulations implementing provisions of the Dodd-Frank Act, we provisionally registered as a swap dealer with the US Commodity Futures Trading Commission ("CFTC") and became subject to the CFTC's extensive oversight. Regulation of swap dealers by the CFTC imposes numerous corporate governance, business conduct, capital, margin, reporting, clearing, execution and other regulatory requirements on us. It also requires us to comply with certain US rules in some circumstances with respect to transactions conducted outside of the United States or with non-US persons. Although the coverage of EMIR and CFTC regulations implementing the Dodd-Frank Act is in many ways similar, certain swaps may be subject to both regulatory regimes to a significant extent. However, pursuant to the CFTC's guidance on cross-border swaps regulation, there may be instances where we can comply with the requirements of EMIR and MiFID in lieu of complying with the CFTC's requirements. The requirements under the Dodd-Frank Act may adversely affect our derivatives business and make us less competitive, especially as compared to competitors not subject to such regulation. Additionally, under the Dodd-Frank Act, security-based swaps are subject to a standalone regulatory regime under the jurisdiction of the US Securities and Exchange Commission ("SEC"). The SEC is finalizing rules for its security-based swap regime that are expected to be parallel to, but not identical to, the CFTC's regulation of swaps. This will impose further regulation of our derivatives business.

In addition, the CRR/CRD 4 legislative package provides for executive compensation reforms including caps on bonuses that may be awarded to "material risk takers" and other employees as defined therein and in the German Banking Act and other applicable rules and regulations such as the Remuneration Regulation for Institutions (Institutsvergütungsverordnung). Such restrictions on compensation, including any guidelines issued by the European Banking Authority to further implement them, could put us at a disadvantage to our competitors in attracting and retaining talented employees, especially compared to those outside the European Union that are not subject to these caps and other constraints.

Following the financial crisis, bank levies have been introduced in some countries including, among others, Germany and the United Kingdom. We accrued € 690 million for bank levies in 2018, € 596 million in 2017 and € 547 million in 2016. Also, we are required to contribute substantially to the Single Resolution Fund under the SRM (which is intended to reach a target level of 1 % of insured deposits of all banks in member states participating in the SRM by the end of 2023) and the statutory deposit guarantee and investor compensation schemes under the recast European Union directive on deposit guarantee schemes ("DGS Directive") and the European Union directive on investor compensation schemes. The DGS Directive defines a 0.8 % target level of prefunding by 2024 (similar to resolution funds), which has significantly increased the costs of the statutory deposit protection scheme. In addition, in this context, on November 24, 2015, the European Commission proposed a regulation to establish a European Deposit Insurance Scheme, or "EDIS", for bank deposits of all credit institutions that are members of any of the current national statutory deposit guarantee schemes of member states participating in the banking union. While the total impact of these future levies cannot currently be quantified, they may have a material adverse effect on our business, financial condition and results of operations in future periods.

The General Data Protection Regulation ("GDPR") became applicable in the European Union on May 25, 2018. It relates to data protection and privacy rights of individuals within the European Union and addresses the export of personal data to other jurisdictions. The GDPR primarily aims at giving individuals control over their personal data and to unifying the regulatory environment for cross-border business. The GDPR contains provisions and requirements pertaining to the processing of personal data of individuals and also applies to businesses inside the European Union that are processing personal data. The regulation furthermore applies to businesses outside of the European Union if goods or services are offered to data subjects in the European Union, or if the behavior of data subjects in the European Union is being monitored. The GDPR imposes compliance obligations and grants broad enforcement powers to supervisory authorities, including the potential to levy significant fines for non-compliance.

Separately, on January 22, 2013, the Council of the European Union adopted a decision authorizing eleven EU member states (Austria, Belgium, Estonia, France, Germany, Greece, Italy, Portugal, Slovakia, Slovenia and Spain) to proceed with the introduction of a financial transaction tax under the European Union's "enhanced cooperation procedure". The European Commission on February 14, 2013 adopted a draft directive for the implementation of the financial transaction tax. Following several rounds of political discussions there is currently no timetable for the conclusion of an agreement. If a financial transaction tax is ultimately adopted, depending on its final details, it could result in compliance costs as well as market consequences and have a material adverse effect on our profit and business.

## Risks Relating to Our Internal Control Environment

A robust and effective internal control environment and adequate infrastructure (comprising people, policies and procedures, controls testing and IT systems) are necessary to ensure that we conduct our business in compliance with the laws, regulations and associated supervisory expectations applicable to us. We have identified the need to strengthen our internal control environment and infrastructure and have embarked on initiatives to accomplish this. If these initiatives are not successful or are delayed, our reputation, regulatory position and financial condition may be materially adversely affected, and our ability to achieve our strategic ambitions may be impaired.

Our businesses are highly dependent on our ability to maintain a robust and effective internal control environment. This is needed for the Bank to process and monitor, on a daily basis, a wide variety of transactions, many of which are highly complex and occur at high speeds, volumes and frequencies, and across numerous and diverse markets and currencies. Such a robust and effective control environment is in turn dependent on the sufficiency of our infrastructure to support that environment. This infrastructure consists broadly of internal policies and procedures, testing protocols, and the IT systems and employees needed to enforce and enable them. An effective control environment is dependent on infrastructure systems and procedures that cover the processing and settling of transactions; the valuation of assets; the identification, monitoring, aggregation, measurement and reporting of risks and positions against various metrics; the evaluation of counterparties and customers for legal, regulatory and compliance purposes; the escalation of reviews; and the taking of mitigating and remedial actions where necessary. They are also critical for regulatory reporting and other data processing and compliance activities.

Both our internal control environment and the infrastructure that underlies it fall short in a number of areas of our standards for completeness and comprehensiveness and are not well integrated across the Bank. Our IT infrastructure, in particular, is fragmented, with numerous distinct platforms, many of which need significant upgrades, in operation across the Bank. Our business processes and the related control systems often require manual procedures and actions that increase the risks of human error and other operational problems that can lead to delays in reporting information to management and to the need for more adjustments and revisions than would be the case with more seamlessly integrated and automated systems and processes. As a result, it is often difficult and labor-intensive for us to obtain or provide information of a consistently high quality and on a timely basis to comply with regulatory reporting and other compliance requirements or to meet regulatory expectations on a consistent basis and, in certain cases, to manage our risk comprehensively. Furthermore, it often takes intensive efforts to identify, when possible, inappropriate behavior by our staff and attempts by third parties to misuse our services as a conduit for prohibited activities, including those relating to anti-financial crime laws and regulation.

In addition, we may not always have the personnel with the appropriate experience, seniority and skill levels to compensate for shortcomings in our processes and infrastructure, or to identify, manage or control risks, and it often has been difficult to attract and retain the requisite talent. This has impacted our ability to remediate existing weaknesses and manage the risks inherent in our activity.

Against this backdrop, our regulators, our Management Board and our Group Audit function have increasingly and more intensively focused on our internal controls and infrastructure through numerous formal reviews and audits of our operations. These reviews and audits have identified various areas for improvement relating to a number of elements of our control environment and infrastructure. These include the infrastructure relating to transaction capturing and recognition, classification of assets, asset valuation frameworks, data and process consistency, risk identification, measurement and management and other processes required by laws, regulations, and supervisory expectations. They also include regulatory reporting, anti-money laundering (AML), "know your customer" (KYC) and other internal processes that are aimed at preventing use of our products and services for the purpose of committing or concealing financial crime. As one example, our January 2017 settlement with the UK FCA relating to trading activities involving our Russian operations stemmed in part from the FCA's review of the AML control functions in our investment bank.

Our principal regulators, including the BaFin, the ECB and the Federal Reserve Board, have also conducted numerous reviews focused on our internal controls and the related infrastructure. These regulators have required us formally to commit to remediate our AML and other weaknesses, including the fragmented and manual nature of our infrastructure. For example, on September 21, 2018, the BaFin issued an order requiring us to implement measures on specified timelines over the coming months and years to improve our control and compliance infrastructure relating to AML and, in particular, the know-your-client (KYC) processes in CIB. Local regulators in other countries in which we do business also review the sufficiency of our control environment and infrastructure with respect to their jurisdictions. While the overall goals of the various prudential regulators having authority over us in the many places in which we do business are broadly consistent, and the general themes of our deficiencies in internal controls and the supporting infrastructure are similar, the regulatory frameworks applicable to us in the area of internal controls are generally applicable at a national or EU-wide level and are not always consistent across the jurisdictions in which we operate around the world. This adds complexity and cost to our efforts to reduce fragmentation and put in place automated systems that communicate seamlessly and quickly with one another.

