# EXHIBIT 8

As filed with the Securities and Exchange Commission on March 20, 2020

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**

# Form 20-F

☐   REGISTRATION STATEMENT PURSUANT TO SECTION 12(b) OR (g) OF THE SECURITIES
EXCHANGE ACT OF 1934

or

☐   ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE
ACT OF 1934 FOR THE FISCAL YEAR ENDED DECEMBER 31, 2019

or

TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES
EXCHANGE ACT OF 1934

or

SHELL COMPANY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES
EXCHANGE ACT OF 1934

Date of event requiring this shell company report…………………………..

**Commission file number 1-15242**

# Deutsche Bank Aktiengesellschaft

(Exact name of Registrant as specified in its charter)

**Deutsche Bank Corporation**

(Translation of Registrant's name into English)

**Federal Republic of Germany**

(Jurisdiction of incorporation or organization)

**Taunusanlage 12, 60325 Frankfurt am Main, Germany**

(Address of principal executive offices)

**Andreas Loetscher, +49-69-910-44468, andreas.loetscher@db.com, Taunusanlage 12, 60325 Frankfurt am Main,
Germany**

(Name, Telephone, E-mail and/or Facsimile number and Address of Company Contact Person)

Securities registered or to be registered pursuant to Section 12(b) of the Act

See following page

Securities registered or to be registered pursuant to Section 12(g) of the Act.

NONE

(Title of Class)

Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act.

NONE

(Title of Class)

Indicate the number of outstanding shares of each of the issuer's classes of capital or common stock as of the close of the period
covered by the annual report:

Ordinary Shares, no par value                                  2,066,101,774

(as of December 31, 2019)

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.

Yes ☐          No ☒

If this report is an annual or transition report, indicate by check mark if the registrant is not required to file reports pursuant to
Section 13 or 15(d) of the Securities Exchange Act of 1934.

Yes ☐          No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities
Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such
reports), and (2) has been subject to such filing requirements for the past 90 days.

Yes ☒          No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted
pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that
the registrant was required to submit such files).

Yes ☒          No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or an
emerging growth company. See definition of "large accelerated filer", "accelerated filer", and emerging growth company in Rule 12b-
2 of the Exchange Act.           ☒

Large accelerated filer                              Accelerated filer

Non-accelerated filer                  Emerging growth company

If an emerging growth company that prepares its financial statements in accordance with U.S. GAAP, indicate by check mark if the
registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards*
provided pursuant to Section 13(a) of the Exchange Act.

*The term "new or revised financial accounting standard" refers to any update issued by the Financial Accounting Standards Board to
its Accounting Standards Codification after April 5, 2012.

Indicate by check mark which basis of accounting the registrant has used to prepare the financial statements included in this filing:

U.S. GAAP ☐      International Financial Reporting Standards ☒          Other ☐

as issued by the International Accounting Standards Board

If "Other" has been checked in response to the previous question, indicate by check mark which financial statement item the
registrant has elected to follow

Item 17 ☐          Item 18 ☐

If this is an annual report, indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the
Exchange Act).

Yes ☐          No ☒

(APPLICABLE ONLY TO ISSUERS INVOLVED IN BANKRUPTCY PROCEEDINGS DURING THE PAST FIVE YEARS)

Indicate by check mark whether the registrant has filed all documents and reports required to be filed by Sections 12, 13 or
15(d) of the

Securities Exchange Act of 1934 subsequent to the distribution of securities under a plan confirmed by a court.

Yes ☐          No ☐

Securities registered or to be registered pursuant to Section 12(b) of the Act (as of February 29, 2020)

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Ordinary shares, no par value | DB | New York Stock Exchange |
| 6.55 % Trust Preferred Securities of Deutsche Bank Contingent Capital Trust II 6.55 % Company Preferred Securities of Deutsche Bank Contingent Capital LLC II* Subordinated Guarantees of Deutsche Bank AG in connection with Capital Securities* | DXB | New York Stock Exchange |
| Fixed to Fixed Reset Rate Subordinated Tier 2 Notes Due 2028 | DB /28 | New York Stock Exchange |
| 4.50 % Fixed Rate Subordinated Tier 2 Notes Due 2025 | DB 25 | New York Stock Exchange |
| DB Crude Oil Double Short Exchange Traded Notes due June 1, 2038 | DTO | NYSE Arca |
| DB Gold Double Long Exchange Traded Notes due February 15, 2038 | DGP | NYSE Arca |
| DB Gold Double Short Exchange Traded Notes due February 15, 2038 | DZZ | NYSE Arca |
| DB Gold Short Exchange Traded Notes due February 15, 2038 | DGZ | NYSE Arca |

* For listing purpose only, not for trading

Deutsche Bank
Annual Report 2019 on Form 20-F

# Table of Contents

**Table of Contents** – 3
PART I – 8
Item 1: Identity of Directors, Senior Management and Advisers – 8
Item 2: Offer Statistics and Expected Timetable – 8
Item 3: Key Information – 8
   Selected Financial Data – 8
   Dividends – 11
   Capitalization and Indebtedness – 12
   Reasons for the Offer and Use of Proceeds – 12
   Risk Factors – 13
Item 4: Information on the Company – 48
   History and Development of the Company – 48
   Business Overview – 48
   Our Corporate Divisions – 53
   The Competitive Environment – 54
   Regulation and Supervision – 60
   Organizational Structure – 78
   Property and Equipment – 78
   Information Required by Industry Guide 3 – 78
Item 4A: Unresolved Staff Comments – 79
Item 5: Operating and Financial Review and Prospects – 79
   Overview – 79
   Significant Accounting Policies and Critical Accounting Estimates – 79
   Recently Adopted Accounting Pronouncements and New Accounting Pronouncements – 80
   Operating Results – 81
   Results of Operations – 82
   Financial Position – 82
   Liquidity and Capital Resources – 82
   Post-Employment Benefit Plans – 82
   Off-Balance Sheet Arrangements – 83
   Tabular Disclosure of Contractual Obligations – 83
   Research and Development, Patents and Licenses – 83
Item 6: Directors, Senior Management and Employees – 84
   Directors and Senior Management – 84
   Board Practices of the Management Board – 87
   Compensation – 87
   Employees – 88
   Share Ownership – 88
Item 7: Major Shareholders and Related Party Transactions – 89
   Major Shareholders – 89
   Related Party Transactions – 90
   Interests of Experts and Counsel – 90
Item 8: Financial Information – 91
   Consolidated Statements and Other Financial Information – 91
   Significant Changes – 95
Item 9: The Offer and Listing – 96
   Offer and Listing Details and Markets – 96
   Plan of Distribution – 96
   Selling Shareholders – 96
   Dilution – 96
   Expenses of the Issue – 96
Item 10: Additional Information – 97
   Share Capital – 97
   Memorandum and Articles of Association – 97
   Notification Requirements – 100
   Material Contracts – 103
   Exchange Controls – 104
   Taxation – 104
   Dividends and Paying Agents – 107
   Statement by Experts – 107
   Documents on Display – 107
   Subsidiary Information – 107

Item 11: Quantitative and Qualitative Disclosures about Credit, Market and Other Risk – 108
Item 12: Description of Securities other than Equity Securities – 108
PART II – 109
Item 13: Defaults, Dividend Arrearages and Delinquencies – 109
Item 14: Material Modifications to the Rights of Security Holders and Use of Proceeds – 109
Item 15: Controls and Procedures – 109
  Disclosure Controls and Procedures – 109
  Management's Annual Report on Internal Control over Financial Reporting – 110
  Report of Independent Registered Public Accounting Firm – 110
  Change in Internal Control over Financial Reporting – 111
Item 16A: Audit Committee Financial Expert – 111
Item 16B: Code of Ethics – 111
Item 16C: Principal accountant fees and services – 112
Item 16D: Exemptions from the Listing Standards for Audit Committees – 112
Item 16E: Purchases of Equity Securities by the Issuer and Affiliated Purchasers – 112
Item 16F: Change in Registrant's Certifying Accountant – 113
Item 16G: Corporate Governance – 114
Item 16H: Mine Safety Disclosure – 116
Disclosures Under Iran Threat Reduction and Syria Human Rights Act of 2012 – 117
PART III – 119
Item 17: Financial Statements – 119
Item 18: Financial Statements – 119
Item 19: Exhibits – 119
Signatures – 120
Annual Report – 121
Supplemental Financial Information (Unaudited) – S-1

# PAGES 5-12 OMITTED PURSUANT TO D. N.J. ECF POLICIES AND PROCEDURES

# Risk Factors

An investment in our securities involves a number of risks. You should carefully consider the following information about the risks we face, together with other information in this document, when you make investment decisions involving our securities. If one or more of these risks were to materialize, it could have a material adverse effect on our financial condition, results of operations, cash flows or prices of our securities.

**Risks Relating to the Macroeconomic, Geopolitical and Market Environment**

As a global investment bank with a large private client franchise, our businesses are materially affected by global macroeconomic and financial market conditions. Significant risks exist that could negatively affect the results of operations and financial condition in some of our businesses as well as our strategic plans, including deterioration of the economic outlook for the euro area and slowing in emerging markets, trade tensions between the United States and China as well between the United States and Europe, inflation risks, geopolitical risks and risks posed by the COVID 19 pandemic.

In 2019, the global economy slowed markedly due to the adverse effects of trade-related and geopolitical uncertainties. Global manufacturing output experienced a slowdown thereby depressing investment in machinery and equipment. Trade tensions between the U.S. and China as well as between the U.S. and Europe weighed significantly on global trade. But towards the end of 2019, the most important downside risks had moderated somewhat. The announcement to seek a phased trade agreement between the U.S. and China led to more favorable financial conditions and improved growth prospects. Constructive developments regarding Brexit have added to this positive drift. Overall, global economic growth slowed to 3.1 % in 2019, after 3.8 % in 2018. Global inflation was 3.0 % in 2019. In the industrialized countries, GDP grew by 1.7 % and consumer prices rose by 1.4 % while GDP of emerging market economies increased by 4.0 % and inflation reached 4.0 %.

The euro area economy was adversely affected by the slowing of international trade as well as by the fear of a hard Brexit and temporary effects in some member states. In particular, manufacturing output of export-oriented economies declined, while the more domestic oriented services sectors held up well. Growth was supported by domestic demand underpinned by solid income growth and easy financial conditions. Monetary policy remained accommodative as the European Central Bank ("ECB") reinitiated its net asset purchase program at a monthly pace of € 20 billion by November 2019. Overall, the euro area economy expanded by 1.2 % and consumer prices rose by 1.2 % in 2019. Due to the industrial recession caused by the external headwinds, German economic growth more than halved to 0.6 %. The services and construction sectors continued to support growth, as well as private consumption, driven by a tight labor market and solid wage growth.

The U.S. economy showed solid performance in 2019. Driven by fiscal spending as well as supportive financial conditions and consumer spending, backed by wage growth and a tight labor market, U.S. GDP grew by 2.3 % in 2019. Nevertheless, trade uncertainty weighed on manufacturing output and thus reduced capex investments. The inflation rate reached 1.8 % in 2019. The U.S. central bank's monetary policy supported economic activity by cutting its policy rate three times in 2019.

Japan's GDP grew by 0.7 % in 2019, following 0.3 % for 2018. Activity in the manufacturing industry had weakened due to the slowdown in overseas economies. Slower employment growth, cuts in overtime work hours and the consumption tax have weighed on consumption growth. Against this backdrop, the inflation rate fell to 0.5 % in 2019, after 1.0 % in 2018.

In 2019, emerging markets GDP grew by 4.0 %. Emerging Asia economies expanded by 5.3 % as they were heavily affected by the slowdown of global trade. This is particularly true for the smaller, more open economies. In China, GDP grew by 6.1 %. Economic activity slowed due to adverse impacts of U.S. tariffs and weaker world trade in general, but tax cuts and infrastructure spending supported economic activity. Chinese inflation edged higher to 2.9 % in 2019.

There are a number of global economic and political risks that could jeopardize global, regional and national economies. Challenges in containing the COVID 19 pandemic or a more severe global spread could considerably dampen economic momentum further. Despite the signing of the 'Phase One' trade agreement between the U.S. and China in January 2020, further trade conflicts including upcoming trade negotiations between the U.S. and the European Union (EU) could negatively impact the global economic outlook. The introduction of car duties on EU exports to the U.S. would have a negative impact on EU industrial production, especially in Germany. Following Brexit, the United Kingdom ("UK") has entered into a transition period with the EU that is expected to expire at the end of 2020. During 2020, the focus will be on the UK's future trading relationship with the EU with the risk that both parties are unable to reach a trade deal before the end of the transition period. In the eurozone, the government debt burden in some countries, especially in Italy, is a risk due to the fragile political situation. We expect fiscal stimulus proposals from the upcoming U.S. elections, the extent of which, however, will depend on the Congressional composition. Additionally, rising geopolitical tensions, particularly in the Middle East could create further uncertainty.

If these risks materialize, or current negative conditions persist or worsen, our business, results of operations or strategic plans could be adversely affected.

Item 3: Key Information

**We are subject to global economic, market and business risks with respect to the current COVID 19 pandemic.**

The current COVID 19 pandemic is expected to have a negative impact on global, regional and national economies and to disrupt supply chains and otherwise reduce international trade and business activity. Reflecting this, the COVID 19 pandemic has already in February and March 2020 caused the levels of equity and other financial markets to decline sharply and to become volatile, and such effects may continue or worsen in the future. This may in turn reduce the level of activity in which certain of our businesses operate and thus have a negative impact on such businesses' ability to general revenues or profits. If the pandemic is prolonged and/or extends more widely to countries around the world this could amplify the current negative demand and supply chain effects as well as the negative impact on global growth and global financial markets. Additionally, despite the business continuity and crisis management policies currently in place, travel restrictions or potential impacts on personnel may disrupt our business.

In addition, a substantial proportion of our assets and liabilities comprise financial instruments that we carry at fair value, with changes in fair value recognized in our income statement. The market declines and volatility could negatively impact the value of such financial instruments and cause us to incur losses. The economic slowdown and market downturn could also negatively impact specific portfolios through negative ratings migration and higher than expected loan losses.

The current COVID 19 pandemic and its potential impact on the global economy may affect our ability to meet our financial targets. While it is too early for us to predict the impacts on our business or our financial targets that the expanding pandemic, and the governmental responses to it, may have, we may be materially adversely affected by a protracted downturn in local, regional or global economic conditions. In that situation, we would need to take action to ensure we meet our minimum capital objectives. These actions or measures may result in adverse effects on our business, results of operations or strategic plans and targets, or the prices of our securities.

**In the European Union, continued elevated levels of political uncertainty could have unpredictable consequences for the financial system and the greater economy, and could contribute to European de-integration in certain areas, potentially leading to declines in business levels, write-downs of assets and losses across our businesses. Our ability to protect ourselves against these risks is limited.**

The last several years have been characterized by increased political uncertainty as Europe in particular has been impacted by the European sovereign debt crisis, the withdrawal of the UK from the European Union ("Brexit"), Italian political and economic developments, protests in France, the refugee crisis and the increasing attractiveness to voters of populist and anti-austerity movements. Negotiations of the future trade relationship between the UK and European Union in the transition period following Brexit could aggravate the already uncertain economic outlook in the UK and Europe and hamper growth. Although the severity of the European debt crisis appeared to have abated somewhat over recent years as the actions by the ECB, the rescue packages and the economic recovery appeared to have stabilized the situation in Europe, political uncertainty has nevertheless continued to be at an elevated level in recent periods and could trigger unwinding of aspects of European integration that have benefitted our businesses. Against this backdrop, the prospects for national structural reform and further integration among EU member states, both viewed as important tools to reduce the eurozone's vulnerabilities to future crises, appear to have worsened. These trends may ultimately result in material reductions in our business levels as our customers rein in activity levels in light of decreased economic output and increased uncertainty, which would materially adversely affect our operating results and financial condition.

An escalation of political risks could have consequences both for the financial system and the greater economy as a whole, potentially leading to declines in business levels, write-downs of assets and losses across our businesses.

In addition, in a number of EU member states which had national elections in recent years, including France, Germany and the Netherlands, political parties disfavoring current levels of European integration, or espousing the unwinding of European integration to varying extents, have attracted support. Brexit has also given a voice to some of these political parties to challenge European integration. The resulting uncertainty could have significant effects on the value of the euro and on prospects for member states' financial stability, which in turn could potentially lead to a significant deterioration of the sovereign debt market, especially if Brexit or any other member country's exit did not result in the strongly adverse effects on the exiting country that many have predicted. If one or more members of the eurozone defaults on their debt obligations or decides to leave the common currency, this would result in the reintroduction of one or more national currencies. Should a eurozone country conclude it must exit the common currency, the resulting need to reintroduce a national currency and restate existing contractual obligations could have unpredictable financial, legal, political and social consequences, leading not only to significant losses on sovereign debt but also on private debt in that country. Given the highly interconnected nature of the financial system within the eurozone, and the high levels of exposure we have to public and private counterparties around Europe, our ability to plan for such a contingency in a manner that would reduce our exposure to non-material levels is likely to be limited. If the overall economic climate deteriorates as a result of one or more departures from the eurozone, our businesses could be adversely affected, and, if overall business levels decline or we are forced to write down significant exposures among our various businesses, we could incur substantial losses.

**The withdrawal of the United Kingdom from the European Union – Brexit – may have adverse effects on our business, results of operations or strategic plans.**

The UK left the European Union on January 31, 2020. Relationships of the UK with Member States of the European Union are subject to a transition period until December 31, 2020 under a withdrawal agreement. The withdrawal agreement allows us to operate our business in the UK during the transition period as if the UK were still a Member State. During the transition period, the European Union and the UK will be negotiating the terms regarding trade and other relations between them. The UK Government aims to complete a Free Trade Agreement with the European Union during 2020 which would come into effect on January 1, 2021. Any areas where agreement is not reached or alternative arrangement not made would be subject to World Trade Organization rules from this date. However, there remains the risk that a trade deal is not reached in time.

Given the ongoing uncertainty over the UK's withdrawal from the European Union, it is difficult to determine the exact impact on us over the long term. However, the UK's economy and those of the eurozone countries are very tightly linked as a result of EU integration projects other than the euro, and the scale of our businesses in the UK – especially those dependent on activity levels in the City of London, to which we are heavily exposed and which may deteriorate as a result of Brexit – means that even modest effects in percentage terms can have a very substantial adverse effect on our businesses. Brexit without an appropriate agreement between the European Union and the UK following the transition period could, in particular, lead to a disruption of the provision of cross-border financial services. Also, failure to reach such agreement may lead to greater costs to reorganize part of our business than would have been the case with an agreed phase-in solution and may restrict our ability to provide financial services to and from the UK. The currently unsettled future relationship between the EU and the UK is also likely to lead to further uncertainty in relation to the regulation of cross-border business activities.

Also, after the expiry of the transition period, Deutsche Bank AG is planning to continue to provide banking and other financial services on a cross-border basis into the UK as well as through its London branch, which it will retain. Deutsche Bank AG will then be subject to additional regulatory requirements in the UK, and its activities in the UK will be supervised and monitored by both the Prudential Regulatory Authority ("PRA") and the Financial Conduct Authority ("FCA"). Deutsche Bank AG is already in the process of applying for authorization to provide banking and other financial services in the United Kingdom after the expiry of the transition period. However, Brexit has impacted the structure and business model of our UK operations, and we will need to complete during 2020 the implementation of the governance structure and business controls necessary to comply with new authorization requirements.

Despite our preparations, as a result of Brexit, our business, results of operations or strategic plans could be adversely affected.

**We may be required to take impairments on our exposures to the sovereign debt of European or other countries if the European sovereign debt crisis reignites. The credit default swaps into which we have entered to manage sovereign credit risk may not be available to offset these losses.**

The effects of the sovereign debt crisis have been especially evident in the financial sector, as a large portion of the sovereign debt of eurozone countries is held by European financial institutions, including Deutsche Bank. As of December 31, 2019, we had a direct sovereign credit risk exposure of € 6.2 billion to Italy, € 1.2 billion to Spain, € 437 million to Greece, € 265 million to Ireland and € 228 million to Portugal. Despite the apparent abatement of the crisis in recent years, it remains uncertain whether, in light of the current political environment, Greece or other eurozone sovereigns, such as Spain, Italy, Portugal and Cyprus, will be able to manage their debt levels in the future and whether Greece will attempt to renegotiate its past international debt restructuring. The rise of anti-austerity parties and populist sentiment in many of these countries poses a threat to the medium- to long-term measures recommended for these countries to alleviate the tensions in the eurozone caused by drastically differing economic situations among the eurozone states. In the future, negotiations or exchanges similar to the Greek debt restructuring in 2012 could take place with respect to the sovereign debt of these or other affected countries. The outcome of any negotiations regarding changed terms (including reduced principal amounts or extended maturities) of sovereign debt may result in additional impairments of assets on our balance sheet. Any negotiations are highly likely to be subject to political and economic pressures that we cannot control, and we are unable to predict their effects on the financial markets, on the greater economy or on ourselves.

In addition, any restructuring of outstanding sovereign debt may result in potential losses for us and other market participants that are not covered by payouts on hedging instruments that we have entered into to protect against the risk of default. These instruments largely consist of credit default swaps, generally referred to as CDSs, pursuant to which one party agrees to make a payment to another party if a credit event (such as a default) occurs on the identified underlying debt obligation. A sovereign restructuring that avoids a credit event through voluntary write-downs of value may not trigger the provisions in CDSs we have entered into, meaning that our exposures in the event of a write-down could exceed the exposures we previously viewed as our net exposure after hedging. Additionally, even if the CDS provisions are triggered, the amounts ultimately paid under the CDSs may not correspond to the full amount of any loss we incur. We also face the risk that our hedging counterparties have not effectively hedged their own exposures and may be unable to provide the necessary liquidity if payments under the instruments they have written are triggered. This may result in systemic risk for the European banking sector as a whole and may negatively affect our business and financial position.

We are also subject to other global macroeconomic and political risks, including with respect to the Middle East.

The escalation of tensions in the Middle East is another important political risk, which came into focus in light of a brief US-Iran military escalation in January 2020. A full scale conflict would lead to a sharp increase in oil prices and affect oil dependent industries (such as Automotives, Chemicals, Aviation). Ensuing turbulence in global financial markets would impact risky assets and countries. Taken together, a full blown conflict would lead to a substantial slowdown in the global economy and diminish our ability to generate revenues and the profitability on specific portfolios as well as result in higher than expected loan losses. Despite the business continuity and crisis management policies currently in place, a regional conflict could pose challenges related to a potential personnel evacuation as well as loss of business continuity, which may disrupt our business and lead to material losses.

### Risks Relating to Our Business and Strategy

Our results of operation and financial condition continue to be negatively impacted by the challenging market environment, uncertain macroeconomic and geopolitical conditions, lower levels of client activity, increased competition and regulation, and the immediate impact of our strategic decisions. If we are unable to improve our profitability as we continue to face these headwinds, we may be unable to meet many of our strategic aspirations, and may have difficulty maintaining capital, liquidity and leverage at levels expected by market participants and our regulators.

In 2019, revenues in our Investment Bank and Private Bank corporate divisions declined and results in our Corporate Bank and Asset Management corporate divisions were essentially flat, reflecting the negative impact of a challenging market environment characterized by low interest rates and low volatility, uncertain macroeconomic and geopolitical conditions, lower levels of client activity and increased competition and regulation. The ultra-low interest rate environment, especially in the eurozone, has put pressure on our margins in our traditional banking business and our trading and markets businesses. Additionally, the low volatility in the market has had a negative impact on our trading and client-driven businesses that may perform well in more volatile environments.

Changes in our business mix towards lower-margin, lower-risk products can limit our opportunities to profit from volatility. Regulators have generally encouraged the banking sector to focus more on the facilitation of client flow and less on risk taking. This has been effected in part by increasing capital requirements for higher-risk activities. In addition, some of our regulators have encouraged or welcomed changes to our business perimeter, consistent with their emphasis on lower-risk activities for banks. In recent years, we have reduced our exposure to a number of businesses that focused on riskier but more capital-intensive products (but that in earlier periods also had the potential to be more highly profitable). Further pressure on our revenues and profitability has resulted from long-term structural trends driven by regulation (especially increased regulatory capital, leverage and liquidity requirements and increased compliance costs) and competition that have further compressed our margins in many of our businesses. Should a combination of these factors continue to lead to reduced margins and subdued activity levels in our trading and markets business over the longer term, this could impair out ability to reach our financial targets.

Although we have in current years made considerable progress resolving litigation, enforcement and similar matters broadly within our established reserves, this pattern may not continue. In particular, these costs could substantially exceed the level of provisions that we established for our litigation, enforcement and similar matters, which can contribute to negative market perceptions about our financial health, costing us business. This, combined with the actual costs of litigation, enforcement and other matters, could in turn adversely affect our ability to maintain capital, liquidity and leverage at levels expected by market participants and our regulators.

Adverse market conditions, asset price deteriorations, volatility and cautious investor sentiment have affected and may in the future materially and adversely affect our revenues and profits, particularly in our investment banking, brokerage and other commission- and fee-based businesses. As a result, we have in the past incurred and may in the future incur significant losses from our trading and investment activities.

As a global investment bank, we have significant exposure to the financial markets and are more at risk from adverse developments in the financial markets than are institutions engaged predominantly in traditional banking activities. Sustained market declines have in the past caused and can in the future cause our revenues to decline, and, if we are unable to reduce our expenses at the same pace, can cause our profitability to erode or cause us to show material losses. Volatility can also adversely affect us, by causing the value of financial assets we hold to decline or the expense of hedging our risks to rise. Reduced customer activity can also lead to lower revenues in our "flow" business.

Specifically, our investment banking revenues, in the form of financial advisory and underwriting fees, directly relate to the number and size of the transactions in which we participate and are susceptible to adverse effects from sustained market downturns. These fees and other income are generally linked to the value of the underlying transactions and therefore can decline with asset values. In addition, periods of market decline and uncertainty tend to dampen client appetite for market and credit risk, a critical driver of transaction volumes and investment banking revenues, especially transactions with higher margins. In recent and other times in the past, decreased client appetite for risk has led to lower levels of activity and lower levels of profitability in our Investment Bank corporate division. Our revenues and profitability could sustain material adverse effects from a significant reduction in the number or size of debt and equity offerings and merger and acquisition transactions.

Market downturns also have led and may in the future lead to declines in the volume of transactions that we execute for our clients and, therefore, to declines in our noninterest income. In addition, because the fees that we charge for managing our clients' portfolios are in many cases based on the value or performance of those portfolios, a market downturn that reduces the value of our clients' portfolios or increases the amount of withdrawals reduces the revenues we receive from our asset management and private banking businesses. Even in the absence of a market downturn, below-market or negative performance by our investment funds may result in increased withdrawals and reduced inflows, which would reduce the revenue we receive. While our clients would be responsible for losses we incur in taking positions for their accounts, we may be exposed to additional credit risk as a result of their need to cover the losses where we do not hold adequate collateral or cannot realize it. Our business may also suffer if our clients lose money and we lose the confidence of clients in our products and services.

In addition, the revenues and profits we derive from many of our trading and investment positions and our transactions in connection with them can be directly and negatively impacted by market prices. In each of the product and business lines in which we enter into these trading and investment positions, part of our business entails making assessments about the financial markets and trends in them. When we own assets, market price declines can expose us to losses. Many of the more sophisticated transactions of our Investment Bank corporate division are influenced by price movements and differences among prices. If prices move in a way we have not anticipated, we may experience losses. Also, when markets are volatile, the assessments we have made may prove to lead to lower revenues or profits, or may lead to losses, on the related transactions and positions. In addition, we commit capital and take market risk to facilitate certain capital markets transactions; doing so can result in losses as well as income volatility. Such losses may especially occur on assets we hold for which there are not very liquid markets to begin with. Assets that are not traded on stock exchanges or other public trading markets, such as derivatives contracts between banks, may have values that we calculate using models other than publicly-quoted prices. Monitoring the deterioration of prices of assets like these is difficult and could lead to losses we did not anticipate. We can also be adversely affected if general perceptions of risk cause uncertain investors to remain on the sidelines of the market, curtailing their activity and in turn reducing the levels of activity in those of our businesses dependent on transaction flow.

Additionally, the current market environment is characterized by very low interest rates, particularly in the eurozone, including negative interest yields on German government bonds. A prolonged period of low interest rates in the eurozone or elsewhere could materially impact our net interest margin, profitability and balance sheet deployment. While our revenues are particularly sensitive to interest rates, given the size of our loan and deposit books denominated in Euros, the low interest rates environment can also impact other balance sheet positions which are accounted at fair value. These current conditions, as well as any further easing of monetary conditions, could result in a significant impact on revenues relative to our current expectations. Actions to offset this rate impact, such as pricing changes or the introduction of additional fees, may not be sufficient to offset this impact.

**Our liquidity, business activities and profitability may be adversely affected by an inability to access the debt capital markets or to sell assets during periods of market-wide or firm-specific liquidity constraints. Credit rating downgrades have contributed to an increase in our funding costs, and any future downgrade could materially adversely affect our funding costs, the willingness of counterparties to continue to do business with us and significant aspects of our business model.**

We have a continuous demand for liquidity to fund our business activities. Our liquidity may be impaired by an inability to access secured and/or unsecured debt markets, an inability to access funds from our subsidiaries or otherwise allocate liquidity optimally across our businesses, an inability to sell assets or redeem our investments, or unforeseen outflows of cash or collateral. This situation may arise due to circumstances unrelated to our businesses and outside our control, such as disruptions in the financial markets, or circumstances specific to us, such as reluctance of our counterparties or the market to finance our operations due to perceptions about potential outflows resulting from litigation, regulatory and similar matters, actual or perceived weaknesses in our businesses, our business model or our strategy, as well as in our resilience to counter negative economic and market conditions. For example, we have experienced steep declines in the price of our shares and increases in the spread versus government bonds at which our debt trades in the secondary markets. Reflecting these conditions, our internal estimates of our available liquidity over the duration of a stressed scenario have at times been negatively impacted in recent periods. In addition, negative developments concerning other financial institutions perceived to be comparable to us and negative views about the financial services industry in general have also affected us in recent years. These perceptions have affected the prices at which we have accessed the capital markets to obtain the necessary funding to support our business activities; should these perceptions exist, continue or worsen, our ability to obtain this financing on acceptable terms may be adversely affected. Among other things, an inability to refinance assets on our balance sheet or maintain appropriate levels of capital to protect against deteriorations in their value could force us to liquidate assets we hold at depressed prices or on unfavorable terms, and could also force us to curtail business, such as the extension of new credit. This could have an adverse effect on our business, financial condition and results of operations.

In addition, we have benefited in recent years from a number of incremental measures by the ECB and other central banks to provide additional liquidity to financial institutions and the financial markets, particularly in the eurozone. To the extent these actions are curtailed or halted, our funding costs could increase, or our funding supply could decrease, which could in turn result in a reduction in our business activities. In particular, any decision by the ECB to discontinue or reduce quantitative easing or steps by the Federal Reserve to tighten its monetary policy or actions by central banks more generally to tighten their monetary policy will likely cause long-term interest rates to increase and accordingly impact the costs of our funding.

Rating agencies regularly review our credit ratings, which could be negatively affected by a number of factors that can change over time, including the credit rating agency's assessment of: our strategy and management's capability; our financial condition including in respect of profitability, asset quality, capital, funding and liquidity; the level of political support for the industries in which we operate; the implementation of structural reform; the legal and regulatory frameworks applicable to our legal structure; business activities and the rights of our creditors; changes in rating methodologies; changes in the relative size of the loss-absorbing buffers protecting bondholders and depositors; the competitive environment, political and economic conditions in our key markets (including the impact of Brexit); and market uncertainty. In addition, credit ratings agencies are increasingly taking into account environmental, social and governance factors, including climate risk, as part of the credit ratings analysis, as are investors in their investment decisions.

