M5GHKarO

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    ALI KARIMI, et al.,

4                  Plaintiffs,

5              v.                        22 Civ. 2854 (JSR)

6    DEUTSCHE BANK
     AKTIENGESELLSCHAFT, et al.,
7                                        Oral Argument

8                  Defendants.

9    ------------------------------x
                                         New York, N.Y.
10                                       May 16, 2022
                                         12:35 p.m.
11
     Before:
12
                         HON. JED S. RAKOFF,
13
                                         District Judge
14
                         APPEARANCES
15
     POMERANTZ LLP
16        Attorneys for Plaintiffs
     BY:  JEREMY A. LIEBERMAN
17        DOLGORA DORZHIEVA
          EMMA GILMORE
18        VILLI A. SHTEYN

19   CAHILL GORDON & REINDEL LLP
          Attorneys for Defendants
20   BY:  DAVID JANUSZWEWSKI
          ISABELLA ABELITE
21        SESI V. GARIMELLA

22

23

24

25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M5GHKarO

```
 1          (Case called)

 2          THE COURT:  Good afternoon.

 3          All right.  We're here for argument on the motion to

 4    dismiss, which had been fully briefed before this case was

 5    transferred from New Jersey to this court, so I don't think I

 6    need extensive argument.  So I'm going to limit each side to 15

 7    minutes in their initial statement and five minutes in their

 8    rebuttal and surrebuttal.  Counsel should speak from the

 9    rostrum where you can take off your mask.  It makes it easier

10    to understand what you have to say.

11          So let's hear first from moving counsel.

12          MR. JANUSZEWSKI:  Thank you, your Honor.  David

13    Januszewski from Cahill for the defendants, representing all

14    the defendants.

15          As you know, your Honor, this is a purported class

16    action brought under Section 10(b) of the Securities Exchange

17    Act of 1934.  As you noted, it was transferred from the

18    District of New Jersey.  We had also moved to dismiss, and the

19    Court did not address that part of the motion.

20          With respect to the motion that's before you, we

21    assert two alternative grounds for dismissal.  First, the

22    plaintiff fails to allege an actionable misstatement or

23    omission with respect to any of the statements that they cite;

24    and, secondly, the plaintiff fails to accurately allege

25    scienter.  Of course, the heightened pleading requirements of
```

M5GHKarO

1   9(b) in the PSLRA apply to the claims here.  Either of those

2   two grounds is sufficient for dismissal.  We submit that both

3   apply.

4          So let me first address the first, which is that they

5   failed to allege an actionable misstatement or omission.  The

6   statements that the plaintiffs rely on for their

7   misrepresentation claims are aspirational in nature.  They

8   stated Deutsche Bank's beliefs concerning the effectiveness of

9   internal controls; anti-money laundering; and know your client,

10  KYC, procedures; and the bank's continuing efforts over the

11  years to improve those processes which had faced challenges

12  over the years, as everyone knows.

13         These statements were not guarantees.  They expressed

14  the bank's intentions, the bank's opinions as to where they

15  stood, and under the case law, these qualify as puffery.  I

16  don't particularly like that word, but that's what the cases

17  call it.  But, basically, the statements are too general in

18  nature for any reasonable investor to have relied on them.  We

19  rely on -- as you noted, your Honor, we have --

20         THE COURT:  Well, some of the statements may fit your

21  description, but a lot of the statements are reasonably

22  specific and factual, it seems to me.  For example, there's

23  statements that the bank's "KYC procedures start with intensive

24  checks," that its KYC program "includes strict identification

25  requirements," etc.  These, the complaint says, are untrue

M5GHKarO

1   based on the information from the confidential witnesses.

2          MR. JANUSZEWSKI:  Yes, your Honor, but we submit they

3   have to be taken in context with all the other statements that

4   accompanied them in the bank's filings, SEC filings, and the

5   other information that was available to the public which made

6   clear that the bank was having trouble with those procedures

7   and was working to improve them and faced challenges with

8   respect to personnel and other issues.

