UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW JERSEYYORK

| | |
|---|---|
| ALI KARIMI, Individually and On Behalf of All Others Similarly Situated,<br><br>                                    Plaintiff,<br><br>          v.<br><br>DEUTSCHE BANK AKTIENGESELLSCHAFT, JOHN CRYAN, AND CHRISTIAN SEWING, MARCUS SCHENCK, AND JAMES VON MOLTKE,<br><br>                                    Defendants. | Case No. 22-cv-2854 (JSR)2:20-cv-08978-ES-MAH<br><br><br>SECOND THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><br>JURY TRIAL DEMANDED |

Lead Plaintiff Yun Wang ("Lead Plaintiff") and Named Plaintiff Ali Karimi ("Named Plaintiff"), collectively referred to as "Plaintiffs," individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Deutsche Bank Aktiengesellschaft ("Deutsche Bank AG," "Deutsche Bank," or the "Bank"), analysts' reports and advisories about the Bank, and information readily obtainable on the Internet.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants who purchased or otherwise acquired Deutsche Bank AG securities between March 14, 2017, and ~~May 12~~September 18, 2020, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Bank and certain of its top officials.

2.      Deutsche Bank has been the subject of repeated scandals, investigations and regulatory enforcements for years because of its anti-money laundering ("AML") compliance failures and deficiencies in its disclosure controls and procedures, causing it to have one of the lowest gradings offered by the U.S. Federal Reserve.  Despite claiming to have "learned" from its missteps, to the chagrin of investors, Deutsche Bank's misconduct continues, encouraged by the failure to hold accountable those at the top.

3.      As many publications have repeatedly acknowledged, it is rare for companies settling allegations of misconduct to name the individuals responsible for those misdeeds—a practice that perpetuates the myth that such acts were inadvertently committed by a faceless institution and were not the consequences of decisions made by individuals in position of power. When those individual wrongdoers bear no discernible consequences, the result is an astonishing rate of recidivism, despite at nauseum promises that bad behavior won't happen again. Neither Deutsche Bank nor its top commanders have learned from past misconduct.  At Deutsch Bank, history keeps repeating itself.

4.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Bank's Know Your Customer ("KYC") processes, a critical part of the Bank's AML procedures.  For example, Defendants repeatedly assured investors that Deutsche Bank has "developed effective procedures for assessing clients (Know Your Customer or KYC) and a process for accepting new clients in order to facilitate comprehensive compliance," and insisted that "[o]ur KYC procedures start with intensive checks before accepting a client and continue in the form of regular reviews."  Defendants similarly claimed that its "robust and strict" KYC program "includes strict identification requirements, name screening procedures and the ongoing monitoring and regular review of all existing business relationships," with "[s]pecial safeguards . . . implemented for . . . politically exposed persons . . . "

5.      In truth, however, far from implementing a "robust and strict" KYC program with "special safeguards" for politically exposed persons ("PEPs")[1], Defendants repeatedly exempted high-net-worth individuals (including people sponsoring terrorism) and PEPs from any meaningful due diligence, enabling their criminal activities through the use of the Bank's facilities.  One particularly egregious example of this misconduct was Deutsche Bank's preferential treatment of notorious child sex abuser Jeffrey Epstein, who the Bank internally designated an "Honorary" PEP because of the millions in fees and referrals he was generating for the Bank.  Unscrupulously, even after it learned that "40 underage girls had come forward with testimony of Epstein sexually assaulting them," Deutsche Bank's Reputational Risk Committee agreed to keep Epstein as a client and was "comfortable with . . . continu[ing] business as usual" with Epstein, "not[ing] a number of sizable deals recently."  During the course of his relationship with Deutsche Bank, Epstein and

---

[1] Deutsche Bank is the entity with knowledge of which individuals it classified as PEPs. Indeed, it specifically discusses PEPs on its website and in public filings. *See e.g.* ¶¶ 144, 159, 163, and 174.

his related entities withdrew huge amounts of money and wired millions of dollars to his victims for the stated purpose of covering hotel expenses, tuition and rent, and made payments to individuals known to be his co-conspirators.

6.      Deutsche Bank's relentless pursuit of profits has been its modus operandi for years, commencing with its former CEOs onboarding, retaining and servicing Russian oligarchs[2] and other unsavory high-net-worth individuals and their affiliated companies.

7.      When the truth about Deutsche Bank's improper KYC practices emerged, Deutsche Bank's stock price plunged, wiping out hundreds of millions of dollars in market capitalization and injuring hundreds of thousands of investors.

## JURISDICTION AND VENUE

8.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

10.      Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b), as the alleged misstatements entered and the subsequent damages took place in this Judicial District.  Pursuant to Deutsche Bank's most recent annual report on Form 20-F, as of December 31, 2019, there were 2,066,101,774 of the Bank's ordinary shares outstanding.  Deutsche Bank's ordinary shares trade on the New York Stock Exchange ("NYSE").  Accordingly, there are presumably hundreds, if not thousands, of investors

---

[2] "Oligarch" means an individual known for his/her wealth and political influence, including but not limited to the names identified in Exhibit A attached hereto.

in Deutsche Bank's ordinary shares located within the U.S., some of whom undoubtedly reside in the State of New ~~Jersey~~ York ("New ~~Jersey~~York").  Additionally, upon information and belief, Deutsche Bank and/or an affiliate or subsidiary of the Bank maintained an office at 60 Wall Street, New York, NY 10005~~Harborside Financial Center Platform, Jersey City, New Jersey, 07311~~ during the Class Period.  In addition, upon information and belief, Deutsche Bank and/or an affiliate or subsidiary of the Bank had multiple offices throughout New ~~Jersey~~ York during the Class Period.

11.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

12.     Lead Plaintiff, as set forth in her Certification previously filed with the Court (*see* Dkt. No. 18-3 at *10–*11), acquired Deutsche Bank securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

13.     Named Plaintiff, as set forth in his Certification previously filed with the Court (*see* Dkt. No. 1 at *34-*36), acquired Deutsche Bank securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures

14.     Defendant Deutsche Bank is organized under the laws of the Federal Republic of Germany, with principal executive offices located at Taunusanlage 12, 60325 Frankfurt am Main, Germany.  The Bank's ordinary shares trade in an efficient market on the NYSE under the ticker symbol "DB."

15.     Defendant John Cryan ("Cryan") served as Deutsche Bank's Chairman of the Management Board and Chief Executive Officer ("CEO") from July 2015 until April 8, 2018.

During his tenure, among other things he was responsible for Deutsche Bank's Group Audit and also took on responsibility for the Bank's business in the Americas as of March 16, 2017.

16.    Defendant Christian Sewing ("Sewing") has served as Deutsche Bank's CEO since April 8, 2018.  Sewing became a member of the Bank's Management Board on January 1, 2015 and was appointed President as of March 5, 2017.  Since January 2016, he had been the Head of Private, Wealth & Commercial Clients.  Effective September 1, 2017, he was appointed Co-Head of Private & Commercial Bank.  As a member of the Management Board, he was responsible for Legal, Incident Management Group and Group Audit.  Before assuming his role on the Management Board, Sewing was Global Head of Group Audit (from June 2013 until February 2015) and held a number of positions before that in Risk, including Deputy Chief Risk Officer (from 2012 to 2013) and Chief Credit Officer (from 2010 to 2012) of Deutsche Bank.

17.    Defendant Marcus Schenck ("Schenck") joined Deutsche Bank in January 2015. Schenck became a member of Deutsche Bank's Management Board on May 21, 2015 and was appointed President as of March 5, 2017.  Until June 30, 2017, he was Deutsche Bank's Chief Financial Officer ("CFO").

18.    Defendant James von Moltke ("Moltke") became a member of Deutsche Bank's Management Board on July 1, 2017.  He has been Deutsche Bank's CFO from July 2017 to present.

19.17.  Defendants listed in paragraphs 15 to 168 above are referred to herein as the "Individual Defendants."

20.18.  During the relevant time, Deutsche Bank's Management Board was responsible for managing the Bank, with its principal responsibilities including financial accounting and reporting, risk management, and corporate control.  During the Class Period, Deutsche Bank's AML controls, including KYC procedures, were overseen by the Management Board.  Deutsche Bank's

Management Board worked closely with the Bank's Group Audit on internal controls, checking and reviewing AML procedures, including "know your customer" processes.

21.19.  The Individual Defendants possessed the power and authority to control the contents of Deutsche Bank's SEC filings, press releases, statements posted on the Bank's official website, and other market communications.  The Individual Defendants were also provided with copies of Deutsche Bank's statements alleged herein to be misleading before or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Deutsche Bank, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

22.20.  Deutsche Bank and the Individual Defendants are collectively referred to herein as "Defendants."

### THE CONFIDENTIAL WITNESSES

23.21.  Confidential witness ("CW") CW1 was a Compliance Officer at Deutsche Bank from around mid-2007 to around mid-2015.  In that position, among other matters s/he was involved in identifying suspicious transactions, including money laundering and other AML/KYC violations.  S/he also oversaw the filings of Suspicious Activity Reports ("SARs").

24.22.  CW2 worked for Deutsche Bank from May 2004 to June 2019, including from 2018 as the assistant to the Head of Anti-Financial Crime ("AFC") for the Americas.  S/he reported to the Head of AFC for the Americas, Richard Weber.

25.23.  CW3 worked for Deutsche Bank from February 2018 to January 2020 as a Vice President/AFC Principal Auditor for Sanctions and Embargoes, which was part of Deutsche

Bank's Group Audit.  In that position, s/he conducted audits on Deutsche Bank's deficiencies in AML processes, including AML violations.

26.24.  CW4 worked for Deutsche Bank from January 2017 to January 2020 as a Vice President/Principal Auditor for AML, Anti-Fraud, Bribery and Corruption.  CW4 reported to the Director/Principal Audit Manager for AFC, who reported to the Managing Director of Group Audit. CW4 worked on an AFC Audit team for AML, Bribery and Corruption, conducting audits.

27.25.  CW5 worked for Deutsche Bank from around mid-2015 to mid-2018 as a Vice President of Group Audit, reporting among others to Managing Director/U.S. Head of Audit Ian Overton.  Overton reported to Global Head of Group Audit Mark Cullen.  CW5 worked closely with Director Silke Fellner out of Frankfurt to compile audit data.  CW5 was part of the Business Management team within Internal Audit, also known as Group Audit.  One of his/her main tasks included facilitating and coordinating requests from Deutsche Bank's regulators.  S/he also helped create monthly reports for the Federal Reserve with updates on the Bank's audit plan and open audit issues.

28.26.  CW6 worked for Deutsche Bank from August 2017 to October 2020 as a Vice President/Head of AFC Risk Analysis.  S/he worked on SARs, writing reports about suspicious transactions.  S/he was in charge of an AFC Risk Analysis function that identified risks facing the Bank concerning its major banking clients and other risky clients.

29.27.  CW7 worked for Deutsche Bank from 2007–2017 in various roles.  Between 2013 and 2017, s/he worked in Internal Audit – Wealth Management and Asset Management.  CW7 conducted audits, including AML audits, of the Wealth Management and Asset management divisions.

30.28.  CW8 worked for Deutsche Bank from May 2018 to March 2020 as a KYC Case Manager and an AML and Business Risk Associate.  CW8 worked specifically on building case files for Private Wealth Management clients, and s/he also reviewed and provided final approval on KYC cases in the Wealth Management division.  CW8 worked with high-net-worth clients during their onboarding process and also with existing high-net-worth clients.

31.29.  CW9 was an AML Financial Crime Investigations Analyst from May 2016 to February 2019.  CW9 reported to the Vice President of AFC, who in turn reported to the Director/Head of the Financial Crime Investigations Division. CW9 conducted investigations on "everything under the sun," including reviewing transactions for money laundering and terrorist financing.  CW9 also wrote SARs.

32.30.  CW10 was an AFC, AML Officer for Wealth Management clients from December 2018 until August 2019.  S/he reported to the AFC Team Manager for Deutsche Bank Wealth Management.  CW10's job entailed oversight of New Client Adoption and KYC processes, a review process for high-risk clients[3] and clients requiring further scrutiny, who posed risks of financial crimes, including money laundering and terrorist funding.  CW10 also screened PEPs.

33.31.  CW11 worked for Deutsche Bank from June 2016 to October 2018 as a Senior KYC Risk Analyst.  CW11 conducted due diligence on new clients as part of the onboarding process and reviewed information from high-net-worth clients and PEPs.

**SUBSTANTIVE ALLEGATIONS**

**I.   THE IMPORTANCE OF AML/KYC PROCEDURES**

34.32.  Many recent financial crimes and AML scandals have left deep scars on Deutsche Bank's reputation, once the world's largest financial institution by assets.  The scandals and

---

[3] Deutsche Bank is the entity with knowledge of which individuals and entities it considers high-risk.

investigations continue, with the Bank being investigated by the Federal Bureau of Investigation, the Justice Department's Money Laundering and Asset Recovery Section in Washington and the United States Attorney's offices in Manhattan and Brooklyn, to name just a few.  During the Class Period, the Bank failed to comply with KYC procedures, a crucial component of any bank's AML efforts.

35.33.  As Linda Lacewell, the Superintendent of the New York State Department of Financial Services remarked, "[b]anks are the first line of defense with respect to preventing the facilitation of crime through the financial system, and it is fundamental that banks tailor the monitoring of their customers' activity based upon the types of risk that are posed by a particular customer."[4]

36.34.  As a regulated financial institution, Deutsche Bank is required to have adequate AML safeguards in place, and to devise and implement systems reasonably designed to identify and report suspicious activity and block transactions prohibited by law.  In addition to having effective AML controls in place, it is also necessary for Deutsche Bank to monitor its customers for the purpose of preventing them from facilitating criminal activity using the Bank's facilities. Accordingly, KYC due diligence is critically important. Deutsche Bank is required to collect customer information at the time of establishing new relationships with clients and during the existence of the relationship, including, as necessary, to carefully and thoroughly assess the risks associated with its clients.

---

[4] Press Release, The New York State Department of Financial Services, Superintendent Lacewell Announces DFS Imposes $150 Million Penalty on Deutsche Bank in Connection with Bank's Relationship with Jeffrey Epstein and Correspondent Relationships with Danske Estonia and FBME Bank, *First Enforcement Action by a Regulator Against a Financial Institution for Dealings with Jeffrey Epstein* (July 7, 2020),
https://www.dfs.ny.gov/reports_and_publications/press_releases/pr202007071.

