**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ALI KARIMI, Individually and On Behalf of All Others Similarly Situated,<br><br>                           Plaintiffs,<br><br>          *- against -*<br><br>DEUTSCHE BANK AKTIENGESELLSCHAFT, JOHN CRYAN, AND CHRISTIAN SEWING,<br><br>                       Defendants. | **Case No. 1:22-cv-02854-JSR** |

**DEFENDANTS' MEMORANDUM OF LAW IN**
**OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

David G. Januszewski
Sheila C. Ramesh
Nicholas N. Matuschak
Ivan Torres
Cahill Gordon & Reindel LLP
32 Old Slip
New York, New York 10005
212-701-3000
djanuszewski@cahill.com
sramesh@cahill.com
nmatuschak@cahill.com
itorres@cahill.com

*Attorneys for Defendants Deutsche Bank*
*Aktiengesellschaft, John Cryan, and Christian*
*Sewing*

August 22, 2022

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................. ii

PRELIMINARY STATEMENT ............................................................................................1

LEGAL STANDARD.............................................................................................................2

ARGUMENT ..........................................................................................................................3

I.    THE COURT SHOULD DENY CLASS CERTIFICATION UNDER RULE
      23(b)(3) BECAUSE INDIVIDUALIZED QUESTIONS OF RELIANCE
      PREDOMINATE AND PLAINTIFFS CANNOT RELY ON ANY
      PRESUMPTION OF RELIANCE ................................................................................3

      A.    The *Basic* Presumption Does Not Apply ................................................................4

            i.    The Alleged Misstatements Did Not Cause an Increase in the Price
                  of Deutsche Bank Shares ................................................................................4

            ii.   The Alleged Corrective Disclosures Did Not Cause a Decrease in
                  the Price of Deutsche Bank Shares ................................................................6

      B.    The *Affiliated Ute* Presumption Does Not Apply ................................................13

II.   THE COURT SHOULD DENY CLASS CERTIFICATION UNDER RULE
      23(a)(3) BECAUSE PLAINTIFFS HAVE NOT ESTABLISHED THAT EITHER
      OF THE PROPOSED REPRESENTATIVES' SHARES WERE PURCHASED
      ON A U.S. STOCK EXCHANGE....................................................................................15

III.  THE COURT SHOULD DENY CLASS CERTIFICATION UNDER RULE
      23(a)(4) BECAUSE PLAINTIFFS HAVE NOT ESTABLISHED THAT EITHER
      OF THE PROPOSED REPRESENTATIVES WILL FAIRLY AND
      ADEQUATELY PROTECT THE INTERESTS OF THE CLASS ................................19

      A.    Ali Karimi Will Not Fairly and Adequately Protect the Interests of the Class......19

      B.    Yun Wang Will Not Fairly and Adequately Protect the Interests of the Class......21

IV.   IF THE COURT DOES NOT DENY PLAINTIFFS' MOTION IN ITS
      ENTIRETY, THE COURT SHOULD NARROW THE PROPOSED CLASS TO
      ONLY THOSE WHO ACQUIRED DEUTSCHE BANK ORDINARY SHARES
      PURCHASED ON A U.S. STOCK EXCHANGE DURING THE PROPOSED
      CLASS PERIOD............................................................................................................23

CONCLUSION....................................................................................................................25

## **TABLE OF AUTHORITIES**

**Cases**                                                                                                 **Pages(s)**

*Affiliated Ute Citizens of Utah* v. *United States*,
    406 U.S. 128 (1972) ................................................................................1, 13

*In re Amla Litigation*,
    282 F. Supp. 3d 751 (S.D.N.Y. 2017)........................................................2

*Arkansas Teachers Retirement System* v. *Goldman Sachs Group, Inc.*,
    879 F.3d 474 (2d Cir. 2018)...................................................................12n

*Basic Inc.* v. *Levinson*,
    485 U.S. 224 (1988)............................................................................1, 6

*Bensley* v. *FalconStor Software, Inc.*,
    277 F.R.D. 231 (E.D.N.Y. 2011) ...........................................................20

*Billhofer* v. *Flamel Technologies, S.A.*,
    281 F.R.D. 150 (S.D.N.Y. 2012) .............................................................7n

*Carpenters Pension Trust Fund of St. Louis* v. *Barclays PLC*,
    310 F.R.D. 69 (S.D.N.Y. 2015) ...............................................................7n

*City of Pontiac Policemen's and Firemen's Retirement System* v. *UBS AG*,
    752 F.3d 173 (2d Cir. 2014).........................................................16n, 17n

*Comcast Corp.* v. *Behrend*,
    569 U.S. 27 (2013)................................................................................3

*Darvin* v. *International Harvester Co.*,
    610 F. Supp. 255 (S.D.N.Y. 1985) ...................................................20n, 22

*Erica P. John Fund, Inc.* v. *Halliburton Co.*,
    563 U.S. 804 (2011)..............................................................................3

*Falcon* v. *Philips Electronics North America Corp.*,
    2007 WL 959374 (S.D.N.Y. Mar. 30, 2007) ............................................15

*In re Flag Telecom Holdings, Ltd. Securities Litigation*,
    574 F.3d 29 (2d Cir. 2009)....................................................................25n

*In re Fyre Festival Litigation*,
    2020 WL 7318276 (S.D.N.Y. Dec. 11, 2020) ...........................................21

*George* v. *China Auto. Sys., Inc.*,
 2013 WL 3357170 (S.D.N.Y. July 3, 2013) ..................................................23n, 25n

*Goldman Sachs Group, Inc.* v. *Arkansas Teacher Retirement System*,
 141 S.Ct. 1951 (2021) ...........................................................................4, 5, 6, 8, 13

*Gordon* v. *Sonar Cap. Mgmt. LLC*,
 92 F. Supp. 3d 193 (S.D.N.Y. 2015).......................................................................20

*Halliburton Co.* v. *Erica P. John Fund, Inc.*,
 573 U.S. 258 (2014).............................................................................................4, 7

*IBEW Local 90 Pension Fund* v. *Deutsche Bank AG*,
 2013 WL 5815472 (S.D.N.Y. Oct. 29, 2013) .......................................................23n

*Kulig* v. *Midland Funding, LLC*,
 2014 WL 6769741 (S.D.N.Y Nov. 20, 2014) ...................................................19, 22

*McIntire* v. *China MediaExpress Holdings, Inc.*,
 38 F. Supp. 3d 415 (S.D.N.Y. 2014)................................................................. 11-12

*In re Monster Worldwide, Inc. Securities Litigation*,
 251 F.R.D. 132 (S.D.N.Y. 2008) .....................................................................19, 22

*In re Moody's Corp. Securities Litigation*,
 274 F.R.D. 480 (S.D.N.Y. 2011) ......................................................................7, 7n

*Morrison* v. *National Australia Bank Ltd.*,
 561 U.S. 247 (2010)........................................................................................1, 16n

*In re Nice Systems Securities Litigation*,
 188 F.R.D. 206 (D.N.J. 1999)........................................................................... 20-21

*In re Petrobras Securities Litigation*,
 312 F.R.D. 354 (S.D.N.Y. 2016), *aff'd in part and vacated in part*,
 *In re Petrobras Securities*, 862 F.3d 250 (2d Cir. 2017) ........................................15

*Schwab* v. *E\*TRADE Financial Corp.*,
 258 F. Supp. 3d 418 (S.D.N.Y. 2017)....................................................................14

