**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ALI KARIMI, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>DEUTSCHE BANK AKTIENGESELLSCHAFT, JOHN CRYAN, AND CHRISTIAN SEWING,<br><br>Defendants. | **Case No. 1:22-cv-02854-JSR** |

**DECLARATION OF EMMA GILMORE IN SUPPORT OF: (i) PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION; and (II) Lead COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND COMPENSATORY AWARDS TO PLAINTIFFS**

# <u>TABLE OF CONTENTS</u>

I.  INTRODUCTION ................................................................................................2

II.  PROSECUTION OF THE ACTION ...................................................................5

    A.  Commencement Of The Action And Appointment Of Lead Plaintiff And Lead Counsel ............................................................................................5

    B.  The Comprehensive Pre-Filing Investigation And The Preparation Of The Complaint ...........................................................................................5

    C.  Defendants' Motion To Dismiss The Complaint And Plaintiffs' Response............6

    D.  Discovery and Class Certification .........................................................7

    E.  Mediation Efforts, Settlement Negotiations, and Preliminary Approval of the Settlement ......................................................................................8

III.  THE RISKS OF CONTINUED LITIGATION .................................................9

    A.  Risks In Proving Liability.....................................................................9

    B.  Risks To Proving Loss Causation And Damages .................................10

    C.  Risks Faced In Obtaining And Maintaining Class Action Status .........12

    D.  Other Risks..........................................................................................13

    E.  The Settlement Is Reasonable In Light Of Potential Recovery In The Action......14

IV.  PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF THE NOTICE................................................14

V.  ALLOCATION OF THE NET PROCEEDS OF THE SETTLEMENT .........................18

VI.  LEAD COUNSEL'S REQUEST FOR ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES................................................21

    A.  The Fee Application..............................................................................22

        1.  The Favorable Outcome Achieved Is the Result of the Significant Time and Labor That Plaintiffs' Counsel Devoted to the Class Action ...................22

        2.  The Magnitude and Complexity of the Action .........................................27

        3.  The Significant Risks Borne By Plaintiffs' Counsel .................................27

        4.  The Quality of Representation, Including the Result Obtained, the Experience and Expertise of Lead Counsel, and the Standing and Caliber of Defendants' Counsel................................................28

        5.  The Requested Fee In Relation to the Settlement....................................29

        6.  Interests of Public Policy, Including the Need to Ensure the Availability of Experienced Counsel in High-Risk Contingent Securities Cases.............29

        7.  The Reaction of the Class Supports Class Counsel's Fee Request...........30

i

8.      Plaintiffs Support Lead Counsel's Fee Request..........................................30

B.      Reimbursement of The Requested Litigation Expenses Is Fair And Reasonable .31

C.      Awards for Lead Plaintiff and Named Plaintiff......................................33

VII.   CONCLUSION.........................................................................................34

## TABLE OF EXHIBITS TO DECLARATION

| EXHIBIT | TITLE |
|---------|-------|
| 1 | Declaration of Jack Ewashko dated December 27, 2022 ("Ewashko Decl.") |
| 2 | Declaration of Peretz Bronstein dated December 26, 2022 ("Bronstein Decl.") |
| 3 | Lodestar Report of Pomerantz LLP |
| 4 | Table of Peer Law Firm Billing Rates |
| 5 | Biography of Pomerantz LLP |
| 6 | Biography of Bronstein, Gewirtz & Grossman, LLC |
| 7 | Schedule of Cases Where Courts Award Fees Of One-Third In Securities Class Action Settlements. |
| 8 | Declaration of Yun Wang dated December 27, 2022 ("Wang Declaration") |
| 9 | Declaration of Ali Karimi date December 23, 2022 ("Karimi Declaration") |
| 10 | Janeen McIntosh and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2021 Full-Year Review* (NERA Jan. 25, 2022) |

I, Emma Gilmore, declare, pursuant to 28 U.S.C. § 1746, as follows:

1.      I am a partner at Pomerantz LLP ("Pomerantz"), Court-appointed Lead Counsel ("Lead Counsel") for Court-appointed Lead Plaintiff Yun Wang ("Wang" or "Lead Plaintiff") and Named Plaintiff Ali Karimi ("Karimi" or "Named Plaintiff" and, with Wang, "Plaintiffs") in this action (the "Action").[1]  *See* ECF No. 31.  I have personal knowledge of the matters set forth herein based on my participation in the prosecution and settlement of the claims asserted on behalf of the Settlement Class in this Action.

2.      I respectfully submit this Declaration in support of Plaintiffs' motion, pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, for final approval of the proposed $26,250,000 settlement (the "Settlement") that the Court preliminarily approved by Order dated October 20, 2022 (the "Preliminary Approval Order") (ECF No. 102); as well as final approval of the proposed plan for allocating the proceeds of the Net Settlement Fund to eligible Settlement Class Members (the "Plan of Allocation") (collectively, the "Final Approval Motion").

3.      I also respectfully submit this Declaration in support of Lead Counsel's motion, on behalf of all Plaintiffs' Counsel,[2] for an award of attorneys' fees amount of 33 1/3% of the Settlement Fund, which equates to $8,750,000, plus interest earned at the same rate as the Settlement Fund; reimbursement of Lead Counsel's out-of-pocket expenses in the amount of $688,352.41; and a total of $40,000 to Plaintiffs ($20,000 to each of Lead Plaintiff and Named Plaintiff), in accordance with the Private Securities Litigation Reform Act of 1995 ("PSLRA") for costs and expenses, including lost wages, incurred in connection with their representation of the Settlement Class (the "Fee and Expense Application").

---

[1] Unless defined herein, all capitalized terms have the meanings set forth in the Stipulation and Agreement of Settlement dated September 23, 2022 (the "Stipulation").  ECF No. 101-1.

[2] "Plaintiffs' Counsel" means Lead Counsel and Bronstein, Gewirtz & Grossman, LLC ("BGG").

4. As part of the Preliminary Approval Order, the Court directed notice of the Settlement to be disseminated to the Settlement Class. *See* ECF No. 102. Pursuant to the Preliminary Approval Order, AB Data Ltd. ("AB Data"), the Court-approved Claims Administrator, implemented a comprehensive notice program under the direction of Lead Counsel, whereby notice was given to potential Settlement Class Members by mail and/or email and by publication.

5. In total, more than 129,600 copies of the initial and updated Postcard Notice or Notice and Claim Form have been disseminated to potential Settlement Class Members, and, to date, no requests for exclusion have been received and no objections have been filed with the Court or received by Lead Counsel.

## I.   INTRODUCTION

6. This is a consolidated securities class action pursuant to Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder and Section 20(a) of the Exchange Act. Plaintiffs asserted claims against defendant Deutsche Bank Aktiengesellschaft ("Deutsche Bank" or the "Company"), and defendants John Cryan and Christian Sewing (collectively, the "Individual Defendants," and, together with Deutsche Bank, the "Defendants").

7. On March 1, 2021, Plaintiffs filed their Amended Consolidated Class Action Complaint (the "Complaint") asserting claims against all Defendants under Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, and against the Individual Defendants under Section 20(a) of the Exchange Act. The Complaint alleged, among other things, that Defendants made materially false and misleading statements and/or omissions about Deutsche Bank's "Know Your Customer" processes and procedures, including their effectiveness. Plaintiffs further alleged that the price of Deutsche Bank's common stock was artificially inflated as a result

2

of Defendants' allegedly false and misleading statements and declined when the truth emerged. ECF No. 37.

8.      The proposed Settlement provides for the resolution of all claims in the Action in exchange for a cash payment of $26.250 million (the "Settlement Amount") for the benefit of the Settlement Class.   As detailed herein, Plaintiffs and Lead Counsel believe that the proposed Settlement represents an excellent result for the Settlement Class considering the significant risks of continued litigation.