In order to improve in the areas discussed above, we are undertaking several major initiatives to enhance the efficacy of the transaction processing environment, strengthen our controls and infrastructure, manage non-financial risks and enhance the skill set of our personnel. We believe that these initiatives will better enable us to avoid the circumstances that have resulted in many of the litigations and regulatory and enforcement investigations and proceedings to which we have recently been subject, and will improve our ability to comply with laws and regulations and meet supervisory expectations. In particular, we are making efforts to reduce the complexity of our business and to integrate and automate processes and business and second-line controls. We have also exited certain businesses, for example in Russia, and high-risk countries, selectively off-boarded a number of clients, worked to strengthen our compliance culture and control functions and increased the size of and strengthened our Group Audit function. However, we may be unable to complete these initiatives as quickly as we intend or as our regulators demand, and our efforts may be insufficient to remediate existing deficiencies and prevent future deficiencies or to result in fewer litigations or regulatory or enforcement investigations, proceedings and criticism in the future. We may also, when faced with the considerable expense of these initiatives, fail to provide sufficient resources for them quickly enough or at all, especially during periods when our operating performance and profitability are challenged. If we are unable to significantly improve our infrastructure and control environment in a timely manner, we may determine to or some of our regulators may require us to reduce our exposure to or terminate certain kinds of products or businesses, counterparties or regions, which could, depending on the extent of such requirement, significantly challenge our ability to operate profitably under our current business model.

Regulators can also impose capital surcharges, requiring capital buffers in addition to those directly required under the regulatory capital rules applicable to us, to reflect the additional risks posed by deficiencies in our control environment. In extreme cases, regulators can suspend our permission to operate in the businesses and regions within their jurisdictions or require extensive and costly remedial actions. Furthermore, implementation of enhanced infrastructure and controls may result in higher-than-expected costs of regulatory compliance that could offset or exceed efficiency gains or significantly affect our profitability. Any of these factors could affect our ability to implement our strategy in a timely manner or at all.

The BaFin has ordered us to improve our control and compliance infrastructure relating to anti-money laundering and know-your-client processes in CIB, and appointed a special representative to monitor these measures' implementation. Our results of operations, financial condition and reputation could be materially and adversely affected if we are unable to significantly improve our infrastructure and control environment by the set deadline.

On September 21, 2018, the BaFin issued an order requiring us to implement measures on specified timelines over the coming months and years to improve our control and compliance infrastructure relating to AML and, in particular, the KYC processes in CIB. The BaFin also appointed KPMG as special representative, reporting to the BaFin on a quarterly basis on certain aspects of our compliance and progress with the implementation of these measures. In February 2019, the BaFin extended the special representative's mandate to cover our internal controls in the correspondent banking business. Our AML and KYC processes, as well as our other internal processes that are aimed at preventing use of our products and services for the purpose of committing or concealing financial crime and our personnel responsible for our efforts in these areas, continue to be the subject of regulatory scrutiny in a number of jurisdictions. If we are unable to significantly improve our infrastructure and control environment by the set deadline, our results of operations, financial condition and reputation could be materially and adversely affected. For example, some of our regulators, such as BaFin, would likely impose fines or require us to reduce our exposure to or terminate certain kinds of products or businesses or relationships with counterparties or regions, which could, depending on the extent of such requirement, significantly challenge our ability to operate profitably under our current business model.

### Risks Relating to Litigation, Regulatory Enforcement Matters and Investigations

We operate in a highly and increasingly regulated and litigious environment, potentially exposing us to liability and other costs, the amounts of which may be substantial and difficult to estimate, as well as to legal and regulatory sanctions and reputational harm.

The financial services industry is among the most highly regulated industries. Our operations throughout the world are regulated and supervised by the central banks and regulatory authorities in the jurisdictions in which we operate. In recent years, regulation and supervision in a number of areas has increased, and regulators, law enforcement authorities, governmental bodies and others have sought to subject financial services providers to increasing oversight and scrutiny, which in turn has led to additional regulatory investigations or enforcement actions. This trend has accelerated markedly as a result of the global financial crisis and the European sovereign debt crisis. There has been a steep escalation in the severity of the terms which regulators and law enforcement authorities have required to settle legal and regulatory proceedings against financial institutions, with settlements in recent years including unprecedented monetary penalties as well as criminal sanctions. As a result, we may continue to be subject to increasing levels of liability and regulatory sanctions, and may be required to make greater expenditures and devote additional resources to addressing these liabilities and sanctions. Regulatory sanctions may include status changes to local licenses or orders to discontinue certain business practices.

We and our subsidiaries are involved in various litigation proceedings, including civil class action lawsuits, arbitration proceedings and other disputes with third parties, as well as regulatory proceedings and investigations by both civil and criminal authorities in jurisdictions around the world. We expect that the costs to us arising from the resolution of litigation, enforcement and similar matters pending against us to continue to be significant in the near to medium term and to adversely affect our business, financial condition and results of operations. Litigation and regulatory matters are subject to many uncertainties, and the outcome of individual matters is not predictable with assurance. We may settle litigation or regulatory proceedings prior to a final judgment or determination of liability. We may do so for a number of reasons, including to avoid the cost, management efforts or negative business, regulatory or reputational consequences of continuing to contest liability, even when we believe we have valid defenses to liability. We may also do so when the potential consequences of failing to prevail would be disproportionate to the costs of settlement. Furthermore, we may, for similar reasons, reimburse counterparties for their losses even in situations where we do not believe that we are legally compelled to do so. The financial impact of legal risks might be considerable but may be difficult or impossible to estimate and to quantify, so that amounts eventually paid may exceed the amount of provisions made or contingent liabilities assessed for such risks.

Actions currently pending against us or our current or former employees may not only result in judgments, settlements, fines or penalties, but may also cause substantial reputational harm to us. The risk of damage to our reputation arising from such proceedings is also difficult or impossible to quantify.

Regulators have increasingly sought admissions of wrongdoing in connection with settlement of matters brought by them. This could lead to increased exposure in subsequent civil litigation or in consequences under so-called "bad actor" laws, in which persons or entities determined to have committed offenses under some laws can be subject to limitations on business activities under other laws, as well as adverse reputational consequences. In addition, the DOJ conditions the granting of cooperation credit in civil and criminal investigations of corporate wrongdoing on the company involved having provided to investigators all relevant facts relating to the individuals responsible for the alleged misconduct. This policy may result in increased fines and penalties if the DOJ determines that we have not provided sufficient information about applicable individuals in connection with an investigation. Other governmental authorities could adopt similar policies.

Item 3: Key Information

In addition, the financial impact of legal risks arising out of matters similar to some of those we face have been very large for a number of participants in the financial services industry, with fines and settlement payments greatly exceeding what market participants may have expected and, as noted above, escalating steeply over the last few years to unprecedented levels. The experience of others, including settlement terms, in similar cases is among the factors we take into consideration in determining the level of provisions we maintain in respect of these legal risks. Developments in cases involving other financial institutions in recent years have led to greater uncertainty as to the predictability of outcomes and could lead us to add to our provisions. Moreover, the costs of our investigations and defenses relating to these matters are themselves substantial. Further uncertainty may arise as a result of a lack of coordination among regulators from different jurisdictions or among regulators with varying competencies in a single jurisdiction, which may make it difficult for us to reach concurrent settlements with each regulator. Should we be subject to financial impacts arising out of litigation and regulatory matters to which we are subject in excess of those we have calculated in accordance with our expectations and the relevant accounting rules and contrary to our publicly communicated expectation that 2015 and 2016 were peak years for the financial impact of litigation and regulatory matters, our provisions in respect of such risks may prove to be materially insufficient to cover these impacts. This could have a material adverse effect on our results of operations, financial condition or reputation as well as on our ability to maintain capital, leverage and liquidity ratios at levels expected by market participants and our regulators. In such an event, we could find it necessary to reduce our risk-weighted assets (including on terms disadvantageous to us) or substantially cut costs to improve these ratios, in an amount corresponding to the adverse effects of the provisioning shortfall.

We are currently the subject of industry-wide investigations by regulatory and law enforcement agencies relating to interbank and dealer offered rates, as well as civil actions. Due to a number of uncertainties, including those related to the high profile of the matters and other banks' settlement negotiations, the eventual outcome of these matters is unpredictable, and may materially and adversely affect our results of operations, financial condition and reputation.

We have responded to requests for information from, and cooperated with, various regulatory and law enforcement agencies in connection with industry-wide investigations concerning the setting of the London Interbank Offered Rate (LIBOR), Euro Interbank Offered Rate (EURIBOR), Tokyo Interbank Offered Rate (TIBOR) and other interbank and dealer offered rates. The investigations underway have the potential to result in the imposition of significant financial penalties and other consequences for the Bank.

As previously reported, we paid €725 million to the European Commission pursuant to a settlement agreement dated December 4, 2013 in relation to anticompetitive conduct in the trading of interest rate derivatives. Also as previously reported, on April 23, 2015, we reached settlements with the DOJ, the CFTC, FCA, and the New York State Department of Financial Services ("DFS") to resolve investigations into misconduct concerning the setting of LIBOR, EURIBOR, and TIBOR. Under the terms of these agreements, we agreed to pay penalties of US$ 2.175 billion to the DOJ, CFTC and DFS and GBP 226.8 million to the FCA. As part of the resolution with the DOJ, DB Group Services (UK) Limited. (an indirectly-held, wholly-owned subsidiary of ours) pled guilty to one count of wire fraud in the US District Court for the District of Connecticut and we entered into a Deferred Prosecution Agreement with a three year term, which expired in 2018. On October 25, 2017, we entered into a settlement with a working group of US state attorneys general resolving their interbank offered rate investigation. Among other conditions, we made a settlement payment of US$ 220 million. The factual admissions we have made in connection with these settlements could make it difficult for us to defend against pending and future claims. Other investigations of us concerning the setting of various interbank offered rates remain ongoing.