Any reductions in our credit ratings, including, in particular, downgrades below investment grade, or a deterioration in the capital markets' perception of our financial resilience could significantly affect our access to money markets, reduce the size of our deposit base and trigger additional collateral or other requirements in derivatives contracts and other secured funding arrangements or the need to amend such arrangements, which could adversely affect our cost of funding and our access to capital markets and could limit the range of counterparties willing to enter into transactions with us. This could in turn adversely impact our competitive position and threaten our prospects in the short to medium-term.

Since the start of the global financial crisis, the major credit rating agencies have lowered our credit ratings or placed them on review or negative watch on multiple occasions. These credit rating downgrades have contributed to an increase in our funding costs. Our credit spread levels (meaning the difference between the yields on our securities as compared to benchmark government bonds) are sensitive to further adverse developments and any future downgrade could bring our credit rating into the non-investment grade category. This could materially and adversely affect our funding costs and significant aspects of our business model. The effect would depend on a number of factors including whether a downgrade affects financial institutions across the industry or on a regional basis, or is intended to reflect circumstances specific to us, such as our potential settlement of regulatory, litigation and similar matters; any actions our senior management may take in advance of or in response to the downgrade; the willingness of counterparties to continue to do business with us; any impact of other market events and the state of the macroeconomic environment more generally.

Additionally, under many of the contracts governing derivative instruments to which we are a party, a downgrade could require us to post additional collateral, lead to terminations of contracts with accompanying payment obligations for us or give counterparties additional remedies. We take these effects into account in our liquidity stress testing analysis, as further described in "Management Report: Risk Report: Liquidity Risk: Stress Testing and Scenario Analysis" in the Annual Report 2019.

On July 7, 2019, we announced changes to our strategy and updates to our financial targets. If we are unable to implement our strategic plans successfully, we may be unable to achieve our financial objectives, or we may incur losses, including further impairments and provisions, or low profitability, and our financial condition, results of operations and share price may be materially and adversely affected.

On July 7, 2019 we announced a strategic transformation intended to reposition Deutsche Bank around its strengths as a leading German bank with strong European roots and a global network. Going forward, we will operate in four client-centric core businesses and separate Capital Release Unit (CRU). Our core bank reflects our strategic vision and comprises the new Corporate Bank, the refocused Investment Bank, the Private Bank and Asset Management, as well as Corporate & Other.

By establishing our new CRU, we plan to liberate capital currently consumed by low return assets, businesses with low profitability and businesses no longer deemed strategic. This includes substantially all of our Equities Sales & Trading business, lower yielding fixed income positions, particularly in Rates, our former CIB Non-Strategic portfolio as well as the exited businesses from our Private & Commercial Bank which include our retail operations in Portugal and Poland.

Our updated key financial targets, as updated in the announcement of our transformation, are:

– Post-tax Return on Average Tangible Equity of 8 % for the Group by 2022
– Adjusted costs of € 17 billion in 2022
– Cost Income Ratio of 70 % by 2022
– Common Equity Tier 1 capital ratio of at least 12.5 %
– Leverage Ratio (fully loaded) of ~5 % from 2022

Our strategic goals are subject to various internal and external factors and to market, regulatory, economic and political uncertainties, and to limitations relating to our operating model. These could negatively impact or prevent the implementation of our strategic goals or the realization of their anticipated benefits. Economic uncertainties such as the impact of the COVID 19 pandemic; the recurrence of extreme turbulence in the markets; potential weakness in global, regional and national economic conditions; the continuation of a market environment characterized by low interest rates and low volatility; increased competition for business; and political instability, especially in Europe, may impact our ability to achieve our strategic goals. Regulatory changes could also adversely impact our ability to achieve our strategic aims. In particular, regulators could demand changes to our business model or organization that could reduce our profitability, or we may be forced to make changes that reduce our profitability in an effort to remain compliant with law and regulation.

We are also involved in numerous litigation, arbitration and regulatory proceedings and investigations in Germany and in a number of jurisdictions outside of Germany, especially in the United States. Such matters are subject to many uncertainties. We expect the litigation environment to continue to be challenging. If litigation and regulatory matters occur at the same or higher rate and magnitude than they have in some recent years or if we are subject to sustained market speculation about our potential exposure to such matters, we may not be able to achieve our strategic aspirations.

Our strategic objectives are also subject to the following assumptions and risks:

– The base case scenario for our financial and capital plan includes revenue growth estimates which are dependent on positive macroeconomic developments. Stagnation or a downturn in the macroeconomic environment could significantly impact our ability to generate the revenue growth necessary to achieve these strategic financial and capital targets. This scenario also includes assumptions regarding our ability to reduce costs in future periods.
– The current COVID 19 pandemic and its potential impact on the global economy may affect our ability to meet our financial targets. While it is too early for us to predict the impacts on our business or our financial targets that the expanding pandemic, and the governmental responses to it, may have, we may be materially adversely affected by a protracted downturn in local, regional or global economic conditions. In that situation, we would need to take action to ensure we meet our minimum capital objectives. These actions or measures may result in adverse effects on our business, results of operations or strategic plans and targets, and the prices of our securities.
– We expect that we will be able to overcome significant challenges arising from our business model. We continue to rely on our trading and markets businesses as a significant source of profit. However, these businesses, in particular our fixed income securities franchise, have continued to face an extremely challenging environment, caused by uncertainty about the duration of the market environment characterized by low interest rates, negative perceptions about our business and central bank intervention in markets and the gradual cessation thereof.
– Asset and client levels have been impacted by the negative market perceptions of Deutsche Bank from time to time. A continued or renewed negative market focus on Deutsche Bank could result in new client and asset outflows.
– We currently operate a highly complex infrastructure, which can compromise the quality of the overall control environment. Establishing a more efficient bank with a strong control environment depends on successfully streamlining and simplifying our IT landscape as well as cultural change.
– A robust and effective internal control environment is necessary to ensure that we conduct our business in compliance with the laws and regulations applicable to us. We may be unable to complete our initiatives to enhance the efficacy of our internal control environment as quickly as we intend or as our regulators demand, and our efforts may be insufficient to prevent all future deficiencies in our control environment or to result in fewer litigations or regulatory and enforcement investigations and proceedings in the future. Furthermore, implementation of enhanced controls may result in higher than expected costs of regulatory compliance that could offset efficiency gains.
– We expect that de-leveraging of CRU will continue. BNP Paribas and Deutsche Bank have signed a master transaction agreement to provide continuity of service to Deutsche Bank's Prime Finance and Electronic Equities clients. Under the agreement Deutsche Bank will continue to operate the platform until clients can be migrated to BNP Paribas. For the remainder of the CRU assets, we will take opportunities to accelerate the wind down, where it is economically rational. In the event that the CRU is not able to de-leverage as planned, or if issues arise that interfere with our agreement with BNP Paribas, our objectives could be jeopardized.

If we fail to implement our strategic initiatives in whole or in part or should the initiatives that are implemented fail to produce the anticipated benefits, or should the costs we incur to implement our initiatives exceed the amounts anticipated, or should we fail to achieve the publicly communicated targets we have set for implementation of these initiatives, we may fail to achieve our financial objectives, or incur losses or low profitability or erosions of our capital base, and our financial condition, results of operations and share price may be materially and adversely affected.

We may have difficulties selling companies, businesses or assets at favorable prices or at all and may experience material losses from these assets and other investments irrespective of market developments.

We seek to sell or otherwise reduce our exposure to assets that are not part of our core business or as part of our strategy to simplify and focus our business and to meet or exceed capital and leverage requirements, as well as to help us meet our return on tangible equity target. This may prove difficult in the current and future market environment as many of our competitors are also seeking to dispose of assets to improve their capital and leverage ratios and returns on equity. We have already sold a substantial portion of our non-core assets, and our remaining non-core assets may be particularly difficult for us to sell as quickly as we have expected at prices we deem acceptable. Where we sell companies or businesses, we may remain exposed to certain of their losses or risks under the terms of the sale contracts, and the process of separating and selling such companies or businesses may give rise to operating risks or other losses. Unfavorable business or market conditions may make it difficult for us to sell companies, businesses or assets at favorable prices, or may preclude a sale altogether. If we cannot reduce our assets according to plan, we may not be able to achieve the capital targets set out under our strategy.

**We may have difficulty in identifying and executing business combinations, and both engaging in combinations and avoiding them could materially harm our results of operations and our share price.**

We consider business combinations from time to time. Were we to announce or complete a significant business combination transaction, our share price or the share price of the combined entity could decline significantly if investors viewed the transaction as too costly, dilutive to existing shareholders or unlikely to improve our competitive position. It is generally not feasible for our reviews of any business with which we might engage in a combination to be complete in all respects. As a result, a combination may not perform as well as expected. In addition, we may fail to integrate our operations successfully with any entity with which we participate in a business combination. Failure to complete announced business combinations or failure to achieve the expected benefits of any such combination could materially and adversely affect our profitability. Such failures could also affect investors' perception of our business prospects and management, and thus cause our share price to fall. They could also lead to departures of key employees, or lead to increased costs and reduced profitability if we felt compelled to offer them financial incentives to remain.

If we avoid entering into business combination transactions or if announced or expected transactions fail to materialize, market participants may perceive us negatively. We may also be unable to expand our businesses, especially into new business areas, as quickly or successfully as our competitors if we do so through organic growth alone. These perceptions and limitations could cost us business and harm our reputation, which could have material adverse effects on our financial condition, results of operations and liquidity.

**Intense competition, in our home market of Germany as well as in international markets, has and could continue to materially adversely impact our revenues and profitability.**

Competition is intense in all of our primary business areas, in Germany as well as in international markets. If we are unable to respond to the competitive environment in these markets with attractive product and service offerings that are profitable for us, we may lose market share in important areas of our business or incur losses on some or all of our activities. In addition, downturns in the economies of these markets could add to the competitive pressure, through, for example, increased price pressure and lower business volumes for us.

There has been substantial consolidation and convergence among financial services companies. This trend has significantly increased the capital base and geographic reach of some of our competitors and has hastened the globalization of the securities and other financial services markets. As a result, we must compete with financial institutions that may be larger and better capitalized than we are and that may have a stronger position in local markets.

In addition to our traditional competitors such as other universal banks and financial services firms, an emerging group of future competitors in the form of start-ups and technology firms, including those providing "fintech" services, are showing an increasing interest in banking services and products. These new competitors could increase competition in both core products, e.g., payments, basic accounts and loans and investment advisory, as well as in new products, e.g., peer to peer lending and equity crowd funding.

**Risks Relating to Regulation and Supervision**

Regulatory reforms enacted and proposed in response to weaknesses in the financial sector, together with increased regulatory scrutiny more generally, have had and continue to have a significant impact on us and may adversely affect our business and ability to execute our strategic plans. Competent regulators may prohibit us from making dividend payments or payments on our regulatory capital instruments or take other actions if we fail to comply with regulatory requirements.

In response to the global financial crisis and the European sovereign debt crisis, governments and regulatory authorities have worked to enhance the resilience of the financial services industry against future crises through changes to the regulatory framework. The pace of change of new proposals has slowed as the focus turns more to implementation of the various elements of the regulatory reform agenda outlined by the Basel Committee on Banking Supervision ("Basel Committee") and other standard-setting bodies. As a result, there continues to be uncertainty for us and the financial industry in general, though the level of uncertainty is reduced from prior periods. The range of new laws and regulations or current proposals includes, among other things:

– provisions for more stringent regulatory capital, leverage and liquidity standards,
– restrictions on compensation practices,
– restrictions on proprietary trading and other investment services;
– special bank levies and financial transaction taxes,
– recovery and resolution powers to intervene in a crisis including the "bail-in" of creditors;
– tightened large exposure limits;
– the creation of a single supervisory authority and a single resolution authority within the eurozone and any other participating member states,
– separation of certain businesses from deposit taking,
– stress testing and capital planning regimes,
– heightened reporting requirements, and
– reforms of derivatives, other financial instruments, investment products and market infrastructures.

As a core element of the reform of the regulatory framework, in December 2010, the Basel Committee on Banking Supervision ("Basel Committee") published a set of comprehensive changes to minimum capital adequacy and liquidity standards, known as Basel 3, which have been implemented into European and national (in our case, German) law beginning in 2014, with the European legislative package also referred to as "CRR/CRD 4" and the Bank Recovery and Resolution Directive (or "BRRD").

In addition, regulatory scrutiny of compliance with existing laws and regulations has become more intense and supervisory expectations remain significant. The specific effects of a number of new laws and regulations remain uncertain because the drafting and implementation of these laws and regulations are still on-going and supervisory expectations continue to develop.

On June 27, 2019, a comprehensive package of reforms (referred to in the following as the "banking reform package") to further strengthen the resilience of European Union banks entered into force. The banking reform package includes amendments to the existing regulation on prudential requirements for credit institutions and investment firms, also referred to as the Capital Requirements Regulation ("CRR"), the directive on access to the activity of credit institutions and the prudential supervision of credit institutions and investment firms, also referred to as the Capital Requirements Directive ("CRD"), the European Union's Regulation establishing Uniform Rules and a Uniform Procedure for the Resolution of Credit Institutions and certain Investment Firms in the Framework of a Single Resolution Mechanism and a Single Resolution Fund (the "SRM Regulation"), and the BRRD.

The adopted changes incorporate various remaining elements of the regulatory framework agreed within the Basel Committee and the Financial Stability Board ("FSB") to refine and supplement the global regulatory framework established by the Basel Committee, the so-called Basel Accords (Basel 1, 2 and 3). This includes more risk-sensitive capital requirements, in particular in the area of counterparty credit risk and for exposures to central counterparties, methodologies that reflect more accurately the actual risks to which banks may be exposed, a binding leverage ratio, a binding net stable funding ratio, tighter regulation of large exposures, new reporting requirements for market risk that may be supplemented at a later stage by own funds requirements, and a requirement for global systemically important institutions ("G-SIIs"), such as Deutsche Bank, to hold certain minimum levels of capital and other instruments which are capable of bearing losses in resolution ("Total Loss-Absorbing Capacity" or "TLAC"). Other measures are aimed at improving banks' lending capacity to support the European Union economy and at further facilitating the role of banks in achieving deeper and more liquid European Union capital markets. While many provisions will not apply until 2021, certain parts, including the TLAC requirements, already apply since June 27, 2019.

At the international level, in December 2017, the Basel Committee published its final agreement ("December 2017 Agreement") on further revisions to the Basel 3 framework that aim to increase consistency in risk weighted asset calculations and improve the comparability of banks' capital ratios. The December 2017 Agreement includes, among other things, changes to the standardized and internal ratings-based approaches for determining credit risk, revisions to the operational risk framework, and an "output floor", set at 72.5 %. The "output floor" limits the amount of capital benefit a bank can obtain from its use of internal models relative to using the standardized approach. This package of reforms is intended to finalize the Basel 3 framework and would reduce the ability of banks to apply internal models, while making the standardized approaches more risk-sensitive and granular. In addition, the December 2017 Agreement introduces a leverage ratio buffer for global systemically important banks ("G-SIBs"), such as Deutsche Bank, to be met with Tier 1 capital and sets it at 50 % of the applicable risk-based G-SIB buffer requirement, which was included in the adopted banking reform package. The Basel Committee also reached agreement on an implementation date for changes in the December 2017 Agreement of January 1, 2022, with a phase-in period of five years through January 1, 2027 for the output floor.

In addition, on January 14, 2019 the Basel Committee also reached an agreement ("January 2019 Agreement") on reforms to the market risk framework, known as the Fundamental Review of the Trading Book ("FRTB"). The main features of the final standard include an internal models approach to determine the risk weight of exposures that relies on the use of expected shortfall models. The standard sets out separate capital requirements for risks that are deemed non-modellable and includes a more risk-sensitive standardized approach as a fallback to the internal models approach. CRR II (as part of the banking reform package) has introduced specific reporting requirements for market risk based on the revised framework as the first step in the application of the FRTB by EU institutions, and empowers the Commission to propose further regulations to establish own funds requirements for market risk based on the FRTB.

Draft legislative proposals to implement the December 2017 Agreement and the January 2019 Agreement are expected for the second or third quarter of 2020.

The banking reform package will likely affect our business by raising our regulatory capital and liquidity requirements and by leading to increased costs. The December 2017 Agreement and the January 2019 Agreement could also affect our business by imposing higher capital charges when adopted into law.

These requirements may be in addition to regulatory capital buffers that may also be increased or be in addition to those already imposed on us and could themselves materially increase our capital requirements.

Regulatory authorities have substantial discretion in how to regulate banks, and this discretion, and the means available to the regulators, have been steadily increasing during recent years. Regulation may be imposed on an ad hoc basis by governments and regulators in response to ongoing or future crises, and may especially affect financial institutions such as Deutsche Bank that are deemed to be systemically important.

In particular, the regulators with jurisdiction over us, including the ECB under the Single Supervisory Mechanism (also referred to as the "SSM"), may, in connection with the supervisory review and evaluation process ("SREP") or otherwise, conduct stress tests and have discretion to impose capital surcharges on financial institutions for risks, including for litigation, regulatory and similar matters, that are not otherwise recognized in risk weighted assets or other surcharges depending on the individual situation of the bank and take or require other measures, such as restrictions on or changes to our business. In this context, the ECB may impose, and has imposed, on us individual capital requirements resulting from the SREP which are referred to as "Pillar 2" requirements. "Pillar 2" requirements must be fulfilled with Common Equity Tier 1 capital in addition to the statutory minimum capital and buffer requirements and any non-compliance may have immediate legal consequences such as restrictions on dividend payments.

Also following the SREP, the ECB may communicate to individual banks, and has communicated to us, an expectation to hold a further "Pillar 2" Common Equity Tier 1 capital add-on, the so-called "Pillar 2" guidance. Although the "Pillar 2" guidance is not legally binding and failure to meet the "Pillar 2" guidance does not automatically trigger legal action, the ECB has stated that it expects banks to meet the "Pillar 2" guidance.

Also, more generally, competent regulators may, if we fail to comply with regulatory requirements, in particular with statutory minimum capital requirements, "Pillar 2" requirements or buffer requirements, or if there are shortcomings in our governance and risk management processes, prohibit us from making dividend payments to shareholders or distributions to holders of our other regulatory capital instruments. This could occur, for example, if we fail to make sufficient profits due to declining revenues, or as a result of substantial outflows due to litigation, regulatory and similar matters. Generally, a failure to comply with the quantitative and qualitative regulatory requirements could have a material adverse effect on our business, financial condition and results of operations, including our ability to pay out dividends to shareholders or distributions on our other regulatory capital instruments or, in certain circumstances, conduct business which we currently conduct or plan to conduct in the future.

Regulatory and legislative changes require us to maintain increased capital and bail-inable debt (debt that can be bailed in in resolution) and abide by tightened liquidity requirements. These requirements may significantly affect our business model, financial condition and results of operations as well as the competitive environment generally. Any perceptions in the market that we may be unable to meet our capital or liquidity requirements with an adequate buffer, or that we should maintain capital or liquidity in excess of these requirements or another failure to meet these requirements could intensify the effect of these factors on our business and results.

The implementation of the CRR/CRD 4 legislative package resulted, among other things, in increased capital and tightened liquidity requirements, including additional capital buffer requirements which were gradually phased in through January 1, 2019. Further revisions, such as stricter rules on the measurement of risks and the changes introduced by the banking reform package, the December 2017 Agreement and the January 2019 Agreement, increased risk weighted assets and the corresponding capital demand for banks, as well as tightened liquidity requirements (such as the introduction of a binding net stable funding ratio). In addition, the introduction of a binding leverage ratio (including a leverage ratio buffer when implemented into German law) by the banking reform package may affect our business model, financial conditions and results of operations.

Furthermore, under the SRM Regulation, the BRRD and the German Recovery and Resolution Act (Sanierungs- und Abwicklungsgesetz), we are required to meet at all times a robust minimum requirement for own funds and eligible liabilities ("MREL") which is determined on a case-by-case basis by the competent resolution authority. In addition, the banking reform package implemented the FSB's TLAC standard for G-SIBs (such as us) by introducing a new Pillar 1 MREL requirement for G-SIIs (the European equivalent term for G-SIBs). This new requirement is based on both risk-based and non-risk-based denominators and will be set at the higher of 18 % of total risk exposure and 6.75 % of the leverage ratio exposure measure following a transition period (until December 31, 2021, 16 % of total risk exposure and 6 % of the leverage ratio exposure measure). It can be met with Tier 1 or Tier 2 capital instruments or debt that meets specific eligibility criteria. Deduction rules apply for holdings by G-SIIs of TLAC instruments of other G-SIIs. In addition, the competent authorities have the ability to impose on G-SIIs individual MREL requirements that exceed the statutory minimum requirements.

Both the TLAC (or Pillar 1 MREL) and MREL requirements are specifically designed to require banks to maintain a sufficient amount of instruments which are eligible to absorb losses in resolution with the aim of ensuring that failing banks can be resolved without recourse to taxpayers' money. To that end, in order to facilitate the meeting of TLAC requirements by German banks, obligations of German banks under certain specifically defined senior unsecured debt instruments issued by them (such as bonds that are not structured debt instruments) rank, since 2017, junior to all other outstanding unsecured unsubordinated obligations of such bank (such as deposits, derivatives, money market instruments and certain structured debt instruments), but continue to rank in priority to contractually subordinated debt instruments (such as Tier 2 instruments).

As part of the harmonization of national rules on the priority of claims of banks' creditors in the European Union, the BRRD now allows banks to issue "senior non-preferred" debt instruments ranking according to their terms (and not only statutorily) junior to the bank's other unsubordinated debt instruments (including bonds that are not treated as "senior non-preferred" debt instruments), but in priority to the bank's contractually subordinated liabilities (such as Tier 2 instruments). Any such "senior non-preferred" debt instruments issued by Deutsche Bank AG under such rules rank on parity with its then outstanding "senior non-preferred" debt instruments under the prior rules. This BRRD amendment was finalized and implemented into German law as of July 21, 2018.

The need to comply with these requirements may affect our business, financial condition and results of operation and in particular may increase our financing costs.

We may not have sufficient capital or other loss-absorbing liabilities to meet these increasing regulatory requirements. This could occur due to regulatory changes and other factors, such as the gradual phase out of our hybrid capital instruments qualifying as Additional Tier 1 (or AT1) capital or our inability to issue new securities which are recognized as regulatory capital or loss-absorbing liabilities under the new standards, due to an increase of risk weighted assets based on more stringent rules for the measurement of risks or as a result of a future decline in the value of the euro as compared to other currencies, due to stricter requirements for the compliance with the non-risk based leverage ratio, due to any substantial losses we may incur, which would reduce our retained earnings, a component of Common Equity Tier 1 capital, or due to a combination of these or other factors.

If we are unable to maintain sufficient capital to meet the applicable minimum capital ratios, the buffer requirements, any specific "Pillar 2" capital requirements, leverage ratio requirements, or TLAC or MREL requirements, we may become subject to enforcement actions and/or restrictions on the pay-out of dividends, share buybacks, payments on our other regulatory capital instruments, and discretionary compensation payments. In addition, any requirement to increase risk-based capital ratios or the leverage ratio could lead us to adopt a strategy focusing on capital preservation and creation over revenue generation and profit growth, including the reduction of higher margin risk weighted assets. If we are unable to increase our capital ratios to the regulatory minimum in such a case or by raising new capital through the capital markets, through the reduction of risk weighted assets or through other means, we may be required to activate our group recovery plan. If these actions or other private or supervisory actions do not restore capital ratios to the required levels, and we are deemed to be failing or likely to fail, competent authorities may apply resolution powers under the Single Resolution Mechanism ("SRM") and applicable rules and regulations, which could lead to a significant dilution of our shareholders' or even the total loss of our shareholders' or creditors' investment.

The CRR introduced a new liquidity coverage requirement intended to ensure that banks have an adequate stock of unencumbered high quality liquid assets that can be easily and quickly converted into cash to meet their liquidity needs for a 30 calendar day liquidity stress scenario. The required liquidity coverage ratio ("LCR") is calculated as the ratio of a bank's liquidity buffer to its net liquidity outflows. Also, banks must regularly report the composition of the liquid assets in their liquidity buffer to their competent authorities.

In addition, the banking reform package introduced a net stable funding ratio ("NSFR") to reduce medium- to long-term funding risks by requiring banks to fund their activities with sufficiently stable sources of funding over a one-year period. The NSFR, which will apply from June 28, 2021 onwards, is defined as the ratio of a bank's available stable funding relative to the amount of required stable funding over a one-year period. Banks must maintain an NSFR of at least 100 %.The ECB may impose on individual banks liquidity requirements which are more stringent than the general statutory requirements if the bank's continuous liquidity would otherwise not be ensured. The NSFR will apply to both the Group as a whole and to individual SSM regulated entities, including the parent entity Deutsche Bank AG. Upon the introduction of the ratio as a binding minimum requirement, we expect both the Group and its subsidiaries for which it applies to be above the regulatory minimum. To achieve this for Deutsche Bank AG, the company is actively working on a number of structural initiatives to improve the standalone NSFR position. In the event these initiatives are not successfully completed by June 2021, Deutsche Bank AG may incur additional costs.

If we fail to meet liquidity requirements, we may become subject to enforcement actions. In addition, any requirement to maintain or increase liquidity could lead us to reduce activities that pursue revenue generation and profit growth.

On January 31, 2020, the European Banking Authority and the ECB launched the 2020 EU-wide stress test, designed to provide supervisors, banks and other market participants with a common analytical framework to compare and assess the resilience of EU banks to economic shocks, releasing at the same time the macroeconomic scenarios for the test. The results of the exercise will feed into the ECB's ongoing supervisory assessments of banks, including the SREP. However, the outcome of the stress test will not affect supervisory capital and liquidity requirements in a mechanical way.

**In some cases, we are required to hold and calculate capital and to comply with rules on liquidity and risk management separately for our local operations in different jurisdictions, in particular in the United States.**

We are required to hold and calculate capital and to comply with rules on liquidity and risk management separately for our local operations in different jurisdictions. In the United States, the Federal Reserve Board has adopted rules that impose enhanced prudential standards on our U.S. operations. In February 2014, the Federal Reserve Board adopted rules that set forth how the U.S. operations of certain foreign banking organizations ("FBOs"), such as Deutsche Bank, are required to be structured in the United States, as well as the enhanced prudential standards that apply to our U.S. operations. Under these rules, as of July 1, 2016, a large FBO with U.S.$ 50 billion or more in U.S. non-branch assets, such as Deutsche Bank, was required to establish or designate a separately capitalized top-tier U.S. intermediate holding company (an "IHC") that would hold substantially all of the FBO's ownership interests in its U.S. subsidiaries. The Federal Reserve Board may permit an FBO subject to the U.S. IHC requirement to establish or designate multiple U.S. IHCs upon written request. On July 1, 2016, we designated DB USA Corporation as our IHC. In March 2018, we completed the partial initial public offering of our Asset Management division, to form DWS Group GmbH & Co. KGaA ("DWS"), in which we retain approximately 80 % of the shares. In April 2018, DWS USA Corporation was formed as a subsidiary of DWS, and, following receipt of Federal Reserve Board approval, we designated it as our second IHC, through which our U.S. asset management subsidiaries are held. As of the date of designation or formation of each of these IHCs, they each became subject, on a consolidated basis, to the risk-based and leverage capital requirements under the U.S. Basel 3 capital framework, capital planning and stress testing requirements (on a phased-in basis), U.S. liquidity buffer requirements and other enhanced prudential standards comparable to those applicable to top-tier U.S. bank holding companies of a similar size as DB USA Corporation. Supplementary leverage ratio requirements applicable to DB USA Corporation took effect beginning in January 2018 and were applicable to DWS USA Corporation upon its formation. The Federal Reserve Board has the authority to examine an IHC, such as DB USA Corporation and DWS USA Corporation, and its subsidiaries, as well as U.S. branches and agencies of FBOs, such as our New York branch.

On October 10, 2019, the Federal Reserve Board finalized rules to categorize the U.S. operations of large FBOs based on size, complexity and risk for purposes of tailoring the application of the U.S. enhanced prudential standards (the "Tailoring Rules"). The Tailoring Rules do not significantly change the capital requirements that apply to DB USA Corporation or DWS USA Corporation although they provide the option to comply with certain simplifications to the capital requirements. However, the Tailoring Rules provide modest relief for our U.S. IHCs with respect to applicable liquidity requirements so long as our IHCs' combined weighted short term wholesale funding remains below $75 billion.

As a bank holding company with assets of U.S.$ 250 billion or more, Deutsche Bank AG is required under Title I of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, as amended (the "Dodd-Frank Act"), and the implementing regulations thereunder to prepare and submit periodically to the Federal Reserve Board and the Federal Deposit Insurance Corporation ("FDIC") a plan for the orderly resolution of its subsidiaries and operations in the event of future material financial distress or failure (the "U.S. Resolution Plan"). For foreign-based companies subject to these resolution planning requirements such as Deutsche Bank AG, the U.S. Resolution Plan relates only to subsidiaries, branches, agencies and businesses that are domiciled in or whose activities are carried out in whole or in material part in the United States. Deutsche Bank AG filed its most recent U.S. Resolution Plan in June 2018 and received written regulatory feedback in December 2018. The Federal Reserve Board and FDIC found that Deutsche Bank's U.S. Resolution Plan had no deficiencies but identified one shortcoming in the plan, associated with governance mechanisms and related escalation triggers. Deutsche Bank submitted a response to its December 2018 feedback letter on April 1, 2019. Deutsche Bank's response discussed its proposed remediation of the shortcoming as well as enhancements of its resolution capabilities. Deutsche Bank is required to make a submission to the Federal Reserve Board and FDIC by July 1, 2020 explaining how it remediated the shortcoming and providing an update on the enhancement of its resolutions capabilities. Following this submission, Deutsche Bank's next targeted U.S. Resolution Plan is due on or before July 1, 2021. If the Federal Reserve Board and the FDIC were to jointly deem our U.S. Resolution Plan not credible and we failed to remedy any deficiencies in the required timeframe, we could be required to restructure or reorganize businesses, legal entities, operational systems and/or intra-company transactions in ways that may negatively impact our operations and strategy, or could be subject to restrictions on growth. We could also eventually be subjected to more stringent capital, leverage or liquidity requirements, or be required to divest certain assets or operations.

Both DB USA Corporation and DWS USA Corporation were subject to the Federal Reserve Board's Comprehensive Capital Analysis and Review ("CCAR") for 2019. On June 27, 2019, the Federal Reserve Board publicly indicated that it did not object to the 2019 capital plans submitted by DB USA Corporation and DWS USA Corporation. DB USA Corporation and DWS USA Corporation will make their next capital plan submissions to the Federal Reserve Board in April 2020. If the Federal Reserve Board were to object to these capital plans we could be required to increase capital or restructure businesses in ways that may negatively impact our operations and strategy or could be subject to restrictions on growth in the United States. On March 4, 2020, the Federal Reserve Board issued a rule to amend its CCAR process to combine the CCAR quantitative assessment and the buffer requirements in the Federal Reserve Board's capital rules to create an integrated capital buffer requirement.

The U.S. federal bank regulators in 2013 issued final rules implementing elements of the Basel 3 capital adequacy framework that are applicable to U.S. banking organizations.

In September 2014, the Federal Reserve Board and other U.S. regulators approved a final rule implementing liquidity coverage ratio ("LCR") requirements for large U.S. banking holding companies and certain of their subsidiary depositary institutions that are generally consistent with the Basel Committee's revised Basel 3 liquidity standards. DB USA Corporation and our principal U.S. bank subsidiary, Deutsche Bank Trust Company Americas ("DBTCA"), became subject to the full LCR requirements on April 1, 2017 and DWS USA Corporation became subject to LCR requirements on a phased-in basis upon its formation in April 2018. The Tailoring Rules reduced the LCR requirements applicable to DB USA Corporation, DWS USA Corporation and DBTCA from 100 to 85 percent beginning on January 1, 2020.