9          THE COURT:  Let me see if I understand.  So you're

10  saying that even if those statements are untrue, a reasonable

11  investor would know they were untrue either because of other

12  statements made by the bank or other statements available to

13  the public generally.  For the second prong of that, what's

14  your authority?

15         MR. JANUSZEWSKI:  In terms of the public?

16         THE COURT:  Yes.  In other words, to take a more

17  extreme example, if a company came out with a statement to its

18  investors that last year we made $10 million, and there was an

19  article in the *Wall Street Journal*, in my hypothetical, saying

20  we doubt that they made $10 million because the bank's been in

21  a lot of problems.  You're saying that would render the false

22  statement nonactionable?

23         MR. JANUSZEWSKI:  Well, I think that's a different

24  case, but in this case, the bank had had issues with KYC

25  procedures and anti-money laundering issues in the past.  There

M5GHKarO

1    was a settlement with British authorities before the class

2    period that laid it all out; that they had these challenges and

3    the steps they were taking to improve them.  And consistently

4    the bank said in its disclosures we're challenged by this.

5    We're not where we need to be or want to be, and we're doing

6    the best we can.  I'm oversimplifying the statements, but we

7    cite them in our brief.  And those accompanied all the

8    statements that they are relying on.

9              THE COURT:  OK.

10             MR. JANUSZEWSKI:  The point I want to emphasize,

11   really -- and as you know, Judge Torres granted a motion to

12   dismiss in another case, which obviously doesn't bind you, but

13   we think she got it right, and the Second Circuit, albeit in a

14   summary order, affirmed.  She pointed out there were a number

15   of problems with the different statements.  Some of them were

16   not alleged to be false, some were aspirational, and some of

17   them related to, really, allegations of corporate

18   mismanagement.

19             I think that last one is critical here because there

20   are allegations of senior management overruling junior people.

21   You mentioned the confidential witnesses.  They're relatively

22   junior people who believe that there were red flags that senior

23   people overruled or came out differently.  That's a

24   mismanagement claim.  That's an allegation that -- for example,

25   Mr. Cryan is alleged to have been involved in a property

M5GHKarO

1    transaction with a Russian, and somebody said it was a red

2    flag, and he intervened to approve it.  That's an allegation

3    that Mr. Cryan, in hindsight, made a bad decision, and that's a

4    breach of fiduciary duty claim in a derivative case.  That's

5    not a securities fraud claim.  In fact, your Honor, there is a

6    derivative claim.

7        THE COURT:  Yes.  So, for example, statements that in

8    a rough way are similar to the kinds of situations that Judge

9    Torres included would be at paragraph 139, "Major achievements

10   in 2016 included . . . Substantial investment in our control

11   functions, including the ongoing implementation of a more

12   comprehensive Know-Your-Client process and an off-boarding

13   process for higher risk clients."  And also, "We are exiting

14   client relationships where we consider risks to be too high

15   while also strengthening our client onboarding and

16   Know-Your-Client procedures."

17       Now, if those statements on their face might not

18   qualify, but the allegation in this case, as I understand it,

19   according to the confidential witnesses, is that higher level

20   executives purposely undercut those efforts.  And when the

21   bank, through its lower level people tried to implement the

22   very procedures referred to in those statements, they were

23   overruled by higher level executives who wanted to keep

24   ultrarich clients.  That, I think, makes it a totally different

25   kind of situation, yes?

M5GHKarO

1          MR. JANUSZEWSKI:  Well, your Honor, with respect to

2     the confidential witnesses, we address some of them in the

3     briefing, but we don't think that they are tied to any reliable

4     information tying them to the --

5          THE COURT:  That may be a question for later on in the

6     case, but I don't see why that is something I can -- if I can

7     ever assess their credibility, how can I assess it on a motion

8     to dismiss against a complaint?

9          MR. JANUSZEWSKI:  Well, for example, Confidential

10    Witness-1 cites this transaction with Mr. Cryan intervening to

11    approve a property sale.  Confidential Witness-1 left the bank

12    three years before that's alleged to have happened.  We think,

13    on the face of the allegations --

14         THE COURT:  So you're saying that there would be a

15    hearsay problem there?