37.35.  To properly consider these risks, Deutsche Bank must consider relevant factors such as the nature of the client's business, the purpose of the client's accounts, the recipients and beneficiaries of bank transfers, and the nature of the client relationship.  Deutsche Bank's obligation to conduct adequate due diligence is ongoing and does not abruptly end upon onboarding a client.  The Bank must conduct robust KYC reviews for each client relationship at intervals commensurate to the AML risks posed by the client, including reviewing account activity to determine whether such activity may facilitate crimes and threaten the Bank's reputation.  Each client's AML risks should also be re-assessed if material new information or unexpected account activity is identified.  Deutsche Bank must also establish criteria for determining when a client relationship poses too high of a risk and therefore must be terminated.  Financial institutions are liable under applicable laws if they maintain such relationships despite repeated indications of facilitating improper transactions.

38.36.  In short, if a bank decides to conduct business with a high-risk client, that institution is required to conduct robust due diligence commensurate with that risk and to tailor its transaction monitoring to detect suspicious or unlawful activity based on what the risk is.  Deutsche Bank failed to do so for its high-net-worth clients and PEPs.

39.37.  Moreover, under the Bank Secrecy Act, financial institutions are required to assist U.S. government agencies in detecting and preventing criminal activities by, among other things, reporting suspicious activity that might signal money laundering or other crimes.  Those reports are commonly referred to as Suspicious Activity Reports.

40.38.  While Deutsche Bank classified some clients as high-risk or PEPs, who would have been subject to extensive and particularly robust KYC procedures, unbeknownst to investors it chose to give them preferential treatment, by onboarding and retaining them as clients without

appropriate due diligence and in utter disregard of the significant reputational risks they posed to the Bank.

41.39.  For example, with respect to notorious financier and repeat child sex offender Jeffrey Epstein, Deutsche Bank elected not to scrutinize the activity in his accounts for the kinds of activities that were obviously implicated by his past.  Deutsche Bank was well aware not only that Epstein had pled guilty and served prison time for engaging in sex with a minor, but also that there were public allegations that he abused over 40 girls and that his conduct was facilitated by several named co-conspirators.  Despite this knowledge, Deutsche Bank did little or nothing to inquire into or block numerous payments Epstein made to known named co-conspirators using his Bank accounts, did little or nothing to inquire into or block payments to numerous young girls he lured into prostitution, and did little or nothing to inquire how Epstein was using, on average, more than $200,000 per year *in cash*.[5]

42.40.  To profiteer from the fees and referrals generated by Epstein, Deutsche Bank continuously allowed Epstein to use the Bank's services to cover up old crimes and to facilitate new ones—a major compliance failure and reputational stain on the Bank.[6]

43.41.  Deutsche Bank's white-glove treatment of Epstein is just one example of how powerful, rich clients of Deutsche Bank were permitted to use the Bank's accounts and services to commit crimes, with impunity.

---

[5] New York State Department of Financial Services, Consent Order Under New York Banking Law §§ 39 and 44 (July 6, 2020), at ¶¶ 35, 56 (emphasis in original), https://www.dfs.ny.gov/system/files/documents/2020/07/ea20200706_deutsche_bank_consent_order.pdf, (hereinafter "Consent Order").

[6] *See id*. ¶ 57.

## II.   THE IMPORTANCE OF MANAGING REPUTATIONAL RISK

44.42.  "Our reputation is our most valuable asset" – the Bank has repeatedly told investors.[7]   The Bank acknowledged that its reputation "is founded on trust from its . . . shareholders, regulators and from the public in general" and that even "[i]solated events can undermine that trust and negatively impact Deutsche Bank's reputation."[8]   Accordingly, Deutsche Bank consistently underscored that it "is therefore of the utmost importance that [its reputation] is protected."[9]

45.43.  With this mantra in mind, Deutsche Bank acknowledged that ignoring AML requirements would expose the Bank to corporate criminal or regulatory liability, civil lawsuits, and/or a loss of reputation.  To that end, the Bank acknowledged that assessing and understanding client-related financial and other crimes was a critical component of its risk management framework and that conducting appropriate due diligence on its customers was necessary to safeguard the Bank's reputation.

46.44.  During the Class Period, Deutsche Bank represented to investors that it applied the highest standards of AML processes in order to avoid being misused for money laundering, terrorist financing, or other illegal purposes, and to protect its reputation.  To that end, Deutsche Bank repeatedly assured investors that it was implementing a strict group-wide KYC program that

---

[7]  *See*, *e.g.*, Matthew Goldstein, *Deutsche Bank Settles Action Over Epstein*, N.Y. Times, July 8, 2020, at B.1; *see also* Matthew Goldstein and David Enrich, *Regulators May Punish Deutsche Bank for Its Jeffrey Epstein Ties*, N.Y. Times (June 2, 2020), https://www.nytimes.com/2020/06/02/business/jeffrey-epstein-deutsche-bank.html  (stating that "Daniel Hunter, a Deutsche Bank spokesman, said the bank regarded its reputation as its 'most precious asset.' 'We regret the decision to associate with Epstein,' he said.").

[8] Deutsche Bank, Responsibility, Reputational Risk Management, https://www.db.com/cr/en/concrete-management-of-reputational-risks.htm (last visited Feb. 27, 2021).

[9] *Id*.

ensured that its customers were adequately identified and monitored. This robust process supposedly included comprehensive due diligence in the form of regular reviews of all existing business relationships.

47.45.  Deutsche Bank understood and represented to investors that effective action against financial crime relies on sufficient and up-to-date information on client relationships, and that rigorous KYC safeguards and procedures are critical to protect the Bank's reputation. The Bank further affirmed that special safeguards were implemented for business relationships with PEPs and clients from countries and industries deemed high risk. PEPs pose a heightened risk  because they are in positions that can be potentially abused for money laundering and other crimes.

48.46. In reality, however, Deutsche Bank repeatedly retained and serviced profitable clients, regardless of their heightened risks. What's more, it failed to subject its most risky clients to *any* due diligence, let alone the type of robust due diligence it was publicly touting. Deutsche Bank repeatedly put the pursuit of profits above its responsibilities to safeguard against financial and other crimes, and repeatedly traded its reputation for profits.

### III.   UNBEKNOWNST TO INVESTORS, DEUTSCHE BANK KNOWINGLY ONBOARDED AND RETAINED HIGH-RISK INDIVIDUALS REPORTEDLY ENGAGED IN CRIMINALITY

#### A.   Deutsche Bank Onboarded and Serviced High-Risk Clients Without Any Meaningful Due Diligence and With the Approval and Consent of Its Top Echelon

49.47.  CW1 explained that at Deutsche Bank, as a general rule the more notorious a person becomes, the higher up the corporate ladder any decision-making process will be taken. According to CW1, in the case of really notorious Russian oligarchs and the like – the onboarding and retainer of such clients only happened with the approval of the highest-level authorities: the CEO, the COO, and Deutsche Bank's Board. Epstein, in particular, was discussed at Deutsche Bank's Board level.

To understand this phenomenon, it bears providing some context, particularly into Deutsche Bank's relationship with Russia.

50.48.  Deutsche Bank was introduced – at a very high level – to Russian oligarchs through a little-known Russian government body set up in 1994.  In 1994, Russia set up the Foreign Investment Advisory Council ("FIAC" or "Council"), a consultative forum for foreign businesses and the Russian government to meet and discuss economics and the business world.  According to the FIAC's constitution, the Council is chaired by the Russian Prime Minister.  In practice, however, it has been the Russian First Deputy Prime Minister who has spent the greatest amount of time attending to the affairs of the Council.

51.49.  Deutsche Bank was one of the earliest members of the Council, with former Deutsche Bank CEO Josef Ackermann himself being a member of the Council since at least 2010. For many years Deutsche Bank was the only banking company on the Council.  According to CW1, serving on the Council carries considerable prestige: for Ackermann, this prestige was boosted by several personal meetings with Russian president Vladimir Putin.[10]  Following Ackermann's retirement, Juergen Fitschen, the Bank's co-CEO from 2012 to 2016, attended Russian FIAC meetings on behalf of Deutsche Bank.  The Russian government website carries a speech delivered by Fitschen to the FIAC in 2013, and it certainly shows that Deutsche Bank saw the Council as a serious undertaking.[11]

52.50.  According to CW1, Ackermann boasted that Council membership provided Deutsche Bank with "enormous opportunities" as it gave him access to the highest levels of

---

[10] Press Release, Government of the Russian Federation, the Executive Branch, Prime Minister Vladimir Putin meets with Deutsche Bank CEO Josef Ackermann (Sept. 2, 2011), http://archive.government.ru/eng/docs/16346/.

[11] The Russian Government, The 27th session of the Foreign Investment Advisory Council in Russia (Oct. 21, 2013), http://government.ru/en/all/7646/.

Russian businessmen and politicians.  Ackermann also boasted that he was "well on his way to getting a Russian diplomatic passport."

~~53.~~51.  CW1 explained that Ackermann approved the onboarding of many high-risk Russian oligarchs and PEPs, without having performed any due diligence.  Those individuals posed significant money laundering and reputational risks for the Bank and should have never been onboarded or maintained as clients.  As explained below, public records demonstrate these individuals had clearly violated compliance and AML guidelines before they were onboarded.

~~54.~~52.  CW1 also explained that Deutsche Bank typically does not conduct due diligence on high-net-worth clients.  For example, in the case of oligarchs and other high-net-worth individuals such as Roman Abramovich and Vitaly Yusufov (discussed below), the onboarding took place in seconds.  Likewise, CW1 said no due diligence was conducted on Epstein.

~~55.~~53.  Epstein himself had several connections with Russia, and they explain at least in part how Epstein was welcomed aboard by Deutsche Bank.  Epstein reportedly boasted to at least one journalist that he had flown to Russia on a number of occasions to meet with Vladimir Putin.[12]  Epstein is also linked to Russia through his former girlfriend's father.  Epstein's former girlfriend, Ghislaine Maxwell, is the daughter of the late publisher Robert Maxwell.  Robert Maxwell was a business associate of Semion Mogilevich, a reportedly notorious Russian mobster[13] with many

---

[12] Lottie Tiplady-Bishop, *Jeffrey Epstein boasted about 'flying to Moscow to visit Vladimir Putin' as secrets behind his millions are revealed*, the Sun (July 19, 2020), https://www.thesun.co.uk/news/12165850/jeffrey-epstein-boasted-putin-millionaire-secrets/.

[13] Wikipedia, Semion Mogilevich, https://en.wikipedia.org/wiki/Semion_Mogilevich (last visited Feb. 27, 2021); Nina Burleigh, *With Jeffrey Epstein Dead, the Search Is on for Alleged Recruiter Ghislaine Maxwell*, RollingStone (Aug. 15, 2019), https://www.rollingstone.com/culture/culture-features/jeffrey-epstein-ghislaine-maxwell-recruiter-history-871182/.

links to politicians in Russia.  Mogilevich is known to have been involved in prostitution.[14]
Ghislaine Maxwell is accused of recruiting women, many of them Russian, to prostitute
themselves to Epstein.  While her father was alive, Ghislaine held numerous positions in his
publishing companies and had access at high level to many politicians and Russian oligarchs.  As
described below, Epstein's accounts at Deutsche Bank record a large number of suspicious
payments to Russia and Eastern Europe in general, including to several of his co-conspirators and
to young girls, who were the victims of Epstein's sexual abuse or otherwise lured by Epstein into
prostitution.

56.54.  CW1 explained that once the CEO of Deutsche Bank introduces a client, it is very
hard for a manager to turn that person away, so the relationships continued during the Class Period
even under a change of guard with a different CEO.  All final decisions regarding AML compliance
were made by Deutsche Bank, even when misconduct occurred at one of its subsidiaries.  Thus,
any requests from government monitors regarding compliance at a U.S. subsidiary, for example,
had to be cleared by Deutsche Bank.  Even if the monitors asked the U.S. subsidiary for something,
the subsidiary had to defer to Deutsche Bank. Deutsche Bank's Reputational Risk
Committee/Group Risk Committee overturned decisions by the U.S. Reputational Risk
Committee, with Deutsche Bank's CEO's involvement.

55.   In one particular instance during the Class Period around April 2018, the U.S.
Reputational Risk Committee had blocked the sale of Deutsche Bank's stake in an office complex
to a controversial Russian PEP, Vitaly Yusufov, whose father Igor Yusufov, the former Russian
Energy Minister, was a Bank client. According to CW1, it was common knowledge within

---

[14] Wikipedia, Semion Mogilevich, https://en.wikipedia.org/wiki/Semion_Mogilevich (last visited
Feb. 27, 2021).

Deutsche Bank that German prosecutors were probing money laundering – and possibly murder – by ~~the Bank's client~~Igor Yusufov and his partners.[15]   This was widely reported on by reputable German publications.  The U.S. Reputational Risk Committee was overruled by the Group Risk Committee, and the deal went through – even though Deutsche Bank's U.S. operation filed a suspicious activity report on itself.  According to CW1, Defendant Cryan personally got involved in the decision to allow the sale of the Silicon Valley property.  This is yet another illustration of Deutsche Bank's CEOs personally interfering and approving transactions benefitting wealthy clients despite their illicit connections and activities.

~~57.~~56.  Vitaly Yusufov also bought a $72 million mansion in California in a transaction through Deutsche Bank. The mansion was acquired by Vitaly Yusufov's Willow Project LLC in May 2018 but the Bank only announced it to U.S. supervisory authorities much later in 2019, and did not immediately decide to approve the deal. Vitaly Yusufov was recognized as a politically significant person and the Bank's reputational risk committee considered the deal and noted the danger of increased sanctions against Russia and refused the transaction. The Bank's global committee appealed the decision and while the head of the Bank's U.S. branch, Richard Weberan, opposed the sale of the house, most of the votes approved the deal.  *Son of Former Russian Energy Minister Buys $72mn California Mansion*, Russia Business Today (November 4, 2019), https://russiabusinesstoday.com/economy/son-of-former-russian-energy-minister-buys-72mn-california-mansion/.

---

[15] Douglas Busvine and Simon Falush, *Insight – Russian bid for UK refinery brings controversy*, Reuters (June 15, 2012), https://www.reuters.com/article/uk-britain-russia-refinery/insight-russian-bid-for-uk-refinery-brings-controversy-idUKBRE85E0DM20120615; *see also* Anastasia Kirilenko, *Why is the West So Weak When It Comes to the Russian Mafia?*, Free Russia (May 16, 2016), https://www.4freerussia.org/why-is-the-west-so-weak-when-it-comes-to-the-russian-mafia/.

58.57.  CW2 similarly explained that the Head of AFC for the Americas, Richard Weber, was routinely overruled by Deutsche Bank's Board in Frankfurt.  Specifically, Weber would say "no" to onboarding specific new clients or approving loans to suspicious individuals or entities, but Deutsche Bank's Board would still approve the new clients and loans despite Weber's objections.  "Issues would come up—red flags all over the place—and the board would approve it [anyway].  They turned a blind eye to everything," said CW2.  During the Class Period, Cryan and Sewing were members of the Bank's Board.