*In re Signet Jewelers Ltd. Securities Litigation*,
 2019 WL 3001084 (S.D.N.Y. July 10, 2019) .........................................................7n

*In re Smart Technologies, Inc. Shareholder Litigation*,
 295 F.R.D. 50 (S.D.N.Y. 2013) ....................................................................16n, 25n

*Strougo* v. *Barclays PLC*,
    312 F.R.D. 307 ................................................................................................7n

*In re SunEdison, Inc. Securities Litigation*,
    329 F.R.D. 124 (S.D.N.Y. 2019) ........................................................................23

*In re Vale S.A. Securities Litigation*,
    2019 WL 11032303 (S.D.N.Y. Sept. 27, 2019) ....................................................2

*Wal-Mart Stores, Inc.* v. *Dukes*,
    564 U.S. 338 (2011) ................................................................................ 2-3, 15

*Waggoner* v. *Barclays PLC*,
    875 F.3d 79 (2d Cir. 2017)................................................................................14

**Rules**

Fed. R. Civ. P. 23 ....................................................................................... *passim*

Defendants Deutsche Bank Aktiengesellschaft ("Deutsche Bank"), John Cryan, and Christian Sewing respectfully submit this memorandum in opposition to Plaintiffs' motion for class certification.

## PRELIMINARY STATEMENT

Plaintiffs' July 18, 2022 Memorandum of Law in Support of Plaintiffs' Motion for Class Certification (Dkt. No. 92; "Plaintiffs' Brief" or "Pl. Br.") attempts to check the boxes of the various requirements of Federal Rules of Civil Procedure (the "Rules") 23(a) and 23(b), but fails to address three basic issues, each of which independently warrants the denial of class certification.

First, Plaintiffs ignore that the alleged misstatements in this case had no impact on the price of Deutsche Bank ordinary shares. This fact precludes them from relying on the presumption of reliance set forth in *Basic Inc.* v. *Levinson*, 485 U.S. 224 (1988). The presumption of reliance set forth in *Affiliated Ute Citizens of Utah* v. *United States*, 406 U.S. 128 (1972), does not apply either because Plaintiffs' case is based primarily on affirmative alleged misstatements, not alleged omissions. Without either presumption, individual issues of reliance overwhelm any common issues and compel the denial of Plaintiffs' motion under Rule 23(b).

Second, Plaintiffs have not established that either of the two proposed class representatives—Ali Karimi and Yun Wang (together, the "Proposed Representatives")—purchased their Deutsche Bank shares on a United States-based stock exchange or via some other United States-based transaction. Since (i) Plaintiffs limit the proposed class to those who acquired Deutsche Bank shares via United States-based transactions and (ii) the Supreme Court's decision in *Morrison* v. *National Australia Bank, Ltd.*, 561 U.S. 247 (2010), so limits the proposed class as a matter of law, neither Proposed Representative has established he or she has a claim here at all, and, under Rule 23(a)(3), a plaintiff without a claim cannot represent a class.

Finally, the Proposed Representatives' complete reliance on their counsel warrants denial of class certification under Rule 23(a)(4). Plaintiffs have failed to meet their burden to show that the Proposed Representatives would fairly and adequately represent the proposed class because they have not established that either of the Proposed Representatives sufficiently understands this case or has any ability or motive to check the discretion of proposed class counsel.

Because neither the requirements of Rule 23(a) nor of Rule 23(b) are satisfied here, Plaintiffs' motion for class certification should be denied.

## LEGAL STANDARD

"To prevail on [a] motion for class certification, plaintiffs must first satisfy the four requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy." *In re Amla Litigation*, 282 F. Supp. 3d 751, 757 (S.D.N.Y. 2017) (Rakoff, J.).[1] A proposed class "must also meet one of the three conditions of Rule 23(b)." *Id.* at 759. Here, Plaintiffs rely on Rule 23(b)(3), which "requires that questions of law or fact common to class members predominate over any questions affecting only individual members," and that "a class action be superior to other available methods for fairly and efficiently adjudicating the controversy." *Id.*

It is Plaintiffs' burden to prove, by a preponderance of the evidence, that all the requirements of Rules 23(a) and 23(b) are met. *See, e.g.*, *In re Vale S.A. Securities Litigation*, 2019 WL 11032303, at *3-*4 (S.D.N.Y. Sept. 27, 2019). "Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently

---

[1] Unless otherwise specified, all internal quotation marks in case quotations are omitted and all brackets and emphasis are added.

numerous parties, common questions of law or fact, etc." *Wal-Mart Stores, Inc.* v. *Dukes*, 564

U.S. 338, 350 (2011) (emphasis in original); *see also Comcast Corp.* v. *Behrend*, 569 U.S. 27, 33-

34 (2013) ("[C]ertification is proper only if the trial court is satisfied, after a rigorous analysis, that

the prerequisites of Rule 23(a) have been satisfied," and, "[i]f anything, Rule 23(b)(3)'s

predominance criterion is even more demanding than Rule 23(a).").

## ARGUMENT

## I.    THE COURT SHOULD DENY CLASS CERTIFICATION UNDER RULE 23(b)(3) BECAUSE INDIVIDUALIZED QUESTIONS OF RELIANCE PREDOMINATE AND PLAINTIFFS CANNOT RELY ON ANY PRESUMPTION OF RELIANCE

Class certification should be denied where, as here, Plaintiffs cannot establish that

"questions of law or fact common to class members predominate over any questions affecting only

individual members[.]"  Fed. R. Civ. P. 23(b)(3).  "Whether common questions of law or fact

predominate in a securities fraud action often turns on the element of reliance." *Erica P. John*

*Fund, Inc.* v. *Halliburton Co.*, 563 U.S. 804, 810 (2011).  Here, there is no evidence that each

member of the proposed class individually relied on Defendants' alleged misstatements.[2]  Instead,

Plaintiffs seek to rely on two legal theories which, in certain circumstances, create presumptions

that allow class-action plaintiffs to avoid individualized questions of reliance.  But neither of those

theories applies here.  As a result, individualized questions of reliance will dominate this case,

---

[2] Indeed, neither Proposed Representative actually relied on any of the alleged misstatements when deciding to purchase Deutsche Bank shares.  *See* the accompanying August 22, 2022 Declaration of Nicholas Matuschak (the "Matuschak Decl."), Ex. 2 (excerpts from transcript of August 10, 2022 deposition of Ali Karimi ["Karimi Tr."]) at 53:6-54:21 (Mr. Karimi based his decision only on numerical criteria such as book value and number of shares); *id.*, Ex. 3 (excerpts from transcript of August 11, 2022 deposition of Yun Wang ["Wang Tr."]) at 121:18-123:13 (Ms. Wang could not recall if she had ever read any of Deutsche Bank's annual reports or visited Deutsche Bank's website, and was unfamiliar with Deutsche Bank's filings with the U.S. Securities and Exchange Commission ["SEC"]).

rendering class certification inappropriate.

A.    The *Basic* Presumption Does Not Apply

Plaintiffs argue that they are entitled to rely on the "fraud-on-the-market" theory set out in *Basic*, which can allow class-action plaintiffs to rely on a presumption of reliance for the entire class. *See* Pl. Br. at 12-22.