9.      The Settlement was reached over two years of contested litigation.   Plaintiffs' Counsel's efforts involved, among other things: (i) conducting a comprehensive investigation into Defendants' allegedly wrongful acts, which included consultation with loss causation and damages experts; (ii) drafting a comprehensive 73-page Second Amended Class Action Complaint (the "SAC") based on an extensive investigation, and filing the SAC in the District of New Jersey; (iii) opposing Defendants' motion to transfer venue to this Court; (iv) and successfully opposing, in part, Defendants' motion to dismiss the SAC. After the Court denied Defendants' motion to dismiss, Lead Counsel (v) filed the Third Amended Complaint (the "TAC"), which lengthened the Class Period based on new allegations; (vi) served and responded to various demands for the production of documents and interrogatories, engaged in meet and confers with respect to discovery requests, exchanged discovery deficiency letters and communications with Defendants, produced their own documents and received over 76,000 documents from Defendants, and engaged in an extensive review of documents received from Defendants; (vii) engaged an expert in support of Plaintiffs' pending motion for Class Certification; (viii) moved for class certification; (ix) prepared Plaintiffs and the class certification expert for depositions; and (x) defended the deposition of each of the Plaintiffs and their class certification expert.

10.     In preparation for the mediation, Lead Counsel drafted a detailed mediation statement and thoroughly reviewed and analyzed Defendants' mediation statement.  Following the exchange of detailed mediation statements addressing both liability and damages, Lead Counsel prepared for and engaged in a two-day in-person mediation session before former United States District Judge Layn R. Phillips; and engaged in negotiations regarding the terms of the proposed Settlement, which resulted in an agreement in principle to settle the Action for $26.250 million.

11.     Based on the foregoing efforts, Plaintiffs and Lead Counsel are well informed of the strengths and weaknesses of the claims and defenses in the Action, and believe the Settlement represents an extremely favorable outcome for the Settlement Class and is in the best interests of its members.  For all the reasons set forth herein and in the accompanying memoranda and declarations, Plaintiffs and Lead Counsel respectfully submit that the Settlement is "fair, reasonable, and adequate" in all respects, and the Court should grant final approval pursuant to Rule 23(e) of the Federal Rules of Civil Procedure.

12.     In addition, Plaintiffs seek approval of the proposed Plan of Allocation as fair and reasonable.  As discussed in further detail below, Lead Counsel developed the Plan of Allocation with the assistance of Plaintiffs' damages consultant.  The Plan of Allocation provides for the distribution of the Net Settlement Fund to each Authorized Claimant on a *pro rata* basis based on their Recognized Loss amounts.

13.     Finally, Lead Counsel, on behalf of all Plaintiffs' Counsel, seek approval of the request for attorneys' fees and reimbursement of Litigation Expenses as set forth in the Fee and Expense Application.  As discussed in detail in the accompanying Fee and Expense Application, the requested 33 1/3% fee is within the range of percentage awards granted by courts in this Circuit in comparable complex litigation.  Additionally, the fairness and reasonableness of the request is

confirmed by a lodestar cross-check, and is warranted in light of the extent and quality of the work performed and the substantial result achieved.  Likewise, the requested out-of-pocket litigation costs of $688,352.41 and the requested awards of $20,000 to each of Lead Plaintiff and Named Plaintiff pursuant to the PSLRA are also fair and reasonable.  Accordingly, for the reasons set forth in the Fee and Expense Application and for the additional reasons set forth herein, Lead Counsel respectfully submits that the request for attorneys' fees and reimbursement of Litigation Expenses be approved.

## II.   PROSECUTION OF THE ACTION

### A.   Commencement Of The Action And Appointment Of Lead Plaintiff And Lead Counsel

14.   On July 15, 2020, Karimi filed a securities class action against Defendants in the District of New Jersey ("D.N.J."). ECF No. 1. On December 28, 2020, D.N.J. Judge Kevin McNulty appointed Wang as Lead Plaintiff and appointed Pomerantz LLP as Lead Counsel. ECF No. 31.

### B.   The Comprehensive Pre-Filing Investigation And The Preparation Of The Complaint

15.   Following Lead Counsel's appointment, counsel conducted a comprehensive investigation into Deutsche Bank's allegedly wrongful acts, which included, among other things: (1) reviewing and analyzing (a) Deutsche Bank's filings with the U.S. Securities and Exchange Commission ("SEC"), (b) public reports and announcements, research reports prepared by analysts, and news articles concerning Deutsche Bank, (c) Deutsche Bank's investor call transcripts, and (d) other publicly available material related to Deutsche Bank; and (2) conducting an extensive investigation (with the aid of a private investigator) that involved, *inter alia*, numerous interviews of former Deutsche Bank employees. Lead Counsel also consulted with damages and loss causation experts.

16.     On March 1, 2021, Plaintiffs filed the 73-page SAC, which asserted claims against all Defendants under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder, and against the Individual Defendants under Section 20(a) of the Exchange Act. ECF No. 37.

17.     Among other things, the SAC alleged that Defendants violated Section 10(b) of the Exchange Act by misrepresenting the Company's KYC processes and procedures. The specific statements that Plaintiffs alleged were false and misleading included, *inter alia*, repeated assurances that Deutsche Bank had "developed effective procedures for assessing clients (Know Your Customer or KYC) and a process for accepting new clients in order to facilitate comprehensive compliance," and that "[o]ur KYC procedures start with intensive checks before accepting a client and continue in the form of regular reviews." ¶¶142, 157, 172.[3] Plaintiffs further alleged that Defendants misrepresented that the bank's KYC program "includes strict identification requirements, name screening procedures and the ongoing monitoring and regular review of all existing business relationships," with "[s]pecial safeguards . . . implemented for . . . politically exposed persons." ¶¶144, 159, 174.

18.     In addition to alleging that these and other statements were false and misleading, the SAC alleged that the price of Deutsche Bank's common stock was artificially inflated during the Settlement Class Period as a result of Defendants' allegedly false and misleading statements and declined when the truth was revealed.

## C.     Defendants' Motion To Dismiss The Complaint And Plaintiffs' Response

19.     On April 23, 2021, Defendants moved to dismiss the SAC, or, in the alternative to transfer the action to the Southern District of New York. ECF No. 52. In moving to dismiss,

---

[3] References to "¶__" or "¶¶__" are to paragraphs in the SAC.

Defendants emphasized two prior cases brought against Deutsche Bank alleging misrepresentations concerning internal controls, both of which were dismissed, with one dismissal affirmed by the Second Circuit on scienter grounds.  *See* ECF No. 52-1 at 1-3 (citing *In re Deutsche Bank Aktiengesellschaft Sec. Litig.*, 2017 WL 4049253 (S.D.N.Y. June 28, 2017), *aff'd sub nom. Sfiraiala v. Deutsche Bank Aktiengesellschaft* ("*In re DB Appeal*"), 729 F. App'x 55 (2d Cir. 2018) (Summary Order); *Green v. Deutsche Bank Aktiengesellschaft*, 2019 WL 4805804 (S.D.N.Y. Sept. 30, 2019).  Defendants also argued that Plaintiffs failed to plead a strong inference of scienter because Plaintiffs did not allege that the Individual Defendants received a concrete and personal benefit from the alleged fraud, and that Plaintiffs' other allegations did not sufficiently support scienter.

20.     On June 1, 2021, Plaintiffs opposed both Defendants' motion to dismiss and the motion to transfer. ECF No. 58. On July 1, 2021, Defendants filed a reply in further support of their motions to dismiss and transfer. ECF No. 62.

21.     On March 31, 2022, Judge Salas of the D.N.J. granted Defendants' motion to transfer the action to this Court. ECF Nos. 63-64. On May 16, 2022, this Court held oral argument on the motion to dismiss, and on May 18, 2022, advised the parties that it would grant Defendants' motion in part and deny it in part. ECF No. 81. On June 13, 2022, the Court issued its Opinion and Order granting Defendants' motion in part and denying it in part. ECF No. 86.