In addition, we are party to 45 US civil actions concerning alleged manipulation relating to the setting of various interbank and/or dealer offered rates, as well as single actions pending in each of the UK, Israel and Argentina. Most of the civil actions, including putative class actions, are pending in the US District Court for the Southern District of New York (SDNY), against us and numerous other defendants. All but four of the US civil actions were filed on behalf of parties who allege losses as a result of manipulation relating to the setting of US dollar LIBOR. The four civil actions pending against us that do not relate to US dollar LIBOR are also pending in the SDNY, and include one consolidated action concerning Pound Sterling (GBP) LIBOR, one action concerning Swiss franc (CHF) LIBOR, one action concerning two Singapore Dollar (SGD) benchmark rates, the Singapore Interbank Offered Rate (SIBOR) and the Swap Offer Rate (SOR), and one action concerning the Canadian Dealer Offered Rate (CDOR).

We cannot predict the effect on us of the interbank and dealer offered rates matters, which could include fines levied by government bodies, damages from private litigation for which we may be liable, legal and regulatory sanctions (including possible criminal sanctions) and other consequences.

Regulators and law enforcement authorities are investigating, among other things, our compliance with the US Foreign Corrupt Practices Act and other laws with respect to our hiring practices related to candidates referred by clients, potential clients and government officials, and our engagement of finders and consultants.

Certain regulators and law enforcement authorities in various jurisdictions, including the SEC and the DOJ, are investigating, among other things, our compliance with the US Foreign Corrupt Practices Act and other laws with respect to our hiring practices related to candidates referred by clients, potential clients and government officials, and our engagement of finders and consultants. We are responding to and continuing to cooperate with these investigations. Certain regulators in other jurisdictions have also been briefed on these investigations. In the event that any violations of law or regulation are found to have occurred or are alleged to have occurred, and an enforcement action is filed, legal and regulatory sanctions in respect thereof may materially and adversely affect our results of operations, financial condition and reputation.

We are currently involved in civil proceedings in connection with our voluntary takeover offer for the acquisition of all shares of Postbank. The extent of our financial exposure to this matter could be material, and our reputation may be harmed.

On September 12, 2010, we announced the decision to make a voluntary takeover offer for the acquisition of all shares in Deutsche Postbank AG (Postbank). On October 7, 2010, we published the official offer document. In our takeover offer, we offered Postbank shareholders consideration of € 25 for each Postbank share. The takeover offer was accepted for a total of approximately 48.2 million Postbank shares.

In November 2010, a former shareholder of Postbank, Effecten-Spiegel AG, which had accepted the takeover offer, brought a claim against us alleging that the offer price was too low and was not determined in accordance with the applicable law of the Federal Republic of Germany. The plaintiff alleges that we had been obliged to make a mandatory takeover offer for all shares in Postbank, at the latest, in 2009. The plaintiff avers that, at the latest in 2009, the voting rights of Deutsche Post AG in Postbank had to be attributed to us pursuant to Section 30 of the German Takeover Act. Based thereon, the plaintiff alleges that the consideration offered by us for the shares in Postbank in the 2010 voluntary takeover offer needed to be raised to € 57.25 per share.

The Regional Court Cologne *(Landgericht)* dismissed the claim in 2011 and the Cologne appellate court dismissed the appeal in 2012. The Federal Court set aside the Cologne appellate court's judgment and referred the case back to the appellate court. In its judgment, the Federal Court stated that the appellate court had not sufficiently considered the plaintiff's allegation that we and Deutsche Post AG "acted in concert" in 2009.

Starting in 2014, additional former shareholders of Postbank, who accepted the 2010 tender offer, brought similar claims as Effecten-Spiegel AG against us which are pending with the Regional Court Cologne and the Higher Regional Court of Cologne, respectively. On October 20, 2017, the Regional Court Cologne handed down a decision granting the claims in a total of 14 cases which were combined in one proceeding. The Regional Court Cologne took the view that we were obliged to make a mandatory takeover offer already in 2008 so that the appropriate consideration to be offered in the takeover offer should have been € 57.25 per share. Taking the consideration paid into account, the additional consideration per share owed to shareholders which have accepted the takeover offer would thus amount to € 32.25. We appealed this decision and the appeal has been assigned to the 13th Senate of the Higher Regional Court of Cologne, which also is hearing the appeal of Effecten-Spiegel AG.

On November 8, 2017, a hearing took place before the Higher Regional Court of Cologne in the Effecten-Spiegel case. In that hearing, the Higher Regional Court indicated that it disagreed with the conclusions of the Regional Court Cologne and took the preliminary view that we were not obliged to make a mandatory takeover offer in 2008 or 2009. Initially the Higher Regional Court resolved to announce a decision on December 13, 2017. However, this was postponed to February 2018 because the plaintiff challenged the three members of the 13th Senate of the Higher Regional Court of Cologne for alleged prejudice. The challenge was rejected by the Higher Regional Court of Cologne at the end of January 2018. In February 2018, the court granted a motion by Effecten-Spiegel AG to re-open the hearing.

The Higher Regional Court informed the parties by notice dated February 19, 2019 that it has doubts that an acting in concert can be based on the contractual clauses which the Regional Court Cologne found to be sufficient to assume an acting in concert (and to grant the plaintiffs' claims in October 2017). Against this background, the Higher Regional Court resolved to take further evidence and to call a number of witnesses in both cases who shall be heard from October 30, 2019 until at least December 11, 2019 in weekly hearings. The individuals to be heard include current and former board members of Deutsche Bank, Deutsche Post AG and Postbank as well as other persons involved in the Postbank transaction. The court further informed the parties that it is considering to request from us the production of relevant transaction documents.

We have been served with a large number of additional lawsuits filed against us shortly before the end of 2017, almost all of which are now pending with the Regional Court Cologne. Some of the new plaintiffs allege that the consideration offered by us for the shares in Postbank in the 2010 voluntary takeover should be raised to € 64.25 per share.

The claims for payment against us in relation to these matters total almost € 700 million (excluding interest).

In September 2015, former shareholders of Postbank filed in the Regional Court Cologne shareholder actions against Postbank to set aside the squeeze-out resolution taken in the shareholders meeting of Postbank in August 2015. Among other things, the plaintiffs allege that we were subject to a suspension of voting rights with respect to its shares in Postbank based on the allegation that we failed to make a mandatory takeover offer at a higher price in 2009. The squeeze out is final and the proceeding itself has no relevance for it, but may result in damage payments. The claimants in this proceeding refer to legal arguments similar to those asserted in the Effecten-Spiegel proceeding described above. In a decision on October 20, 2017, the Regional Court Cologne declared the squeeze-out to be void. The court, however, did not rely on a suspension of voting rights due to an alleged failure by us to make a mandatory takeover offer, but argued that Postbank violated information rights of Postbank shareholders in Postbank's shareholders meeting in August 2015. Postbank has appealed this decision.

The legal question of whether we had been obliged to make a mandatory takeover offer for all Postbank shares prior to its 2010 voluntary takeover may also impact two pending appraisal proceedings (*Spruchverfahren*). These proceedings were initiated by former Postbank shareholders with the aim to increase the cash compensation offered in connection with the squeeze-out of Postbank shareholders in 2015 and the cash compensation offered and annual guaranteed dividend paid in connection with the execution of a domination and profit and loss transfer agreement (*Beherrschungs- und Gewinnabführungsvertrag*) between DB Finanz-Holding AG (now DB Beteiligungs-Holding GmbH) and Postbank in 2012. The Regional Court Cologne issued resolutions indicating that it is inclined to consider a potential obligation of Deutsche Bank to make a mandatory takeover offer for Postbank at an offer price of € 57.25 when determining the adequate cash compensation in the appraisal proceedings. The cash compensation paid in connection with the domination and profit and loss transfer agreement was € 25.18 and was accepted for approximately 0.5 million shares. The squeeze-out compensation paid in 2015 was € 35.05 and approximately 7 million shares were squeezed-out.

The extent of our financial exposure to this matter could be material, and our reputation may be harmed.

We have investigated the circumstances around equity trades entered into by certain clients in Moscow and London and have advised regulators and law enforcement authorities in several jurisdictions about those trades. In the event that violations of law or regulation are found to have occurred, any resulting penalties against us may materially and adversely affect our results of operations, financial condition and reputation.

We have investigated the circumstances around equity trades entered into by certain clients with us in Moscow and London that offset one another. The total volume of transactions reviewed is significant. Our internal investigation of potential violations of law, regulation and policy and into the related internal control environment has concluded, and we have assessed the findings identified during the investigation; to date we have identified certain violations of our policies and deficiencies in our control environment. We have advised regulators and law enforcement authorities in several jurisdictions (including Germany, Russia, the UK and the United States) of this investigation and have taken disciplinary measures with regards to certain individuals in this matter.