On June 1, 2016, the Federal Reserve Board and other U.S. regulators proposed rules implementing the second element of the Basel 3 liquidity framework, the net stable funding ratio ("NSFR"), which measures whether an institution maintains sufficiently stable amounts of longer-term funding. Under the Tailoring Rules, DB USA Corporation, DWS USA Corporation and DBTCA would be subject to an 85 percent NSFR so long as our IHCs' combined weighted short term wholesale funding remains below $ 75 billion; however, the NSFR proposal has yet to be finalized and, accordingly, such entities are not currently subject to the proposed requirements.

On December 15, 2016, the Federal Reserve Board adopted final rules that implement the FSB's TLAC standard in the United States. The final rules require, among other things, U.S. IHCs of non-U.S. G-SIBs, including our IHCs, DB USA Corporation and DWS USA Corporation, to maintain a minimum amount of TLAC, and separately require them to maintain a minimum amount of long-term debt meeting certain requirements.

U.S. rules and interpretations, including those described above, could cause us to reduce assets held in the United States, inject capital and/or liquidity into or otherwise change the structure of our U.S. operations, and could also restrict the ability of our U.S. subsidiaries to pay dividends to us or the amount of such dividends. To the extent that we are required to reduce operations in the United States or deploy capital or liquidity in the United States that could be deployed more profitably elsewhere, these requirements could have an adverse effect on our business, financial condition and results of operations.

Any increased capital or liquidity requirements, including those described above, could have adverse effects on our business, financial condition and results of operations, as well as on perceptions in the market of our stability, particularly if any such proposal becomes effective and results in our having to raise capital at a time when we or the financial markets are distressed, or take other measures to increase liquidity in certain jurisdictions due to local requirements. These measures we might be required or find necessary to take in response to these shifting local requirements may be inconsistent with, and hinder the achievement of our strategic goals. In addition, if these regulatory requirements must be implemented more quickly than currently foreseen, we may decide that the quickest and most reliable path to compliance is to reduce the level of assets on our balance sheet, dispose of assets or otherwise segregate certain activities or reduce or close down certain business lines. The effects on our capital raising efforts in such a case could be amplified due to the expectation that our competitors, at least those subject to the same or similar capital requirements, would likely also be required to raise capital at the same time. Moreover, some of our competitors, particularly those outside the European Union, may not face the same or similar regulations, which could put us at a competitive disadvantage.

In addition to these regulatory initiatives, market sentiment may encourage financial institutions such as Deutsche Bank to maintain significantly more capital, liquidity and loss-absorbing capital instruments than regulatory-mandated minima, which could exacerbate the effects on us described above or, if we do not increase our capital to the encouraged levels, could lead to the perception in the market that we are undercapitalized relative to our peers generally.

It is unclear whether the U.S. capital and other requirements described above, as well as similar developments in other jurisdictions could lead to a fragmentation of supervision of global banks that could adversely affect our reliance on regulatory waivers allowing us to meet capital adequacy requirements, large exposure limits and certain organizational requirements on a consolidated basis only rather than on both a consolidated and non-consolidated basis. Should we no longer be entitled to rely on these waivers, we would have to adapt and take the steps necessary in order to meet regulatory capital requirements and other requirements on a consolidated as well as a non-consolidated basis, which could result also in significantly higher costs and potential adverse effects on our profitability and dividend paying ability.

Our regulatory capital and liquidity ratios and our funds available for distributions on our shares or regulatory capital instruments will be affected by our business decisions and, in making such decisions, our interests and those of the holders of such instruments may not be aligned, and we may make decisions in accordance with applicable law and the terms of the relevant instruments that result in no or lower payments being made on our shares or regulatory capital instruments.

Our regulatory capital and liquidity ratios are affected by a number of factors, including decisions we make relating to our businesses and operations as well as the management of our capital position, of our risk weighted assets and of our balance sheet in general, and external factors, such as regulations regarding the risk weightings we are permitted to allocate to our assets, commercial and market risks or the costs of our legal or regulatory proceedings. While we and our management are required to take into account a broad range of considerations in our and their managerial decisions, including the interests of the Bank as a regulated institution and those of our shareholders and creditors, particularly in times of weak earnings and increasing capital requirements, the regulatory requirements to build capital and liquidity may become paramount. Accordingly, in making decisions in respect of our capital and liquidity management, we are not required to adhere to the interests of the holders of instruments we have issued that qualify for inclusion in our regulatory capital, such as our shares or Additional Tier 1 capital instruments. We may decide to refrain from taking certain actions, including increasing our capital at a time when it is feasible to do so (through securities issuances or otherwise), even if our failure to take such actions would result in a non-payment or a write-down or other recovery- or resolution-related measure in respect of any of our regulatory capital instruments. Our decisions could cause the holders of such regulatory capital instruments to lose all or part of the value of their investments in these instruments due to their effect on our regulatory capital ratios, and such holders will not have any claim against us relating to such decisions, even if they result in a non-payment or a write-down or other recovery- or resolution-related measure in respect of such instruments they hold.

In addition, our annual profit and distributable reserves form an important part of the funds available for us to pay dividends on our shares and make payments on our other regulatory capital instruments, as determined in the case of each such instrument by its terms or by operation of law, and any adverse change in our financial prospects, financial position or profitability, or our distributable reserves, each as calculated on an unconsolidated basis, may have a material adverse effect on our ability to make dividend or other payments on these instruments. In addition, as part of the implementation of our strategy, we may record impairments that reduce the carrying value of subsidiaries on our unconsolidated balance sheet and reduce profits and distributable reserves. Future impairments or other events that reduce our profit or distributable reserves on an unconsolidated basis could lead us to be unable to make such payments in respect of future years in part or at all. In particular, the direct costs of our potential settlements of litigation, enforcement and similar matters, especially to the extent in excess of provisions we have established for them, and their related business impacts, if they occur, could impact such distributable amounts.

In addition, German law places limits on the extent to which annual profits and otherwise-distributable reserves, as calculated on an unconsolidated basis, may be distributed to our shareholders or the holders of our other regulatory capital instruments, such as our Additional Tier 1 capital instruments. Our management also has, subject to applicable law, broad discretion under the applicable accounting principles to influence all amounts relevant for calculating funds available for distribution. Such decisions may impact our ability to make dividend or other payments under the terms of our regulatory capital instruments.

European and German legislation regarding the recovery and resolution of banks and investment firms could, if steps were taken to ensure our resolvability or resolution measures were imposed on us, significantly affect our business operations, and lead to losses for our shareholders and creditors.

Germany participates in the SRM, which centralizes at a European level the key competences and resources for managing the failure of any bank in member states of the European Union participating in the banking union. The SRM is based on the SRM Regulation and the BRRD, which was implemented in Germany through the German Recovery and Resolution Act. In addition, the German Resolution Mechanism Act (Abwicklungsmechanismusgesetz) adapted German bank resolution laws to the SRM.

The SRM Regulation and the German Recovery and Resolution Act require the preparation of recovery and resolution plans for banks and grant broad powers to public authorities to intervene in a bank which is failing or likely to fail. For a bank directly supervised by the ECB, such as Deutsche Bank, the Single Resolution Board (referred to as the "SRB") assesses its resolvability and may require legal and operational changes to the bank's structure to ensure its resolvability. In the event that such bank is deemed by the ECB or the SRB as failing or likely to fail and certain other conditions are met, the SRB is responsible for adopting a resolution scheme for resolving the bank pursuant to the SRM Regulation. The European Commission and, to a lesser extent, the Council of the European Union, have a role in endorsing or objecting to the resolution scheme proposed by the SRB. The resolution scheme would be addressed to and implemented by the competent national resolution authorities (in Germany, the German Federal Financial Supervisory Authority (Bundesanstalt für Finanzdienstleistungsaufsicht, "BaFin")) in line with the national laws implementing the BRRD. Resolution measures that could be imposed upon a bank in resolution may include the transfer of shares, assets or liabilities of the bank to another legal entity, the reduction, including to zero, of the nominal value of shares, the dilution of shareholders or the cancellation of shares outright, or the amendment, modification or variation of the terms of the bank's outstanding debt instruments, for example by way of a deferral of payments or a reduction of the applicable interest rate. Furthermore, certain eligible unsecured liabilities, in particular certain senior "non-preferred" debt instruments specified by the German Banking Act, may be written down, including to zero, or converted into equity (commonly referred to as "bail-in") if the bank becomes subject to resolution.

The SRM is intended to eliminate, or reduce, the need for public support of troubled banks. Therefore, financial public support for such banks, if any, would be used only as a last resort after having assessed and exploited, to the maximum extent practicable, the resolution powers, including a bail-in. The taking of actions to ensure our resolvability or the exercise of resolution powers by the competent resolution authority could materially affect our business operations and lead to a significant dilution of our shareholders or even the total loss of our shareholders' or creditors' investment.

*Other regulatory reforms adopted or proposed in the wake of the financial crisis – for example, extensive new regulations governing our derivatives activities, compensation, bank levies, deposit protection, data protection or a possible financial transaction tax – may materially increase our operating costs and negatively impact our business model.*

Beyond capital requirements and the other requirements discussed above, we are affected, or expect to be affected, by various additional regulatory reforms, including, among other things, regulations governing our derivatives activities, compensation, bank levies, deposit protection, data protection or a possible financial transaction tax.

On August 16, 2012, the EU Regulation on over-the-counter ("OTC") derivatives, central counterparties and trade repositories, referred to as European Market Infrastructure Regulation ("EMIR"), entered into force. EMIR introduced a number of requirements, including clearing obligations for certain classes of OTC derivatives and various reporting and disclosure obligations. EMIR implementation has led and may lead to changes that may negatively impact our profit margins. The revised Markets in Financial Instruments Directive ("MiFID 2") and the corresponding Regulation ("MiFIR") became applicable to us on January 3, 2018 and provide for, among other things, a trading obligation for those OTC derivatives which are subject to mandatory clearing and which are sufficiently standardized.

In the United States, the Dodd-Frank Act has numerous provisions that affect or may affect our operations. Pursuant to regulations implementing provisions of the Dodd-Frank Act, we provisionally registered as a swap dealer with the U.S. Commodity Futures Trading Commission ("CFTC") and became subject to the CFTC's extensive oversight. Regulation of swap dealers by the CFTC imposes numerous corporate governance, business conduct, capital, margin, reporting, clearing, execution and other regulatory requirements on us. It also requires us to comply with certain U.S. rules in some circumstances with respect to transactions conducted outside of the United States or with non-U.S. persons. Although the coverage of EMIR and CFTC regulations implementing the Dodd-Frank Act is in many ways similar, certain swaps may be subject to both regulatory regimes to a significant extent. However, pursuant to the CFTC's guidance on cross-border swaps regulation, there may be instances where we can comply with the requirements of EMIR and MiFID in lieu of complying with the CFTC's requirements. The requirements under the Dodd-Frank Act may adversely affect our derivatives business and make us less competitive, especially as compared to competitors not subject to such regulation.

Additionally, under the Dodd-Frank Act, security-based swaps are subject to a standalone regulatory regime under the jurisdiction of the U.S. Securities and Exchange Commission ("SEC"). The SEC has recently adopted supplemental guidance and rule amendments addressing the cross-border application of certain rules regulating security-based swaps. This rulemaking will establish a firm timeline for security-based swap dealer registration. The compliance date for Deutsche Bank to register with the SEC is no earlier than October 6, 2021. This will impose further regulation of our derivatives business.

In addition, the CRR/CRD 4 legislative package provides for executive compensation reforms including caps on bonuses that may be awarded to "material risk takers" and other employees as defined therein and in the German Banking Act and other applicable rules and regulations such as the Remuneration Regulation for Institutions (Institutsvergütungsverordnung). Such restrictions on compensation, including any guidelines issued by the European Banking Authority to further implement them, could put us at a disadvantage to our competitors in attracting and retaining talented employees, especially compared to those outside the European Union that are not subject to these caps and other constraints.

Following the financial crisis, bank levies have been introduced in some countries including, among others, Germany and the United Kingdom. We accrued € 622 million for bank levies in 2019, € 690 million in 2018 and € 596 million in 2017. Also, we are required to contribute substantially to the Single Resolution Fund under the SRM (which is intended to reach a target level of 1 % of insured deposits of all banks in member states participating in the SRM by the end of 2023) and the statutory deposit guarantee and investor compensation schemes under the recast European Union directive on deposit guarantee schemes ("DGS Directive") and the European Union directive on investor compensation schemes. The DGS Directive defines a 0.8 % target level of prefunding by 2024 (similar to resolution funds), which has significantly increased the costs of the statutory deposit protection scheme. In addition, in this context, on November 24, 2015, the European Commission proposed a regulation to establish a European Deposit Insurance Scheme, or "EDIS", for bank deposits of all credit institutions that are members of any of the current national statutory deposit guarantee schemes of member states participating in the banking union. While the total impact of these future levies cannot currently be quantified, they may have a material adverse effect on our business, financial condition and results of operations in future periods.

We are subject to the General Data Protection Regulation ("GDPR") which has increased our regulatory obligations in connection with the processing of personal data, including requiring compliance with the GDPR's data protection principles, the increased number of data subject rights and strict data breach notification requirements. The GDPR grants broad enforcement powers to supervisory authorities, including the potential to levy significant fines for non-compliance and provides for a private right of action for individuals who are affected by a violation of the GDPR. Compliance with the GDPR requires investment in appropriate technical and organizational measures and we may be required to devote significant resources to data protection on an ongoing basis. In the event that we are found to have not met the standards required by the GDPR we may incur damage to our reputation, the imposition by data protection supervisory authorities of significant fines or restrictions on our ability to process personal data, and we may be required to defend claims for compensation brought by affected individuals, all of which could have a material adverse effect on us.

Since the Council of the European Union adopted a decision in January 2013 authorizing EU member states to proceed with the introduction of a financial transaction tax under the European Union's "enhanced cooperation procedure", the EU member states Austria, Belgium, France, Germany, Greece, Italy, Portugal, Slovakia, Slovenia and Spain have been discussing the introduction of a European financial transaction tax. To date, Italy and France have introduced a national tax on listed share transactions. With the recently issued new legislative draft on the basis of renewed political commitment from the German Finance Minister, a risk that a European financial transaction tax may be introduced remains, though there is no timetable. If such a financial transaction tax is ultimately adopted, depending on its final details, it could result in compliance costs.

### Risks Relating to Our Internal Control Environment

A robust and effective internal control environment and adequate infrastructure (comprising people, policies and procedures, controls testing and IT systems) are necessary to ensure that we conduct our business in compliance with the laws, regulations and associated supervisory expectations applicable to us. We have identified the need to strengthen our internal control environment and infrastructure and have embarked on initiatives to accomplish this. If these initiatives are not successful or are delayed, our reputation, regulatory position and financial condition may be materially adversely affected, and our ability to achieve our strategic ambitions may be impaired.

Our businesses are highly dependent on our ability to maintain a robust and effective internal control environment. This is needed for the Bank to process and monitor, on a daily basis, a wide variety of transactions, many of which are highly complex and occur at high speeds, volumes and frequencies, and across numerous and diverse markets and currencies. Such a robust and effective control environment is in turn dependent on the sufficiency of our infrastructure to support that environment. This infrastructure consists broadly of internal policies and procedures, testing protocols, and the IT systems and employees needed to enforce and enable them. An effective control environment is dependent on infrastructure systems and procedures that cover the processing and settling of transactions; the valuation of assets; the identification, monitoring, aggregation, measurement and reporting of risks and positions against various metrics; the evaluation of counterparties and customers for legal, regulatory and compliance purposes; the escalation of reviews; and the taking of mitigating and remedial actions where necessary. They are also critical for regulatory reporting and other data processing and compliance activities.

Both our internal control environment and the infrastructure that underlies it fall short in a number of areas of our standards for completeness and comprehensiveness and are not well integrated across the Bank. Our IT infrastructure, in particular, is fragmented, with numerous distinct platforms, many of which need significant upgrades, in operation across the Bank. Our business processes and the related control systems often require manual procedures and actions that increase the risks of human error and other operational problems that can lead to delays in reporting information to management and to the need for more adjustments and revisions than would be the case with more seamlessly integrated and automated systems and processes. As a result, it is often difficult and labor-intensive for us to obtain or provide information of a consistently high quality and on a timely basis to comply with regulatory reporting and other compliance requirements or to meet regulatory expectations on a consistent basis and, in certain cases, to manage our risk comprehensively. Furthermore, it often takes intensive efforts to identify, when possible, inappropriate behavior by our staff and attempts by third parties to misuse our services as a conduit for prohibited activities, including those relating to anti-financial crime laws and regulation.

In addition, we may not always have the personnel with the appropriate experience, seniority and skill levels to compensate for shortcomings in our processes and infrastructure, or to identify, manage or control risks, and it often has been difficult to attract and retain the requisite talent. This has impacted our ability to remediate existing weaknesses and manage the risks inherent in our activity.

Against this backdrop, our regulators, our Management Board and our Group Audit function have increasingly and more intensively focused on our internal controls and infrastructure through numerous formal reviews and audits of our operations. These reviews and audits have identified various areas for improvement relating to a number of elements of our control environment and infrastructure. These include the infrastructure relating to transaction capturing and recognition, classification of assets, asset valuation frameworks, models, data and process consistency, risk identification, measurement and management and other processes required by laws, regulations, and supervisory expectations. They also include regulatory reporting, anti-money laundering (AML), "know your customer" (KYC), sanctions and embargoes, market conduct and other internal processes that are aimed at preventing use of our products and services for the purpose of committing or concealing financial crime.

Our principal regulators, including the BaFin, the ECB and the Federal Reserve Board, have also conducted numerous reviews focused on our internal controls and the related infrastructure. These regulators have required us formally to commit to remediate our AML and other weaknesses, including the fragmented and manual nature of our infrastructure. For example, on September 21, 2018, the BaFin issued an order requiring us to implement measures on specified timelines over the coming months and years to improve our control and compliance infrastructure relating to AML and, in particular, the know-your-client (KYC) processes in certain of our businesses. Local regulators in other countries in which we do business also review the sufficiency of our control environment and infrastructure with respect to their jurisdictions. While the overall goals of the various prudential regulators having authority over us in the many places in which we do business are broadly consistent, and the general themes of our deficiencies in internal controls and the supporting infrastructure are similar, the regulatory frameworks applicable to us in the area of internal controls are generally applicable at a national or EU-wide level and are not always consistent across the jurisdictions in which we operate around the world. This adds complexity and cost to our efforts to reduce fragmentation and put in place automated systems that communicate seamlessly and quickly with one another.

In order to improve in the areas discussed above, we are undertaking several major initiatives to enhance the efficacy of the transaction processing environment, strengthen our controls and infrastructure, manage non-financial risks and enhance the skill set of our personnel. We believe that these initiatives will better enable us to avoid the circumstances that have resulted in many of the litigations and regulatory and enforcement investigations and proceedings to which we have recently been subject, and will improve our ability to comply with laws and regulations and meet supervisory expectations. In particular, we are making efforts to reduce the complexity of our business and to integrate and automate processes and business and second-line controls. We have also exited certain businesses and high-risk countries, selectively off-boarded a number of clients, worked to strengthen our compliance culture and control functions. However, we may be unable to complete these initiatives as quickly as we intend or as our regulators demand, and our efforts may be insufficient to remediate existing deficiencies and prevent future deficiencies or to result in fewer litigations or regulatory or enforcement investigations, proceedings and criticism in the future. We may also, when faced with the considerable expense of these initiatives, fail to provide sufficient resources for them quickly enough or at all, especially during periods when our operating performance and profitability are challenged or when we focus on our cost-savings efforts. If we are unable to significantly improve our infrastructure and control environment in a timely manner, we may determine to or some of our regulators may require us to reduce our exposure to or terminate certain kinds of products or businesses, counterparties or regions, which could, depending on the extent of such requirement, significantly challenge our ability to operate profitably under our current business model.

Regulators can also impose capital surcharges, requiring capital buffers in addition to those directly required under the regulatory capital rules applicable to us, to reflect the additional risks posed by deficiencies in our control environment. In extreme cases, regulators can suspend our permission to operate in the businesses and regions within their jurisdictions or require extensive and costly remedial actions. Furthermore, implementation of enhanced infrastructure and controls may result in higher-than-expected costs of regulatory compliance that could offset or exceed efficiency gains or significantly affect our profitability. Any of these factors could affect our ability to implement our strategy in a timely manner or at all.

The BaFin has ordered us to improve our control and compliance infrastructure relating to our anti-money laundering and know-your-client processes, and appointed a special representative to monitor these measures' implementation. Our results of operations, financial condition and reputation could be materially and adversely affected if we are unable to significantly improve our infrastructure and control environment by the set deadline.

On September 21, 2018, the BaFin issued an order requiring us to implement measures on specified timelines over the coming months and years to improve our control and compliance infrastructure relating to AML and, in particular, the KYC processes in certain of our businesses. The BaFin also appointed KPMG as special representative, reporting to the BaFin on a quarterly basis on certain aspects of our compliance and progress with the implementation of these measures. In February 2019, the BaFin extended the special representative's mandate to cover our internal controls in the correspondent banking business. Our AML and KYC processes, as well as our other internal processes that are aimed at preventing use of our products and services for the purpose of committing or concealing financial crime and our personnel responsible for our efforts in these areas, continue to be the subject of regulatory scrutiny in a number of jurisdictions. If we are unable to significantly improve our infrastructure and control environment by the set deadline, our results of operations, financial condition and reputation could be materially and adversely affected. For example, some of our regulators, such as BaFin, would likely impose fines or require us to reduce our exposure to or terminate certain kinds of products or businesses or relationships with counterparties or regions, which could, depending on the extent of such requirement, significantly challenge our ability to operate profitably under our current business model.

### Risks Relating to Litigation, Regulatory Enforcement Matters and Investigations

We operate in a highly and increasingly regulated and litigious environment, potentially exposing us to liability and other costs, the amounts of which may be substantial and difficult to estimate, as well as to legal and regulatory sanctions and reputational harm.

The financial services industry is among the most highly regulated industries. Our operations throughout the world are regulated and supervised by the central banks and regulatory authorities in the jurisdictions in which we operate. In recent years, regulation and supervision in a number of areas has increased, and regulators, law enforcement authorities, governmental bodies and others have sought to subject financial services providers to increasing oversight and scrutiny, which in turn has led to additional regulatory investigations or enforcement actions. This trend has accelerated markedly as a result of the global financial crisis and the European sovereign debt crisis. There has been a steep escalation in the severity of the terms which regulators and law enforcement authorities have required to settle legal and regulatory proceedings against financial institutions, with settlements in recent years including unprecedented monetary penalties as well as criminal sanctions. As a result, we may continue to be subject to increasing levels of liability and regulatory sanctions, and may be required to make greater expenditures and devote additional resources to addressing these liabilities and sanctions. Regulatory sanctions may include status changes to local licenses or orders to discontinue certain business practices.

We and our subsidiaries are involved in various litigation proceedings, including civil class action lawsuits, arbitration proceedings and other disputes with third parties, as well as regulatory proceedings and investigations by both civil and criminal authorities in jurisdictions around the world. We expect that the costs to us arising from the resolution of litigation, enforcement and similar matters pending against us to continue to be significant in the near to medium term and to adversely affect our business, financial condition and results of operations. Litigation and regulatory matters are subject to many uncertainties, and the outcome of individual matters is not predictable with assurance. We may settle litigation or regulatory proceedings prior to a final judgment or determination of liability. We may do so for a number of reasons, including to avoid the cost, management efforts or negative business, regulatory or reputational consequences of continuing to contest liability, even when we believe we have valid defenses to liability. We may also do so when the potential consequences of failing to prevail would be disproportionate to the costs of settlement. Furthermore, we may, for similar reasons, reimburse counterparties for their losses even in situations where we do not believe that we are legally compelled to do so. The financial impact of legal risks might be considerable but may be difficult or impossible to estimate and to quantify, so that amounts eventually paid may exceed the amount of provisions made or contingent liabilities assessed for such risks.

Actions currently pending against us or our current or former employees may not only result in judgments, settlements, fines or penalties, but may also cause substantial reputational harm to us. The risk of damage to our reputation arising from such proceedings is also difficult or impossible to quantify.

Regulators have increasingly sought admissions of wrongdoing in connection with settlement of matters brought by them. This could lead to increased exposure in subsequent civil litigation or in consequences under so-called "bad actor" laws, in which persons or entities determined to have committed offenses under some laws can be subject to limitations on business activities under other laws, as well as adverse reputational consequences. In addition, the U.S. Department of Justice ("DOJ") conditions the granting of cooperation credit in civil and criminal investigations of corporate wrongdoing on the company involved having provided to investigators all relevant facts relating to the individuals responsible for the alleged misconduct. This policy may result in increased fines and penalties if the DOJ determines that we have not provided sufficient information about applicable individuals in connection with an investigation. Other governmental authorities could adopt similar policies.

In addition, the financial impact of legal risks arising out of matters similar to some of those we face have been very large for a number of participants in the financial services industry, with fines and settlement payments greatly exceeding what market participants may have expected and, as noted above, escalating steeply in recent years to unprecedented levels. The experience of others, including settlement terms, in similar cases is among the factors we take into consideration in determining the level of provisions we maintain in respect of these legal risks. Developments in cases involving other financial institutions in recent years have led to greater uncertainty as to the predictability of outcomes and could lead us to add to our provisions. Moreover, the costs of our investigations and defenses relating to these matters are themselves substantial. Further uncertainty may arise as a result of a lack of coordination among regulators from different jurisdictions or among regulators with varying competencies in a single jurisdiction, which may make it difficult for us to reach concurrent settlements with each regulator. Should we be subject to financial impacts arising out of litigation and regulatory matters to which we are subject in excess of those we have calculated in accordance with our expectations and the relevant accounting rules, our provisions in respect of such risks may prove to be materially insufficient to cover these impacts. This could have a material adverse effect on our results of operations, financial condition or reputation as well as on our ability to maintain capital, leverage and liquidity ratios at levels expected by market participants and our regulators. In such an event, we could find it necessary to reduce our risk weighted assets (including on terms disadvantageous to us) or substantially cut costs to improve these ratios, in an amount corresponding to the adverse effects of the provisioning shortfall.

We are currently the subject of industry-wide investigations by regulatory and law enforcement agencies relating to interbank and dealer offered rates, as well as civil actions. Due to a number of uncertainties, including those related to the high profile of the matters and other banks' settlement negotiations, the eventual outcome of these matters is unpredictable, and may materially and adversely affect our results of operations, financial condition and reputation.

We have responded to requests for information from, and cooperated with, various regulatory and law enforcement agencies in connection with industry-wide investigations concerning the setting of the London Interbank Offered Rate (LIBOR), Euro Interbank Offered Rate (EURIBOR), Tokyo Interbank Offered Rate (TIBOR) and other interbank and dealer offered rates. The investigations underway have the potential to result in the imposition of significant financial penalties and other consequences for the Bank.

As previously reported, we paid € 725 million to the European Commission pursuant to a settlement agreement dated December 4, 2013 in relation to anticompetitive conduct in the trading of interest rate derivatives. Also as previously reported, on April 23, 2015, we reached settlements with the DOJ, the CFTC, FCA, and the New York State Department of Financial Services ("DFS") to resolve investigations into misconduct concerning the setting of LIBOR, EURIBOR, and TIBOR. Under the terms of these agreements, we paid penalties of U.S.$ 2.175 billion to the DOJ, CFTC and DFS and GBP 226.8 million to the FCA. As part of the resolution with the DOJ, DB Group Services (UK) Limited. (an indirectly-held, wholly-owned subsidiary of ours) pled guilty to one count of wire fraud in the U.S. District Court for the District of Connecticut and entered into a Deferred Prosecution Agreement with a three year term, which expired in 2018. On October 25, 2017, we entered into a settlement with a working group of U.S. state attorneys general resolving their interbank offered rate investigation. Among other conditions, we made a settlement payment of U.S.$ 220 million. The factual admissions we have made in connection with these settlements could make it difficult for us to defend against pending and future claims. Other investigations of us concerning the setting of various interbank offered rates remain ongoing.

In addition, we are party to 42 U.S. civil actions concerning alleged manipulation relating to the setting of various interbank and/or dealer offered rates, as well as single actions pending in each of the UK, Israel and Argentina. Most of the civil actions, including putative class actions, are pending in the U.S. District Court for the Southern District of New York (SDNY), against us and numerous other defendants. All but three of the U.S. civil actions were filed on behalf of parties who allege losses as a result of manipulation relating to the setting of U.S. dollar LIBOR. The three civil actions pending against us that do not relate to U.S. dollar LIBOR were also filed in the SDNY, and include one consolidated action concerning Pound Sterling (GBP) LIBOR, one action concerning Swiss franc (CHF) LIBOR, and one action concerning two Singapore Dollar (SGD) benchmark rates, the Singapore Interbank Offered Rate (SIBOR) and the Swap Offer Rate (SOR).

We cannot predict the effect on us of the interbank and dealer offered rates matters, which could include fines levied by government bodies, damages from private litigation for which we may be liable, legal and regulatory sanctions (including possible criminal sanctions) and other consequences.

Regulators and law enforcement authorities are investigating, among other things, our compliance with the U.S. Foreign Corrupt Practices Act and other laws with respect to our engagement of finders and consultants.

Certain regulators and law enforcement authorities in various jurisdictions, including the SEC and the DOJ, are investigating, among other things, our compliance with the U.S. Foreign Corrupt Practices Act and other laws with respect to our engagement of finders and consultants. We are responding to and continuing to cooperate with these investigations. Certain regulators in other jurisdictions have also been briefed on these investigations. In the event that any violations of law or regulation are found to have occurred or are alleged to have occurred, and an enforcement action is filed, legal and regulatory sanctions in respect thereof may materially and adversely affect our results of operations, financial condition and reputation.

We are currently involved in civil proceedings in connection with our voluntary takeover offer for the acquisition of all shares of Postbank. The extent of our financial exposure to this matter could be material, and our reputation may be harmed.

In September 2010, we announced a voluntary takeover offer for the acquisition of all shares in Deutsche Postbank AG (Postbank), and we published the official offer document in October 2010. In our takeover offer, we offered Postbank shareholders consideration of € 25 for each Postbank share. This offer was accepted for a total of approximately 48.2 million Postbank shares.

In November 2010, a former shareholder of Postbank, Effecten-Spiegel AG, which had accepted the takeover offer, brought a claim against us alleging that the offer price was too low and was not determined in accordance with the applicable German law. The plaintiff alleges that we had been obliged to make a mandatory takeover offer for all shares in Postbank, at the latest, in 2009. The plaintiff avers that, at the latest in 2009, the voting rights of Deutsche Post AG in Postbank had to be attributed to us pursuant to Section 30 of the German Takeover Act. Based thereon, the plaintiff alleges that the consideration offered by us in the 2010 voluntary takeover offer needed to be raised to € 57.25 per share.

The Regional Court Cologne *(Landgericht)* dismissed the claim in 2011 and the Cologne appellate court dismissed the appeal in 2012. The Federal Court set aside the Cologne appellate court's judgment and referred the case back to the appellate court. In its judgment, the Federal Court stated that the appellate court had not sufficiently considered the plaintiff's allegation that we and Deutsche Post AG "acted in concert" in 2009.

Starting in 2014, additional former shareholders of Postbank, who accepted the 2010 tender offer, brought similar claims as Effecten-Spiegel AG against us which are pending with the Regional Court Cologne and the Higher Regional Court of Cologne, respectively. On October 20, 2017, the Regional Court Cologne handed down a decision granting the claims in a total of 14 cases which were combined in one proceeding. The Regional Court Cologne took the view that we were obliged to make a mandatory takeover offer already in 2008 so that the appropriate consideration to be offered in the takeover offer should have been € 57.25 per share. Taking the consideration paid into account, the additional consideration per share owed to shareholders which have accepted the takeover offer would thus amount to € 32.25. We appealed this decision and the appeal has been assigned to the 13th Senate of the Higher Regional Court of Cologne, which also is hearing the appeal of Effecten-Spiegel AG.