16         MR. JANUSZEWSKI:  Well, there's no basis for the

17    witness to have any knowledge about it.  He wasn't at the bank.

18         THE COURT:  All right.

19         MR. JANUSZEWSKI:  Similar --

20         THE COURT:  Go ahead.

21         MR. JANUSZEWSKI:  I was going to say similarly, if you

22    go through the particular witnesses, and we can jump ahead to

23    scienter, but if you go through the factual allegations of the

24    confidential witnesses, they're just too junior to tie anything

25    to the individual defendants in this case.

M5GHKarO

1           THE COURT:  The class period is from March 14, 2017,

2      to May 2020, and CW-1 was a compliance officer at the bank to

3      around mid-2015.  So how can you say CW-1 couldn't have

4      personal knowledge?

5           MR. JANUSZEWSKI:  Well, I was referring to that

6      specific transaction which is alleged to have happened in

7      April 2018.

8           THE COURT:  Well, so then CW-2 worked at the bank as

9      the assistant to the head of any financial crime to June 2019.

10     CW-3 worked for the bank as a vice president to January 2020.

11     CW-4 worked as a vice president to January 2020, etc.  Of

12     course, we have altogether 11 CWs here.

13          MR. JANUSZEWSKI:  Right.  But it's quality, not

14     quantity when it comes to confidential witnesses, and when you

15     walk through --

16          THE COURT:  Well, I agree with you it's quality, not

17     quantity, but what that means on a motion to dismiss is that

18     any statement made in the complaint attributable to a CW must

19     be taken, for purposes of a motion to dismiss, as true, yes?

20          MR. JANUSZEWSKI:  Yes.  But you also have to look to

21     see if there is a basis to attribute the allegations to the

22     individual defendants, particularly with respect to scienter.

23     These people are saying -- I'm not saying that they didn't work

24     at the bank and didn't perform these functions, but to

25     summarize, most of them are saying there were flags raised, and

M5GHKarO

1   transactions went through anyway.  There's no allegations tying

2   the decision-making -- tying those allegations to the

3   decision-making at the top, which would be necessary to --

4          THE COURT:  All right.  I've, unfortunately for you,

5   interrupted you too often.  I'll give you five more minutes to

6   complete whatever you wanted to say.

7          MR. JANUSZEWSKI:  OK.  Thank you, your Honor.

8          I did want to just turn briefly to scienter, then.  I

9   know your Honor is, obviously, on top of all the case law as to

10  what's required and the heightened requirements under the

11  PSLRA.  There's no suggestion of motive here.  There's no

12  personal interest.  Nobody bought stock or sold stock.  The

13  allegation is basically they were trying to get more business

14  for the bank, and the case law is very clear that that's

15  insufficient to establish scienter.  In their brief, they --

16         THE COURT:  But I think -- and I apologize for

17  interrupting you once more -- but, again, as I understand the

18  theory, the scienter is that, at least as to the two CEOs, that

19  they signed off on these statements knowing or willfully

20  disregarding evidence that they were false.  So what more do

21  you need for scienter?

22         MR. JANUSZEWSKI:  Well, yes, your Honor, I was

23  addressing the motive element, which I don't think is --

24         THE COURT:  Last I checked, forgive me, motive is not

25  a required part of what the plaintiff has to show.

M5GHKarO

1          MR. JANUSZEWSKI:  That's right.  That's right.  I just

2     was addressing their argument which --

3          THE COURT:  I see.

4          MR. JANUSZEWSKI:  -- they tie it -- they come back and

5     say that these two CEOs had relationships with Russia and

6     wanted to develop business.  Those are prior CEOs before the

7     class period.

8          THE COURT:  I agree that their motives at this stage,

9     unless they are falling back on motive versus an opportunity,

10    that kind of stuff, it's otherwise irrelevant.

11         MR. JANUSZEWSKI:  But with respect to conscious

12    disregard or recklessness, which is really what they're basing

13    it on, again, the allegations, if taken as true by the

14    confidential witnesses, only show that certain people in the

15    chain raised these issues.  There's nothing placing any of the

16    individual defendants in the room or any other people whose

17    knowledge would be attributable to the bank because they were

18    senior enough.  Again, they are alleging bad decision-making.