59.58.  Another example demonstrates Deutsche Bank's executives' familiarity with the Bank's handicapped KYC processes.  Cryan, for example, became personally involved with a 2016 SAR filed by Bank of America on Deutsche Bank.  Bank of America filed the SAR out of concerns that Deutsche Bank's KYC procedures were not robust and permitted  money laundering.  Bank of America informed the government that certain transactions facilitated by Deutsche Bank involved the "suspicious designation of beneficiaries" and "suspicious EFT/wire transfers."  The SAR specifically mentions Defendant Cryan, as well as Paul Achleitner, the Chairman of Deutsche Bank's Supervisory Board, having interacted with Bank of America on the matter.

60.59.  According to CW1, Deutsche Bank engaged in other practices designed to actively circumvent AML rules.  CW1 observed that with regards to sanctioned persons and companies,  it was standard practice at Deutsche Bank to circumvent sanctions.  To evade these rules, the persons or companies that had been sanctioned would be onboarded by Deutsche Bank in a country where they were not sanctioned.  For example, if a Russian individual was sanctioned in the United States, Deutsche Bank would onboard that client in Germany.  This person would then be permitted to conduct business in the United States by setting up a company in the United States as a proxy.  This company would in turn transact business with Deutsche Bank.  Deutsche Bank USA would

not perform KYC diligence on the company – such due diligence would be a waste of resources, as the client had already been onboarded.

61.60.  Another witness, CW3, recounted that during the Class Period, there were critical audit findings in three different areas showing that Deutsche Bank's AML processes were deficient.  First, CW3 explained that one critical AML deficiency identified by the audits was that the Bank was "not going through the right protocols to onboard" clients, specifically high-net-worth, Wealth Management clients.  The clients were not vetted properly or as seriously as required.  CW3 said that the decision-makers in Germany were "more interested in bringing in the accounts than doing everything they should be doing in vetting people."

62.61.  CW3 explained that another critical audit finding was that the Bank was working with companies or other clients that were sanctioned in the United States and also transacting in the United States.  Deutsche Bank got around the sanctions issues by onboarding those clients in other countries.

63.62.  CW3 stated that another critical audit finding was that Deutsche Bank was engaging in "wire stripping."  CW3 described the practice as a "type of money laundering" in which the Bank allowed high-net-worth individual clients and corporation clients to wire funds, for example, in the United States, indirectly through other countries in order to avoid sanctions and avoid being traced.  This was done in part by removing the actual name of the sanctioned individuals and entities from a wire transfer and by replacing it with a "fictitious" or "straw company" name.  CW3 said the "wire stripping" occurred at least with several princes from the Middle East, including princes from Iran and Iraq, who would have been on the U.S. sanctions list.  CW3 personally saw that wire stripping occurred repeatedly.

64.63.  CW3 explained that Deutsche Bank's Global Head of Audit Group and Chief Auditor Max Ng was aware of the three improper practices described above  because he received regular updates on the status of the audits that identified those practices.  According to CW3, "Max was copied on every audit report that went out," including the audit report identifying the three critical deficiencies, and other senior management in Germany also participated in conference calls several times a week, receiving the audit updates.  And, according to CW1, Max Ng would have reported any audit shortcomings to Deutsche Bank's CEO.  CW1 added that Ng was also known to be a close ally of Defendant Sewing.

65.64.  CW3 explained that the three critical audit violations described above continued to occur into 2019 and at least until s/he left the Bank in January 2020.  The auditors specifically found "proof of [AML] violations" and the audits produced findings labeled "Unsatisfactory."

66.65.  CW4 also recounted that during his/her employment with the Bank, an audit of the Bank's Enhanced Due Diligence ("EDD") research and reporting process found that the EDD reports lacked key details and supporting files – such as the outcome of a client that was found to be under investigation.  The EDD deficiencies were occurring specifically with the Bank's Wealth Management clients.  CW4 said that the  deficiencies were described in an audit report finalized in mid-2019.  CW4 further explained that in a previous EDD audit conducted in 2017, auditors found cases highlighting similar deficiencies with the Bank's Wealth Management and Asset Management divisions.  In one example, an EDD report stated that an Israeli client of the Bank was under a civil tax investigation when, in fact, the company was under a criminal investigation.  CW4 explained that all final audit reports, including those described above, were signed off on by the Managing Director/Group Audit, and that all audits resulting in "Unsatisfactory" findings were

sent to the Bank's Managing Director/Global Head of AFC and Group AML Officer Philippe Vollot ("Vollot").

67.66.  In a similar vein, CW5 recalled that during his/her tenure at Deutsche Bank, including in 2017 and 2018, there were numerous "critical audit findings" related to improper KYC and customer due diligence practices when dealing with high-net-worth clients.  The findings showed that the Bank lacked appropriate documentation for its high-net-worth clients and also failed to identify and trace the source of wealth for high-net-worth clients.  CW5 knew about the critical audit findings because s/he personally had access to a dashboard showing these findings. The findings were labeled by severity and by business within the Bank, and the dashboard "had details of every critical finding open."  CW5 explained that Deutsche Bank's Global Head of Group Audit, who from March 2015 to November 2018 was Mark Cullen, had access to the dashboard with details about the Bank's critical audit findings.  According to CW5, during the relevant time Cullen reported directly to Defendant Sewing.  CW5 also explained that in addition to Cullen, Steve Morcombe, the Director of Deutsche Bank's Group's COO Asset & Wealth Management Technology Office, also had access to the dashboard.

68.67.  CW6 recounted that his/her team frequently presented concerns about the sources of funds of oligarchs who were the Bank's clients, and about their questionable business practices during Risk Identification Forums ("RIF"), up to and including October 2020.  Some of the oligarchs were listed on the U.S. Department of Treasury's list of designated Russian oligarchs. The RIFs were attended by Jeffrey Harwin, Head of AFC Americas, Deutsche Bank's most senior AML person in the United States, and other senior Compliance and business line executives. Timothy McNeil, a Managing Director of AFC, attended the RIF meetings. Carmel Speers, the London-based Head of Business Line AFC for Deutsche Bank, attended the RIF meetings by

teleconference.  Nicholas Joseph, the Global Head of the AFC Evaluation Team and leader of the Business Line Advisory, AFC Global Head of Client Intelligence Unit, also received information from CW6's team concerning reviews CW6 and his/her team conducted in connection with the RIF meetings.

69.68.  Another witness, CW7, explained that with respect to bringing on new clients who were extremely wealthy (net worth of at least $15 million), "as long as we were able to make the bank money, the client was going to come on board regardless. It didn't really matter that you didn't think they should be a client. If they were going to generate funds, they were going to be a client. And once they're in, they're in. That's it."  CW7 did not recall the Bank's Wealth Management division *ever* turning away a client.[16]

70.69.  *Reuters* also reported, based on two Deutsche Bank internal confidential reports of the Bank's KYC processes and procedures dated June 5 and July 9, 2018 (which *Reuters* reviewed) that the Bank's KYC processes were severely deficient during the Class Period.[17]  The reports detailed the results of tests on a sample of the Bank's customer files in several countries.[18]

71.70.  In the 13-page June 2018 report, for example, Deutsche Bank assigned itself a ***pass rate of zero percent*** in countries such as Russia, Ireland, Spain, Italy and South Africa when it checked how client files had been processed.  The pass rate measures the percentage of files that meet the Bank's KYC standards.  According to the reports, Deutsche Bank strives for 95%

---

[16] Deutsche Bank Wealth Management comprises the Deutsche Bank Wealth Management-U.S. division of Deutsche Bank.  *See, e.g.*, Deutsche Bank Wealth Management, 2021 Important note regarding client privacy, *available at* https://deutschewealth.com/content/dam/deutschewealth/docs/DBWM_Privacy-Notice_Jan2021_FINAL.pdf.

[17] *Deutsche Bank reports show shortcomings in its customer screening process*, Reuters (Aug. 3, 2018), https://www.cnbc.com/2018/08/03/deutsche-bank-reports-show-shortcomings-in-its-customer-screenings.html#:~:text=Deutsche%20Bank%0has%20uncovered%20shortcomings,2017%20for%20allowing%20money%20laundering.

[18] *Id.*

(roughly in line with other global banks).  Reportedly, Defendant Sewing was aware of the KYC infirmities and supposedly "vowed" to address the undisclosed weaknesses in the Bank's controls.[19]

~~72.~~71.  Deutsche Bank gave the June report  to the European Central Bank ("ECB").  The Bank's executives met with the ECB in late July 2018 to discuss the June report and the Bank's control procedures.[20]

72.  In a written public response to *Reuters*, Deutsche Bank flatly denied that its KYC processes were not effective and doubled-down on its continued misrepresentations that "Our procedures to identify potential anti-money laundering and KYC risks are very effective," saying of its group-wide controls.[21]

73.  Additionally, Hinrich Völcker, who previously served as the Global Head of Financial Crimes Investigations for Deutsche Bank, and Vollot, were asked to investigate high risk entities that held accounts at Deutsche Bank and present their findings to the Supervisory Board. Their nine-page presentation was shared in 2018 with the audit committee of the Supervisory Board. The pair identified numerous high-risk entities. They included 1,244 in the US, 329 in the UK and 950 in Germany. These entities were responsible for nearly 700,000 transactions, the report says, involving at least £62m in the UK, $47m in the US, and €55m in Germany.[22]

74.  Defendants' misconduct in issuing the false and misleading assurances about the Bank's supposedly strict and robust KYC procedures is particularly egregious also in light of the

---

[19] *Id.*

[20] *Id.*

[21] *Id.*

[22] Luke Harding, *Deutsche Bank faces action over $20bn Russian money-laundering scheme*, The Guardian (April 17, 2019), https://www.theguardian.com/business/2019/apr/17/deutsche-bank-faces-action-over-20bn-russian-money-laundering-scheme

fact that Defendants were aware that Deutsche Bank's KYC procedures were strikingly deficient and improper.  On January 30, 2017, as part of a settlement agreement, the U.K. Financial Conduct Authority ("Authority") fined  Deutsche Bank for permitting billions of dollars in laundered money to occur through the Bank's facilities.[23]   The settlement agreement between the Authority and Deutsche Bank also discussed a separate assessment by the Authority of Deutsche Bank's AML processes.[24]   That assessment commenced in 2015 and "found serious deficiencies in Deutsche Bank's AML control framework and serious CDD [customer due diligence], EDD [enhanced due diligence], and ongoing monitoring failings."[25]   These findings were based on the Authority's review of a sample of customer files and interviews of numerous Deutsche Bank personnel.[26]

75.    Specifically, the Authority found that "[a]ll of the medium and low risk files reviewed during the SAMLP [the Authority's Systematic Anti-Money Laundering Programme] had inadequate CDD, including: missing identification and verification documents; inadequate information about UBOs [ultimate beneficial owners]; a lack of information about corporate ownership structures . . . and a failure to identify PEPs as connected parties.  *Similarly, almost all of the higher risk files had inadequate EDD, with deficiencies such as: limited evidence of meetings with customers; and inappropriate disregarding of negative press coverage. The common theme in both the CDD and EDD was a failure to evidence source of funds and wealth where appropriate* and a lack of understanding of the customer's business."[27]

---

[23] Financial Conduct Authority, January 30, 2017 Final Notice to Deutsche Bank AG, *available at* https://www.fca.org.uk/publication/final-notices/deutsche-bank-2017.pdf.

[24] *Id*. ¶¶ 4.44-4.45.

[25] *Id*.

[26] *Id.*

[27] *Id*. ¶ 4.57.

76.     Moreover, in late 2016 and early 2017, during their meetings with the Authority, Deutsche Bank admitted to the Authority that there were around 5000 orphan accounts within the Bank as of 2014, which "had not been onboarded in line with KYC requirements."[28]  ***As of 2017, "[t]hese orphan accounts were active customer accounts for which Deutsche Bank's systems could not generate a link to underlying KYC documentation***."[29]   These accounts were active and trading.[30]   Epstein's accounts, as well as other accounts of individuals and entities engaged in wrongdoing, were orphan accounts that were active and trading with no underlying KYC documentation.

**B.      Deutsche Bank Onboarded and Serviced Child Sex Trafficker and Abuser Jeffrey Epstein, Aiding and Abetting His Criminal Activities**

77.     Jeffrey Epstein was a wealthy American financier with more than 500 million dollars in assets (including real estate, an island and private planes) and an extensive network of friends and connections that included prominent financial institutions, politicians, royalty, and billionaires.[31]  Epstein engaged in the abuse and sex trafficking of minors from as early as 2005 and during the entire time of his relationship with Deutsche Bank.   Epstein worked with several employees and associates to ensure that he had a steady supply of minor victims to abuse and paid several of those victims themselves to recruit other underage girls to engage in similar sex acts for money.[32]

---

[28] *Id.* ¶ 4.59.

[29] *Id.*

[30] *Id.*

[31] Consent Order ¶ 8.

[32] United States Department of Justice, the United States Attorney's Office, Southern District of New York, Priorities, Human Trafficking and Sexual Exploitation of Minors, https://www.justice.gov/usao-sdny/human-trafficking-and-sexual-exploitation-minors       (last visited Feb. 27, 2021); Press Release, United States Department of Justice, the United States Attorney's Office, Southern District of New York, Jeffrey Epstein Charged In Manhattan Federal

78.     Allegations against Epstein began appearing prominently in the press as early as March 2005, with the accusation that he paid a 14-year old girl for a "massage."[33] In 2005, the Palm Beach (Florida) Police Department commenced an investigation into allegations against Epstein related to his activities in Palm Beach. The investigation quickly uncovered dozens of other alleged victims.[34]   In September 2007, Epstein agreed to plead guilty to two prostitution charges in state court, including the solicitation of a minor to engage in prostitution, in exchange for a deferred prosecution agreement providing him with immunity from extensive federal sex trafficking charges.[35]

79.     Between 2005 and 2013, numerous domestic and international news outlets continued publicizing Epstein's abuse of young girls.[36]   For example, in August 2006, it was reported that Epstein abused six girls between the ages of 14 and 16;[37] in September 2006, it was reported that Epstein routinely paid an underage girl to bring teenage girls to his home;[38] in October 2007, it was reported that Epstein agreed to plead guilty to soliciting underage prostitutes at his Florida mansion;[39] in March 2011, it was reported that Epstein groomed his 15-year-old masseuse

---

Court With Sex Trafficking Of Minors, Alleged Conduct Occurred in both New York and Florida over Multiple Years, Involving Dozens fo Victims (July 8, 2019), https://www.justice.gov/usao-sdny/pr/jeffrey-epstein-charged-manhattan-federal-court-sex-trafficking-minors.