"To invoke the *Basic* presumption, a plaintiff must prove: (1) that the alleged misrepresentation was publicly known; (2) that it was material; (3) that the stock traded in an efficient market; and (4) that the plaintiff traded the stock between the time the misrepresentation was made and when the truth was revealed." *Goldman Sachs Group, Inc.* v. *Arkansas Teacher Retirement System*, 141 S.Ct. 1951, 1958 (2021) (hereinafter "*Goldman*").  Other than materiality, "class-action plaintiffs must prove the *Basic* prerequisites before class certification[.]" *Id.* at 1959. Even if those prerequisites are satisfied, "defendants may rebut the *Basic* presumption at class certification by showing that an alleged misrepresentation did not actually affect the market price of the stock. . . .  If a misrepresentation had no price impact, then *Basic*'s fundamental premise completely collapses, rendering class certification inappropriate." *Id.* (citing *Halliburton Co.* v. *Erica P. John Fund, Inc.*, 573 U.S. 258, 283-84 (2014) [hereinafter "*Halliburton II*"]).

"In assessing price impact at class certification, courts should be open to *all* probative evidence on that question—qualitative as well as quantitative—aided by a good dose of common sense." *Goldman*, 141 S.Ct. at 1960 (emphasis in original).  Here, both quantitative *and* qualitative criteria show that the alleged misstatements had no impact on the price of Deutsche Bank shares.

i.    The Alleged Misstatements Did Not Cause an Increase in the Price of Deutsche Bank Shares

An alleged misstatement can impact the price of a company's shares by causing an

4

immediate, "front-end" increase in the price (*see Goldman*, 141 S.Ct. at 1961), but that did not happen here.  There was no statistically-significant increase in the price of Deutsche Bank shares that could be tied to the alleged misstatements.  *See* Matuschak Decl., Ex. 1 (August 22, 2022 Expert Report of Dr. Vinita Juneja ["Juneja Report"]) at 35-37; *see also id.*, Appendices VI & VII. Indeed, on seventeen of the twenty alleged misrepresentation dates, Deutsche Bank-specific returns were negative in the U.S. and/or German markets—that is, the price of Deutsche Bank shares increased *less* than what would be expected from market and industry factors.  *See id*.

"[C]ommon sense" (*Goldman*, 141 S.Ct. at 1960) supports this analysis. The alleged misstatements were (i) small portions of Deutsche Bank's larger annual filings which collectively totaled many hundreds of pages (*see* June 30, 2022 Third Amended Complaint [Dkt. No. 89; the "Complaint" or "Cmplt."] ¶¶ 137, 140, 146, 148, 150, 152, 155, 163, 165, 167, 170, 176); (ii) statements alleged to have been posted to an unspecified part of Deutsche Bank's "official website" but not alleged to have been publicized in any formal filing or press release that might draw investors' attention (*see id.* ¶¶ 142, 144, 157, 159, 172, 174); or (iii) a portion of a brief response a representative of Deutsche Bank provided to *Reuters* in 2018 (*see id.* ¶ 161).  It is hardly surprising that these vague, generic statements failed to cause any front-end price impact.  *See generally Goldman*, 141 S.Ct. at 1960 ("[A]s a rule of thumb, a more-general statement will affect a security's price less than a more-specific statement on the same question.").[3]

---

[3] The Juneja Report uses the same regression model used by Plaintiffs' expert Zachary Nye, adjusted to correct for multiple comparisons, as is appropriate here. *See* Juneja Report at 25-26. But even applying Dr. Nye's model without adjustments shows no statistically-significant, Deutsche Bank-specific share-price increase after any alleged misrepresentation. *Compare* Cmplt. ¶¶ 137-77 (alleging misrepresentations on 20 dates between March 2017 and March 2020) *with* Exs. 11B & 11E to the July 18, 2022 Expert Report of Zachary Nye (the "Nye Report," Dkt. Nos. 93-1 to 93-3) (no statistically-significant, Deutsche Bank-specific price increase on any of the

ii.     **The Alleged Corrective Disclosures Did Not Cause a Decrease in the Price of Deutsche Bank Shares**

Because the alleged misstatements did not cause any "front-end" price impact, Plaintiffs may argue that they are proceeding under an "inflation-maintenance theory," which posits that "price impact is the amount of price inflation maintained by an alleged misrepresentation[.]" *Goldman*, 141 S.Ct. at 1961. In such a scenario, "[p]laintiffs typically try to prove the amount of inflation indirectly: They point to a negative disclosure about a company and an associated drop in its stock price; allege that the disclosure corrected an earlier misrepresentation; and then claim that the price drop is equal to the amount of inflation maintained by the earlier misrepresentation." *Id.*

But the evidence here reveals that none of the eleven purported corrective disclosures (which are alleged to have occurred on ten dates in 2020; *see* Cmplt. ¶¶ 179-203) had any impact on the price of Deutsche Bank shares. While it is true that the price of Deutsche Bank shares did decline in absolute terms after each alleged corrective disclosure, none of these price declines can be traced to those alleged disclosures. Specifically, (i) there was no statistically-significant price decline on any alleged disclosure date; (ii) no analyst reports discussed the alleged corrective disclosures; (iii) there was no substantive confounding positive news on these dates; and (iv) there is a fundamental mismatch between the alleged misstatements and the alleged corrective disclosures. Taken together, this evidence "severs the link between the alleged misrepresentation[s]" and the alleged corrective disclosures and establishes that "the [alleged] misrepresentation[s] in fact did not lead to a distortion of price[.]" *Basic*, 485 U.S. at 248.

_____

alleged misrepresentation dates); *see also* Juneja Report at 35 n.89 (concluding the same).

First, on a purely quantitative level, there was no statistically-significant decline at the 95%
confidence level on *any* of these dates once market and industry effects are accounted for.[4]  *See*
Juneja Report at 23-26; *see also id.*, Appendices IV & V.  In other words, it cannot be established
with any statistical certainty that any alleged corrective disclosure caused a decline in Deutsche
Bank's share price.  This striking fact is "direct . . . salient evidence showing that the alleged
misrepresentation[s] did not actually affect the stock's market price and, consequently, that the
*Basic* presumption does not apply."  *Halliburton II*, 573 U.S. at 282; *see also In re Moody's Corp.*,
274 F.R.D. at 493 (denying class certification because "there [was] no period within the proposed
class period where the alleged misrepresentation caused a statistically significant increase in the
price or where a corrective disclosure caused a statistically significant decline in the price").

Second, market analysts never discussed any of the alleged corrective disclosures, further
showing that the disclosures were not the reason for any Deutsche Bank share-price decline.  *See*
Juneja Report at 26-34.  Plaintiffs' expert acknowledged that analyst reports are an important
resource when determining the effect of an alleged corrective disclosure.  *See* Matuschak Decl.,

---

[4] "In most scientific work, the level needed to obtain a statistically significant result is set at a five
percent level of significance, which means that there is no more than a five percent chance that the
observed relationship is purely random."  *Carpenters Pension Trust Fund of St. Louis* v. *Barclays
PLC*, 310 F.R.D. 69, 81 (S.D.N.Y. 2015); *see also Strougo* v. *Barclays PLC*, 312 F.R.D. 307, 317
(same).  The five percent significance level—which equates to a 95% confidence level—is the
standard courts in this District use when assessing statistical significance for price-impact
purposes. *See, e.g.*, *In re Signet Jewelers Limited Securities Litigation*, 2019 WL 3001084, at *15,
n.7 (S.D.N.Y. July 10, 2019) (referring to declines "statistically significant at the 5% level" or
lower); *Billhofer* v. *Flamel Technologies, S.A.*, 281 F.R.D. 150, 162 (S.D.N.Y. 2012) (accepting
testimony that "a 5% statistical significance level (equating to a 95% confidence level) is the
standard test in the finance literature"); *In re Moody's Corp. Securities Litigation*, 274 F.R.D. 480,
493 n.11 (S.D.N.Y. 2011) (evidence of "a significant negative return at the 90% confidence level"
was "below the conventional statistical measure of a 95% confidence level and therefore [was] not
sufficient evidence of a link between the corrective disclosure and the price").  *See also* Juneja
Report at 22.