### D.      Discovery and Class Certification

22.     On May 25, 2021, the parties and the Court participated in a telephonic scheduling conference, and on May 26, 2021, the Court entered a Civil Case Management Plan that, among other things, ordered Plaintiffs to move for Class Certification by July 18, 2022, Defendants to oppose that motion by August 22, 2022, and Plaintiffs to reply in further support of their motion by September 19, 2022. Thereafter, the parties exchanged, responded to, and met and conferred

regarding requests for documentary discovery and interrogatories. The parties also began to negotiate search terms for electronically stored information ("ESI") and proposed custodians. Defendants produced over 76,000 documents over several productions in response to Plaintiffs' discovery requests, and Lead Counsel reviewed the documents produced by Defendants.

23.     On July 18, 2022, Plaintiffs moved for class certification in reliance on an expert report by Zachary D. Nye, Ph.D. Defendants took, and Plaintiffs defended, the depositions of each Plaintiff and Dr. Nye and opposed Plaintiffs' motion for class certification on August 22, 2022.

**E.     Mediation Efforts, Settlement Negotiations, and Preliminary Approval of the Settlement**

24.     On September 6 and 7, 2022, the parties participated in private mediation sessions with former U.S. District Judge Layn R. Phillips. In advance of the mediation session, Lead Counsel dedicated substantial efforts to preparing a persuasive mediation statement setting forth the relevant factual and legal predicates for their claims. . The Parties then exchanged mediation statements.

25.     During the mediation, the parties reached an agreement in principle to settle the action for $26,250,000.00 for the benefit of the Settlement Class, subject to the execution of a settlement stipulation and related papers.

26.     On September 8, 2022, the parties informed the Court of the agreement in principle, and the Court agreed to adjourn class certification briefing and oral argument and ordered that preliminary approval papers be filed no later than September 23, 2022.

27.     Thereafter, the Parties exchanged multiple drafts of—and ultimately executed—the Stipulation dated September 23, 2022. ECF No. 101-1. On September 23, 2022, Plaintiffs submitted their Unopposed Motion for Preliminary Approval of Class Action Settlement.  ECF No. 100.

28.     On October 20, 2022, the Court issued its Order Preliminarily Approving Settlement and Providing for Notice.  ECF No. 102.

## III.    THE RISKS OF CONTINUED LITIGATION

29.     The Settlement provides an immediate and certain benefit to the Settlement Class in the form of a non-reversionary cash payment of $26.250 million.  As explained more fully below, there were significant risks that the Settlement Class might recover substantially less than the Settlement Amount—or nothing at all—if the case were to proceed through continued litigation to a jury trial, followed by the inevitable appeals.  Before trial and a potentially litigated verdict, the most immediate risk faced by the Settlement Class related to Plaintiffs' pending motion for class certification.  There was no guarantee that Plaintiffs and the Settlement Class would surmount this hurdle and, even if they did, later achieve any recovery, let alone one greater than $26.250 million.

### A.     Risks In Proving Liability

30.     When the Settlement was reached, Plaintiffs had successfully opposed, in part, Defendants' motion to dismiss the SAC.  Plaintiffs' defeat of Defendants' motion to dismiss was especially striking given the challenges Plaintiffs faced in asserting their claims.  For example, courts have been reluctant to sustain claims where, as here, investors allege that defendants made false and misleading statements regarding an issuer's internal controls.

31.     The fact that Plaintiffs overcame Defendants' motion to dismiss in part, however, was not a guarantee of ultimate success.  Plaintiffs faced ongoing risks associated with their pending motion for class certification as well as Defendants' forthcoming summary judgment motions, in limine motions, trial, and likely appeals, which would extend the litigation for years and might lead to a smaller recovery or no recovery at all.  While Plaintiffs believe they effectively demonstrated that Defendants made materially false and misleading statements in violation of the

federal securities laws, Defendants will contest at summary judgment and trial whether their statements are actionable because they are too general and/or not objectively verifiable, Defendants publicly warned of risks, and/or the truth was on the market.  Further, Plaintiffs faced considerable challenges in continuing to assert their claims given that courts have been reluctant to sustain claims where, as here, investors allege that they were misled regarding a financial institution's application of internal controls.

32.     Additionally, Defendants contended that the alleged false and misleading statements were not made with the requisite state of mind (*i.e.*, scienter) to support the securities fraud claims alleged.  While Lead Counsel believes that the Complaint adequately alleges scienter, Lead Counsel was well aware of the high hurdle they would have to prove that the Defendants acted with the intent to "deceive, manipulate, or defraud" investors under the federal securities laws.

33.     Here, Defendants argued that the alleged false and misleading statements were not made with the requisite state of mind (*i.e.*, scienter) to support the securities fraud claims alleged, because the SAC did not allege that the Individual Defendants received a concrete and personal benefit from the alleged fraud, and that Plaintiffs' other allegations did not sufficiently support scienter.

**B.     Risks To Proving Loss Causation And Damages**

34.     Even assuming that Plaintiffs overcame the risk of establishing Defendants' liability, as discussed above, Plaintiffs would have confronted considerable challenges in establishing loss causation and class-wide damages.

35.     Plaintiffs allege that the truth about Deutsche Bank's KYC processes leaked into the market through a series of corrective disclosures. The overwhelming majority of the alleged corrective disclosures, however, are subject to defenses that they were arguably not statistically

significant.

36.    Pursuant to *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), it is the plaintiff's burden to prove loss causation and damages. This would require Plaintiffs to proffer expert testimony as to: (a) what the "true value" of Deutsche Bank's stock would have been had there been no alleged material misstatements or omissions; (b) the amount by which the value of Deutsche Bank's common stock was inflated by the alleged material misstatements and omissions; and (c) the amount of artificial inflation removed by each alleged corrective disclosure. Defendants almost certainly would have presented their own damages expert(s), who would have no doubt asserted that there was no statistically significant, Company-specific price drop on any corrective disclosure date, and thus that declines in Deutsche Bank's share price on the dates of the alleged corrective disclosures were not caused by the alleged corrective disclosures. At bottom, the burden of proving loss causation and damages would require a jury to decide the "battle of the experts"—an expensive and intrinsically unpredictable process.

37.    The memoranda of law and expert reports for and in opposition to Plaintiffs' motion for class certification (ECF Nos. 91-93, 96-97), preview the challenges Plaintiffs would need to overcome to prove loss causation and damages to a jury. For example, Defendants asserted that Plaintiffs' own expert was only able to confirm that one of the eleven alleged corrective disclosures was associated with statistically significant, Company-specific subsequent price decline at a confidence level above 95%, and Defendants' expert contested the statistical significance of the decline on that date. *See* ECF No. 96 at 6-7, 23 n.17. Further, Defendants' motion to dismiss and opposition to Plaintiffs' motion to for class certification vigorously asserted that the "truth was already on the market because Deutsche Bank had been the subject of repeated regulatory scrutiny and public reports regarding know-your-customer and anti-money-laundering internal controls

deficiencies. *E.g.*, ECF No. 52-1 at 28; ECF No. 96 at 11.

38.     Moreover, expert testimony can often rest on many assumptions, any of which risks being rejected by a jury.  A jury's reaction to such expert testimony is highly unpredictable, and Plaintiffs recognize that, in a such a battle, there is the possibility that a jury could be swayed by Defendants' expert(s) and find there were no damages, or that they were only a fraction of the amount claimed by Plaintiffs.  Thus, the amount of damages that the Settlement Class would actually recover at trial, even if successful on liability issues, was uncertain.  Similarly, there was no assurance that Plaintiffs' key evidence and testimony relating to liability and damages would be admitted as evidence by the Court at trial.  These issues could have seriously affected Plaintiffs' ability to successfully prosecute the Action.

39.     In sum, had any of Defendants' loss causation and damages arguments been accepted at summary judgment or trial, they could have dramatically limited—if not eliminated— any potential recovery by the Settlement Class.