On January 30 and 31, 2017, the DFS and FCA announced settlements with the Bank related to their investigations into this matter. The settlements conclude the DFS and the FCA's investigations into the bank's AML control function in its investment banking division, including in relation to the equity trading described above. Under the terms of the settlement agreement with the DFS, Deutsche Bank entered into a consent order, and agreed to pay civil monetary penalties of US$ 425 million and to engage an independent monitor to conduct a comprehensive review of its existing AML compliance programs that pertain to or affect activities conducted by or through our US bank subsidiary DBTCA and our New York branch for a term of up to two years. Under the terms of the settlement agreement with the FCA, we agreed to pay civil monetary penalties of approximately GBP 163 million. On May 30, 2017, the Federal Reserve announced its settlement with us resolving this matter as well as additional AML issues identified by the Federal Reserve. We paid a penalty of US$ 41 million. We also agreed to retain independent third parties to assess our Bank Secrecy Act/AML program and review certain foreign correspondent banking activity of DBTCA. We are also required to submit written remediation plans and programs.

We continue to cooperate with regulators and law enforcement authorities, including the DOJ which has its own ongoing investigation into these securities trades. In the event that violations of law or regulation are found to have occurred, legal and regulatory sanctions in respect thereof may materially and adversely affect our results of operations, financial condition and reputation.

Deutsche Bank
Annual Report 2018 on Form 20-F

Part I

We are currently involved in civil and criminal proceedings in connection with transactions with Monte dei Paschi di Siena. The extent of our financial exposure to these matters could be material, and our reputation may be harmed.

In March 2013, Banca Monte dei Paschi di Siena ("MPS") initiated civil proceedings in Italy against us alleging that we assisted former MPS senior management in an accounting fraud on MPS, by undertaking repo transactions with MPS and "Santorini", a wholly owned special-purpose vehicle of MPS, which helped MPS defer losses on a previous transaction undertaken with us. Subsequently, in July 2013, the Fondazione Monte dei Paschi di Siena ("FMPS"), MPS' largest shareholder, also commenced civil proceedings in Italy for damages based on substantially the same facts. In December 2013, we reached an agreement with MPS to settle the civil proceedings and the transactions were unwound. The civil proceedings initiated by FMPS, in which damages of between € 220 million and € 381 million were claimed, were also recently settled upon payment by us of € 17.5 million. FMPS's separate claim filed in July 2014 against FMPS's former administrators and a syndicate of 12 banks including DB S.p.A. for € 286 million continues to be pending before the first instance Florence courts.

A criminal investigation was launched by the Siena Public Prosecutor into the transactions entered into by MPS with us and certain unrelated transactions entered into by MPS with other parties. Such investigation was moved in summer 2014 from Siena to the Milan Public Prosecutors as a result of a change in the alleged charges being investigated. On February 16, 2016, the Milan Public Prosecutors issued a request of committal to trial against us and six current and former employees. The committal process concluded with a hearing on October 1, 2016, during which the Milan court committed all defendants in the criminal proceedings to trial. Our potential exposure is for administrative liability under Italian Legislative Decree n. 231/2001 and for civil vicarious liability as an employer of current and former employees who are being criminally prosecuted. A verdict is not expected before summer 2019.

On May 22, 2018, CONSOB, the authority responsible for regulating the Italian financial markets, issued fines of € 100,000 each against the six current and former employees of ours who are individual defendants in the criminal proceedings. The six individuals were also banned from performing management functions in Italy and for Italian based institutions for three to six months each. No separate fine or sanction was imposed on us but we are jointly and severally liable for our six current/former employees' fines. On June 14, 2018, we and the six individuals filed an appeal in the Milan Court of Appeal challenging CONSOB's decision and one of the individuals sought a stay of enforcement of the fine against that individual. The stay was granted on July 21, 2018. The hearing of the appeal is scheduled for June 5, 2019 with a verdict expected by the end of 2019.

The extent of our financial exposure to these matters could be material, and our reputation may suffer material harm as a result of these matters.

We are under continuous examination by tax authorities in the jurisdictions in which we operate. Tax laws are increasingly complex and are evolving. The cost to us arising from the conclusion and resolution of routine tax examinations, tax litigation and other forms of tax proceedings or tax disputes may increase and may adversely affect our business, financial condition and results of operation.

We are under continuous examination by tax authorities in the jurisdictions in which we operate. Tax laws are increasingly complex. In the current political and regulatory environment, tax administrations' and courts' interpretation of tax laws and regulations and their application are evolving, and scrutiny by tax authorities has become increasingly intense. On December 22, 2017, the new US tax legislation, known as the "Tax Cuts and Jobs Act" or "TCJA", was signed into law. The TCJA includes a number of provisions, such as the Base Erosion Anti-Abuse Tax, for which proposed regulations were issued on December 13, 2018. While providing a certain level of clarity, the proposed regulations are subject to further changes before being made final, and certain issues will require further interpretative guidance over the coming months and years. In addition, wide ranging changes in the principles of international taxation emanating from the OECD's Base Erosion and Profit Shifting agenda are generating significant uncertainties for us and our subsidiaries and may result in an increase in instances of bilateral tax disputes going forward, as member states may take different approaches in transposing these requirements into national law. Tax administrations have also been focusing on the eligibility of taxpayers for reduced withholding taxes on dividends in connection with certain cross-border lending or derivative transactions with the German Federal Ministry of Finance having issued administrative guidance in this area in 2017. As a result, the cost to us arising from the conclusion and resolution of routine tax examinations, tax litigation and other forms of tax proceedings or tax disputes, as well as from rapidly changing and increasingly complex and uncertain tax laws and principles, may increase and may adversely affect our business, financial condition and results of operation.

We are currently involved in a legal dispute with the German tax authorities in relation to the tax treatment of certain income received with respect to our pension plan assets. The proceeding is pending in front of the German supreme fiscal court (Bundesfinanzhof). Should the courts ultimately rule in favor of the German tax authorities, the outcome could have a material effect on our comprehensive income and financial condition.

We sponsor a number of post-employment benefit plans on behalf of our employees. In Germany, the pension assets that fund the obligations under these pension plans are held by Benefit Trust GmbH. The German tax authorities are challenging the tax treatment of certain income received by Benefit Trust GmbH in the years 2010 to 2013 with respect to its pension plan assets. For the year 2010 Benefit Trust GmbH paid the amount of tax and interest assessed of € 160 million to the tax authorities and is seeking a refund of the amounts paid in litigation with the relevant lower fiscal court. For 2011 to 2013 the matter is stayed pending the outcome of the 2010 tax litigation. The amount of tax and interest under dispute for years 2011 to 2013, which also has been paid to the tax authorities, amounts to € 456 million. In March 2017, the lower fiscal court ruled in favor of Benefit Trust GmbH and in September 2017 the tax authorities appealed the decision to the German supreme fiscal court (Bundesfinanzhof). A decision by the supreme fiscal court is not expected for a number of years. An ultimate decision by the courts that is unfavorable to us could materially and adversely affect our comprehensive income and financial condition.

US Congressional committees and other US governmental entities have sought and may seek information from us concerning potential dealings between us and the US executive branch, the President, his family and other close associates, exposing us in particular to risk to our reputation and potential loss of business as a result of extensive media attention.

A number of media entities have reported that US Congressional committees and other US governmental entities are seeking or may seek information from us concerning, among other things, potential dealings between the Bank and certain members of the Executive branch of the US government, the President, his family, and other close associates. Attention surrounding such actual or potential requests and inquiries and our responses can create reputational and other risks that could have a material adverse effect on us. Our policy is to cooperate with all authorized government inquiries.

We have received requests for information from regulatory and law enforcement agencies concerning our correspondent banking relationship with Danske Bank, exposing us in particular to risk to our reputation and potential loss of business as a result of extensive media attention.

We have received requests for information from regulatory and law enforcement agencies concerning our correspondent banking relationship with Danske Bank, including our historical processing of correspondent banking transactions on behalf of customers of Danske Bank's Estonia branch prior to cessation of the correspondent banking relationship with that branch in 2015. We are providing information to and otherwise cooperating with the investigating agencies. We are also conducting an internal investigation into these matters, including of whether any violations of law, regulation or policy occurred and the effectiveness of the related internal control environment. Media and market attention surrounding these requests can create reputational risks in particular, even if our investigations and those of our regulators and the authorities do not result in evidence of wrongdoing. We could in particular suffer diminished volumes of business as a result, which could have a material adverse effect on our financial condition and results of operations.

In November 2018, our offices in Frankfurt were searched by German law enforcement authorities on the suspicion that two employees and as-yet unidentified further individuals deliberately abstained from issuing suspicious activity reports (SARs) in a timely manner and aided and abetted money laundering, exposing us in particular to risk to our reputation and potential loss of business as a result of extensive media attention.

On November 29, 2018, based on a search warrant issued by the Local Court *(Amtsgericht)* in Frankfurt, our offices in Frankfurt were searched by German law enforcement authorities on the suspicion that two employees and as-yet unidentified further individuals deliberately abstained from issuing suspicious activity reports (SARs) in a timely manner and aided and abetted money laundering in connection with our offshore trust business. The physical searches ended on November 30, 2018. Nevertheless, the search remains formally open until we have completed additional data deliveries. We are cooperating in the investigation, as has been publicly acknowledged by the Frankfurt Public Prosecutor's Office. Attention surrounding such search and investigation can create reputational risks in particular, even if our investigations and those of our regulators and the authorities do not result in evidence of wrongdoing. We could in particular suffer diminished volumes of business as a result, which could have a material adverse effect on our financial condition and results of operations.