On November 8, 2017, a hearing took place before the Higher Regional Court of Cologne in the Effecten-Spiegel case. In that hearing, the Higher Regional Court indicated that it disagreed with the conclusions of the Regional Court Cologne and took the preliminary view that we were not obliged to make a mandatory takeover offer in 2008 or 2009. The Higher Regional Court informed the parties by notice dated February 19, 2019 that it still has doubts that an acting in concert can be based on the contractual clauses which the Regional Court Cologne found to be sufficient to assume an acting in concert (and to grant the plaintiffs' claims in October 2017). Against this background, the Higher Regional Court resolved to take further evidence and to call a number of witnesses in both cases who were heard in several hearings from October 30, 2019 onwards. The individuals to be heard include current and former board members of Deutsche Bank, Deutsche Post AG and Postbank as well as other persons involved in the Postbank transaction. In addition, the court ordered the production of relevant transaction documents.

We have been served with a large number of additional lawsuits filed against us shortly before the end of 2017, almost all of which are now pending with the Regional Court Cologne. Some of the new plaintiffs allege that the consideration offered by us for the shares in Postbank in the 2010 voluntary takeover should be raised to € 64.25 per share.

The claims for payment against us in relation to these matters total almost € 700 million (excluding interest).

In September 2015, former shareholders of Postbank filed in the Regional Court Cologne shareholder actions against Postbank to set aside the squeeze-out resolution taken in the shareholders meeting of Postbank in August 2015. Among other things, the plaintiffs allege that we were subject to a suspension of voting rights with respect to our shares in Postbank based on the allegation that we failed to make a mandatory takeover offer at a higher price in 2009. The squeeze out is final and the proceeding itself has no reversal effect, but may result in damage payments. The claimants in this proceeding refer to legal arguments similar to those asserted in the Effecten-Spiegel proceeding described above. In a decision on October 20, 2017, the Regional Court Cologne declared the squeeze-out resolution to be void. The court, however, did not rely on a suspension of voting rights due to an alleged failure by us to make a mandatory takeover offer, but argued that Postbank violated information rights of Postbank shareholders in Postbank's shareholders meeting in August 2015. Postbank has appealed this decision. The Higher Regional Court of Cologne scheduled an oral hearing for May 7, 2020.

The legal question of whether we had been obliged to make a mandatory takeover offer for all Postbank shares prior to our 2010 voluntary takeover may also impact two pending appraisal proceedings (*Spruchverfahren*). These proceedings were initiated by former Postbank shareholders with the aim to increase the cash compensation offered in connection with the squeeze-out of Postbank shareholders in 2015 and the cash compensation offered and annual guaranteed dividend paid in connection with the execution of a domination and profit and loss transfer agreement (*Beherrschungs- und Gewinnabführungsvertrag*) between DB Finanz-Holding AG (now DB Beteiligungs-Holding GmbH) and Postbank in 2012.

The applicants in the appraisal proceedings claim that a potential obligation of ours to make a mandatory takeover offer for Postbank at an offer price of € 57.25 should be decisive when determining the adequate cash compensation in the appraisal proceedings. The Regional Court Cologne had originally followed this legal opinion of the applicants in two resolutions. In a decision dated June 2019, the Regional Court of Cologne expressly deviated from this legal resolution in the appraisal proceedings in connection with execution of a domination and profit and loss transfer agreement. According to this decision, the question whether we were obliged to make a mandatory offer for all Postbank shares prior to our voluntary takeover offer in 2010 shall not be relevant for determining the appropriate cash compensation. It is likely that the Regional Court Cologne will take the same legal position in the appraisal proceedings in connection with the squeeze-out.

The extent of our financial exposure to this matter could be material, and our reputation may be harmed.

We have investigated the circumstances around equity trades entered into by certain clients in Moscow and London and have advised regulators and law enforcement authorities in several jurisdictions about those trades. In the event that violations of law or regulation are found to have occurred, any resulting penalties against us may materially and adversely affect our results of operations, financial condition and reputation.

We have investigated the circumstances around equity trades entered into by certain clients with us in Moscow and London that offset one another. The total volume of transactions reviewed is significant. Our internal investigation of potential violations of law, regulation and policy and into the related internal control environment has concluded, and we have assessed the findings identified during the investigation; to date we have identified certain violations of our policies and deficiencies in our control environment. We have advised regulators and law enforcement authorities in several jurisdictions (including Germany, Russia, the UK and the United States) of this investigation and have taken disciplinary measures with regards to certain individuals in this matter.

On January 30 and 31, 2017, the DFS and FCA announced settlements with the Bank related to their investigations into this matter. The settlements conclude the DFS and the FCA's investigations into the bank's AML control function in its investment banking division, including in relation to the equity trading described above. Under the terms of the settlement agreement with the DFS, Deutsche Bank entered into a consent order, and agreed to pay civil monetary penalties of U.S.$ 425 million and to engage an independent monitor to conduct a comprehensive review of its existing AML compliance programs that pertain to or affect activities conducted by or through our U.S. bank subsidiary DBTCA and our New York branch for a term of up to two years. Under the terms of the settlement agreement with the FCA, we agreed to pay civil monetary penalties of approximately GBP 163 million. On May 30, 2017, the Federal Reserve announced its settlement with us resolving this matter as well as additional AML issues identified by the Federal Reserve. We paid a penalty of U.S.$ 41 million. We also agreed to retain independent third parties to assess our Bank Secrecy Act/AML program and review certain foreign correspondent banking activity of DBTCA. We are also required to submit written remediation plans and programs.

We continue to cooperate with regulators and law enforcement authorities, including the DOJ which has its own ongoing investigation into these securities trades. In the event that violations of law or regulation are found to have occurred, legal and regulatory sanctions in respect thereof may materially and adversely affect our results of operations, financial condition and reputation.

We are currently the subject of industry-wide inquiries and investigations by regulatory and law enforcement authorities relating to transactions of clients in German shares around the dividend record dates for the purpose of obtaining German tax credits or refunds in relation to withholding tax levied on dividend payments (so-called cum-ex transactions). In addition, we are exposed to potential tax liabilities and to the assertion of potential civil law claims by third parties, e.g. former counterparties, custodian banks, investors and other market participants, including as a consequence of criminal judgements in criminal proceedings in which we are not directly involved. Due to a number of uncertainties, including the development of investigations, court proceedings, administrative actions by authorities and the assertion of claims by third parties, the eventual outcome of these matters is unpredictable, and may materially and adversely affect our results of operations, financial condition and reputation.

The Public Prosecutor in Cologne (Staatsanwaltschaft Köln, "CPP") has been conducting a criminal investigation since August 2017 concerning two former employees of Deutsche Bank in relation to cum-ex transactions of certain former clients of the Bank. At the end of May and beginning of June 2019, the CPP broadened the investigation proceedings against further current and former employees and former board members of the Bank. It is difficult to predict how the proceeding will further develop. Deutsche Bank is a potential secondary participant in these proceedings and the proceedings could result in a disgorgement of profits and fines. There is a risk that the proceedings lead to a formal indictment and criminal prosecution of accused individuals and Deutsche Bank. Increased media attention surrounding the cum-ex topic as well as any future criminal judgement that is unfavourable to the Bank can create reputational risks. The imposition of fines and the disgorgement of profits could have a material adverse effect on our financial condition or results of operations.

We are further exposed to the assertion of potential tax and civil law recourse and compensation claims by German tax authorities and third parties.

Deutsche Bank acted as participant in and filed withholding tax refund claims through the electronic refund procedure (elektronisches Datenträgerverfahren) on behalf of, inter alia, two former custody clients in connection with their cum-ex transactions. In February 2018, Deutsche Bank received from the German Federal Tax Office (Bundeszentralamt für Steuern, "FTO") a demand of approximately € 49 million for tax refunds paid to one former custody client. In December 2019, Deutsche Bank received a liability notice from the FTO in the amount of € 2.1 million in connection with tax refund claims Deutsche Bank had submitted on behalf of another former custody client. Deutsche Bank made the requested payment and filed an objection. In the event that the FTO issues the liability notice announced in February 2018 or further liability notices and to the extent Deutsche Bank is eventually liable under the liability notices, this would expose the Bank to potential financial losses and could have a material adverse effect on our results of operations.

As regards civil law claims, The Bank of New York Mellon SA/NV ("BNY") – as a parent of two companies acting as depot bank and fund administrator which Deutsche Bank acquired in 2010 and sold to BNY later in 2010 – has informed Deutsche Bank of its intention to assert indemnification claims under a contractual tax indemnity provision for potential cum-ex related tax liabilities incurred by these companies. BNY estimates the potential tax liability to amount to up to € 120 million (excluding interest of 6 per cent p.a.). On August 19, 2019, one of the companies, BHF Asset Servicing GmbH ("BAS"), obtained the status of a third party subject to confiscation in a trial that commenced before the Regional Court Bonn on September 4, 2019. In December 2019, Deutsche Bank was informed of two hearing letters issued by the FTO to BAS in which the FTO stated that a potential liability of BAS exists and that BAS should expect a liability notice.

On February 6, 2019, Deutsche Bank was served by the Regional Court Frankfurt am Main with a claim by M.M.Warburg & CO Gruppe GmbH and M.M.Warburg & CO (AG & Co.) KGaA (together "Warburg") in connection with cum-ex transactions of Warburg with a custody client of Deutsche Bank during 2007 to 2011. Warburg claims indemnification against German taxes in relation to transactions conducted in 2010 and 2011, compensation of unspecified damages relating to these transactions as well as declaratory relief that Deutsche Bank will have to indemnify Warburg against any potential future tax assessments for cum-ex transactions conducted in the years 2007 to 2009. The claims against us amount to approximately € 198 million. The proceeding is ongoing and the next hearing date is scheduled for April 20, 2020.

The risks arising from the cum-ex topic are difficult to quantify and the likelihood of these risks materializing is hard to predict. In the event that Deutsche Bank is eventually liable under the civil law claims already asserted or under claims that will potentially be asserted by third parties in the future, this may materially and adversely affect our financial condition or results of operations.

We are under continuous examination by tax authorities in the jurisdictions in which we operate. Tax laws are increasingly complex and are evolving. The cost to us arising from the resolution of routine tax examinations, tax litigation and other forms of tax proceedings or tax disputes may increase and may adversely affect our business, financial condition and results of operation.

We are under continuous examination by tax authorities in the jurisdictions in which we operate. Tax laws are increasingly complex. In the current political and regulatory environment, tax administrations' and courts' interpretation of tax laws and regulations and their application are evolving, and scrutiny by tax authorities has become increasingly intense. Wide ranging and continuous changes in the principles of international taxation emanating from the OECD's Base Erosion and Profit Shifting agenda are generating significant uncertainties for us and our subsidiaries and may result in an increase in instances of tax disputes or instances of double taxation going forward, as member states may take different approaches in transposing these requirements into national law or may choose to implement unilateral measures. A recent example is the EU directive requiring disclosure of arrangements with specific tax features that will take full effect in 2020. Tax administrations have also been focusing on the eligibility of taxpayers for reduced withholding taxes on dividends in connection with certain cross-border lending or derivative transactions. In addition, while a significant amount of guidance has been issued since the enactment of the U.S. tax reform at the end of 2017 which included the Base Erosion Anti-Abuse Tax provisions, uncertainties remain and further interpretative guidance may be necessary over the coming years. As a result, the cost to us arising from the resolution of routine tax examinations, tax litigation and other forms of tax proceedings or tax disputes, as well as from rapidly changing and increasingly complex and uncertain tax laws and principles, may increase and may adversely affect our business, financial condition and results of operation.

We are currently involved in a legal dispute with the German tax authorities in relation to the tax treatment of certain income received with respect to our pension plan assets. The proceeding is pending in front of the German supreme fiscal court (Bundesfinanzhof). Should the courts ultimately rule in favor of the German tax authorities, the outcome could have a material effect on our comprehensive income and financial condition.

We sponsor a number of post-employment benefit plans on behalf of our employees. In Germany, the pension assets that fund the obligations under these pension plans are held by Benefit Trust GmbH. The German tax authorities are challenging the tax treatment of certain income received by Benefit Trust GmbH in the years 2010 to 2013 with respect to its pension plan assets. For the year 2010 Benefit Trust GmbH paid the amount of tax and interest assessed of € 160 million to the tax authorities and is seeking a refund of the amounts paid in litigation with the relevant lower fiscal court. For 2011 to 2013 the matter is stayed pending the outcome of the 2010 tax litigation. The amount of tax and interest under dispute for years 2011 to 2013, which also has been paid to the tax authorities, amounts to € 456 million. In March 2017, the lower fiscal court ruled in favor of Benefit Trust GmbH and in September 2017 the tax authorities appealed the decision to the German supreme fiscal court (Bundesfinanzhof). A decision by the supreme fiscal court is not expected for a number of years. An ultimate decision by the courts that is unfavorable to us could materially and adversely affect our comprehensive income and financial condition.

U.S. Congressional committees and other U.S. governmental entities have sought and may seek information from us concerning potential dealings between us and the U.S. executive branch, the President, his family and other close associates, exposing us in particular to risk to our reputation and potential loss of business as a result of extensive media attention.

A number of media entities have reported that U.S. Congressional committees and other U.S. governmental entities are seeking or may seek information from us concerning, among other things, potential dealings between the Bank and certain members of the Executive branch of the U.S. government, the President, his family, and other close associates. Attention surrounding such actual or potential requests and inquiries and our responses can create reputational and other risks that could have a material adverse effect on us. Our policy is to cooperate with all authorized government inquiries.

**We have received requests for information from regulatory and law enforcement agencies concerning our correspondent banking relationship with Danske Bank, exposing us in particular to risk to our reputation and potential loss of business as a result of extensive media attention.**

We have received requests for information from regulatory and law enforcement agencies concerning our correspondent banking relationship with Danske Bank, including our historical processing of correspondent banking transactions on behalf of customers of Danske Bank's Estonia branch prior to cessation of the correspondent banking relationship with that branch in 2015. We are providing information to and otherwise cooperating with the investigating agencies. We have also completed an internal investigation into these matters, including of whether any violations of law, regulation or policy occurred and the effectiveness of the related internal control environment. Additionally, on September 23 and 24, 2019, based on a search warrant issued by the Local Court (Amtsgericht) in Frankfurt, the Frankfurt public prosecutor's office conducted investigations into Deutsche Bank. The investigations are in connection with suspicious activity reports relating to money laundering at Danske Bank. The Bank is cooperating in the investigation. Media and market attention surrounding these requests can create reputational risks in particular, even if our investigations and those of our regulators and the authorities do not result in evidence of wrongdoing. We could in particular suffer diminished volumes of business as a result, which could have a material adverse effect on our financial condition and results of operations.

**We have received requests for information from regulatory and law enforcement agencies concerning our anti-financial crime controls, including in the United States. Should any of the investigations result in a finding that the Bank failed to comply with applicable law, the Bank could be exposed to material fines, limitations on business, remedial undertakings and/or criminal prosecution, as well as risk to our reputation and potential loss of business as a result of extensive media attention.**

We have received requests for information from regulatory and law enforcement agencies concerning our anti-financial crime controls over the past several years, both generally and in connection with specific clients, counterparties or incidents, including in the United States. Among the areas within the scope of these inquiries are client onboarding and KYC processes, transaction monitoring systems and procedures, processes concerning the decision to file or not to file a suspicious activity report, escalation procedures, and other related processes and procedures. The Bank is cooperating in these investigations. Should any of the investigations result in a finding that the Bank failed to comply with applicable law, the Bank could be exposed to material fines, limitations on business, remedial undertakings and/or criminal prosecution. Media and market attention surrounding these inquiries can create reputational risks in particular, even if our investigations and those of our regulators and the authorities do not result in evidence of wrongdoing. We could in particular suffer diminished volumes of business as a result, which could have a material adverse effect on our financial condition and results of operations.

**Guilty pleas by or convictions of us or our affiliates in criminal proceedings may have consequences that have adverse effects on certain of our businesses.**

We and our affiliates have been and are subjects of criminal proceedings or investigations. In particular, as part of the resolution of the investigation of the DOJ into misconduct relating to London interbank offered rates, our subsidiary DB Group Services (UK) Limited entered into a plea agreement with the DOJ, pursuant to which the company pled guilty to one count of wire fraud, and, subsequently, a judgment of conviction was issued against the company. Also, in connection with the KOSPI Index unwind matters, our subsidiary Deutsche Securities Korea Co. was convicted of vicarious corporate criminal liability in respect of spot/futures linked market manipulation by one of its employees; though the criminal trial verdict has been overturned on appeal, the Korean prosecutor's office has appealed the decision. We and our subsidiaries are also subjects of other criminal proceedings or investigations.

Guilty pleas or convictions against us or our affiliates could lead to our ineligibility to use an important trading exemption under ERISA. In particular, such guilty pleas or convictions could cause our asset management affiliates to no longer qualify as "qualified professional asset managers" ("QPAMs") under the QPAM Prohibited Transaction Exemption, which exemption is relied on to provide asset management services to certain pension plans in connection with certain asset management strategies. While there are a number of statutory exemptions and numerous other administrative exemptions that our asset management affiliates may use to trade on behalf of ERISA plans, and in many instances they may do so in lieu of relying on the QPAM exemption, loss of QPAM status could cause customers who rely on such status (whether because they are legally required to do so or because we have agreed contractually with them to maintain such status) to cease to do business or refrain from doing business with us and could negatively impact our reputation more generally. For example, clients may mistakenly see the loss as a signal that our asset management affiliates are somehow no longer approved as asset managers generally by the U.S. Department of Labor ("DOL"), the agency responsible for ERISA, and cease to do business or refrain from doing business with us for that reason. This could have a material adverse effect on our results of operations, particularly those of our asset management business in the United States. On December 29, 2017, the DOL published an individual exemption permitting certain of our affiliates to retain their QPAM status despite both the conviction of DB Group Services (UK) Limited and the conviction of Deutsche Securities Korea Co. The exemption applies through April 17, 2021 but may terminate earlier if, among other things, we or our affiliates are convicted of crimes in other matters. The disqualification period arising from these convictions extends until April 17, 2027, so we will need to obtain a further exemption by April 18, 2021 to avoid a loss of QPAM status at that time, with the potential for the adverse effects described above if such further exemption is not granted.

### Other Risks

*In addition to our traditional banking businesses of deposit-taking and lending, we also engage in nontraditional credit businesses in which credit is extended in transactions that include, for example, our holding of securities of third parties or our engaging in complex derivative transactions. These nontraditional credit businesses materially increase our exposure to credit risk.*

As a bank and provider of financial services, we are exposed to the risk that third parties who owe us money, securities or other assets will not perform their obligations. Many of the businesses we engage in beyond the traditional banking businesses of deposit-taking and lending also expose us to credit risk.

In particular, much of the business we conduct through our Investment Bank corporate division entails credit transactions, frequently ancillary to other transactions. Nontraditional sources of credit risk can arise, for example, from holding securities of third parties; entering into swap or other derivative contracts under which counterparties have obligations to make payments to us; executing securities, futures, currency or commodity trades that fail to settle at the required time due to nondelivery by the counterparty or systems failure by clearing agents, exchanges, clearing houses or other financial intermediaries; and extending credit through other arrangements. Parties to these transactions, such as trading counterparties, may default on their obligations to us due to bankruptcy, political and economic events, lack of liquidity, operational failure or other reasons.

Many of our derivative transactions are individually negotiated and non-standardized, which can make exiting, transferring or settling the position difficult. Certain credit derivatives require that we deliver to the counterparty the underlying security, loan or other obligation in order to receive payment. In a number of cases, we do not hold, and may not be able to obtain, the underlying security, loan or other obligation. This could cause us to forfeit the payments otherwise due to us or result in settlement delays, which could damage our reputation and ability to transact future business, as well as impose increased costs on us. Legislation in the European Union (EMIR) and the United States (the Dodd-Frank Act) has introduced requirements for the standardization, margining, central clearing and transaction reporting of certain over-the-counter derivatives. While such requirements are aimed at reducing the risk posed to counterparties and the financial system by such derivatives, they may reduce the volume and profitability of the transactions in which we engage, and compliance with such provisions may impose substantial costs on us.

The exceptionally difficult market conditions experienced during the global financial crisis severely adversely affected certain areas in which we do business that entail nontraditional credit risks, including the leveraged finance and structured credit markets, and similar market conditions, should they occur, may do so in the future.

A substantial proportion of our assets and liabilities comprise financial instruments that we carry at fair value, with changes in fair value recognized in our income statement. As a result of such changes, we have incurred losses in the past, and may incur further losses in the future.

A substantial proportion of the assets and liabilities on our balance sheet comprise financial instruments that we carry at fair value, with changes in fair value recognized in the income statement. Fair value is defined as the price at which an asset or liability could be exchanged in an arm's length transaction between knowledgeable, willing parties, other than in a forced or liquidation sale. If the value of an asset carried at fair value declines (or the value of a liability carried at fair value increases) a corresponding unfavorable change in fair value is recognized in the income statement. These changes have been and could in the future be significant.

Observable prices or inputs are not available for certain classes of financial instruments. Fair value is determined in these cases using valuation techniques we believe to be appropriate for the particular instrument. The application of valuation techniques to determine fair value involves estimation and management judgment, the extent of which will vary with the degree of complexity of the instrument and liquidity in the market. Management judgment is required in the selection and application of the appropriate parameters, assumptions and modeling techniques. If any of the assumptions change due to negative market conditions or for other reasons, subsequent valuations may result in significant changes in the fair values of our financial instruments, requiring us to record losses.

Our exposure and related changes in fair value are reported net of any fair value gains we may record in connection with hedging transactions related to the underlying assets. However, we may never realize these gains, and the fair value of the hedges may change in future periods for a number of reasons, including as a result of deterioration in the credit of our hedging counterparties. Such declines may be independent of the fair values of the underlying hedged assets or liabilities and may result in future losses.

Pursuant to accounting rules, we must periodically test the value of the goodwill of our businesses and the value of our other intangible assets for impairment. In the event such test determines that criteria for impairment exists, we are required under accounting rules to write down the value of such asset. Impairments of goodwill and other intangible assets have had and may have a material adverse effect on our profitability results of operations.

Goodwill arises on the acquisition of subsidiaries and associates and represents the excess of the aggregate of the cost of an acquisition and any noncontrolling interests in the acquiree over the fair value of the identifiable net assets acquired at the date of the acquisition. Goodwill on the acquisition of subsidiaries is capitalized and reviewed for impairment annually or more frequently if there are indications that impairment may have occurred. Intangible assets are recognized separately from goodwill when they are separable or arise from contractual or other legal rights and their fair value can be measured reliably. These assets are tested for impairment and their useful lives reaffirmed at least annually. The determination of the recoverable amount in the impairment assessment of non-financial assets requires estimates based on quoted market prices, prices of comparable businesses, present value or other valuation techniques, or a combination thereof, necessitating management to make subjective judgments and assumptions. These estimates and assumptions could result in significant differences to the amounts reported if underlying circumstances were to change.

Impairments of goodwill and other intangible assets have had and may have a material adverse effect on our profitability and results of operations. Impairment of goodwill and other intangible assets was € 1.0 billion in 2019. The announcement of the strategic transformation in July 2019 triggered the impairment review of Deutsche Bank's goodwill. A worsening macro-economic outlook, including interest rate curves, industry-specific market growth corrections, as well as the impact related to the implementation of the transformation strategy resulted in the full impairment of the Wealth Management goodwill of € 545 million in the Private Bank and the Global Transaction Banking and Corporate Finance goodwill of € 492 million in the Corporate Bank in the second quarter of 2019.

Pursuant to accounting rules, we must review our deferred tax assets at the end of each reporting period. To the extent that it is no longer probable that sufficient taxable income will be available to allow the benefit of part or all of deferred tax assets to be utilized, we have to reduce the carrying amounts. These reductions have had and may in the future have material adverse effects on our profitability, equity and financial condition.

We recognize deferred tax assets for future tax consequences attributable to temporary differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases, unused tax losses and unused tax credits. Deferred tax assets are recognized only to the extent that it is probable that sufficient taxable profit will be available against which those unused tax losses, unused tax credits and deductible temporary differences can be utilized. As of December 31, 2019 and December 31, 2018, we recognized deferred tax assets of € 3.2 billion and € 6.5 billion, respectively in entities which have suffered a loss in either the current or preceding period.

In determining the amount of deferred tax assets, we use historical tax capacity and profitability information and, if relevant, forecasted operating results based upon approved business plans, including a review of the eligible carry-forward periods, available tax planning opportunities and other relevant considerations. The analysis of historical tax capacity includes the determination as to whether a history of recent losses exists at the reporting date, and is generally based on the pre-tax results adjusted for permanent differences for the current and the two preceding financial years. Each quarter, we re-evaluate our estimate related to deferred tax assets, including our assumptions about future profitability. The accounting estimate related to the deferred tax assets depends upon underlying assumptions about the historical tax capacity and profitability information, as well as forecasted operating results based upon approved business plans, that can change from period to period and requires significant management judgment. For example, tax law changes or variances in future projected operating performance could result in an adjustment to the deferred tax assets that would be charged to income tax expense or directly to equity in the period such determination was made.

These adjustments have had and may in the future have material adverse effects on our profitability or equity. In updating the strategic plan in connection with our current transformation, we adjusted the value of our deferred tax assets in affected jurisdictions. This resulted in total valuation adjustments of € 2.8 billion for the financial year ended December 31, 2019 that primarily relate to the U.S. and UK.

We are exposed to pension risks which can materially impact the measurement of our pension obligations, including interest rate, inflation and longevity risks that can materially impact our earnings.

We sponsor a number of post-employment benefit plans on behalf of our employees, including defined benefit plans. Our plans are accounted for based on the nature and substance of the plan. Generally, for defined benefit plans the value of a participant's accrued benefit is based on each employee's remuneration and length of service. We maintain various external pension trusts to fund the majority of our defined benefit plan obligations. Our funding principle is to maintain funding of the defined benefit obligation by plan assets within a range of 90 % to 100 % of the obligation, subject to meeting any local statutory requirements. We have also determined that certain plans should remain unfunded, although their funding approach is subject to periodic review, e.g. when local regulations or practices change. Obligations for our unfunded plans are accrued on the balance sheet. For most of the externally funded defined benefit plans there are local minimum funding requirements. We can decide on any additional plan contributions, with reference to our funding principle. There are some locations, e.g. the United Kingdom, where the trustees and the Bank jointly agree contribution levels. We also sponsor retirement and termination indemnity plans in several countries, as well as some post-employment medical plans for a number of current and retired employees, mainly in the United States. The post-employment medical plans typically pay fixed percentages of medical expenses of eligible retirees after a set deductible has been met.

We develop and maintain guidelines for governance and risk management, including funding, asset allocation and actuarial assumption setting. In this regard, risk management means the management and control of risks for us related to market developments (e.g., interest rate, credit spread, price inflation), asset investment, regulatory or legislative requirements, as well as monitoring demographic changes (e.g., longevity). To the extent that pension plans are funded, the assets held mitigate some of the liability risks, but introduce investment risk. In our key pension countries, our largest post-employment benefit plan risk exposures relate to potential changes in credit spreads, interest rates, price inflation and longevity, although these have been partially mitigated through the investment strategy adopted. Overall, we seek to minimize the impact of pensions on our financial position from market movements, subject to balancing the trade-offs involved in financing post-employment benefits, regulatory capital and constraints from local funding or accounting requirements.

All plans are valued annually by independent qualified actuaries using the projected unit credit method, with inputs including the discount rate, inflation rate, rate of increase in future compensation and for pensions in payment and longevity expectations. In 2019, we decided to apply Deutsche Bank-specific mortality assumptions used to determine the defined benefit obligation for our defined benefit pension plans in Germany. In this context – based on actuarial calculations for the Deutsche Bank-specific population – we adjusted the mortality expectations from the so-far used "Richttafeln Heubeck 2018G" to the Deutsche Bank-specific mortality experience of employees and pensioners. This change in actuarial assumptions led to an actuarial loss of € 125 million before taxes for the year ended December 31, 2019 and is reported in the consolidated statement of comprehensive income in the line item re-measurement gains (losses).

Our investment objective in funding the plans and our obligations in respect of them is to protect ourselves from adverse impacts of our defined benefit pension plans on key financial metrics. We seek to allocate plan assets closely to the market risk factor exposures of the pension liability to interest rates, credit spreads and inflation and, thereby, plan assets broadly reflect the underlying risk profile and currency of the pension obligations.

To the extent that the factors that drive our pension liabilities move in a manner adverse to us, or that our assumptions regarding key variables prove incorrect, or that our funding of our pension liabilities does not sufficiently hedge those liabilities, we could be required to make additional contributions or be exposed to actuarial or accounting losses in respect of our pension plans. More detailed information regarding our employee benefit plans is provided in Note 33, "Employee Benefits" of the consolidated financial statements.

Our risk management policies, procedures and methods leave us exposed to unidentified or unanticipated risks, which could lead to material losses.

We have devoted significant resources to developing our risk management policies, procedures and assessment methods and intend to continue to do so in the future. Nonetheless, the risk management techniques and strategies have not been and may in the future not be fully effective in mitigating our risk exposure in all economic market environments or against all types of risk, including risks that we fail to identify or anticipate. Some of our quantitative tools and metrics for managing risk are based upon our use of observed historical market behavior. We apply statistical and other tools to these observations to arrive at quantifications of our risk exposures. During the financial crisis, the financial markets experienced unprecedented levels of volatility (rapid changes in price direction) and the breakdown of historically observed correlations (the extent to which prices move in tandem) across asset classes, compounded by extremely limited liquidity. In this volatile market environment, our risk management tools and metrics failed to predict some of the losses we have experienced, and they may in the future fail to predict important risk exposures. In addition, our quantitative modeling does not take all risks into account and makes numerous assumptions regarding the overall environment, which may not be borne out by events. As a result, risk exposures have arisen and could continue to arise from factors we did not anticipate or correctly evaluate in our statistical models. This has limited and could continue to limit our ability to manage our risks especially in light of geopolitical developments, many of the outcomes of which are currently unforeseeable. Our losses thus have been and may in the future be significantly greater than the historical measures indicate.

In addition, our more qualitative approach to managing those risks not taken into account by our quantitative methods could also prove insufficient, exposing us to material unanticipated losses. Also, if existing or potential customers or counterparties believe our risk management is inadequate, they could take their business elsewhere or seek to limit their transactions with us. This could harm our reputation as well as our revenues and profits. See "Management Report: Risk Report" in the Annual Report 2019 for a more detailed discussion of the policies, procedures and methods we use to identify, monitor and manage our risks.

Operational risks, which may arise from errors in the performance of our processes, the conduct of our employees, instability, malfunction or outage of our IT system and infrastructure, or loss of business continuity, or comparable issues with respect to our vendors, may disrupt our businesses and lead to material losses.

We face operational risk arising from errors in the execution, confirmation or settlement of transactions or from transactions not being properly recorded, evaluated or accounted for. An example of this risk concerns our derivative contracts, which are not always confirmed with the counterparties on a timely basis. For so long as the transaction remains unconfirmed, we are subject to heightened credit and operational risk and in the event of a default may find it more difficult to enforce the contract.

In addition, our businesses are highly dependent on our ability to process manually or through our systems a large number of transactions on a daily basis, across numerous and diverse markets in many currencies. Some of the transactions have become increasingly complex. Moreover, management relies heavily on its financial, accounting and other data processing systems that include manual processing components. If any of these processes or systems do not operate properly, or are disabled, or subject to intentional or inadvertent human error, we could suffer financial loss, a disruption of our businesses, liability to clients, regulatory intervention or reputational damage.