19    In hindsight, maybe a transaction with a Russian over this

20    property shouldn't have been approved.  Maybe they shouldn't

21    have approved Mr. Epstein as a client.  Maybe they should have

22    looked at him more carefully.  That's the subject of the

23    settlement with the DFS.  Those are all claims that senior

24    management made bad decisions, and there's a derivative case

25    across the street against Deutsche Bank that goes through all

M5GHKarO

1   these same things and alleges breach of fiduciary duty.  And we

2   submit that the allegations here are the same as that and that

3   there's no basis for a securities fraud allegation.

4            THE COURT:  All right.  Thank you very much.

5            Let me hear from plaintiffs' counsel.  You can take

6   off your mask, yes.

7            MR. LIEBERMAN:  Thank you, your Honor.  Good

8   afternoon.

9            A threshold issue raised by defendants is materiality,

10  whether or not these statements made by defendants throughout

11  the class period could -- in any situation could be a

12  materially false and misleading statement, i.e., in defendants'

13  words, these are inherently puffery statements, they're

14  inherently aspirational, and they can never give rise to a

15  securities fraud claim.  That is defendants' theory.  There is

16  just a litany of case law contradicting that very faulty

17  notion.

18           It was very important.  This was briefed, as this

19  Court is well aware, in the District Court of New Jersey, and

20  this was the Third Circuit.  And just 18 months ago you had the

21  *Jaroslawicz* case that analyzed statements very similar to this

22  and actually far less specific than the statements alleged in

23  this case.  And in that *Jaroslawicz* case, you have statements

24  regarding conservative underwriting standards, lending

25  philosophy which emphasizes a prompt identification and follow

M5GHKarO

1   up of problem loan, and conservative approach to problem loans

2   recognition.  These are the types of statements.

3          And the defendants, as they want to do, argue that

4   these statements were inherently aspirational, and no investor

5   could duly rely on them.  And the Third Circuit said –- and the

6   issue there was the practice of putting in –- offering free

7   checking to customers and then putting them into accounts,

8   unbeknownst to them, that ultimately charged them fees, etc.

9   The Third Circuit very clearly said these statements do give

10  rise to –- are both false and misleading and give rise to a

11  duty to speak fully about your compliance issues and about your

12  due diligence efforts.  That's the Third Circuit.

13         Interestingly, in the brief, in defendants' brief,

14  there is no reference –- we raise *Jaroslawicz* significantly.

15  It's prominent in our brief.  There's no reference whatsoever

16  to *Jaroslawicz* in defendants' reply brief, and we think that

17  omission is telling.

18         THE COURT:  Just as I am not governed by Judge Torres'

19  decision, I am also not governed by the Third Circuit's

20  decision.  It is true that I grew up in Philadelphia, but I

21  escaped.

22         MR. LIEBERMAN:  OK.  Well, congratulations on the

23  escape, your Honor.

24         But then more importantly are the *Goldman Sachs* cases.

25  As this Court is well aware, and everyone is well aware, the

M5GHKarO

1    Goldman Sachs saga has been going on in the courts, Supreme

2    Court, Second Circuit, with for well over a decade.  And there

3    you have statements like "we have extensive procedures and

4    controls that are designed to identify and address conflict of

5    interest," "reputation is of one of our most important assets,"

6    "integrity and honesty are at the heart of our business," and

7    that went to the Second Circuit.  And the argument was, both on

8    a motion to dismiss and class certification, obviously, was

9    that these statements are inherently aspirational and can never

10   give rise to a claim by materiality or can never cause price

11   impact.

12        And in all the decisions, the Second Circuit held that

13   it -- one could not reasonably believe that an investor would

14   not think that a company's violation of law -- of protocols

15   relating to conflicts of interest, particularly when it's such

16   a large transaction like the CDO transaction in that case, was

17   immaterial.  And the Second Circuit -- the debate was whether

18   or not there could be price impact.

19        THE COURT:  But let me shift gears because we have

20   limited time.