[33] Consent Order ¶ 9.

[34] *Id*. ¶ 10.

[35] *Id*. ¶ 12.

[36] *Id*. ¶ 14.

[37] Andrew Marra, *The Man Who Had Everything; Jeffrey Epstein Craved Big Homes, Elite Friends and, Investigators Say, Underage Girls*, The Palm Beach Post, Aug. 14,  2006.

[38] Abby Goodnough, *Questions of Preferential Treatment Are Raised in Florida Sex Case*, N.Y. Times (Sept. 3rd, 2006), https://www.nytimes.com/2006/09/03/us/03epstein.html.

[39] Dan Mangan, '*Unhappy Ending' Plea Deal*, N.Y. Post (Oct. 1, 2007), https://nypost.com/2007/10/01/unhappy-ending-plea-deal/.

to become a teenage prostitute;[40] and in October 2013, it was reported that Epstein served 13 months in jail for soliciting a minor for prostitution and that he paid confidential settlements to nearly two dozen young women who filed lawsuits against him.[41]

80.     Despite widespread coverage of Epstein's child sex trafficking and abuse, Deutsche Bank's executives onboarded Epstein as a client in 2013, enabling his criminal activities to continue.[42]   Deutsche Bank's relationship with Epstein commenced after another big bank, JPMorgan Chase, dropped Epstein as a client in part based on reputational concerns.  That didn't deter Deutsche Bank.  In addition to opening and servicing wealth-management accounts for Epstein, Deutsche Bank also provided loans to Epstein and his businesses.

81.     Deutsche Bank relationship manager Paul Morris brought Epstein into Deutsche Bank in 2013.[43]   Morris urged the Bank's senior management, including Charles Packard, then Co-Head of the Wealth Management division, and Patrick Harris, the Chief Operating Officer of Wealth Management division, to onboard Epstein because he would generate millions of dollars of revenue, as well as leads for other lucrative clients to Deutsche Bank.[44]   Morris presented

---

[40] Sharon Churcher and Chelsea White, *The Prince, a paedophile and the sex slave teen*, The Daily Telegraph (Mar. 1, 2011), https://www.dailytelegraph.com.au/the-prince-a-paedophile-and-the-sex-slave-teen/news-story/8cdeee961a486febf459eafe00a7f710.

[41] Michele Dargan, *Newest lawsuit against Epstein expected to include victim testimony*, Palm Beach Daily News (Oct. 24, 2013), https://www.palmbeachdailynews.com/news/local/newest-lawsuit-against-epstein-expected-include-victim-testimony/CZ14s0ESb0Q4rib7njc1hL/.
[42] Consent Order ¶ 24.

[43] *Id*. ¶¶ 16–17; James B. Stewart, *These Are the Deutsche Bank Executives Responsible for Serving Jeffrey Epstein*, N.Y. Times (July 13, 2020) (identifying RELATIONSHIP MANAGER-1 as Paul Morris and "nearly every person anonymously described in the [consent] order"), https://www.nytimes.com/2020/07/13/business/deutsche-bank-jeffrey-epstein.html.

[44] Consent Order ¶¶ 18–19; James B. Stewart, *These Are the Deutsche Bank Executives Responsible for Serving Jeffrey Epstein*, N.Y. Times (July 13, 2020) (identifying EXECUTIVE-1 as Charles Packard), https://www.nytimes.com/2020/07/13/business/deutsche-bank-jeffrey-epstein.html.

Packard and Harris with a memorandum containing information on Epstein's plea deal and prison sentence, so it was crystal clear that Epstein had engaged in despicable acts, posing a significant reputational and financial crime risk to the Bank.[45]

82.     In particular, the memorandum stated that "Epstein was charged with soliciting an underage prostitution [SIC] in 2007," that "[h]e served 13 months out of his 18 month sentence," and that "[h]e was accused of paying young woman [SIC] for massages in his Florida home."[46]  It also highlighted that Epstein was involved in 17 out-of-court civil settlements related to his conduct in the 2007 conviction.[47]  But all that was meaningless to Deutsche Bank, whose main goal was profiteering.

83.     In an April or May 2013 email sent to Packard and Harris attaching the memorandum, Morris underscored how lucrative the relationship with Epstein could be to Deutsche Bank, stating "***[e]stimated flows of $100-300 [million] overtime [SIC] (possibly more) w/ revenue of $2-4 million annually over time*** . . . ." In the same email, Morris proposed that all Epstein-related accounts be for "entities" affiliated with Epstein, "not personal accounts."[48]

84.     In a reply email, Packard noted that he had taken the issue to Deutsche Bank Americas' general counsel and the head of its AML Compliance operation and that neither felt Epstein required additional review.[49]  At the time, Deutsche Bank was aggressively expanding its U.S. wealth management business under its new co-chief executive, Anshu Jain, and was courting wealthy clients shunned by other banks.  Indeed, attractive earnings multiples had driven strong

---

[45] Consent Order ¶¶ 19–20.

[46] *Id.* ¶ 20.

[47] *Id.*

[48] *Id.* ¶ 21.

[49] *Id.* ¶ 22.

investment from Deutsche Bank into asset and wealth management, as they consumed less capital than the investment banking business.  Deutsche Bank officials have repeatedly called the Bank's private banking wealth management business in the Americas a "key geographic region."

85.     CW1 explained that there was never any real due diligence carried on Epstein. According to CW1, upon learning of Epstein's convictions for criminal offenses, the Bank should have carried out thorough KYC investigations.  But CW1 stated that no KYC investigations were ever undertaken.

86.     Deutsche Bank's Americas Reputational Risk Committee ("ARRC") also agreed to keep Epstein as a client despite knowing that by 2011 "***40 underage girls had come forward with testimony of Epstein sexually assaulting them***."[50]   For example, on January 30, 2015, members of the ARRC met to discuss the Epstein relationship.[51]   In preparation for the ARRC meeting, Packard and Morris met in person with Epstein at his New York home.[52]   The meeting was held ***in a bar*** adjacent to Epstein's indoor swimming pool, located in the basement of his Manhattan mansion. At this meeting, Epstein allegedly explained away suspicious transactions, including large cash withdrawals and payments to Russian accounts that appeared suspicious in that they may have been indicators of prostitution.

87.     According to CW1, the way this meeting was conducted flouted all of Deutsche Bank's rules about how such meetings should be handled.  Specifically, the meeting at Epstein's bar has been described as a "due diligence meeting" by Deutsche Bank.  However, Deutsche Bank's own rules lay out how such due diligence meetings are to be conducted when dealing with

---

[50] *Id*. ¶ 35.  The ARRC reported to the Group Reputational Risk Committee, a subcommittee of the Group Risk Committee.  The Group Risk Committee is run by the Management Board.

[51] *Id*. ¶ 37.

[52] *Id*. ¶ 36.

high-risk clients.  CW1 explained: "There are meant to be minutes taken, there is meant to be a thorough record of the meeting, allegations are meant to be put to the client in writing and the client is generally expected to have his lawyer or advisor, and often also an accountant, with him." Both sides are meant to sign off on the minutes of such meetings.  Failing to abide by these regulations is a disciplinary offense at Deutsche Bank.  According to CW1, however, neither Packard nor Morris were ever disciplined.

88.  Deutsche Bank has also represented to the New York State Department of Financial Services that it is not in possession of contemporaneous records reflecting the substance of the meeting with Epstein, and is not aware of any other steps taken by Deutsche Bank at the time to investigate the veracity of the allegations beyond speaking with Epstein.[53]

89.  The ARRC meeting that followed the bar meeting with Epstein was chaired by Stuart Clarke, Chief Operating Officer for the Americas and General Manager of Deutsche Bank's New York branch and a member of the Regional Executive Committee.  Other attendees included Jan Ford, a Managing Director and Deutsche Bank Americas Head of Compliance and a member of the North America Executive Committee and the Global Compliance Executive Committee.[54] Once again, no recorded minutes of that meeting were taken or kept, despite such a requirement at the Bank.[55]

---

[53] *Id.*

[54] James B. Stewart, *These Are the Deutsche Bank Executives Responsible for Serving Jeffrey Epstein*, N.Y. Times (July 13, 2020) (identifying Deutsche Bank's executives who participated in the January 30, 2015 ARRC meeting concerning Epstein), https://www.nytimes.com/2020/07/13/business/deutsche-bank-jeffrey-epstein.html. SIFMA, Jan Ford, Head of Compliance, Americas Deutsche Bank, https://www.sifma.org/people/jan-ford/ (last visited Feb. 27, 2021).

[55] Consent Order ¶ 58.

90.     Later that day, a member of the ARRC emailed Packard to say, without explanation, that the committee was "***comfortable with things continuing" with Epstein***, and that another member of the committee had "***noted a number of sizable deals recently***."[56]

91.     The following week, Jan Ford reiterated the ARRC's decision in an email to other executives, stating that ARRC had agreed to "***continue business as usual with Jeff Epstein*** based upon [EXECUTIVE-1 (Packard)]'s due diligence [bar] visit with him."[57]

92.     Then, on July 21, 2015, when Epstein requested an increase in his trading limits, the Chairman of the ARRC conferred with other members of the ARRC without formally meeting and stated that he had no objections, saying "I also checked in with [EXECUTIVE-1 (Packard)] last night to make sure he supports this and has heard nothing negative on the client. [EXECUTIVE-1 (Packard)] confirmed both."[58]  Again, without any due diligence and in complete disregard for the crimes Epstein was perpetrating and the reputational risks he posed, Deutsche Bank allowed him to continue to employ the Bank's services to further his criminal activities.

93.     CW1 said that Pamela Root, Global Head of Compliance at Deutsche Bank, was also informed of the contents of the January 2015 ARRC meeting discussing Epstein when she joined the Bank in April 2016.  Still, Epstein remained a client.

94.     According to media reports, in 2015 and 2016, AML compliance officers in Deutsche Bank's offices in New York and Jacksonville, Florida, again raised many concerns about the work the Bank was doing with Epstein.[59]  The employees were concerned that the Bank's reputation would be harmed if it became public that Epstein was a client.  Moreover, the

---

[56] *Id*. ¶ 37.

[57] *Id*. ¶ 38.

[58] *Id*. ¶ 43.

[59] Many of the Bank's AML operations are based in Jacksonville, Florida.

compliance officers noticed potentially illegal activity in Epstein's accounts, including transactions in which money was moving outside the United States. Despite the information, the Bank continued its extensive business with Epstein unabated.

95.     As the New York State Department of Financial Services later found when it fined the Bank for its relationship with Epstein, Deutsche Bank "created the very real risk" that payments through the Bank "could be used to further or coverup criminal activity and perhaps even to endanger more young women."[60]

96.     Over the course of his relationship with Deutsche Bank, Epstein held a number of bank accounts with the Bank, with more than $110 million in just one of the accounts. During the relationship, Epstein, his related entities, and associates opened and funded more than 40 accounts at the Bank.[61]

97.     Soon after he was onboarded and as early as November 1, 2013, Epstein and his representatives began using the Deutsche Bank accounts to further his crimes.[62] For example, Epstein made suspiciously large cash withdrawals and 120 wire transfers totaling $2.65 million to women with Eastern European surnames for the stated purpose of covering hotel expenses, tuition and rent.[63] He also made many payments to individuals who had been publicly identified as Epstein's co-conspirators, including at least 18 wire transfers in the amount of $10,000 or more to such co-conspirators.[64] For some wire transfers, the connection was easily made by Bank personnel for certain transactions, and Bank personnel were also aware that some of Epstein's trust

---

[60] Consent Order ¶ 29.

[61] *Id*. ¶ 24.

[62] *Id*. ¶ 27.

[63] *Id*. ¶ 31.

[64] *Id*. ¶¶ 27–30.

beneficiaries were co-conspirators, as was the case with one of Epstein's trusts called "The Butterfly Trust."[65]  The existence of co-conspirators as beneficiaries of the Trust created the very real risk that payments through the Trust could be used to further or cover up criminal activity and perhaps even to endanger more young women.[66]  Still, Deutsche Bank lent money to Epstein, held his accounts, and provided trading services throughout the duration of the relationship.

98.     Epstein also used his various Deutsche Bank accounts to satisfy multiple settlements, for a total of $7 million to law firms, as well as to make dozens of payments to law firms, totaling over $6 million, for legal expenses for him and his co-conspirators.[67]

99.     Moreover, from 2013 to and including 2018, one of Epstein's attorneys withdrew from Epstein's personal accounts *over $800,000.00 in cash*, for the stated purpose of using the funds "for tipping and household expenses."[68]  The lawyer had repeatedly asked Bank officials how much money could be withdrawn without triggering some kind of alert.[69]  Deutsche Bank never sought or received an explanation, nor did it conduct any due diligence about the recipients of such payments.[70]

100.    From the time of Epstein's onboarding, the relationship was classified by Deutsche Bank as "high-risk" and therefore should have been subject to enhanced due diligence.[71]  Instead, in a twist of irony, the Bank designated Epstein an "*Honorary* PEP."[72]  According to CW1, "there

---

[65] *Id.*

[66] *Id.* ¶ 29.

[67] *Id.* ¶ 32.

[68] *Id.* ¶¶ 48–52.

[69] *Id.* ¶¶ 50–51.

[70] *Id.* ¶ 50.

[71] *Id.* ¶ 26.

[72] *Id.*

is no such thing as an honorary PEP.  You are either a PEP or you aren't.  I suspect they use this term to fudge things.  Epstein was certainly very high risk . . . But Deutsche Bank did not treat him as a high-risk client.  I think the phrase 'honorary PEP' has been dreamt up to explain away why he wasn't treated as a high-risk client – whose accounts should have been constantly reviewed."

101.    According to CW8, Deutsche Bank had a KYC "special deal" for Epstein and other high-net-worth individuals.  CW8 explained that such individuals were not required to submit to the normally required KYC documentation.  Deutsche Bank gave them special exceptions because of the amount of business they generated.

102.    CW8 explained that after Epstein was onboarded, decisions about whether to continue keeping him as a client were repeatedly escalated, including to Deutsche Bank's Reputational Risk Committee.  "He would go up, get approved, go up, get approved," CW8 said.  CW8 noted that the people who sat on Deutsche Bank's Reputational Risk Committee were "primarily business-sided people," meaning they were interested solely in making money for the Bank.  CW8 said that Americas Region Head for Wealth Management Patrick Campion and Deutsche Bank's Managing Director/COO for Wealth Management and Global Head of Digital and Client Analytics, Wealth Management, Thomas Klemm, were on Deutsche Bank's Reputational Risk Committee, which repeatedly approved Epstein despite his reputational risks.  Both Campion and Klemm were also Executive Committee Members for Deutsche Bank's Global Wealth Management.