Ex. 4 (excerpts from transcript of August 12, 2022 deposition of Zachary Nye ["Nye Tr."]) at 56:12-16 (Dr. Nye would look at analyst reports when determining whether a given piece of news affected the price of Deutsche Bank shares); 120:22-121:18 (when developing an event study focused on the alleged corrective disclosures, Dr. Nye would "want to get the analyst reports published around the corrective event dates and also consider whatever analyst reports are produced by defendants' experts").  The absence of any discussion in analyst reports regarding the disclosures at issue weighs heavily against their relevance to Deutsche Bank's share price.

Third, Dr. Juneja was unable to find any substantive confounding positive news on the alleged corrective disclosure dates that could have counteracted a share-price decline due to any alleged corrective disclosure. *See* Juneja Report at 26.

Finally, there is an obvious mismatch between the alleged misstatements on the one hand, and the alleged corrective disclosures on the other.  This is "important evidence of a lack of price impact" because an inflation-maintenance theory "starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure," such as when "the earlier misrepresentation is generic . . . and the later corrective disclosure is specific . . . .  Under those circumstances, it is less likely that the specific disclosure actually corrected the generic misrepresentation[.]"  *Goldman*, 141 S.Ct. at 1961.

Here, the alleged misstatements spoke to Deutsche Bank's know-your-customer (or "KYC") procedures at a high level:  for example, that Deutsche Bank was "strengthening" (Cmplt. ¶¶ 137, 140, 152, 155, 167, 170) or "enhanc[ing]" (*id.* ¶ 146) its procedures and that those procedures were "effective" (*id.* ¶¶ 142, 157, 161, 172) or "comprehensive" (*id.* ¶¶ 144, 159, 174).  *See also* Pl. Br. at 1 (asserting that the alleged misstatements concern "Deutsche Bank's Know Your Customer ('KYC') procedures and processes").  But ***none*** of the alleged corrective

disclosures addressed Deutsche Bank's KYC procedures overall.   Plaintiffs point only to the following items, none of which actually "correct" anything in the alleged misstatements:

- A May 13, 2020 German news article (Matuschak Decl., Ex. 5)[5] and U.S. coverage thereof which the Complaint acknowledges did not specifically mention KYC procedures at all but rather reported only that the Federal Reserve had "express[ed] continued dissatisfaction with Deutsche Bank's AML [anti-money laundering] controls and liquidity management at its U.S. unit[.]"  Cmplt. ¶ 179.[6]

- A June 24, 2020 *Financial Times* article (Matuschak Decl., Ex. 6) reporting on the arrest of Markus Braun, the former head of Wirecard, which mentioned only in passing that Braun had borrowed money from Deutsche Bank and said nothing about Deutsche Bank's KYC procedures.  *See* Cmplt. ¶ 181.[7]

- A June 26, 2020 *Bloomberg Law* article (Matuschak Decl., Ex. 7) reporting that "a German retail investor association" (*id.*) alleged links between a Deutsche Bank executive and Wirecard based on that executive's ***previous*** role as a partner at Ernst & Young and saying nothing about Deutsche Bank's KYC procedures.  *See* Cmplt. ¶ 183.

---

[5] The versions of the alleged corrective disclosures attached to the Matuschak Decl. are provided for general reference and do not in all cases reflect the exact dates or times each item was first published.  Pages 14-18 of the Juneja Report contain Dr. Juneja's analysis of the precise times at which each such item was originally published.

[6] Deutsche Bank's AML controls encompass much more than just its KYC procedures.  *See, e.g.*, https://www.db.com/files/documents/Excerpt-of-globally-applicable-Anti-Money-Laundering-and-Anti-Financial-Crime-Standard.pdf?language_id=1 at 3 (Deutsche Bank anti-money laundering statement setting forth numerous measures to "identify, measure, and control its AML risk," only one of which is "[a] robust and strict KYC program").

[7] Notably, Plaintiffs do not allege that Deutsche Bank failed to conduct sufficient due diligence on Braun or otherwise violated its KYC procedures with respect to Braun.

- A July 7, 2020 consent order by the New York Department of Financial Services (Matuschak Decl., Ex. 8; the "DFS Consent Order") that alleged that Deutsche Bank had failed to follow KYC procedures with regard to three **specific** individuals and entities, not that Deutsche Bank's KYC procedures overall were ineffective.  *See* Cmplt. ¶ 185.[8]

- A July 9, 2020 *Bloomberg Law* article (Matuschak Decl., Ex. 10) that reported on a **different** bank's relationship with two of the entities at issue in the DFS Consent Order and that discussed Deutsche Bank only in the context of summarizing parts of that Order.  *See* Cmplt. ¶¶ 190-91.

- A July 13, 2020 *New York Times* article (Matuschak Decl., Ex. 11) that merely purported to identify some of the unnamed individuals referenced in the DFS Consent Order.  *See* Cmplt. ¶ 193.[9]

- A Bloomberg research report updated on July 13, 2020 (Matuschak Decl., Ex. 12) that simply summarized publicly-known legal risks for Deutsche Bank including "potential money-laundering breaches" and that did not connect any of those legal risks to Deutsche Bank's KYC procedures.  *See* Cmplt. ¶ 194.[10]

---

[8] Although the DFS Consent Order is dated June 6, 2020, it was not released to the public until July 7, 2020.  *See* https://www.dfs.ny.gov/reports_and_publications/press_releases/pr202007071. Plaintiffs also refer in their Complaint to a *Law360* article from the same date (Cmplt. ¶¶ 186-88) that merely summarized the DFS consent order.  *See* Matuschak Decl. Ex. 9.

[9] In addition, this article was published **after** the close of both the German and U.S. exchanges on July 13, 2020, and thus could not have caused any Deutsche Bank share-price movements on that date.  *See* Juneja Report at 16 n.27, 31.

[10] The report simply repeated the well-known fact that "Deutsche Bank's legal risks in the U.S. include potential money-laundering breaches," including a "Justice Department probe that may result in fines[.]"  Matuschak Decl., Ex. 12.  As discussed below, the press had been reporting that the U.S. Justice Department and other regulators were investigating whether Deutsche Bank had violated anti-money-laundering laws for well over a year at the time this Bloomberg update was

- A July 28, 2020 *ABC News* article (Matuschak Decl., Ex. 13) that reported that Deutsche Bank ***and at least nine other financial institutions*** had been subpoenaed for documents concerning Jeffrey Epstein and otherwise simply summarized portions of the DFS Consent Order.  *See* Cmplt. ¶ 196.

- A September 9, 2020 *Law360* article (Matuschak Decl., Ex. 14) reporting that a Deutsche Bank subsidiary had settled with the U.S. Treasury Department concerning alleged Ukraine-related sanctions violations in connection with a 2015 transaction and saying nothing whatsoever about Deutsche Bank's KYC procedures.  *See* Cmplt. ¶ 198.[11]

- A September 20, 2020 *BuzzFeed News* article (Matuschak Decl., Ex. 15) that purported to provide additional details concerning "scandal[s]" that, as discussed below, were ***already known*** to the public and saying nothing about its KYC procedures specifically.  *See* Cmplt. ¶ 200.