## C.     Risks Faced In Obtaining And Maintaining Class Action Status

40.     Defendants have opposed Plaintiffs' motion for class certification.  While Lead Counsel researched and analyzed class certification and are confident that all the Rule 23 requirements are satisfied, and that the Court would have certified the proposed class, Plaintiffs bear the burden of proof on class certification, and Defendants would have undoubtedly raised a host of arguments challenging the propriety of class certification.

41.     Plaintiffs also faced the significant risk that Defendants could successfully argue that Defendants' misstatements did not affect the price of Deutsche Bank's securities. For example, Defendants' opposition to Plaintiffs' motion for class certification argued that there was no statistically significant increase in the price of Deutsche Bank shares that could be tied to Defendant's alleged misstatements. Defendants further asserted that on seventeen of the twenty

alleged misrepresentation dates, Deutsche Bank-specific returns were negative in the United States and/or German markets. In other words, according to Defendants, the price of Deutsche Bank shares increased less than what would be expected from market and industry factors, and thus the Company's share price was not inflated by any alleged misstatements. While Plaintiffs believe that they have rebutted these assertions under the theory of "price maintenance," *i.e.*, the Defendants false statements did not cause the Company's share price to increase because the alleged false statements simply maintained investors perception of the Company's internal controls, there is no guarantee that the Court would have agreed.

42.     Even if Plaintiffs successfully obtained class certification, Defendants could have sought permission from the Second Circuit to appeal any class certification order under Federal Rule of Civil Procedure 23(f), further delaying or precluding any potential recovery.  Class certification was, by no means, a foregone conclusion. Further, even if the Court were to certify the class, there is always a risk that the certified class could be decertified at a later stage in the proceedings.

**D.     Other Risks**

43.     In addition to the pending motion to dismiss, Plaintiffs would have had to prevail at several later stages of the litigation, each of which presenting significant risks in complex class actions such as this Action.

44.     Plaintiffs would have to successfully navigate and prevail against Defendants' eventual motion(s) for summary judgment, and at trial.  Each of these several stages of litigation present significant risks in complex class actions such as this one.  Lead Counsel know from experience that despite the most vigorous and competent efforts, success in complex litigation such as this case is never assured.

45.     Even if Plaintiffs succeeded in proving all the elements of their case at trial and

obtained a jury verdict, Defendants almost certainly would have appealed.  An appeal not only would have renewed the risks faced by Plaintiffs—as Defendants would have reasserted their arguments summarized above—but also would have resulted in significant additional delay.  Given these significant litigation risks, Plaintiffs and Lead Counsel believe the Settlement represents an excellent result for the Settlement Class.

### E. The Settlement Is Reasonable In Light Of Potential Recovery In The Action

46.     In addition to the risks of litigation discussed above, the Settlement is also fair and reasonable in light of the potential recovery of available damages.  If Plaintiffs had fully prevailed on each of their claims at both summary judgment and after a jury trial, if the Court certified the same class period as the Settlement Class Period, and if the Court and jury accepted Plaintiffs' damages theory of $0.47 of inflation, the total potential maximum damages would be approximately $53.14 million.  Under this scenario, the $26.250 million Settlement represents a recovery of ***approximately 49.40%***, well above the median recovery of approximately 1.8% of estimated damages.  *See* Ex. 10 (Janeen McIntosh and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2021 Full-Year Review* (NERA Jan. 25, 2022 at 24 (Fig. 22))); *see also id.* at 23 (Fig. 21) (median recovery was 5.2% for securities class actions with estimated damages between $20-$49 million that settled between December 2012-December 2021).

47.     However, if Defendants prevailed on any or all of their arguments concerning liability, Plaintiffs would have recovered far less, if anything.

## IV. PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF THE NOTICE

48.     Pursuant to the Preliminary Approval Order, Lead Counsel and the Court-approved Claims Administrator, AB Data, implemented a comprehensive notice program whereby notice was given to potential Settlement Class Members by mail, email, and publication.

49.     The Preliminary Approval Order directed that the Postcard Notice be mailed to potential Settlement Class Members and set a deadline of January 17, 2023 (14 calendar days before the final fairness hearing) for Settlement Class Members to submit objections to the Settlement, the Plan of Allocation, and/or the Fee and Expense Application, a deadline of January 10, 2023 to request exclusion from the Settlement Class, and a final fairness hearing date of January 31, 2023 (the "Settlement Hearing").

50.     Pursuant to the Preliminary Approval Order, Lead Counsel instructed AB Data, the Court-approved Claims Administrator, to disseminate copies of the Postcard Notice and publish the Summary Notice.  Contemporaneously with the mailing of the Postcard Notice, Lead Counsel instructed AB Data to post downloadable copies of the Notice of (I) Pendency of Class Action, Certification of Settlement Class, and Proposed Settlement of Class Action; (II) Settlement Hearing; and (III) Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses ("Notice") and Claim Form online at www.deutschebanksecuritieslitigation.com (the "Settlement Website").  The Postcard Notice directed Settlement Class Members to the Settlement Website in order to obtain additional information on the Settlement, including how to file a claim, request exclusion or object to the Settlement, and access to downloadable copies of the Notice and Claim Form.

51.     The Notice disclosed, among other things, the following information to Settlement Class Members: (a) a summary of the Settlement, including the $26.250 million Settlement Amount; (b) the proposed Plan of Allocation; (c) that Lead Counsel would apply for an award of attorneys' fees on behalf of all Plaintiffs' Counsel in an amount not to exceed 33 1/3% of the Settlement Fund (*i.e.*, $8,750,000, plus interest), as well as Litigation Expenses, which may include an application for reimbursement to Plaintiffs for their costs and expenses related to their

representation of the Settlement Class; (d) that any Settlement Class Member could object to the requested attorneys' fees and Litigation Expenses; (e) an explanation of the reasons for the Settlement; (f) that requests for exclusion from the Settlement must be submitted to the Claims Administrator no later than January 10, 2023; (g) that objections to the Settlement, the Plan of Allocation, and/or the Fee and Expense Application must be filed with the Court no later than January 17, 2023; and (h) that the deadline for submitting a Claim Form is February 7, 2023.

52.     To disseminate the Postcard Notice, on November 21, 2022, AB Data mailed a copy of the Postcard Notice to 150 individuals and organizations identified in the transfer agent records provided by Deutsche Bank's counsel. *See* Declaration of Jack Ewashko Concerning: (A) Mailing of the Postcard Notice; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion and Objections ("Ewashko Decl."), attached hereto as Exhibit 1 at ¶5.

53.     In addition, AB Data maintains a proprietary database with names and addresses of the largest and most common banks, brokerage firms, institutions, and other third-party nominees. On November 21, 2022, AB Data caused Notice Packets to be mailed or emailed to the 4,142 nominees and institutional groups contained in the AB Data master mailing list. Ewashko Decl., ¶4 and Ex. B (copy of the Notice Packets sent to nominees). The mailings The Notice directed those who purchased or otherwise acquired Deutsche Bank securities during the Class Period, for the beneficial interest of a person or entity other than themselves, to either (i) within seven (7) calendar days of receipt of the Notice, request from the Claims Administrator sufficient copies of the Postcard Notice to forward to all such beneficial owners and within seven (7) calendar days of receipt of those Postcard Notices forward them to all such beneficial owners; or (ii) within seven (7) calendar days of receipt of the Notice, provide. a list of the names, mailing addresses, and, if available, email addresses of all such beneficial owners to A.B. Data. Ewashko Decl. ¶6.

54.     As of December 27, 2022, 129,891 potential Settlement Class Members have been mailed copies of the Postcard Notice, updated Postcard Notice (as described below) and/or have received a link to the Notice and Claim Form and/or updated Notice (as described below). *See id.* at ¶¶3-9, 12.

55.     On December 19, 2022, in accordance with the Preliminary Approval Order, AB Data caused the Summary Notice to be published once in *Investor's Business Daily* and to be transmitted over *PR Newswire*. *See id.* at ¶10; Exs. E-F (confirmations of publications).