**Guilty pleas by or convictions of us or our affiliates in criminal proceedings may have consequences that have adverse effects on certain of our businesses.**

We and our affiliates have been and are subjects of criminal proceedings or investigations. In particular, as part of the resolution of the investigation of the DOJ into misconduct relating to London interbank offered rates, our subsidiary DB Group Services (UK) Limited entered into a plea agreement with the DOJ, pursuant to which the company pled guilty to one count of wire fraud, and, subsequently, a judgment of conviction was issued against the company. Also, in connection with the KOSPI Index unwind matters, our subsidiary Deutsche Securities Korea Co. was convicted of vicarious corporate criminal liability in respect of spot/futures linked market manipulation by one of its employees; though the criminal trial verdict has been overturned on appeal, the Korean prosecutor's office has appealed the decision. We and our subsidiaries are also subjects of other criminal proceedings or investigations.

Guilty pleas or convictions against us or our affiliates could lead to our ineligibility to use an important trading exemption under ERISA. In particular, such guilty pleas or convictions could cause our asset management affiliates to no longer qualify as "qualified professional asset managers" ("QPAMs") under the QPAM Prohibited Transaction Exemption, which exemption is relied on to provide asset management services to certain pension plans in connection with certain asset management strategies. While there are a number of statutory exemptions and numerous other administrative exemptions that our asset management affiliates may use to trade on behalf of ERISA plans, and in many instances they may do so in lieu of relying on the QPAM exemption, loss of QPAM status could cause customers who rely on such status (whether because they are legally required to do so or because we have agreed contractually with them to maintain such status) to cease to do business or refrain from doing business with us and could negatively impact our reputation more generally. For example, clients may mistakenly see the loss as a signal that our asset management affiliates are somehow no longer approved as asset managers generally by the US Department of Labor ("DOL"), the agency responsible for ERISA, and cease to do business or refrain from doing business with us for that reason. This could have a material adverse effect on our results of operations, particularly those of our asset management business in the United States. On December 29, 2017, the DOL published an individual exemption permitting certain of our affiliates to retain their QPAM status despite both the conviction of DB Group Services (UK) Limited and the conviction of Deutsche Securities Korea Co. The exemption applies through April 17, 2021 but may terminate earlier if, among other things, we or our affiliates are convicted of crimes in other matters. The disqualification period arising from these convictions extends until April 17, 2027, so we will need to obtain a further exemption by April 18, 2021 to avoid a loss of QPAM status at that time, with the potential for the adverse effects described above if such further exemption is not granted.

## Other Risks

**In addition to our traditional banking businesses of deposit-taking and lending, we also engage in nontraditional credit businesses in which credit is extended in transactions that include, for example, our holding of securities of third parties or our engaging in complex derivative transactions. These nontraditional credit businesses materially increase our exposure to credit risk.**

As a bank and provider of financial services, we are exposed to the risk that third parties who owe us money, securities or other assets will not perform their obligations. Many of the businesses we engage in beyond the traditional banking businesses of deposit-taking and lending also expose us to credit risk.

In particular, much of the business we conduct through our Corporate & Investment Bank corporate division entails credit transactions, frequently ancillary to other transactions. Nontraditional sources of credit risk can arise, for example, from holding securities of third parties; entering into swap or other derivative contracts under which counterparties have obligations to make payments to us; executing securities, futures, currency or commodity trades that fail to settle at the required time due to nondelivery by the counterparty or systems failure by clearing agents, exchanges, clearing houses or other financial intermediaries; and extending credit through other arrangements. Parties to these transactions, such as trading counterparties, may default on their obligations to us due to bankruptcy, political and economic events, lack of liquidity, operational failure or other reasons.

Many of our derivative transactions are individually negotiated and non-standardized, which can make exiting, transferring or settling the position difficult. Certain credit derivatives require that we deliver to the counterparty the underlying security, loan or other obligation in order to receive payment. In a number of cases, we do not hold, and may not be able to obtain, the underlying security, loan or other obligation. This could cause us to forfeit the payments otherwise due to us or result in settlement delays, which could damage our reputation and ability to transact future business, as well as impose increased costs on us. Legislation in the European Union (EMIR) and the United States (the Dodd-Frank Act) has introduced requirements for the standardization, margining, central clearing and transaction reporting of certain over-the-counter derivatives. While such requirements are aimed at reducing the risk posed to counterparties and the financial system by such derivatives, they may reduce the volume and profitability of the transactions in which we engage, and compliance with such provisions may impose substantial costs on us.

The exceptionally difficult market conditions experienced during the global financial crisis severely adversely affected certain areas in which we do business that entail nontraditional credit risks, including the leveraged finance and structured credit markets, and similar market conditions, should they occur, may do so in the future.

A substantial proportion of our assets and liabilities comprise financial instruments that we carry at fair value, with changes in fair value recognized in our income statement. As a result of such changes, we have incurred losses in the past, and may incur further losses in the future.

A substantial proportion of the assets and liabilities on our balance sheet comprise financial instruments that we carry at fair value, with changes in fair value recognized in the income statement. Fair value is defined as the price at which an asset or liability could be exchanged in an arm's length transaction between knowledgeable, willing parties, other than in a forced or liquidation sale. If the value of an asset carried at fair value declines (or the value of a liability carried at fair value increases) a corresponding unfavorable change in fair value is recognized in the income statement. These changes have been and could in the future be significant.

Observable prices or inputs are not available for certain classes of financial instruments. Fair value is determined in these cases using valuation techniques we believe to be appropriate for the particular instrument. The application of valuation techniques to determine fair value involves estimation and management judgment, the extent of which will vary with the degree of complexity of the instrument and liquidity in the market. Management judgment is required in the selection and application of the appropriate parameters, assumptions and modeling techniques. If any of the assumptions change due to negative market conditions or for other reasons, subsequent valuations may result in significant changes in the fair values of our financial instruments, requiring us to record losses.

Our exposure and related changes in fair value are reported net of any fair value gains we may record in connection with hedging transactions related to the underlying assets. However, we may never realize these gains, and the fair value of the hedges may change in future periods for a number of reasons, including as a result of deterioration in the credit of our hedging counterparties. Such declines may be independent of the fair values of the underlying hedged assets or liabilities and may result in future losses.

Pursuant to accounting rules, we must periodically test the value of the goodwill of our businesses and the value of our other intangible assets for impairment. In the event such test determines that criteria for impairment exists, we are required under accounting rules to write down the value of such asset. Impairments of goodwill and other intangible assets have had and may have a material adverse effect on our profitability results of operations.

Goodwill arises on the acquisition of subsidiaries and associates and represents the excess of the aggregate of the cost of an acquisition and any noncontrolling interests in the acquiree over the fair value of the identifiable net assets acquired at the date of the acquisition. Goodwill on the acquisition of subsidiaries is capitalized and reviewed for impairment annually or more frequently if there are indications that impairment may have occurred. Intangible assets are recognized separately from goodwill when they are separable or arise from contractual or other legal rights and their fair value can be measured reliably. These assets are tested for impairment and their useful lives reaffirmed at least annually. The determination of the recoverable amount in the impairment assessment of non-financial assets requires estimates based on quoted market prices, prices of comparable businesses, present value or other valuation techniques, or a combination thereof, necessitating management to make subjective judgments and assumptions. These estimates and assumptions could result in significant differences to the amounts reported if underlying circumstances were to change.

Impairments of goodwill and other intangible assets have had and may have a material adverse effect on our profitability and results of operations. In 2016, changes in goodwill included impairments of € 285 million in Sales & Trading and of € 500 million in Asset Management. The impairment in Sales & Trading was the result of a transfer of certain businesses from Asset Management to Sales & Trading. The goodwill impairment in Asset Management was recorded in relation to the sale of the Abbey Life business and the formation of a disposal group held for sale.

Pursuant to accounting rules, we must review our deferred tax assets at the end of each reporting period. To the extent that it is no longer probable that sufficient taxable income will be available to allow the benefit of part or all of deferred tax assets to be utilized, we have to reduce the carrying amounts. These reductions have had and may in the future have material adverse effects on our profitability, equity and financial condition.

We recognize deferred tax assets for future tax consequences attributable to temporary differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases, unused tax losses and unused tax credits. Deferred tax assets are recognized only to the extent that it is probable that sufficient taxable profit will be available against which those unused tax losses, unused tax credits and deductible temporary differences can be utilized. As of December 31, 2018 and December 31, 2017, we recognized deferred tax assets of € 6.5 billion and € 5.9 billion, respectively in entities which have suffered a loss in either the current or preceding period.

In determining the amount of deferred tax assets, we use historical tax capacity and profitability information and, if relevant, forecasted operating results based upon approved business plans, including a review of the eligible carry-forward periods, available tax planning opportunities and other relevant considerations. Each quarter, we re-evaluate our estimate related to deferred tax assets, including our assumptions about future profitability. The accounting estimate related to the deferred tax assets depends upon underlying assumptions that can change from period to period and requires significant management judgment. For example tax law changes or variances in future projected operating performance could result in an adjustment to the deferred tax assets that would be charged to income tax expense or directly to equity in the period such determination was made.