We are also dependent on our employees to conduct our business in accordance with applicable laws, regulations and generally accepted business standards. If our employees do not conduct our business in this manner, we may be exposed to material losses. Furthermore, if an employee's misconduct reflects fraudulent intent, we could also be exposed to reputational damage. We categorize these risks as conduct risk, which comprises inappropriate business practices, including selling products that are not suitable for a particular customer, fraud, unauthorized trading and failure to comply with applicable regulations, laws and internal policies.

We in particular face the risk of loss events due to the instability, malfunction or outage of our IT system and IT infrastructure. Such losses could materially affect our ability to perform business processes and may, for example, arise from the erroneous or delayed execution of processes as either a result of system outages or degraded services in systems and IT applications. A delay in processing a transaction, for example, could result in an operational loss if market conditions worsen during the period after the error. IT-related errors may also result in the mishandling of confidential information, damage to our computer systems, financial losses, additional costs for repairing systems, reputational damage, customer dissatisfaction or potential regulatory or litigation exposure (including under data protection laws such as the GDPR).

Business continuity risk is the risk of incurring losses resulting from the interruption of normal business activities. We operate in many geographic locations and are frequently subject to the occurrence of events outside of our control. Despite the contingency plans we have in place, our ability to conduct business in any of these locations may be adversely impacted by a disruption to the infrastructure that supports our business, whether as a result of, for example, events that affect our third party vendors or the community or public infrastructure in which we operate. Any number of events could cause such a disruption including deliberate acts such as sabotage, terrorist activities, bomb threats, strikes, riots and assaults on the bank's staff; natural calamities such as hurricanes, snow storms, floods, disease pandemics (such as the current COVID 19 pandemic) and earthquakes; or other unforeseen incidents such as accidents, fires, explosions, utility outages and political unrest. Any such disruption could have a material adverse effect on our business and financial position.

We utilize a variety of vendors in support of our business and operations. Services provided by vendors pose risks to us comparable to those we bear when we perform the services ourselves, and we remain ultimately responsible for the services our vendors provide. Furthermore, if a vendor does not conduct business in accordance with applicable standards or our expectations, we could be exposed to material losses or regulatory action or litigation or fail to achieve the benefits we sought from the relationship.

We utilize a variety of vendors in support of our business and operations. We do so in order to focus on our core competencies and to seek improvements in costs, efficiency and effectiveness in our operations, for instance in connection with our IT modernization efforts. Services provided by vendors pose risks to us comparable to those we bear when we perform the services ourselves, and we remain ultimately responsible for the services our vendors provide. We depend on our vendors to conduct their delivery of services in compliance with applicable laws, regulations and generally accepted business standards and in accordance with the contractual terms and service levels they have agreed with us. If our vendors do not conduct business in accordance with these standards, we may be exposed to material losses and could be subject to regulatory action or litigation as well as be exposed to reputational damage. More generally, if a vendor relationship does not meet our expectations, we could be exposed to financial risks, such as the costs and expenses associated with migration of the services to another vendor and business and operational risks related to the transition, and we could fail to achieve the benefits we sought from the relationship.

**Our operational systems are subject to an increasing risk of cyber-attacks and other internet crime, which could result in material losses of client or customer information, damage our reputation and lead to regulatory penalties and financial losses.**

Among the operational risks we face is the risk of breaches of the security of our or our vendors' computer systems due to unauthorized access to networks or resources, the introduction of computer viruses or malware, or other forms of cybersecurity attacks or incidents. Such breaches could threaten the confidentiality of our or our clients' data and the integrity of our systems. We devote significant resources toward the protection of our computer systems against such breaches and toward ensuring that our vendors employ appropriate cybersecurity safeguards. To address the evolving cyber threat risk, we have expended significant resources to modify and enhance our protective measures and to investigate and remediate any information security vulnerabilities. These measures, however, may not be effective against the many security threats we face.

The increasing frequency and sophistication of recent cyber-attacks has resulted in an elevated risk profile for many organizations around the world, and significant attention by our management has been paid to the overall level of preparedness against such attacks. Cybersecurity is growing in importance due to factors such as the continued and increasing reliance on our technology environment. We and other financial institutions have experienced attacks on computer systems, including attacks aimed at obtaining unauthorized access to confidential company or customer information or damaging or interfering with company data, resources or business activities, or otherwise exploiting vulnerabilities in our infrastructure. We expect to continue to be the target of such attacks in the future. Although we have to date not experienced any material business impact from these attacks, we may not be able to effectively anticipate and prevent more material attacks from occurring in the future. A successful attack could have a significant negative impact on us, including as a result of disclosure or misappropriation of client or proprietary information, damage to computer systems, financial losses, remediation costs (such as for investigation and re-establishing services), increased cybersecurity costs (such as for additional personnel, technology, or third-party vendors), reputational damage, customer dissatisfaction and potential regulatory or litigation exposure.

**The size of our clearing operations exposes us to a heightened risk of material losses should these operations fail to function properly.**

We have large clearing and settlement businesses and an increasingly complex and interconnected information technology (IT) landscape. These give rise to the risk that we, our customers or other third parties could lose substantial sums if our systems fail to operate properly for even short periods. This will be the case even where the reason for the interruption is external to us. In such a case, we might suffer harm to our reputation even if no material amounts of money are lost. This could cause customers to take their business elsewhere, which could materially harm our revenues and profits.

**Ongoing global benchmark reform efforts initiated by the FSB, specifically the transition from interbank offered rates to alternative reference rates, including so-called "risk-free-rates", that are under development, introduce a number of inherent risks to our business and the financial industry. These risks, should they materialize, may have adverse effects on our business, results of operations and profitability.**

Regulators and central banks have set the goal of improving the robustness of financial benchmarks, especially interest rate benchmarks. As a result of this initiative, the ongoing availability of, among other benchmarks, the London Interbank Offered Rate ("LIBOR") and the Euro Overnight Index Average rate ("EONIA" and, together with LIBOR, and other interbank benchmark rates, "IBORs") is uncertain. In the UK, the FCA has asserted that they will not compel LIBOR submissions beyond 2021, thereby jeopardising its continued availability, and has strongly urged market participants to transition to alternative risk-free rates ("RFRs"), as has the CFTC and other regulators in the US. As a result, LIBOR may be modified or discontinued after 2021. As of October 2, 2019, the administrator of EONIA has changed the way it calculates EONIA, so that it is now redefined as the "€STR" euro short-term rate, plus a spread of 8.5 basis points; nonetheless, EONIA is scheduled to cease to exist as of January 3, 2022. There are efforts under way to extend the transition period of the EU financial benchmarks regulation through 2021 for critical and third country benchmarks, which would allow these rates to remain available through 2021. In 2019, EURIBOR was reformed to comply with the EU financial benchmarks regulation, and continues to be available.

We and other market participants are actively engaged in industry working groups to identify and recommend RFRs and processes through which parties can transition to such rates, and a number of sub-working groups have been set up to address open questions and issues surrounding these changes.

In addition, there are ongoing initiatives of benchmark administrators and their respective regulators to revise existing benchmark methodologies with the aim of improving the robustness of such benchmarks. As a contributing bank to a range of interest rate benchmarks, including LIBOR, we are closely involved with such initiatives.

A material portion of our assets and liabilities, including financial instruments we trade and other transactions and services we are involved in, have interest rates that are linked to IBORs that may be subject to potential discontinuation, requiring us to prepare for such discontinuation and for a potential transition to RFRs. Although we are actively engaged with customers and industry working groups to manage the risks relating to such exposure, and are exploring ways to utilise RFRs to the extent possible, the legal mechanisms to effect transition cannot be confirmed, and the impact cannot be determined nor any associated costs accounted for, until such time that RFRs are utilised exclusively and there is market acceptance on the form of alternative RFRs for different products, and certain IBOR obligations may not be changed. The transition and uncertainties around the timing and manner of transition to RFRs represent a number of risks for us, our customers and the financial services industry more widely. The discontinuation of these IBORs and the transition to RFRs pose a variety of risks to us, including the following:

–  Legal and compliance risk (including conduct risk) may arise due to possible disputes regarding disclosures to clients or provisions in financial contracts with counterparties. Many financial instruments linked to IBORs contain provisions for the use of a successor interest rate in the event of the discontinuation of such IBORs, while others do not. In connection with such a discontinuation and transition, the counterparty to the financial instrument may challenge the rate determined for such instrument, particularly if we are the obligor under such financial instrument or are otherwise involved in the determination or setting of the successor rate, whether in respect of the particular financial instrument or in respect of the applicable benchmarks generally. Such disputes could result in claims of market abuse and mistreatment of customers, litigation or regulatory action.
–  Liquidity risk may arise due to slow acceptance, take-up, and development of liquidity in RFR-related products, leading to market dislocation or fragmentation. Additionally, bid/offer spreads may widen impacting funding and collateral postings. Also, replacement of IBORs with a new benchmark rate could adversely impact the value of and return on existing instruments and contracts and the market for securities and other instruments whose returns are linked to IBOR benchmarks.
–  Market risk may arise due to interest rate "basis" risks – the risks posed by different interest rate provisions applying to assets than to liabilities – across tenors and currencies, driven by differing fallback methodologies and timings. Different timings of adoption of fallback protocols will create new basis and potentially make hedging more costly or less effective, and losses may result from value transfer in the fallback methodology adopted. In the event of discontinuation of IBORs and a transition to a successor interest rate, we may incur losses in respect of our assets and liabilities linked to IBORs if the successor interest rate is not economically equivalent to the discontinued IBORs.
–  Introduction of new RFRs will require us to develop new pricing and risk models related to new RFR-linked products. The models we develop may require approval by competent regulators if they differ significantly from existing models, which may introduce delays.
–  Finance and tax risk may arise due to the discontinuation of IBORs and transition to RFRs, which could cause hedge accounting items to be derecognized, adversely impacting our profitability or causing us to incur losses. Discontinuation and transition could also pose difficulties for the independent price verification of financial instruments, where market data is unavailable for the new or modified financial instrument. Tax uncertainties could arise if a discontinuation or transition is viewed as a significant modification of a financial instrument that results in a profit or loss recognition event for tax purposes.
–  Technology and operational risk may arise as a result of the complexity of transition processes, which will require collaboration with our regulators and central banks as well as a wide range of market participants. Also, significant change efforts – relating to RFR product development, re-documentation of client contracts and infrastructure change, including to systems, processes and models across the business and our Finance, Risk and Treasury functions –, will be required. Successful transition processes are, to some extent, dependent on achieving industry and client consensus on standards and conventions, timing and sequencing of transition steps, creation of term versions of the RFRs and the timely re-documenting of client contracts.

It is therefore currently difficult to determine to what extent the changes will affect us, or the costs of implementing any relevant remedial action. Uncertainty as to the nature and extent to such potential changes, alternative reference rates or other reforms including the potential continuation of the publication of IBORs may adversely affect financial instruments using IBORs as benchmarks. The implementation of any alternative RFRs may be impossible or impracticable under the existing terms of such financial instruments and could have an adverse effect on the value of, return on the trading market for certain financial instruments and on our profitability. There is also the risk of an adverse effect to reported performance arising from the transition rules established by accounting bodies, as certain rules (as proposed by the IASB) are still to be finalized.

Initiatives to reform existing benchmarks and our participation in them potentially give risk to similar legal and other risks.

The necessity and potential timing of the discontinuation of IBORs, the prospects for transition to RFRs in the various markets in which they would be required, and industry, market and regulatory response, remain highly uncertain. Also, as mentioned, there are external factors, such as required actions of regulators or counterparties, which create risks that an individual institution, or the industry as a whole, would find difficult to address. Depending how such contingencies develop, and the adequacy of the response of the industry, the market, regulators and us to them, the discontinuation of IBORs and transition to RFRs could have adverse effects on our business, results of operations and profitability.

**We are subject to laws and other requirements relating to financial and trade sanctions and embargoes. If we breach such laws and requirements, we can be subject, and have in the past been subject, to material regulatory enforcement actions and penalties.**

We are required to monitor, evaluate, and observe laws and other requirements relating to financial and trade sanctions and embargoes set by the EU, the Deutsche Bundesbank, Germany's Federal Office for Economic Affairs and Export Control, and other authorities, such as the U.S. Treasury Department's Office of Foreign Assets Control (OFAC) and the UK Treasury Department. If we breach such laws and requirements, we can be subject, and have in the past been subject, to material regulatory enforcement actions and penalties.

**Transactions with counterparties in countries designated by the U.S. State Department as state sponsors of terrorism or persons targeted by U.S. economic sanctions may lead potential customers and investors to avoid doing business with us or investing in our securities, harm our reputation or result in regulatory or enforcement action which could materially and adversely affect our business.**

We engage or have engaged in a limited amount of business with counterparties, including government-owned or -controlled counterparties, in certain countries or territories that are subject to comprehensive U.S. sanctions, including Iran and Cuba (referred to as "Sanctioned Countries"), or with persons targeted by U.S. economic sanctions (referred to as "Sanctioned Persons"). U.S. law generally prohibits U.S. persons or any other persons acting within U.S. jurisdiction from doing business with Sanctioned Countries or Sanctioned Persons. Additionally, U.S. indirect or "secondary" sanctions threaten retaliation against certain activities, including categories of transactions with certain entities and countries, by non-U.S. persons entirely outside of U.S. jurisdiction. Thus, U.S. regulations may extend to activities in other geographic areas and by non-U.S. persons depending on the circumstances. Our U.S. subsidiaries, branch offices, and employees are, and our non-U.S. subsidiaries, branch offices, and employees may become, subject to those prohibitions and other regulations.

We are a German bank and our activities with respect to Sanctioned Countries and Sanctioned Persons have been subject to policies and procedures designed to avoid the involvement of persons acting under U.S. jurisdiction in any managerial or operational role and to ensure compliance with United Nations, European Union and German sanctions and embargoes; in reflection of legal developments in recent years, we have further developed our policies and procedures with the aim of ensuring – to the extent legally permitted – compliance with regulatory requirements extending to other geographic areas regardless of jurisdiction. However, should our policies prove to be, or have been, ineffective, we may be subject to regulatory or enforcement action that could materially and adversely affect our reputation, financial condition, or business. We have taken action to reduce the risk of compliance violations. In 2007, our Management Board decided that we will not engage in new business with counterparties in countries such as Iran, Syria, Sudan and North Korea and to exit existing business to the extent legally possible. It also decided to limit our business with counterparties in Cuba. Iran, North Korea Sudan and Syria are currently designated as state sponsors of terrorism by the U.S. State Department.

We had a representative office in Tehran, Iran, which we discontinued on December 31, 2007. Our remaining business with Iranian counterparties consisted mostly of participations as lender and/or agent in a few large trade finance facilities arranged before 2007 to finance the export contracts of exporters in Europe and Asia. As of December 31, 2018, those loans were fully paid back, subsequently the majority of the remaining Iranian business consists of legacy contractual obligations related to guarantees. We do not believe our business activities with Iranian counterparties are or had been material to our overall business, with the aforementioned guarantees having notional amounts of substantially less than 0.01 % of our total assets over recent years. As of December 31, 2019, the revenues from such activities represented substantially less than 0.01 % of our total revenues for the year ended December 31, 2019.

As required by Section 219 of the Iran Threat Reduction and Syria Human Rights Act of 2012 (Section 13(r) of the Securities Exchange Act of 1934, as amended) we have disclosed certain information regarding our activities or transactions with persons subject to U.S. sanctions against Iran and other persons subject to such provision. Such disclosure is set forth in the section of this document entitled "Disclosures Under Iran Threat Reduction and Syria Human Rights Act of 2012", which follows "Item 16H: Mine Safety Disclosure".

We are also engaged in a limited amount of business with counterparties domiciled in Cuba, which is not subject to any United Nations, European Union or German embargoes. The business consists of a limited number of letters of credit and of cash payments, each without a U.S. nexus, and it represented substantially less than 0.01 % of our assets as of December 31, 2019. The letters of credit served to finance commercial products such as machinery as well as medical products.

We have set up appropriate processes and procedures aimed at complying with other substantial changes in U.S. economic sanctions that have occurred since 2017. In August 2017, the United States enacted the "Countering America's Adversaries Through Sanctions Act" (referred to as "CAATSA"), which codifies existing U.S. sanctions against Russia (including designation of Russian entities under U.S. sanctions), expands U.S. secondary sanctions against Russia, tightens existing sectoral sanctions (targeting specific sectors of the Russian economy), and permits the imposition of sectoral sanctions against additional sectors of the Russian economy. In particular, expanded U.S. secondary sanctions under CAATSA allow for the imposition of U.S. sanctions on non-U.S. entities who engage in "significant" transactions with Russian SDNs or specific entities in the Russian defense and intelligence sectors. We do not believe we have engaged or are currently engaged in any transactions with Russian entities that violate, or are sanctionable under, U.S. sanctions. However, given the broad discretion U.S. authorities have in interpreting and enforcing U.S. sanctions, there can be no assurances that U.S. authorities will not bring enforcement actions against us, or impose secondary sanctions on us for our ongoing activities. Any such actions could have a material impact on our business and harm our reputation. It is also possible that the United States could impose broader sanctions on Russia or Russian entities in the future and that such sanctions could have a material impact on our business activities.

Additionally, since 2017, the U.S. Administration has imposed a number of sanctions against the Government of Venezuela and Venezuelan officials. These sanctions prohibit (beginning on August 5, 2019) virtually all unlicensed transactions involving the Government of Venezuela, including state owned or state controlled companies, and also threaten to impose regulations on (non-U.S.) persons having materially assisted such transactions or dealings. We have taken appropriate steps and established appropriate processes and procedures aimed at complying with these U.S. sanctions against the Government of Venezuela. In response to these U.S. sanctions, we have wound down several client relationships. With respect to entities of the Government of Venezuela, we are currently only engaged in legacy transactions. We do not believe that any of our remaining activities related to the Government of Venezuela violate U.S. sanctions. However, given the broad discretion U.S. authorities have in interpreting and enforcing U.S. sanctions, there can be no assurances that U.S. authorities do not allege that our ongoing activities violate U.S. sanctions.

We are aware, through press reports and other means, of initiatives by governmental and non-governmental entities in the United States and elsewhere to adopt laws, regulations or policies prohibiting transactions with or investment in, or requiring divestment from, entities doing business with Sanctioned Countries, particularly Iran and Russia. Such initiatives may result in our being unable to gain or retain entities subject to such prohibitions as customers or as investors in our securities. In addition, our reputation may suffer due to our association with such countries. Such a result could have significant adverse effects on our business or the price of our securities. It is also possible that new direct or indirect secondary sanctions could be imposed by the United States or other jurisdictions without warning as a result of geopolitical developments.

# Item 4: Information on the Company

## History and Development of the Company

The legal and commercial name of our company is Deutsche Bank Aktiengesellschaft. It is a stock corporation organized under the laws of Germany.

Deutsche Bank Aktiengesellschaft originated from the reunification of Norddeutsche Bank Aktiengesellschaft, Hamburg, Rheinisch-Westfälische Bank Aktiengesellschaft, Düsseldorf, and Süddeutsche Bank Aktiengesellschaft, Munich. Pursuant to the Law on the Regional Scope of Credit Institutions, these were disincorporated in 1952 from Deutsche Bank, which had been founded in 1870. The merger and the name were entered in the Commercial Register of the District Court Frankfurt am Main on May 2, 1957.

We are registered under registration number HRB 30 000. Our registered address is Taunusanlage 12, 60325 Frankfurt am Main, Germany, and our telephone number is +49-69-910-00. Our agent in the United States is: DB USA Corporation, c/o Office of the Secretary, 60 Wall Street, Mail Stop NYC60-4099, New York, NY 10005.

For information on significant capital expenditures and divestitures, please see "Management Report: Operating and Financial Review: Deutsche Bank Group: Significant Capital Expenditures and Divestitures" in the Annual Report 2019.

The Securities and Exchange Commission ("SEC") maintains an Internet site that contains reports, proxy and information statements, and other information regarding issuers that file electronically with the SEC, such as Deutsche Bank Aktiengesellschaft, with the address http://www.sec.gov. Our filings are available on the SEC's Internet site under File Number 001-15242. Our Internet address is http://www.db.com.

## Business Overview

### Our Organization

Please see "Management Report: Operating and Financial Review: Deutsche Bank Group: Our Organization" in the Annual Report 2019. For information on net revenues by geographic area and by corporate division please see Note 4 "Business Segments and Related Information: Entity-Wide Disclosures" to the consolidated financial statements and "Management Report: Operating and Financial Review: Results of Operations: Segment Results of Operations" in the Annual Report 2019.

### Management Structure

Please see "Management Report: Operating and Financial Review: Deutsche Bank Group: Management Structure" in the Annual Report 2019.

### Our Business Strategy

In July 2019, we announced a radical transformation strategy for Deutsche Bank. Our goal is to change Deutsche Bank fundamentally in a manner which significantly improves returns to shareholders. This strategy is underpinned by four specific objectives. First, to refocus Deutsche Bank around four core businesses, focusing on key areas of strength and on more predictable revenue sources while exiting business areas unlikely to produce adequate returns. Second, to reduce our adjusted costs and improve the efficiency and effectiveness of our infrastructure. Third, to reinvigorate the leadership and spirit of the bank by enabling faster decision-making, increasing discipline in execution and unleashing Deutsche Bank's entrepreneurial culture. Finally, to free up capital for return to shareholders by reducing our assets through a newly-created Capital Release Unit.

For 2019, we reported that our performance was in-line with or slightly ahead of our near-term objectives and financial targets regarding cost reductions as well as capital and leverage ratios.

As part of the profound transformation and restructuring of our business, we want to embed sustainability across all our businesses and to become a strategic partner of choice for our clients to support their transition and the overall transformation towards sustainable economic growth.

# PAGES 49-59 OMITTED PURSUANT TO D. N.J. ECF POLICIES AND PROCEDURES

# Regulation and Supervision

Our operations throughout the world are regulated and supervised by the relevant authorities in each of the jurisdictions where we conduct business. Such regulation relates to licensing, capital adequacy, liquidity, risk concentration, conduct of business as well as organizational and reporting requirements. It affects the type and scope of the business we conduct in a country and how we structure specific operations. In reaction to the 2008 financial crisis, the regulatory environment has undergone and is still undergoing significant changes.

## Highlights

On June 27, 2019, a comprehensive package of reforms (referred to in the following as the "banking reform package") to further strengthen the resilience of European Union banks entered into force. The banking reform package includes amendments to the existing regulation on prudential requirements for credit institutions and investment firms, also referred to as the Capital Requirements Regulation ("CRR"), the directive on access to the activity of credit institutions and the prudential supervision of credit institutions and investment firms, also referred to as the Capital Requirements Directive ("CRD"), the European Union's Regulation establishing Uniform Rules and a Uniform Procedure for the Resolution of Credit Institutions and certain Investment Firms in the Framework of a Single Resolution Mechanism and a Single Resolution Fund (the "SRM Regulation"), and the Bank Resolution and Recovery Directive ("BRRD").

The adopted changes incorporate various remaining elements of the regulatory framework agreed within the Basel Committee on Banking Supervision ("Basel Committee") and the Financial Stability Board ("FSB") to refine and supplement the global regulatory framework established by the Basel Committee, the so-called Basel Accords (Basel 1, 2 and 3). This includes more risk-sensitive capital requirements, in particular in the area of counterparty credit risk and for exposures to central counterparties, methodologies that reflect more accurately the actual risks to which banks may be exposed, a binding leverage ratio, a binding net stable funding ratio, tighter regulation of large exposures, new reporting requirements for market risk that may be supplemented at a later stage by own funds requirements, and a requirement for global systemically important institutions ("G-SIIs"), such as Deutsche Bank, to hold certain minimum levels of capital and other instruments which are capable of bearing losses in resolution ("Total Loss-Absorbing Capacity" or "TLAC"). Other measures are aimed at improving banks' lending capacity to support the European Union economy and at further facilitating the role of banks in achieving deeper and more liquid European Union capital markets. While many provisions will not apply until 2021, certain parts, including the TLAC requirements, already apply since June 27, 2019. The banking reform package will likely affect our business by raising our regulatory capital and liquidity requirements and by leading to increased costs.

Similarly, the implementation of the remaining outstanding proposals under Basel 3 as contained in the December 2017 Agreement and in the January 2019 Agreement (see "The Competitive Environment – Regulatory Environment" above) could also affect our business by imposing higher capital charges when adopted into law. Corresponding draft legislative proposals are expected for the second or third quarter of 2020.

Furthermore, a new regulation amending the CRR entered into force on April 26, 2019 relating to minimum loss coverage for non-performing exposures, creating a statutory prudential backstop against excessive future build-up of non-performing loans without sufficient loss coverage on banks' balance sheets.

The United Kingdom left the European Union on January 31, 2020. Relationships with Member States of the European Union are subject to a transition period until December 31, 2020 under a withdrawal agreement. The withdrawal agreement allows us to operate our business in the United Kingdom during the transition period as if the United Kingdom were still a Member State. Also after the expiry of the transition period, Deutsche Bank AG is planning to continue to provide banking and other financial services on a cross-border basis into the United Kingdom as well as through its London branch, which it will retain. Deutsche Bank AG will then be subject to additional regulatory requirements in the United Kingdom, and its activities in the United Kingdom will be supervised and monitored by both the Prudential Regulatory Authority ("PRA") and the Financial Conduct Authority ("FCA"). Deutsche Bank AG is already in the process of applying for authorization to provide banking and other financial services in the United Kingdom after the expiry of the transition period.

The following sections present a description of the regulation and supervision of our business in our home market Germany under the European Union framework of regulation and in the United States.

## Regulation in Germany under the Regulatory Framework of the European Union

We are subject to comprehensive regulation under German law and regulations promulgated by the European Union which are directly applicable law in Germany.

The German Banking Act (Kreditwesengesetz) and the CRR are important sources of regulation for German banks with respect to prudential regulation, licensing requirements, and the business activities of financial institutions. In particular, the German Banking Act requires that an enterprise which engages in one or more of the activities categorized in the German Banking Act as "banking business" or "financial services" in Germany must be licensed as a credit institution (Kreditinstitut) or financial services institution (Finanzdienstleistungsinstitut), as the case may be. Deutsche Bank AG is licensed as a credit institution and is authorized to conduct banking business and to provide financial services.

Significant parts of the regulatory framework for banks in the European Union are governed by the CRR. The CRR includes requirements relating to regulatory capital, risk-based capital adequacy, consolidated supervision, leverage, liquidity and public disclosure, including Basel 3 standards.

Certain other requirements that apply to us, including those with respect to capital buffers, organizational and risk management requirements, are set forth in the German Banking Act and other German laws, partly implementing European Union directives such as the CRD.

Deutsche Bank AG, headquartered in Frankfurt am Main, Germany, is the parent institution of Deutsche Bank Group. Under the CRR, Deutsche Bank AG, as credit institution and parent company, is responsible for regulatory consolidation of all subsidiary credit institutions, financial institutions, asset management companies and ancillary service undertakings. Generally, the bank regulatory requirements under the CRR and the German Banking Act apply both on a stand-alone and a consolidated basis. However, banks forming part of a consolidated group may receive a waiver with respect to the application of specific regulatory requirements on an unconsolidated basis if certain conditions are met. As of December 31, 2019, Deutsche Bank AG benefited from such a waiver, according to which Deutsche Bank AG needs to apply the requirements relating to own funds, large exposures, exposures to transferred credit risks, leverage and disclosure by institutions, as well as certain risk management requirements, only on a consolidated basis.

## Capital Adequacy Requirements

### Minimum Capital Adequacy Requirements (Pillar 1)

The minimum capital adequacy requirements for banks are primarily set forth in the CRR. The CRR requires German banks to maintain an adequate level of regulatory capital in relation to the total of their risk positions, referred to as total exposure amount. Risk positions include credit risk positions, market risk positions and operational risk positions (including, among other things, risks related to certain external factors, as well as to technical errors and errors of employees). The most important type of capital for compliance with the capital requirements under the CRR is Common Equity Tier 1 capital. Common Equity Tier 1 capital primarily consists of share capital, retained earnings and other reserves, subject to certain regulatory adjustments. Another component of regulatory capital is Additional Tier 1 capital, which includes, for example, certain unsecured subordinated perpetual capital instruments and related share premium accounts. An important feature of Additional Tier 1 capital is that the principal amount of the instruments will be written down, or converted into Common Equity Tier 1 capital, when the Common Equity Tier 1 capital ratio of the financial institution falls below a minimum of 5.125 % (or such higher level as the issuing bank may determine). Regulators may require an earlier conversion, for example for stress-testing purposes. Common Equity Tier 1 capital and Additional Tier 1 capital together constitute Tier 1 capital. An additional type of regulatory capital is Tier 2 capital which generally consists of long-term subordinated debt instruments. Tier 1 capital and Tier 2 capital together constitute own funds. Pursuant to the CRR, hybrid capital instruments that qualified as Tier 1 or Tier 2 capital under what is known as Basel 2.5 cease to qualify as such and will be gradually phased out through the end of 2021.

Under the CRR, banks are required to maintain a minimum ratio of Tier 1 capital to total risk exposure amount of 6 % and a minimum ratio of Common Equity Tier 1 capital to total risk exposure of 4.5 %. The minimum total capital ratio of own funds to total risk exposure is 8 %.

## Capital Buffers

The German Banking Act also requires banks to build up a mandatory capital conservation buffer (Common Equity Tier 1 capital amounting to 2.5 % of total risk exposure), and authorizes the German Federal Financial Supervisory Authority (Bundesanstalt für Finanzdienstleistungsaufsicht ("BaFin")) to set a domestic counter-cyclical capital buffer for Germany (Common Equity Tier 1 capital of generally 0 % to 2.5 % of total risk exposure, or more in particular circumstances) during periods of high credit growth. In order to comply with the countercyclical capital buffer requirement, banks must calculate their institution-specific countercyclical capital buffer as the weighted average of the countercyclical capital buffers that apply to them in the jurisdictions where their relevant credit exposures are located. Accordingly, the total countercyclical buffer requirement, if any, with which we need to comply also depends on the corresponding buffer requirements in other jurisdictions. In addition, the BaFin may require banks to build up a systemic risk buffer (Common Equity Tier 1 capital of between 1 % and 3 % of risk-weighted assets for all exposures and – in exceptional cases – up to 5 % for domestic and third-country exposures) to prevent and mitigate long term non-cyclical systemic or macro-prudential risks not otherwise covered by CRR/CRD. G-SIIs, such as Deutsche Bank, are subject to an additional capital buffer (Common Equity Tier 1 capital of between 1 % and 3.5 % of risk-weighted assets), which the BaFin determines for German banks based on a scoring system measuring the bank's global systemic importance. The BaFin can also determine a capital buffer of Common Equity Tier 1 capital of up to 2 % of risk-weighted assets for other systemically important banks (so-called O-SIIs, such as Deutsche Bank) in Germany, based on criteria measuring, among others, the bank's importance for the economy in Germany and the European Economic Area. Currently, the systemic risk buffer, the buffers for G-SIIs and the buffer for O-SIIs are generally not cumulative; only the highest of these buffers applies. If a bank fails to build up the required capital buffers, it will be subject to restrictions on the pay-out of dividends, share buybacks and discretionary compensation payments. Also, within the single supervisory mechanism ("SSM"), the European Central Bank ("ECB") may require banks to maintain higher capital buffers than those required by the BaFin.

Upon implementation into national law of the relevant rules contained in the banking reform package, certain aspects of the capital buffers will change. In particular, the maximum O-SII buffer will no longer be capped at 2 %, but generally at 3 %, but can be set higher with the approval of the European Commission. Also, while the buffers for G-SIIs and O-SIIs will continue to be non-cumulative, the systemic risk buffer will become cumulative to the higher of such buffers. Where such total buffer would be higher than 3 % or 5 %, as the case may be, its determination would be subject to an approval process at the European level.

## Leverage Ratio

The banking reform package (see "Highlights" above) also introduces a binding minimum leverage ratio requirement of 3 % of Tier 1 capital. The minimum leverage ratio requirement is calculated on a non-risk basis and complements the other risk-based capital requirements. Banks are currently only required to report and publish their leverage ratios and will become required to comply with the minimum leverage ratio requirement from June 28, 2021.