21        What is the evidence of scienter on the part of the

22   CFOs?

23        MR. LIEBERMAN:  On the CFO himself, it would be

24   just -- I don't think we have a specific allegation to the CFO.

25   And the scienter theory there is that as someone who made

M5GHKarO

1    multiple statements and signed off on protocols relating to the

2    company's KYC processes, relating to the company's AML

3    processes, those statements -- he had a duty to inspect on

4    those statements, and it is illogical to assume he did not know

5    about the audits that raise the three significant violations

6    into the KYC and AML issues.  So, therefore, he had a duty to

7    inspect.  There are multiple audits alleged during the class

8    period that talk about problems with respect to KYC and the

9    AML, violations onboarding clients, wire stripping in a way to

10   evade sanctions.

11          THE COURT:  First of all, I think, correct me if I'm

12   wrong, we're talking about two defendants here: Mr. Shank, who

13   is CFO until June 30, 2017, and Mr. Von Moltke, who was his

14   successor.  They were not -- well, I don't see, maybe I missed

15   it in the complaint, any description of why they would know the

16   falsity of any of the particular statements on which you rely.

17   Now, they're just sort of thrown in there.

18          MR. LIEBERMAN:  No, they're not just thrown in there,

19   your Honor.

20          THE COURT:  Well, then point me to where they are not

21   thrown in.

22          MR. LIEBERMAN:  Fair enough.  It's based on their

23   duties.  Paragraph 17 and 18, based on their duties within the

24   company, they served on the management board of Deutsche Bank,

25   paragraph 17, Marcus Schenk; and Moltke became CFO from

M5GHKarO

1    July 2017.  And the theory that somehow the CFO would be

2    unaware of the multiple audits showing failures in KYC and AML

3    processes, showing a pass rate of zero, when we have specific

4    allegations --

5              THE COURT:  I'm sorry.  Seventeen and 18 don't say

6    anything along what you're saying now.

7              MR. LIEBERMAN:  OK.  Then turning to paragraph 20,

8    discusses the duties of the management board, and they work

9    closely with the bank's group audit on internal controls,

10   checking and reviewing AML procedures including

11   Know-Your-Customer processes.

12             So it is correct that we don't allege a specific

13   connection between -- that a specific report went to Schenk or

14   went to Von Moltke, but they did work closely with the bank's

15   group audit on internal controls.  And we allege with

16   specificity that the audits finding all the issues that we

17   discussed in the complaint went up to as high as the head of

18   audit, and then the management board discussed these audits.

19   So that's alleged in the complaint.

20             So being that they served on the management board,

21   they would have been aware, then, of these faulty audits.  We

22   allege that Sewing himself was aware of the Reuters' report and

23   the audits in the Reuters' report noting AML deficiencies.  The

24   theory that someone how Sewing would be alerted to these

25   findings in their internal audits but not the CFO himself when

M5GHKarO

1    he's signing off on the company's internal controls, we think

2    is a faulty theory.

3            But if your Honor's making the point that we don't

4    allege specifically that the report was emailed to these two

5    executives, that is correct, we don't allege that.  It's by

6    inference of their positions in the company and by inference of

7    the specific statements they make about AML and KYC procedures

8    that they would have known (a) of the fault of the numerous

9    audits alleging AML and KYC violations.  And then that would

10   trigger a duty to inspect, and they'd find out, hey, what type

11   of clients do we have in our company here?  And they're

12   servicing Epstein, and they're servicing --

13           THE COURT:  Yes, but I don't even see those arguments

14   set forth in your complaint, maybe I missed it, as to these two

15   defendants.  Remember, of course, you have to plead scienter to

16   the high degree required by the PSLRA.  So this is far from

17   being just a question of inference from other statements made

18   in your complaint.  So if you want to point me to something

19   else, I'll let you mull on that till your rebuttal.