### C.    Deutsche Bank Onboarded and Serviced Eastern European Oligarchs Reportedly Involved in Criminality

103.    Jeffrey Epstein was not the only unsavory character on Deutsche Bank's client roster.  As a matter of practice at the highest level of the corporate apex, unbeknownst to investors the Bank routinely onboarded without due diligence and serviced individuals reportedly engaged

in criminal activities, in reckless disregard of the financial crimes they helped perpetrate and despite the reputational risks they posed to the Bank.

### (i)      Deutsche Bank Onboarded and Serviced PEP Igor Putin

104.    Igor Putin was a client of Deutsche Bank until 2019.  Igor Putin is the first cousin of Russian President Vladimir Putin, and himself a Russian businessman, politician, and former Vice President of Master Bank, a private bank in Moscow.  Igor Putin was associated with a number of companies engaged in money laundering.  Deutsche Bank did not conduct any due diligence on Igor Putin before onboarding him.

105.    In September 2010, Igor Putin became Vice President of Master Bank.  In the same month, Master Bank received a lucrative contract with the Russian Nanotechnology Corporation.  After receiving the lucrative contact, Igor Putin held the position of Vice President for only a few months and retired in December 2010.  His retirement coincided with a criminal investigation in which over 30 million rubles were allegedly stolen from Master Bank by its employees using IT technologies.  The investigation accused the leading IT specialist of Master Bank, Mery Tevanyan, of operating a large illegal business, with a daily volume of up to 500 million Russian rubles, using Master Bank's money.

106.    In March 2011, five days after the conclusion of the investigation, Igor Putin returned to Master Bank as a director.  According to Master Bank, he was not supposed to manage its daily operations.  In November 2013, the Central Bank of Russia revoked the banking license of Master Bank following money-laundering scandals.  Igor Putin was director of the Board of Master Bank at the time of the scandal.

107.    In 2014, a report by the Organized Crime and Corruption Reporting Project exposed a $20-billion money-laundering scheme between Russian banks and the Moldovan bank

Moldindconbank, a scheme where Russian Land Bank wired $5 billion to the Moldovan bank. Igor Putin was a director of Land Bank.

108.    The Russky Zemelny Bank, in which Igor Putin was an investor, was shut down that same year for suspicious activities related to a $20-billion money-laundering scheme. Igor Putin resigned from the Board of Directors of the Russky Zemelny Bank, Promyshlenny Sberegatelny Bank and the construction company Yakut. In 2017, the banker Alexei Kulikov was arrested for illegally spiriting $10 billion out of the country through Promersbank, a bank that had Igor Putin on its Board at the time of this arrest.

### (ii)    Deutsche Bank Onboarded and Serviced PEP Roman Abramovich

109.    Oligarch Roman Abramovich is a current client of Deutsche Bank AG. Abramovich was onboarded by Deutsche Bank's former CEO Josef Ackermann. Deutsche Bank did not conduct any due diligence on Abramovich. Abramovich is an Israeli-Russian billionaire businessman and politician. Abramovich is the primary owner of the British private investment company Millhouse LLC and is best known outside the U.K. as the owner of Chelsea F.C., a Premier League British football club. On paper, Millhouse Capital does not have links to Abramovich's name, but is ultimately controlled by Abramovich. He was formerly governor of Chukotka Autonomous Okrug in Russia from 2000 to 2008. Deutsche Bank is an advisor to Millhouse Capital.[73] The Bank also loaned $700 million to Abramovich's steel company Evraz.[74]

---

[73] Georgina Prodhan and Michael Shields, *Deutsche Bank: Millhouse Capital ready to raise Hypo Balkans offer*, MarketScreener (July 29, 2014), https://www.marketscreener.com/quote/stock/DEUTSCHE-BANK-AG-56358396/news/Deutsche-Bank-Millhouse-Capital-ready-to-raise-Hypo-Balkans-offer-18811657/ (stating that the Bank is "advising on the sale" of Hypo Balkans network to Millhouse Capital).

[74] The Moscow Times, *ING, Deutsche Bank Launch $700M Syndicated Loan for Steel-Maker Evraz* (May 28, 2014), https://www.themoscowtimes.com/2014/05/28/ing-deutsche-bank-launch-700m-syndicated-loan-for-steel-maker-evraz-a35927.

110.    According to *Forbes*, Abramovich's net worth was $12.9 billion in 2019 making him the richest person in Israel, 10th-richest in Russia, and the 113th-richest person in the world. Since 1988, Abramovich has traded in timber, sugar, foodstuffs and various other products. Abramovich set up and liquidated at least 20 companies during the early 1990s, in sectors as diverse as tire retreading and bodyguard recruitment.

111.    In 1992, he was arrested and sent to prison in a case of theft of government property: AVEKS-Komi sent a train containing 55 cisterns of diesel fuel, worth 3.8 million rubles, from the Ukhta Oil Refinery in Russia. Abramovich met the train in Moscow and re-sent the shipment to the Kaliningrad military base under a fake agreement, but the fuel arrived in Riga, Latvia.

112.    In May 1995, jointly with Boris Berezovsky, another prominent Russian business oligarch, Abramovich set up the P.K. Trust closed joint-stock company.  In 1995 and 1996, he established 10 more firms: the Mekong close joint-stock company, the Centurion-M close joint-stock company, the Agrofert limited liability company, the Multitrans close joint-stock company, the Oilimpex close joint-stock company, the Sibreal close joint-stock company, the Forneft close joint-stock company, the Servet close joint-stock company, the Branco close joint-stock company, and the Vector-A limited liability company.

113.    In 1995, Abramovich and Berezovsky acquired a controlling interest in the large oil company, Sibneft. The deal took place within the controversial loans-for-shares program and each partner paid $100 million for half of the company, above the stake's stock market value of $150 million at the time, and rapidly increased its market capitalization to billions of dollars.  The fast-rising value of the company led many observers, in hindsight, to suggest that the real cost of the company should have been in the billions of dollars (it was worth $2.7 billion at that time). Abramovich later admitted in court that he paid huge bribes (in millions) to government officials

and obtained protection from gangsters to acquire these and other assets (including aluminum assets during the aluminum wars).

114.    Abramovich is one of many Russian oligarchs named in the Countering America's Adversaries Through Sanctions Act, signed into law by President Donald Trump in 2017.[75]

115.    According to a 2018 article in *The Guardian*, in 2016, Abramovich applied for residency in Switzerland, intending to move to the ski resort of Verbier. Swiss authorities denied the application after the Swiss Federal Office of Police concluded that Abramovich was under "suspicion of money laundering and presumed contacts with criminal organizations," and that his assets were "at least partially of illegal origin."[76] Abramovich unsuccessfully took legal action to prevent Swiss media from reporting on the matter and denied the allegations.

116.    The article reported that "Switzerland's federal police advised that the Russian oligarch Roman Abramovich posed a 'threat to public security and a reputational risk' to the country if he became a resident."[77] The article indicated that "[v]isa troubles have left Abramovich unable to work in the UK. His Israeli passport allows him to visit Britain for up to six months each year, but Israeli nationals are required to obtain a visa if they want to work, live or study in Britain. If he were to re-apply for a UK visa, the tycoon would have to submit to an examination of the source of his wealth, under tighter controls introduced since his last visa renewal."[78]

---

[75] January 29, 2018 Unclassified Report to Congress Pursuant to Section 241 of the Countering America's Adversaries Through Sanctions Act of 2017 Regarding Senior Foreign Political Figures and Oligarchs in the Russian Federation and Russian Parastatal Entities, *available at* http://prod-upp-image-read.ft.com/40911a30-057c-11e8-9650-9c0ad2d7c5b5.

[76] Juliette Garside, *Roman Abramovich posed threat to public security, Swiss Police said*, The Guardian (Sept. 25, 2018), https://www.theguardian.com/world/2018/sep/25/roman-abramovich-posed-threat-to-public-security-swiss-police-said.

[77] *Id.*

[78] *Id.*

### D. Deutsche Bank Onboarded and Serviced the Founders of the Hezbollah Terrorist Organization

117.     CW9 stated that on about six occasions, U.S. Department of Treasury officials who were monitoring the Bank's compliance came over to CW9's desk and questioned CW9 on why flagged transactions and clients had not been written up in SAR reports.

118.     CW9 told the officials that CW9 had in fact written SARs.  Indeed, CW9 kept the files on CW9's computer and pulled them up for the Treasury officials.  As it turned out, the SAR reports had not been sent to Treasury officials after CW9 sent them to the Bank's SAR team, CW9 said.  Speaking about CW9's interactions with the Treasury officials, CW9 said: "They would pull up an account where obviously there was something going on, and they would ask me why this wasn't escalated, why this didn't make it to the SAR, why there wasn't a SAR.  And I told them there actually was a SAR. I kept everything. I showed it to them."

119.     When CW9 and others sent SAR reports to the SAR team – which occurred via email – "supposedly [the SAR team] would send them over to the feds," CW9 said, "but a lot of times, that wouldn't happen."  CW9 showed Treasury officials a SAR CW9 had written to document a string of "five and dime" "mom and pop stores" in Kazakhstan that were passing "hundreds of thousands of dollars" through their stores each day.

120.     CW9 had flagged the account after noticing large transactions that were of an abnormal amount, especially given the nature of the "five and dime" stores. "They're transferring about half a million dollars every day through the stores," CW9 said. "It was very blatant."  After flagging the transactions, CW9 looked up the name of the company/stores, which was unknown. CW9 then used the address associated with the account to find out more information about the stores.  CW9 then determined that the stores were linked to "the two founders, the two brothers of the Hezbollah terrorist organization. They were most assuredly involved," CW9 said.

121.     CW9 wrote up a SAR report and sent it to the Bank's SAR team, but CW9 did not know what happened to the report afterward. CW9's boss, Vice President of AFC, Scott Rossman and Director/Head of Financial Crime Investigations Division – Jacksonville, Josh Blazer told CW9 to "let it go." "I was fighting with my manager … They did not want us to go any further with it," CW9 said, adding that Deutsche Bank was "dirty" and emphasizing that the Bank "squashed" SAR reports that were filed.

122.     When CW9 raised concerns about SARs that were not being escalated, including the one on the Hezbollah-associated clients, CW9's superiors – including Rossman and Blazer – told CW9, "You need to weigh the amount of money that we're making versus the fine that we're going to get," CW9 said.

### E.     Deutsche Bank Onboarded and Serviced a Billionaire Suspected of Financing Terrorism

123.     According to CW10, Deutsche Bank serviced a billionaire who was a relative of one of the founders of Al Rajhi Bank in Saudi Arabia, an entity long suspected of financing terrorists.[79]   CW10 also discovered that one of the account holder's relatives, who was using the account holder's account, was (and still is) on the FBI's Most Wanted Fugitive list for terrorism. CW10 said: "If a person was on that Most Wanted list and also came up under World-Check as being a relative of one of the founders of the Al Rajhi Bank, that is the biggest red flag you would ever need."

---

[79] *See, e.g.*, Glenn R. Simpson, *U.S. Tracks Saudi Bank Favored by Extremists*, Wall St. J. (July 26, 2007), https://www.wsj.com/articles/SB118530038250476405 (stating that "[c]onfidential reports by the Central Intelligence Agency and other U.S. agencies, reviewed by The Wall Street Journal, detail for the first time how much the U.S. learned about the use of Al Rajhi Bank by alleged extremists."); Bernie Pazanowski, *Saudi Bank Sees $4 Billion Suit Alleging Al Qaeda Aid Revived*, Bloomberg Law (Oct. 15, 2019) (reporting that the Second Circuit reinstated a lawsuit against Al Rajhi Bank for allegedly aiding and abetting al Qaeda's terrorist attacks in the U.S. on September 11, 2001), https://news.bloomberglaw.com/us-law-week/4-billion-lawsuit-tying-saudi-bank-to-al-qaeda-support-revived.

124.     CW10 followed the procedures, wrote up a SAR report in the summer of 2019, and

sent it to the AFC Team Manager for Deutsche Bank's Wealth Management division, Gwendolyn

Hill.  Hill told CW10 that s/he was doing "too much digging" and  instructed CW10 not to go back

to the FBI's website because "that's not a tool and that's not something you should be doing and

the additional in-depth investigation has been done." Hill told CW10: "We can't tell a billion-

dollar client we're going to close their accounts because our analyst thinks s/he saw something.'"

### F.    Deutsche Bank Onboarded and Serviced Germán and José Efromovich Despite Their Links to a Mexican Drug Cartel

125.     According to CW11, Deutsche Bank's AFC unit approved two billionaire brothers

with links to a Mexican drug cartel.  The two brothers, allegedly Germán and José Efromovich,

owned the Avianca airline company in Colombia, which automatically placed them in the "high-

risk" category because of their location. In addition to location, the airline industry also

automatically placed the brothers in the "high-risk" category.

126.     Avianca, the airline company owned by the Efromovich brothers, was the second

largest airline business in Latin America before it became bankrupt.[80] The SEC records for

Avianca Holdings show that former Avianca CEO Fabio Villegas Ramírez was previously a

Managing Director for Deutsche Bank in Colombia,[81] and the current Avianca CFO Adrian

Neuhauser previously held a senior position at Deutsche Bank.[82] Avianca's SEC records also show

---

[80] Ricardo Brito, Marcelo Rochabrun, *UPDATE 3-Avianca's majority shareholders arrested in Brazil on accusations of corruption*, Reuters (Aug. 19, 2020), https://www.reuters.com/article/brazil-corruption/update-3-aviancas-majority-shareholders-arrested-in-brazil-on-accusations-of-corruption-idUSL1N2FL0N3.

[81] Avianca Holdings S.A.'s Form 20-F filed with the SEC on April 30, 2015, *available at* https://google.brand.edgar-online.com/efxapi/EFX_dll/EDGARpro.dll?FetchFilingHtmlSection1?SessionID=nvG5qvigikET5G7&SectionID=9594501-813647-848322#D538577D424B4_HTM_TOC.

[82] Avianca Holdings S.A.'s Form 20-F filed with the SEC on June 10, 2020, *available at* https://sec.report/Document/0001193125-20-165956/.

that Deutsche Bank Securities Inc. is listed as an underwriter of Avianca's American Depository Shares.[83] Additionally, Avianca had filed for bankruptcy in 2018 and bankruptcy court records show that Deutsche Bank is listed as a lender of $33.5 million to Avianca Holdings.[84]

127.    Germán and José Efromovich are also high-risk PEPs.   The sister of Colombia's president-elect Iván Duque, Maria Paula is a senior Vice President of Strategic Relations & Customer Experience at Avianca Holdings.[85]  Additionally, former Brazilian president Luiz Inácio Lula da Silva (2003–2010) was a student at an adult-education school run by Germán Efromovich in the 1970s, according to press reports. The Efromovich brothers received numerous shipyard contracts under Lula and his hand-picked successor Dilma Rousseff (2011–2016). Government-owned banks BNDES and Caixa Econômica Federal provided financing for some of these contracts.[86]

---

[83] Avianca Holdings S.A.'s Amendment No. 2 to Form F-1 Registration Statement submitted to the SEC on August 7, 2013, *available at* https://www.sec.gov/Archives/edgar/data/1575969/000095012313005530/filename1.htm.