- A September 22, 2020 *Bloomberg Law* article (Matuschak Decl., Ex. 16) summarizing an investigative report alleging that various entities, including Deutsche Bank, handled "suspicious flows" in Hong Kong but saying nothing whatsoever about Deutsche Bank's KYC procedures.  *See* Cmplt. ¶ 202.

This evidence of a lack of price impact is not surprising.  In an efficient market, which Plaintiffs assert the market for Deutsche Bank shares is, "the share price would not change in response to" news that "the market had anticipated[.]"  *McIntire* v. *China MediaExpress Holdings,*

---

published, and the full research document itself includes prior updates on the same or similar topics. *See id.*

[11] The enforcement release from the Treasury Department similarly made no reference to Deutsche Bank's KYC procedures.  *See* https://www.law360.com/articles/1308631/attachments/0.

*Inc.*, 38 F. Supp. 3d 415, 430 (S.D.N.Y. 2014).

Here, if the alleged corrective disclosures contained "news" at all concerning Deutsche Bank, it was news that the market would have anticipated given that the public had been aware of the issues addressed in the alleged disclosures for years prior to the alleged disclosure dates. *See, e.g.*, Matuschak Decl., Ex. 17 (November 21, 2018 *EU Observer* article reporting that the "US Department of Justice [was] still investigating" Deutsche Bank's relationship with Danske Bank, a European Bank accused of allowing its clients to launder money); *id.*, Ex. 18 (June 19, 2019 *Reuters* article reporting that "[t]he U.S. Federal Bureau of Investigation is examining whether Deutsche Bank complied with laws meant to stop money laundering" in connection with transactions "linked to companies controlled by U.S. President Donald Trump and his son-in-law and advisor Jared Kushner"); *id.*. Ex. 19 (July 23, 2019 *New York Times* article reporting that Deutsche Bank was under investigation by "prosecutors and other government authorities" concerning its relationship with Jeffrey Epstein and discussing many aspects of that relationship that the Complaint incorrectly alleges was only revealed in 2020); *id.*, Ex. 20 (July 11, 2019 *Reuters* article reporting that "[t]he U.S. Justice Department is investigating whether Deutsche Bank . . . violated foreign corruption or anti-money-laundering laws in its work for state fund 1Malaysia Development Berhad (1MDB)"); *id.*, Ex. 21 (September 25, 2019 *Reuters* article reporting that "[a]n investigation by the U.S. Department of Justice" into "artificial trades between Moscow, London and New York that could have been used for money laundering" was "still ongoing").[12] *See also* Juneja Report at 31, 34 (discussing further evidence showing that the July

---

[12] Dr. Nye's unadjusted regression model shows no statistically-significant price drops on the dates of any of these articles—which are only a few of the dozens of reports published prior to 2020 that touch on the same or similar topics as those addressed in the alleged corrective disclosures—in either the U.S. or German market.  In fact, Deutsche Bank's share price ***increased*** in at least one

13, 2020 and September 20, 2020 alleged corrective disclosures in particular cannot be evidence of price impact); *id.* at 29 (observing that market analysts at Societe Generale had mentioned concerns about Deutsche Bank's role in Russian money laundering in October 2019).

Combining this fundamental mismatch between alleged misstatements and the alleged corrective disclosures with the analysis of the statistical data, analyst reports, and news contained in the Juneja Report—and applying the *Goldman*-recommended "good dose of common sense" (141 S.Ct. at 1960)—establishes that none of the alleged corrective disclosures are actually corrective disclosures at all and cannot support the application of the *Basic* presumption.

Since there is no evidence of price impact on the dates of any alleged misstatement (*i.e.*, no "front end" price impact) and no evidence of price impact on the dates of any alleged corrective disclosure (*i.e.*, no "back end" price impact), the evidence establishes that the alleged misstatements had no price impact overall and, as such, the *Basic* presumption does not apply.

**B.    The *Affiliated Ute* Presumption Does Not Apply**

Plaintiffs also briefly reference the separate presumption set forth in *Affiliated Ute* (*see* Pl. Br. at 22-23), but that presumption does not apply here either.

As Plaintiffs acknowledge, the *Affiliated Ute* presumption is limited to cases alleging a failure to disclose material information, as opposed to affirmative alleged misstatements. *See id.*

---

market on all five of those dates in both absolute and relative terms. *See* Nye Report, Exs. 11B & 11E. This is further evidence that the market was indifferent to generalized criticisms of Deutsche Bank's AML controls, further severing the link between the alleged misstatements and any back-end price impact. *See Arkansas Teachers Retirement System* v. *Goldman Sachs Group, Inc.*, 879 F.3d 474, 486 (2d Cir. 2018) (evidence that the market had become aware of the allegedly concealed facts before the corrective disclosures, but there was no "accompanying decline in the price of [the] stock" on those earlier occasions, was "evidence to show that [the alleged misstatements] did not actually affect the stock's market price").

13

Where plaintiffs allege "numerous affirmative misstatements," the *Affiliated Ute* presumption is inapplicable because it is limited to cases "based ***primarily*** on omissions." *Waggoner* v. *Barclays PLC*, 875 F.3d 79, 95-96 (2d Cir. 2017); *see also Schwab* v. *E*TRADE Financial Corp.*, 258 F. Supp. 3d 418, 429 (S.D.N.Y. 2017) (*Affiliated Ute* presumption inapplicable in "primarily an affirmative misrepresentation case"). Put another way, the *Affiliated Ute* presumption is applicable only where "reliance as a practical matter is impossible to prove" because "no positive [mis]statements exist[.]" *Waggoner*, 875 F.3d at 95. "The *Affiliated Ute* presumption does not apply to earlier misrepresentations made more misleading by subsequent omissions, or to what has been described as 'half-truths,' nor does it apply to misstatements whose only omission is the truth that the statement misrepresents." *Id.* at 96.

Here, "Plaintiffs are . . . not in a situation in which it is impossible for them to point to affirmative [alleged] misstatements." *Id.* On the contrary, in a section of the Complaint titled "Materially False and Misleading Statements Issued During the Class Period" (*see* Cmplt. ¶¶ 136-77), Plaintiffs identify no fewer than twenty affirmative statements they allege were "materially false and misleading." *Id.* ¶ 136. Nor can there be any question that those misstatements are the focus of Plaintiffs' claims. The Complaint is littered with accusations that Deutsche Bank "assured" (*id.* ¶¶ 4, 44), "affirmed" (*id.* ¶ 45), "publicly tout[ed]" (*id.* ¶ 46), and "represented" (*id.* ¶¶ 146, 161, 163, 176) to investors facts that Plaintiffs allege were false. As this Court recognized in its Order on Defendants' motion to dismiss, this case involves "specific, alleged misrepresentations." Dkt. No. 86 at 20; *see also id.* at 4 (observing that the case involves allegations that various "statements from DB's annual reports, Form 20-F submissions, and website . . . were materially misleading").

Since this case is primarily focused on affirmative misstatements, not omissions, the

14

*Affiliated Ute* presumption is inapplicable.  Because the *Basic* presumption also does not apply

here, individualized questions of reliance will dominate the lawsuit and warrant the denial of class

certification under Rule 23(b)(3).