56.     Lead Counsel also caused AB Data to establish the dedicated Settlement Website, which became operational on November 21, 2022, to provide potential Settlement Class Members with information concerning the Settlement, including exclusion, objection, and claim-filing deadlines for the case; the online claim filing link; the date and time of the Settlement Hearing; and downloadable versions of the Notice and Claim Form, updated Notice, as well as copies of the Stipulation and Preliminary Approval Order. Ewashko Decl. ¶12.

57.     AB Data maintains a toll-free telephone number for potential Settlement Class Members to call and obtain information about the Settlement and/or request a Notice and Claim Form.  AB Data promptly responds to each telephone inquiry and will continue to address potential Settlement Class Members' inquiries. *Id.* at ¶11.

58.     As set forth above, the Postcard Notice and Notice informed potential Settlement Class Members that the deadline to file objections to the Settlement, the proposed Plan of Allocation, and/or the Fee and Expense Application is January 17, 2023, and that the deadline to request exclusion from the Settlement Class is January 10, 2023.  To date, no requests for exclusion have been received. *Id.* at ¶13.

59.     In addition, to date, no objections to the Settlement, the Plan of Allocation, and/or

the Fee and Expense Application have been entered on this Court's docket or have otherwise been received by Lead Counsel or AB Data. Lead Counsel will file reply papers by January 24, 2023, which will address any objections that may be received. Lead Counsel's reply papers will include a supplemental affidavit from AB Data addressing whether any requests for exclusion have been received.

60.     On December 15, 2022, the Court advised Lead Counsel that it was rescheduling the Settlement Hearing to 9:00 AM on January 31, 2022 and directed Lead Counsel to provide Settlement Class Members with notice of the rescheduled hearing. On December 19, 2022, Lead Counsel mailed an updated Postcard Notice announcing the new time of the Settlement Hearing. Lead Counsel also issued a press release and updated the Settlement Website and Notice reflecting the new hearing time. *Id.* at ¶¶9, 12.

61.     Although the Postcard Notice and Notice initially informed the Settlement Class that Lead Counsel intended to apply for reimbursement of expenses of up to $500,000 (*id.* at Ex. A; Ex. B at ¶¶5, 66), that number inadvertently underestimated the actual expenses incurred by Lead Counsel by $188,352.41. On December 16, 2022, Lead Counsel posted an updated Notice to the Settlement Website and shortly thereafter mailed an updated Postcard Notice to the Class indicating that it would seek reimbursement of Litigation Expenses not to exceed $1,000,000, an increase from the $500,000 referenced in the initial Notice, as discussed in Section VI.B, *infra*. *Id.* at ¶¶9, 12; Ex. C; Ex. D at ¶5 & n.2, ¶66 & n.6. The updated Postcard Notice further advised investors that Lead Counsel was going to request reimbursement of up to $1,000,000 in expenses. *Id.* Ex. C.

## V.     ALLOCATION OF THE NET PROCEEDS OF THE SETTLEMENT

62.     Pursuant to the Preliminary Approval Order, and as set forth in the Notice, all Settlement Class Members who want to participate in the distribution of the Net Settlement Fund

(*i.e.*, the Settlement Fund less (a) any Taxes, (b) any Notice and Administration Costs, (c) any Litigation Expenses awarded by the Court, and (d) any attorneys' fees awarded by the Court) must submit a valid Claim Form with all required information postmarked no later than February 7, 2023.  As set forth in the Notice, the Net Settlement Fund will be distributed among Settlement Class Members according to the plan of allocation approved by the Court.

63.    Plaintiffs' damages expert developed the proposed Plan of Allocation in consultation with Lead Counsel.  Lead Counsel believes that the Plan of Allocation provides a fair and reasonable method to equitably allocate the Net Settlement Fund among Settlement Class Members who suffered losses as a result of the conduct alleged in the Complaint.

64.    The Plan of Allocation is set forth at pages 10 to 12 of the Notice and updated Notice.  *See* Ewashko Decl. Ex. B (Notice) and Ex. D. (updated Notice).  As described in the Notice, the calculations made pursuant to the Plan of Allocation are not intended to be estimates of, nor indicative of, the amounts that Settlement Class Members might have been able to recover after a trial.  Nor are the calculations pursuant to the Plan of Allocation intended to be estimates of the amounts that will be paid to Authorized Claimants pursuant to the Settlement.  The computations under the Plan of Allocation are only a method to weigh the claims of Authorized Claimants against one another for the purposes of making *pro rata* allocations of the Net Settlement Fund.

65.    In developing the Plan of Allocation, Plaintiffs' damages expert calculated the amount of estimated alleged artificial inflation in the per share closing prices of Deutsche Bank common stock that was allegedly proximately caused by Defendants' purportedly false or misleading statements and omissions.  In calculating the estimated artificial inflation caused by Defendants' alleged misrepresentations and omissions, Plaintiffs' damages expert considered the

price change in Deutsche Bank common stock that occurred on July 9, 2020, and September 21, 2020, respectively, and adjusted the price change observed on this day for changes that were attributable to market or industry forces.

66.     Under the Plan of Allocation, a "Recognized Loss Amount" will be calculated for each purchase of Deutsche Bank common stock during the Settlement Class Period (*i.e.*, from March 14, 2017, through and including September 18, 2020) that is listed in the Claim Form and for which adequate documentation is provided.  The calculation of Recognized Loss Amounts will depend upon several factors, including how many shares of Deutsche Bank common stock the Claimant purchased, when the Deutsche Bank common stock was bought, acquired, or sold (or if it was still held at the end of the Settlement Class Period), and the purchase price and sales price (if sold).  In general, the Recognized Loss Amount calculated will be the difference between the estimated artificial inflation on the date of purchase and the estimated artificial inflation on the date of sale (with certain adjustments based on the 90-day average price following the end of the Settlement Class Period if the stock was still held as of the end of the Settlement Class Period), or the difference between the actual purchase price and sales price of the stock, whichever is less.

67.     Claimants who purchased Deutsche Bank common stock during the Settlement Class Period and sold those shares before the alleged corrective disclosures impacted the Company's share price (on July 9, 2020, and September 21, 2020, respectively) will have no Recognized Loss Amount for those transactions.  The Plan of Allocation also incorporates the "Lookback Period" damage claim ceiling provisions of the PSLRA.  Recognized Loss Amounts for shares of Deutsche Bank common stock sold during the 90-day period after the end of the Settlement Class Period or still held at the end of trading on December 17, 2020, the end of the 90-day period, are also limited by the difference between the purchase price and the average

closing price of Deutsche Bank common stock during that period, consistent with provisions of the PSLRA, 15 U.S.C. § 78u-4(e).

68.     The sum of the Recognized Loss Amounts for all of a Claimant's purchases of Deutsche Bank common stock during the Settlement Class Period is the Claimant's "Recognized Claim" and the Net Settlement Fund will be allocated to Authorized Claimants on a *pro rata* basis based on the relative size of their Recognized Claims.

69.     In sum, the Plan of Allocation was designed to fairly and rationally allocate the proceeds of the Net Settlement Fund among Settlement Class Members based on the losses they suffered on transactions in Deutsche Bank common stock that were attributable to the conduct alleged in the Complaint.   Accordingly, Lead Counsel respectfully submits that the Plan of Allocation is fair and reasonable and should be approved by the Court.

70.     To date, no objections to the proposed Plan of Allocation have been received by Lead Counsel or the Claims Administrator or posted on the Court's docket.  *See* Ewashko Decl. at ¶8.

## VI.   LEAD COUNSEL'S REQUEST FOR ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES

71.     In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel is applying for a fee award of 33 1/3% of the Settlement Fund (or $8,750,000, plus interest earned at the same rate as the Settlement Fund).   Lead Counsel also request reimbursement of Litigation Expenses from the Settlement Fund in the amount of $688,352.41 in out-of-pocket expenses that Plaintiffs' Counsel incurred in connection with the prosecution of the Action. Finally, Plaintiffs request awards of $20,000 to each of Lead Plaintiff and Named Plaintiff as an award in connection with representing the Settlement Class.  The total Litigation Expenses amount of $688,352.41 is below the maximum expense amount of $1,000,000, set forth in the updated

Settlement Website, Long Notice, and Postcard Notice.  The legal authorities supporting a 33 1/3%
fee award are set forth in the accompanying Fee and Expense Application, filed concurrently
herewith.  The primary factual bases for the requested fee and reimbursement of Litigation
Expenses are summarized below.