These adjustments have had and may in the future have material adverse effects on our profitability or equity. In 2017, we recognized a one-time tax charge of € 1.4 billion attributable to the remeasurement of US deferred tax assets as a result of the US tax reform.

Our risk management policies, procedures and methods leave us exposed to unidentified or unanticipated risks, which could lead to material losses.

We have devoted significant resources to developing our risk management policies, procedures and assessment methods and intend to continue to do so in the future. Nonetheless, the risk management techniques and strategies have not been and may in the future not be fully effective in mitigating our risk exposure in all economic market environments or against all types of risk, including risks that we fail to identify or anticipate. Some of our quantitative tools and metrics for managing risk are based upon our use of observed historical market behavior. We apply statistical and other tools to these observations to arrive at quantifications of our risk exposures. During the financial crisis, the financial markets experienced unprecedented levels of volatility (rapid changes in price direction) and the breakdown of historically observed correlations (the extent to which prices move in tandem) across asset classes, compounded by extremely limited liquidity. In this volatile market environment, our risk management tools and metrics failed to predict some of the losses we have experienced, and they may in the future fail to predict important risk exposures. In addition, our quantitative modeling does not take all risks into account and makes numerous assumptions regarding the overall environment, which may not be borne out by events. As a result, risk exposures have arisen and could continue to arise from factors we did not anticipate or correctly evaluate in our statistical models. This has limited and could continue to limit our ability to manage our risks especially in light of geopolitical developments, many of the outcomes of which are currently unforeseeable. Our losses thus have been and may in the future be significantly greater than the historical measures indicate.

In addition, our more qualitative approach to managing those risks not taken into account by our quantitative methods could also prove insufficient, exposing us to material unanticipated losses. Also, if existing or potential customers or counterparties believe our risk management is inadequate, they could take their business elsewhere or seek to limit their transactions with us. This could harm our reputation as well as our revenues and profits. See "Management Report: Risk Report" in the Annual Report 2018 for a more detailed discussion of the policies, procedures and methods we use to identify, monitor and manage our risks.

*Operational risks, which may arise from errors in the performance of our processes, the conduct of our employees, instability, malfunction or outage of our IT system and infrastructure, or loss of business continuity, or comparable issues with respect to our vendors, may disrupt our businesses and lead to material losses.*

We face operational risk arising from errors, inadvertent or intentional, made in the execution, confirmation or settlement of transactions or from transactions not being properly recorded, evaluated or accounted for. An example of this risk concerns our derivative contracts, which are not always confirmed with the counterparties on a timely basis. For so long as the transaction remains unconfirmed, we are subject to heightened credit and operational risk and in the event of a default may find it more difficult to enforce the contract.

In addition, our businesses are highly dependent on our ability to process manually or through our systems a large number of transactions on a daily basis, across numerous and diverse markets in many currencies. Some of the transactions have become increasingly complex. Moreover, management relies heavily on its financial, accounting and other data processing systems that include manual processing components. If any of these processes or systems do not operate properly, or are disabled, or subject to intentional or inadvertent human error, we could suffer financial loss, a disruption of our businesses, liability to clients, regulatory intervention or reputational damage.

We are also dependent on our employees to conduct our business in accordance with applicable laws, regulations and generally accepted business standards. If our employees do not conduct our business in this manner, we may be exposed to material losses. Furthermore, if an employee's misconduct reflects fraudulent intent, we could also be exposed to reputational damage. We categorize these risks as conduct risk, which comprises inappropriate business practices, including selling products that are not suitable for a particular customer, fraud, unauthorized trading and failure to comply with applicable regulations, laws and internal policies.

We in particular face the risk of loss events due to the instability, malfunction or outage of our IT system and IT infrastructure. Such losses could materially affect our ability to perform business processes and may, for example, arise from the erroneous or delayed execution of processes as either a result of system outages or degraded services in systems and IT applications. A delay in processing a transaction, for example, could result in an operational loss if market conditions worsen during the period after the error. IT-related errors may also result in the mishandling of confidential information, damage to our computer systems, financial losses, additional costs for repairing systems, reputational damage, customer dissatisfaction or potential regulatory or litigation exposure.

Business continuity risk is the risk of incurring losses resulting from the interruption of normal business activities. We operate in many geographic locations and are frequently subject to the occurrence of events outside of our control. Despite the contingency plans we have in place, our ability to conduct business in any of these locations may be adversely impacted by a disruption to the infrastructure that supports our business, whether as a result of, for example, events that affect our third party vendors or the community or public infrastructure in which we operate. Any number of events could cause such a disruption including deliberate acts such as sabotage, terrorist activities, bomb threats, strikes, riots and assaults on the bank's staff; natural calamities such as hurricanes, snow storms, floods, disease pandemic and earthquakes; or other unforeseen incidents such as accidents, fires, explosions, utility outages and political unrest. Any such disruption could have a material adverse effect on our business and financial position.

*We utilize a variety of vendors in support of our business and operations. Services provided by vendors pose risks to us comparable to those we bear when we perform the services ourselves, and we remain ultimately responsible for the services our vendors provide. Furthermore, if a vendor does not conduct business in accordance with applicable standards or our expectations, we could be exposed to material losses or regulatory action or litigation or fail to achieve the benefits we sought from the relationship.*

We utilize a variety of vendors in support of our business and operations. We do so in order to focus on our core competencies and to seek improvements in costs, efficiency and effectiveness in our operations, for instance in connection with our IT modernization efforts. Services provided by vendors pose risks to us comparable to those we bear when we perform the services ourselves, and we remain ultimately responsible for the services our vendors provide. We depend on our vendors to conduct their delivery of services in compliance with applicable laws, regulations and generally accepted business standards and in accordance with the contractual terms and service levels they have agreed with us. If our vendors do not conduct business in accordance with these standards, we may be exposed to material losses and could be subject to regulatory action or litigation as well as be exposed to reputational damage. More generally, if a vendor relationship does not meet our expectations, we could be exposed to financial risks, such as the costs and expenses associated with migration of the services to another vendor and business and operational risks related to the transition, and we could fail to achieve the benefits we sought from the relationship.

**Our operational systems are subject to an increasing risk of cyber-attacks and other internet crime, which could result in material losses of client or customer information, damage our reputation and lead to regulatory penalties and financial losses.**

Among the operational risks we face is the risk of breaches of the security of our or our vendors' computer systems due to unauthorized access to networks or resources, the introduction of computer viruses or malware, or other forms of cybersecurity attacks or incidents. Such breaches could threaten the confidentiality of our or our clients' data and the integrity of our systems. We devote significant resources toward the protection of our computer systems against such breaches and toward ensuring that our vendors employ appropriate cybersecurity safeguards. To address the evolving cyber threat risk, we have expended significant resources to modify and enhance our protective measures and to investigate and remediate any information security vulnerabilities. These measures, however, may not be effective against the many security threats we face.

The increasing frequency and sophistication of recent cyber-attacks has resulted in an elevated risk profile for many organizations around the world, and significant attention by our management has been paid to the overall level of preparedness against such attacks. Cybersecurity is growing in importance due to factors such as the continued and increasing reliance on our technology environment. We and other financial institutions have experienced attacks on computer systems, including attacks aimed at obtaining unauthorized access to confidential company or customer information or damaging or interfering with company data, resources or business activities, or otherwise exploiting vulnerabilities in our infrastructure. We expect to continue to be the target of such attacks in the future. Although we have to date not experienced any material business impact from these attacks, we may not be able to effectively anticipate and prevent more material attacks from occurring in the future. A successful attack could have a significant negative impact on us, including as a result of disclosure or misappropriation of client or proprietary information, damage to computer systems, financial losses, remediation costs (such as for investigation and re-establishing services), increased cybersecurity costs (such as for additional personnel, technology, or third-party vendors), reputational damage, customer dissatisfaction and potential regulatory or litigation exposure.

**The size of our clearing operations exposes us to a heightened risk of material losses should these operations fail to function properly.**

We have large clearing and settlement businesses and an increasingly complex and interconnected information technology (IT) landscape. These give rise to the risk that we, our customers or other third parties could lose substantial sums if our systems fail to operate properly for even short periods. This will be the case even where the reason for the interruption is external to us. In such a case, we might suffer harm to our reputation even if no material amounts of money are lost. This could cause customers to take their business elsewhere, which could materially harm our revenues and profits.