In addition to the minimum leverage ratio requirement, provides for a leverage ratio buffer requirement for G-SIIs (such as Deutsche Bank) to be applied from January 2022 onwards, which must be met with Tier 1 capital and is set at 50 % of the G-SII's risk-weighted capital buffer rate. Certain aspects relating to the leverage ratio buffer requirement as contained in the CRD (such as restrictions on the pay out of dividends etc. if the requirements are not met) must be implemented in the laws of the individual member jurisdictions.

## Pillar 2 Capital Requirements and Guidance

Furthermore, the ECB may impose capital requirements on individual significant credit institutions which are more stringent than the statutory minimum requirements set forth in the CRR, the German Banking Act or the related regulations. Upon completion of the supervisory review and evaluation process ("SREP") discussed in greater detail below, the competent supervisory authority makes an SREP decision in relation to each relevant bank, which may include specific capital and liquidity requirements for each affected bank. Any such additional bank-specific capital requirements resulting from the SREP are referred to as "Pillar 2" requirements that must be met with Common Equity Tier 1 capital in addition to the statutory minimum capital and buffer requirements. In addition, the ECB may decide following the SREP to communicate to individual banks an expectation to hold a further Pillar 2 Common Equity Tier 1 capital add-on, the so-called Pillar 2 guidance. The ECB has stated that it expects banks to meet the Pillar 2 guidance although it is not legally binding and failure to meet the Pillar 2 guidance does not automatically have legal consequences. The competent supervisory authority may take a range of other measures based on the SREP outcome to address shortcomings in a bank's governance and risk management processes or its capital or liquidity position, such as prohibiting dividend payments to shareholders or distributions to holders of regulatory capital instruments.

For details of Deutsche Bank's regulatory capital, see "Management Report: Risk Report: Risk and Capital Performance" in our Annual Report 2019.

## MREL Requirements

As discussed below under "Recovery and Resolution", to ensure that European banks have a sufficient amount of liabilities with loss-absorbing capacity, they are required to meet minimum requirements for own funds and eligible liabilities ("MREL") determined for each institution individually on a case-by-case basis. As part of the banking reform package (see "Highlights" above), the European Union implemented the FSB's TLAC standard for G-SIBs (such as us) by introducing a new Pillar 1 MREL requirement for G-SIIs (the European equivalent term for G-SIBs). This new requirement is based on both risk-based and non-risk-based denominators and will be set at the higher of 18 % of total risk exposure and 6.75 % of the leverage ratio exposure measure following a transition period (until December 31, 2021, 16 % of total risk exposure and 6 % of the leverage ratio exposure measure). It can be met with Tier 1 or Tier 2 capital or debt that meets specific eligibility criteria. Deduction rules apply for holdings by G-SIIs of TLAC instruments of other G-SIIs. In addition, the competent authorities have the ability to impose on G-SIIs individual MREL requirements that exceed the statutory minimum requirements.

## Limitations on Large Exposures

The CRR also contains the primary restrictions on large exposures, which limit a bank's concentration of credit risks. The German Banking Act and the Large Exposure Regulation (Großkredit- und Millionenkreditverordnung) supplement the CRR. Under the CRR, our exposure to a customer and any customers affiliated with such customer is deemed to be a "large exposure" when the value of such exposure is equal to or exceeds 10 % of our eligible regulatory capital. All exposures to a single customer and any customers affiliated with such customer are aggregated for these purposes. In general, no large exposure may exceed 25 % of our eligible regulatory capital. "Eligible regulatory capital" for this purpose means the sum of Tier 1 capital and Tier 2 capital where the latter may not exceed one third of Tier 1 capital. If the customer is a credit institution or investment firm, the exposure is limited to the higher of 25 % of our eligible regulatory capital or € 150 million. Competent authorities may set a lower limit than € 150 million. For exposures in the trading book, the large exposure regime may give greater latitude, subject to an additional own funds requirement.

The banking reform package (see "Highlights" above) will restrict a bank's exposures to a single counterparty to 25 % of its Tier 1 capital (instead of 25 % of the sum of its Tier 1 and Tier 2 capital) and will further limit exposures between banks designated as G-SIIs, such as Deutsche Bank, to 15 % of Tier 1 capital. The new rules will apply from June 28, 2021.

## Liquidity Requirements

The CRR introduced a liquidity coverage requirement intended to ensure that banks have an adequate stock of unencumbered high quality liquid assets that can be easily and quickly converted into cash to meet their liquidity needs for a 30-calendar day liquidity stress scenario. The required liquidity coverage ratio ("LCR") is calculated as the ratio of a bank's liquidity buffer to its net liquidity outflows. Also, banks must regularly report the composition of the liquid assets in their liquidity buffer to their competent authorities.

In addition, the banking reform package (see "Highlights" above) introduced a net stable funding ratio ("NSFR") to reduce medium- to long-term funding risks by requiring banks to fund their activities with sufficiently stable sources of funding over a one-year period. The NSFR, which will apply from June 28, 2021 onwards, is defined as the ratio of a bank's available stable funding relative to the amount of required stable funding over a one-year period. Banks must maintain an NSFR of at least 100 %.The NSFR will apply to both the Group as a whole and to individual SSM regulated entities, including the parent entity Deutsche Bank AG. Upon the introduction of the ratio as a binding minimum requirement, we expect both the Group and its subsidiaries for which it applies to be above the regulatory minimum. To achieve this for Deutsche Bank AG, the company is actively working on a number of structural initiatives to improve the standalone NSFR position. In the event these initiatives are not successfully completed by June 2021, Deutsche Bank AG may incur additional costs.

The ECB may impose on individual banks liquidity requirements which are more stringent than the general statutory requirements if the bank's continuous liquidity would otherwise not be ensured.

Item 4: Information on the Company

## Separation of Proprietary Trading Activities by Universal Banks

The German Separation Act provides that deposit-taking banks and their affiliates are prohibited from engaging in proprietary trading that does not constitute a service for others, high-frequency trading, and credit or guarantee transactions with hedge funds and comparable enterprises that are substantially leveraged, unless such activities are exempt or excluded, or in the case no such exemption or exclusion is available, is transferred to a separate legal entity, referred to as a financial trading institution (Finanzhandelsinstitut). The separation requirement applies if certain thresholds are exceeded, which is the case for us. In addition, the German Separation Act authorizes the BaFin to prohibit the deposit-taking bank and its affiliates, on a case-by-case basis, from engaging in market-making and other activities that are comparable to the activities prohibited by law, if these activities may put the solvency of the deposit-taking bank or any of its affiliates at risk. In the event that the BaFin orders such a prohibition, the respective activities must be discontinued or transferred to a separate financial trading institution. The financial trading institution may be established in the form of an investment firm or a bank and may be part of the same group as the deposit-taking bank. However, it must be economically and organizationally independent from the deposit-taking bank and its affiliates, and it has to comply with enhanced risk management requirements. We have established a compliance and control framework to ensure that no prohibited activities are conducted. Deutsche Bank has not established a financial trading institution.

## Anti-Financial Crime, Sanctions, Fraud, Bribery and Corruption

Financial sector participants are required to take steps to prevent the abuse of the financial system through money laundering and other financial crime. The European Union has continually sought to strengthen its framework for anti-money laundering and combating the financing of terrorism, in line with international standards set by the Financial Action Task Force. Recent developments include the implementation into German law as of January 2020 of the European Union's Fifth Anti-Money Laundering Directive. It aims to enhance transparency on beneficial ownership and reinforce the framework for the assessment of high-risk third countries, address other risk and further the cooperation between anti-money-laundering and prudential supervisors. In addition, the Sixth Anti-Money Laundering Directive must be implemented into German law by December 3, 2020. Generally, the requirements (such as know-your-customer requirements) set out in the German AML Act (Geldwäschegesetz) and German Banking Act apply to all business lines and infrastructure units as well as all subsidiaries and affiliates that undertake AML-relevant business and in which Deutsche Bank AG has a dominating influence.

We are required to comply with international sanctions, which are measures to protect national security interests or international law by countries, multilateral or regional organizations against certain countries, organizations or individuals restricting economic activity. In 2019, various sanctions laws were issued or changed requiring us to update policies, processes or name list screening or transaction filtering.

We are subject to fraud, bribery and corruption laws and regulations under the German Criminal Code and in the other countries in which we conduct business. The UK Bribery Act 2010 has extraterritorial impact and requires us to design and develop appropriate measures to mitigate bribery and corruption risk and to administer controls and safeguards to mitigate such risks.

## Data Protection and Cyber Risk

We have to comply with all applicable data protection laws in the countries in which we operate. The regulation on the protection of natural persons with regard to the processing of personal data and on the free movement of such data, also referred to as the General Data Protection Regulation ("GDPR"), became applicable in the European Union on May 25, 2018. It relates to data protection and privacy rights of individuals within the European Union and addresses the export of personal data to other jurisdictions. The GDPR primarily aims at giving individuals control over their personal data and to unifying the regulatory environment for cross-border business. Superseding the 1995 Data Protection Directive, the GDPR contains provisions and requirements pertaining to the processing of personal data of individuals and also applies to businesses inside the European Union that are processing personal data. The regulation furthermore applies to businesses outside of the European Union if goods or services are offered to data subjects in the European Union, or if the behavior of data subjects in the European Union is being monitored. The GDPR imposes compliance obligations and grants broad enforcement powers to supervisory authorities, including the potential to levy significant fines for non-compliance.

Under the German Banking Act and the BaFin's Minimum Requirements for Risk Management for Banks (Mindestan-forderungen an das Risikomanagement) information security needs to be an integral part of a financial institution's IT strategy and risk management. The BaFin requires that financial institutions establish a comprehensive information and cyber security program, define standards, implement controls and adhere to their resulting security policies and standards in accordance with evolving business requirements, regulatory guidance, and an emerging threat landscape. Information security risk management is part of vendor risk management for any procurement if information technology or outsourcing activity include the use of new technologies like cloud services. Information security risk (also referred to as cyber risk) is a component of operational risk assessed in the context of the SREP under Guidelines on Information and Communication Technology Risk Assessment issued by the European Banking Authority, which expects financial institutions to protect the confidentiality, integrity, and availability of customer data and information assets.

## Remuneration Rules

Under the German Banking Act and the German Credit Institution Remuneration Regulation (Institutsvergütungsverordnung), we are subject to certain restrictions on the remuneration we pay our management board members and employees. These remuneration rules implement requirements of the CRD and impose a cap on bonuses. Pursuant to this cap, the variable remuneration for management board members and employees must not exceed the fixed remuneration. The variable remuneration may be increased to twice the management board member's or employee's fixed remuneration if expressly approved by the shareholders' meeting with the required majority. In addition, we are obliged to identify individuals who have a material impact on our risk profile ("material risk takers"). Such material risk takers are subject to additional rules, such as the requirement that at least 40 % to 60 % of the variable remuneration granted to them must be on a deferred basis. The deferral period must be at least three to five years. (Following the implementation of the respective changes in the banking reform package (see "Highlights" above), the minimum deferral period will be extended to four years, or five years for significant institutions (such as us) from December 29, 2020.) Also at least 50 % of the variable remuneration for material risk takers must be paid in shares of the bank or instruments linked to shares of the bank. Variable compensation of material risk takers has to be subject to an ex post risk adjustment mechanism and from the 2018 measurement period onwards to a claw back provision in case of personal wrongdoing. Finally, we are required to comply with certain disclosure requirements relating to the remuneration we pay to, and our remuneration principles in respect of, our material risk takers and other affected employees.

For details of Deutsche Bank's remuneration system, see "Management Report: Compensation Report" in our Annual Report 2019.

## Deposit Protection and Investor Compensation in Germany

### The Deposit Protection Act and the Investor Compensation Act

The German Deposit Protection Act (Einlagensicherungsgesetz) and the German Investor Compensation Act (Anlegerentschädigungsgesetz) provide for a mandatory deposit protection and investor compensation system in Germany, based on a European Union directive on deposit guarantee schemes ("DGS Directive") and a European Union directive on investor compensation schemes.

The German Deposit Protection Act requires that each German bank participates in one of the statutory government-controlled deposit protection schemes (Entschädigungseinrichtungen). The Entschädigungseinrichtung deutscher Banken GmbH acts as the deposit protection scheme for private sector banks such as Deutsche Bank, collects and administers the contributions of the member banks, and settles any compensation claims of depositors in accordance with the German Deposit Protection Act.

Under the German Deposit Protection Act, deposit protection schemes are generally liable for obligations resulting from deposits denominated in any currency in an amount of up to € 100,000 per depositor and bank. Certain depositors, such as banks, insurance companies, investment funds and governmental bodies, are excluded from coverage.

Deposit protection schemes are financed by annual contributions of the participating banks proportionate to their potential liabilities, depending on the amount of its covered deposits and the degree of risk the bank is exposed to. A target level of 0.8 % of the total covered deposits of the participating banks is supposed to be reached by July 3, 2024. Deposit protection schemes may also levy special contributions if required to settle compensation claims.

Deposit protection schemes will be required to contribute to bank resolution costs where resolution tools are used. The contribution made by the deposit protection scheme is limited to the compensation it would have to pay if the affected bank had become subject to insolvency proceedings. Furthermore, deposit protection schemes may provide funding to its participating banks to avoid their failure under certain circumstances.

Under the German Investor Compensation Act, in the event that the BaFin ascertains a compensation case, Entschädigungseinrichtung deutscher Banken GmbH as our deposit protection scheme is also required to compensate 90 % of the aggregate claims of each covered creditor arising from securities transactions denominated in euro or in a currency of any other European Union Member State up to an amount of the equivalent of € 20,000. Many financial sector participants such as banks, insurance companies, investment funds, governmental bodies or medium-sized and large corporations do not benefit from this coverage.

## European Deposit Insurance Scheme

The European Union is still aiming for a common European Deposit Insurance Scheme ("EDIS") based upon a proposal of the European Commission originally published in 2015. EDIS is still under discussion at the European Union level and the ultimate impact on us is uncertain.

## Voluntary Deposit Protection System

Liabilities to creditors that are not covered by a statutory compensation scheme may be covered by the Deposit Protection Fund (Einlagensicherungsfonds) set up by the Association of German Banks (Bundesverband deutscher Banken e.V.) of which Deutsche Bank AG is a member. The Deposit Protection Fund protects deposits, i.e., generally credit balances credited to an account or resulting from interim positions which the bank is required to repay, subject to certain exclusions, up to an amount equal to 15 % of the bank's own funds (Eigenmittel) as further specified in the Deposit Protection Fund's by-laws. This limit will be reduced to 8.75 % from January 1, 2025 onwards.

The financial resources of the Deposit Protection Fund are funded by contributions of the participating banks. If the resources of the Fund are insufficient, banks may be required to make special contributions. If one or more German banks are in financial difficulties, we may participate in their restructuring even where we have no business relationship or strategic interest, in order to avoid making special contributions to the Deposit Protection Fund in case of an insolvency of such bank or banks, or we may be required to make such special contributions.

# Market Conduct, Investor Protection and Infrastructure Regulation

Under the German Securities Trading Act (Wertpapierhandelsgesetz), the BaFin regulates and supervises securities trading, including the provision of investment services, in Germany. The German Securities Trading Act contains, among other things, disclosure and transparency rules for issuers of securities that are listed on a German exchange and organizational requirements as well as rules of conduct which apply to all businesses that provide investment services. Investment services include, in particular, the purchase and sale of securities or derivatives for others and the intermediation of transactions in securities or derivatives as well as investment advice. The BaFin has broad powers to investigate businesses providing investment services to monitor their compliance with the organizational requirements, rules of conduct and reporting requirements. In addition, the German Securities Trading Act requires an independent auditor to perform an annual audit of the investment services provider's compliance with its obligations under the German Securities Trading Act.

A related area is the Market Abuse Regulation ("MAR") which establishes a common European Union framework for, inter alia, insider dealing, the public disclosure of inside information, market manipulation, and managers' transactions. The German Securities Trading Act, which had contained rules on market abuse prior to the entering into force of the MAR, continues to supplement the MAR in this respect, for example by providing for sanctions in case of violations of the MAR.

In addition, the revised Markets in Financial Instruments Directive ("MiFID 2"), implemented primarily through amendments to the German Securities Trading Act, and the new Markets in Financial Instruments Regulation ("MiFIR") became applicable on January 3, 2018. Their objectives are greater regulation and oversight of financial firms providing investment services or activities in the European Union by covering additional markets and instruments, the extension of pre- and post-trade transparency rules from equities to all financial instruments, greater restrictions on operating trading platforms, and greater sanctioning powers. The trading venues under supervision now also include organized trading facilities. In addition, MiFID 2/MiFIR, introduced a trading obligation for those OTC derivatives which are subject to mandatory clearing and which are sufficiently standardized, and new investor protection rules that significantly impact the way investment firms distribute products. The Regulation on Key Information Documents or Packaged Retail and Insurance-based Investment Products (PRIIPs) applies since January 1, 2018. It focuses on disclosure and transparency requirements when advising on or selling retail structured products and other complex and packaged investment products and aims at increasing investor protection.

Beyond the infrastructure-related provisions of MiFID 2 and MiFIR, market infrastructure has been the focus of other regulatory initiatives of the European Union that are relevant for Deutsche Bank. The Regulation on Transparency of Securities Financing Transaction aims at increasing transparency and reducing risks associated with such transactions. The regulation requires that repos, securities lending transactions and transactions with equivalent effect and margin lending transactions be reported to trade repositories and requires risk disclosures and consent before assets are reused or re-hypothecated. For the OTC derivatives markets, the European Regulation on OTC Derivatives, Central Counterparties and Trade Repositories, also referred to as European Market Infrastructure Regulation ("EMIR"), pursues the goals of reducing system, counterparty and operational risk and increase transparency in the OTC derivatives markets. The regulation introduced requirements for standardized over-the-counter derivatives, such as central clearing, margining, portfolio reconciliation or reporting to trade repositories.

In addition, the European Union's Regulation on Financial Benchmarks seeks to ensure the integrity and accuracy of indices used as benchmarks for financial instruments and contracts, and prevent their manipulation. European Union-regulated banks, investment firms, fund managers and certain other supervised entities are only permitted to use benchmarks provided in accordance with the regulation. Benchmark administrators in the European Union are required to obtain authorization or registration, and are subject to rules and oversight regarding their organization, governance and conduct. Benchmarks provided by non-EU administrators are permissible under certain conditions.

## Payment Services Regulation

Payment services in Germany are governed by the Payment Services Directive II ("PSD II") as transposed into German law by the Payment Services Supervision Law (Zahlungsdiensteaufsichtsgesetz, "ZAG"). Payment services regulation is aimed at increasing competition for payment services and providing a level playing field by harmonizing consumer protection and rights and obligations of payment services providers and users within the European Union. The PSD II and the ZAG provide the legal framework for the rapidly progressing digitalization in payment services and promote consistent interpretation and application of the provisions throughout the European Union.

## Legal Requirements relating to Financial Statements and Audits

As required by the German Commercial Code (Handelsgesetzbuch), Deutsche Bank AG prepares its non-consolidated financial statements in accordance with German GAAP. Deutsche Bank Group's consolidated financial statements are prepared in accordance with International Financial Reporting Standards ("IFRS"), and our compliance with capital adequacy requirements and large exposure limits is determined solely based upon such consolidated financial statements.

Under German law, Deutsche Bank AG is required to be audited annually by a certified public accountant (Wirtschaftsprüfer). Deutsche Bank AG's auditor is appointed each year at the annual shareholders' meeting. However, the supervisory board mandates the auditor and supervises the audit. The BaFin and the Deutsche Bundesbank ("Bundesbank"), the German central bank, must be informed of the appointment and the BaFin may reject the auditor's appointment. The German Banking Act requires that a bank's auditor inform the BaFin and the Bundesbank of any facts that come to the auditor's attention which would lead it to refuse to certify or to limit its certification of the bank's annual financial statements or which would adversely affect the bank's financial position. The auditor is also required to notify the BaFin and the Bundesbank in the event of a material breach by management of the articles of association or of any other applicable law. The auditor is required to prepare a detailed and comprehensive annual audit report (Prüfungsbericht) for submission to the bank's supervisory board, the BaFin and the Bundesbank. The BaFin and the Bundesbank share their information with the ECB. In addition to the statutory audit directive and its amendment that has been implemented into national law, Deutsche Bank is also subject to the European Union's Regulation on Specific Requirements regarding Statutory Audit of Public-Interest Entities which includes requirements for mandatory audit firm rotation and restrictions on non-audit services.

## Banking Supervision under the Single Supervisory Mechanism

Under the European Union's system of financial supervision referred to as the single supervisory mechanism ("SSM"), the ECB is the primary supervisor of all systemically important or significant credit institutions (such as Deutsche Bank AG) and their banking affiliates in the relevant Member States. The competent national authorities supervise the remaining, less significant banks under the oversight of the ECB. As a result, Deutsche Bank AG is supervised by the ECB, the BaFin and the Bundesbank.

With respect to us and other significant credit institutions, the ECB is the primary supervisor and is responsible for most tasks of prudential supervision, such as compliance with regulatory requirements concerning own funds, large exposure limits, leverage, liquidity, securitizations, corporate governance, business organization and risk management requirements. The ECB carries out its day-to-day supervisory functions through a joint supervisory team ("JST") established for Deutsche Bank Group. The JST is led by the ECB and comprises staff from the ECB and national supervisory authorities, including the BaFin and the Bundesbank. In addition, and regardless of whether an institution is significant or not, the ECB is responsible for issuing new licenses to credit institutions and for assessing the acquisition and increase of significant participations (also referred to as qualifying holdings) in credit institutions established in those Member States of the European Union that participate in the SSM and where notification of such changes must be filed.

The BaFin is our principal supervisor for regulatory matters with respect to which we are not supervised by the ECB. These include business conduct in the securities markets, in particular when providing investment services to clients, anti-money laundering, terrorist financing and payment services, as well as certain special areas of bank regulation, such as those related to the issuance of covered bonds (Pfandbriefe) and the supervision of German home loan banks (Bausparkassen) with regard to certain regulatory requirements specifically applicable to such home loan banks. Generally, the BaFin also supervises us with respect to those requirements under the German Banking Act that are not based upon European law. The Bundesbank supports the BaFin and the ECB and closely cooperates with them. The cooperation includes the ongoing review and evaluation of reports submitted by us and of our audit reports as well as assessments of the adequacy of our capital base and risk management systems. The ECB, the BaFin and the Bundesbank receive comprehensive information from us in order to monitor our compliance with applicable legal requirements and to obtain information on our financial condition.

## Supervisory Review and Evaluation Process

For significant institutions such as Deutsche Bank, the JST conducts the supervisory review and evaluation process (or "SREP") for an ongoing assessment of risks, governance arrangements and the capital and liquidity situation. The SREP requires that the JSTs review the arrangements, strategies, processes and mechanisms of supervised banks on a regular basis, in order to evaluate risks to which these banks are or might be exposed, risks they could pose to the financial system, and risks revealed by stress testing.

The SREP framework consists of a business model analysis, an assessment of internal governance and institution-wide control arrangements, an assessment of risks to capital and adequacy of capital to cover these risks; and an assessment of risks to liquidity and adequacy of liquidity resources to cover these risks. The SREP can result in Pillar 2 capital and liquidity requirements or guidance for the relevant institution (see above "Pillar 2 Capital Requirements and Guidance").

## Audits, Investigations and Enforcement

### Investigations and Supervisory Audits

The ECB and the BaFin may conduct audits of banks on a discretionary basis, as well as for cause. In particular, the ECB may audit our compliance with requirements with respect to which it supervises us, such as those set forth in CRR/CRD. The BaFin may also decide to audit our compliance with requirements with respect to which it supervises us, such as those relating to business conduct in the securities markets and the regulation of anti-money laundering, to counter terrorist financing and payment services, as well as certain special areas of bank regulation, such as those related to the issuance of covered bonds and the supervision of German home loan banks.

The ECB as well as the BaFin may require a bank to furnish information and documents in order to ensure that the bank is complying with applicable bank supervisory laws. The ECB and the BaFin may conduct investigations without having to state a reason therefor. Such investigations may also take place at a foreign entity that is part of a bank's group for regulatory purposes. Investigations of foreign entities are limited to the extent that the law of the jurisdiction where the entity is located restricts such investigations.

The ECB and the BaFin may attend meetings of a bank's supervisory board and shareholders meetings. They also have the authority to require that such meetings be convened.

## Supervisory and Enforcement Powers

The ECB has a wide range of enforcement powers in the event it discovers any irregularities concerning adherence to requirements with respect to which it supervises us.

It may, for example,

- impose additional own funds or liquidity requirements in excess of statutory minimum requirements;
- restrict or limit a bank's business;
- require the cessation of activities to reduce risk;
- require a bank to use net profits to strengthen its own funds;
- restrict or prohibit dividend payments to shareholders or distributions to holders of Additional Tier 1 instruments; or
- remove the members of the bank's management or supervisory board members from office.

To the extent necessary to carry out the tasks granted to it, the ECB may also require national supervisory authorities to make use of their powers under national law. If these measures are inadequate, the ECB may revoke the bank's license. Furthermore, the ECB has the power to impose administrative penalties in case of breaches of directly applicable European Union laws, such as the CRR, or of applicable ECB regulations and decisions. Penalties imposed by the ECB may amount to up to twice the amount of profits gained or losses avoided because of the violation, or up to 10 % of the total annual turnover of the relevant entity in the preceding business year or such other amounts as may be provided for in relevant European Union law. In addition, where necessary to carry out the tasks granted to it, the ECB may also require that the BaFin initiate proceedings to ensure that appropriate penalties are imposed on the affected bank.

The BaFin also retains a wide range of enforcement powers. As discussed above, it may take action if instructed by the ECB in connection with supervisory tasks granted to the ECB. With respect to supervisory tasks remaining with the BaFin, the BaFin may take action upon its own initiative. In particular, if a bank is in danger of defaulting on its obligations to creditors, the BaFin may take emergency measures to avert default. These emergency measures may include:

- issuing instructions relating to the management of the bank;
- prohibiting the acceptance of deposits and the extension of credit;
- prohibiting or restricting the bank's managers from carrying on their functions;
- prohibiting payments and disposals of assets;
- closing the bank's customer services; and
- prohibiting the bank from accepting any payments other than payments of debts owed to the bank.

The BaFin may also impose administrative pecuniary penalties under the German Banking Act and other German laws. Penalties under the German Banking Act may amount to generally up to € 5 million or, in certain cases, € 20 million, depending of the type of offense. If the economic benefit derived from the offense is higher, the BaFin may impose penalties of up to 10 % of the net turnover of the preceding business year or twice the amount of the economic benefit derived from the violation.

Finally, violations of the German Banking Act may result in criminal penalties against the members of the Management Board or senior management.

## Recovery and Resolution

Germany participates in the European Union's single resolution mechanism ("SRM"), which centralizes at a European level the key competences and resources for managing the failure of banks in Member States of the European Union participating in the banking union. The SRM is based on the SRM Regulation and the BRRD, which was implemented in Germany through the German Recovery and Resolution Act (Sanierungs- und Abwicklungsgesetz). In addition, the German Resolution Mechanism Act (Abwicklungsmechanismusgesetz) adapted German bank resolution laws to the SRM.

Under the SRM, broad resolution powers with respect to banks domiciled in the participating Member States are granted to the Single Resolution Board ("SRB") as the central European resolution authority and to the competent national resolution authorities. Resolution powers in particular include the power to reduce, including to zero, the nominal value of shares, or to cancel shares outright, and to write down certain eligible subordinated and unsubordinated unsecured liabilities, including to zero, or convert them into equity (commonly referred to as "bail-in").

For a bank directly supervised by the ECB, such as Deutsche Bank, the SRB draws up the resolution plan, assesses the bank's resolvability and may require legal and operational changes to the bank's structure to ensure its resolvability. In the event that a bank is failing or likely to fail and certain other conditions are met, in particular where there is no reasonable prospect that any alternative private sector measures would prevent the failure and resolution measures are necessary in the public interest, the SRB is responsible for adopting a resolution scheme for resolving the bank pursuant to the SRM Regulation. The European Commission and, to a lesser extent, the Council of the European Union, have a role in endorsing or objecting to the resolution scheme proposed by the SRB. The resolution scheme would be addressed to and implemented by the competent national resolution authorities (the BaFin in Germany).

Resolution measures that could be imposed upon a failing bank may include a range of measures including the transfer of shares, assets or liabilities of the bank to another legal entity, the reduction, including to zero, of the nominal value of shares, the dilution of shareholders of a failing bank or the cancellation of shares outright, or the amendment, modification or variation of the terms of the bank's outstanding debt instruments, for example by way of deferral of payments or a reduction of the applicable interest rate. Furthermore, by way of a "bail-in", certain liabilities may be written down, including to zero, or converted into equity after the bank's regulatory capital has been exhausted.

To ensure that resolution measures can be effectively taken, contractual obligations governed by the laws of a non-EU country or that are subject to jurisdiction outside the European Union are required to include contractual provisions that ensure that the relevant obligation can be bailed in. In the case of financial contracts governed by the laws of a non-EU country or that are subject to jurisdiction outside the European Union, stay acceptance clauses need to be included.

To ensure sufficient availability of liabilities with loss-absorbing capacity that could be bailed in, the SRM Regulation and the German Recovery and Resolution Act introduced a requirement for banks to meet minimum requirements for own funds and eligible liabilities ("MREL"). The required level of MREL is determined by the competent resolution authorities for each supervised bank individually on a case-by-case basis, depending on the preferred resolution strategy. In the case of Deutsche Bank AG, MREL is determined by the SRB.

In addition, the banking reform package entered into force on June 27, 2019 (see "Highlights" above) implemented the FSB's TLAC standard for G-SIBs by introducing a new Pillar 1 MREL requirement for G-SIIs. This new requirement is based on both risk-based and non-risk-based denominators and will be set at the higher of 18 % of total risk exposure and 6.75 % of the leverage ratio exposure measure following a transition period (until December 31, 2021, 16 % of total risk exposure and 6 % of the leverage ratio exposure measure). It can be met with Tier 1 or Tier 2 capital instruments or debt that meets specific eligibility criteria. In addition, the competent authorities have the ability to impose MREL requirements on G-SIIs that exceed the statutory minimum requirements.

We anticipate that G-SIIs will need to predominantly rely on capital instruments or eligible subordinated debt for this purpose. Effective January 1, 2017, the German Banking Acts provided for a new class of statutorily subordinated debt securities that rank as senior non-preferred below the bank's other senior liabilities (but in priority to the bank's contractually subordinated liabilities, such as those qualifying as Tier 2 instruments). Following a harmonization effort by the European Union implemented in Germany effective July 21, 2018, banks are permitted to decide if a specific issuance of eligible senior debt will rank as senior non-preferred debt or as senior preferred debt.

The SRB is charged with administering the Single Resolution Fund, a pool of money which is financed by bank levies raised at national level and intended to reach a target level of 1 % of insured deposits of all banks in Member States participating in the SRM by the end of 2023. It will be used for resolving failing banks after other options, such as the bail-in tool, have been exhausted. In line with the German Recovery and Resolution Act, public financial support for a failing bank should only be used as a last resort, after having assessed and exploited, to the maximum extent possible, resolution measures set forth in the SRM Regulation and the German Recovery and Resolution Act, including the bail-in tool.

In addition, a German bank could become subject to a stabilization plan or reorganization proceedings under the German Credit Institution Reorganization Act (Gesetz zur Reorganisation von Kreditinstituten).