20           MR. LIEBERMAN:  Fair enough.

21           THE COURT:  You've got some --

22           MR. LIEBERMAN:  Dedicated staff.

23           THE COURT:  A whole team of heavy workers.

24           MR. LIEBERMAN:  Poring through the complaint, your

25   Honor.

M5GHKarO

1          THE COURT:  Anything else you wanted to say?

2          MR. LIEBERMAN:  Yes.  Clearly, we think the *Goldman*

3    *Sachs* cases, *Jaroslawicz* case, your Honor's own opinion in the

4    *Petrobras* case discuss these very issues.  And particularly in

5    the *Petrobras* case, it was in the context of prior misdeeds,

6    and it was also of denials made by the company, and those

7    elevated --

8          THE COURT:  I barely remember that case, but I know

9    what you're saying.

10         MR. LIEBERMAN:  I seem to be forgetting about it as

11   well, your Honor, as time goes on.  But those elevated those

12   statements from mere aspirational in context into something

13   much more, much more material.  And as your Honor pointed out,

14   we have numerous specific tailored statements by Deutsche Bank

15   as to their KYC and AML procedures.  There's just -- we can

16   enumerate a few: effective procedures, comprehensive

17   compliance, regular reviews, a rating system, protocols

18   throughout the entire company.  These are very specific.  They

19   pay special attention to high-risk clients, particularly with

20   PEPs, politically exposed persons.  There are dozens of

21   statements very tailored, very specific with respect to the

22   company's compliance.

23         So, your Honor, if your Honor doesn't have any more

24   questions, then I'll save for rebuttal and see what my team

25   comes up with.

M5GHKarO

1          THE COURT:  Thanks very much.  Let's hear rebuttal

2     first from defense counsel.

3          MR. JANUSZEWSKI:  Your Honor, just a few quick points.

4     We don't think they allege anything against the two CFOs with

5     respect to scienter.  In our brief we go through each

6     individual defendant and show how light the allegations are.

7          But similarly, with respect to Mr. Cryan, the CEO, and

8     Mr. Sewing, who is now the CEO, the allegations are just that

9     they had these positions.  They were on the management board.

10     They were the CEO.  The only specific allegation, which is not

11     what you usually see, which is, you know, Mr. So-and-so got

12     this report which put him on notice of the falsity of the

13     statement.  There's nothing like that.

14          The allegation again Mr. Cryan, again, is that he

15     intervened.  He was in the room when some decisions were made

16     to reject or overrule concerns raised by the lower folks.  But

17     there's no allegation as to why he made that decision.  There's

18     no allegation that he did not believe the statements that were

19     out there concerning the company's controls were accurate, and

20     the fact that he may have approved a transaction that in

21     hindsight is subject to criticism by the plaintiffs because it

22     involved a Russian or involved Mr. Epstein, again, is just --

23          THE COURT:  I think the question of scienter is also

24     an open question with respect to the CEOs, but there are at

25     least some specific allegations made there which I didn't see

M5GHKarO

1    in the case of the CFOs.  That may not be enough, but there is

2    that distinction.

3           MR. JANUSZEWSKI:  Well, we submit it's not enough for

4    the reasons that I described.  They do not tie the confidential

5    witnesses to the CEOs in any way.  There's no allegation that

6    they received discussion of the concerns that were raised

7    below.  And the fact that they made a decision to do business

8    with somebody is not a securities fraud claim.

9           THE COURT:  All right.

10          MR. JANUSZEWSKI:  Just lastly, if we're citing your

11   authorities, I would look to *Moshell v. Sasol* from 2020, which

12   is more recent.

13          THE COURT:  Thank you.

14          All right.  Let me hear finally from plaintiffs'

15   counsel.

16          MR. LIEBERMAN:  Your Honor, on the question of the

17   CFO, we turn your attention to paragraphs 49 and 50.

18          THE COURT:  Hang on.

19          All right.  So 49 reads:  "CW1 explained that at

20   Deutsche Bank, as a general rule, the more notorious a person

21   becomes, the higher up the corporate ladder any decision-making

22   process will be taken.  According to CW1, in the case of really

23   notorious Russian oligarchs, and the like, the onboarding and

24   retainer of such clients only happen with the approval of the

25   highest level authorities: the CEO, the COO, and Deutsche

M5GHKarO

1   Bank's board.  Epstein, in particular, was discussed at

2   Deutsche Bank's board level.  To understand this phenomena, it

3   bears providing some context, particularly into Deutsche Bank's

4   relationship with Russia."