[84] Debtors' Reply to the Objections of USAV and the USAV Secured Lender Group to the Debtors' Motion for Entry of an Order Authorizing Rejection of Certain Executory Contracts, Exhibit 3 to Renenger Declaration at 150, In re Avianca Holdings S.A., *et al.*, No. 20-11133 (MG) (S.D.N.Y. Aug. 7, 2020), ECF No. 683, *available at* http://www.kccllc.net/avianca/document/2011133200807000000000008; Ricardo Meier, *Avianca Brasil (OceanAir) confirms collapse*, Airway (July 7, 2020), https://www.airway1.com/avianca-brasil-oceanair-confirms-collapse/.

[85] Loren Moss, *While Asking For Government Bailout & Furloughing Thousands of Employees, Bankrupt Avianca Paid 7 "Insiders" Bonuses Of Over $10.3 Million USD*, Finance Colombia (Sept. 21, 2020), https://www.financecolombia.com/while-asking-for-government-bailout-furloughing-thousands-of-employees-bankrupt-avianca-paid-7-insiders-bonuses-of-over-10-3-million-usd/.

[86] Debtwire, Shareholder Profile: Efromovich brothers double down on Avianca as shipyards struggle, Avianca Holdings, OceanAir Linhas Aéreas, Synergy Group at 7 (June 19, 2018), *available at*  https://s3.eu-west-2.amazonaws.com/acuris-live/Efromovich%20profile%2019%20Jun%202018.pdf.

128.    José Carlos Bumlai is a Brazilian executive and friend of Lula.  In 2015, Brazilian federal police found documents in Bumlai's apartment suggesting he used his influence to help the Efromovich brothers win contracts with Petrobras, Brazil's state-owned oil company.  Bumlai was sentenced to nearly 10 years in prison for fraud and corruption in 2016.[87]

129.    The family of Mauricio Macri, the president of Argentina since 2015, sold MacAir Jet SA (now Avian Líneas Aéreas) to the Efromovich Brothers in March 2016 for $10 million, according to the press. The Macri family, Germán Efromovich and the CEO of Avian Líneas Aéreas, have been under criminal investigation in Argentina since 2017 over the allocation of airline routes.[88]

130.    Furthermore, the Efromovich brothers were arrested last year in Brazil by the country's federal police, placed under house arrest and forbidden from leaving Brazil.  The brothers were charged with creating a corporate structure in Brazil and abroad to launder money, costing Brazil $111 million.  The brothers were also charged with bribing public officials in order to land ship-building contracts with Transpetro, the logistic unit of Brazilian oil company Petrobras.[89] The prosecutor Luciana Bogo stated: "The network of corruption in contracts for the construction of ships generated incalculable losses for Transpetro and the Brazilian naval

---

[87] *Id.*

[88] *Id.*

[89] Ricardo Brito, Marcelo Rochabrun, *UPDATE 3-Avianca's majority shareholders arrested in Brazil on accusations of corruption*, Reuters (Aug. 19, 2020), https://www.reuters.com/article/brazil-corruption/update-3-aviancas-majority-shareholders-arrested-in-brazil-on-accusations-of-corruption-idUSL1N2FL0N3.

industry."[90]  The arrest of the Efromovich brothers was carried out within the largest anti-corruption operation in the history of Brazil.[91]

131.    CW11 found that the Efromovich brothers' Avianca ownership structure included a Mexican family linked to a Mexican drug cartel.  CW11 learned about the family's stake in the business from an organizational chart submitted to the Bank.  Given Colombia's links to cocaine trafficking, the brothers' involvement in a high-risk industry and their ties to a family with links to a Mexican drug cartel, "all of those were red, red, red flags," CW11 said.

132.    CW11 escalated the brothers' case for further review to the AFC department. According to CW11, the Bank's AFC department had a specific team dedicated to "KYC High-Risk Escalations."  This occurred through a process where CW11 compiled all research related to the brothers, uploaded documents into a system called "DB CAR" and annotated CW11's findings with notes.  CW11 explained: "You take all of the findings, write up the concern – 'This is what we have. This is what we found.'"

133.    Despite the red flags, the AFC unit approved the Efromovich brothers as clients. CW11 knew the brothers were approved because CW11 was notified about decisions related to clients CW11 escalated.  Referring to the approval of the billionaire brothers with ties to a Mexican drug cartel, CW11 noted: "I'm sure it was a lot of money."

134.    CW11 said the AFC unit regularly approved new clients, despite their cases being escalated because of red flags linked to adverse news findings, location, industry and other information that came up during the KYC/due diligence process. "They would approve them

---

[90] *Efromovich brothers, formally denounced for corruption*, Archyde (Sept. 25, 2020), https://www.archyde.com/efromovich-brothers-formally-denounced-for-corruption/.
[91] *Id.*

anyway even though we brought it to their attention," CW11 stated, referring to red flags discovered during the due diligence process. "I've never seen them not approve [a client] – never."

### G.      Deutsche Bank Was Raided by German Authorities For Its Involvement In Facilitating Transactions With The Family of Syrian Dictator Bashar al-Assad

134.135.      Recently, it was reported that Deutsche Bank was raided on suspicion of filing money laundering reports too late concerning transactions involving the family of Syrian dictator Bashar al-Assad. Raids were carried out in April 2022 with officers from the German Federal Criminal Police Office (BKA) and Germany's financial watchdog Bafin. German financial newspaper *Handelsblatt* reported a transaction linked to the family of Assad, carried out several years ago and involving Assad's uncle, Rifaat Assad. While Rifaat did not have an account with the Bank, the Bank still processed and distributed money to the Assad family. Bank employees are legally obligated to immediately report suspicions of money laundering, particular transactions that could be linked to criminal or terrorist financing, but the Bank only reported the transaction last year.

### MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

135.136.      During the Class Period, Defendants made materially false and misleading statements concerning Deutsche Bank's client relationships and its KYC processes and procedures.

### A.      The 2017 Statements

136.137.      On March 14, 2017, Deutsche Bank published on its official website its Annual Report 2016, representing that "We are exiting client relationships where we consider . . . risks to be too high while also strengthening our client on-boarding and know-your client (KYC)

procedures."  The Annual Report 2016 was signed by, among others, Defendants Cryan and Schenck.

137.138.        The statements in the paragraph above were false and misleading when made because Deutsche Bank was not, in reality, exiting high-risk relationships and was not, in reality, strengthening its client onboarding and KYC procedures.  To the contrary, for high-net-worth  clients, Deutsche Bank was making exceptions, disregarding the high-risk nature of the relationships and the attending reputational and financial crime risks, in order to extract profits.  Deutsche Bank was onboarding and servicing high-net-worth clients without any real due diligence, enabling their criminal activities to continue.

138.139.        On March 20, 2017, Deutsche Bank filed an annual report on Form 20-F with the SEC, reporting the Bank's financial and operating results for the quarter and year ended December 31, 2016 (the "2016 20-F").   The 2016 20-F contained a signed Sarbanes Oxley certifications by, among others, Defendants Cryan and Schenck.

139.140.        The 2016 20-F contained the following statements concerning the Bank's KYC procedures:

> Major achievements in 2016 included . . . Substantial investment in our control functions, including the ongoing implementation of a more comprehensive Know-Your-Client (KYC) process and an off-boarding process for higher risk clients.
>
> *        *        *
>
> We are exiting client relationships where . . . risks are too high while also strengthening our client on-boarding and KYC procedures.

140.141.        The statements in the paragraph above were false and misleading when made because Deutsche Bank was not, in reality, exiting high-risk relationships and was not, in reality, strengthening its client onboarding and KYC procedures.  To the contrary, for high-net-worth  clients, Deutsche Bank was making exceptions, disregarding the high-risk nature of the

relationships and the attending reputational and financial crime risks, in order to extract profits. Deutsche Bank was onboarding and servicing high-net-worth clients without any real due diligence, enabling their criminal activities to continue.   Moreover, the representation that one of Deutsche Bank's "major achievements in 2016" was the implementation of a "more comprehensive" KYC process and off-boarding for higher risk clients gave investors the false impression that Deutsche Bank was taking significant steps to strengthen its KYC processes when, in reality, the Bank's KYC procedures did not apply to high-net-worth clients, who were afforded special treatment.

141.142.      On or around July 2, 2017, Deutsche Bank posted on its official website the following statements concerning the Bank's KYC procedures:

> Compliance: Conformity with the law and adherence to regulations and standards. How we assess and accept clients: We have developed effective procedures for assessing clients (Know Your Customer or KYC) and a process for accepting new clients in order to facilitate comprehensive compliance. Furthermore they help us to minimize risks relating to money laundering, financing of terrorism and other economic crime. Our KYC procedures start with intensive checks before accepting a client and continue in the form of regular reviews. Our procedures apply not only to individuals and corporations that are or may become our direct business partners, but also to people and entities that stand behind them or are indirectly linked to them.

142.143.      The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the statements failed to disclose, among other things, that the Bank was not conducting due diligence on high-net-worth clients, and there were no "intensive checks" before accepting such clients or during the duration of their relationship with Deutsche Bank.   Far from "minimiz[ing] risks" related to money laundering, financing of terrorism, or other crimes, Deutsche Bank was facilitating such crimes by lending money, holding and servicing the accounts, and providing trading services to unsavory clients engaged in criminal activities.

143.144.　　　On or about July 10, 2017, Deutsche Bank posted on its official website the following representations:

> DB has developed and implemented a comprehensive set of measures to identify, manage and control its AML risk. These measures are: A robust and strict KYC program.
>
> 6.3. KYC Program
> DB has implemented a strict group-wide KYC program to ensure all kinds of customers (natural or legal persons or legal structures, correspondent banks) are subject to adequate identification, risk rating and monitoring measures. This program has been implemented globally and throughout all business divisions. KYC includes not only knowing the clients and entities the Bank deals with (either as a single transaction or ongoing relationship), or renders services to, but also the Ultimate Beneficial Owners (UBOs), Legal Representatives and Authorised Signatories as appropriate. The program includes strict identification requirements, name screening procedures and the ongoing monitoring and regular review of all existing business relationships. Special safeguards are implemented for business relationships with politically exposed persons (PEPs) and clients from countries or industries deemed high risk.

144.145.　　　The statements in the paragraph above were materially false and misleading when made because Deutsche Bank did not, in fact, have a "robust and strict KYC program" to ensure "all kinds of customers . . . are subject to adequate identification, risk rating and monitoring measures" and Deutsche Bank did not, in fact, subject its high-net-worth clients to "strict identification requirements, name screening procedures and the ongoing monitoring and regular review of all existing . . . relationships." Far from applying such "strict" processes, Deutsche Bank had relaxed all KYC procedures for its high-net-worth clients. There were, in reality, no "special safeguards" implemented for PEPs and clients such as Epstein were treated as "Honorary" PEPs excused from any robust due diligence or meaningful KYC processes.

**B.　　The 2018 Statements**

145.146.　　　On or about March 12, 2018, Deutsche Bank published on its official website its Non-Financial Report 2017, as a supplement to the Bank's 2017 Annual Report signed by Defendant Cryan.  The Non-Financial Report 2017 represented that the Bank's newly-

implemented KYC program "pay[s] special attention to high-risk clients (such as politically exposed persons [PEP]) . . . Clients are assessed as part of due diligence and are regularly screened against internal and external criteria. In 2017, we continued to roll out an extended screening program, which serves as the basis for further enhancement with regards to screening effectiveness and efficiency."

146.147.      The statements in the paragraph above were false and misleading when made because Deutsche Bank did not in fact "pay special [due diligence] attention to high-risk clients such as politically exposed persons,"  as high-net-worth, high-risk clients were in fact not subject to any meaningful due diligence and instead were afforded special treatment.  Epstein, for example, was designated an "Honorary PEP," a label that excused him from KYC scrutiny.  The statement that in 2017, Deutsche Bank enhanced the effectiveness and efficiency of its client screening program was misleadingly incomplete because it failed to disclose that Deutsche Bank's high-net-worth clients were exempted from due diligence.

147.148.      The Non-Financial Report 2017 also maintained in relation to its KYC assurances that "[a]ssessing and understanding client-related money laundering and terrorist financing risks is a critical component of our AFC Risk Management framework, which helps us to mitigate and manage risk in line with our financial crime risk appetite.  The primary objective of risk segmenting our client base is to conduct appropriate due diligence and to ensure a comprehensive client profile is in place to enable the comparison of the results of ongoing monitoring and identify any discrepancies. Our risk rating methodology considers the following aspects of each client relationship to determine a Client Risk Rating: country risk, industry risk, product risk, and entity-type risk.  Irrespective of the risk type, if the client is a PEP or an ultimate beneficial owner of the client is a PEP, they will always be classified as high risk."

148.149.    The statements in the paragraph above were false and misleading when made because they conveyed overall a hopelessly incomplete picture of Deutsche Bank's KYC procedures.  For example, Deutsche Bank concealed that PEPs who were high-net-worth clients were not subject to any meaningful due diligence.  Moreover, some, if not all, PEPs were labeled "Honorary" PEPs and therefore not treated as high-risk or subject to any meaningful scrutiny.

149.150.    On or around March 12, 2018, Deutsche Bank published on its official website its Annual Financial Statements and Management Report of Deutsche Bank AG 2017, which contained similar representations as to those made in paragraphs 1465 and 1487 above.  The report was signed by, among others, Defendants Cryan and Moltke.

150.151.    Those statements were false misleading when made for the reasons described in paragraphs 1476 and 1498 above.

151.152.    On or around March 15, 2018, Deutsche Bank published on its official website its Annual Report 2017, representing that "We are exiting client relationships where we consider . . . risks to be too high while also strengthening our client on-boarding and know-your-client (KYC) procedures."    The report was signed by, among others, Defendants Cryan and Moltke.

152.153.    The statements in the paragraph above were false and misleading when made because  Deutsche Bank was not, in reality, exiting high-risk relationships and was not, in reality, strengthening its client onboarding and KYC procedures.  To the contrary, for high-net-worth  clients, Deutsche Bank was making exceptions, disregarding the high-risk nature of the relationships and the attending reputational and financial crime risks, in order to extract profits. Deutsche Bank was onboarding and servicing high-net-worth clients without any real due diligence, enabling their criminal activities to continue.