**II.     THE COURT SHOULD DENY CLASS CERTIFICATION UNDER RULE 23(a)(3)
         BECAUSE PLAINTIFFS HAVE NOT ESTABLISHED THAT EITHER OF THE
         PROPOSED REPRESENTATIVES' SHARES WERE PURCHASED ON A U.S.
         STOCK EXCHANGE**

Even if Plaintiffs could satisfy the requirements of Rule 23(b), Plaintiffs' motion for class

certification fails because they cannot establish that the claims of the Proposed Representatives are

typical of the claims of the class, as required by Rule 23(a)(3).

Specifically, Plaintiffs have not met their burden to prove, by a preponderance of the

evidence, that either of the Proposed Representatives is actually a member of the class they wish

to represent.  *See In re Petrobras Securities Litigation*, 312 F.R.D. 354, 360 (S.D.N.Y. 2016)

(Rakoff, J.) ("[W]hile typicality does not require identity amongst class members' claims, it does

demand that a class representative be a member of the Class."), *aff'd in part and vacated in part*,

*In re Petrobras Securities*, 862 F.3d 250 (2d Cir. 2017); *see also Wal-Mart*, 564 U.S. at 348 ("[A]

class representative must be part of the class[.]"); *Falcon* v. *Philips Electronics North America

Corp.*, 2007 WL 959374, at *1 (S.D.N.Y. Mar. 30, 2007) (Rakoff, J.) (denying class certification

in part because the proposed class representative did not fall within the proposed class).

The proposed class is limited to those who "purchased or otherwise acquired Deutsche

Bank securities . . . on (i) any stock exchanges located in the United States, (ii) on any alternative

trading systems located in the United States, or (iii) pursuant to other domestic transactions."  Pl.

Br. at 1.  There is no evidence that either of the Proposed Representatives fall into categories (ii)

or (iii)—indeed, neither Proposed Representative knows what the terms used in those categories

mean.  *See* Karimi Tr. at 77:17-78:21; Wang Tr. at 114:23-115:12.  Thus, the only way either of the Proposed Representatives can establish that they fall within the proposed class is if they prove, by a preponderance of the evidence, that their Deutsche Bank shares were purchased on a "stock exchange[] located in the United States[.]"  Pl. Br. at 1.[13]

It is undisputed that, during the proposed class period, Deutsche Bank shares traded, at minimum, "on the New York Stock Exchange . . . and the German Xetra Exchange[.]"  Nye Report at 6.  But neither Proposed Representative could point to anything definitive to prove that their shares were purchased on the former and not the latter, where the vast majority of Deutsche Bank shares are traded.  *See id.* at 11; Juneja Report at 7.

When Mr. Karimi was asked whether it is "possible that [his Deutsche Bank shares] may have been purchased on the German exchange as opposed to the U.S. exchange," he answered: "I have no idea.  That's my answer."  Karimi Tr. at 55:12-19; *see also id.* at 58:2-10 (again testifying that he had "no idea which Stock Exchange executed" one of his class-period purchases).  And when asked whether there was "anything on [the Fidelity transaction confirmations he produced reflecting his class-period share purchases (*see* Matuschak Decl., Ex. 22)] that you can see that says whether your shares were purchased on the New York Stock Exchange as opposed to the German Stock Exchange," Mr. Karimi unequivocally responded: "No.  . . .  No.  I am not aware

---

[13] As a matter of law, the class must exclude those who purchased Deutsche Bank shares outside of the United States in any event.  *See, e.g.*, *In re Smart Technologies, Inc. Shareholder Litigation*, 295 F.R.D. 50, 55-56 (S.D.N.Y. 2013) (under *Morrison*, there is no cause of action under the federal securities laws unless the plaintiff purchased a security listed on a domestic exchange or engaged in some other domestic purchase of a security); *City of Pontiac Policemen's and Firemen's Retirement System* v. *UBS AG*, 752 F.3d 173, 181 (2d Cir. 2014) ("*Morrison* does not support the application of § 10(b) of the Exchange Act to claims by a foreign purchaser of foreign-issued shares on a foreign exchange simply because those shares are also listed on a domestic exchange.").

of which Stock Exchange executed the order.  They never let me know[.]"  *Id.* at 56:4-14.

After a break in his deposition, Mr. Karimi attempted to walk back this testimony, but was still unable to say more than that he "believe[s]" the shares were purchased in the United States. *See id.* at 83:3-86:25; *see also id.* at 179:20-180:22 (Mr. Karimi testified it was his "thought . . . assumption[] and . . . belief" that the shares were purchased in the United States but, when asked whether his stock broker "might, for example, purchase shares on the German market, then . . . transfer them and quote them to you in a different price," Mr. Karimi responded: "I have no idea.").[14]  When asked if he had any document that would reflect where the shares were purchased, he responded: "No, I don't.  No, I do not, but I can acquire, if necessary."  Karimi Tr. at 87:2-87:7. Plaintiffs have not produced any such document.

After speaking with his counsel during a break in the deposition, Mr. Karimi also asserted that he believed that the shares were purchased in the United States because they were purchased during the "[New York] Stock Exchange open hours."  Karimi Tr. at 83:17-21.  But there is nothing on Mr. Karimi's Fidelity transaction confirmation documents that says at what time of day the shares were purchased.  *See* Matuschak Decl., Ex. 22.  During the deposition, Plaintiffs' counsel also attempted to draw attention to the fact that the transaction confirmation documents identify the stock symbol as "DB" instead of "DBK" (*see* Karimi Tr. at 151:5-158:20), but Mr. Karimi later testified that he did not know how Fidelity used those symbols.  *See id.* at 182:12-183:4.

Ms. Wang testified that her "brokerage firm . . . only [has] U.S. stock market stocks" and

---

[14] If, in fact, Mr. Karimi's broker did purchase them on the German exchange, it does not matter whether Mr. Karimi (and/or his broker) placed the order while physically present in the United States.  *See City of Pontiac*, 752 F.3d at 181 (plaintiff that "placed a buy order in the United States that was then executed on a foreign exchange" did not have standing pursuant to *Morrison*).

that her brokerage's web page lists only U.S. and Hong Kong stocks (Wang Tr. at 74:19-76:10), but Plaintiffs have not produced any document that would support this assertion.[15]  And although Ms. Wang testified that her brokerage firms send "monthly statements" where it would be "very clear . . . what the stock was being purchased [*sic*]" (*id.* at 80:21-81:11), the transaction documents Ms. Wang produced are just as ambiguous as those Mr. Karimi produced regarding where the shares were purchased.  *See* Matuschak Decl., Ex. 23.  Indeed, Ms. Wang was, in some cases, unable to even identify from which broker a given transaction document came.  S*ee, e.g.*, Wang Tr. at 87:3-91:7.  Moreover, Ms. Wang is a native Mandarin Chinese speaker who (i) used an interpreter during her deposition and does not "understand" or "read" English (*id.* at 13:7, 50:21); (ii) lives in Albania and was living in "many different countries" during the proposed class period (*id.* at 20:2-15); (iii) has never set foot in the United States (*see id.* at 20:16-18); and (iv) testified it is sometimes "difficult" for her to understand documents she receives from HSBC because many of those documents are in English.  *Id.* at 85:4-9.  All of this testimony further calls into question how she could be sure that her Deutsche Bank shares were purchased in the United States.

Because the claims of the Proposed Representatives cannot be typical of the proposed class if the Proposed Representatives do not themselves fall within that class, and because Plaintiffs have not satisfied their burden to establish that their purchases of Deutsche Bank shares bring them within the definition of the proposed class, class certification should be denied under Rule 23(a)(3).