### A.    The Fee Application

72.    Lead Counsel are applying for a percentage-of-the-common-fund fee award to
compensate them for the services they rendered on behalf of the Settlement Class.  As set forth in
the accompanying Fee and Expense Application, the percentage method is the best method for
determining a fair attorneys' fee award, because unlike the lodestar method, it aligns the lawyers'
interest with that of the Settlement Class in achieving the maximum recovery.  The lawyers are
motivated to achieve maximum recovery in the shortest amount of time required under the
circumstances.  This paradigm minimizes unnecessary drain on the Court's resources.  Notably,
the percentage-of-the-fund method has been recognized as appropriate by the Supreme Court and
the Second Circuit for cases of this nature.  Furthermore, the requested fee is fully supported by a
"lodestar multiplier cross-check."

73.    Based on the quality of the result achieved, the extent and quality of the work
performed, the significant risks of the litigation, and the fully contingent nature of the
representation, Lead Counsel respectfully submit that the requested fee award is fair and
reasonable and should be approved.  As discussed in the Fee and Expense Application, a 33 1/3%
fee award is well within the range of percentages awarded in securities class actions with
comparable settlements in this Circuit.

### 1.    The Favorable Outcome Achieved Is the Result of the Significant Time and Labor That Plaintiffs' Counsel Devoted to the Class Action

74.    Plaintiffs' Counsel spent considerable time prosecuting this Action on behalf of the

Settlement Class.  As previously summarized above, Plaintiffs' Counsel, among other things:

- drafted the initial complaint in the Action and moved for appointment of Lead Plaintiff and Lead Counsel;

- conducted an extensive investigation of the claims asserted in the Action, which included, among other things: (a) reviewing and analyzing (i) Deutsche Bank's filings with the U.S. Securities and Exchange Commission ("SEC"), (ii) research reports prepared by securities and financial analysts, and news and industry articles, concerning Deutsche Bank, (iii) Deutsche Bank's investor call transcripts and (iv) other publicly available material related to the Company; (b) retaining and working with a private investigator who interviewed numerous former Company employees; and (c) working with a damages and loss causation expert to analyze Deutsche Bank's stock price movements;

- utilized the foregoing comprehensive investigation and additional research to draft and file the comprehensive 73-page Second Amended Complaint ("SAC") (ECF No. 37, the "Complaint"), which asserted claims against all Defendants under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder, and against the Individual Defendants under Section 20(a) of the Exchange Act;

- opposed Defendants' motion to transfer venue to this Court;

- researched and drafted the opposition to Defendants' motion to dismiss, which successfully opposed, in part, Defendants' motion;

- after the Court denied Defendants' motion to dismiss, filed the Third Amended Complaint (the "TAC"), which lengthened the Class Period based on new allegations;

- served and responded to various demands for the production of documents and interrogatories, engaged in meet and confers with respect to discovery requests, began negotiating search terms for electronically stored information ("ESI"), and proposed custodians, exchanged discovery deficiency letters and communications with Defendants, produced their own documents and received over 76,000 documents from Defendants, and engaged in an extensive review of documents received from Defendants;

- moved for class certification;

- prepared Plaintiffs and the class certification expert for depositions;

- defended the deposition of each of the Plaintiffs and their class certification expert;

- engaged in a mediation process overseen by a highly experienced third-party mediator, former United States District Judge Layn R. Phillips, which involved an exchange of written submissions concerning the facts of the case, liability and damages, two full-day formal mediation sessions, and extensive consultation with Plaintiffs' expert on damages and loss causation;

- negotiated a detailed confidential settlement term sheet with Defendants' counsel, which was executed on September 7, 2022;

- drafted and then negotiated the terms of the Stipulation (including the exhibits thereto) and Supplemental Agreement with Defendants' Counsel;

- worked with a damages expert to craft a plan of allocation that treats Plaintiffs and all other members of the proposed Settlement Class fairly;

- drafted the Preliminary Approval Motion and supporting papers;

- oversaw the implementation of the notice process; and

- drafted the Motion for Final Approval and supporting papers.

75.     Lead Counsel was substantially assisted by BGG in this action. As set forth in the declaration of Peretz Bronstein, attached hereto as Exhibit 2 ("Bronstein Decl."), BGG served as Lead Counsel's principal liaison counsel to Lead Plaintiff and Named Plaintiff throughout the Action. Bronstein Decl. ¶2. In this role, BGG explained the roles and duties of serving as lead plaintiff to Wang and of acting as a named plaintiff to Karimi and gathered trade records filed with the initial complaint in this action and with Wang's motion to be lead plaintiff, respectively. Id. at ¶4. BGG also presented the lead plaintiff motion to Wang, explained its contents, addressed questions and concerns, provided comments to Lead Counsel and ensured that those comments were addressed in the filed motion. *Id.* BGG also presented the Amended Complaint, Second Amended Complaint, and Third Amended Complaint (collectively, the "Complaints") to each of Wang and Karimi, explained their contents, the reasons why Lead Counsel sought to file each of the Complaints, and addressed any questions or concerns. ¶5.

76.     BGG also presented to Wang and Karimi Lead Counsel's oppositions to Defendants' motion to transfer this action from the District of New Jersey to this Court and Defendants' motion to dismiss, explained the purpose of each opposition, its procedural role in the Action, and the effect the grant or denial of each motion would have on this Action, Plaintiffs' claims, and the claims of Settlement Class Members. *Id.* at ¶6

77.     Further, BGG explained Defendants' document requests to Plaintiffs and helped them search for responsive documents. *Id.* at ¶7. BGG also presented responses and objections to Defendants' requests to Plaintiffs, explained their purpose in the Action, and confirmed that the responses were accurate. *Id.*

78.     BGG also participated in deposition preparation sessions with Plaintiffs, and attended each deposition. *Id.* at ¶8. Finally, BGG also explained the purpose and potential outcomes of the mediation sessions to Plaintiffs and helped obtain their approvals of the settlement. *Id.* at ¶9.

79.     Attached hereto as Exhibit 3 is a schedule summarizing Lead Counsel's hours and lodestar.[4]

80.     The hourly rates for the attorneys and professional support staff are similar to the rates that have been accepted in other securities or shareholder litigation in this District in the context of a lodestar cross-check.   Additionally, the rates billed by Lead Counsel attorneys (ranging from $375-$580 per hour for non-partners and $660-$1,025 per hour for partners) are comparable to peer plaintiff and defense firms litigating matters of similar magnitude.   *See* Ex. 3 attached hereto (table of peer law firm billing rates).

81.     As set forth above and in detail in Exhibit 3, Lead Counsel expended a total of 5947.85 hours in the investigation and prosecution of the Action.  The resulting total lodestar is $3,335,503.50.  The requested fee amount of 33 1/3% of the Settlement Fund currently equals $8,750,000 (plus interest earned at the same rate as the Settlement Fund), and therefore represents a 2.62 multiplier of Lead Counsel's lodestar.

82.     Plaintiffs' Counsel will continue to work towards effectuating the Settlement in the

---

[4] Time expended in preparing the Fee and Expense Application has not been included.

event the Court grants final approval.  Among other things, Lead Counsel will continue working with the Claims Administrator to resolve issues with Settlement Class Member's claims, will respond to shareholder inquiries, will draft and file a motion for distribution, and will oversee the distribution process.  ***No additional compensation will be sought for this work, other than expenses incurred with respect to claims administration and any other necessary activities to conclude this matter.***

83.  As detailed above, throughout this litigation, Lead Counsel devoted substantial time to the prosecution of the Action.  Lead Counsel maintained control of, and monitored the work performed by, lawyers and other personnel on this case.  I personally devoted substantial time to this litigation and was personally involved in, among other things: (a) the investigation of the facts and applicable law; (b) drafting, reviewing and editing all pleadings, court filings, the meditation statement, and other correspondence prepared on behalf of Plaintiffs; (c) engaging with damages and loss causation experts; (d) conducting discussions with counsel for Defendants on a variety of matters; (e) serving and responding to various demands for the production of documents and interrogatories, engaging in meet and confers with respect to discovery requests, negotiating search terms for ESI, and proposing custodians, exchanging discovery deficiency letters and communications with Defendants; and (f) participating in settlement negotiations.