**Ongoing global benchmark reform efforts initiated by the FSB, specifically the transition from interbank offered rates to alternative reference rates, including so-called "risk-free-rates", that are under development, introduce a number of inherent risks to our business and the financial industry. These risks, should they materialize, may have adverse effects on our business, results of operations and profitability.**

Regulators and central banks have set the goal of improving the robustness of financial benchmarks, especially interest rate benchmarks. As a result of this initiative, the ongoing availability of, among other benchmarks, the London Interbank Offered Rate ("LIBOR"), the Euro Interbank Offered Rate ("EURIBOR") and the Euro Overnight Index Average rate ("EONIA" and, together with LIBOR, EURIBOR and other interbank benchmark rates, "IBORs") is uncertain. In the UK, the FCA has announced that it will no longer compel panel banks to submit rates for the calculation of LIBOR after 2021. As a result, LIBOR may be modified or discontinued after 2021. EURIBOR reform to comply with the EU financial benchmarks regulation is underway, but there is a risk that the process will not be completed by the end of the transition period in the regulation, which leaves EURIBOR's future availability in doubt. Additionally, the administrator of EONIA expects the rate to be unavailable for use in the EU after the end of the transition period. The transition period currently ends at the end of 2019, but an extension of the transition period for critical and third country benchmarks, which would allow these rates to remain available through 2021, has been agreed by EU policymakers in February 2019 and is expected to be enacted into law in the coming months.

We and other market participants are actively engaged in industry working groups to identify and recommend alternative "risk-free-rates" ("RFRs") and processes through which parties can transition to such rates, and a number of sub-working groups have been set up to address open questions and issues surrounding these changes.

In addition, there are ongoing initiatives of benchmark administrators and their respective regulators to revise existing benchmark methodologies with the aim of improving the robustness of such benchmarks. As a contributing bank to a range of interest rate benchmarks, including LIBOR and EURIBOR, we are closely involved with such initiatives.

A material portion of our assets and liabilities, including financial instruments we trade and other transactions and services we are involved in, have interest rates that are linked to IBORs that may be subject to potential discontinuation, requiring us to prepare for such discontinuation and for a potential transition to RFRs. The discontinuation of these IBORs and the transition to RFRs pose a variety of risks to us, including the following:

– Legal and compliance risk (including conduct risk) may arise due to possible disputes regarding disclosures to clients or provisions in financial contracts with counterparties. Many financial instruments linked to IBORs contain provisions for the use of a successor interest rate in the event of the discontinuation of such IBORs, while others do not. In connection with such a discontinuation and transition, the counterparty to the financial instrument may challenge the rate determined for such instrument, particularly if we are the obligor under such financial instrument or are otherwise involved in the determination or setting of the successor rate, whether in respect of the particular financial instrument or in respect of the applicable benchmarks generally. Such disputes could result in claims of market abuse and mistreatment of customers, litigation or regulatory action.
– Liquidity risk may arise due to slow acceptance, take-up, and development of liquidity in RFR-related products, leading to market dislocation or fragmentation. Additionally, bid/offer spreads may widen impacting funding and collateral postings. Also, replacement of IBORs with a new benchmark rate could adversely impact the value of and return on existing instruments and contracts and the market for securities and other instruments whose returns are linked to IBOR benchmarks.
– Market risk may arise due to interest rate "basis" risks – the risks posed by different interest rate provisions applying to assets than to liabilities – across tenors and currencies, driven by differing fallback methodologies and timings. Different timings of adoption of fallback protocols will create new basis and potentially make hedging more costly or less effective, and losses may result from value transfer in the fallback methodology adopted. In the event of discontinuation of IBORs and a transition to a successor interest rate, we may incur losses in respect of our assets and liabilities linked to IBORs if the successor interest rate is not economically equivalent to the discontinued IBORs.
– Introduction of new RFRs will require us to develop new pricing and risk models related to new RFR-linked products. The models we develop may require approval by competent regulators if they differ significantly from existing models, which may introduce delays.
– Finance and tax risk may arise due to the discontinuation of IBORs and transition to RFRs, which could cause hedge accounting items to be derecognized, adversely impacting our profitability or causing us to incur losses. Discontinuation and transition could also pose difficulties for the independent price verification of financial instruments, where market data is unavailable for the new or modified financial instrument. Tax uncertainties could arise if a discontinuation or transition is viewed as a significant modification of a financial instrument that results in a profit or loss recognition event for tax purposes.
– Technology and operational risk may arise as a result of the complexity of transition processes, which will require collaboration with our regulators and central banks as well as a wide range of market participants. Also, significant change efforts – relating to RFR product development, re-documentation of client contracts and infrastructure change, including to systems, processes and models across the business and our Finance, Risk and Treasury functions –, will be required. Successful transition processes are, to some extent, dependent on achieving industry and client consensus on standards and conventions, timing and sequencing of transition steps, creation of term versions of the RFRs and the timely re-documenting of client contracts.

Initiatives to reform existing benchmarks and our participation in them potentially give risk to similar legal and other risks.

The necessity and potential timing of the discontinuation of IBORs, the prospects for transition to RFRs in the various markets in which they would be required, and industry, market and regulatory response, remain highly uncertain. Also, as mentioned, there are external factors, such as required actions of regulators or counterparties, which create risks that an individual institution, or the industry as a whole, would find difficult to address. Depending how such contingencies develop, and the adequacy of the response of the industry, the market, regulators and us to them, the discontinuation of IBORs and transition to RFRs could have adverse effects on our business, results of operations and profitability.

Part I

**We are subject to laws and other requirements relating to financial and trade sanctions and embargoes. If we breach such laws and requirements, we can be subject, and have in the past been subject, to material regulatory enforcement actions and penalties.**

We are required to monitor, evaluate, and observe laws and other requirements relating to financial and trade sanctions and embargoes set by the EU, the Deutsche Bundesbank, Germany's Federal Office for Economic Affairs and Export Control, and other authorities, such as the US Treasury Department's Office of Foreign Assets Control (OFAC) and the UK Treasury Department. If we breach such laws and requirements, we can be subject, and have in the past been subject, to material regulatory enforcement actions and penalties.

Transactions with counterparties in countries designated by the US State Department as state sponsors of terrorism or persons targeted by US economic sanctions may lead potential customers and investors to avoid doing business with us or investing in our securities, harm our reputation or result in regulatory or enforcement action which could materially and adversely affect our business.

We engage or have engaged in a limited amount of business with counterparties, including government-owned or -controlled counterparties, in certain countries or territories that are subject to comprehensive US sanctions, including Iran and Cuba (referred to as "Sanctioned Countries"), or with persons targeted by US economic sanctions (referred to as "Sanctioned Persons"). US law generally prohibits US persons or any other persons acting within US jurisdiction from doing business with Sanctioned Countries or Sanctioned Persons. Additionally, US indirect or "secondary" sanctions threaten retaliation against certain activities, including categories of transactions with certain entities and countries, by non-US persons entirely outside of US jurisdiction. Thus, US regulations may extend to activities in other geographic areas and by non-US persons depending on the circumstances. Our US subsidiaries, branch offices, and employees are, and our non-US subsidiaries, branch offices, and employees may become, subject to those prohibitions and other regulations.

We are a German bank and our activities with respect to Sanctioned Countries and Sanctioned Persons have been subject to policies and procedures designed to avoid the involvement of persons acting under US jurisdiction in any managerial or operational role and to ensure compliance with United Nations, European Union and German sanctions and embargoes; in reflection of legal developments in recent years, we have further developed our policies and procedures with the aim of ensuring – to the extent legally permitted – compliance with regulatory requirements extending to other geographic areas regardless of jurisdiction. However, should our policies prove to be, or have been, ineffective, we may be subject to regulatory or enforcement action that could materially and adversely affect our reputation, financial condition, or business. We have taken action to reduce the risk of compliance violations. In 2007, our Management Board decided that we will not engage in new business with counterparties in countries such as Iran, Syria, Sudan and North Korea and to exit existing business to the extent legally possible. It also decided to limit our business with counterparties in Cuba. Iran, North Korea Sudan and Syria are currently designated as state sponsors of terrorism by the US State Department.

We had a representative office in Tehran, Iran, which we discontinued on December 31, 2007. Our remaining business with Iranian counterparties consisted mostly of participations as lender and/or agent in a few large trade finance facilities arranged before 2007 to finance the export contracts of exporters in Europe and Asia. The lifetime of most of these facilities is ten years or more and we were legally obligated to fulfil our contractual obligations. We do not believe our business activities with Iranian counterparties are or had been material to our overall business, with the outstanding loans to Iranian borrowers representing substantially less than 0.01 % of our total assets over recent years. As of December 31, 2018, those loans were fully repaid, and the revenues from such activities represented less than 0.01 % of our total revenues for the year ended December 31, 2018.

In recent years, the United States has taken steps to deter foreign companies from dealing with Iran by providing for a variety of secondary sanctions against companies engaged in targeted activities there. Many of these secondary sanctions were suspended following the occurrence on January 16, 2016 of "Implementation Day" of the Joint Comprehensive Plan of Action (referred to as the "JCPoA") between the "P5+1" parties and Iran, but they were re-instated between May and November 2018 by the United States following its withdrawal from the JCPoA. Following the Implementation Day, we engaged in new activities with respect to Iran, but only to a limited extent. We executed cash payments in Euro from or to Iran on behalf of our own non-Iranian clients with enhanced due diligence. We remained restrictive towards any new trade finance activities and did not engage in loan arrangements with Iranian counterparties. We do not believe we have engaged in activities likely to result in the imposition of sanctions under Iran-related secondary sanctions, but we do engage in limited non-US dollar transactions with certain German branches or offices of Iranian banks that are targets of US secondary sanctions, and the US authorities have considerable discretion in applying the statutes, and any imposition of sanctions against us could be material. In light of the inherent regulatory, operational and reputational risks resulting from this environment and in the wake of the repositioning of the US Government in relation to the JCPoA, which became fully effective on November 5, 2018, we have processed the aforementioned cash payments only in very restricted cases and have since then further restricted our approach.