Item 4: Information on the Company

## Regulation in the European Economic Area and Brexit

Since 1989 the European Union has worked to create a single European Union-wide market with almost no internal barriers on banking and financial services. To this end, the European Union pursues common standards of laws and regulations to create consistency across the internal market and reduce compliance and regulatory burdens for businesses operating on a cross-border basis. The Agreement on the European Economic Area extends this single market to Iceland, Liechtenstein and Norway. These non-EU members of the European Economic Area have agreed to enact legislation similar to that passed in the European Union in many areas. Within this market, our branches generally operate under the so-called "European Passport". Under the European Passport, our branches are subject to regulation and supervision primarily by the ECB and the BaFin. Similarly, we also provide cross-border services in the European Economic Area under the "European Passport" directly without intermediation of branches. To the extent that activities are carried out within its jurisdiction, the authorities of the host country supervise the conduct of such activities. This includes, for example, rules on treating clients fairly and rules governing a bank's conduct in the securities market.

The United Kingdom left the European Union on January 31, 2020. Relationships with Member States of the European Union are subject to a transition period until December 31, 2020 under a withdrawal agreement. The withdrawal agreement allows us to operate our business in the United Kingdom during the transition period as if the United Kingdom were still a Member State. Also after the expiry of the transition period, Deutsche Bank AG is planning to continue to provide banking and other financial services on a cross-border basis into the United Kingdom as well as through its London branch, which it will retain. Deutsche Bank AG will then be subject to additional regulatory requirements in the United Kingdom, and its activities in the United Kingdom will be supervised and monitored by both the Prudential Regulatory Authority ("PRA") and the Financial Conduct Authority ("FCA"). Deutsche Bank AG is already in the process of applying for authorization to provide banking and other financial services in the United Kingdom after the expiry of the transition period.

## Regulation and Supervision in the United States

Our operations are subject to extensive federal and state banking, securities and derivatives regulation and supervision in the United States. We engage in U.S. banking activities directly through our New York branch. We also control U.S. banking organization subsidiaries, including DB USA Corporation and Deutsche Bank Trust Company Americas ("DBTCA"), and U.S. broker-dealers, such as Deutsche Bank Securities Inc., U.S. nondeposit trust companies and nonbanking subsidiaries. We hold our U.S. subsidiaries through two intermediate holding companies, DB USA Corporation, through which our U.S. banking subsidiaries and the large majority of our other U.S. subsidiaries are held, and DWS USA Corporation, through which our U.S. asset management subsidiaries are held.

In 2010, the United States enacted the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act"), which provides a broad framework for significant regulatory changes that extend to almost every area of U.S. financial regulation. While rulemaking in respect of many of the provisions of the Dodd-Frank Act has already taken place, full implementation of the Dodd-Frank Act will require further detailed rulemaking and uncertainty remains about the final details, timing and impact of some rules. Some existing regulations implementing the Dodd-Frank Act are undergoing tailoring as part of the implementation process. In addition, the substance and impact of the Dodd-Frank Act may be affected by subsequent legislation and changes in the U.S. political landscape.

The Dodd-Frank Act provisions known as the "Volcker Rule" limit the ability of banking entities and their affiliates to engage as principal in certain types of proprietary trading and to sponsor or invest in private equity or hedge funds or similar funds ("covered funds"), subject to certain exclusions and exemptions. In the case of non-U.S. banking entities such as Deutsche Bank AG, these exemptions permit certain activities conducted outside the United States, provided that certain criteria are satisfied. The Volcker Rule also limits the ability of banking entities and their affiliates to enter into certain transactions with covered funds with which they or their affiliates have certain relationships. The Volcker Rule also requires banking entities to establish comprehensive compliance programs designed to help ensure and monitor compliance with restrictions under the Volcker Rule. In September and October 2019, the US federal agencies responsible for administration of the Volcker Rule finalized amendments to simplify and tailor compliance requirements related to the proprietary trading provisions of the Volcker Rule. While the recent amendments are intended to streamline the existing requirements and result in a more simplified revised final rule, these changes to the Volcker Rule may result in increased compliance and operational costs. These amendments to the Volcker Rule became effective January 1, 2020, with compliance required by January 1, 2021. On January 30, 2020, the agencies proposed further amendments to the Volcker Rule's covered funds provisions. The proposal is currently open for comment, and the timeline for finalization remains uncertain.

The Dodd-Frank Act also provides regulators with tools to provide greater capital, leverage and liquidity requirements and other prudential standards, particularly for financial institutions that pose significant systemic risk. U.S. regulators are also able to restrict the size and growth of systemically significant non-bank financial companies and large interconnected bank holding companies. U.S. regulators are also required to impose bright-line debt-to-equity ratio limits on financial companies that the Financial Stability Oversight Council determines pose a grave threat to financial stability if it determines that the imposition of such limits is necessary to minimize the risk.

With respect to prudential standards, in February 2014, the Federal Reserve Board adopted rules that set forth how the U.S. operations of certain foreign banking organizations ("FBOs"), such as Deutsche Bank, are required to be structured, as well as the enhanced prudential standards that apply to our U.S. operations. Under these rules, as of July 1, 2016, a large FBO with U.S.$ 50 billion or more in U.S. non-branch assets, such as Deutsche Bank, was required to establish or designate a separately capitalized top-tier U.S. intermediate holding company (an "IHC") that would hold substantially all of the FBO's ownership interests in its U.S. subsidiaries. The Federal Reserve Board may permit an FBO subject to the U.S. IHC requirement to establish or designate multiple U.S. IHCs upon written request. On July 1, 2016, we designated DB USA Corporation as our IHC. In March 2018, we completed the partial initial public offering of our Asset Management division, consolidating these activities in DWS Group GmbH & Co. KGaA, in which we retain approximately 80 % of the shares. In April 2018, DWS USA Corporation was formed as a subsidiary of DWS Group GmbH & Co. KGaA, and, following receipt of Federal Reserve Board approval, we designated it as our second IHC, through which our U.S. asset management subsidiaries are held. As of the date of their designation or formation, they each became subject, on a consolidated basis, to the risk-based and leverage capital requirements under the U.S. Basel 3 capital framework, capital planning and stress testing requirements (on a phased-in basis), U.S. liquidity buffer requirements and other enhanced prudential standards comparable to those applicable to top-tier U.S. bank holding companies of a similar size as DB USA Corporation. Supplementary leverage ratio requirements applicable to DB USA Corporation took effect beginning in January 2018 and were applicable to DWS USA Corporation upon its formation.

On October 10, 2019, the Federal Reserve Board finalized rules to categorize the US operations of large FBOs based on size, complexity and risk for purposes of tailoring the application of the US enhanced prudential standards (the "Tailoring Rules"). The Tailoring Rules do not significantly change the capital requirements that apply to DB USA Corporation or DWS USA Corporation, although they provide the option to comply with certain simplifications to the capital requirements. However, the Tailoring Rules provide modest relief for our US IHCs with respect to applicable liquidity requirements so long as the IHCs' combined weighted short term wholesale funding remains below $75 billion.

The Federal Reserve Board has the authority to examine an IHC, such as DB USA Corporation and DWS USA Corporation, and its subsidiaries, as well as U.S. branches and agencies of FBOs, such as our New York branch. An FBO's U.S. branches and agencies are not held beneath an IHC; however, the U.S. branches and agencies of the FBO are subject to certain liquidity requirements, as well as other specific enhanced prudential standards, such as risk management and, under certain circumstances, asset maintenance requirements. Additionally, the Tailoring Rules also placed requirements on the FBO itself related to the adequacy and reporting of the FBO's home country capital and stress testing regime.

In June 2018 and October 2019, the Federal Reserve Board finalized rules relating to single counterparty credit limits that apply to an FBO's combined U.S. operations and its IHCs. Our IHCs will each be prohibited from having net credit exposure to a single unaffiliated counterparty in excess of 25 percent of each IHC's tier 1 capital beginning on July 1, 2020. In addition, our combined U.S. operations (including our IHCs and our New York branch) would become separately subject to similar restrictions beginning July 1, 2020 unless Deutsche Bank AG certifies compliance with a home country large exposure regime that is consistent with the Basel large exposure framework. In November 2019, the Federal Reserve Board issued a proposed rule to extend the initial compliance date for FBOs' combined US operations to July 1, 2021 or January 1, 2022. If the rule is adopted as proposed, Deutsche Bank AG may avail itself of substituted compliance through certification for its combined U.S. operations, as the European Union's framework becomes effective on June 28, 2021.

In addition, the Federal Reserve Board proposed but has not adopted an "early remediation" framework under which it would implement prescribed restrictions and penalties against the FBO and its U.S. operations, such as restrictions on the ability of the FBO and its U.S. operations to make discretionary compensation payments to certain of its officers and directors, if the FBO and/or its U.S. operations do not meet certain risk-based capital, leverage, liquidity, stress testing or other risk management requirements, and would authorize the termination of U.S. operations under certain circumstances.

As a bank holding company with assets of U.S.$ 250 billion or more, Deutsche Bank AG is required under Title I of the Dodd-Frank Act, as amended, to prepare and submit periodically to the Federal Reserve Board and the Federal Deposit Insurance Corporation ("FDIC") a plan for the orderly resolution of its subsidiaries and operations in the event of future material financial distress or failure (the "U.S. Resolution Plan"). For foreign-based companies subject to these resolution planning requirements such as Deutsche Bank AG, the U.S. Resolution Plan relates only to subsidiaries, branches, agencies and businesses that are domiciled in or whose activities are carried out in whole or in material part in the United States. Deutsche Bank AG filed its most recent U.S. Resolution Plan in July 2018. The U.S. Resolution Plan describes the single point of entry strategy for our U.S. Material Entities, Core Business Lines, Critical Operations and prescribes that DB USA Corporation, our single U.S. IHC as of December 31, 2017, would provide liquidity and capital support to its U.S. Material Entity subsidiaries and ensure their solvent wind-down outside of applicable resolution proceedings. In December 2018, Deutsche Bank AG received regulatory feedback from the Federal Reserve and FDIC, which found that Deutsche Bank's U.S. Resolution Plan had no deficiencies but identified one shortcoming in the plan, associated with governance mechanisms and related escalation triggers. Deutsche Bank submitted a response to its December 2018 feedback letter on April 1, 2019. Deutsche Bank's response discussed its proposed remediation of the shortcoming as well as enhancements of its resolution capabilities. Deutsche Bank is required to make a submission to the Federal Reserve Board and FDIC by July 1, 2020 explaining how it remediated the shortcoming and providing an update on the enhancement of its resolutions capabilities. Following this submission, Deutsche Bank's next targeted U.S. Resolution Plan is due on or before July 1, 2021.

Both DB USA Corporation and DWS USA Corporation were subject to the Federal Reserve Board's Comprehensive Capital Analysis and Review ("CCAR") for 2019. On June 27, 2019, the Federal Reserve Board publicly indicated that it did not object to the 2019 capital plans submitted by DB USA Corporation and DWS USA Corporation. DB USA Corporation and DWS USA Corporation will make their next capital plan submissions to the Federal Reserve Board in April 2020. On March 4, 2020, the Federal Reserve Board issued a rule to amend its CCAR process to combine the CCAR quantitative assessment and the buffer requirements in the Federal Reserve Board's capital rules to create an integrated capital buffer requirement.

In September 2014, the Federal Reserve Board and other U.S. regulators approved a final rule implementing liquidity coverage ratio ("LCR") requirements for large U.S. banking holding companies and certain of their subsidiary depositary institutions that are generally consistent with the Basel Committee's revised Basel 3 liquidity standards. DB USA Corporation and DBTCA became subject to the full LCR requirements on April 1, 2017 and DWS USA Corporation became subject to LCR requirements on a phased-in basis following its formation in April 2018. The Tailoring Rules reduced the LCR requirements applicable to DB USA Corporation, DWS USA Corporation and DBTCA from 100 to 85 percent beginning on January 1, 2020.

On June 1, 2016, the Federal Reserve Board and other U.S. regulators proposed rules implementing the second element of the Basel 3 liquidity framework, the net stable funding ratio ("NSFR"). Under the Tailoring Rules, DB USA Corporation, DWS USA Corporation and DBTCA would be subject to an 85 percent NSFR so long as our IHCs' combined weighted short term wholesale funding remains below $75 billion; however, the NSFR proposal has yet to be finalized and, accordingly, such entities are not currently subject to the proposed requirements.

On December 15, 2016, the Federal Reserve Board adopted final rules that implement a U.S. version of the FSB's TLAC standard in the United States. The final rules require, among other things, the U.S. IHCs of non-U.S. G-SIBs, including DB USA Corporation and DWS USA Corporation, to maintain a minimum TLAC amount, and separately require them to maintain a minimum amount of eligible long-term debt. Under the final rules, the required TLAC amount and the ability or inability of the IHC to count long-term debt issued externally towards the requirements varies depending on the G-SIB's planned resolution strategy. DB USA Corporation and DWS USA Corporation are each considered a "non-resolution covered IHC", which means that they are intended, under the planned resolution strategy of their G-SIB parent (Deutsche Bank AG), to continue to operate outside of resolution proceedings while the G-SIB parent is subject to a bail-in under the applicable European resolution regime. The final rules require a "non-resolution covered IHC" to maintain (i) internal minimum TLAC of at least 16 % of its risk-weighted assets, 6 % of its Basel 3 leverage ratio denominator and 8 % of its average total consolidated assets, and (ii) internal eligible long-term debt of at least 6 % of its risk-weighted assets, 2.5 % of its Basel 3 leverage ratio denominator and 3.5 % of its average total consolidated assets. Eligible long-term debt instruments for non-resolution covered IHCs are required to meet certain criteria, including issuance to a foreign company that controls directly or indirectly the covered IHC or a foreign affiliate (a non-U.S. entity that is wholly owned, directly or indirectly, by the non-U.S. G-SIB) and the inclusion of a contractual trigger allowing for, in limited circumstances, the immediate conversion or exchange of some or all of the instrument into Common Equity Tier 1 instruments upon an order by the Federal Reserve Board. Internal TLAC requirements may be satisfied with a combination of eligible long-term debt instruments and Tier 1 capital. Each of DB USA Corporation and DWS USA Corporation would also face restrictions on its discretionary bonus payments and capital distributions if it fails to maintain a TLAC buffer consisting of Common Equity Tier 1 capital above the minimum TLAC requirement equal to 2.5 % of risk-weighted assets. The final rules also prohibit or limit the ability of DB USA Corporation and DWS USA Corporation to engage in certain types of financial transactions.

Furthermore, the Dodd-Frank Act provides for an extensive framework for the regulation of over-the-counter ("OTC") derivatives, including mandatory clearing, exchange trading and transaction reporting of certain OTC derivatives, as well as rules regarding the registration of, and capital, margin and business conduct standards for, swap dealers, security-based swap dealers, major swap participants and major security-based swap participants. The Commodity Futures Trading Commission ("CFTC") adopted final rules in 2016 that require additional interest rate swaps to be cleared. In November 2018 the CFTC proposed amendments to rules that would significantly expand the types of swaps that must be executed on an approved platform. More recently, in January 2020, also pursuant to the Dodd-Frank Act, the CFTC re-proposed regulations to impose position limits on certain commodities and economically equivalent swaps, futures and options. These proposals have not yet been finalized. In December 2019, the CFTC issued a proposal on the cross-border application of U.S. swap rules, building on the CFTC's cross-border guidance from 2013 and related no-action relief letters. The Securities and Exchange Commission ("SEC") has also finalized rules regarding registration, capital, risk-mitigation techniques, reporting, business conduct standards, trade acknowledgement and verification requirements, and cross-border requirements for security-based swap dealers and major security-based swap participants. These rules will generally come into effect in October 2021, the compliance date for registration of security-based swap dealers and major security-based swap participants. Finally, the U.S. prudential regulators (the Federal Reserve Board, the FDIC, the Office of the Comptroller of the Currency, the Farm Credit Administration and the Federal Housing Finance Agency) have adopted final rules establishing margin requirements for non-cleared swaps and security-based swaps, the CFTC has adopted final rules establishing margin requirements for non-cleared swaps, and the SEC has adopted final rules establishing margin requirements for non-cleared security-based swaps. The final margin rules follow a phased implementation schedule, with certain initial margin and variation margin requirements in effect as of September 2016, additional variation margin requirements in effect as of March 2017, and additional initial margin requirements phased in on an annual basis from September 2017 through September 2020, with the relevant compliance dates depending in each case on the transactional volume of the parties and their affiliates. Compliance with SEC margin requirements will not be required prior to the compliance date for registration of security-based swap dealers in October 2021.

The Dodd-Frank Act, as amended, also established a regulatory framework and enhanced regulation for several other areas, including but not limited to the following. The Dodd-Frank Act established a new regime for the orderly liquidation of failing financial companies through the appointment of the FDIC as receiver that is available only if the U.S. Secretary of the Treasury determines in consultation with the U.S. President that certain criteria are met, including that the failure of the company and its resolution under otherwise applicable federal or state law would have serious adverse effects on U.S. financial stability. In addition, the Dodd-Frank Act requires U.S. regulatory agencies to prescribe regulations with respect to incentive-based compensation at financial institutions in order to prevent inappropriate behavior that could lead to a material financial loss. Other provisions require issuers with securities listed on U.S. stock exchanges, which may include foreign private issuers such as Deutsche Bank, to establish a "clawback" policy to recoup previously awarded executive compensation in the event of an accounting restatement; in May 2016, the SEC re-proposed rules to implement this provision of the Dodd-Frank Act that would cover foreign private issuers, but such rules have not yet been adopted. The Dodd-Frank Act also grants the SEC discretionary rule-making authority to impose a new fiduciary standard on brokers, dealers and investment advisers; pursuant to this authority, on June 5, 2019, the SEC adopted rules and interpretations applicable to the relationships between such entities and their retail customers, which include a transition period until June 30, 2020 for full compliance. The Dodd-Frank Act also expands the extraterritorial jurisdiction of U.S. courts over actions brought by the SEC or the United States with respect to violations of the antifraud provisions of the Securities Act of 1933, the Securities Exchange Act of 1934 and the Investment Advisers Act of 1940.

Implementation of the Dodd-Frank Act and related final regulations will result in additional costs and could limit or restrict the way we conduct our business.

## Regulatory Authorities

We, as well as our wholly owned subsidiary DB USA Corporation are bank holding companies under the U.S. Bank Holding Company Act of 1956, as amended (the "Bank Holding Company Act"), by virtue of, among other things, our and its ownership of DBTCA. As bank holding companies, we and DB USA Corporation have elected to become financial holding companies. As a result, we and our U.S. operations are subject to regulation, supervision and examination by the Federal Reserve Board as our U.S. "umbrella supervisor".

DBTCA is a New York state-chartered bank whose deposits are insured by the FDIC to the extent permitted by law. DBTCA is subject to regulation, supervision and examination by the Federal Reserve Board and the New York State Department of Financial Services and to relevant FDIC regulation. In addition, DBTCA is also subject to regulation by the Consumer Financial Protection Bureau in relation to retail products and services offered to its customers. Deutsche Bank Trust Company Delaware is a Delaware state-chartered bank which is subject to regulation, supervision and examination by the FDIC and the Office of the State Bank Commissioner of Delaware. Deutsche Bank AG's New York branch is supervised by the Federal Reserve Board and the New York State Department of Financial Services. Deutsche Bank's federally chartered nondeposit trust companies are subject to regulation, supervision and examination by the Office of the Comptroller of the Currency. We and our subsidiaries are also subject to regulation, supervision and examination by state banking regulators of certain states in which we and they conduct banking operations.

## Restrictions on Activities

As described below, federal and state banking laws and regulations restrict our ability to engage, directly or indirectly through subsidiaries, in activities in the United States. Among others, we are required to obtain the prior approval of the Federal Reserve Board before directly or indirectly acquiring the ownership or control of more than 5 % of any class of voting shares of U.S. banks, certain other depository institutions, and bank or depository institution holding companies. Under applicable U.S. federal banking law, our U.S. banking operations are also restricted from engaging in certain "tying" arrangements involving products and services.

Our two U.S. FDIC-insured bank subsidiaries, as well as our New York branch, are subject to requirements and restrictions under federal and state law, including requirements to maintain reserves against deposits, restrictions on the types and amounts of loans that may be made and the interest that may be charged thereon, and limitations on the types of investments that may be made and the types of services that may be offered.

In addition to the business of banking, and managing or controlling banks, so long as we are a financial holding company under U.S. law, we may also engage in nonbanking activities in the United States that are financial in nature, or incidental or complementary to such financial activity, including certain securities, merchant banking, insurance and other financial activities, subject to certain limitations on the conduct of such activities and to notice or prior regulatory approval in some cases. As a non-U.S. bank, Deutsche Bank AG and our non-U.S. subsidiaries are generally authorized under U.S. law and regulations to acquire a non-U.S. company engaged in nonfinancial activities as long as that company's U.S. operations do not exceed certain thresholds and certain other conditions are met.

In November 2018, the Federal Reserve Board adopted a revised supervisory rating system for bank holding companies with U.S.$ 100 billion or more in total consolidated assets and for IHCs with U.S.$ 50 billion or more in total consolidated assets, such as DB USA Corporation. The revised system will also generally apply to DWS USA Corporation. Under the revised system, covered companies receive separate ratings from the Federal Reserve Board for (i) capital planning and positions, (ii) liquidity risk management and positions and (iii) governance and controls. Each of these component areas will receive one of the following four ratings: (i) Broadly Meets Expectations, (ii) Conditionally Meets Expectations, (iii) Deficient-1, and (iv) Deficient-2. A covered company must maintain a rating of Broadly Meets Expectations or Conditionally Meets Expectations for each of the three components to be considered "well managed."

In August 2017, the Federal Reserve Board issued proposed guidance intended to enhance the effectiveness of boards of directors and refocus the Federal Reserve Board's supervisory expectations for boards of directors on their core responsibilities, and also to delineate between roles and responsibilities for boards of directors and for senior management. Although the proposed guidance does not directly apply to DB USA Corporation or DWS USA Corporation, the Federal Reserve Board indicated that it expects to issue a separate proposal on governance specific to IHCs.

Our status as a financial holding company, and our resulting ability to engage in a broader range of nonbanking activities, are dependent on Deutsche Bank AG, DB USA Corporation and our two insured U.S. depository institutions qualifying as "well capitalized" and "well managed" under applicable regulations and upon our insured U.S. depository institutions meeting certain requirements under the Community Reinvestment Act. The Federal Reserve Board's and other U.S. regulators' "well capitalized" standards are generally based on specified quantitative thresholds set at levels above the minimum requirements to be considered "adequately capitalized." For our two insured depository institution subsidiaries, DBTCA and Deutsche Bank Trust Company Delaware, the well-capitalized thresholds under the U.S. Basel 3 framework are a Common Equity Tier 1 capital ratio of 6.5 %, a Tier 1 capital ratio of 8 %, a Total capital ratio of 10 %, and a U.S. leverage ratio of 5 %. For bank holding companies, including Deutsche Bank AG and DB USA Corporation, the well-capitalized thresholds are a Tier 1 capital ratio of 6 % and a Total capital ratio of 10 %, both of which in the case of Deutsche Bank AG are calculated for Deutsche Bank AG under its home country standards.

State-chartered banks (such as DBTCA) and state-licensed branches and agencies of foreign banks (such as our New York branch) may not, with certain exceptions that require prior regulatory approval, engage as a principal in any type of activity not permissible for their federally chartered or licensed counterparts. In addition, DBTCA and Deutsche Bank Trust Company Delaware are subject to their respective state banking laws pertaining to legal lending limits and permissible investments and activities. Likewise, the United States federal banking laws also subject state branches and agencies to the single-borrower lending limits that apply to federal branches or agencies, which are substantially similar to the lending limits applicable to national banks. The single-borrower lending limits applicable to branches and agencies are calculated based on the dollar equivalent of the capital of the foreign bank (i.e., Deutsche Bank AG in the case of the New York branch).

The Federal Reserve Board may terminate the activities of any U.S. office of a foreign bank if it determines that the foreign bank is not subject to comprehensive supervision on a consolidated basis in its home country or that there is reasonable cause to believe that such foreign bank or its affiliate has violated the law or engaged in an unsafe or unsound banking practice in the United States or, for a foreign bank that presents a risk to the stability of the United States financial system, the home country of the foreign bank has not adopted, or made demonstrable progress toward adopting, an appropriate system of financial regulation to mitigate such risk.

Also, under the so-called swaps "push-out" provisions of the Dodd-Frank Act, certain structured finance derivatives activities of FDIC-insured banks and U.S. branch offices of foreign banks (including our New York branch) are restricted.

There are various qualitative and quantitative restrictions on the extent to which we and our nonbank subsidiaries can borrow or otherwise obtain credit from our U.S. banking subsidiaries or engage in certain other transactions involving those subsidiaries, including derivative transactions and securities borrowing or lending transactions. In general, these transactions must be on terms that would ordinarily be offered to unaffiliated entities, must be secured by designated amounts of specified collateral and are subject to volume limitations. These restrictions also apply to certain transactions of our New York branch with our U.S. broker-dealers and certain of our other U.S. affiliates.

A major focus of U.S. governmental policy relating to financial institutions is aimed at preventing money laundering and terrorist financing and compliance with economic sanctions in respect of designated countries or activities. Failure of an institution to have policies and procedures and controls in place to prevent, detect and report money laundering and terrorist financing could in some cases have serious legal, financial and reputational consequences for the institution.

## New York Branch

The New York branch of Deutsche Bank AG is licensed by the Superintendent of the New York State Department of Financial Services to conduct a commercial banking business and is required to maintain and pledge eligible high-quality assets with banks in the State of New York (up to a maximum of U.S.$ 100 million of assets pledged so long as the foreign bank remains designated as "well-rated" by the Superintendent of Financial Services). Should we cease to be designated as "well-rated" by the Superintendent of Financial Services, we may need to maintain and pledge substantial additional amounts of eligible assets. The Superintendent of Financial Services may also impose asset maintenance requirements on foreign banks with branch offices in New York. In addition, the Federal Reserve Board is authorized to impose institution-specific asset maintenance requirements under certain conditions, pursuant to the Tailoring Rules. Currently, no such requirements have been imposed upon our New York branch.

The New York State Banking Law authorizes the Superintendent of Financial Services to take possession of the business and property of a New York branch of a foreign bank under certain circumstances, generally involving violation of law, conduct of business in an unsafe manner, impairment of capital, suspension of payment of obligations, or initiation of liquidation proceedings against the foreign bank at its domicile or elsewhere. In liquidating or dealing with a branch's business after taking possession of a branch, only the claims of depositors and other creditors which arose out of transactions with a branch are to be accepted by the Superintendent of Financial Services for payment out of the business and property of the foreign bank in the State of New York or in the U.S. and reflected on the books of the New York branch, without prejudice to the rights of the holders of such claims to be satisfied out of other assets of the foreign bank. After such claims are paid, the Superintendent of Financial Services will turn over the remaining assets, if any, first to the liquidators of other offices of the foreign bank that are being liquidated in the United States and then, if any assets remain, to the foreign bank or its duly appointed liquidator or receiver.

## Deutsche Bank Trust Company Americas

The Federal Deposit Insurance Corporation Improvement Act of 1991 ("FDICIA") provides for extensive regulation of depository institutions (such as DBTCA and its direct and indirect parent companies), including requiring federal banking regulators to take "prompt corrective action" with respect to FDIC-insured banks that do not meet minimum capital requirements. As an insured bank's capital level declines and the bank falls into lower categories (or if it is placed in a lower category by the discretionary action of its supervisor), greater limits are placed on its activities and federal banking regulators are authorized (and, in many cases, required) to take increasingly more stringent supervisory actions, which could ultimately include the appointment of a conservator or receiver for the bank (even if it is solvent). In addition, FDICIA generally prohibits an FDIC-insured bank from making any capital distribution (including payment of a dividend) or payment of a management fee to its holding company if the bank would thereafter be undercapitalized. If an insured bank becomes "undercapitalized," it is required to submit to federal regulators a capital restoration plan guaranteed by the bank's holding company. Since the enactment of FDICIA, both of our U.S. insured banks have maintained capital above the "well capitalized" standards, the highest capital category under applicable regulations.

DBTCA, like other FDIC-insured banks, is required to pay assessments to the FDIC for deposit insurance under the FDIC's Deposit Insurance Fund (calculated using the FDIC's risk-based assessment system). The minimum reserve ratio for the Deposit Insurance Fund was increased under the Dodd-Frank Act from 1.15 % to 1.35 %, which was reached as of September 30, 2018 following the imposition from July 1, 2016 through that date of a surcharge on the quarterly assessments of large insured depository institutions, including DBTCA. In addition, the FDIC has set the designated reserve ratio at 2 % as a long-term goal. The FDIC's standard maximum deposit insurance amount per customer at an insured depository institution is U.S.$ 250,000.

## Other

In the United States, our U.S.-registered broker-dealers are regulated by the SEC. Broker-dealers are subject to regulations that cover all aspects of the securities business, including sales methods, trade practices among broker-dealers, use and safekeeping of customers' funds and securities, capital structure, recordkeeping, the financing of customers' purchases and the conduct of directors, officers and employees.

Our principal U.S. SEC-registered broker-dealer subsidiary, Deutsche Bank Securities Inc., is a member of the New York Stock Exchange (and other securities exchanges) and is regulated by the Financial Industry Regulatory Authority, Inc. ("FINRA") and the individual state securities authorities in the states in which it operates. The U.S. government agencies and self-regulatory organizations, as well as state securities authorities in the United States having jurisdiction over our U.S. broker-dealer affiliates, are empowered to conduct administrative proceedings that can result in censure, fine, the issuance of cease-and-desist orders or the suspension or expulsion of a broker-dealer or its directors, officers or employees. Deutsche Bank Securities Inc. is also registered with and regulated by the SEC as an investment adviser, and by the CFTC and the National Futures Association as a futures commission merchant and commodity pool operator.

Under the Dodd-Frank Act, with certain exceptions, our entities that are swap dealers, security-based swap dealers, major swap participants or major security-based swap participants are registered or will be required to register with the SEC or CFTC, or both. Currently, Deutsche Bank AG is provisionally registered as a swap dealer. At a future date, we will be required to register one or more subsidiaries as security-based swap dealers with the SEC and may be required to register additional subsidiaries as swap dealers with the CFTC and certain subsidiaries as CFTC-regulated major swap participants and/or SEC-regulated major security-based swap participants. Registration, including provisional registration, as swap dealers, security-based swap dealers, major swap participants or major security-based swap participants subjects us to requirements as to capital, margin, business conduct and recordkeeping, among other requirements.

# PAGES 78-108 OMITTED PURSUANT TO D. N.J. ECF POLICIES AND PROCEDURES

# PART II

# Item 13: Defaults, Dividend Arrearages and Delinquencies

Not applicable.

# Item 14: Material Modifications to the Rights of Security Holders and Use of Proceeds

The Bank has outstanding several issuances of notes qualifying as Additional Tier 1 capital – sometimes referred to as capital securities –, some of which are governed by German law and issued in transactions exempt from registration under the U.S. Securities Act of 1933 and some of which are governed by New York law (except for the provisions thereof relating to ranking and status, which are governed by German law) and issued in transactions registered under the U.S. Securities Act of 1933. The terms of these notes restrict us from making interest payments on them in certain circumstances when the distributions that are simultaneously planned or made or that have been made by us on our other Tier 1 Instruments during the relevant financial year would exceed our "Available Distributable Items". The term "Available Distributed Items" is defined by reference to the term "distributable items" set forth in the CRR (Regulation (EU) No 575/2013 of the European Parliament and the Council of June 26, 2013 on prudential requirements for credit institutions and investment firms). The CRR was amended by EU Regulation 2019/876 effective June 27, 2019, including to amend the definition of "distributable items" so that it includes capital reserves, and so that distribution restrictions pursuant to Sections 253 (6) and 268 (8) of the German Commercial Code (HGB) do not apply. As a result, the amount of Available Distributable Items – and thus the circumstances under which we would be permitted to make interest payments on the notes – was significantly increased. The amendment to the CRR was automatically effective as to the German law-governed notes and became effective with respect to the then-outstanding and subsequently issued New York law-governed notes pursuant to an amendment to the indenture under which they were issued.