5        I don't see any reference there to the two CFO

6   defendants.  In fact, one might argue that by specifically

7   mentioning the CEO, the COO, inferentially the complaint is

8   excluding the CFO.

9        MR. LIEBERMAN:  I understand, your Honor, but

10  paragraph 18 says that --

11       THE COURT:  I'm sorry, paragraph 18?

12       MR. LIEBERMAN:  Paragraph 17, excuse me, says that

13  Marcus Schenk became a member of Deutsche Bank's management

14  board on May 21, 2015, and was appointed president as of

15  March 5, 2017.  And then paragraph 18 says Von Moltke was a

16  member of Deutsche Bank's management board on July 1, 2017.

17       THE COURT:  Well, that's true, but it's also true that

18  you haven't named as defendants every member of the management

19  board.  And here you expressly make mention of the CEO, who is

20  part of the management board, and you don't make mention of the

21  CFO, which suggests, by at least possible negative inference, a

22  lack of any specific information with respect to what the CFOs

23  heard in their management board meetings, assuming they even

24  attended all the meetings.

25       MR. LIEBERMAN:  Your Honor, it's correct to say that

M5GHKarO

1    the allegations with respect to the CFOs are based upon their

2    membership on the board and the board's approval -- the

3    ultimate approval of the onboarding of the oligarchs referenced

4    in our complaint, in addition to the onboarding of Jeffrey

5    Epstein where we say the board specifically approved it, and

6    also their knowledge that the CFO would be in a position to be

7    knowledgeable regarding the specific audit reports that raised

8    numerous deficiencies in the AML and KYC procedures.  That is

9    the crux of the allegations with respect to the CFOs.

10            THE COURT:  All right.

11            MR. LIEBERMAN:  And I think your Honor has noted we

12   have numerous allegations with respect to, whether it be

13   Ackermann or the other CEOs, onboarding and agreeing to onboard

14   PEPs --

15            THE COURT:  No, certainly, whether they're sufficient

16   or not is not a matter I'm dealing with today.  But as a

17   factual matter, there's no doubt that the complaint makes

18   direct reference to statements made by or made to or decisions

19   made by the CEOs with a considerable frequency in a way that's

20   not true with the CFOs.

21            MR. LIEBERMAN:  And I would only remind your Honor of

22   your Honor's decision in the *Silvercorp* case where this Court

23   held that there could be liability, corporate scienter, and all

24   you needed to allege was that the --

25            THE COURT:  But that was like 20 years ago.  I was

M5GHKarO

1    just a baby judge at the time.

2              MR. LIEBERMAN:  It was 2014, your Honor.  The decision

3    was very learned and worthy of everyone's review, and that

4    decision held that it's enough to allege that the scienter of

5    an executive whose behavior could be imputed to the company,

6    whether or not he issues a statement alleged in the complaint,

7    that's sufficient.

8              THE COURT:  All right.  I thank both counsel very

9    much.  I think, because this case was originally filed in 2020

10   but has been delayed through no fault of anyone, we need to get

11   you a decision promptly.  So I will get you a bottom-line

12   decision by the end of May and a full opinion by the end of

13   June.

14             After I issue the bottom-line decision, then if the

15   case has been completely dismissed, judgment will wait till I

16   issue my final order.  If the case has been not completely

17   dismissed or not dismissed at all, we'll then need to have you

18   jointly call chambers right after the bottom-line order issues

19   so we can set a case management plan because we can then go

20   forward with a plan for discovery.  So that will be the

21   schedule going forward.

22             Anything else anyone needs to raise with the Court?

23             MR. LIEBERMAN:  Nothing for plaintiffs, your Honor.

24             MR. JANUSZEWSKI:  Not for defendants, your Honor.

25   Thank you.

M5GHKarO

1              THE COURT:  Very good.  Thanks so much.

2              MR. LIEBERMAN:  Thank you.

3              (Adjourned)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25