153.154.          On March 16, 2018, Deutsche Bank filed its annual report on Form 20-F with the SEC, reporting the Bank's financial and operating results for the quarter and year ended December 31, 2017 (the "2017 20-F").   The 2017 20-F contained a signed Sarbanes Oxley certifications by, among others, Defendants Cryan and Moltke.

154.155.          The 2017 20-F contained the following statements concerning the Bank's KYC procedures:

> We are exiting client relationships where we consider returns to be too low or risks to be too high while also strengthening our client on-boarding and know-your-client (KYC) procedures.

155.156.          The statements in the paragraph above were false and misleading when made because Deutsche Bank was not, in reality, exiting high-risk relationships and was not, in reality, strengthening its client onboarding and KYC procedures.   To the contrary, for high-net-worth  clients, Deutsche Bank was making exceptions, disregarding the high-risk nature of the relationships and the attending reputational and financial crime risks, in order to extract profits. Deutsche Bank was onboarding and servicing high-net-worth clients without any real due diligence, enabling their criminal activities to continue.

156.157.          On or around July 2 and September 30, 2018, Deutsche Bank posted on its official website the following statements concerning the Bank's KYC procedures:

> Compliance: Conformity with the law and adherence to regulations and standards. How we assess and accept clients: We have developed effective procedures for assessing clients (Know Your Customer or KYC) and a process for accepting new clients in order to facilitate comprehensive compliance. Furthermore they help us to minimize risks relating to money laundering, financing of terrorism and other economic crime. Our KYC procedures start with intensive checks before accepting a client and continue in the form of regular reviews. Our procedures apply not only to individuals and corporations that are or may become our direct business partners, but also to people and entities that stand behind them or are indirectly linked to them.

157.158.    The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the statements failed to disclose, among other things, that the Bank was not conducting due diligence on high-net-worth clients, and there were no "intensive checks" before accepting such clients or during the duration of their relationship with Deutsche Bank.  Far from "minimiz[ing] risks" related to money laundering, financing of terrorism, or other crimes, Deutsche Bank was facilitating such crimes by lending money, holding and servicing the accounts, and providing trading services to unsavory clients engaged in criminal activities.

158.159.    On or about July 10, 2018 and September 27, 2018, Deutsche Bank posted on its official website the following representations:

> DB has developed and implemented a comprehensive set of measures to identify, manage and control its AML risk. These measures are: A robust and strict KYC program.
>
> 6.3. KYC Program
> DB has implemented a strict group-wide KYC program to ensure all kinds of customers (natural or legal persons or legal structures, correspondent banks) are subject to adequate identification, risk rating and monitoring measures. This program has been implemented globally and throughout all business divisions. KYC includes not only knowing the clients and entities the Bank deals with (either as a single transaction or ongoing relationship), or renders services to, but also the Ultimate Beneficial Owners (UBOs), Legal Representatives and Authorised Signatories as appropriate. The program includes strict identification requirements, name screening procedures and the ongoing monitoring and regular review of all existing business relationships. Special safeguards are implemented for business relationships with politically exposed persons (PEPs) and clients from countries or industries deemed high risk.

159.160.    The statements in the paragraph above were materially false and misleading when made because Deutsche Bank did not, in fact, have a "robust and strict KYC program" to ensure "all kinds of customers . . . are subject to adequate identification, risk rating and monitoring measures" and Deutsche Bank did not, in fact, subject its high-net-worth clients to "strict identification requirements, name screening procedures and the ongoing monitoring and regular

review of all existing . . . relationships." Far from applying such "strict" processes, Deutsche Bank had relaxed all KYC procedures for its high-net-worth clients. There were, in reality, no "special safeguards" implemented for PEPs and clients, such as Epstein, were treated as "Honorary" PEPs excused from any robust due diligence or meaningful KYC processes.

160.161.     In an August 3, 2018 public response addressing rumors reported by *Reuters* that the Bank was suffering from shortcomings in its customer screening process, Deutsche Bank publicly represented of its group-wide controls: "We are not struggling with procedures designed to help prevent criminals from money laundering and other criminal action. Our procedures to identify potential anti-money laundering and KYC risks are very effective."

161.162.     The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the statements failed to disclose, among other things, that the Bank was, in fact, enabling financial crimes through its practice of onboarding and retaining PEPs and other high-net-worth clients engaged in criminal activities without subjecting such clients to any substantive due diligence. In fact, Deutsche Bank was treating certain PEPs as "Honorary" PEPs exempt from any meaningful KYC safeguards.

### C.     The 2019 Statements

162.163.     On or about March 15, 2019, Deutsche Bank published on its official website its Non-Financial Report 2018, as a supplement to the Bank's 2018 Annual Report signed by Defendant Sewing. The Non-Financial Report 2018 represented that the Bank's "KYC is an ongoing process throughout the life cycle of a client relationship . . . As part of our regular client due diligence, we screen our relationships against internal and external criteria, e.g. relating to Politically Exposed Persons (PEPs), terrorism, or sanctions."

163.164.    The statements in the paragraph above were materially false and misleading when made because, in reality, Deutsche Bank was not conducting any client due diligence for high-net-worth individuals and entities, let alone "regular" client due diligence.  What's more, it was designating PEPs as "Honorary" PEPs exempt from any meaningful due diligence, and it was enabling high-net-worth clients to commit crimes using the Bank's facilities.

164.165.    The statements in the paragraph above were also repeated in Deutsche Bank's Annual Financial Statements and Management Report of Deutsche Bank AG 2018, published on Deutsche Bank's official website on or around March 15, 2019, and signed, among others, by Defendants Sewing and Moltke.

165.166.    Those statements were false and misleading when made for the reasons described in the paragraph 1643 above.

166.167.    On or around March 21, 2019, Deutsche Bank published on its official website its Annual Report 2018, representing that "We are exiting client relationships where we consider . . . risks to be too high while also strengthening our client on-boarding and know-your-client (KYC) procedures."   The report was signed by, among others, Defendants Sewing and Moltke.

167.168.    The statements in the paragraph above were false and misleading when made because Deutsche Bank was not, in reality, exiting high-risk relationships and was not, in reality, strengthening its client onboarding and KYC procedures.  To the contrary, for high-net-worth  clients, Deutsche Bank was making exceptions, disregarding the high-risk nature of the relationships and the attending reputational and financial crime risks, in order to extract profits. Deutsche Bank was onboarding and servicing high-net-worth clients without any real due diligence, enabling their criminal activities to continue.

168.169.        On March 22, 2019, Deutsche Bank filed an annual report on Form 20-F

with the SEC, reporting the Bank's financial and operating results for the quarter and year ended

December 31, 2018 (the "2018 20-F").   The 2018 20-F contained a signed Sarbanes Oxley

certifications by, among others, Defendants Sewing and Moltke.

169.170.        The 2018 20-F contained the following statements concerning the Bank's

KYC procedures:

> We are exiting client relationships where we consider returns to be too low or risks
> to be too high while also strengthening our client on-boarding and know-your-client
> (KYC) procedures.

170.171.        The statements in the paragraph above were false and misleading when

made because Deutsche Bank was not, in reality, exiting high-risk relationships and was not, in

reality, strengthening its client onboarding and KYC procedures.  To the contrary, for high-net-

worth  clients, Deutsche Bank was making exceptions, disregarding the high-risk nature of the

relationships and the attending reputational and financial crime risks, in order to extract profits.

Deutsche Bank was onboarding and servicing high-net-worth clients without any real due

diligence, enabling their criminal activities to continue.

171.172.        On or around July 2, 2019 and September 30, 2019, Deutsche Bank also

posted on its official website the following statements concerning the Bank's KYC procedures:

> Compliance: Conformity with the law and adherence to regulations and standards.
> How we assess and accept clients: We have developed effective procedures for
> assessing clients (Know Your Customer or KYC) and a process for accepting new
> clients in order to facilitate comprehensive compliance. Furthermore they help us
> to minimize risks relating to money laundering, financing of terrorism and other
> economic crime. Our KYC procedures start with intensive checks before accepting
> a client and continue in the form of regular reviews. Our procedures apply not only
> to individuals and corporations that are or may become our direct business partners,
> but also to people and entities that stand behind them or are indirectly linked to
> them.

172.173.     The statements in the paragraph above were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading, because the statements failed to disclose, among other things, that the Bank was not conducting due diligence on high-net-worth clients, and there were no "intensive checks" before accepting such clients or during the duration of their relationship with Deutsche Bank.  Far from "minimiz[ing] risks" related to money laundering, financing of terrorism, or other crimes, Deutsche Bank was facilitating such crimes by lending money, holding and servicing the accounts, and providing trading services to unsavory clients engaged in criminal activities.

173.174.     On or about July 10, 2019 and September 27, 2019, Deutsche Bank posted on its official website the following representations:

> DB has developed and implemented a comprehensive set of measures to identify, manage and control its AML risk. These measures are: A robust and strict KYC program.
>
> 6.3. KYC Program
> DB has implemented a strict group-wide KYC program to ensure all kinds of customers (natural or legal persons or legal structures, correspondent banks) are subject to adequate identification, risk rating and monitoring measures. This program has been implemented globally and throughout all business divisions. KYC includes not only knowing the clients and entities the Bank deals with (either as a single transaction or ongoing relationship), or renders services to, but also the Ultimate Beneficial Owners (UBOs), Legal Representatives and Authorised Signatories as appropriate. The program includes strict identification requirements, name screening procedures and the ongoing monitoring and regular review of all existing business relationships. Special safeguards are implemented for business relationships with politically exposed persons (PEPs) and clients from countries or industries deemed high risk.

174.175.     The statements in the paragraph above were materially false and misleading when made because Deutsche Bank did not, in fact, have a "robust and strict KYC program" to ensure "all kinds of customers . . . are subject to adequate identification, risk rating and monitoring measures" and Deutsche Bank did not, in fact, subject its high-net-worth clients to "strict identification requirements, name screening procedures and the ongoing monitoring and regular

review of all existing relationships."  Far from applying such "strict" processes, Deutsche Bank

had relaxed all KYC procedures for its high-net-worth clients.  There were, in reality, no "special

safeguards" implemented for PEPs.

### D.     The 2020 Statements

~~175.~~176.          On or about March 13, 2020, Deutsche Bank published on its official

website its Non-Financial Report 2019, as a supplement to the Bank's 2019 Annual Report signed

by Defendant Sewing.  The Non-Financial Report 2019 represented that "Know Your Client

(KYC) is an ongoing process throughout the life cycle of a client relationship . . . As part of its

regular client due diligence, Deutsche Bank screens its client relationships against internal and

external criteria, for instance relating to politically exposed persons, terrorism, or sanctions . . .

payments are screened prior to being made."

~~176.~~177.        The statements referenced in the paragraph above were materially false and

misleading when made because Deutsche Bank was not, in fact, conducting any due diligence, let

alone "regular due diligence" for its high-net-worth clients and/or PEPs, and it was not, in fact,

screening payments before they were made.

### LOSS CAUSATION/ECONOMIC LOSS

~~177.~~178.        During the Class Period, as detailed above, Deutsche Bank and the

Individual Defendants made false and misleading statements and engaged in a scheme to deceive

the market and a course of conduct that artificially inflated the prices of Deutsche Bank's securities

and operated as a fraud or deceit on Class Period purchasers of Deutsche Bank securities, by

misrepresenting the Bank's KYC procedures—a critical component of the Bank's AML processes.

Later, when Defendants' prior misrepresentations and fraudulent conduct became known to the

market, the price of Deutsche Bank's securities declined as the prior artificial inflation came out

of the price over time.  As a result of their purchases of Deutsche Bank securities during the Class

Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

178.179.      On May 13, 2020, German newspaper *Sueddeutsche Zeitung* reported that the Federal Reserve had sharply criticized Deutsche Bank's U.S. operations in an internal audit. The audit reportedly found that Deutsche Bank had failed to address multiple concerns identified years earlier, including concerns related to the Bank's AML and other control procedures. For example, U.S. media outlets, citing *Sueddeutsche Zeitung*, reported that, in late March, the Federal Reserve had sent an audit report to Defendant Sewing and other top executives "expressing continued dissatisfaction" with Deutsche Bank's AML controls and liquidity management at its U.S. unit, which was reportedly "based on investigations in late 2019 and early 2020."

179.180.      On this news, the value of Deutsche Bank's ordinary shares fell $0.31 per share, or 4.49%, to close at $6.60 per share on May 13, 2020.

180.181.      On June 24, 2020, the *Financial Times* published an article entitled "Wirecard Founder Braun Arrested on Suspicion of False Accounting." The *Financial Times* article reported that Deutsche Bank's client Markus Braun, Wirecard's CEO and CTO, "was arrested on suspicion of false accounting and market manipulation days after the company he built into Europe's leading fintech admitted that €1.9bn of cash reported on its balance sheet probably does 'not exist.' Shares in Wirecard have fallen more than 80 percent since last week, when the company revealed that the cash was missing." The article also reported that "Mr. Braun in late 2017 had borrowed €150m from Deutsche Bank, pledging his shares as collateral for a margin loan."

181.182.        On this news, the value of Deutsche Bank's securities fell $0.43 per share, or 4.50%, to close at $9.12 per share on June 24, 2020.

182.183.        On June 26, 2020, *Bloomberg Law* published an article entitled "Deutsche Bank Accounting Head Is Aim of Wirecard Complaint."   Discussing Deutsche Bank's controversial hire, Andreas Loetscher, the *Bloomberg Law* article reported, in relevant part:

> Deutsche Bank AG's top accounting executive, Andreas Loetscher, and two ex-colleagues at his former firm Ernst & Young were targeted in a criminal complaint by a German retail investor association for their alleged role in the accounting scandal at Wirecard AG.
>
> The SdK association filed the claim against two unnamed current partners of EY -- which also audits Deutsche Bank's accounts -- and one former partner because of "the events around Wirecard," according to a statement on Friday. That ex-partner is Loetscher, a person familiar with the matter said. Loetscher, a two-decade veteran at the accounting firm, oversaw the Wirecard audits for the financial years 2015 through 2017, filings show. He left in 2018 to become chief accounting officer at Deutsche Bank, taking over after the bank struggled for years with legal and regulatory mishaps.
>
> Loetscher is just one link between Wirecard and Deutsche Bank. Germany's largest lender has loaned money to both Wirecard and Braun [Markus Braun, former Wirecard CEO and CTO, until his arrest in June 2020] and it also served as global coordinator on the company's bond issue last year. The bank also led on its share sale in 2014. DWS, Deutsche Bank's asset-management unit, was briefly one of Wirecard's biggest shareholders earlier this year.
>
> Braun has served one of the bank's regional advisory boards. Wirecard even toyed with a tie-up with Deutsche Bank and approached the lender with the idea, people familiar with the matter previously said.