---

[15] Ms. Wang testified that she used two stock brokers during the proposed class period:  "HSBC Security" and "Wangfa Security."  *See* Wang Tr. at 68:24-69:10.  It is not clear from her testimony whether she was referring to both firms, or only one, when she testified that her brokerage's web page lists only U.S. and Hong Kong stocks.

**III.    THE COURT SHOULD DENY CLASS CERTIFICATION UNDER RULE 23(a)(4) BECAUSE PLAINTIFFS HAVE NOT ESTABLISHED THAT EITHER OF THE PROPOSED REPRESENTATIVES WILL FAIRLY AND ADEQUATELY PROTECT THE INTERESTS OF THE CLASS**

Class certification should also be denied because Plaintiffs have not proven, by a preponderance of the evidence, that either of the Proposed Representatives will "fairly and adequately protect the interests of the class," as required by Rule 23(a)(4).

This Court has observed that "[a] class representative must not simply lend his name to a suit controlled entirely by the class attorney, as the class is entitled to an adequate representative, one who will check the otherwise unfettered discretion of counsel in prosecuting the suit." *In re Monster Worldwide, Inc. Securities Litigation*, 251 F.R.D. 132, 135 (S.D.N.Y. 2008) (Rakoff, J.); *see also Kulig* v. *Midland Funding, LLC*, 2014 WL 6769741, at *3 (S.D.N.Y Nov. 20, 2014) (denying class certification where proposed class representative "profess[ed] near-total reliance on [her counsel]"). Here, both Proposed Representatives are entirely reliant on class counsel and unable to check counsel's discretion, rendering them unfit under Rule 23(a)(4).

**A.    Ali Karimi Will Not Fairly and Adequately Protect the Interests of the Class**

Mr. Karimi's deposition testimony reflects a total reliance on counsel that renders him inadequate to be a class representative. Mr. Karimi is unfamiliar with critical aspects of the case, such as who would fall inside or outside of the proposed class. *See* Karimi Tr. at 17:7-19; *see also id.* at 72:5-75:22 (Mr. Karimi could not say whether the proposed class set forth on the first page of Plaintiffs' Brief was "the class that [he is] seeking to represent" and incorrectly testified that the proposed class period is "[b]etween 2017 and 2021"). He was also initially unable to say whether he had seen key filings in the case before they were filed or whether he had approved their filing ahead of time. *See, e.g., id.* at 69:11-70:19 (when asked if he approved of the filing of Plaintiffs'

19

Brief, Mr. Karimi responded: "Well, I trusted my lawyers to file the documents that they deemed necessary for the case."); *id.* at 94:12-99:15 (Mr. Karimi could not recall if he had seen a draft of the Complaint and, if he had, whether he saw it before or after it was filed); *id.* at 169:19-171:23 (similar testimony).[16]  *See Gordon* v. *Sonar Capital Management LLC*, 92 F. Supp. 3d 193, 200 (S.D.N.Y. 2015) (Rakoff, J.) (proposed class representative was inadequate in part due to "his difficulties with recollection and lack of familiarity with the litigation," which indicated "that he [was] wholly dependent on counsel to make crucial decisions").

Additionally, Mr. Karimi only purchased 1,000 Deutsche Bank shares during the proposed class period.  *See* Dkt. No. 1 at 36.  Combining all the Deutsche Bank share declines that Plaintiffs allege were caused by corrective disclosures results in a total drop of $3.21 per share.  Thus, even if all of the declines alleged in the Complaint were the result of Defendants' alleged misstatements—in fact, none of them were, as discussed in Section I, above, and in the Juneja Report—Mr. Karimi would stand to recover no more than around $3,200 in this case.  "[A] minimal financial stake" like Mr. Karimi's suggests that he will "act[] primarily as a tool of the lawyers" in the case.  *See Bensley* v. *FalconStor Software, Inc.*, 277 F.R.D. 231, 234 n.8 (E.D.N.Y. 2011); *In re Nice Systems Securities Litigation*, 188 F.R.D. 206, 221 (D.N.J. 1999) (a "relatively small interest . . . in the instant litigation could cause [an individual's] interests to diverge from

---

[16] In response to questioning from his own counsel, Mr. Karimi attempted to assert that he had, in fact, discussed filings with his counsel prior to their filing.  *See* Karimi Tr. 160:9-164:17.  This kind of inconsistent testimony—also reflected in Mr. Karimi's testimony concerning where his Deutsche Bank shares were purchased, as discussed in Section II, above—is further evidence that Mr. Karimi is being directed by his counsel, and not the other way around.  *See, e.g.*, *Darvin* v. *International Harvester Co.*, 610 F. Supp. 255, 257 (S.D.N.Y. 1985) (denying class certification where class representative provided "inconsistent testimony" that "could create serious problems with respect to plaintiff's credibility and could become the focus of cross examination and unique defenses at trial").

those of the class").

Overall, Plaintiffs have failed to establish that Mr. Karimi will be an adequate class representative as required by Rule 23(a)(4).

### B.      Yun Wang Will Not Fairly and Adequately Protect the Interests of the Class

The same is true of Ms. Wang.  At her deposition, when asked how she oversees the litigation in this case, Ms. Wang could not point to anything other than providing transaction information to her attorneys, and made clear that, "[b]ecause [she is] not American . . . [she] mainly rel[ies] on [her] attorney's team[.]"  Wang Tr. 100:11-101:4.  Later, Ms. Wang testified: "I 100 percent rely on my attorneys."  *Id.* at 117:24-25.

As discussed above, Ms. Wang does not speak English and lives in Albania.  This, alone, calls into question whether she can be an adequate class representative in this case.  *See, e.g.*, *In re Fyre Festival Litigation*, 2020 WL 7318276, at *6 (S.D.N.Y. Dec. 11, 2020) ("[T]he Court is unable to conclude on this record that [the proposed class representative], who resides in the Netherlands, can adequately monitor and direct counsel in this case. If it were not that other shortcomings counseled against class certification, the Court would require further briefing on whether a foreign national residing 3,600 miles away can serve as an adequate class representative on claims arising exclusively under the law of the various states of the United States.").

Other aspects of Ms. Wang's testimony raise more specific concerns.  For example, it is not clear to what extent Ms. Wang has reviewed translated versions of filings in this case.  Early in her deposition, Ms. Wang testified that she had reviewed "[a]ll of the documents being sent to the Court" (*id.* at 13:3-10), but then later testified that she had never received a Chinese translation of her declaration in support of Plaintiffs' Motion for Class Certification (Dkt. No. 93-5), and appeared to confuse it with the certification she submitted in connection with her motion to be

appointed Lead Plaintiff.  Wang Tr. at 96:21-98:17.  Ms. Wang did recall that she had discussions

with her attorneys about certain documents, but it is not clear how detailed those discussions were.

*See id.* at 98:14-17; 116:21-117:20.  Moreover, Plaintiffs have not produced translated versions of

proposed filings that were sent to Ms. Wang, leaving Defendants with no way to verify which

specific documents Ms. Wang has reviewed in translated form, or whether the translations are

accurate.  In sum, Ms. Wang "profess[ed] near-total reliance" on her counsel (*Kulig*, 2014 WL

6769741, at *3), revealing she therefore cannot "check . . . [their] discretion . . . in prosecuting the

suit."  *In re Monster Worldwide*, 251 F.R.D. at 135.