84.  Experienced attorneys at Lead Counsel and BGG were involved with drafting, reviewing and/or editing pleadings, court filings, and the mediation submissions, communicating with Plaintiffs, serving, responding to, and negotiating discovery, the mediation process, negotiating the terms of the Settlement, Term Sheet and Stipulation, and other matters.  More junior attorneys and paralegals also worked on matters appropriate to their skill and experience level.  Throughout the litigation, Plaintiffs' Counsel maintained an appropriate level of staffing

that avoided unnecessary duplication of effort and ensured the efficient prosecution of this litigation.

85.     Plaintiffs' Counsel's extensive efforts in the face of substantial risks and uncertainties have resulted in a significant recovery for the benefit of the Settlement Class.  In circumstances such as these, and in consideration of the hard work and the result achieved, I respectfully submit that the requested fee is reasonable and should be approved.

### 2.     The Magnitude and Complexity of the Action

86.     As detailed in the Fee and Expense Application, securities class action cases are known for their notorious complexity.  This case was no different.  As detailed above, this Action presented many novel and complex issues, including distinguishing the current circumstances from circumstances in  prior decisions holding that statements about a financial institution's internal controls were not actionable, identifying and investigating potential confidential witnesses who could testify about weaknesses and deficiencies in Deutsche Bank's internal controls and Know Your Customer protocols, drafting an amended complaint that would comply with the rigorous pleading standards of the PSLRA despite the PSLRA's automatic stay of discovery, and contesting a motion to dismiss drafted by Defendants' sophisticated and well-resourced counsel at Cahill Gordon & Reindel LLP.

87.     Additionally, the mediation and settlement process in this Action was hard-fought. The Parties zealously advocated their positions throughout the mediation process, including two days of mediation.

### 3.     The Significant Risks Borne By Plaintiffs' Counsel

88.     This prosecution was undertaken by Plaintiffs' Counsel on an entirely contingent-fee basis.  From the outset, there was no guarantee that Plaintiffs' Counsel would ever be compensated for the substantial investment of time and money the case would require.  In

undertaking that responsibility, Plaintiffs' Counsel were obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, that funds were available to compensate attorneys and staff, and that the considerable litigation costs required by a litigation like this one was covered. With an average lag time of many years for complex cases like this to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis. Indeed, Plaintiffs' Counsel received no compensation during the course of the Action and incurred $688,352.41 in out-of-pocket litigation-related expenses.

89.     Additionally, Plaintiffs alleged their claims without information gained through subpoena power, as Defendants would likely have argued that any attempt to do so would have been precluded by the PSLRA's automatic stay of discovery.

90.     Plaintiffs' Counsel also bore the risk that no recovery would be achieved. As discussed above, from the outset, this litigation presented multiple risks and uncertainties that could have prevented any recovery whatsoever.

91.     Moreover, despite the most vigorous and competent of efforts, success in contingent-fee litigation like this one is never assured. Plaintiffs' Counsel know from experience that the commencement of a class action does not guarantee a settlement. *See supra* ¶¶30-33. On the contrary, it takes hard work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint or win at trial, or to induce sophisticated defendants to engage in serious settlement negotiations at meaningful levels.

### 4.     The Quality of Representation, Including the Result Obtained, the Experience and Expertise of Lead Counsel, and the Standing and Caliber of Defendants' Counsel

92.     As demonstrated by the firm resumes of Pomerantz and BGG, attached hereto as Exhibits 5 and 6, Lead Counsel are highly experienced and skilled laws firms that focus their practices on securities class action litigation. Indeed, Lead Counsel have substantial experience in

litigating securities fraud class actions and have negotiated scores of other class settlements, which have been approved by courts throughout the country. Lead Counsel enjoys a well-deserved reputation for skill and success in the prosecution and favorable resolution of securities class actions and other complex civil matters. Lead Counsel's experience added valuable leverage in the settlement negotiations.

93.     Additionally, the quality of the work performed by Plaintiffs' Counsel in obtaining the Settlement should also be evaluated in light of the quality of the opposition. Here, the Defendants were represented by Cahill Gordon & Reindel LLP, a well-known international law firm that vigorously represented the interests of its clients throughout the Action. In the face of this experienced and formidable opposition, Plaintiffs' Counsel were able to develop a case that was sufficiently strong to nonetheless persuade Defendants to settle the case on terms that we believe are highly favorable to the Settlement Class.

### 5.     The Requested Fee In Relation to the Settlement

94.     The amount of the fee requested (33⅓%) in relation to the Settlement Amount ($8.75 million) is fair and reasonable. Courts routinely award fees of one-third in securities class action settlements. *See* Fee and Expense Application at § III.D; *see also* Ex. 7 (collecting cases).

### 6.     Interests of Public Policy, Including the Need to Ensure the Availability of Experienced Counsel in High-Risk Contingent Securities Cases

95.     Courts consistently recognize that it is in the public interest to have experienced and able counsel to enforce the securities laws and regulations pertaining to the duties of officers and directors of public companies. As recognized by Congress through the passage of the PSLRA, vigorous private enforcement of the federal securities laws can only occur if private investors take an active role in protecting the interests of shareholders. If this important public policy is to be carried out, the courts should award fees that adequately compensate plaintiffs' counsel in

consideration of the risks undertaken in prosecuting a particular securities class action. Relatedly, it is a long-recognized public policy that settlement is to be encouraged, including the resolution of fee applications that fairly and adequately compensate the counsel who bear the risks and dedicate the time, financial investment, and expertise necessary to achieve those settlements.

### 7. The Reaction of the Class Supports Class Counsel's Fee Request

96.    As noted above, as of December 27, 2022, 129,891 copies of the updated Postcard Notice and/or updated Notice have been disseminated advising Settlement Class Members that Lead Counsel would apply for an award of attorneys' fees in an amount not to exceed one-third of the Settlement Fund. Ewashko Decl. ¶¶9, 12, Ex. A (Postcard Notice); Ex. B (Notice); Ex. C (updated Postcard Notice); Ex. D (updated Notice). In addition, the Summary Notice has been published in *Investor's Business Daily* and transmitted over the *PR Newswire*. Ewashko Decl. at ¶10; Exs. E-F (confirmation of Summary Notice publications). To date, no objections to the maximum potential attorneys' fees request set forth in the Postcard Notice and Notice have been received or entered on this Court's docket. Any objections received after the date of this filing will be addressed in Lead Counsel's reply papers, set to be filed by January 24, 2023.

### 8. Plaintiffs Support Lead Counsel's Fee Request

97.    As set forth in their respective declarations submitted, Plaintiffs have concluded that Lead Counsel's requested fee is fair and reasonable based on the work performed, the recovery obtained for the Settlement Class, and the risks of the Action. *See* Ex. 8 ("Wang Decl.") ¶¶1-6; Ex. 9 ("Karimi Decl.") ¶¶1-6. Plaintiffs have been involved in the litigation and settlement of the Action, and their endorsement of Lead Counsel's fee request supports the reasonableness of the request and should be given weight in the Court's consideration of the fee award.

98.    In sum, Plaintiffs' Counsel accepted the Action on a fully contingent basis, committed significant resources, and prosecuted the Action without any compensation or

guarantee of success.  Based on the result obtained, the quality of the work performed, the litigation risks, and the contingent nature of the representation, Lead Counsel respectfully submit that a fee award of 33 1/3% of the Settlement Fund, resulting in a multiplier of 2.62, is fair and reasonable, and is supported by the fee awards courts have granted in other comparable cases.