Deutsche Bank
Annual Report 2018 on Form 20-F

Item 3: Key Information

As required by Section 219 of the Iran Threat Reduction and Syria Human Rights Act of 2012 (Section 13(r) of the Securities Exchange Act of 1934, as amended) we have disclosed certain information regarding our activities or transactions with persons subject to US sanctions against Iran and other persons subject to such provision. Such disclosure is set forth in the section of this document entitled "Disclosures Under Iran Threat Reduction and Syria Human Rights Act of 2012", which follows "Item 16H: Mine Safety Disclosure".

We are also engaged in a limited amount of business with counterparties domiciled in Cuba, which is not subject to any United Nations, European Union or German embargoes. The business consists of a limited number of letters of credit and of cash payments, each without a US nexus, and it represented substantially less than 0.01 % of our assets as of December 31, 2018. The letters of credit served to finance commercial products such as machinery as well as medical products.

We have set up appropriate processes and procedures aimed at complying with other substantial changes in US economic sanctions that have occurred since 2017. In August 2017, the United States enacted the "Countering America's Adversaries Through Sanctions Act" (referred to as "CAATSA"), which codifies existing US sanctions against Russia (including designation of Russian entities under US sanctions), expands US secondary sanctions against Russia, tightens existing sectoral sanctions (targeting specific sectors of the Russian economy), and permits the imposition of sectoral sanctions against additional sectors of the Russian economy. In particular, expanded US secondary sanctions under CAATSA allow for the imposition of US sanctions on non-US entities who engage in "significant" transactions with Russian SDNs or specific entities in the Russian defense and intelligence sectors. We do not believe we have engaged or are currently engaged in any transactions with Russian entities that violate, or are sanctionable under, US sanctions. However, given the broad discretion US authorities have in interpreting and enforcing US sanctions, there can be no assurances that US authorities will not bring enforcement actions against us, or impose secondary sanctions on us for our ongoing activities. Any such actions could have a material impact on our business and harm our reputation. It is also possible that the United States could impose broader sanctions on Russia or Russian entities in the future and that such sanctions could have a material impact on our business activities.

Additionally, since 2017, the US Administration has imposed number of sanctions against the Government of Venezuela and Venezuelan officials. These sanctions prohibit, inter alia, transactions or other dealings by US persons or within US jurisdiction involving new debt of and certain bonds issued by the Government of Venezuela (including state-owned or state-controlled enterprises), the direct or indirect purchases of securities from the Government of Venezuela, or (beginning on January 28, 2019) virtually all unlicensed Petróleos de Venezuela S.A. transactions. A substantial portion of economic activity within US jurisdiction involving the Government of Venezuela is now prohibited by US sanctions. We have taken appropriate steps and established appropriate processes and procedures aimed at complying with these US sanctions against the Government of Venezuela. In response to these US sanctions, we have wound down several client relationships. With respect to entities of the Government of Venezuela, we are currently only engaged in legacy transactions. We do not believe that any of our remaining activities related to the Government of Venezuela violate US sanctions. However, given the broad discretion US authorities have in interpreting and enforcing US sanctions, there can be no assurances that US authorities do not allege that our ongoing activities violate US sanctions.

We are aware, through press reports and other means, of initiatives by governmental and non-governmental entities in the United States and elsewhere to adopt laws, regulations or policies prohibiting transactions with or investment in, or requiring divestment from, entities doing business with Sanctioned Countries, particularly Iran. Such initiatives may result in our being unable to gain or retain entities subject to such prohibitions as customers or as investors in our securities. In addition, our reputation may suffer due to our association with such countries. Such a result could have significant adverse effects on our business or the price of our securities. It is also possible that new direct or indirect secondary sanctions could be imposed by the United States or other jurisdictions without warning as a result of geopolitical developments.

# PAGES 44-70 OMITTED PURSUANT TO D. N.J. ECF POLICIES AND PROCEDURES

A major focus of US governmental policy relating to financial institutions is aimed at preventing money laundering and terrorist financing and compliance with economic sanctions in respect of designated countries or activities. Failure of an institution to have policies and procedures and controls in place to prevent, detect and report money laundering and terrorist financing could in some cases have serious legal, financial and reputational consequences for the institution.

## New York Branch

The New York branch of Deutsche Bank AG is licensed by the Superintendent of the New York State Department of Financial Services to conduct a commercial banking business and is required to maintain and pledge eligible high-quality assets with banks in the State of New York (up to a maximum of US$ 100 million of assets pledged so long as the foreign bank remains designated as "well-rated" by the Superintendent of Financial Services). Should we cease to be designated as "well-rated" by the Superintendent of Financial Services, we may need to maintain substantial additional amounts of eligible assets. The Superintendent of Financial Services may also impose asset maintenance requirements on foreign banks with branch offices in New York. In addition, the Federal Reserve Board is authorized to impose institution-specific asset maintenance requirements under certain conditions, pursuant to the FBO Rules. Currently, no such requirements have been imposed upon our New York branch.

The New York State Banking Law authorizes the Superintendent of Financial Services to take possession of the business and property of a New York branch of a foreign bank under certain circumstances, generally involving violation of law, conduct of business in an unsafe manner, impairment of capital, suspension of payment of obligations, or initiation of liquidation proceedings against the foreign bank at its domicile or elsewhere. In liquidating or dealing with a branch's business after taking possession of a branch, only the claims of depositors and other creditors which arose out of transactions with a branch are to be accepted by the Superintendent of Financial Services for payment out of the business and property of the foreign bank in the State of New York or in the US and reflected on the books of the New York branch, without prejudice to the rights of the holders of such claims to be satisfied out of other assets of the foreign bank. After such claims are paid, the Superintendent of Financial Services will turn over the remaining assets, if any, first to the liquidators of other offices of the foreign bank that are being liquidated in the United States and then, if any assets remain, to the foreign bank or its duly appointed liquidator or receiver.

## Deutsche Bank Trust Company Americas

The Federal Deposit Insurance Corporation Improvement Act of 1991 ("FDICIA") provides for extensive regulation of depository institutions (such as DBTCA and its direct and indirect parent companies), including requiring federal banking regulators to take "prompt corrective action" with respect to FDIC-insured banks that do not meet minimum capital requirements. As an insured bank's capital level declines and the bank falls into lower categories (or if it is placed in a lower category by the discretionary action of its supervisor), greater limits are placed on its activities and federal banking regulators are authorized (and, in many cases, required) to take increasingly more stringent supervisory actions, which could ultimately include the appointment of a conservator or receiver for the bank (even if it is solvent). In addition, FDICIA generally prohibits an FDIC-insured bank from making any capital distribution (including payment of a dividend) or payment of a management fee to its holding company if the bank would thereafter be undercapitalized. If an insured bank becomes "undercapitalized", it is required to submit to federal regulators a capital restoration plan guaranteed by the bank's holding company. Since the enactment of FDICIA, both of our US insured banks have maintained capital above the "well capitalized" standards, the highest capital category under applicable regulations.

DBTCA, like other FDIC-insured banks, is required to pay assessments to the FDIC for deposit insurance under the FDIC's Deposit Insurance Fund (calculated using the FDIC's risk-based assessment system). The minimum reserve ratio for the Deposit Insurance Fund was increased under the Dodd-Frank Act from 1.15 % to 1.35 %, with the target of 1.35 % to be reached by 2020 and with the incremental cost charged to banks with more than US$ 10 billion in assets. In addition, the FDIC has set the designated reserve ratio at 2 % as a long-term goal. This shift has had financial implications for all FDIC-insured banks, including DBTCA. In order to achieve the 1.35 % goal, in March 2016, the FDIC adopted a rule imposing an additional surcharge of 4.5 % per $ 100 of the quarterly assessments (after making certain adjustments) of insured depository institutions with total consolidated assets of US$ 10 billion or more, including DBTCA. The surcharge took effect on July 1, 2016 and ended as of September 30, 2018, when the 1.35 % goal had been met. The FDIC's standard maximum deposit insurance amount per customer at an insured depository institution is US$ 250,000.

# PAGES 72-110 OMITTED PURSUANT TO D. N.J. ECF POLICIES AND PROCEDURES

# Signatures

The registrant hereby certifies that it meets all of the requirements for filing on Form 20-F and has duly caused and authorized the undersigned to sign this annual report on its behalf.

Date: March 22, 2019

Deutsche Bank Aktiengesellschaft

/s/    CHRISTIAN SEWING

Christian Sewing
Chairman of the Management Board
Chief Executive Officer

/s/    JAMES VON MOLTKE

James von Moltke
Member of the Management Board
Chief Financial Officer

# ANNUAL REPORT AND EXHIBITS ANNEXED TO 2018 FORM 20-F OMITTED PURSUANT TO D. N.J. ECF POLICIES AND PROCEDURES