# Item 15: Controls and Procedures

## Disclosure Controls and Procedures

An evaluation was carried out under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934) as of December 31, 2019. There are, as described below, inherent limitations to the effectiveness of any control system, including disclosure controls and procedures. Accordingly, even effective disclosure controls and procedures can provide only reasonable assurance of achieving their control objectives. Based upon such evaluation, our Chief Executive Officer and Chief Financial Officer concluded that the design and operation of our disclosure controls and procedures were effective as of December 31, 2019.

# Management's Annual Report on Internal Control over Financial Reporting

Management of Deutsche Bank Aktiengesellschaft, together with its consolidated subsidiaries, is responsible for establishing and maintaining adequate internal control over financial reporting. Our internal control over financial reporting is a process designed under the supervision of our principal executive officer and our principal financial officer to provide reasonable assurance regarding the reliability of financial reporting and the preparation of the firm's financial statements for external reporting purposes in accordance with International Financial Reporting Standards (IFRS) as issued by the International Accounting Standards Board (IASB) and endorsed by the European Union (EU). As of December 31, 2019, management conducted an assessment of the effectiveness of our internal control over financial reporting based on the framework established in Internal Control – Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on the assessment performed, management has determined that our internal control over financial reporting as of December 31, 2019 was effective based on the COSO framework (2013).

KPMG AG Wirtschaftsprüfungsgesellschaft, the registered public accounting firm that audited the financial statements included in this document, has issued a report on our internal control over financial reporting, which is set forth below.

# Report of Independent Registered Public Accounting Firm

To the Shareholders and Supervisory Board
Deutsche Bank Aktiengesellschaft:

## Opinion on Internal Control over Financial Reporting

We have audited Deutsche Bank Aktiengesellschaft and subsidiaries' (the Company) internal control over financial reporting as of December 31, 2019, based on criteria established in Internal Control – Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission. In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2019, based on criteria established in Internal Control – Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated balance sheets of the Company as of December 31, 2019 and 2018, the related consolidated statements of income, comprehensive income, changes in equity, and cash flows for each of the years in the three-year period ended December 31, 2019, and the related notes, and the specific disclosures described in Note 1 to the consolidated financial statements as being part of the financial statements (collectively, the consolidated financial statements) and our report dated March 13, 2020 expressed an unqualified opinion on those consolidated financial statements.

## Basis for Opinion

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying 'Management's Annual Report on Internal Control over Financial Reporting'. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audit also included performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

## Definition and Limitations of Internal Control over Financial Reporting

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Frankfurt am Main, Germany
March 13, 2020

KPMG AG
Wirtschaftsprüfungsgesellschaft

# Change in Internal Control over Financial Reporting

There was no change in our internal control over financial reporting identified in connection with the evaluation referred to above that occurred during the year ended December 31, 2019 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

A control system, no matter how well conceived and operated, can provide only reasonable, not absolute, assurance that the objectives of the control system are met. As such, disclosure controls and procedures or systems for internal control over financial reporting may not prevent all error and all fraud. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, within the company have been detected. These inherent limitations include the realities that judgments in decision-making can be faulty, and that breakdowns can occur because of simple error or mistake. Additionally, controls can be circumvented by the individual acts of some persons, by collusion of two or more people, or by management override of the control. The design of any system of controls also is based in part upon certain assumptions about the likelihood of future events, and any design may not succeed in achieving its stated goals under all potential future conditions; over time, control may become inadequate because of changes in conditions, or the degree of compliance with the policies or procedures may deteriorate. Because of the inherent limitations in a cost-effective control system, misstatements due to error or fraud may occur and not be detected.

# Item 16A: Audit Committee Financial Expert

Please see "Corporate Governance Statement/Corporate Governance Report: Auditing and Controlling: Audit Committee Financial Expert" in the Annual Report 2019.

# Item 16B: Code of Ethics

Please see "Corporate Governance Statement/Corporate Governance Report: Values and Leadership Principles of Deutsche Bank AG and Deutsche Bank Group: Deutsche Bank Group Code of Conduct and Code of Ethics for Senior Financial Officers" in the Annual Report 2019.

# Item 16C: Principal accountant fees and services

Please see "Management Report: Corporate Governance Statement/Corporate Governance Report: Auditing and Controlling: Principal Accountant Fees and Services" in the Annual Report 2019.

# Item 16D: Exemptions from the Listing Standards for Audit Committees

Our common shares are listed on the New York Stock Exchange, the corporate governance rules of which require a foreign private issuer such as us to have an audit committee that satisfies the requirements of Rule 10A-3 under the U.S. Securities Exchange Act of 1934. These requirements include a requirement that the audit committee be composed of members that are "independent" of the issuer, as defined in the Rule, subject to certain exemptions, including an exemption for employees who are not executive officers of the issuer if the employees are elected or named to the board of directors or audit committee pursuant to the issuer's governing law or documents, an employee collective bargaining or similar agreement or other home country legal or listing requirements. The German Co-Determination Act of 1976 (Mitbestimmungsgesetz) requires that the shareholders elect half of the members of the supervisory board of large German companies, such as us, and that employees in Germany elect the other half. Employee-elected members are typically themselves employees or representatives of labor unions representing employees. Pursuant to law and practice, committees of the Supervisory Board are typically composed of both shareholder- and employee-elected members. Of the current members of our Audit Committee, four – Henriette Mark, Gabriele Platscher, Detlef Polaschek and Bernd Rose – are current employees of Deutsche Bank who have been elected as Supervisory Board members by the employees. None of them is an executive officer. Accordingly, their service on the Audit Committee is permissible pursuant to the exemption from the independence requirements provided for by paragraph (b)(1)(iv)(C) of the Rule. We do not believe the reliance on such exemption would materially adversely affect the ability of the Audit Committee to act independently and to satisfy the other requirements of the Rule.

# Item 16E: Purchases of Equity Securities by the Issuer and Affiliated Purchasers

In 2019, we repurchased a total of 23,300,001 shares of which none via derivatives, for group purposes pursuant to share buybacks authorized by the General Meeting. During the period from January 1, 2019 until the 2019 Annual General Meeting on May 23, 2019, we repurchased 15,000,000 shares, of which none via derivatives, of our ordinary shares pursuant to the authorization granted by the Annual General Meeting on May 24, 2018, at an average price of € 7.54 and for a total consideration of € 113 million. This authorization was replaced by a new authorization to buy back shares approved by the Annual General Meeting on May 23, 2019. Under the new authorization, up to 206,677,313 shares may be repurchased through April 30, 2024. Of these, 103,338,656 shares may be purchased by using derivatives. During the period from the 2019 Annual General Meeting until December 31, 2019, we repurchased 8,300,001 shares at an average price of € 7.06 and for a total consideration of € 59 million (excluding option premia). At December 31, 2019, the number of shares held in Treasury from buybacks totaled one share. This figure stems from one thousand shares at the beginning of the year, plus 23.3 million shares from buybacks in 2019, less 23.3 million shares which were used to fulfill delivery obligations in the course of share-based compensation of employees. We did not cancel any shares in 2019.

In addition to these share buybacks for group purposes, pursuant to a shareholder authorization approved at our 2019 Annual General Meeting, we are authorized to buy and sell, for the purpose of securities trading, our ordinary shares through April 30, 2024, provided that number of shares held for this purpose may not at any time exceed 10 % of the company's share capital. The shares may be bought through the stock exchange or by means of a public purchase offer to all shareholders. The gross volume of these securities trading transactions is often large, and even the net amount of such repurchases or sales may, in a given month, be large, though over longer periods of time such transactions tend to offset and are in any event constrained by the 10 % of share capital limit. These securities trading transactions consist predominantly of transactions on major non-US securities exchanges. We also enter into derivative contracts with respect to our shares and limited to shares in a maximum volume of 5 % of the actual share capital.

The following table sets forth, for each month in 2019 and for the year as a whole, the total gross number of our shares repurchased by us and our affiliated purchasers (pursuant to both activities described above), the total gross number of shares sold, the net number of shares purchased or sold, the average price paid per share (based on the gross shares repurchased), the number of shares that were purchased for group purposes mentioned above and the maximum number of shares that at that date remained eligible for purchase under such programs.

Issuer Purchases of Equity Securities in 2019

| Month | Total number of shares purchased | Total number of shares sold | Net number of shares purchased or (sold) | Average price paid per share (in €) | Number of shares purchased for group purposes | Maximum number of shares that may yet be purchased under plans or programs |
|---|---|---|---|---|---|---|
| January | 51,805,171 | 36,836,461 | 14,968,710 | 7.55 | 15,000,000 | 197,336,313 |
| February | 7,126,211 | 11,817,012 | (4,690,801) | 7.68 | 0 | 182,336,313 |
| March | 8,723,282 | 16,705,604 | (7,982,322) | 7.85 | 0 | 182,336,313 |
| April | 5,283,842 | 6,933,222 | (1,649,380) | 7.51 | 0 | 182,336,313 |
| May | 47,272,668 | 47,394,099 | (121,431) | 6.58 | 0 | 182,336,313 |
| June | 11,098,662 | 11,134,252 | (35,590) | 6.19 | 0 | 206,677,313 |
| July | 23,064,523 | 14,855,637 | 8,208,886 | 7.01 | 8,300,000 | 206,677,313 |
| August | 334,928 | 97,425 | 237,503 | 6.34 | 0 | 198,377,313 |
| September | 5,851,562 | 14,956,067 | (9,104,505) | 7.14 | 0 | 198,377,313 |
| October | 29,303,436 | 29,279,026 | 24,410 | 6.62 | 0 | 198,377,313 |
| November | 1,769,790 | 2,102,846 | (333,056) | 6.75 | 0 | 198,377,313 |
| December | 2,032,080 | 2,227,291 | (195,211) | 6.75 | 1 | 198,377,313 |
| Total 2019 | 193,666,155 | 194,338,942 | (672,787) | 7.02 | 23,300,001 | 198,377,312 |

At December 31, 2019, the number of shares held by us in treasury totaled 671,357. This figure stems from 1,344,144 shares at the beginning of the year, plus 672,787 net shares sold in 2019. At December 31, 2019, our issued share capital consisted of 2,066,773,131 ordinary shares, of which 2,066,101,774 were outstanding.

# Item 16F: Change in Registrant's Certifying Accountant

Our long-time external auditor, KPMG AG Wirtschaftsprüfungsgesellschaft ("KPMG"), has acted as our auditor for the 2019 financial year covered by this Annual Report on Form 20-F and the consolidated financial statements contained herein.

New European and national regulations, however, require a rotation of the external auditor at regular intervals. The Bank's tender process for a new external auditor was announced in February 2018. An extensive and rigorous evaluation process held over seven months was run independently by the Audit Committee of the Bank's Supervisory Board. As a result of this required rotation, the Bank did not request KPMG to submit a tender proposal to stand for re-election as auditor.

The Bank's Supervisory Board decided to recommend the appointment of Ernst & Young GmbH Wirtschaftsprüfungs-gesellschaft ("EY") as external auditor. This recommendation was approved by the Bank's shareholders at the 2019 Annual General Meeting on May 23, 2019.

The new external auditor will review the presentation of the Group's financial results for the first quarter of 2020 and will be recommended at the 2020 Annual General Meeting as external auditor for the full financial year 2020.

The current audit engagement of KPMG will terminate as of March 24, 2020.

Neither of KPMG's reports on the Group's consolidated financial statements for the two preceding fiscal years – 2018 and 2019 – contained an adverse opinion or a disclaimer of an opinion, or was qualified or modified as to uncertainty, audit scope, or accounting principles, except that KPMG's reports on the consolidated financial statements of the Group, which reports appear in the 2018 and 2019 Annual Reports on Form 20-F, contained separate paragraphs stating that the Group changed its method of accounting for financial instruments in 2018 due to the adoption of International Financial Reporting Standard 9, Financial Instruments.

During the two most recent fiscal years – 2018 and 2019 – and through the date of filing of this Annual Report on Form 20-F, there has not been any disagreement between the Bank and KPMG on any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedure, which disagreement, if not resolved to the satisfaction of KPMG, would have caused KPMG to make reference to the subject matter of the disagreement in connection with its report, nor have there been any "reportable events" as that term is defined in Item 16F(a)(1)(v) of Form 20-F.

During the two most recent fiscal years – 2018 and 2019 – and through the date of filing of this Annual Report on Form 20-F, neither the Bank nor anyone on its behalf has consulted EY regarding either the application of accounting principles to a specific transaction, either completed or proposed; or the type of audit opinion that might be rendered on the Group's consolidated financial statements, and either a written report was provided to the Bank or oral advice was provided that the new external auditor concluded was an important factor considered by the Bank in reaching a decision as to the accounting, auditing or financial reporting issue, or regarding any matter that was either the subject of a disagreement (as defined in Item 16F(a)(1)(iv)) or a reportable event (as defined in Item 16F(a)(1)(v)).

As required by Item 16F, the Bank has provided KPMG with a copy of the foregoing disclosures and requested KPMG to furnish the Bank with a letter addressed to the Securities and Exchange Commission stating whether KPMG agrees with the statements made by the Bank in response to this Item 16F and, if not, stating the respects in which it does not agree. The letter from KPMG, dated March 20, 2020, in which KPMG states that it agrees with the statements made by the Bank in response to this Item 16F, is provided as Exhibit 15.2 of this Annual Report on Form 20-F.

# Item 16G: Corporate Governance

Our common shares are listed on the New York Stock Exchange, as well as on all seven German stock exchanges. Set forth below is a description of the significant ways in which our corporate governance practices differ from those applicable to US domestic companies under the New York Stock Exchange's listing standards as set forth in its Listed Company Manual (the "NYSE Manual").

**The Legal Framework.** Corporate governance principles for German stock corporations (Aktiengesellschaften) are set forth in the German Stock Corporation Act (Aktiengesetz), the German Co-Determination Act of 1976 (Mitbestimmungsgesetz) and the German Corporate Governance Code (Deutscher Corporate Governance Kodex, referred to as the Code).

**The Two-Tier Board System of a German Stock Corporation.** The German Stock Corporation Act provides for a clear separation of management and oversight functions. It therefore requires German stock corporations to have both a supervisory board (Aufsichtsrat) and a management board (Vorstand). These boards are separate; no individual may be a member of both. Both the members of the management board and the members of the supervisory board must exercise the standard of care of a diligent business person to the company. In complying with this standard of care they are required to take into account a broad range of considerations, including the interests of the company and those of its shareholders, employees and creditors.

The management board is responsible for managing the company and representing the company in its dealings with third parties. The management board is also required to ensure appropriate risk management within the corporation and to establish an internal monitoring system. The members of the management board, including its chairperson or speaker, are regarded as peers and share a collective responsibility for all management decisions.

The supervisory board appoints and removes the members of the management board. It also may appoint a chairman (CEO) and one or more deputy chairmen ("Presidents") of the management board. Although it is not permitted to make management decisions, the supervisory board has comprehensive monitoring functions with respect to the activities of the management board, including advising the management board and participating in decisions of fundamental importance to the company. To ensure that these monitoring functions are carried out properly, the management board must, among other things, regularly report to the supervisory board with regard to current business operations and business planning, including any deviation of actual developments from concrete and material targets previously presented to the supervisory board. The supervisory board may also request special reports from the management board at any time. Transactions of fundamental importance to the company, such as major strategic decisions or other actions that may have a fundamental impact on the company's assets and liabilities, financial condition or results of operations, may be subject to the consent of the supervisory board. Pursuant to our Articles of Association (Satzung), such transactions include the granting of powers of attorney without limitation to the affairs of a specific office, major acquisitions or disposals of real estate or other participations and granting of loans, including the acquisition of participations in other companies if the German Banking Act (Kreditwesengesetz) requires approval by the Supervisory Board.

Pursuant to the German Co-Determination Act, our Supervisory Board consists of representatives elected by the shareholders and representatives elected by the employees in Germany. Based on the total number of Deutsche Bank employees in Germany these employees have the right to elect one-half of the total of twenty Supervisory Board members. The chairperson of the Supervisory Board of Deutsche Bank is a shareholder representative who has the deciding vote in the event of a tie.

This two-tier board system contrasts with the unitary board of directors envisaged by the relevant laws of all US states and the New York Stock Exchange listing standards for US companies.

German companies which have their shares listed on a stock exchange must report each year on the company's corporate governance in their annual report to shareholders.

**The Recommendations of the Code.** The Code was issued in 2002 by a commission composed of German corporate governance experts appointed by the German Federal Ministry of Justice in 2001. The Code was last amended in [February] 2020 It describes and summarizes the basic mandatory statutory corporate governance principles found in the provisions of German law. In addition, it contains supplemental recommendations and suggestions for standards on responsible corporate governance intended to reflect generally accepted best practice.

The Code is structured from a task perspective and addresses seven core areas of corporate governance. These are the tasks of (a) management and supervision, (b) appointment of candidates to the management board, (c) composition of the supervisory board, (d) supervisory board procedures, (e) conflicts of interest, (f) transparency and external reporting as well as (g) the remuneration for the members of the management board and the supervisory board. The Code contains three types of provisions. First, the Code contains principles which reflect material legal requirements for responsible governance, and are used in the Code to inform investors and other stakeholders. The second type of provisions is recommendations. While these are not legally binding, Section 161 of the German Stock Corporation Act requires that any German exchange-listed company declare annually that the company complies with the recommendations of the Code or, if not, which recommendations the company does not comply with ("comply or explain"). The third type of Code provisions comprises suggestions which companies may choose not to comply with without disclosure. The Code contains a significant number of such suggestions, covering almost all of the core areas of corporate governance it addresses.

In their last Declaration of Conformity of October 30, 2019, the Management Board and the Supervisory Board of Deutsche Bank stated that, since the last Declaration of Conformity issued on October 25, 2018, they have acted and will act in the future in conformity with the recommendations of the Code, with certain specified exceptions. The Declaration of Conformity is available on Deutsche Bank's internet website at www.db.com/ir/en/documents.htm.

**Supervisory Board Committees.** The supervisory board may form committees. The German Co-Determination Act requires that the supervisory board form a mediation committee to propose candidates for the management board in the event that the two-thirds majority of the members of the supervisory board needed to appoint members of the management board is not met.

The German Stock Corporation Act specifically mentions the possibility to establish an "audit committee" to deal with the supervision of accounting processes, the efficiency of the internal control system the risk management system and the internal revision system as well as with the annual auditing, in particular with the selection and the independence of the external auditor and the additional services rendered by the external auditor. The Code recommends establishing such an "audit committee". The Code also recommends establishing a "nomination committee" comprised only of shareholder-elected supervisory board members to prepare the supervisory board's proposals for the election or appointment of new shareholder representatives to the supervisory board. In general the Code recommends that the supervisory board shall form – depending on the specific circumstances of the enterprise and the number of supervisory board members – committees of members with relevant specialist expertise which can handle subjects, such as corporate strategy, compensation of the members of the management board, investments and financing. Under the German Stock Corporation Act, any supervisory board committee must regularly report to the supervisory board. Sections 25d (7) to (12) of the German Banking Act require, depending on size and complexity of the respective credit institution, the establishment of supervisory board committees with specific tasks to be performed as follows: risk committee, audit committee, nomination committee (with different tasks and composition requirements than under the Code) and compensation control committee.

The Supervisory Board of Deutsche Bank has established a Chairman's Committee (Präsidialausschuss) which is inter alia responsible for conclusion, amendment and termination of employment and pension contracts in consideration of the plenary Supervisory Board's sole authority to decide on the remuneration of the members of the Management Board, a Nomination Committee (Nominierungsausschuss), an Audit Committee (Prüfungsausschuss), a Risk Committee (Risikoausschuss), an Integrity Committee (Integritätsausschuss), a Compensation Control Committee (Vergütungskontrollausschuss), a Strategy Committee (Strategieausschuss), a Technology, Data and Innovation Committee (Technologie-, Daten- und Innovationsausschuss) and a Mediation Committee (Vermittlungsausschuss). The functions of a nominating/corporate governance committee and of a compensation committee required by the NYSE Manual for US companies listed on the NYSE are therefore performed by the Supervisory Board or one of its committees, in particular the Chairman's Committee, the Compensation Control Committee and the Mediation Committee.

**Independent Board Members.** The NYSE Manual requires that a majority of the members of the board of directors of a NYSE listed US company and each member of its nominating/corporate governance, compensation and audit committees be "independent" according to strict criteria and that the board of directors determines that such member has no material direct or indirect relationship with the company.

As a foreign private issuer, Deutsche Bank is not subject to these requirements. However, its audit committee must meet the more lenient independence requirement of Rule 10A-3 under the Securities Exchange Act of 1934. German corporate law does not require an affirmative independence determination, meaning that the Supervisory Board need not make affirmative findings that audit committee members are independent. However, the Code contains several rules, recommendations and suggestions to ensure the supervisory board's independent advice to, and supervision of, the management board. As noted above, no member of the management board may serve on the supervisory board (and vice versa). Supervisory board members will not be bound by directions or instructions from third parties. Any advisory, service or similar contract between a member of the supervisory board and the company is subject to the supervisory board's approval. A similar requirement applies to loans granted by the company to a supervisory board member or other persons, such as certain members of a supervisory board member's family. In addition, the German Stock Corporation Act prohibits a person who within the last two years was a member of the management board from becoming a member of the supervisory board of the same company unless he or she is elected upon the proposal of shareholders holding more than 25 % of the voting rights of the company.

The Code also recommends that each member of the supervisory board inform the supervisory board of any conflicts of interest. In the case of material conflicts of interest or ongoing conflicts, the Code recommends that the mandate of the Supervisory Board member be removed by the shareholders' meeting. The Code further recommends that any conflicts of interest that have occurred be reported by the supervisory board at the annual general meeting, together with the action taken, and that potential conflicts of interest also be taken into account in the nomination process for the election of supervisory board members.

**Audit Committee Procedures.** Pursuant to the NYSE Manual the audit committee of a US company listed on the NYSE must have a written charter addressing its purpose, an annual performance evaluation, and the review of an auditor's report describing internal quality control issues and procedures and all relationships between the auditor and the company. The Audit Committee of Deutsche Bank operates under written terms of reference and reviews the efficiency of its activities regularly.

**Disclosure of Corporate Governance Guidelines.** Deutsche Bank discloses its Articles of Association, the Terms of Reference of its Management Board, its Supervisory Board, the Chairman's Committee, the Audit Committee, the Risk Committee, the Integrity Committee, the Compensation Control Committee, the Nomination Committee, the Strategy Committee and the Technology, Data and Innovation Committee, its Declaration of Conformity under the Code pursuant to Section 161 of the German Stock Corporation Act and other documents pertaining to its corporate governance on its internet website at www.db.com/ir/en/documents.htm.

# Item 16H: Mine Safety Disclosure

Not applicable.

Disclosures Under Iran Threat Reduction and Syria Human Rights Act of 2012

# Disclosures Under Iran Threat Reduction and Syria Human Rights Act of 2012

Under Section 219 of the Iran Threat Reduction and Syria Human Rights Act of 2012, which added Section 13(r) of the US Securities Exchange Act of 1934, as amended, an issuer of securities registered under the Securities Exchange Act of 1934 is required to disclose in its periodic reports filed under the Securities Exchange Act of 1934 certain of its activities and those of its affiliates relating to Iran and to other persons sanctioned by the US under programs relating to terrorism and proliferation of weapons of mass destruction that occurred during the period covered by the report. We describe below a number of potentially disclosable activities of Deutsche Bank AG and its affiliates. Disclosure is generally required regardless of whether the activities, transactions or dealings were conducted in compliance with applicable law. Deutsche Bank also reports transactions in which other Iranian persons or entities listed on OFAC sanctions lists were involved, whether or not they are directly or indirectly owned or controlled by the Iranian government.

**Legacy Contractual Obligations Related to Guarantees and Letters of Credit.** Prior to 2007, we provided guarantees to a number of Iranian entities. In almost all of these cases, we issued counter-indemnities in support of guarantees issued by Iranian banks because the Iranian beneficiaries of the guarantees required that they be backed directly by Iranian banks. In 2007, we made a decision to discontinue issuing new guarantees to Iranian or Iran-related beneficiaries. Although the pre-existing guarantees stipulate that they must be either extended or honored if we receive such a demand and we are legally not able to terminate these guarantees, we decided to reject any "extend or pay" demands under such guarantees. Even though we had exited, where possible, many of these guarantees, guarantees with an aggregate face amount of approximately € 7.0 million are still outstanding as of year-end 2019. The gross revenues from this business in 2019 which we received from non-Iranian parties were approximately € 21,000 and the net profit we derived from these activities was less than this amount.

We also have outstanding legacy guarantees in relation to a Syrian bank sanctioned by the US under its non-proliferation program. The aggregate face amount of these legacy guarantees was approximately € 9.8 million as of December 31, 2019, the gross revenues received from non-Syrian parties for these guarantees were approximately € 69,000 in 2018 and the net profit we derived from these activities was less than this amount. We intend to exit these guarantee arrangements.

**Payments Executed.** Deutsche Bank continuous to severely restrict its policy on Iran and consequently the execution of such payments.

**Incoming Payments.** In 2019, we received 10 payments adding up to approximately € 2.0 million in favor of non-Iranian clients of which the majority were channeled through Iranian intermediary banks. Revenues for these incoming payments were less than € 100. These figures include relevant transactions for Iranian Embassy-related offices not included in the section on Iranian Consulates and Embassies below and in favor of our non-Iranian clients.

**Outgoing Payments.** In 2019, we executed 1 payment with an amount of € 100, in favor of an Iranian Embassy-related office not included in the section on Iranian Consulates and Embassies below. Revenues for this outgoing payment were less than € 10.

**Operations of Iranian Bank Branches and Subsidiaries in Germany.** Several Iranian banks, including Bank Melli Iran, Bank Saderat, Bank Sepah, and Europäisch-Iranische Handelsbank, have branches or offices in Germany, even though their funds and other economic resources had been frozen earlier under European law. As part of the payment clearing system in Germany and other European countries, when these branches or offices needed to make payments in Germany or Europe to cover their day-to-day operations such as rent, taxes, insurance premia and salaries for their remaining staff, or for any other kind of banking-related operations, fund transfers from these Iranian banks had been accepted through Target2.

In 2019, we executed approximately € 4.2 million in (almost only in-coming) transfers through Target2 across approximately 900 transactions and credited the relevant amounts to our non-Iranian clients. The gross revenues derived from these payments were approximately € 4,500.

We do not consider the execution of such transactions to be significant and we expect that we will continue to execute such transactions in the future.

Disclosures Under Iran Threat Reduction and Syria Human Rights Act of 2012

**Maintaining of Accounts for Iranian Consulates and Embassies.** In 2019, Iranian embassies and consulates in Germany held accounts with us. The purpose of these accounts is the funding of day-to-day operational costs of the embassies and consulates, such as salaries, rent and electricity. In 2019, the total volume of outgoing payments from these accounts was approximately € 9.6 million which have been funded through € 9.1 million of incoming payments. From these activities, we derived gross revenues of approximately € 25,000 and net profits which were less than this amount. The German government has requested that we provide these services to enable the government of Iran to conduct its diplomatic relations and we intend to continue such maintenance.

**Activities of Entities in Which We Have Interests.** Section 13(r) requires us to provide the specified disclosure with respect to ourselves and our "affiliates," as defined in Exchange Act Rule 12b-2. Although we have minority equity interests in certain entities that could arguably result in these entities being deemed "affiliates," we do not have the authority or the legal ability to acquire in every instance the information from these entities that would be necessary to determine whether they are engaged in any disclosable activities under Section 13(r). In some cases, legally independent entities are not permitted to disclose the details of their activities to us because of German privacy and data protection laws or the applicable banking laws and regulations. In such cases, voluntary disclosure of such details could violate such legal and/or regulatory requirements and subject the relevant entities to criminal prosecution or regulatory investigations.

# PART III

# Item 17: Financial Statements

Not applicable.

# Item 18: Financial Statements

The Financial Statements of this Annual Report on Form 20-F consist of the Consolidated Financial Statements including Notes 1 to 44 thereto, which are set forth as Part 2 of the Annual Report 2019, and, as described in Note 1 "Significant Accounting Policies and Critical Accounting Estimates" thereto in the third paragraph under "Basis of Accounting", certain parts of the Management Report set forth as Part 1 of the Annual Report 2019. Such Consolidated Financial Statements have been audited by KPMG AG Wirtschaftsprüfungsgesellschaft, as described in their "Report of Independent Registered Public Accounting Firm" included in the Annual Report 2019.

# Item 19: Exhibits

We have filed the following documents as exhibits to this document.

| Exhibit number | Description of Exhibit |
|---|---|
| 1.1 | English translation of the Articles of Association of Deutsche Bank AG, furnished as Exhibit 3.2 to our Report on Form 6-K dated December 1, 2017 and incorporated by reference herein. |
| 2.1 | The total amount of long-term debt securities of us or our subsidiaries authorized under any instrument does not exceed 10 percent of the total assets of our Group on a consolidated basis. We hereby agree to furnish to the Commission, upon its request, a copy of any instrument defining the rights of holders of long-term debt of us or of our subsidiaries for which consolidated or unconsolidated financial statements are required to be filed. |
| 2.2 | Descriptions of securities registered under the Securities Exchange Act of 1934. |
| 4.1 | Equity Plan Rules 2016, furnished as Exhibit 4.6 to our 2015 Annual Report on Form 20-F and incorporated by reference herein. |
| 4.2 | Equity Plan Rules 2017, furnished as Exhibit 4.6 to our 2016 Annual Report on Form 20-F and incorporated by reference herein. |
| 4.3 | Equity Plan Rules 2018, furnished as Exhibit 4.6 to our Registration Statement on Form S-8 No. 333-223301 and incorporated by reference herein. |
| 4.4 | Equity Plan Rules 2019, furnished as Exhibit 4.5 to our 2018 Annual Report on Form 20-F and incorporated by reference herein. |
| 4.5 | Equity Plan Rules 2020. |
| 4.6 | Key Retention Plan Equity Plan Rules 2017, furnished as Exhibit 4.7 to our 2016 Annual Report on Form 20-F and incorporated by reference herein. |
| 4.7 | Restricted Share Plan Rules 2018, furnished as Exhibit 4.8 to our Registration Statement on Form S-8 No. 333-223301 and incorporated by reference herein. |
| 4.8 | Restricted Share Plan Rules 2019, furnished as Exhibit 4.8 to our 2018 Annual Report on Form 20-F and incorporated by reference herein. |
| 4.9 | Restricted Share Plan Rules 2020. |
| 8.1 | List of Subsidiaries. |
| 12.1 | Principal Executive Officer Certifications Required by 17 C.F.R. 240.13a-14(a). |
| 12.2 | Principal Financial Officer Certifications Required by 17 C.F.R. 240.13a-14(a). |
| 13.1 | Chief Executive Officer Certification Required by 18 U.S.C. Section 1350. |
| 13.2 | Chief Financial Officer Certification Required by 18 U.S.C. Section 1350. |
| 14.1 | Legal Opinion regarding confidentiality of related party customers. |
| 15.1 | Consent of KPMG AG Wirtschaftsprüfungsgesellschaft. |
| 15.2 | Letter, dated March 20, 2020, from KPMG AG Wirtschaftsprüfungsgesellschaft to the Securities and Exchange Commission. |
| 101.1 | Interactive Data File. |

# Signatures

The registrant hereby certifies that it meets all of the requirements for filing on Form 20-F and has duly caused and authorized the undersigned to sign this annual report on its behalf.

Date: March 20, 2020

Deutsche Bank Aktiengesellschaft

/s/        CHRISTIAN SEWING

Christian Sewing
Chairman of the Management Board
Chief Executive Officer

/s/        JAMES VON MOLTKE

James von Moltke
Member of the Management Board
Chief Financial Officer

# ANNUAL REPORT AND EXHIBITS ANNEXED TO 2019 FORM 20-F OMITTED PURSUANT TO D. N.J. ECF POLICIES AND PROCEDURES