183.184.        On this news, the value of Deutsche Bank's ordinary shares fell $0.57 per share, or 5.96%, to close at $9.00 per share on June 26, 2020.

184.185.        On July 7, 2020, the Department of Financial Services fined the Bank $150 million for neglecting to flag numerous questionable transactions from accounts associated with Epstein and two correspondent banks, Danske Estonia and FBME Bank, which were both the subject of prior scandals involving financial misconduct.

185.186.        For example, a *Law360* article published the same day, entitled "Deutsche Bank Fined $150M For Epstein, Partner Bank Lapses," stated, in relevant part, that "New York state's financial regulator . . . fined Deutsche Bank $150 million for failing to appropriately manage its dealings with alleged bad actors including millionaire sex offender Jeffrey Epstein," and that, "[a]ccording to the terms of a consent order with the [DFS], Deutsche Bank AG, its New York branch and Deutsche Bank Trust Company America agreed to pay the sum in connection with DFS claims that the bank neglected to flag numerous questionable transactions from accounts associated with Epstein and two correspondent banks, Danske Estonia and FBME Bank."

186.187.        With specific respect to Deutsche Bank's failure to appropriately monitor transactions related to Epstein, the *Law360* article reported, in relevant part:

> According to the DFS, Deutsche bank "processed hundreds of transactions totaling millions of dollars that, at the very least, should have prompted additional scrutiny in light of Mr. Epstein's history."

> Those transactions included payments to Epstein associates who were "publicly alleged" to have played roles in luring Epstein's victims, more than $7 million in settlement payments and $6 million in legal fees, more than $800,000 in cash withdrawals and "(consistent with public allegations of prior wrongdoing) payments directly to numerous women with Eastern European surnames."

> * * *

> "Throughout the relationship, very few problematic transactions were ever questioned, and even when they were, they were usually cleared without satisfactory explanation," the regulator said Tuesday.

> * * *

> The DFS' announcement comes on the heels of the arrest last week in New Hampshire of Epstein associate and alleged "fixer" Ghislaine Maxwell, who was charged by federal prosecutors in connection with her alleged actions on behalf of the financier and was removed to stand trial in New York. And the announcement occurs nearly a year after Epstein committed suicide in a federal jail in Manhattan as he awaited trial following his arrest in Florida on sex trafficking charges.

187.188.      The *Law360* article also quoted the DFS's Superintendent of Financial Services, Linda A. Lacewell ("Lacewell"), who stated that "in each of the cases that are being resolved today, Deutsche Bank failed to adequately monitor the activity of customers that the bank itself deemed to be high risk."  Lacewell further stated that "[i]n the case of Jeffrey Epstein in particular, despite knowing Mr. Epstein's terrible criminal history, the bank inexcusably failed to detect or prevent millions of dollars of suspicious transactions."

188.189.      On this news, the value of Deutsche Bank's ordinary shares fell $0.13 per share, or 1.31%, to close at $9.82 per share on July 7, 2020.

189.190.      On July 9, 2020, *Bloomberg Law* published an article entitled "JPMorgan Dropped Accounts That Became Bad News for Deutsche Bank."  The *Bloomberg Law* article reported that JPMorgan distanced itself from "the trio of clients that got Deutsche Bank AG in regulatory trouble this week" as early as 2009.  The article stated that JPMorgan "stepped away from handling money for FBME in 2009" and that it distanced itself from Epstein and Danske Bank A/S "around 2013."

190.191.      Discussing Deutsche Bank's relationships with Danske Bank and FBME, the *Bloomberg Law* article reported, in relevant part:

> JPMorgan stopped providing the [Danske Bank] Estonia unit access to the U.S. financial system in 2013, citing the high percentage of client accounts domiciled outside the Baltic country. Deutsche Bank continued providing banking services to Danske for another two years.
>
>                     \* \* \*
>
> JPMorgan started doing business with FBME in the early 2000s and quickly grew frustrated with its failure to fully explain certain transactions, according to documents reviewed by Bloomberg News. The banking giant was also wary of other practices at FBME, such as offering "hold mail" services, in which a bank allows clients to use the bank's address to limit paper trails, according to those documents. Deutsche Bank provided banking services to FBME for five years after JPMorgan stopped, processing some $618 billion in all.

191.192.        On this news, the value of Deutsche Bank's ordinary shares fell $0.28 per share, or 2.80%, to close at $9.72 per share on July 9, 2020.

193.    On July 13, 2020, the *New York Times* published an article entitled "These Are the Deutsche Bank Executives Responsible for Serving Jeffrey Epstein."  The *New York Times* article identified "nearly every person anonymously described" in the New York State Department of Financial Services' Consent Order "that omitted the executives' and bankers' names."  The article stated: "At least one high-ranking executive remains in her position: Jan Ford, the bank's head of compliance in the Americas."  The article identified Paul Morris (described in the Consent Order as "RELATIONSHIP MANAGER-1") and Charles Packard, then Co-Head of the Wealth Management division (described in the Consent Order as "EXECUTIVE-1").   Based on descriptions of the employees in the Consent Order and interviews with current and former Deutsche Bank officials, the *New York Times* also identified other top executives who participated in the January 30, 2015 ARRC meeting and decided to continue conducting business with Epstein: Stuart Clarke, Chief Operating Officer for the Americas and General Manager of Deutsche Bank's New York branch and a member of the Regional Executive Committee and Jan Ford, a Managing Director and Deutsche Bank Americas Head of Compliance and a member of the North America Executive Committee and the Global Compliance Executive Committee.

192.194.        Also on July 13, 2020, Bloomberg reported that Deutsche Bank's legal risks in the U.S. include potential money-laundering breaches, with a Justice Department probe that may result in fines, despite penalties paid to other agencies over Russia mirror trades, Danske Bank and Jeffrey Epstein.

193.195.        On this news, the value of Deutsche Bank's ordinary shares fell $0.37 per share, or 3.66%, to close at $9.73 per share on July 13, 2020.

194.196.        On July 28, 2020, *ABC News* reported that Denise N. George, the U.S. Virgin Islands Attorney General, subpoenaed Deutsche Bank for account records, transaction details and communications concerning Epstein, his estate, and more than 30 corporations, trusts and nonprofit entities connected to him.  George filed a  civil forfeiture lawsuit against Epstein's estate in January 2020, which alleged that Jeffrey Epstein trafficked girls to the U.S. Virgin Islands, as recently as 2018.

195.197.        On this news, the value of Deutsche Bank's ordinary shares fell $0.1 per share, or 1.05%, to close at $9.45 per share on July 28, 2020.

196.198.        On September 9, 2020, *Law360* published an article entitled "Deutsche Bank to Pay $583K to End Ukraine Sanctions Probe."  The article attached an Enforcement Release from the U.S. Department of Treasury, disclosing that Deutsche Bank Trust Company Americas violated Ukraine-related sanctions regulations when, without conducting appropriate due diligence, it processed a multi-million dollar transaction that involved IPP Oil Products (Cyprus) Ltd., an entity on the Office of Foreign Assets Control's list of Specially Designated Nationals and Blocked Persons.

197.199.        On this news, the value of Deutsche Bank's ordinary shares fell $0.07 per share, or 0.74%, to close at $9.35 per share on September 10, 2020.

198.200.        On September 20, 2020, *BuzzFeed News* published an article entitled "Deutsche Bank Execs Missed Money Laundering Red Flags."  Citing an extensive review of "closely held US Treasury documents" as well as "confidential bank documents," *BuzzFeed* reported, *inter alia*, "that Deutsche managers, including top executives, had direct knowledge for years of serious failings that left the bank vulnerable to money launderers" and characterized the Bank's conduct as "let[ting] dirty clients run rampant."

199.201.    On this news, the value of Deutsche Bank's ordinary shares fell $0.75 per share, or 8.25%, to close at $8.34 per share on September 21, 2020.

200.202.    On September 22, 2020, *Bloomberg Law* published an article entitled "Singapore, Hong Kong Top Asia Destinations for Suspect Funds."  The article reported that Singapore and Hong Kong were the biggest destinations for suspect transactions in Asia and that Deutsche Bank processed suspicious transactions in Hong Kong:

> Singapore processed $4.4 billion in suspicious flows through banks, including DBS Group Holdings Ltd., Oversea-Chinese Banking Corp. and United Overseas Bank Ltd., the International Consortium of Investigative Journalists said in an investigation published Sunday. Some $4.1 billion was handled in Hong Kong by lenders including HSBC Holdings Plc and Deutsche Bank AG, it said. The banks involved in the transactions are among global firms that profited from "powerful and dangerous players" even after the U.S. imposed penalties on the institutions, the report said.

201.203.    On this news, the value of Deutsche Bank's ordinary shares fell $0.2 per share, or 2.4%, to close at $8.14 per share on September 22, 2020.

202.204.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Bank's securities, Plaintiffs and other class members have suffered significant losses and damages.

**APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET**

203.205.    Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the- market doctrine in that, among other things:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) the omissions and misrepresentations were material;

(c) the Bank's stock traded in an efficient market;

(d) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Bank's stock; and

(e) Plaintiffs and other members of the Class purchased the Bank's securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

204.206.       At all relevant times, the markets for the Bank's securities were efficient for the following reasons, among others:

(a) as a regulated issuer, Deutsche Bank filed periodic public reports with the SEC;

(b) Deutsche Bank regularly communicated with public investors via established market communication mechanisms;

(c) Deutsche Bank was followed by several securities analysts employed by major brokerage firm(s) who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and

(d) Deutsche Bank's common stock was actively traded in an efficient market, namely the NYSE, under the ticker symbol "DB."

205.207.       As a result of the foregoing, the market for Deutsche Bank securities promptly digested current information regarding the Bank from publicly available sources and reflected such information in the prices of Deutsche Bank's securities.  Under these circumstances, all purchasers of Deutsche Bank securities during the Class Period suffered similar injury through their purchase of Deutsche Bank securities at artificially inflated prices and the presumption of reliance applies.

206.208.        Further, to the extent that the Defendants concealed or improperly failed to disclose material facts with regard to the Bank, Plaintiffs are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128,  153 (1972).

**NO SAFE HARBOR**

207.209.        The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward- looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer or top management of Deutsche Bank who knew that the statement was false when made.

**CLASS ACTION ALLEGATIONS**

208.210.        Plaintiffs bring this action as a class action, pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Deutsche Bank securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Bank, at all relevant times, members of their immediate

families and their legal representatives, heirs, successors or assignees and any entity in which Defendants have or had a controlling interest.

209.211.      The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Deutsche Bank securities were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Deutsche Bank or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

210.212.      Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

211.213.      Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

212.214.      Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Deutsche Bank;

- whether the Individual Defendants caused Deutsche Bank to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Deutsche Bank securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

213.215.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

214.216.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Deutsche Bank securities are traded in an efficient market;

- the Bank's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Bank traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Bank's securities; and

- Plaintiffs and members of the Class purchased, acquired and/or sold Deutsche Bank securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

215.217.     Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

216.218.     Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements, in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

217.219.     Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

218.220.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

219.221.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Deutsche Bank securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise

acquire Deutsche Bank securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

220.222.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Deutsche Bank securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Deutsche Bank's finances and business prospects.

221.223.    By virtue of their positions at Deutsche Bank, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth, in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

222.224.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Deutsche Bank, the Individual Defendants had knowledge of the details of Deutsche Bank's internal affairs.

223.225.      The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Deutsche Bank.   As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Deutsche Bank's KYC processes.  As a result of the dissemination of the aforementioned false and misleading statements, the market price of Deutsche Bank securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Deutsche Bank's actual KYC processes, which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Deutsche Bank securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

224.226.      During the Class Period, Deutsche Bank securities were traded on an active and efficient market.  Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Deutsche Bank securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Deutsche Bank securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class.  The market price of Deutsche Bank securities

declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

225.227.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

226.228.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Bank's securities during the Class Period, upon the disclosure that the Bank had made misrepresentations and omissions to the investing public.

### COUNT II
### (Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)

227.229.     Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

228.230.     During the Class Period, the Individual Defendants participated in the operation and management of Deutsche Bank, and conducted and participated, directly and indirectly, in the conduct of Deutsche Bank's business affairs, including the onboarding and retention of high-risk-clients.  Because of their senior positions, they knew the adverse non-public information about Deutsche Bank's misstatements and omissions.

229.231.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate, complete, and truthful information with respect to Deutsche Bank's KYC processes, and to correct promptly any public statements issued by Deutsche Bank which had become materially false or misleading.

230.232.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press

releases and public filings which Deutsche Bank disseminated in the marketplace during the Class Period concerning Deutsche Bank's KYC processes. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Deutsche Bank to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Deutsche Bank within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged, which artificially inflated the market price of Deutsche Bank securities.

231.233.    Each of the Individual Defendants, therefore, acted as a controlling person of Deutsche Bank. By reason of their senior management positions and/or being members of the Management Board of Deutsche Bank, each of the Individual Defendants had the power to direct the actions of, and exercised the same, to cause Deutsche Bank to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Deutsche Bank and possessed the power to control the specific activities that comprise the primary violations about which Plaintiffs and the other members of the Class complain.

232.234.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Deutsche Bank.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B.    Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated:  ~~March 1~~June 30, 2022~~, 2021~~            Respectfully submitted,

                                            POMERANTZ LLP

                                            /s/ Emma Gilmore
                                            Jeremy A. Lieberman ~~(admitted *pro hac vice*)~~
                                            Emma Gilmore ~~(admitted *pro hac vice*)~~
                                            Dolgora Dorzhieva ~~(admitted *pro hac vice*)~~
                                            Villi Shteyn
                                            600 Third Avenue, 20th Floor
                                            New York, New York 10016
                                            Telephone: (212) 661-1100
                                            Facsimile: (917) 463-1044
                                            jalieberman@pomlaw.com
                                            egilmore@pomlaw.com
                                            ddorzhieva@pomlaw.com
                                            vshteyn@pomlaw.com

                                            *Counsel for Plaintiffs and for the Proposed Class*

                                            ~~/s/  Terrence W. Scudieri~~
                                            ~~Terrence W. Scudieri~~
                                            ~~POMERANTZ LLP~~

                                            ~~*Counsel for Plaintiffs and for the Proposed Class*~~


                                            Peretz Bronstein
                                            ~~(*pro hac vice* application forthcoming)~~
                                            BRONSTEIN, GEWIRTZ & GROSSMAN, LLC

60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Fascimile: (212) 697-7296
peretz@bgandg.com

*Additional Counsel for Plaintiffs and for the Proposed Class*