Ms. Wang also does not understand the basic allegations of the Complaint.  When asked

whether she is aware that some of the alleged misrepresentations were contained in Deutsche

Bank's annual reports, Ms. Wang replied: "I don't think so."  *Id.* at 121:9-17.  Nor was Ms. Wang

aware that Deutsche Bank periodically files documents with the SEC, much less that certain such

filings are relevant to this case.  *See id.* at 122:17-25.  When Ms. Wang was asked whether she

was aware that the Complaint alleges that Deutsche Bank made misstatements on its "official

website" (*see, e.g.*, Cmplt. ¶ 172), Ms. Wang testified: "I have never seen these before.  No, I don't

know."  Wang Tr. at 123:2-9.  *See Darvin*, 610 F. Supp. at 257 (proposed class representative

inadequate where "[h]is deposition demonstrate[d] that his personal knowledge of many of the

facts pleaded in the complaint [was] extremely limited or nonexistent").  And, like Mr. Karimi,

Ms. Wang appeared to be confused about which investors would fall within the proposed class,

and was unable to recall the proposed class period.  *See* Wang Tr. at 16:19-22 (incorrectly stating

that the proposed class period covers March 2017 to September 2019).

Thus, like Mr. Karimi, Ms. Wang has contributed little more than her name to this lawsuit

and has shown no willingness or ability to check class counsel or otherwise protect the interests of

the proposed class.  She, too, therefore fails to satisfy the requirements of Rule 23(a)(4).[17]

## IV.   IF THE COURT DOES NOT DENY PLAINTIFFS' MOTION IN ITS ENTIRETY, THE COURT SHOULD NARROW THE PROPOSED CLASS TO ONLY THOSE WHO ACQUIRED DEUTSCHE BANK ORDINARY SHARES PURCHASED ON A U.S. STOCK EXCHANGE  DURING THE PROPOSED CLASS PERIOD

For the reasons discussed herein, the Court should deny Plaintiffs' class certification motion in its entirety.  But even if the Court determines to grant the motion, it should, at minimum, narrow the proposed class to include only those who, during the proposed class period, (i) purchased Deutsche Bank ordinary shares (ii) on a stock exchange located in the United States. *See generally In re SunEdison, Inc. Securities Litigation*, 329 F.R.D. 124, 134 (S.D.N.Y. 2019) ("[T]he Court has authority sua sponte to modify a proposed class definition.").

First, Plaintiffs' proposed class definition broadly seeks to include in the class any entities or individuals, subject to limited exceptions, who purchased or otherwise acquired "Deutsche Bank securities" during the proposed class period.  Pl. Br. at 1.  Plaintiffs appear to equate the term "securities" with Deutsche Bank ordinary shares (*see, e.g.*, *id.* at 16) or Deutsche Bank's "common stock" (*see, e.g.*, *id.* at 9), but Deutsche Bank has issued numerous other kinds of securities as well.

---

[17] "[I]f one were to not make a multiple-comparisons adjustment, then the only significant date of the 10 alleged disclosure dates is September 20, 2020[.]"  Juneja Report at 26.  That is still no evidence of price impact because (i) the multiple-comparisons adjustment is proper here (*see id.* at 25-26) and (ii) even without that adjustment, there was no statistically-significant drop after that date in Germany—where the vast majority of Deutsche Bank shares trade.  *See id.* at 26.  But even if it were, Ms. Wang sold virtually all of her Deutsche Bank shares **before** that date.  *See* Dkt. No. 18-3 at 4.  As such, she would not be a proper class representative because she was an "in-and-out" trader—*i.e.*, someone who both purchased and sold her Deutsche Bank shares before a corrective disclosure was made and thus did not suffer any losses because the share price was allegedly inflated both at the time she purchased and at the time she sold her shares.  *See, e.g.*, *George* v. *China Automotive Systems, Inc.*, 2013 WL 3357170, at *6 (S.D.N.Y. July 3, 2013) (denying class certification because named plaintiffs were in-and-out traders and citing other cases doing the same); *IBEW Local 90 Pension Fund* v. *Deutsche Bank AG*, 2013 WL 5815472, at *19 (S.D.N.Y. Oct. 29, 2013) (same).

*See, e.g.*, Matuschak Decl. Ex. 24 (excerpt of Deutsche Bank's 2018 Annual Report referring to, among other things, "Hybrid Debt Securities" and "trust preferred securities").

Nowhere do Plaintiffs provide any analysis of the market for any securities other than Deutsche Bank ordinary shares.  *See also* Nye Tr. at 30:9-31:25 (acknowledging that the Nye Report deals only with Deutsche Bank's "ordinary shares" as opposed to "debt securities or trust preferred securities or derivatives").   And neither of the Proposed Representatives has ever purchased any Deutsche Bank securities other than ordinary shares.  *See, e.g.*, Karimi Tr. at 49:9-17; Wang Tr. at 50:22-51:7.  As such, if Plaintiffs do, in fact, intend the proposed class to encompass purchases of securities other than Deutsche Bank ordinary shares, they have utterly failed to meet their burden under Rules 23(a) and 23(b).

Second, Plaintiffs' proposed class seeks to include those who purchased Deutsche Bank "securities" not only on "any stock exchanges located in the United States," but also "on any alternative trading systems located in the United States" or "pursuant to other domestic transactions[.]"  Pl. Br. at 1.  But, again, the Nye Report contains no analysis of the market for Deutsche Bank shares traded outside of a stock exchange, and neither of the Proposed Representatives understood what the phrases "alternative trading systems" or "domestic transactions" mean.  *See, e.g.*, Nye Report at 16 (referring to the fact that Deutsche Bank stock "traded on . . . Alternative Trading Systems" but never analyzing the market for Deutsche Bank stock on those systems); Karimi Tr. at 75:23-78:7; Wang Tr. at 114:23-115:12.

Thus, to the extent Plaintiffs have satisfied their burden under Rules 23(a) and 23(b) at all—which, for the reasons discussion in Sections I-III above, they have not—they certainly have not done so with respect to Deutsche Bank securities other than ordinary shares, nor with respect

to shares traded somewhere other than a U.S. stock exchange.[18]

## **CONCLUSION**

For the foregoing reasons, the proposed class fails to meet the requirements of Rules 23(a)

and Rule 23(b) and Plaintiffs' motion for class certification should be denied in its entirety.

Dated:  August 22, 2022

CAHILL GORDON & REINDEL LLP

By: /s/ David G. Januszewski
David G. Januszewski
Sheila C. Ramesh
Nicholas N. Matuschak
Ivan Torres
32 Old Slip
New York, New York 10005
212-701-3000
djanuszewski@cahill.com
sramesh@cahill.com
nmatuschak@cahill.com
itorres@cahill.com

*Attorneys for Defendants Deutsche Bank
Aktiengesellschaft, John Cryan, and
Christian Sewing*

---

[18] It is unclear if Plaintiffs intend their proposed class definition to include "in and out" traders but, if they do, the class definition should also be modified to exclude such traders.  *See, e.g.*, *In re Flag Telecom Holdings, Ltd. Securities Litigation*, 574 F.3d 29, 40 (2d Cir. 2009) (in-and-out traders "should not have been included in the certified class"); *In re Smart Technologies*, 295 F.R.D. at 60 (S.D.N.Y. 2013) (excluding in-and-out traders from the class because they were subject to unique defenses concerning causation); *George*, 2013 WL 3357170, at *6 (citing additional cases where in-and-out traders were excluded from the class).