### B.   Reimbursement of The Requested Litigation Expenses Is Fair And Reasonable

99.   Lead Counsel seeks a total $688,352.41 in out-of-pocket expenses reasonably and necessarily incurred by in connection with commencing, litigating, and settling the claims asserted in the Action. The following is a combined breakdown by category of all expenses incurred by Lead Counsel:

| CATEGORY OF EXPENSE | AMOUNT |
|---|---|
| CLERICAL OVERTIME | $1,142.25 |
| CLERK/COURT FILING FEES | $2,189.27 |
| COMPUTER RESEARCH | $10,180.57 |
| DEPOSITION TRANSCRIPTS | $10,739.60 |
| DISCOVERY DATABASE CHARGES | $11,916.00 |
| EXPERT FEES | $473,044.00 |
| INVESTIGATOR FEES | $91,218.62 |
| MEALS AND CONFERENCE | $1,161.65 |
| MEDIATOR FEES | $65,000.00 |
| PHOTOCOPYING | $2,010.55 |
| POSTAGE AND OVERNIGHT MAIL | $507.96 |
| PRESS RELEASES & NEWSWIRES | $3,995.54 |
| TRANSLATION SERVICES | $13,077.99 |
| TRAVEL | $2,168.41 |
| GRAND TOTAL | $688,352.41 |

100.   Although the Postcard Notice and Notice initially informed the Settlement Class that Lead Counsel intended to apply for reimbursement of expenses of up to $500,000 (Ewashko Decl. Ex. A, Ex. B at ¶¶5, 66), that number inadvertently underestimated the actual expenses incurred by Lead Counsel by $188,352.41.  This differential is attributable to expenses incurred by Plaintiffs' experts in connection with Plaintiffs' motion for class certification which were

inadvertently overlooked by Lead Counsel at the time that the initial Notice was published.  On December 21, 2022, Lead Counsel posted an updated Notice to the Settlement Website and mailed an updated Postcard Notice to the Class indicating that it would seek reimbursement of Litigation Expenses not to exceed $1,000,000. *Id.* at Ex. B, Ex. D at ¶¶5 & n.2, 66 & n.6),

101.    To date, no objection has been raised as to expenses.  If any objection to the request for reimbursement of Litigation Expenses is made after the date of this filing, Lead Counsel will address it in their reply papers.

102.    From the commencement of this Action, Lead Counsel understood that they might not recover their out-of-pocket expenses.  Lead Counsel also understood that, even assuming the case was ultimately successful, reimbursement for expenses would not compensate them for the contemporaneous lost use of funds advanced to prosecute the Action.  Accordingly, Lead Counsel were motivated to, and did, take steps to assure that only necessary expenses were incurred for the vigorous and efficient prosecution of the case.

103.    By far the largest component of expenses, $473,044, or approximately 68.50% of the total expenses, was expended on the retention of damages, loss causation, and market efficiency experts.  These experts were consulted at different points throughout the litigation, including on matters related to the preparation of the Complaint, negotiation of the Settlement, and the proposed Plan of Allocation. The vast majority of the expert expenses, however, were in connection with Plaintiffs' motion for class certification. Plaintiffs' Counsel incurred $456,739 in expenses in connection with obtaining an expert report in support of Plaintiffs' motion for class certification, preparing an expert for a deposition by Defendants' counsel and defending that deposition, and reviewing Defendants' opposition to class certification, which included a report from Defendants' expert.

104.     Another large component of expenses, $91,218.62, or approximately 13.2% of the total expenses, was expended on the retention of private investigators in connection with Lead Counsel's investigation.  Plaintiffs retained the investigatory services of a U.S.-based investigator, On Point Investigations, in addition to a Germany-based investigator, Paladin Associates.  The investigation included numerous fact interviews with former Deutsche Bank employees.  The use of investigators is necessary in securities class actions given the PSLRA's high pleading standard and automatic stay of discovery pending a court's resolution of a motion to dismiss.

105.     Additionally, Lead Counsel paid $65,000 in mediation fees, which is approximately 9.4% of the total expenses incurred.

106.     The other litigation expenses for which Lead Counsel seek reimbursement are types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour.  These litigation expenses included, among other things: (a) the use of online research databases to research many of the factual allegations alleged in the Complaint and to research and support Plaintiffs' legal arguments; (b) court costs; (c) service of process costs; (d) photocopying; and (e) postage and delivery expenses.

### C.     Awards for Lead Plaintiff and Named Plaintiff

107.     Finally, as stated above, Plaintiffs respectfully request PSLRA awards in the amount of $20,000 for Wang and $20,000 for Karimi pursuant to 15 U.S.C. § 78u-4(a)(4) for the reasonable costs directly incurred, including the time and effort expended by Wang and Karimi in connection with representing the Settlement Class.  *See* Wang Decl., ¶6; Karimi Decl., ¶6.  Based on the work performed by Plaintiffs for the benefit of the Settlement Class, I believe the awards are justified and appropriate.

108.     As set forth in her declaration, Wang participated in discussions concerning the prosecution of the Action, the strengths of and risks of the asserted claims, and potential settlement.

In particular, throughout the course of the Action, Wang (a) communicated with Plaintiffs' Counsel regarding the posture and progress of the case; (b) compiled her trading data and completed her certification in connection with her motion to be appointed Lead Plaintiff; (c) reviewed all of the significant pleadings and pre-motion letters filed in the Action; (d) searched her files for documents and produced documents in response to Defendants' discovery requests; (e) prepared and sat for a deposition; (f) consulted with Plaintiffs' Counsel regarding the settlement negotiations and mediation; and (g) evaluated and approved the proposed Settlement.

109.    As set forth in his declaration, Karimi participated in discussions concerning the prosecution of the Action, the strengths of and risks of the asserted claims, and potential settlement. Karimi Decl. ¶5. In particular, throughout the course of the Action, Karimi: (a) communicated with Plaintiffs' Counsel regarding the posture and progress of the case; (b) compiled his trading data and completed his certification in connection with the initial complaint in this Action; (c) reviewed all of the significant pleadings and pre-motion letters filed in the Action; (d) searched his files for documents and produced documents in response to Defendants' discovery requests; (e) prepared and sat for a deposition; (f) consulted with Plaintiffs' Counsel regarding the settlement negotiations and mediation; and (g) evaluated and approved the proposed Settlement.

110.    To date, no objections to the Litigation Expenses have been filed on the Court's docket.  In Lead Counsel's opinion, the Litigation Expenses incurred by Lead Counsel and Plaintiffs were reasonable and necessary to represent the Settlement Class and achieve the Settlement.  Accordingly, Lead Counsel respectfully submit that the Litigation Expenses should be reimbursed in full from the Settlement Fund.

## VII.    CONCLUSION

111.    In view of the significant recovery for the Settlement Class and the substantial risks of this Action, as described herein and in the accompanying Final Approval Memorandum, Lead

Counsel respectfully submit that the Settlement should be approved as fair, reasonable, and adequate and the proposed Plan of Allocation should be approved as fair and reasonable.  Lead Counsel further submit that the requested fee in the amount of 33 1/3% ($8,750,000) of the Settlement Fund should be approved as fair and reasonable, the request for reimbursement of $688,352.41 in Litigation Expenses, and Plaintiffs' request for $40,000 in PSLRA compensation in the amount of $20,000 for each of Lead Plaintiff and Named Plaintiff should also be approved.

I declare under penalty of perjury under the laws of the United States of America that the foregoing facts are true and correct.

Executed this 27th day of December 2022, at New York, New York.

*/s/ Emma Gilmore*
EMMA GILMORE

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was electronically filed with the Clerk of Court via the CM/ECF system, which will send Notice of such filing to all counsel of record.

Dated: December 27, 2022                */s/ Emma Gilmore*
                                        Emma Gilmore